# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH I. SCHORR and SUSAN SCHORR, in their own right and as personal representatives of the Estate of RYAN K. SCHORR, Plaintiffs, | : : : : : : | JURY TRIAL DEMANDED |
| v. | : : | NO.: 1:CV-01-0930 |
| WEST SHORE REGIONAL POLICE DEPARTMENT, HOWARD DOUGHERTY, CUMBERLAND COUNTY, and HOLY SPIRIT HOSPITAL, Defendants. | : : : : : : | HONORABLE YVETTE KANE |

FILED
HARRISBURG, PA

FEB 2 8 2003

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## DEFENDANT HOLY SPIRIT HOSPITAL'S MOTION
## FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

AND NOW, comes the Defendant, HOLY SPIRIT HOSPITAL, by and through its attorneys, Mette, Evans & Woodside, and files this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, and in support thereof avers as follows:

1.     Plaintiffs Keith I. Schorr and Susan Schorr, in their own right and as personal representatives of the Estate of Ryan K. Schorr ("the Defendant") commenced an action for damages and other relief arising from the death of the Decedent (their son) who, after a violent struggle with two police officers of the Defendant West Shore Regional Police Department, was fatally shot by one of the officers.

2.     Plaintiffs filed a Complaint on May 25, 2001 and a First Amended Complaint on August 2, 2001, naming Holy Spirit Hospital as a Defendant.

3.     Holy Spirit Hospital is a facility that provides certain mental health treatment and "crisis intervention" services pursuant to an Agreement with Cumberland County, Pennsylvania.

4.     The First Amended Complaint contains four counts against Defendant Holy Spirit Hospital: Count II is brought pursuant to 42 U.S.C. §1983 and alleges violation of the Fourteenth Amendment of the United States Constitution; Count III is a pendent state law claim that alleges negligence; Count VI is a derivative claim brought under Pennsylvania's survival statute; and Count VII is a derivative claim brought under Pennsylvania's Wrongful Death Act.

-2-

## PENNSYLVANIA MENTAL HEALTH ACT IMMUNITY

5.    Count III of Plaintiffs' First Amended Complaint is a pendent state law claim for negligence.

6.    In paragraphs 53 and 54 of Count III of the First Amended Complaint, Plaintiffs allege ordinary "negligence" against Holy Spirit Hospital:

> 53.    Plaintiffs' decedent was injured and died as a result of the *negligence* and/or gross negligence of Holy Spirit and its employees, agents and servants, all of whom acted within the course and scope of their employment, agency or service.
>
> 54.    Said *negligence* included, but was not limited to:
>
> a.    Failure to train staff and physicians properly;
>
> b.    Failure to provide adequate security at the Hospital's Crisis Intervention Unit;
>
> c.    Failure to design, provide or maintain a proper facility for the detention, evaluation and/or treatment of mentally ill persons subject to involuntary commitment procedures;
>
> d.    Failure to provide proper diagnosis, evaluation and treatment to Ryan Schorr.

7.    The Pennsylvania Mental Health Procedures Act, 50 P.S. §7101 *et seq.* [hereinafter "MHPA"] provides individuals and institutions charged with

-3-

treating the mentally ill with immunity from criminal and civil liability for their decisions pertaining to the care and treatment of mentally ill patients.

8.    The Pennsylvania Supreme Court has held that a hospital falls within the scope of this Act and is protected by the immunity conferred under the MHPA. Farago v. Sacred Heart General Hospital, 522 Pa. 410, 562 A.2d 300 (1989).

9.    The MHPA provides that psychiatrists, mental health workers, and institutions such as Holy Spirit cannot be held liable absent a showing that their conduct rose to the level of "willful misconduct" or "gross negligence." 50 P.S. §7144.

10.    The MHPA does not define the term "gross negligence," but the Pennsylvania Superior Court has held that the "gross negligence" standard is a difficult one to overcome, requiring a Plaintiff to address facts which indicate conduct significantly more egregious than ordinary negligence:

> We hold that the legislature intended the term "gross negligence" to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity or indifference. The behavior of the Defendant must be flagrant, grossly deviating from the ordinary standard of care.

Bloom v. Dubois Regional Medical Center, 409 Pa. Super. 83, 98-99, 597 A.2d 671, 679 (1991).

-4-

11.    In this Court's December 4, 2001 Memorandum and Order, the

Honorable Yvette Kane wrote: "Indeed, Plaintiffs concede that they must prove

willful misconduct or gross negligence for items [54] (a) and (d) [in Count III of

the First Amended Complaint] in the above list because those were *treatment*

decisions." See Memorandum and Order dated December 4, 2001, pp. 3-4

(emphasis added).

12.    Plaintiffs' allegations in subparagraphs 54(b) and 54(c) quoted above,

although couched in terms of "security" and "design" issues actually involve the

issue of the supervision of the Decedent while he was at Holy Spirit Hospital.

13.    "*Treatment* as defined by Sections 104 and 107 of the MHPA fully

encompasses decisions to 'maintain decent, safe and healthful living conditions,'

50 P.S. §7104, and the need 'to impose the least restrictive alternative consistent

with affording the person adequate treatment for his condition.' 50 P.S. §7107."

Holland v. Commonwealth, Norristown State Hospital, 136 Pa. Commw. 655,

661-662, 584 A.2d 1056, 1058 (1990) (emphasis added).

14.    Moreover, the Pennsylvania Commonwealth Court has held that

"decisions made concerning the supervision of the patient fall with[in] the

definition of *treatment* in the MHPA." Holland v. Commonwealth, Norristown

-5-

State Hospital, 136 Pa. Commw. at 662, 584 A.2d at 1058 (emphasis added). See also Farago v. Sacred Heart General Hospital, 522 Pa. 410, 562 A.2d 300 (1989).

15.    In the instant case, Dr. David Spurrier of Holy Spirit Hospital performed an assessment of the Decedent and, together with other hospital staff, including a crisis intervention worker, determined to allow the Decedent to remain unsupervised in Room 17 of the Emergency Department without physical restraints. See, Exhibit "A", Written Statement of David J. Spurrier, M.D.

16.    Therefore, Holy Spirit's decision regarding supervision of the Decedent was a "treatment decision" and in order to establish Plaintiffs' allegations in not only subparagraphs 54(a) and 54(d), but also in 54(b) and 54(c), Plaintiffs must prove willful misconduct or gross negligence and Plaintiffs' ordinary negligence claims should be dismissed with prejudice.

17.    Significantly, Plaintiffs' counsel, Gerald J. Williams, Esquire, admitted in a letter to Plaintiffs' expert, Ira S. Somerson, that Plaintiffs would have to prove "gross negligence" in order to recover against Holy Spirit Hospital. This letter was attached to the Transcript of the Deposition of Ira S. Somerson as "Somerson - Exhibit 6", and states:

-6-

> As you know, the burden of proof we must meet with
> respect to our claims against the hospital is that it was
> "grossly negligent."

See Exhibit "B", Transcript of Deposition of Ira S. Somerson (plus exhibit

attached thereto).

18.    Therefore, it is clear that the MHPA provides immunity for Holy

Spirit Hospital from claims for ordinary negligence.

19.    The Plaintiffs' claims against Holy Spirit Hospital for ordinary

negligence, including those in Count III and particularly in subparagraphs 53 and

54(a)-(d) should be dismissed with prejudice.

## NO FILIAL CONSORTIUM UNDER PENNSYLVANIA LAW

20.    In Count VII of the First Amended Complaint, Plaintiffs bring a

derivative claim under Pennsylvania's Wrongful Death Act.

21.    In paragraph 73 of Count VII Plaintiffs plead as follows:

> 73.    Plaintiffs claims [sic] damages for the harms and
> injuries averred in Paragraph 35, above, pursuant
> to Pennsylvania's Wrongful Death Act, 42 P.S.
> §8301.

See First Amended Complaint, paragraph 73.

22.    In paragraphs 35 and 36 of the First Amended Complaint, Plaintiffs

plead as follows:

-7-

35.  As a result of Ryan Schorr's death, his estate and heirs suffered pecuniary losses, incurred medical and funeral expenses, and suffered the *deprivation of his aid, assistance, services, maintenance* and the economic value of his life during the remainder of his life expectancy.

36.  As a further result of Ryan Schorr's death, Plaintiffs, his parents, suffered a deprivation of their constitutionally protected interest in his life, including *their interest in his companionship and support*.

<u>See</u> First Amended Complaint, paragraphs 35 and 36 (emphasis added).

23.  Under Pennsylvania law, wrongful death damages are to compensate spouse, children, or parents of the deceased for <u>pecuniary</u> loss they have sustained by denial of future contributions the deceased would have made in his lifetime, and also to allow recovery for certain administration, funeral and medical expenses. <u>Burkett v. George</u>, 118 Pa. Commw. 543, 545 A.2d 985 (1988).

24.  However, in paragraphs 35 and 36, quoted above and incorporated into/referred to in paragraph 73 of Count VII of the First Amended Complaint, Plaintiffs bring a loss of filial consortium claim.

25.  Pennsylvania appellate court case law limits loss of consortium claims to spouses. <u>Huda v. Kirk</u>, 122 Pa. Commw. 129, 551 A.2d 637 (1988), *allocatur denied*, 524 Pa. 613, 569 A.2d 1371 (1989).

-8-

26.    For example, in <u>Jackson v. Tastykake, Inc.</u> 437 Pa. Super. 34, 648 A.2d 1214 (1994), the Pennsylvania Superior Court sustained the Defendant's preliminary objections seeking dismissal of the Plaintiff parents' claims for loss of companionship, comfort and society of their child.

27.    Therefore, Plaintiffs' claims in Paragraphs 35 and 36, and as incorporated into/referred to in paragraph 73, for the loss of consortium of their deceased child should be dismissed for failure to state a claim upon which relief may be granted.

## HOLY SPIRIT HOSPITAL IS NOT A STATE ACTOR IN THE INVOLUNTARY COMMITMENT CONTEXT PURSUANT TO *JANICSKO*

28.    Count II of the First Amended Complaint alleges a claim pursuant to 42 U.S.C. §1983, claiming that Holy Spirit Hospital's conduct pursuant to the involuntary commitment procedures of §302 of the MHPA violated the rights of the Plaintiffs and the Decedent under the Fourteenth Amendment and federal law. See First Amended Complaint, Count II.

29.    In order to prevail in a §1983 action, a Plaintiff must establish (1) that "the conduct complained of was committed by a person acting under color of state law" and (2) that the "conduct deprived a person of rights, privileges or

-9-

immunities secured by the Constitution or laws of the United States." <u>Shaw by Strain v. Strackhouse</u>, 920 F.2d 1135, 1141-1142 (3d Cir. 1990), *citing* <u>Parratt v. Taylor</u>, 451 U.S. 527, 535, 101 S. Ct. 1908, 1912, 68 L.Ed. 2d 420 (1981).

30.     In the First Amended Complaint, Plaintiffs allege in a conclusory fashion that Holy Spirit Hospital's "acts material to this claim" "were done under color and authority of state law." <u>See</u> First Amended Complaint, paragraph 49.

31.     However, this Court has held in <u>Janicsko v. Pellman</u>, 774 F. Supp. 331 (M.D. Pa. 1991) that the involuntary commitment of the mentally ill by private physicians and hospitals under the MHPA is not "a function compelled by or sufficiently connected to state directives to attribute those actions to the state." <u>Janicsko v. Pellman</u>, 774 F. Supp. 331, 339 (M.D. Pa. 1991).

32.     In <u>Janicsko</u>, the Honorable Sylvia Rambo held that a woman who was involuntarily committed to Holy Spirit Hospital pursuant to the MHPA had no §1983 claim against the hospital or physicians that participated in the involuntary commitment because it was not a function compelled by or sufficiently connected to state directives to attribute those actions to the state.

33.     Judge Rambo further held in <u>Janicsko</u> that Holy Spirit Hospital and two Defendant physicians were not "state actors" for purposes of §1983 claims

-10-

based on their conduct pursuant to the state's involuntary commitment statute.
See also S.P. v. City of Takoma Park, 134 F.3d 260 (4th Cir. 1998) (citing and
referring to Janicsko with approval).

34.    Therefore, pursuant to this Court's holding in Janicsko, Holy Spirit
Hospital is not a state actor for §1983 purposes.

35.    Consequently, Plaintiffs' §1983 claims in Count II of the First
Amended Complaint should be dismissed for failure to state a claim upon which
relief may be granted.

36.    Even if, *arguendo*, Holy Spirit Hospital could be considered a state
actor in the involuntary commitment context (which pursuant to Janicsko it clearly
cannot), Plaintiffs have failed to establish that Holy Spirit Hospital, through its
customs, practices and/or policies, acted with "deliberate indifference."

37.    Plaintiffs allege that Holy Spirit Hospital acted with "deliberate
indifference" in three areas: (1) employment of health care providers who would
provide treatment to persons detained under §302; (2) training of physicians, crisis
intervention workers, nurses and other personnel who would treat persons
detained under §302; and (3) maintenance of adequate crisis intervention facilities
and staff.

-11-

38.    With regard to employment of persons qualified to provide treatment and care to persons detained under §302, Holy Spirit Hospital employed qualified persons at all times relevant to the events alleged in the First Amended Complaint: Carol Joerger, R.N. had worked eleven years as a nurse in the emergency room (See Transcript of Deposition of Carol Joerger, page 9, lines 7-9). Security Guard Cory Graby testified that he had been a security officer at Holy Spirit for five and one-half years and had three years of college (See Exhibit "D", Transcript of Deposition of Cory Grahy, page 6). Candice Highfield was a part-time crisis worker, and a clinical social worker who was "aware of the mental health procedures and law" (See Exhibit "E", Transcript of Deposition of Candice Highfield, page 6). Steve Bucciferro had served nine years as administrative director of Mental Health Services (See Exhibit "F", Transcript of Deposition of Steve Bucciferro, page 5) and had twenty-two years experience in healthcare (See Exhibit "F", page 7) (See page 7 of Exhibit "F" for more details). Mercedes Briscese, a part-time crisis worker, had earned her Master's degree in counseling in 1982 and had experience in working with the Capable Adolescent Mothers Program and the Superior Court in New Jersey. (See Exhibit "G", Transcript of Deposition of Mercedes Briscese, page 8, lines 1-10). She also received training

-12-

in crisis work when she began to work for Holy Spirit Hospital. (See Exhibit "G", page 8, lines 20-25; page 9, lines 1-5).

39.   Also, with regard to employment of persons qualified to provide treatment and care to persons detained under §302, Steve Bucciferro, administrative director of mental health services, described the training and educational requirements for professional staff who provide Crisis Intervention services. See Exhibit "F", pages 17-19.

40.   Bucciferro pointed out that "[t]he professional staff members who provide Crisis Intervention services have to have a minimum of a bachelor's degree training, whether it be in a psychosocial service background, they have to have at least a bachelor's degree." See Exhibit "F", page 17, lines 22-25; page 18, lines 1-4. He also stateed that:

> RNs, registered nurses, have provided Crisis Intervention
> services in the past as well, because they've been trained
> in psychiatric nursing.  So we have had RNs.  Now, with
> a minimum educational background, then it's a matter of
> how much training they may have had elsewhere,
> experience elsewhere working in either a psychiatric or
> mental health setting or behavioral health setting,
> whether it be in drug and alcohol or in other types of
> counseling centers or experience in that way.  That helps
> in terms of being able to hire that person.  If they come
> with a degree and training but may not have a lot of
> training with the Crisis, then they'll be trained more here

-13-

> at Holy Spirit with the supervisor and the other crisis workers. So there's a minimum educational and then it depends on the type of experience – working experience they have. That's all taken into account before they're hired.

See Exhibit "F", page 18, lines 6-25; page 19, lines 1-3.

41.    Bucciferro also discussed the types of providers who do Crisis Intervention work at Holy Spirit:

> There's no specific title or type of ... provider that would do Crisis. It's more of a general behavioral health specialist professional of a bachelor's level or higher. They may have a Masters Degree or they may have more of a postgraduate degree, but they are behavioral health specialists or behavioral health generalists more so. An RN is a specific category of someone who is a registered nurse. You might have a counselor, you might have an DNA expert, someone who's gone to school and got a masters in social work is a crisis worker so there's no specific category other than just a generalist and behavioral health or mental health.

See Exhibit "F", page 22, lines 19-25, page 23, lines 1-10.

42.    Bucciferro also pointed out that Holy Spirit Hospital employs psychiatrists who would have as part of their duties to assist in evaluation of individuals brought in on a §302 involuntary commitment:

> Psychiatrists are employed at Holy Spirit Hospital to work within the mental health center, specifically holding positions or duties that we need to provide

-14-

service. We have adult psychiatrists who work in our
inpatient unit, also work in our outpatient clinic and
program providing outpatient services. We have child
and adolescent psychiatrists who are hired to provide
inpatient service and outpatient services to children and
adolescents. We have psychiatrists who function as
medical director of the mental health center and we have
a psychiatrist who works as our clinical director for
child/adolescent services. ... [A]ll psychiatrists and staff
that have responsibility to be on-call and to respond to
the emergency room may be involved with doing a 302
assessment.

(See Exhibit "F", page 19, lines 17-25, page 20, lines 1-8; page 21, lines 18-21).

43.   With regard to training people to provide treatment and care pursuant

to persons detained under §302, security officer Cory Graby received training in

Act 235 (weapons certification in Pennsylvania) and in red alert training, which

involves assisting in subduing a combative patient (See Exhibit "D", Transcript of

Deposition of Cory Graby, page 7, lines 22-25; page 8, line 1; page 19, lines 6-

10). Cory Graby also has certification in IAHSS (See Exhibit "H", page 8, lines 2-

5). Charles Sterling, security manager at Holy Spirit Hospital, discussed training

that hospital security personnel undertake (See Exhibit "H", pages 33-37). The

training includes an initial hospital orientation (See Exhibit "H", page 33, lines

14-15); red alert training on how to deal with aggressive individuals (See Exhibit

"H", page 33, lines 18-25; page 34, lines 1-5); the basic and the advanced security

-15-

officer course offered by the Society of Healthcare Safety and Security (See Exhibit "H", lines 11-17); and violence in the workplace training (Exhibit "H", page 34 lines 19-20).

44.    With regard to adequate crisis intervention facilities, Carol Joerger, R.N., who had eleven years experience in the emergency department, testified that Room 17, where the Decedent had been placed, was one of the seclusion rooms in the emergency room (See Exhibit "C", page 14, lines 11-13).  The door to Room 17 was closed and was locked "as far as the inside person [the Decedent] was concerned" at the time of the events alleged in the First Amended Complaint (See Exhibit "D", p. 24, lines 4-11).  Also, the door in Room 17 has an observation window from which healthcare providers and crisis workers can observe the patient within.  (See Exhibit "E", p. 17, lines 11-14.)  Carol Joerger, R.N. also testified that the usual §302 commitment procedure involved using Room 17, the secured room.  (See Exhibit "C", p. 21, lines 7-12.)

45.    With regard to allegations regarding "adequate" staffing, paragraphs 38 to 43 (above) are incorporated herein by reference to show the adequacy of the staff's training, education and experience.

46.    Therefore, as demonstrated by the above-cited evidence of record, Holy Spirit Hospital did not show deliberate indifference with regard to customs, policies or procedures regarding employing and training physicians and other healthcare providers who would be providing treatment to §302 detainees; nor did the hospital show deliberate indifference in the maintenance of adequate crisis intervention staff and facilities.

47.    For these reasons and pursuant to this Court's prior ruling in Janicsko, Count II of the First Amended Complaint, alleging violation of 42 U.S.C. §1983, should be dismissed with prejudice.

## HOLY SPIRIT HOSPITAL'S CONDUCT DOES NOT RISE TO THE LEVEL OF "GROSS NEGLIGENCE"

48.    As stated previously, the Pennsylvania Mental Health Procedures Act, 50 P.S. §7101, *et seq*. ["MHPA"] provides that psychiatrists and other mental health workers cannot be held liable absent a showing that their conduct rose to the level of "willful misconduct" or "gross negligence."  50 P.S. §7114.

49.    The MHPA does not define the term "gross negligence," but the Pennsylvania Superior Court has held that the "gross negligence" standard is a

-17-

difficult one to overcome, requiring a plaintiff to address facts which indicate

conduct significantly more egregious than ordinary negligence:

> We hold that the legislature intended the term "gross
> negligence" to mean a form of negligence where the
> facts support substantially more than ordinary
> carelessness, inadvertence, laxity or indifference. The
> behavior of the defendant must be flagrant, grossly
> deviating from the ordinary standard of care.

Bloom v. Dubois Regional Medical Center, 409 Pa. Super. 83, 98-99, 597 A.2d

671, 679 (1991).

    50.    In the instant case, the facts of record reveal that no triable issue of

material fact has been raised which would tend to prove that Holy Spirit Hospital's

care and treatment of Plaintiffs' Decedent constituted "gross negligence" under

the MHPA.

    51.    Therefore, Plaintiffs' claims of gross negligence against Holy Spirit

Hospital should be dismissed with prejudice.

    WHEREFORE, Holy Spirit Hospital respectfully requests that this

Honorable Court enter an Order granting its Motion for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56 such that Plaintiffs' claims under

-18-

42 U.S.C. §1983, and Plaintiffs' claims of ordinary negligence, gross negligence and filial consortium are dismissed with prejudice.

Respectfully submitted,

**METTE, EVANS & WOODSIDE**

By: _____

John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 N. Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000
Attorneys for Defendant Holy Spirit
Hospital and Cumberland County

DATED: February 28, 2003

-19-

## CERTIFICATE OF NONCONCURRENCE

I, JOHN F. YANINEK, ESQUIRE, counsel for the Defendant Holy Spirit

Hospital, called Stephen S. Pennington, Esquire, counsel for the Plaintiffs, in February,

2003 and he does not concur with the Motion for Summary Judgment of the Defendant

Holy Spirit Hospital Pursuant to Fed. R. Civ. P. 56.

John F. Yaninek

DATE: February 28, 2003

:313404 _1

## CERTIFICATE OF SERVICE

I, JOHN F. YANINEK, ESQUIRE, hereby certify that I am serving a copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure, by depositing a copy of same in the United States Mail at Harrisburg, Pennsylvania, with first-class postage, prepaid, as follows:

Gerald J. Williams, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1895

David J. MacMain, Esquire
Mongtomery, McCracken,
Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Stephen S. Pennington, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban
1617 JFK Boulevard
 Station Suite 800
Philadelphia PA 19103

METTE, EVANS & WOODSIDE

By: _____
John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000

Attorneys for Defendants Holy Spirit
Hospital and Cumberland County

Date: February 28, 2003