# ORIGINAL

**FILED**
HARRISBURG, PA

FEB 2 8 2003

MARY E. D'ANDREA, **CLERK**
Per _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH I. SCHORR and SUSAN SCHORR, in their own right and as personal representatives of the Estate of RYAN K. SCHORR,<br>Plaintiffs, | : <br> : <br> : <br> : <br> : <br> : | JURY TRIAL DEMANDED |
| v. | : <br> : | NO.:  1:CV-01-0930 |
| WEST SHORE REGIONAL POLICE DEPARTMENT, HOWARD DOUGHERTY, CUMBERLAND COUNTY, and HOLY SPIRIT HOSPITAL,<br>Defendants. | : <br> : <br> : <br> : <br> : <br> : | HONORABLE YVETTE KANE |

## DEFENDANT CUMBERLAND COUNTY'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

I.    PROCEDURAL HISTORY

On August 2, 2001, Plaintiffs, Keith I. Schorr and Susan Schorr

("Plaintiffs") filed a First Amended Complaint against Cumberland County and

other defendants on behalf of their deceased son, Ryan K. Schorr ("Decedent").

The First Amended Complaint had seven Counts.  Defendant Cumberland County

filed a 12(b)(6) Motion.  Subsequently, Plaintiffs withdrew all Counts against

Cumberland County, except Count II which alleges a violation of 42 U.S.C.

§1983.

Cumberland County has filed a Motion for Summary Judgment related to

the final remaining Count against it in this suit.  This Brief is submitted in support

of that Motion.

II.    STATEMENT OF THE FACTS

This action arises out of the death of Plaintiffs' son, Ryan K. Schorr, as a

result of an incident that occurred on November 18, 2000.  See First Amended

Complaint, paragraphs 1, 5 an 17.  The Decedent suffered from a psychiatric

illness known as bipolar (manic) disorder.  See First Amended Complaint,

paragraph 12.  Shortly before November 18, 2000, the Decedent's mental state

allegedly deteriorated.  See First Amended Complaint, paragraph 15.  With the

Plaintiffs' approval, the Decedent's housemate, Matthew Gaumer, requested that

an order be issued for the Decedent's involuntary commitment pursuant to §302 of

the Pennsylvania Mental Health Procedures Act, 50 P.S. §7302.  See First

Amended Complaint, paragraph 17. Grand Jury Report at 8-9.[1] (The Grand Jury Report has been previously filed as an exhibit to Defendant West Shore Regional Police Department's 12(b)(6) Motion.

A crisis intervention worker at Holy Spirit Hospital evaluated the application, determined that the Decedent presented a clear and present danger to himself or others, and caused an order to be issued for the Decedent's involuntary commitment. See First Amended Complaint, paragraph 19; Grand Jury Report at 9. After obtaining the order and corresponding warrant, Officers Gary Berresford and Harry Hart of the West Shore Regional Police Department went to Decedent's house and transported him to Holy Spirit Hospital. See First Amended Complaint, paragraph 21; Grand Jury Report at 11.

At Holy Spirit Hospital, the officers were instructed to take the Decedent to Room 17 in the Emergency Department ("ED"). Grand Jury Report at 11. Room

---

[1] It is well settled that [in ruling on a motion to dismiss,] a district court may take judicial notice of matters of public record without converting the motion into one for summary judgment. Pension Benefit Guar. Corp. v. White Consol. Indus. Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); Anderson v. Simon, 217 F.3d 472, 474-75 (7th Cir. 2000) cert. denied, 531 U.S. 1073 (2001). Since the Grand Jury Report has been "filed as a public record with the Court of Common Pleas of Cumberland County," this Court can consider it for purposes of ruling on the instant motion. See Grand Jury Report, at 1. A copy of the Grand Jury is attached to the Motion as Exhibit "B."

3

17 in the ED of Holy Spirit Hospital is a specially adapted room used for patients

that present a potential security risk. Grand Jury Report at 11. It is equipped with

minimal furniture that is bolted to the floor and with a door that locks from outside

whenever the door is closed. Grand Jury Report at 11. The door to Room 17 also

has an observation window from which healthcare providers and crisis workers

can observe the patient within. (See Exhibit "E, " Deposition Transcript of

Candice Highfield, p. 17, lines 11-14). The usual §302 commitment procedure

involved using Room 17. (See Exhibit "C," Deposition Transcript of Carol

Joerger, R.N., p. 21, lines 7-12).

The Decedent became increasingly agitated and the ED charge nurse, Carol

Joerger, called security for assistance. Grand Jury Report at 11-12. Security

officer, Cory Graby, arrived shortly thereafter. Grand Jury Report at 11-12. This

is a standard practice during a §302 mental health intake. Grand Jury Report at

11-12.

Afterward, Nurse Joerger attempted to conduct an initial medical

assessment of the Decedent. Grand Jury Report at 12. Crisis Worker Candice

Highfield telephoned the Decedent's mother to get more background information

for the assessment. Grand Jury Report at 12. Emergency Department Dr. David

Spurrier then assessed the Decedent. Grand Jury Report at 12. Dr. Spurrier then

4

left the room and completed the §302 paperwork for the involuntary committal

because, in his opinion, the Decedent was psychotic and hallucinatory. Grand

Jury Report at 13. Dr. Spurrier and crisis worker Highfield then discussed the

Decedent's status, and Dr. Spurrier told her he would administer medication to the

Decedent anytime that Highfield felt it necessary. Grand Jury Report at 13.

Highfield replied that first she wanted to read the Decedent his §302 rights. Grand

Jury Report at 13. She went to the door of Room 17, looked through the

observation window, and saw the Decedent sitting on the bed. Grand Jury Report

at 13. However, as she attempted to enter the room, the Decedent forced his way

past her and ran out of the hospital. See First Amended Complaint, paragraph 23;

Grand Jury Report at 13.

Eventually, the Decedent returned to his house. See First Amended

Complaint, paragraph 24. After being notified of the Decedent's whereabouts, the

West Shore Regional Police Department ("WSRPD") officers returned to the

Decedent's house and again attempted to take him into custody. See First

Amended Complaint, paragraphs 25 and 29. The subsequent encounter escalated

into a physical struggle between the Decedent and the WSRPD officers, during

which the Decedent was fatally wounded by one of the officers. See First

Amended Complaint, paragraph 33.

5

III.   STATEMENT OF QUESTIONS PRESENTED

**SHOULD CUMBERLAND COUNTY'S MOTION FOR SUMMARY JUDGMENT BE GRANTED AND PLAINTIFFS' CLAIMS PURSUANT TO 42 U.S.C. §1983 BE DISMISSED WITH PREJUDICE?**

Suggested Answer:        **Yes.**

IV.   ARGUMENT

**Cumberland County's Motion for Summary Judgment should be granted and Plaintiffs' 42 U.S.C. §1983 claim should be dismissed with prejudice.**

Summary judgment is properly granted if, taking the non-moving party's allegations as true in drawing all inferences in its favor, the court is convinced from its review of the evidence that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(b); Scott v. Plante, 532 F.2d 939, 940 (3rd. Cir. 1976).  An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The facts must be viewed in the light most favorable to the non-moving party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party.  Tyro

6

Industries, Inc. v. Trevose Construction Company, Inc., 737 F. Supp. 856, 861

(E.D. Pa. 1990).

However, if evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted.  Anderson, 106 S. Ct. at 2511.  Where the

record, taken as a whole, could not "lead a rationale trier of fact to find for the

nonmoving party, summary judgment is proper."  Matsushita Lec. Indus.

Company v. Zenith Radio, 475 U.S. 574, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538

(1986).

In Count II of Plaintiffs' First Amended Complaint, Plaintiffs allege that

Cumberland County violated Decedent's rights pursuant to 42 U.S.C. §1983.  42

U.S.C. §1983 provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom or usage, of any State . . . subjects or
> causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity or in
> other proper proceeding for redress.

The constitutional rights at issue with regard to detainees were set forth in

Estelle v. Gamble, 429 U.S. 97 (1976) in which the United States Supreme Court

stated:

7

> Deliberate indifference to the serious medical needs of
> prisoners constitutes the 'unnecessary and wanton
> infliction of pain' proscribed by the Eighth Amendment.

The <u>Estelle</u> standard is applied where the adequacy of medical care is questioned

pursuant to 42 U.S.C. §1983 under both Eighth and Fourteenth Amendment

theories. <u>Unterberg v. Correctional Medical Systems, Inc.</u>, 799 F. Supp. 490, 494

N.3 (E.D. Pa. 1992). Under this standard, however, a municipality or county may

not be liable in a §1983 action under the doctrine of *respondeat superior*. <u>Monell</u>

<u>v. Department of Social Services</u>, 436 U.S. 658 (1978).

Here, Plaintiffs, in their First Amended Complaint, have pled in paragraph

50 various alleged customs, practices and polices allegedly implemented and

maintained by Cumberland County with deliberate indifference.

> 50.    Said customs, practices and/or policies including,
>        but not limited to:
>
>        a.    Failure to employ physicians or other
>              healthcare providers qualified to provide
>              emergency treatment to persons detained
>              under §302 of the Mental Health Procedures
>              Act;
>
>        b.    Failure to train physicians, crisis
>              intervention workers and other personnel
>              with respect to the proper evaluation,
>              security, restraint and/or treatment of
>              persons detained under §302 of the Mental
>              Health Procedures Act;

8

c.   Failure to train crisis intervention workers, nurses, and other personnel with respect to communication to police officers, family members and patients with respect to the condition and mental state of patients subject to §302 procedures, including those who have "escaped," in order to avoid creating or increasing the foreseeable danger of harm to persons similarly situated as Ryan Schorr;

d.   Failure to maintain adequate crisis intervention facilities and staff.

Cumberland County contracted with Holy Spirit Hospital to provide certain crisis intervention services within Cumberland County, Pennsylvania. By doing so, Cumberland County attended to the needs of mentally ill and emotionally disturbed persons.

Cumberland County's decision to contract with Holy Spirit Hospital for the various physicians and other health care providers who gave treatment to Decedent under §302 of the Mental Health Procedures Act demonstrates that the County attended to the needs of mentally ill and emotionally disturbed persons and did not act with deliberate indifference toward them.

The record shows that Holy Spirit Hospital was adequately staffed with physicians and other health care providers well qualified to provide emergency treatment and crisis intervention services. For example, Carol Joerger, R.N. had

9

worked eleven years as a nurse in the emergency room (See Transcript of

Deposition of Carol Joerger, page 9, lines 7-9).  Security Guard Cory Graby

testified that he had been a security officer at Holy Spirit for five and one-half

years and had three years of college.  (See Exhibit "D", Transcript of Deposition

of Cory Graby, page 6).  Candice Highfield was a part-time crisis worker, and a

clinical social worker who was "aware of the mental health procedures and law"

(See Exhibit "E", Transcript of Deposition of Candice Highfield, page 6).  Steve

Bucciferro had served nine years as administrative director of Mental Health

Services (See Exhibit "F", Transcript of Deposition of Steve Bucciferro, page 5)

and had twenty-two years experience in healthcare (See Exhibit "F", page 7) (See

page 7 of Exhibit "F" for more details).  Mercedes Briscese, a part-time crisis

worker, had earned her Master's degree in counseling in 1982 and had experience

in working with the Capable Adolescent Mothers Program and the Superior Court

in New Jersey.  (See Exhibit "G", Transcript of Deposition of Mercedes Briscese,

page 8, lines 1-10).  She also received training in crisis work when she began to

work for Holy Spirit Hospital.  (See Exhibit "G", page 8, lines 20-25; page 9, lines

1-5).

Also, Steve Bucciferro, administrative director of Mental Health Services,

described the training and educational requirements for professional staff who

provide crisis intervention services.  See Exhibit "F", pages 17-19.  Bucciferro

pointed out that "[t]he professional staff members who provide Crisis Intervention

services have to have a minimum of a bachelor's degree training, whether it be in

a psychosocial service background, they have to have at least a bachelor's

degree."  See Exhibit "F", page 17, lines 22-25; page 18, lines 1-4.  He also stated

that:

> RNs, registered nurses, have provided Crisis Intervention
> services in the past as well, because they've been trained
> in psychiatric nursing.  So we have had RNs.  Now, with
> a minimum educational background, then it's a matter of
> how much training they may have had elsewhere,
> experience elsewhere working in either a psychiatric or
> mental health setting or behavioral health setting,
> whether it be in drug and alcohol or in other types of
> counseling centers or experience in that way.  That helps
> in terms of being able to hire that person.  If they come
> with a degree and training but may not have a lot of
> training with the Crisis, then they'll be trained more here
> at Holy Spirit with the supervisor and the other crisis
> workers.  So there's a minimum educational and then it
> depends on the type of experience – working experience
> they have.  That's all taken into account before they're
> hired.

See Exhibit "F", page 18, lines 6-25; page 19, lines 1-3.

Bucciferro also discussed the types of providers who do Crisis Intervention work at Holy Spirit:

> There's no specific title or type of . . . provider that
> would do Crisis. It's more of a general behavioral health
> specialist professional of a bachelor's level or higher.
> They may have a Masters Degree or they may have more
> of a postgraduate degree, but they are behavioral health
> specialists or behavioral health generalists more so. An
> RN is a specific category of someone who is a registered
> nurse. You might have a counselor, you might have an
> DNA expert, someone who's gone to school and got a
> masters in social work is a crisis worker so there's no
> specific category other than just a generalist and
> behavioral health or mental health.

See Exhibit "F", page 22, lines 19-25; page 23, lines 1-10.

Bucciferro also pointed out that Holy Spirit Hospital employs psychiatrists who would have as part of their duties to assist in evaluation of individuals brought in on a §302 involuntary commitment:

> Psychiatrists are employed at Holy Spirit Hospital to
> work within the mental health center, specifically
> holding positions or duties that we need to provide
> service. We have adult psychiatrists who work in our
> inpatient unit, also work in our outpatient clinic and
> program providing outpatient services. We have child
> and adolescent psychiatrists who are hired to provide
> inpatient service and outpatient services to children and
> adolescents. We have psychiatrists who function as
> medical director of the mental health center and we have
> a psychiatrist who works as our clinical director for
> child/adolescent services. . . . [A]ll psychiatrists and

12

> staff that have responsibility to be on-call and to respond
> to the emergency room may be involved with doing a
> 302 assessment.

<u>See</u> Exhibit "F", page 19, lines 17-25; page 20, lines 1-8; page 21, lines 18-21.

Moreover, these employees or agents received appropriate and relevant training. For example, security officer Cory Graby received training in Act 235 (weapons certification in Pennsylvania) and in red alert training, which involves assisting in subduing a combative patient. (<u>See</u> Exhibit "D", Transcript of Deposition of Cory Graby, page 7, lines 22-25; page 8, line 1; page 19, lines 6-10). Cory Graby also has certification by the International Association of Hospital Safety and Security. (<u>See</u> Exhibit "H", page 8, lines 2-5). Charles Sterling, security manager at Holy Spirit Hospital, discussed training that hospital security personnel undertake. (<u>See</u> Exhibit "H", pages 33-37). The training includes an initial hospital orientation (<u>See</u> Exhibit "H", page 33, lines 14-15); red alert training on how to deal with aggressive individuals (<u>See</u> Exhibit "H", page 33, lines 18-25; page 34, lines 1-5); the basic and the advanced security officer course offered by the Society of Healthcare Safety and Security (<u>See</u> Exhibit "H", lines 11-17); and violence in the workplace training (Exhibit "H", page 34, lines 19-20).

13

Holy Spirit Hospital also provided adequate crisis intervention facilities. Carol Joerger, R.N., who had eleven years experience in the emergency department, testified that room 17, where the decedent had been placed, was one of the seclusion rooms in the emergency room. (See Exhibit "C", page 14, lines 11-13). The door to room 17 was closed and was locked "as far as the inside person [the decedent] was concerned" at the time of the events alleged in the First Amended Complaint. (See Exhibit "D", page 24, lines 4-11). Also, the door in room 17 has an observation window from which health care providers and crisis workers can observe the patient within. (See Exhibit "E", page 17, lines 11-14).

Cumberland County's decision to utilize Holy Spirit Hospital to render services and care to for individuals subject to §302 of the Mental Health Procedures Act exhibited the proper care concern and provisions for the treatment of an individual, such as Decedent. Cumberland County was certainly not deliberately indifferent to the needs of such an individual when choosing Holy Spirit Hospital to administer those services.

Also, during the events alleged within Plaintiffs' First Amended Complaint, Decedent never had any direct contact with any Cumberland County official or employee. A municipality may not be liable in a §1983 action under the doctrine of *respondeat superior*. Monell v. Department of Social Services, 436 U.S. 658

14

(1978).  Therefore, any conduct by Holy Spirit Hospital which Plaintiffs contend

was violative of Ryan Schorr's rights cannot be imputed to Cumberland County.

For all of the above-stated reasons, Cumberland County's Motion for

Summary Judgment should be granted and Count II of the First Amended

Complaint should be dismissed as to Defendant Cumberland County, with

prejudice.

Respectfully submitted,

**METTE, EVANS & WOODSIDE**

By: _____

John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 N. Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000
Attorneys for Defendant Holy Spirit
DATED: February 28, 2003         Hospital and Cumberland County

15

## CERTIFICATE OF SERVICE

I, JOHN F. YANINEK, ESQUIRE, hereby certify that I am serving a copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure, by depositing a copy of same in the United States Mail at Harrisburg, Pennsylvania, with first-class postage, prepaid, as follows:

Gerald J. Williams, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 800
Philadelphia, PA  19103-1895

David J. MacMain, Esquire
Mongtomery, McCracken,
Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA  19109

Stephen S. Pennington, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban
1617 JFK Boulevard
Station Suite 800
Philadelphia PA  19103

METTE, EVANS & WOODSIDE

By: _____

John F. Yaninek, Esquire
Sup. Ct. I.D. No.  55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000

Attorneys for Defendants Holy Spirit
Hospital and Cumberland County

Date: February 28, 2003

:319013 _1