**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FILED
HARRISBURG, PA

FEB 2 8 2003

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

| | |
|---|---|
| KEITH I. SCHORR and SUSAN SCHORR, In their own right and as personal representatives of the Estate of RYAN K. SCHORR, | : : : : : |
| Plaintiffs, | : No. 1:CV-01-0930 : |
| vs. | : : |
| WEST SHORE REGIONAL POLICE COMMISSION, HOWARD DOUGHERTY, CUMBERLAND COUNTY, ROBERT GORIL and HOLY SPIRIT HOSPITAL, | : The Honorable Yvette Kane : : : |
| Defendants. | : : : |

**DEFENDANTS WEST SHORE REGIONAL POLICE COMMISSION AND
CHIEF HOWARD DOUGHERTY'S STATEMENT OF MATERIAL
FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1 of the Local Rules of the United States District Court for the

Middle District of Pennsylvania, Defendants West Shore Regional Police Commission and Chief

Howard Dougherty, by and through their undersigned counsel, Montgomery, McCracken,

Walker & Rhoads, LLP, hereby respectfully submit this statement of material facts as to which

they contend there is no genuine issue to be tried as follows:

**A.    The Incident**

　　1.    At the time of his death, Ryan Schorr ("Decedent") was a 25 year old man who lived with a roommate, Matthew Gaumer, in the Borough of Wormleysburg.  See Grand Jury Report, at 2, Ex. "E."[1]

　　2.    For a large part of his life, Decedent suffered from bipolar manic disorder, a psychiatric illness which severely disrupted his ability to carry out his daily life activities.  Id.; Compl. ¶¶12-13, Ex. "A."

　　3.    While the disorder was treatable with medication, Decedent failed to take his medication on several occasions, causing him to experience delusions and hallucinations.  See Grand Jury Report, at 2, Ex. "E."

　　4.    On several of these occasions, Decedent had been involuntarily committed pursuant to Section 302 of Pennsylvania's Mental Health Act, 50 Pa. C.S.A. § 7302.  Id. at 2.

　　5.    In early November 2000, Decedent's roommate, Mr. Gaumer, became concerned for Decedent's well-being.  Id. at 3.

　　6.    He had been friends with Decedent since high school and recognized that Decedent was acting odd.  Id.

　　7.    At some point, Mr. Gaumer learned that Decedent had stopped taking his medication and ceased seeing his psychiatrist.  Id.

　　8.    It was also later determined that Decedent exacerbated his condition by ingesting illegal mind-altering drugs, including ecstasy and marijuana.  Id. at 27-28; see also Gaumer Dep. at 56-58, 103-04, Ex. "F."

---

[1]  All of the materials cited herein are included as exhibits in the appendix which accompanies the motion for summary judgment.

9.    Mr. Gaumer decided to place a phone call to Decedent's mother, Plaintiff Susan Schorr.  Id. at 7.

10.    He told her about the odd behavior that Decedent had recently been exhibiting.  Id. at 8.

11.    For example, earlier that day, Decedent had entered the Hershey Hotel and attempted to get a room, telling hotel staff that he did not carry cash without his bodyguard and stating that the only way he was going to get a room was if he had either a credit card or a gun. Id. at 5.

12.    Because of Decedent's unusual behavior, Mr. Gaumer and Mrs. Schorr went to Holy Spirit Hospital, where Mr. Gaumer completed an Application for Involuntary Emergency Examination and Treatment.  Id. at 9.

13.    In the application, Mr. Gaumer indicated that Decedent should be involuntarily committed because he believed that Decedent was mentally disabled and that he presented a "clear and present danger" to himself or others.  See Gaumer Dep. at Exhibit 1, Ex. "F."

14.    A crisis intervention worker evaluated the application and caused an order to be issued for Decedent's involuntary commitment.  See Compl. ¶ 19, Ex. "A"; Grand Jury Report, at 9, Ex. "E."

15.    At approximately 7:30 a.m. on the morning of November 18, 2000, Officers Gary Berresford and Harry Hart were dispatched to execute the Section 302 warrant and corresponding order that had been issued for Decedent.  See Grand Jury Report, at 9-10, Ex. "E."

16.    When the officers arrived at Decedent's house, they explained that they were there to take him to the hospital.  Id. at 11.

17.    Decedent told the officers that he was losing a million dollars a day by putting up with "this bullshit" and that he had "a license to kill from the President." Id.

18.    When the officers told Decedent that they could all go to the hospital together where they could talk about this situation, Decedent became complacent. Id.

19.    The officers then transported Decedent to the hospital and escorted him into a room in the Emergency Department that is specifically adapted for patients that present a security risk. Id.; Berresford Dep. at 32-34, Ex. "G"; Hart Dep. at 20-21, 58, Ex. "H."

20.    The officers remained at the hospital until hospital personnel indicated that they were not needed anymore. See Berresford Dep. at 34, Ex. "G"; Hart Dep. at 22, Ex. "H."

21.    Despite Decedent's emotional problems, the officers handled the first encounter without any problems or difficulties and consistent with their prior training and experience. See Berresford Dep. at 34, Ex. "G"; Hart Dep. at 22, Ex. "H."

22.    Shortly after 9:00 a.m. that morning, a crisis intervention worker attempted to enter Decedent's room so that she could read him his rights. See Grand Jury Report, at 13, Ex. "E."

23.    When she opened the door, Decedent rushed toward her, pushed her backwards and fled from the hospital. Id. at 13.

24.    A nurse quickly called 911 and informed the operator that Decedent had escaped. Id. at 14.

25.    Police began searching the vicinity for Decedent. Id.

26.    At approximately 11:20 a.m., Mrs. Schorr notified police that Decedent had returned to his home. Id. at 16.

27.    Cumberland County Control radioed Officers Berresford and Hart and informed them that Decedent was back home. Id. at 17.

-4-

28.    The officers approached the front of Decedent's house, repeatedly banging on Decedent's door and trying to contact Decedent by calling him on the phone, but received no response. Id. at 17-18.

29.    The officers then walked around the back of the house and discovered that a sliding glass door was unlocked. Id. at 18.

30.    The officers entered the house and could hear loud music coming from upstairs. Officer Hart called out: "Police officers. We're here. We need to talk to you. Come on out and talk to us." Id. at 18.

31.    In response, the volume of the music was turned up louder. Id. at 19.

32.    Officer Berresford proceeded up the stairs first with Officer Hart following a few steps behind. Id.

33.    When he reached the top of the stairs, Officer Berresford peeked around the corner in the direction of the music. Id.

34.    He saw Decedent standing in his bedroom wearing a hat and a long shaggy white coat. Id.

35.    The coat was hanging open and Officer Berresford could see that Decedent had no clothes on underneath the coat. Id.

36.    When Officer Berresford told Decedent that he needed to take him back to the hospital, Decedent's facial expression changed dramatically and he attacked Officer Berresford. Id.

37.    Decedent grabbed Officer Berresford, threw him on the bed and got the gun out of his holster. Id.

38.     The two wrestled over the gun until Decedent pulled the trigger and shot Officer

Berresford's ring finger on his left hand. Id. at 20.

39.     When Officer Hart entered the bedroom, he saw Officer Hart on his knees with

Decedent on top of him. Id.

40.     Officer Hart repeatedly struck Decedent with his ASP baton, but it didn't seem to

have any effect. Id.

41.     After Officer Hart heard the gunshot (which struck Officer Berresford's finger),

Officer Hart reached down and managed to pry Decedent's fingers off of the gun. Id. at 21.

42.     Decedent then grabbed a knife and attacked Officer Hart with it. Id.

43.     Officer Hart hit Decedent's arm as hard as he could and managed to knock it loose.

Id.

44.     At that point, Decedent grabbed an air rifle that had been leaning up against the

bedroom wall and began hitting Officers Berresford and Hart with it. Id. at 22.

45.     Decedent – whose coat had come off during the altercation and was now

completely nude – eventually dropped the rifle and ran out of the bedroom. Id.

46.     During this encounter, neither officer fired their gun even though they had been

subjected to a violent and deadly attack by Decedent. Id. at 19-22.

47.     After Decedent fled from the bedroom, both officers were bleeding profusely. Id. at

22.

48.     Officer Hart radioed for back-up and requested medical assistance. Id.

49.     About one minute later, however, Decedent suddenly reappeared in the doorway of

the bedroom with two cooking pots in each hand. Id. at 24.

50.     Officer Hart ordered Decedent to stop, but he started swinging and advancing toward the officer. Id.

51.     Officer Hart ordered him to stop again, but to no avail. Id. Decedent then struck Officer Hart with one of the pots on the top of the head. Id.

52.     As Officer Hart felt his knees buckle, he fired several shots at Decedent, which resulted in Decedent's death. Id.

53.     The autopsy of Decedent revealed that there were traces of the illegal drug Ecstasy in his blood stream that were consistent with ingestion two to six hours prior to Decedent's death. Id. at 27.

54.     The blood concentration of Ecstasy detected was in a range that was acutely toxic and capable of significant mental disturbances in humans. Id.

55.     The autopsy also revealed that there was marijuana in Decedent's urine that was consistent with ingestion at some point between six to twenty-four hours before Decedent's death. Id. at 28.

56.     Because officers from the West Shore Regional Police Commission ("WSPD") were involved in the shooting of Decedent, the investigation was turned over to the District Attorney's Office for Cumberland County. See Dougherty Dep. at 33, 39, 59-60, Ex. "I."

57.     The District Attorney's Office convened a grand jury, which heard testimony from 44 witnesses and reviewed 180 exhibits. See Grand Jury Report, at 2, Ex. "E."

58.     At the conclusion of its investigation, the grand jury made the following findings of fact:

- Officer Berresford was violently attacked and seriously injured as a result of actions taken by Decedent;

- Decedent violently attacked and caused extensive bodily injury to Officer Hart;

- During Decedent's brief absence from the bedroom following the initial attack on the police officers, Officer Hart exercised sound judgment in waiting in the bedroom while attempting to obtain police and medical backup by radio; and

- Officer Hart was justified in using deadly force upon Decedent because it was necessary to use such force to prevent death or serious bodily injury to himself and/or Officer Berresford when Decedent failed to desist from his aggravated, violent attack.

Id. at 35.

**B.    The WSPD**

59.    The WSPD was formed in 1995 by an agreement between the Boroughs of Lemoyne and Wormleysburg for the purpose of providing police services to both boroughs. See Compl. ¶ 7, Ex. "A."

60.    All persons employed as police officers in the Commonwealth of Pennsylvania – including officers of the WSPD – must be certified by the Municipal Police Officers Education and Training Commission ("MPOETC"). See 53 Pa. C.S.A. § 2161, et seq.

61.    MPOETC requires officers to receive both basic training, which is often referred to as "Act 120" training, and annual training, which is often referred to as "Act 180" training. Id.; see also Dougherty Dep. at 17-19, 58-59, Ex. "I."

62.    At the time of the incident involving Decedent, both Officer Berresford and Hart were certified and in good standing with MPOETC. See Grand Jury Report, at 29, Ex. "E."

63.    The WSPD serves approximately four (4) involuntary commitment warrants each year. See Dougherty Dep. at 14-15, 17, Ex. "I."

64.    Prior to the incident involving Decedent, the WSPD had not experienced any problems with respect to the handling of involuntary commitments. Id. at 61.

65.    Aside from the incident involving Decedent, not once between January 1, 1998 and December 31, 2000 had the execution of an involuntary commitment order resulted in the use of

force by police officers or physical injury to anyone.  <u>See</u> Responses to Plaintiffs' First Set of Interrogatories addressed to West Shore Police Department, at 10-11, Ex. "J."

66.    Additionally, Chief Dougherty testified that in the ten (10) years preceding the incident with Decedent, there had never been a shooting involving an officer of the WSPD.  <u>See</u> Dougherty Dep. at 62, Ex. "I."

**C.    <u>Officer Berresford</u>**

67.    Officer Berresford graduated from the police academy in 1978.  <u>See</u> Berresford Dep. at 12, Ex. "G."

68.    He has worked as a police officer continuously from that time until the present, except for a brief period between September 1990 and April 1991.  <u>Id.</u> at 80.

69.    He began working as a patrolman with the WSPD at the time of its inception in 1995.  <u>Id.</u> at 11.

70.    Since his graduation from the police academy, Officer Berresford has attended training courses on various topics, including training on the use of firearms, ASP batons and pepper spray.  <u>Id.</u> at 13-14, 80.

71.    He has also received on-the-job training concerning the execution of involuntary commitment orders.  <u>Id.</u> at 19-20, 81-82.

72.    For example, as a rookie, he accompanied other officers and observed how to properly serve the warrant.  <u>Id.</u> at 81-82.

73.    Officer Berresford testified that at the time he executed the involuntary commitment order for Decedent, he felt as if he was qualified and properly trained to do so.  <u>Id.</u> at 82.

74.    Officer Berresford estimated that over the course of his career, approximately 50 percent of the calls that he has handled involved someone with some nature of emotional disturbance. Id. at 82.

75.    He explained that he has very rarely had any difficulty in dealing with these types of people as he has usually been successful in talking them down to where they can talk reasonably with one another. Id. at 83.

76.    During his career with the WSPD, there have never been any complaints by a citizen or any lawsuits of any type filed against Officer Berresford. See Dougherty Dep. at 61-62, Ex. "I."

77.    In both 2001 and 2002, MPOETC introduced courses for police officers in Pennsylvania that were aimed at assisting officers in the recognition of various disabilities. See Doc. No. W00203-04, Ex. "K."

78.    Officer Berresford took both of these courses and testified that there was nothing that he learned which would have made him handle the incident involving Decedent any differently. See Berresford Dep. at 83-84, Ex. "G."

**D.    Officer Hart**

79.    Officer Hart was first hired as a police officer by the New Cumberland Police Department in 1965. See Hart Dep. at 7-8, Ex. "H."

80.    He retired from that department as a sergeant in 1990, after having worked there for 25 years. Id. at 7.

81.    Between 1990 and 1994, Officer Hart worked as a police officer in the Borough of Lemoyne and from 1995 to the present, he has worked for the WSPD. Id.

82.     At the beginning of his career, Officer Hart received police training when he attended programs at the Harrisburg City Police School and the Municipal Police Officer's Training Academy in Hershey. Id. at 8-9.

83.     Each of these training programs lasted about three months. Id.

84.     Since the early 1980's, he has attended the annual training courses that are required to be taken by all police officers in Pennsylvania. Id. at 11.

85.     Also, in the early 1990's, he was certified as an instructor for the ASP baton. Id. at 14.

86.     Officer Hart testified that a number of the training courses that he has attended have dealt with the procedures for dealing with emotionally disturbed individuals. Id. at 65.

87.     He estimated that over the course of his career, he has served several dozen involuntary commitment warrants. Id. at 12-13, 66.

88.     He also estimated that about 50% to 60% of the calls that he handles involves someone who is emotionally upset. Id. at 67.

89.     Officer Hart explained that he has received both formal and on-the-field training with respect to dealing with these types of people. Id. at 67-68.

90.     Officer Hart also testified that at the time of the incident involving Decedent, there was no question in his mind about how to properly execute an involuntary commitment order. Id. at 66.

91.     Like Officer Berresford, there have never been any citizen complaints or any lawsuits of any type filed against Officer Hart. See Dougherty Dep. at 61-62, Ex. "I."

-11-

92.    In the years following the incident involving Decedent, Officer Hart attended the courses offered by MPOETC that were aimed at assisting officers in the recognition of various disabilities. <u>See</u> Hart Dep. at 68-69, Ex. "H."

93.    Officer Hart took both of these courses and testified that there was nothing that he learned which would have made him handle the incident differently. <u>See</u> <u>id.</u>

Respectfully submitted,

Dated: February 28, 2003

David J. MacMain (Pa. Atty. I.D. No. 59320)
Gregory J. Hauck (Pa. Atty. I.D. No. 82958)
MONTGOMERY, McCRACKEN,
   WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109-1099
(215) 772-1500

Attorneys for Defendants West Shore Regional
Police Commission and Chief Howard Dougherty

-12-

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing statement of

material facts to be served, via first-class mail, postage prepaid, upon each of the following

persons:

> Gerald J. Williams, Esquire
> Williams, Cuker & Berezofsky
> One Penn Center
> 1617 JFK Boulevard, Suite 800
> Philadelphia, PA 19103-1895
> Attorney for Plaintiffs
>
> John F. Yaninek
> Mette, Evans & Woodside
> 3401 North Front Street
> P.O. Box 5950
> Harrisburg, PA 17110-0950
> Attorney for Holy Spirit Hospital and
> Cumberland County

Dated: February 28, 2003

Gregory J. Hauck