

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR,
In their own right and as personal
representatives of the Estate of RYAN K.
SCHORR,

     Plaintiffs,

  vs.

WEST SHORE REGIONAL POLICE
COMMISSION, HOWARD DOUGHERTY,
CUMBERLAND COUNTY, ROBERT
GORIL and HOLY SPIRIT HOSPITAL,

     Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 1:CV-01-0930

The Honorable Yvette Kane

*FILED*
*HARRISBURG, PA*

*FEB 2 8 2003*

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

## APPENDIX TO DEFENDANTS WEST SHORE REGIONAL
## POLICE COMMISSION AND CHIEF HOWARD DOUGHERTY'S
## MOTION FOR SUMMARY JUDGMENT

 **TABLE OF CONTENTS** 

**Tab**

Plaintiffs' First Amended Complaint ....................................................................A

Stipulation of Partial Dismissal, dated Sept. 5, 2002 ...................................B

Order, dated Feb. 10, 2003 ............................................................................C

Memorandum and Order, dated Feb. 10, 2003 ...............................................D

Order Accepting and Filing Investigating Grand Jury Report No. 1 ...............E

Deposition of Matthew Gaumer ........................................................................ F

Deposition of Officer Gary Berresford ............................................................G

Deposition of Officer Harry Hart .....................................................................H

Deposition of Chief Howard Dougherty ........................................................... I

Objections and Responses to Plaintiffs' First Set of Interrogatories Addressed
To Defendant West Shore Regional Police Commission .................................J

Mandatory Inservice Training 1991 through 2002 .........................................K

Report of Officer Injuries....................................................................................L

Brown v. Commonwealth of Pennsylvania Dep't of
        Health Emergency Med. Servs., No. 01-3234,
        2003 WL 148919 (3d Cir. Jan. 22, 2003) ...........................................M

Ross v. Town of Austin, No. NA 01-15-C-B/K, 2002
        WL 31160139 (S.D. Ind. Sept. 23, 2002) ...........................................N

Williams v. Musser, No. 94 C 4140, 1997 WL 403509
        (N.D. Ill. July 16, 1997) ......................................................................O

Dansby v. Borough of Paulsboro, Civ. A. No. 92-4558(JEI)
        1995 WL 352995 (D.N.J. June 7, 1995), aff'd,
        79 F.3d 1137 (3d Cir. 1996) ................................................................P

Anthony v. City of New York, No. 00 Civ. 4688(DLC),
    2001 WL 741743 (S.D.N.Y. July 2, 2001) .........................................................................Q

Amirault v. City of Roswell, No. 6:95-CV-422, 1996
    WL 391986 (D.N.M. July 11, 1996) .................................................................................R



EXHIBIT
Ⓐ

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH I. SCHORR<br>209 Summer Lane<br>Enola, PA 17025 | : : : : | **JURY TRIAL DEMANDED** |
| **and** | : : | |
| SUSAN SCHORR<br>1419 Miller Road<br>Dauphin, PA 17018<br>In their own right and as personal<br>representatives of the Estate of<br>RYAN K. SCHORR, | : : : : : : | **HONORABLE YVETTE KANE** |
| Plaintiffs, | : : | |
| v. | : : : | |
| WEST SHORE REGIONAL POLICE<br>COMMISSION<br>301 Market Street<br>Lemoyne, PA 17043 | : : : : | |
| **and** | : : | |
| HOWARD DOUGHERTY, CHIEF<br>WEST SHORE REGIONAL POLICE<br>DEPARTMENT<br>301 Market Street<br>Lemoyne, PA 17043 | : : : : : | |
| **and** | : : | |
| CUMBERLAND COUNTY<br>1 Courthouse Square<br>Carlisle, PA 17013 | : : : : | |
| **and** | : : | |
| ROBERT GORIL, EXECUTIVE DIRECTOR,<br>CUMBERLAND COUNTY MENTAL/<br>HEALTH MENTAL RETARDATION | : : : | |

DEPARTMENT                          :
                                    :
    and          :
                                    :
HOLY SPIRIT HOSPITAL                :
503 North 21ˢᵗ Street               :
Camp Hill, PA 17011                 :
                                    :
      Defendants.   :    1:CV-01-0930


## FIRST AMENDED COMPLAINT - CIVIL ACTION

### I.    NATURE OF ACTION, JURISDICTION AND VENUE

1.    This is an action for damages and other relief, arising from the death of plaintiffs'

decedent, Ryan K. Schorr.  Plaintiffs make claims under federal law, including 42 U.S.C. § 1983,

the Americans with Disabilities Act ["ADA"], 42 U.S.C. § 12101 et seq., and Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794.  As averred hereinbelow, they also make claims under

the law of Pennsylvania.

2.    Jurisdiction is vested in this Court by virtue of the presence of federal questions,

pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over plaintiffs' state law

claims pursuant to 28 U.S.C. § 1367, inasmuch as they arise from the same operative facts as the

federal claims, and are so closely related to them that, together, they comprise the entire claim or

controversy presented herein.

3.    At all times material to plaintiffs' claims under 42 U.S.C. § 1983, defendants acted

under color of state law.

4.    Venue is proper in this judicial district because all parties reside or are found therein,

and the cause of action arose therein.

-2-

## II.    THE PARTIES

5.    Plaintiffs Keith Schorr and Susan Schorr are the parents of their decedent, Ryan K. Schorr, who died intestate on November 18, 2000.

6.    On December 26, 2000, plaintiffs were appointed co-representatives of Ryan K. Schorr's estate, by Letters of Administration granted by the Register of Wills of Cumberland County. Plaintiffs are also the same persons entitled by Pennsylvania law to recover damages for Ryan Schorr's wrongful death. 42 Pa. C.S. § 8301.

7.    Defendant West Shore Regional Police Commission [hereinafter, "the Commission"] is an entity organized under Pennsylvania law, created by agreement between the Borough of Lemoyne and the Borough of Wormleysburg, charged with providing police services to both boroughs through a consolidated West Shore Regional Police Department, and empowered to supervise and implement the activities of that Department, including its training, practices, policies and customs.

8.    Defendant Howard Dougherty was, at all times material hereto, the Borough Manager for Lemoyne, and the Chief of the West Shore Regional Police Department, responsible for its supervision and the development, making, implementation and maintenance of its policies, customs and practices.

9.    Defendant Cumberland County is a governmental unit organized under Pennsylvania law.

10.    Defendant Robert Goril was at all material times, the Executive Director of Cumberland County's Mental Health/Mental Retardation Department, and was responsible for the

-3-

development, making, implementation and maintenance of the County's policies, customs and practices with respect to dealing with persons suffering from mental illness.

     11.    Defendant Holy Spirit Hospital is a private hospital organization providing certain medical, emergency and "crisis intervention" services within Cumberland County.

## III.   MATERIAL FACTUAL ALLEGATIONS

     12.    For a substantial time before his death, Ryan Schorr suffered from a significant psychiatric illness known as bipolar (manic) disorder.

     13.    Ryan Schorr's illness had symptoms and effects which severely disrupted his ability to carry out daily activities of living. These symptoms and effects included high levels of anxiety, delusional thinking, hallucinations, an inability to handle finances, and impaired perception and judgment.

     14.    Said symptoms and effects of illness rendered Ryan Schorr a "person with disabilities," as the term is defined under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. [hereinafter the "ADA"]. They also rendered his illness a qualifying disability under Section 504 of the Rehabilitation Act of 1973 [hereinafter "§ 504"].

     15.    Shortly before November 18, 2000, Ryan Schorr's psychiatric condition had deteriorated to a delusional, agitated and paranoid "manic" state.

     16.    Ryan's deterioration reached a point at which his family and friends believed that involuntary psychiatric evaluation and treatment had become necessary.

     17.    Accordingly, on the morning of November 18, 2000, with the approval of Ryan's family, his housemate requested that an order be issued for an involuntary "commitment" of Ryan, pursuant to § 302 of the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7302.

-4-

18.    This request under § 302 was made, in compliance with the statute, at the Crisis Intervention Unit at Holy Spirit Hospital [hereinafter, "Holy Spirit"]. Holy Spirit had contracted with Cumberland County to provide "crisis intervention services" in the County with respect to applications for involuntary psychiatric commitments.

19.    Pursuant to the arrangement with the County, a "crisis intervention worker" employed by Holy Spirit took and evaluated the application, caused an order to be issued for Ryan's involuntary commitment, and arranged, through Cumberland County's Control Unit, for the West Shore Regional Police Department to take Ryan into custody.

20.    In performing the above-averred acts, Holy Spirit's crisis intervention worker acted as the designee of the Cumberland County Mental Health and Mental Retardation Administrator, and acted under color and authority of state law.

21.    Police officers Gary Berresford and Harry Hart, Jr., of the West Shore Regional Police Department obtained the order and associated warrant, traveled to Ryan Schorr's apartment, and escorted him to Holy Spirit, where, eventually, Ryan was placed in a "high security" room in the hospital's emergency department, to await further "processing" under § 302.

22.    In the emergency department, Ryan Schorr had become agitated. Shortly after his placement in the "high security" room, the security personnel for Holy Spirit left the area. Ryan was left without physical restraints, and had not been sedated or otherwise medicated.

23.    When Candice Highfield, a crisis intervention worker in Holy Spirit's employ, started to enter the room in order to "read" his rights under § 302 to Ryan, he rushed past her and left the hospital.

-5-

24.     Approximately two hours later, Ryan Schorr had returned to his home at 445 Meadow Drive in Wormleysburg, PA. His mother, plaintiff Susan Schorr, telephoned him there, and ascertained that he was in a highly agitated state, in part because an employee of Holy Spirit had left a telephone message concerning his involuntary commitment on his answering machine.

25.     Susan Schorr reported Ryan's whereabouts and his emotional state to the "911" operator at Cumberland County's Control Center. The County Control Center was in contact with West Shore Regional Police Department officers Berresford and Hart, who had arrived at 445 Meadow Drive in search of Ryan.

26.     As of November 18, 2000, neither Officer Berresford nor Officer Hart had received, or been required by the West Shore Regional Police Commission or Chief Dougherty to receive any training regarding encounters or dealings with persons with mental illness, or persons in the condition of Ryan Schorr.

27.     When they arrived at Ryan Schorr's home, officers Berresford and Hart were alone, unaccompanied by any psychiatric personnel, crisis intervention workers, or any person with training and experience relevant to encounters with mentally ill persons, and had no readily available access to persons with such expertise.

28.     Officers Berresford and Hart were equipped with firearms and batons, but in keeping with the West Shore Regional Police Department's policy, had no instruments of less lethal force.

29.     Officers Berresford and Hart entered Ryan Schorr's home through a sliding glass door in the rear of the house. At the time, Ryan was in an upstairs room of the house.

30.     Officers Berresford and Hart proceeded up the stairs, where they confronted Ryan Schorr in the doorway of his bedroom, clothed only in a long coat or robe.

-6-

31.    The confrontation quickly escalated into a physical struggle between Ryan Schorr and the West Shore Regional Police Department officers. During the struggle, Officer Berresford was wounded in the ring finger when his pistol was discharged. Ryan Schorr was struck several times with batons during the struggle.

32.    Now totally nude, Ryan Schorr fled the house, and for a brief time, sat in the officers' patrol car. He then returned to his home, where the policemen had remained, and another struggle ensued.

33.    During this second struggle, Officer Hart repeatedly fired his pistol at Ryan Schorr, inflicting multiple wounds, and killing Ryan Schorr.

34.    As a result of his physical injuries, Ryan Schorr suffered great pain and mental distress, and as a result of his death, was deprived of earnings and earning capacity, the ability to inherit, and the economic value of his life.

35.    As a result of Ryan Schorr's death, his estate and heirs suffered pecuniary losses, incurred medical and funeral expenses, and suffered the deprivation of his aid, assistance, services, maintenance and the economic value of his life during the remainder of his life expectancy.

36.    As a further result of Ryan Schorr's death, plaintiffs, his parents, suffered a deprivation of their constitutionally protected interest in his life, including their interest in his companionship and support.

## IV.    CAUSES OF ACTION

### COUNT I

### PURSUANT to 42 U.S.C. § 1983
### PLAINTIFFS V. THE COMMISSION AND DOUGHERTY

37.    Plaintiffs incorporate herein by reference paragraphs 1 through 36 as though each and every allegation were set forth fully at length herein.

38.    For many years it has been known by law enforcement agencies in general, and defendants in particular, that a substantial percentage of police encounters are with persons with emotional disturbance or mental illness, and that dealing with such persons requires the taking of special precautions designed, *inter alia*, to avoid the provocation of violence.

39.    In addition, defendants were aware at all material times that West Shore Regional Police officers are frequently required to encounter emotionally disturbed and mentally ill persons in connection with involuntary commitment procedures.

40.    Easily implemented, effective training in how to respond to emotionally disturbed and mentally ill persons has been available to the law enforcement community for over twenty years.

41.    In addition, federal law, including the ADA, and the Rehabilitation Act of 1973, conferred on defendants affirmative duties to modify policies, practices and procedures to insure that persons with disabilities are not denied services or treated in a discriminatory manner.

42.    Despite their knowledge of these facts, and their obligations under federal law, defendants, with deliberate indifference, failed to provide West Shore Regional Police officers with any training for dealing with emotionally disturbed or mentally ill persons, for peacefully executing involuntary commitment orders, or for handling difficult encounters with mentally ill citizens

-8-

without resorting to force and failed to establish and maintain policies, practices and procedures to insure that persons with disabilities were not discriminated against or otherwise harmed in the course of their contact with police service.

43.    In addition, defendants, with deliberate indifference, implemented and maintained policies and procedures which prevented West Shore Regional Police officers from availing themselves of available resources for dealing with emotionally disturbed and mentally ill persons, including but not limited to coordination with, or "back-up" from other law enforcement agencies and/or crisis intervention units.

44.    In addition, defendants, with deliberate indifference, maintained policies and practices which prevented West Shore Regional Police officers from employing instruments of force less lethal than firearms and batons.

45.    Ryan Schorr was injured and died as a result of Officers Berresford and Hart's failure and/or inability to employ proper methods and procedures for dealing effectively and peacefully with persons in Ryan's condition.

46.    This failure and/or inability resulted from defendants' failure to train them and/or from the customs, practices or policies of the West Shore Regional Police Department for which defendants are responsible.

47.    Defendants' culpable acts and/or failures to act deprived Ryan Schorr of his life in violation of the Fourteenth Amendment of the Constitution of the United States of America, and his rights under federal law, and deprived plaintiffs of their interest in Ryan Schorr's life, in violation of the Fourteenth Amendment.

## COUNT II

### PURSUANT to 42 U.S.C. § 1983
### PLAINTIFFS' V. DEFENDANTS CUMBERLAND COUNTY,
### ROBERT GORIL AND HOLY SPIRIT HOSPITAL

48.    Plaintiffs incorporate herein by reference paragraphs 1 through 47 as though each and every allegation were set forth fully at length herein.

49.    Defendants' acts material to this claim were done in performance of their duties under the Pennsylvania Mental Health Procedures Act, as the County, County Administrator, or his designee, and were done under color and authority of state law. Plaintiffs' decedent was injured and died as a result of customs, practices and/or policies implemented and maintained by defendants with deliberate indifference to needs of mentally ill and emotionally disturbed persons.

50.    Said customs, practices and/or policies including, but not limited to:

    a.    Failure to employ physicians or other health providers qualified to provide emergency treatment to persons detained under §302 of the Mental Health Procedures Act;

    b.    Failure to train physicians, crisis intervention workers and other personnel with respect to the proper evaluation, security, restraint and/or treatment of persons detained under §302 of the Mental Health Procedures Act;

    c.    Failure to train crisis intervention workers, nurses, and other personnel with respect to communication to police officers, family members and patients with respect to the condition and mental state of patients subject to §302 procedures, including those who have "escaped," in order to avoid creating

-10-



or increasing the foreseeable danger of harm to persons similarly situated as

Ryan Schorr;

    d.    Failure to maintain adequate crisis intervention facilities and staff.

    51.    These culpable customs, practices and policies deprived Ryan Schorr of his life, in

violation of the Fourteenth Amendment of the Constitution of the United States of America, and his

rights under federal law, and deprived plaintiffs of their interest in his life, in violation of the

Fourteenth Amendment.

**COUNT III**

**NEGLIGENCE (PENDENT JURISDICTION)**
**PLAINTIFFS V. HOLY SPIRIT HOSPITAL**

    52.    Plaintiffs incorporate herein by reference paragraphs 1 through 51 as though each and

every allegation were set forth fully at length herein.

    53.    Plaintiffs' decedent was injured and died as a result of the negligence and/or gross

negligence of Holy Spirit and its employees, agents and servants, all of whom acted within the

course and scope of their employment, agency or service.

    54.    Said negligence included, but was not limited to:

    a.    Failure to train staff and physicians properly;

    b.    Failure to provide adequate security at the Hospital's Crisis Intervention

Unit;

    c.    Failure to design, provide or maintain a proper facility for the detention,

evaluation and/or treatment of mentally ill persons subject to involuntary

commitment procedures;

    d.    Failure to provide proper diagnosis, evaluation and treatment to Ryan Schorr.

-11-

## COUNT IV

### PURSUANT TO THE REHABILITATION ACT OF 1973
### PLAINTIFFS V. the COMMISSION, DOUGHERTY
### CUMBERLAND COUNTY AND GORIL

55.    Plaintiffs incorporate herein by reference paragraphs 1 through 54 as though each and every allegation were set forth fully at length herein.

56.    Section 504 of the Rehabilitation Act provides that no otherwise qualified person with a disability shall, solely by reason of his disability, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

57.    Defendants the Commission and Cumberland County are public agencies which receive Federal financial assistance.

58.    Defendants Dougherty and Goril are agents of such public agencies.

59.    Section 504 requires that recipients of Federal financial assistance reasonably accommodate people with disabilities so that they are not harmed by, but can benefit from, police services and mental health services as fully as persons without disabilities.

60.    Defendants to this claim failed to perform this duty with respect to Ryan Schorr, *inter alia*, by acting and failing to act as averred in Counts I and II, above.

61.    Plaintiffs and their decedent suffered the harms and damages averred hereinabove as a result of defendants' breach of their duties under § 504.

-12-

## COUNT V

### PURSUANT TO TITLE II OF THE ADA
### PLAINTIFFS V. THE COMMMISION,
### CUMBERLAND COUNTY, DOUGHERTY AND GORIL

62.    Plaintiffs incorporate herein by reference paragraphs 1 through 61 as though each and every allegation were set forth fully at length herein.

63.    Title II of the ADA prohibits any local government or department thereof from denying the benefits of their services, programs, or activities to any persons with a disability, or discriminating against any person with a disability. 42 U.S.C. §12132.

64.    Defendants the Commission and Cumberland County are public entities within the meaning and purview of Title II of the ADA. 42 U.S.C. §12132(1).

65.    Defendants Dougherty and Goril are agents of such entities.

66.    Defendants violated Ryan Schorr's federally guaranteed right to be free from discrimination on the basis of disability by failing to make reasonable modifications to their policies, practices and procedures to ensure that his needs as an individual with a disability would be met.

67.    Defendants further violated the rights of Ryan Schorr, *inter alia*, by acting and failing to act as averred in Counts I and II, above.

68.    Plaintiffs and their decedent suffered the harms and damages averred hereinabove as a result of said violations of the rights or Ryan Schorr.

## COUNT VI

### SURVIVAL
### PLAINTIFFS V. ALL DEFENDANTS

69.    Plaintiffs incorporate herein by reference paragraphs 1 through 68 as though each and every allegation were set forth fully at length herein.

-13-

70.    Plaintiffs claim damages for the harms and injuries averred in Paragraph 34, above, pursuant to Pennsylvania's Survival Act, 42 P.S. § 8302.

71.    Said harms and injuries resulted from the culpable acts of defendants as averred hereinabove.

## COUNT VII

### WRONGFUL DEATH
**Plaintiffs v. ALL DEFENDANTS**

72.    Plaintiffs incorporate herein by reference paragraphs 1 through 71 as though each and every allegation were set forth fully at length herein.

73.    Plaintiffs claims damages for the harms and injuries averred in Paragraph 35, above, pursuant to Pennsylvania's Wrongful Death Act, 42 P.S. §8301.

74.    Said harms and injuries resulted from the culpable acts and omissions of defendants as averred hereinabove.

**V.    JURY DEMAND**

75.    Plaintiffs demand a jury determination of all issues so triable.

**VI.    PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs ask this Honorable Court to enter judgment in their favor and against Defendants, individually, jointly and severally, and to:

a.    Award them general and compensatory damages;

b.    Award them reasonable attorneys fees, and the costs of this litigation;

-14-

c.    Provide such other relief as this Court deems just and proper.

WILLIAMS CUKER & BEREZOFSKY

BY:_____

GERALD J. WILLIAMS, ESQUIRE
I.D. #36418
One Penn Center at Suburban
Station, Suite 800
1617 JFK Boulevard
Philadelphia, PA 19103-1895
(215) 557-0099


CENTER FOR DISABILITY LAW
& POLICY

BY:_____

STEPHEN S. PENNINGTON, ESQUIRE
JAMIE C. RAY, ESQUIRE
One Penn Center at Suburban
Station, Suite 800
1617 JFK Boulevard
Philadelphia, PA 19103-1895
(215) 557-7112

\\wcbfile\docs\DATA\SCHORR\PLEADING\719amendcomp.wpd

-15-

EXHIBIT
B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR,           :
in their own right and as personal          :      CIVIL ACTION
representatives of the Estate of RYAN K.     :      NO. 1:CV-01-0930
SCHORR,                                      :
                                             :
                    Plaintiffs,              :
                                             :
        v.                                   :
                                             :
WEST SHORE REGIONAL POLICE                   :
COMMISSION, HOWARD DOUGHERTY,                :
CUMBERLAND COUNTY, ROBERT GORIL              :
and HOLY SPIRIT HOSPITAL,                    :
                                             :
                    Defendants.              :

**FILED**
HARRISBURG, PA

SEP 0 5 2002

MARY E. D'ANDREA, CLER
Per _____
            Deputy Clerk

## STIPULATION OF PARTIAL DISMISSAL

The undersigned parties, by and through their undersigned counsel, hereby stipulate and

agree that Count IV - Rehabilitation Act claim brought under §504, of Plaintiffs' Complaint is

HEREBY VOLUNTARILY DISMISSED WITH PREJUDICE as to Defendants West Shore

Regional Police Commission and Howard Dougherty.


Gerald J. Williams, Esquire                  David J. MacMain, Esquire (59320)
Williams Cuker Berezofsky                    Montgomery, McCracken, Walker
One Penn Center                                & Rhoads, LLP
1617 J.F.K. Boulevard, Suite 800             Philadelphia, PA  19109
Philadelphia, PA  19103

Counsel for Plaintiffs                       Counsel for Defendants
                                             West Shore Regional Police Commission
                                             and Howard Dougherty

_John F. Yaninek_

John F. Yaninek, Esquire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA  17110

Counsel for Defendants Cumberland County
and Holy Spirit Hospital



EXHIBIT (11)
(C)
2-10-03

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR, SUSAN SCHORR,  :    JURY TRIAL DEMANDED
in their own right and as personal  :
representatives of the ESTATE OF  :
RYAN K. SCHORR  :
                            :    HONORABLE YVETTE KANE
          v.  :

          Plaintiffs,  :

BOROUGH OF LEMOYNE, et al.  :

          Defendants.  :    NO. 1:CV-01-0930

**FILED**
**HARRISBURG**

FEB 1 0 2003

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## ORDER

AND NOW, this 10 day of Feb, 2003, upon consideration of Plaintiffs'

Motion to Dismiss, it is hereby ORDERED AND DECREED that Count IV, Count

V as to defendants Cumberland County and Howard Dougherty, Count VI, and

Count VII of Plaintiffs' First Amended Complaint are dismissed with prejudice.

_____
Kane, J.

EXHIBIT 
D

∂-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and            :
SUSAN SCHORR, In their own right and :
as personal representatives of the :
Estate of Ryan K. Schorr,       :
     Plaintiffs       :
                             :
     v.                        :     CIVIL ACTION NO. 1:CV-01-930
                             :
                             :     (Judge Kane)
BOROUGH OF LEMOYNE;            :
BOROUGH OF WORMLEYSBURG;       :
WEST SHORE REGIONAL POLICE     :
DEPT.; HOWARD DOUGHERTY,       :
Chief, West Shore Regional Police :
Dept.; CUMBERLAND COUNTY;      :
ROBERT GORIL, Executive Director, :
Cumberland County Mental Health/ :
Mental Retardation Dept.; HOLY :
SPIRIT HOSPITAL, and WEST      :
SHORE REGIONAL POLICE          :
COMMISSION,                    :
     Defendants       :

FILED
HARRISBURG

⁓ 9 1 0 2003

MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK

## MEMORANDUM AND ORDER

    Before this Court are motions to dismiss filed by (1) West Shore Regional Police

Commission and Police Chief Howard Dougherty (Doc. No. 34), and (2) Cumberland County

(Doc. No. 36); the Report and Recommendation of Magistrate Judge Mannion (Doc. No. 63);

and Plaintiffs' objections thereto (Doc. No. 64). For the reasons discussed below, this Court will

adopt the Report and Recommendation in part and sustain the Plaintiffs' objections.

I.    **Factual Background**

    This Court adopts the factual background as found by the Magistrate Judge as follows:

    Plaintiffs' decedent, Ryan K. Schorr, ("Schorr"), suffered from bipolar disorder.
    Schorr's condition deteriorated shortly before November 18, 2000, and his
    roommate and family applied for his involuntary committal pursuant to § 302 of

the Pennsylvania Mental Health Procedures Act. A crisis intervention worker employed by Holy Spirit Hospital took and evaluated the application, and caused an order for involuntary commitment to be issued. The worker then contacted the Cumberland County Control Unit and arranged for West Shore Regional Police Department officers to detain Schorr pursuant to the commitment order and related warrant.

Two officers went to Schorr's apartment and took him to Holy Spirit Hospital, where he was placed in a "high security" room in the emergency department to wait for an evaluation. When a crisis intervention worker entered the room, Schorr pushed past the worker and escaped from custody. Schorr's family called his apartment and, finding him there, called the police to report his whereabouts. Two officers were again dispatched to Schorr's apartment to take him back into custody and to Holy Spirit Hospital. A violent confrontation ensued and Schorr was shot and killed by one of the officers.

(Doc. No. 63 at 1-2.)

**II.    Scope of Review**

Plaintiffs, Keith and Susan Schorr, filed this civil action against several Defendants as a result of the events surrounding the death of their son, Ryan Schorr. The remaining Defendants are West Shore Regional Police Commission ("Commission"), Howard Dougherty, Chief of West Shore Regional Police Department ("Dougherty"), Cumberland County, and Holy Spirit Hospital. The Commission and Dougherty moved to dismiss Counts I, V, VI, and VII of Plaintiffs' complaint; Cumberland County moved to dismiss Counts IV, V, VI, and VII of Plaintiffs' complaint. The Magistrate recommends denying the Commission and Dougherty's motion to dismiss Count I of the complaint and granting the motions to dismiss Counts IV, V, VI, and VII of the complaint against all remaining Defendants.

Pursuant to 28 U.S.C. § 636(b)(1)(C), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Plaintiffs object only

2

to the dismissal of Count V of the amended complaint against the Commission. Defendants have not filed objections to the Report and Recommendation. Additionally, Plaintiffs have since filed, and this Court has granted, a motion to dismiss Counts VI and VII against all moving Defendants, Count IV against Cumberland County, and Count V against Dougherty and Cumberland County. This Court will therefore limit its review to those portions of the Magistrate's Report and Recommendation reviewing Count I as to the Commission and Dougherty and Count V as to the Commission.

## III.    **Discussion**

### A.    **Plaintiffs' § 1983 Claim**

Plaintiffs bring Count I of their complaint against the Commission and Dougherty pursuant to 42 U.S.C. § 1983, alleging unconstitutional policies and procedures for dealing with mentally ill persons and unconstitutional failure to train police officers to peacefully deal with mentally ill persons. The Commission and Dougherty moved for dismissal of Count I of Plaintiffs' complaint, arguing that it fails to allege a deprivation of Schorr's constitutional rights, and characterizing it as a fourth amendment excessive force claim. However, Plaintiffs' claim is more properly characterized as a fourteenth amendment substantive due process claim.

Therefore, the Magistrate properly concluded that Plaintiffs have stated a § 1983 claim against the Commission and Dougherty. See City of Canton v. Harris, 489 U.S. 378, 388 (1989) (holding that the inadequacy of police training may serve as the basis for § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact"); Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994) (substantive due process case for failure to train arising out of police pursuit could be brought even where there was no allegation of constitutional violations by individual police officers). This Court will

3

adopt the Report and Recommendation on this ground and deny Defendants' motion to dismiss Count I of the complaint.

**B.    Plaintiffs' ADA and Rehabilitation Act Claims**

Plaintiffs bring Count V against the Commission pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 (2003) ("ADA" or "Title II"). The Magistrate recommends dismissing this claim, to which Plaintiffs object. In Count V of their complaint, Plaintiffs allege that "Defendants violated Ryan Schorr's federally guaranteed right to be free from discrimination on the basis of disability by failing to make reasonable modifications to their policies, practices and procedure to ensure that his needs as an individual with a disability would be met." (Doc. No. 24 at 13.) Defendants do not appear to contest whether Schorr qualifies as a disabled individual under the ADA, but only whether the ADA applies to the facts of this case. Defendants characterize the claim as alleging failure to accommodate "while making an arrest" and argue that arrests "do not fall within the ambit of the ADA." (Doc. No. 35 at 9-11.)

This Court's analysis of whether Plaintiffs can state a claim under the ADA begins with the statute itself. See Watt v. Alaska, 451 U.S. 259, 265 (1981) ("the starting point in every case involving construction of a statute is the language itself") (citation omitted). Title II of the ADA provides, in relevant part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although the ADA does not define "services, programs, or activities," § 504 of the Rehabilitation Act[1] specifies that "'program or activity' means all of the operations of . . . a

---

[1]Title II of the ADA must be interpreted in a manner consistent with Section 504 of the Rehabilitation Act. 42 U.S.C. §§ 12134(b) & 12201(a). Therefore, the law developed under the

4

department, agency, special purpose district, or other instrumentality of a State or of a local government[.]" 29 U.S.C. § 794(b) (emphasis added).

On its face, by guaranteeing disabled persons full access to all of the "services, programs, or activities of a public entity," the Act appears to provide protection from a very broad range of discriminatory treatment. Although to the lay reader this language may suggest only commonly available and publicly shared accommodations such as parks, playgrounds, and transportation, the Act in no way limits the terms "services, programs, or activities," and appears to include all core functions of government. Among the most basic of these functions is the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law. Plaintiffs allege that these essential government functions are activities covered by the ADA and that the failure of Defendants to properly train the police for peaceful encounters with disabled persons caused decedent Schorr to be discriminated against and excluded from these government services. Nothing in the language of the statute suggests that the ADA does not extend to this type of governmental activity.

Indeed, in enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . failure to make modifications to existing facilities and practices." 42 U.S.C. § 12101(a)(5). Congress stated that one purpose of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Thus, the ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society. As a remedial statute, it must be broadly construed to effectuate its

---

Rehabilitation Act is applicable to Title II claims. Chisolm v. McManimon, 275 F.3d 315, 324 n.9 (3d Cir. 2001).

5

purposes. Tcherepnin v. Knight, 389 U.S. 332, 335 (1967).

Other legislative materials provide further support for a broad statutory interpretation.[2]
The regulations to Title II of the ADA state that the statute "applies to all services, programs,
and activities provided or made available by public entities." 28 C.F.R. § 35.102(a). In the
preamble to the regulations, the Department of Justice explains that this broad language is
comparable to the coverage under § 504 of the Rehabilitation Act, such that Title II "applies to
anything a public entity does." 56 Fed. Reg. 35694-01, 35696 (1991), section-by-section
analysis codified at 28 C.F.R. pt. 35, app. A (2003). The preamble, discussing law enforcement
activities specifically, further states that "[t]he general regulatory obligation to modify policies,
practices, or procedures requires law enforcement to make changes in policies that result in
discriminatory arrests or abuse of individuals with disabilities." Id. at 35703.

The legislative history of the ADA provides additional support for a broad interpretation
encompassing Plaintiffs' claim. The House Judiciary Committee stated: "[i]n order to comply
with the non-discrimination mandate, it is often necessary to provide training to public
employees about disability. . . . discriminatory treatment based on disability can be avoided by
proper training." H.R. Rep. No. 101-485, pt. III, at 50 (1990), reprinted in 1990 U.S.C.C.A.N.
445, 473. The House Committee on Education and Labor stated, discussing Title II of the ADA:
"[t]he Committee has chosen not to list all the types of actions that are included within the term
'discrimination', as was done in titles I and III, because this title essentially simply extends the
anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to all actions

---

[2]Department of Justice regulations and commentary accompanying the regulations should
be given "controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the
statute[.]'" See Yeskey, 118 F.3d at 171 (citing Babbitt v. Sweet Home Chapter of Cmtys. for a
Great Or., 515 U.S. 687 (1995) and Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994)).

of state and local governments." Id., pt. II, at 84, reprinted in 1990 U.S.C.C.A.N. 303, 367 (emphasis added). That Committee also noted: "Title II of the bill makes all activities of State and local governments subject to the types of prohibitions against discrimination against a qualified individual with a disability included in section 504 (nondiscrimination)." Id. at 151, reprinted in 1990 U.S.C.C.A.N. 303, 434 (emphasis added). In short, nothing in the statue, regulations, or legislative history suggests any exceptions to the Act for certain police activities or anything other than an interpretation that includes Plaintiffs' claim.

Although the Court of Appeals for the Third Circuit has not yet addressed the application of the statute to police activities and procedures, the Court has addressed the breadth of Title II in another context. In Yeskey v. Pennsylvania Department of Corrections, the Third Circuit held that the provisions of the ADA and Rehabilitation Acts prohibiting exclusion of disabled persons from government services, programs, and activities applies to state prisons. 118 F.3d 168 (3d Cir. 1997), aff'd, 524 U.S. 206 (1998). In making the determination, the Court analyzed the statutory, regulatory and ordinary definitions of "program" and "activity"[3] and concluded that the terms "were intended to be all-encompassing." Id. at 170-71. The Supreme Court unanimously affirmed the Third Circuit's holding in Yeskey, finding that "the statute's language unmistakably includes State prisons and prisoners within its coverage." Pa. Dept. of Corr. v. Yeskey, 524 U.S. 206, 209 (1998). The Court held that the Act "plainly covers state institutions without any exception that could cast the coverage of prisons into doubt" and that the text of the statute "provides no basis for distinguishing [prison] programs, services, and activities from those provided by public entities that are not prisons." Id. at 209-10 (emphasis in original). Finally,

---

[3]"Activity" is defined by Webster's Third New International Dictionary 22 (1986) as a "natural or normal function or operation." See Yeskey, 118 F.3d at 170.

7

the Court noted that "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Id. at 212 (internal quotation marks and citation omitted). This important precedential case serves as guidance to this Court. The provision of the ADA at issue here has been interpreted as "all-encompassing," and "without any exception," suggesting that the facts of this case fit squarely within the statute as interpreted by the Third Circuit and the Supreme Court.

Indeed, the Eight Circuit relied on the Supreme Court's decision in Yeskey to hold that the ADA was applicable in the context of an arrest. Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998). In Gorman, an arrestee in a wheelchair sustained injuries after being transported in a police van that was not equipped with wheelchair restraints. Id. at 910. The Gorman court noted that a local police department falls "squarely within the statutory definition of 'public entity'" and that the involuntariness of Plaintiff's arrest did not diminish his eligibility for reasonable accommodations under the statue. Id. at 912 (citing Yeskey, 524 U.S. 206).

Other district courts have also found that a public entity violated the ADA by discriminating against a disabled individual in its provision of services, activities, or programs during the course of an arrest. See, e.g., Calloway v. Glassboro Dept. of Police, 89 F. Supp. 2d 543 (D.N.J. 2000) (finding ADA applicable to a situation where a deaf person was subjected to police investigative questioning without the assistance of a qualified interpreter); Lewis v. Truitt, 960 F. Supp. 175, 178 (S.D. Ind. 1997) (ADA claim exists in an arrest situation where plaintiff shows that he is disabled, that the arresting officers knew or should have known of the disability, and the officers arrested plaintiff because of legal conduct related to his disability); Barber v. Guay, 910 F. Supp. 790, 802 (D. Me. 1995) (plaintiff's claim "that he was denied proper police protection and fair treatment due to his psychological and alcohol problems" during investigation

8

and arrest stated a valid cause of action under the ADA); Jackson v. Inhabitants of Sanford, 1994 WL 589617 (D. Me. Sept. 23, 1994) (calling the municipal defendant's contention that the ADA is inapplicable to arrests "plainly wrong" and holding that Title II of the ADA applied to Plaintiff's discriminatory arrest and failure to train claims).

The parties here have not addressed the Yeskey decision or the decisions from other courts that have allowed similar claims to proceed under the ADA. Rather, Plaintiffs, Defendants, and the Magistrate all seem to agree that this dispute is governed by the Fifth Circuit decision in Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000). Analyzing Plaintiffs' claim under Hainze and Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999), the Magistrate recommended dismissing Plaintiffs' ADA claim on the grounds that the ADA does not apply to actions taken by police officers during an arrest. (Doc. No. 63 at 13-15.)[4] Plaintiffs do not challenge the Hainze decision, but rather argue that the police encounter in this case was not an arrest controlled by the decision. Further, Plaintiffs argue that because the activity complained of, the refusal to modify practices and procedures to accommodate the disabled, occurred before the police encounter, application of the ADA in this case would not run afoul of Hainze.

Relying on Hainze, the Magistrate ruled that there are only two bases of recovery for police misconduct under the ADA and that neither applies here. The Magistrate stated that the "wrongful arrest" theory "is not applicable when the plaintiff's actions were unlawful at the time of the arrest." (Doc. No. 63 at 13 (citing Gohier, 186 F.3d at 1221)). The "reasonable

---

[4]Other courts have similarly held. See, e.g., Rosen v. Montgomery County Md., 121 F.3d 154 (4th Cir. 1997) (indicating doubt in dicta as to whether ADA would apply to arrest); Patrice v. Murphy, 43 F. Supp. 2d 1156 (W.D. Wash. 1999) (relying on Rosen to hold ADA inapplicable to arrests, at least in situation such as one presented, where in response to 911 call or where police witness crime).

9

accommodations" theory, the Magistrate ruled, "does not apply to the actions of officers while affecting an arrest." (Id. at 15 (citing Hainze, 207 F.3d at 801)). Even if this Court were to anticipate Hainze becoming the law of this Circuit, which it cannot do, the findings of the Magistrate still cannot be sustained. At this stage of the proceedings, it has not been established conclusively as a matter of fact or law that the police conduct in question constitutes an "arrest" or that Schorr's actions were unlawful. These are disputed issues and on a motion to dismiss, the facts must be taken in a light most favorable to Plaintiffs as the nonmoving party. See Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir.1989).

The Hainze court was presented with a claim similar to the one here, that the defendant county "failed to reasonably accommodate [plaintiff's] disability by failing and refusing to adopt a policy protecting the well-being of [plaintiff] as a person with a mental illness in a mental health crisis situation," yet the court declined to specifically address it. 207 F.3d at 801 (internal quotation marks omitted). Rather, the court simply stated:

> Despite Hainze's claims, we hold that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life. Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

Id.

The Hainze rationale for disallowing ADA claims when the challenged conduct occurred during "exigent circumstances" does not apply here, and this Court believes that the Third

10

Circuit would agree. Plaintiffs have not brought this action against any of the officers involved, nor are they challenging the degree of force used by the officers, and any exigent circumstances at the time of arrest are therefore irrelevant. Rather, Plaintiffs have brought their ADA claim against the Commission for failing to properly train those officers, resulting in the death of Schorr. The alleged non-compliance with the training requirements of the ADA did not occur the day that the officers shot Ryan Schorr; it occurred well before that day, when the Defendant policy makers failed to institute polices to accommodate disabled individuals such as Schorr by giving the officers the tools and resources to handle the situation peacefully.

In sum, this Court finds that the plain language of the statute, other legislative materials, and case precedent all strongly indicate that properly executing § 302 involuntary commitment warrants and modifying police practices to accommodate subjects of the warrants are included in "programs, services, or activities of a public entity" under § 12132 of the ADA. Therefore, it is clear to this Court that Plaintiffs have stated a claim under the ADA. This Court will respectfully decline to adopt Magistrate Mannion's recommendation and will allow the ADA claim to proceed against the Commission.

11

## IV.   ORDER

**AND NOW**, therefore, **IT IS ORDERED THAT**:

1.   Plaintiffs' objections to the Report and Recommendation (Doc. No. 64) are **SUSTAINED**.

2.   This Court adopts the Report and Recommendation (Doc. No. 63) in part as follows:  Defendants Commission and Dougherty's motion to dismiss Count I of Plaintiffs' first amended complaint (Doc. No. 34) is **DENIED**.

3.   This Court declines to adopt the Report and Recommendation in part as follows: Defendant Commission's motion to dismiss Count V of Plaintiffs' first amended complaint (Doc. No. 34) is **DENIED**.

Yvette Kane
United States District Judge

Date:____10 Feb____, 2003

12

EXHIBIT
E



IN RE:                                    :        IN THE COURT OF COMMON PLEAS OF
                                          :        CUMBERLAND COUNTY, PENNSYLVANIA
THE 3RD CUMBERLAND COUNTY:
INVESTIGATING GRAND JURY    :        99-0454 MISCELLANEOUS
                                          :
                                          :        NOTICE NUMBER:  03-99-11
                                          :

## ORDER ACCEPTING AND FILING
### INVESTIGATING GRAND JURY REPORT NO. 1

AND NOW, this __12__ day of January, 2001, upon review of Investigating Grand Jury

Report Number 1, and finding that said report properly proposes recommendations for

administrative action in the public interest based upon facts received in the course of an

investigation authorized by the Investigating Grand Jury Act, 42 Pa.C.S. § 4541 et seq., and is

supported by the preponderance of the evidence, it is hereby ORDERED

1.  That the Investigative Grand Jury Report No. 1 is accepted by the court with the direction

    that it be filed as a public record with the Court of Common Pleas of Cumberland County.

2.  That the Attorney for the Commonwealth deliver copies of the report to the Cumberland

    County Board of Commissioners, The Cumberland County Chiefs of Police Association, The

    Cumberland County Coroner, The West Shore Regional Police Department, The Cumberland

    County Mental Health and Retardation Department, The Municipal Police Officers

    Education and Training Commission, The Pennsylvania Commission on Crime and

    Delinquency, and The Deputy Sheriffs' Education and Training Board.

**A TRUE COPY FROM RECORD**
In Testimony whereof, I here unto set my hand
and the seal of said Court at Carlisle, PA.
This __12th__ day of __January__, 20 01
_____
                        Clerk of the Court
        Deputy          Cumberland County

BY THE COURT:

_____
Edgar B. Bayley, Supervising Judge

IN RE:                            :       IN THE COURT OF COMMON PLEAS OF
                                  :       CUMBERLAND COUNTY, PENNSYLVANIA
THE 3RD CUMBERLAND COUNTY:
INVESTIGATING GRAND JURY    :       99-0454 MISCELLANEOUS
                                  :
                                  :       NOTICE NUMBER: 03-99-11
                                  :

TO THE HONORABLE EDGAR B. BAYLEY, SUPERVISING JUDGE:

<u>REPORT NO. 1</u>

   We, the Third Investigating Grand Jury, based upon facts received in the course of an

investigation authorized by the Investigating Grand Jury Act, recommend administrative action

in the public interest. So finding, with not fewer than twelve concurring we do hereby adopt this

Report for submission to the Supervising Judge.

                                                Kathleen D. Stoup
                                                Foreperson
                                                Third Investigating Grand Jury

DATE: January 11, 2001

We, the 3rd Cumberland County Investigating Grand Jury, after hearing testimony from 44 witnesses, serving 61 subpoenas and receiving into the record 180 exhibits including physical evidence, witness statements, video tapes, audio recordings, records, expert reports, documents, teaching manuals, policies and procedures, statistics, diagrams and photographs have compiled the following summary of testimony, specific findings of fact and recommendations:

## SUMMARY OF TESTIMONY

Ryan Schorr was a 25 year old, Caucasian male, who resided with his roommate, Matthew Gaumer, at 445 Meadow Drive, Wormleysburg Borough, Cumberland County, Pennsylvania. Ryan Schorr suffered from bipolar manic disorder since his late teens. Bipolar manic disorder is a mental illness whose symptoms include, among others, high levels of anxiety, delusional thinking, hallucinations, and an inability to handle finances, i.e. spending money beyond one's means. Ryan had been receiving treatment from numerous psychiatrists for more than six years. His bipolar manic disorder was treatable with medication, and he was prescribed several psychotropic medications for this purpose since his initial diagnosis. On occasion, Ryan Schorr either failed to take his medications, as prescribed, or the medication levels in his blood stream failed to maintain a lucid state, causing Ryan to experience delusions and hallucinations. On four of these occasions, Ryan's family and friends sought civil commitment orders to involuntarily commit Ryan pursuant to Section 302 of Pennsylvania's Mental Health Act. Ryan's last period of delusions, resulting in efforts to civilly commit him, began approximately during the first week of November, 2000.

In early November, 2000, Ryan Schorr began to talk with family, friends, associates, and even complete strangers, about business ventures he was going to undertake. He informed them that he was in the process of seeking investors to help him get his ventures underway. Ryan went so far as to sketch rough floor plans for offices, strip malls, and nightclubs he was going to

open. On November 14, 2000, Ryan gave notice to Applebee's that he was quitting his job as a server. Despite stated intentions to continue to work for a short period and mounting unpaid bills, Ryan never returned to work at Applebee's after giving them notice. Ryan told his friends he was quitting because he was going to pursue these other business ventures. This particular week, he was to open a candle shop in a strip mall he was going to build. These plans were clearly delusional, as Ryan had no income capable of making these ventures a reality.

Ryan's roommate, Matthew Gaumer, became concerned for Ryan. Matthew Gaumer had known Ryan since high school and had been friends with Ryan during prior periods of delusions and involuntary civil commitments. He recognized that Ryan was displaying much of the same behavior and making similar statements to those he had made during these prior periods. Additionally, he learned from Ryan that Ryan had stopped taking his medication. Matthew encouraged Ryan to take his medication and to see his psychiatrist. Matthew believed that Ryan had made an appointment to see his psychiatrist on Wednesday, November 15, 2000. However, Wednesday evening, he overheard a telephone conversation during which Ryan indicated he did not see his psychiatrist that day. Matthew continued to be concerned about Ryan's mental state, but could do nothing more than request that Ryan take his medication and see his doctor.

Ryan Schorr's mental state continued to deteriorate and he continued to display the classic symptoms of his bipolar manic disorder. His thoughts became more delusional, his financial obligations were ignored, and his mood frequently changed without cause from extreme hyperactivity to depression and withdrawal.

On Friday, November 17, 2000, Ryan Schorr left his residence before sunrise. At approximately 6:30 a.m., Ryan Schorr called Matthew Gaumer from the Harrisburg International Airport requesting his credit card number in order to purchase a plane ticket to fly to Washington D.C., to see President Clinton. Ryan became upset when Matthew refused to give him his credit

card information and hung up. Matthew refused to give Ryan this information, not only because his request seemed ludicrous, but also because Ryan owed him money for several months of rent and other shared household bills.

At approximately 7:30 a.m., on November 17, 2000, Harrisburg International Airport Police, having noticed Ryan in the airport for some time, engaged him in a conversation about his purpose for being at the airport. Ryan made numerous delusional statements to the police. He told them, among other things, that he was a millionaire waiting for his limousine, that he had an equation for betting at the racetrack that won him $2M every time he placed a bet, that he had a heart attack the night before, that he and his girlfriend had been saving money for a very long time and he had to give it all away, and that he had to give away all of his Christmas gifts. Despite these statements, the police allowed Ryan to wait at the airport terminal for his ride, as he did not appear to be a danger to himself or others.

Approximately an hour and a half later, the same police officers who had talked with Ryan earlier, noticed Ryan walking along Airport Drive towards Harrisburg and confronted him again. This time Ryan told the police officers that he needed to get to Steelton, but did not have any money for a car, that he was prescribed Depakote but had not been taking it, and that his parents should be committed under a Section 302 mental health commitment because they had committed him several times in the past. The police ran a wants and warrant check on Ryan that came back negative, and they offered to help him. Ryan refused any assistance. He was given directions to Steelton, and he was allowed to leave the airport because, again, he did not appear to be a danger to himself or others.

During the early evening hours of Friday, November 17, 2000, Matthew Gaumer made plans and went out with friends. He returned home around 1:00 a.m., and went to bed. Ryan

4

was not at home. When Matthew left the house earlier that night, he knew Ryan Schorr had also made plans to go out with some of his friends for the evening.

At approximately 10:30 that evening, Ryan was walking alongside the road on Route 39 towards Route 81 and flagged down a Pennsylvania State Police trooper. Ryan told the Trooper his car had broken down on Linglestown Road, he would make arrangements to have his car towed the next day, and he was walking to a nearby truck stop to call for a ride.

In the early morning hours of Saturday, November 18, Ryan entered the lobby of the Hotel Hershey and inquired about purchasing some clothes from the gift shop, which was closed. After he was told that the gift shop was only open after hours for guests of the hotel, Ryan attempted to get a room, but he did not have any money. Hotel staff became concerned when Ryan told them he had lots of money in his vault, he did not carry cash without his bodyguard, and he was a stripper who walked to the hotel from Harrisburg, which was why he needed a room. At that point, hotel staff contacted hotel security because Ryan continued to ask to charge a room to his business credit card, which he did not have. Hotel security allowed Ryan to use a telephone in order to obtain his business credit card number. Ryan used the phone to place two calls to a long-time friend, Brian Kieffer. Ryan spoke to both Brian and Brian's father. He said he was going to make lots of money and asked for their credit card number so he could get a room. When they refused, Ryan hung up, walked around in the lobby and appeared to be getting agitated. Hotel staff overheard Ryan talking on the telephone. They became very concerned when Ryan told the person on the phone that the only way he was going to get a room at the hotel was if he had either a credit card or a gun. Because of Ryan's statements and his agitated state, they decided to contact the Derry Township Police Department for assistance in removing Ryan from the premises.

5

At approximately 2:15 a.m., two police officers from the Derry Township Police Department arrived in response to hotel staff's request. When both officers approached Ryan and tried to calm him down, Ryan accused one of the officers of having him involuntarily committed in May of 1999. Although Ryan was mistaken as to his belief that one of the officers had previously been involved in a prior Section 302 commitment, the presence of this officer bothered him, so he left Ryan's immediate vicinity. The other officer remained with Ryan and tried to help him place some phone calls to get his credit card number. Ryan was unable to find any of the telephone numbers he was looking for because he was frantically flipping the pages, so the officer who remained with Ryan helped him look up the phone numbers he needed. At Ryan's request, the officer helped Ryan call Nick's 1040 Café and Your Place Restaurant. Ryan asked on each call if there was anyone there from Applebee's. When it became apparent that Ryan had no idea who he was trying to locate, the officer told Ryan that he could not place any more calls and that he had to leave the hotel. Ryan again became agitated and used abusive language and profanities while talking to the officer who was trying to help him. The other police officer came to assist, and Ryan addressed him using profanities. Ryan was placed under arrest for disorderly conduct, and as soon as he was handcuffed, he became docile. Ryan was transported to the Derry Township Police Department without any further problems.

At the police department, while talking with the police, Ryan again began making delusional comments about his finances and plans for the future. The Police asked Ryan who he wanted them to call to pick him up and take him home. At Ryan's request, they contacted the Kieffers. The police talked with Brian Kieffer's father, and they informed him that Ryan was at the station and needed to be picked up. Brian Kieffer's father told the police that Ryan suffered from a mental disorder, that they had three different medicines for Ryan, and that as soon as they picked him up all concerns would be alleviated. While waiting for Brian Kieffer, Ryan told

6

Officer Day that he was the nicest police officer Ryan had ever met, and that through Ryan's connections, Officer Day would be promoted to Police Chief by Monday. Brian Kieffer picked Ryan up at the police station at approximately 3:20 a.m. He did not have any medication for Ryan.

As Brian Kieffer and Ryan Schorr arrived back at 445 Meadow Drive, they went to the front door, and Ryan knocked several times. Brian watched as Ryan walked around the side of the house toward the back and disappeared from view. Shortly thereafter, he heard breaking glass. Brian then began knocking on the front door, and when the door opened, Ryan let him into the house. Brian noticed that the kitchen window had been broken, and glass was all over the floor. He decided he needed to wake Ryan's roommate Matthew Gaumer.

While Matthew did not hear the knocking on the door, he was awakened by the sound of breaking glass. He remained in his room until he heard a knock on his bedroom door. When he opened the door, Brian Kieffer was standing in the hallway, and came into his room, and locked the door. Brian told Matthew about the incident involving Ryan at the Hotel Hershey and the Derry Township Police. They both left Matthew's bedroom to look for Ryan. As they made their way down the stairs, Ryan was proceeding up the stairs headed toward his bedroom. On the stairs, Ryan confronted Matthew about using his credit card, and the two of them got into an argument. Ryan was trying to provoke Matthew into a fight. During the argument, Ryan tried to push Matthew and ran up the stairs into his room and locked the door. Matthew and Brian continued down the stairs, through the house, and down into the basement to further discuss what they should do. They decided that they had to call Ryan's mother, Susan Schorr, to tell her what had happened and that Ryan needed help. Mrs. Schorr suggested that they call the police. Matthew Gaumer agreed to call the police because he knew Ryan was bipolar and had very harsh

7

mood swings. He believed that it was the best thing that he could do for Ryan at the time, hoping that the police could get Ryan to the hospital to get him back on his medication.

Matthew Gaumer placed a call to 911 (County Control) at 4:10 a.m., and requested police assistance because his roommate was "manic depressive" [sic] and had broken into his apartment. Officer Capers of the West Shore Regional Police Department (WSRPD) was contacted and asked to contact Matthew Gaumer. The police called and discussed the situation with Matthew Gaumer. The police explained to Matthew that there was nothing they could do about the broken window, because it was Ryan's house too, and it was not a crime to break your own window. The police suggested that Matthew go to the Holy Spirit Hospital and try to obtain a Section 302 mental health involuntary commitment.

A few minutes later, Susan Schorr called County Control and asked for the East Pennsboro Township Police. She told County Control that a Matthew Gaumer would be calling for assistance related to her son, and that the police should be warned that her son Ryan was bi-polar. County Control told her that Matthew had already called and warned them, and that the police were aware of her son's mental disorder. She asked County Control where she should go and they suggested that she stay near her phone. She told them that she would be going to 445 Meadow Drive. County Control asked her if Ryan was dangerous and she replied that he was not, as long as the officers did not tell him that he was going to be taken to the hospital. She stated that Ryan would threaten them because he was bipolar. She asked County Control to have the police call her. County Control contacted WSRPD, and asked them to contact Susan Schorr in reference to her son, Ryan.

Matthew Gaumer and Susan Schorr spoke on the phone again and decided to go to the hospital to seek a Section 302 mental health commitment order. Susan Schorr arrived at 445 Meadow Drive to pick Matthew up approximately an hour later. While picking Matthew up,

8

Mrs. Schorr did not have any contact with Ryan, because when he was in his delusional state, she and Ryan often got into arguments. Mrs. Schorr told Brian Kieffer to go home because she and Matthew were going to the hospital to take care of things.

Susan Schorr and Matthew Gaumer arrived at the Holy Spirit Hospital around 6:30 a.m., and met with Crisis Worker Mercedes Briscese. After discussing the situation with Ms. Briscese, it was decided that Matthew Gaumer would be the one to request that a Section 302 commitment order be issued for Ryan. Matthew indicated in the Section 302 paperwork that he believed Ryan to be severely mentally disabled. As a result of mental illness Ryan's capacity to exercise self-control, judgment and discretion in the conduct of his own affairs and social relations was so lessened that Ryan posed a clear and present danger to others because he has attempted to inflict serious bodily harm and that there was reasonable probability that this same conduct would be repeated. The specific acts Matthew cited were that at "5:00 a.m. 11/18/00 Ryan broke the kitchen window to get in the house. After he was in he threatened me and verbally wanted me to fight. He then pushed me once. I then left the situation so nothing else would happen. I feel very unsafe around him and also feel he is a danger to himself. He has also verbally threatened his mother several times on the phone." After the Section 302 paperwork was completed, Susan Schorr drove Matthew back to 445 Meadow Drive and dropped him off, again avoiding any contact with Ryan.

Shortly before 7:30 a.m., the Holy Spirit Hospital Crisis Intervention Unit Worker, Mercedes Briscese, called County Control to tell them that she had a Section 302 warrant to take a Ryan Schorr, who resided at 445 Meadow Drive, Wormleysburg, into custody. At 7:28 a.m., County Control spoke with Officer Capers, who was at the police department, and asked him to contact Crisis Worker Briscese at the Holy Spirit Hospital in reference to a Section 302 mental health commitment. When Officer Capers spoke with County Control, Officers Gary Berresford

9

and Harry Hart were at the station getting ready for their uniformed patrol shift to begin. The officers going off duty at the time advised Officer Berresford about Matthew Gaumer's broken window complaint involving Ryan Schorr made earlier in the morning. Officer Berresford contacted Holy Spirit Hospital, spoke with the Crisis Intervention Unit, and advised them that he would drive to the hospital to pick up the Section 302 paperwork for Ryan Schorr. Prior to leaving for the hospital, Officer Berresford informed Officer Hart, who would be working with him that morning, that he was going to pick up Section 302 paperwork for a Ryan Schorr.

At approximately 7:45 a.m., Mrs. Schorr called County Control and told them that her son Ryan was at 445 Meadow Drive and that he was getting ready to leave. She told them that the police needed to pick him up immediately. She also told them that if Ryan were allowed to leave his house, the police would not be able to find him. She advised County Control to tell the police not to argue with her son, because if they did, he would become belligerent. County suggested that she call Ryan and try to stall him, but she stated that every time she called the house, Ryan would hang up. County then advised Mrs. Schorr that the police were en route. Mrs. Schorr suggested that rather than tell Ryan he was going to be committed, the police should tell Ryan that he would be going to the hospital for a checkup.

A few minutes after 8:00 a.m., Officer Berresford radioed County Control and requested a non-emergency EMS dispatch to 445 Meadow Drive in case medical assistance would be needed. County Control began the process to dispatch EMS to the scene. At the same time, Officer Hart radioed County Control that he was available from a previous call and told them he was headed to 445 Meadow Drive. Officer Berresford parked his marked patrol vehicle near the intersection of Yverdon Drive and Meadow Drive where he could see Ryan's house and waited for Officer Hart to arrive in his marked patrol vehicle. At 8:09 a.m., they arrived at 445 Meadow Drive and approached the house.

10

When they got to the front door, Officer Berresford pounded on the screen door several times and then opened the screen door and pounded on the inside door. Ryan opened the door and they told Ryan they were there to take him to the hospital. Ryan walked back toward the kitchen and they proceeded to follow him into the living room. Ryan told them that this whole thing was "bullshit" and that he had important things to do that day. He told the officers that he was an important man and that he was losing a million dollars a day putting up with "this bullshit". He also told them during the exchange that he had "a license to kill from the President". Ryan then began to demand that the police contact his bodyguard and that there was a limousine waiting for him at the Hilton. When the officers told Ryan that they could all go to the Holy Spirit Hospital together where they could talk about this situation, Ryan agreed, and he became complacent. The officers patted him down and placed him in Officer Berresford's marked police cruiser. As they left 445 Meadow Drive at approximately 8:15 a.m., Officer Berresford radioed County Control that he and Officer Hart would be on their way to the Holy Spirit Hospital with a "visitor" and that the EMS dispatch should be cancelled.

The Officers arrived with Ryan at the Holy Spirit Hospital at 8:17 a.m. They proceeded to the reception area and introduced Ryan to the receptionist and told her that Ryan needed to talk with the Crisis Intervention Unit. Ryan then stepped to the window and told the receptionist that he wanted his bodyguard and his limousine and that if he didn't get it he'd kill her. The Officers walked Ryan back away from the reception desk and stood with him until they were instructed to take Ryan to Room 17 in the Emergency Department (ED). Room 17 in the ED of the Holy Spirit Hospital is a specially adapted room used for patients that present a potential security risk. It is equipped with minimal furniture that is bolted to the floor and with a door that locks from the outside whenever the door is closed. When Ryan was placed in Room 17, he became more and more agitated, and ED nurse, Carol Joerger, called security for assistance.

11

This is a standard practice during a Section 302 mental health intake. Ms. Briscese's shift had ended, and Crisis Worker Candice Highfield was on duty. Shortly after Nurse Joerger requested security, Security Officer Cory Graby arrived in the ED where he was met by ED Technician Rodney Buckles. They both remained in the area of Room 17 in case their assistance was needed.

Shortly after Ryan was placed in Room 17, Nurse Joerger entered the room to conduct an initial medical assessment. Ryan was pacing and appeared to be agitated. Officers Berresford and Hart stood in the doorway to Room 17 as Nurse Joerger attempted to get information from Ryan. Ryan was totally non-compliant, raising his voice and cursing at Nurse Joerger. Ryan was talking incoherently, becoming increasingly agitated, and asking for his limousine to take him to the Hilton Hotel. Nurse Joerger abandoned her attempt to question Ryan, left the room, and closed the door. Nurse Joerger and Crisis Worker Highfield, who had also been in the area of Room 17, returned to the nurses' station. Nurse Joerger was about to go on break, but prior to leaving, she contacted ED Dr. David Spurrier and advised that Ryan was brought in on a Section 302 mental health commitment due to violent behavior, but that in the ED he appeared agitated, but not violent. Crisis Worker Highfield called and spoke with Susan Schorr to get background information in order to complete the initial assessment. Dr. Spurrier entered the room to do an initial physical assessment of Ryan. Ryan allowed him to listen to his heart and lungs, but refused all of Dr. Spurrier's other requests. Hospital staff then instructed the police that they could leave, but if further assistance was needed they would call East Pennsboro Police. As the officers prepared to leave the ED, Security Officer Graby received a page, which required him to leave the area to handle another matter. Prior to leaving, Security Officer Graby and ED Technician Buckles entered Room 17 to attempt to place an ID bracelet on Ryan's wrist, but Ryan refused to let them and told them that he would not be touched without his bodyguard, that

12

he had a lot of money in various bank accounts under various names, and that he intended to obtain a firearm, buy the hospital, and blow it up with everyone in it. As Ryan was refusing to cooperate, Security Officer Graby and ED Technician Buckles decided to leave Ryan alone in the room.

Ryan was talking loudly and rapidly, repeatedly asking Dr. Spurrier to get him his limousine and bodyguard. Ryan told Dr. Spurrier that he would not take any medication unless his bodyguard and lawyer were present. Despite Dr. Spurrier's telling Ryan that he needed medication, Ryan continued to refuse. Dr. Spurrier told Ryan that as long as he was quiet and cooperative, he would hold off on giving him medication, but that if he became uncooperative, he would give him an injection. Dr. Spurrier left the room and completed the appropriate portions of the Section 302 paperwork applying for the involuntary committal because in his opinion Ryan was clearly psychotic and hallucinating. Following a discussion of Ryan's status with Crisis Worker Highfield, Dr. Spurrier told her that he would administer medication to Ryan anytime she felt it necessary. Crisis Worker Highfield told Dr. Spurrier that before Ryan was medicated, she wanted to read Ryan his Section 302 rights. Crisis Worker Highfield went to Room 17, looked in the window, and saw that Ryan was sitting on the bed. As she started to open the door to enter the room, Ryan rushed towards her, pushed her backward and ran out of the hospital through the automatic doors to the ED located immediately adjacent to Room 17. As ED Technician Buckles started to run after him, Dr. Spurrier instructed him not to pursue Ryan down into the adjacent Holy Spirit Hospital parking garage. Dr. Spurrier believed it would be better to have ED Technician Buckles wait for the arrival of hospital security staff, rather than follow an escaped committee (Ryan Schorr) into the parking garage alone.

At this time, Nurse Joerger was returning from her break. She requested a Red Alert be called out over the hospital paging system. In response, Security Officer Graby returned to the

13

ED. He and ED Technician Buckles searched the area of the parking garage and the parking lot, but failed to locate Ryan.

At approximately 9:07 a.m., Nurse Joerger called 911 and informed them that Ryan Schorr had fled the hospital ED within the last five minutes and provided a description of Ryan's clothes. She requested that the police locate Ryan and return him to the hospital. Nurse Joerger told the dispatcher, based upon her observations of Ryan and her review of the Section 302 paperwork, that Ryan was "very belligerent and homicidal". Crisis Worker Highfield called Mrs. Schorr to inform her that Ryan had escaped from the ED.

At 9:07 a.m., County Control dispatched East Pennsboro Police Officer Coll to check the area and requested that he meet Nurse Joerger at the Holy Spirit ED. County Control also notified Officers Berresford and Hart that Ryan had escaped. Prior to responding to the Holy Spirit ED, Officer Coll telephoned the Holy Spirit Crisis Intervention Unit to confirm that they did in fact have a Section 302 mental health commitment order for Ryan. This was his normal practice. In his experience, it is not uncommon for staff at the Holy Spirit Hospital to report the walk away of a patient who was brought to their the hospital for a mental health observation as a Section 302 escape, despite the fact that no Section 302 warrant had been issued for the patient. All three East Pennsboro units responded to the area and drove around in an effort to locate Ryan. Officer Coll drove back and forth across the Harvey Taylor Bridge looking for Ryan in case he tried to walk to Harrisburg. Officer Berresford also tried to locate Ryan. He searched the area around 445 Meadow Drive looking for Ryan without success and requested that County Control call Harrisburg City Police Department to be on the lookout for Ryan because he remembered Ryan's statements about the limousine he had waiting for him at the Hilton. County Control did notify the Harrisburg City Police Department. The initial search for Ryan lasted approximately one hour.

14

Following his escape from the Holy Spirit Hospital, Ryan ran to the Susquehanna View Apartments on Senate Avenue, which is located next to the Holy Spirit Hospital. He attempted to call a friend from the courtesy phone in the lobby of the apartment building. Ryan then made his way to the Uni Mart on Erford Road in East Pennsboro Township. Ryan came into the store and wandered about, taking sodas and adult magazines off the shelves, opening them, and putting them back down. One of the items he picked up in the store was a can of lighter fluid that he later placed back down. Ryan continued to take packages off of the shelf and take drinks out of the coolers, opening them even though he did not have any money to pay for them. The Uni Mart clerk confronted Ryan about taking the items and told him he would have to leave. Ryan asked her to place a phone call for him saying that he would leave the store, but first he needed a ride and he asked for a phone book. Ryan was frantically flipping through the phonebook faster than he could possibly see the listings. The clerk finally offered to look up a number for Ryan. He told the clerk that he was a guest at the Hilton in Harrisburg and asked that she find the number so he could get a ride. The clerk called the Hilton and arranged for the Hilton limousine to come and pick Ryan up. Ryan told the clerk that he would pay for the items he had consumed when his limousine arrived. While he was waiting for the Hilton limousine to arrive, Ryan was overheard telling customers in the store that he was a millionaire, that he had a lot of guns, and that he was going to have a busy day. When the Hilton limousine arrived, Ryan got in the limousine, which drove off toward Harrisburg. When the clerk realized that Ryan was leaving without paying for any of the items he had consumed, the clerk called 911, provided a license plate number and the vehicle's probable destination, and requested police assistance regarding the theft.

East Pennsboro Police Officer Coll arrived at the Uni Mart around 10:00 a.m. and took information from the witnesses. He also telephoned Officer Berresford confirming that the theft

15

suspect was Ryan. Officer Coll confirmed with the Hilton driver that Ryan had been driven to the front of the Hilton in Harrisburg, but he was unsure if he entered the hotel.

Ryan did enter the Hilton in Harrisburg, walked to the front desk, and told the front desk supervisor, Kristine Dennis, that he had a room. The clerk told Ryan that she could not find any notation of it, and he told her to try checking under several names, including Brian Kieffer. She again informed Ryan that there was no reservation under any of the names he was providing. He became agitated, stating that the parade that was taking place outside in the street was in his honor, referring to the City of Harrisburg's holiday parade occurring that day. The desk clerk called for security. Hilton Security Guard Jason Brown responded to the front desk. He noticed that Ryan had lacerations on his arm and was not making any sense, so he escorted Ryan out of the hotel at approximately 10:20 a.m.

Ryan made his way north, up Front Street in Harrisburg, to the home of Richard and Christine Bair. Ryan approached them as they were getting ready to walk to the holiday parade and asked to use the telephone. Ryan made several phone calls, but got no response. Ryan finally got an answering machine. He left a message stating that he would be walking up Front Street, and asked if someone could pick him up. Ryan then asked for a coat. Mr. Bair gave him an old black windbreaker. Ryan then left and walked north up Front Street.

After being informed by the Holy Spirit Crisis Intervention Unit that Ryan had escaped from the ED, Susan Schorr had been periodically calling Ryan's house in an attempt to help find Ryan. At 11:20 a.m., Susan Schorr called County Control and told them that Ryan was at home. She called his house several times. He answered the phone and hung up when he learned it was she who was calling. County Control informed her that they would send police units to the house.

16