At approximately 11:23 a.m. County Control radioed Officer Hart and told him that Susan Schorr had called to report that Ryan was back at 445 Meadow Drive. Officer Berresford heard the communication between County Control and Officer Hart. He radioed County Control and specifically asked whether Susan Schorr had stated that Ryan was in the house or around the house. County Control responded that Mrs. Schorr stated that Ryan was in the house.

Officer Berresford arrived in his marked police vehicle at 445 Meadow Drive at 11:32 a.m., approached the front of the house, and banged on the screen door. When there was no response, he took his ASP baton out of its holster and used it to bang on the screen door. While he was attempting to get a response from Ryan, County Control conducted a five-minute check pursuant to County policy. County Control policy requires that when a police officer is handling an incident, County Control will check with the officer every five minutes if they do not hear any radio transmissions from the officer during that time. Officer Berresford replied at 11:38 a.m., that he was not getting any response and requested another five-minute check.

Officer Hart arrived in his marked police car and joined Officer Berresford on the porch of 445 Meadow Drive. Officer Berresford opened the screen door and banged on the inside door with his ASP baton and tried to turn the doorknob, but the door was locked. Officers Berresford and Hart discussed the situation and Officer Hart suggested that they call County Control to get Susan Schorr's telephone number so that they could attempt to get a key to the house. Officer Berresford did this at 11:46 a.m. At that time, County Control gave him Susan Schorr's telephone number and advised him that Mrs. Schorr told County Control that she had been calling the house and talking to Ryan and that he seemed agitated because he got a message on his answering machine from the Holy Spirit Hospital concerning his commitment.

Officer Berresford called Susan Schorr from his police car, and she indicated that she did not have a key. While on the telephone, Mrs. Schorr told Officer Berresford that she was

17

concerned because she did not know the whereabouts of Matthew Gaumer. She told Officer Berresford that she did not think Ryan would hurt Matthew, but she was not sure.

Susan Schorr also told Officer Berresford that she had been calling the house, but Ryan kept hanging up on her. She suggested that they might be able to get into the house through the back window that Ryan had broken earlier that morning. If not, she would try to contact maintenance to get a key to the house.

Following the phone call with Susan Schorr, Officers Berresford and Hart discussed the situation. They were uncertain whether they could make a forcible entry into a house to execute a Section 302 mental health commitment warrant. Officer Hart decided that they were going to enter the house because of their concern for Matthew Gaumer's safety and Ryan's clearly deteriorating mental state. At 11:48 a.m., as the officers discussed the situation further, County Control conducted another five-minute check. They indicated that they were "okay" so far. County asked if there was any need to check again until they proceeded further. Officer Hart indicated that at that time he believed that they would be "okay".

The Officers tried to contact Ryan several times by calling the residence, but they kept getting busy signals and concluded the telephone must be off the hook. They decided to walk around the back of the house, but agreed they were not going to enter through the broken window. When they got to the rear of the house, they looked through the broken window and saw glass all over the kitchen floor.

Officer Hart noticed that the sliding glass door was open a few inches, and he was able to slide it open. He stood at the entrance and called out several times "Police officers. We're here. We need to talk to you. Come on out and talk to us." There was no response, so both officers stepped into the kitchen. They could hear loud music coming from upstairs and continued to call "Police officers. Ryan, come on down and talk to us. We need to talk to you." They walked

18

toward the stairs in the direction of the music that appeared to be coming from upstairs. When they got to the bottom of the stairs, they called again and identified themselves. In response, the stereo was turned up louder, indicating that Ryan knew they were there.

Officer Berresford went up the stairs first, and Officer Hart followed a few steps behind him allowing sufficient distance to avoid an ambush in the funnel created by the staircase. They continued to identify themselves as they proceeded up the stairs a few steps at a time. At the top of the stairs, Officer Berresford peeked around the corner in the direction of the music. He saw Ryan standing in his bedroom wearing a hat and a long shaggy white coat, which was hanging open in the front. He had nothing else on. Ryan asked Officer Berresford if he could help him. Officer Berresford told him that they were there to take him back to the hospital.

George Kahler lives in a home attached on one side to 445 Meadow Drive. He had witnessed many of the events that occurred throughout the morning involving the police. He saw the police arrive and heard them trying to get a response at the front door. He saw the police walk around behind the house to the backyard. He heard the volume of the stereo increase shortly after the officers went around back. He believed that the officers had gained entrance to the home, because just a few minutes after he saw them at the back of 445 Meadow Drive, he heard thumping and banging from next door that sounded like a struggle.

The altercation that occurred began immediately after Officer Berresford replied to Ryan's initial question. When Officer Berresford told Ryan that they needed to take him back to the hospital, Ryan's facial expression changed dramatically, and he attacked officer Berresford. Officer Berresford described the initial attack as follows. "And at that, his face changed. He rushed at me, grabbed me, threw me on the bed... and he got the gun out of the holster. And I'm hanging onto this gun, 'cause I don't want him having this gun to himself, and I continued to hang onto it and we're wrestling all over the place basically him trying to get the gun off me, me

19

holding onto the gun so he's dragging me around and we're falling on top of each other and...

fell off the bed onto the floor. I had no idea where Harry was cause I'm just concentrating totally

on this gun, trying to get my hand either behind the trigger on the hammer, try to grasp the slide

so it wouldn't slide, so it wouldn't work if he did pull the trigger. Um, I'm hanging onto it.

Unfortunately he was able to pull the trigger and my hand was hanging over the end of it and he

shot my ring finger. And so I continued to hang on, at that point I knew Harry was trying to

fight him to hold him to knock him."

Officer Hart's recount of the initial attack is as follows: "Gary started up the steps and I

started up behind him like two maybe three steps behind him. And he eased up, kept talking

about that time... music. I called out again and by that time Gary was at the top of the steps.

Gary peeked around the corner and he just disappeared. I didn't know what happened to him. I

took like two more steps. I was on the landing and around the corner going into a bedroom.

Gary's down on his knees and the other guy is over top of him...And he had like I guess it was a

large loose bathrobe. Looked almost like a bedspread... And he was over top of Gary. It looked

like he had Gary in a front headlock with Gary underneath. I had my ASP baton in my hand and

I snapped that over him. Told him to let go. Gary was telling him to let go. And I struck him

down across the back of the shoulders; I don't know, four, six times. It just didn't have any

effect on him. He didn't... he didn't move or anything. I reached down then and grabbed him

around the front of his face and his forehead and started to pull his head back and the whole time

Gary's telling him to let go and I thought he was choking him... And I kept trying to pull him

back and that's when I think it was his fist back...back hand fist and hit me here and here and

broke my glasses, cut my eye. And I remember seeing a lot of blood down near my glasses and

stuff... And I had, still had a hold of his head trying to pull him back, and I hear a gun shot. And

that's when I realized he had Gary's gun and that's what Gary was telling him to let go of... And

20

when the gun went off Gary said "You son of a bitch you shot me!" And I reach, reached over his head and reached down. Got my hand down in there and my other hand, my only thought at that point was to control the gun because I knew that if I stood up and shot him, Gary was underneath of him... I was gonna be shootin' Gary too. And I got my hand down in there and I could feel his hand and started trying to pry his fingers loose and then I felt the gun and I got, got my hand around the slide and the barrel and my thought at that time was to control the way it's pointing. And I shoved it down and back as hard as I could I really wasn't sure which was the muzzle and which was the grip but it felt more like the muzzle this way towards my leg and I shoved it down and back and kept trying to pry his fingers. Gary was in there too with his other hand trying to get it loose. And we were rolling around there and all the sudden he gave, I was down over him and all of a sudden he pushed back and I went over backwards and against either some furniture or the wall and he and Gary were sort of on top of me. And I thought I can't lay here like this. If I do I'm gonna die and so is Gary and I can't lay here, and I shoved. ... we sort of came up off the floor onto the end of the bed. And cause I remember shoving the gun down again and I could feel it, you know, going down into something soft and I could keep the muzzle down then... And somehow the gun disappeared. I remember coming up off the bed and him swinging. How he got it loose from me I don't know. But I remember him swinging. I think he hit Gary with it across the top of the head. And I don't know if I hit his arm or what but all the sudden the gun just disappeared. And at that point in time he came off the bed and towards me. Drove me back again into the wall and his right arm came up and I said Gary, he's got a knife now too, 'cause he had a steak knife in his right hand. And I remember hitting his arm as hard as I could and then grabbing for his wrist so I could hold onto the hand that had the knife. And then that's the last I saw of it... And at that point I don't know if I was holding onto that robe and him or standing on it but he sort of scrambled away from me towards the door and the robe stayed

21

there and he was completely nude. And while we were doing all this wrestling around before over to the right inside the door leaning from an angle against the wall I saw what looked like an air rifle. Looked more like plastic then a metal. And at that point he stopped and picked that up and came back like a baseball and started swinging it at me... and I told him two or three times to stop and he sort of clipped me across the one arm one time 'cause I threw my arm up. He swung several times and then dropped it and ran out the door and disappeared from sight."

Officer Berresford continued: "We just hung on, I just hung on to the gun and we wrestled, wrestled around... hanging onto the gun. Then... the gun got away from me. It did get away from me but I also noticed that the clip was out of it. And he started hitting Harry and I with the gun. He just had it in his hand. He was just hitting us with it and then in the struggle he lost the gun... And he rushed over by the dresser and grabbed what looked to be a BB gun, and he started using it as a club. Beating us with it, and we continued to struggle with him but ... he kept beating us with I know he used other things, but I don't know what they were. Just seems like anything to hit us with. Then he broke away and ran out of the room and ran downstairs."

George Kahler had been paying attention to the sounds he was hearing coming from inside 445 Meadow Drive, and he was watching the residence in order to figure out what was occurring. As he looked outside he saw Ryan Schorr running naked toward one of the police cars and he saw that Ryan was covered in red splotches. Ryan got in the police car, closed the door and sat there. Another neighbor witnessed Ryan do the same thing. Neither witness saw any police officers come out of the house in pursuit of Ryan.

Following Ryan's flight from the upstairs bedroom, Officer Hart helped Officer Berresford up onto the bed. Both Officers were bleeding profusely from their injuries. At 11:59 a.m. Officer Hart radioed County Dispatch and requested EMS and help. He advised County Control that a police officer had been shot. County Control immediately dispatched all East

22

Pennsboro Township police units to respond to 445 Meadow Drive and East Pennsboro radioed back that they were en route. County Control dispatched other available units from area police departments as well, and some other police officers radioed County Control to offer their assistance if needed. At 12:01 p.m., County Control's EMS dispatcher dispatched Ambulance 14 and Medic 81 to 445 Meadow Drive. Medic 81 responded en route.

At 12:01 p.m., Officer Hart again radioed County Control from inside Ryan Schorr's bedroom. He is audibly out of breath when he requested an ambulance and told County Control that the suspect had fled and that he and Officer Berresford were on the second floor of the residence. County Control transmitted the directions and information to all responding units and notified Officer Hart that EMS was en route. Other police officers continued to radio County Control that they were en route to the scene, including the WSRPD Chief of Police, Howard Dougherty. County Control notified responding EMS units that the scene was not safe. An unidentified police officer requested information as to whether or not Ryan Schorr had any weapons on him. Officer Hart radioed back that he did not know. Following that transmission, one minute and forty-six seconds after Officer Hart radioed that Ryan had left the bedroom, he is heard making an unintelligible sound indicative of fear as Ryan returned to the second floor bedroom swinging large kitchen pans.

Officer Hart gave the following account: "I stayed on the radio and kept calling for assistance and by some miracle every time I wanted to transmit I got right on the air. I got done making sure we had help on the way. I could hear units hollering and responding and stuff, at that I drew my weapon, turned around and faced the door. I kept my radio in my hand… I had blood running down over my right glass lens and I could hardly see out of that one because of the blood, not because of injury at that time but because of the blood. And I told Gary, I said "We're staying right here," because in my mind I knew we were there and we had no idea where

23

he was. Both of us were hurt and I wasn't going to go chasing after him when I was already injured. I didn't know what he might have downstairs as far as other weapons. And when I got done talking on the radio I drew my firearm and rested the butt right on top of my radio in a two handed hold and stood there at the corner of the bed watching the doorway. And after a minute or so the son of a gun came back in. I couldn't believe it. He comes back around that doorway. He's completely nude, and it looked like he had two big cooking pots in each hand. In the right hand it looked like a big saucepan, very large and I think he had a frying pan in his left hand. I'm not sure. But I just couldn't believe he came back. And I told him, I said "Stop, stop, put them down." And he just started swinging, advancing on me and I hollered again "stop," and then he hit me on top of the head with the big pot and I felt my knees buckle and I thought, "you don't have a choice" and I just started shooting him. At that point I knew it was the only way. He was just trying to kill us. He was determined to kill us. He was determined to kill us. I shot him once and it just had no effect at all on him, and I shot him twice more and he was still swinging, and I don't know if I shot him one or two more times, but I know the last shot that hit him, he didn't have any clothing on and I could just see the blood squirt out of him and he just collapsed…(Officer Hart crying) and then I stepped back beside Gary and told him to sit there and don't move and I told him again that help was coming because I could hear them on the radio. They started hollering about where he was and if he had firearms and stuff and I told 'em he was in the bedroom with us and he was down."

Officer Berresford's account of the final moments of the altercation are as follows: "I'm sitting there on the bed and Harry's standing …. He kept calling for an ambulance, officer shot, and stuff like, shots fired, suspect ran out; those kind of things. Then all of a sudden he runs back in the room. And it looked to me that he had a pot in each hand. That's what it looked like to me… maybe he didn't have two pots but he had at least one. But he had something in each

24

hand and he comes in. He starts beating Harry with this thing, hitting him in the head, and I jump on him and we're struggling with them and he throws, throws me. He does throw me off and I fall back and Harry kept telling him to stop, stop. And Harry shot him."

At 12:03 p.m., as police units from other jurisdictions arrive in the area, Officer Hart radioed County Control that the suspect was down. Officer Berresford is heard on County Control tapes to be calling out "I'm hit, I'm hit." Officer Hart, shortly thereafter, requested that County Control have his Chief respond to the scene, as is required pursuant to WSRPD policy whenever a police officer uses deadly force in the line of duty.

Officer Coll from East Pennsboro Township entered 445 Meadow Drive to assist Officers Hart and Berresford and assess the situation. Officer Coll stated that he opened the front door and yelled out for the officers. He entered the living room and heard people upstairs calling that they were there. Officer Coll went up the stairs and saw Officer Berresford at the top standing on the landing and Officer Hart in the doorway of the bedroom. It initially appeared to Officer Coll that Officer Hart had been shot in the head because he was bleeding so profusely. Both Officers appeared calm and were trying to tend to their wounds. Officer Coll made certain Ryan, who was lying against the far wall in the bedroom, could not reach any weapons in the event he was still alive and requested EMS assistance at 12:04 p.m. Officer Coll also informed County Control that all responding units should be advised that the suspect was down.

Robert Sharpe of the West Shore EMS was on his way to work when he heard the incident transpiring on his radio. He headed directly to 445 Meadow Drive. At the top of the stairs, Officer Coll directed him into the bedroom to Ryan. He checked Ryan for vital signs and found none. Ryan Schorr was pronounced dead at 12:21 p.m.

The crime scene was secured and thoroughly processed. Over the course of the next three days more than 100 items of physical evidence were collected, 7 search warrants were

25

obtained and served, more than 200 photographs were taken and nearly 100 witnesses were interviewed.

At the request of Cumberland County Coroner, Michael Norris, Dr. Sarah Funke, M.D., performed an autopsy, on Ryan Schorr.   Dr. Funke determined that Ryan Schorr's death was attributable to multiple gunshot wounds.  She observed six gunshot wounds:

A.  Gunshot wound to right upper chest.  This gunshot wound is fatal on the basis of massive bleeding from injuries to vital organs (lung) and structures (bones).  The injury to the spinal cord would have produced immediate neurological deficits, e.g. paralysis of the lower body.  The entrance site has stippling, which is indicative of an intermediate range of fire.

B.  Gunshot wound to left upper chest.  This gunshot wound is fatal on the basis of injuries to a vital organ (lung) and consequent hemorrhage.  The entrance site has stippling, indicative of an intermediate range of fire.

C.  Gunshot wound to left upper chest.  This gunshot wound is fatal on the basis of injuries to a vital organ (lung) with consequent internal hemorrhage.  The entrance site has stippling pattern indicative of an intermediate range of fire.

D.  Gunshot wound to left lower chest.  This gunshot wound is considered to be fatal on the basis of massive fracturing of the sternum and injury to a vital organ (heart).  The entrance site has no soot or stippling.  Note is made of the atypically large size of the entrance site and its atypical large abrasion ring.  These are features that can be seen in a tumbling bullet, or a bullet that has already passed through another object in the environment (which would include another part of the body).  Therefore, it is possible that this entrance site is a re-entrance site.  For example, there is a through-and-

26

through gunshot wound of the left hand, and the bullet that passed through-and-through this wound may have re-entered the body at this entrance.

E.  Through-and-through gunshot wound to left lateral chest.  This gunshot wound is not considered to be fatal as it injures no vital organs and contributes to no significant internal bleeding.  The entrance site has no visible soot or stippling.

F.  Through-and-through gunshot wound of left hand.  This gunshot wound entrance site has no visible soot or stippling.  The wound is associated with no injuries to vital structures and no life threatening hemorrhage, and thus is not considered to be fatal.

Cumberland County Coroner Michael Norris explained based upon his education, training, and experience that a gunshot wound described as indicative of an intermediate range of fire is one which is discharged at a maximum distance of four feet from its target.  He also testified that examination of crime scene evidence has led him to conclude that, despite the existence of six shotgun wounds, five shots struck Ryan Schorr.  The autopsy also revealed cuts on Ryan Schorr's body consistent with the types of cuts one would receive had they broken a window and crawled through it to gain access to a home.  It also revealed red markings on Ryan's body consistent with markings one would expect to receive if struck with a baton-like object.

The findings of Dr. Theodore J. Siek, Forensic Toxicologist, DABFT, indicate that at the time of Ryan's death, there were no detectable amounts of his prescribed psychotropic medications (Depakote or Wellbutrin) in his bloodstream.  Methylenedioxymethylamphetamine, commonly known as Ecstasy, was detected in his blood stream, and cannabinoids, or marijuana, were detected in his urine.  The blood concentration of Ecstasy detected was in a range that was acutely toxic and capable of significant mental disturbances in human species.  The levels of Ecstasy are consistent with ingestion two to six hours prior to Ryan's death.  The fact that there

27

were cannabinoids detected in the urine and none in the blood is consistent with the use of marijuana within the last twenty-four hours and not less than six hours of Ryan Schorr's death.

Candace Krzywicki, M.H.S., Director of Prevention/Intervention Services, Cumberland/Perry Drug and Alcohol Commission, testified regarding the physiological and psychological affects and effects caused by the use of methylenedioxymethylamphetamine (MDMA), commonly referred to as Ecstasy. Some of the physiological effects associated with the use of this drug can be nausea, loss of appetite, teeth grinding, muscle cramping, vomiting, hypertension, blurred vision, immunity to pain, dehydration, elevated body temperature, coma, and death. Psychological effects include increased anxiety, hallucinations, paranoia, confusion, and depression. Studies show that the higher the dosage, the more amplified the effects.

Ballistics evidence gathered in relation to the shooting death of Ryan Schorr was submitted to the Pennsylvania State Police ballistics section for analysis by ballistics expert Trooper Todd Neumyer. Examination of the evidence and forensic analysis of the evidence submitted indicated that five shots were fired from Officer Hart's department issued firearm and one shot was fired from Officer Berresford's department issued firearm. The evidence is consistent with the fact that the five shots fired from Officer Hart's firearm struck Ryan Schorr. The evidence is also consistent with the fact that the shot fired from Officer Berresford's firearm struck Officer Berresford.

Forensic latent fingerprint and serology analysis and examination of crime scene evidence submitted to the Pennsylvania State Police laboratory supported witness' accounts that subsequent to injuries to Officer Berresford, Ryan Schorr exited the apartment and sat for a very brief period of time in the front seat of a West Shore Regional Police Department vehicle prior to returning to the apartment to again attack Officers Hart and Berresford.

28

Sergeant Michael Guido of the Carlisle Police Department, a certified instructor regarding use of force and restraint, testified regarding the physiological and psychological affects and effects of stress during violent encounters. He also testified regarding less-lethal weapons available to police officers such as pepper spray, bean bag guns, K-9s, net-guns, stun guns, tasers, etc. While these weapons are available for purchase and use by police officers, most are cost prohibitive, can be awkward or cumbersome to use, and can only be used in certain circumstances. They all have their limitations. Based upon his review of the evidence in this case, due to the small size of the room, the close proximity of the officers to Ryan Schorr during the assault, and his nonresponsiveness to pain, these less lethal weapons would have been ineffective had Officers Hart and Berresford had them at their disposal.

Robert Nardi, Administrative Officer for the Municipal Police Officers Education and Training Commission (MPOETC), testified regarding certification of municipal police officers in the Commonwealth of Pennsylvania. All persons employed as police officers in the Commonwealth of Pennsylvania must be certified by MPOETC. As a requirement for continued certification, all certified police officers must undergo continuing annual training. He testified that both Officer Hart and Officer Berresford are presently certified and in good standing with MPOETC. Since its inception, MPOETC has included instruction in its basic curriculum regarding police intervention and contact with persons having special needs. Prior to this incident, MPOETC had already approved that its 2001 mandatory in-service training program would include "Recognizing Special Needs." The course will cover subjects such as civil rights statutes, recognizing impairment, custody and disposition, and an overview of autism, deafness, mental retardation, diabetes, epilepsy, Alzheimer's Disease and Tourette's Syndrome.

Commander Les Freehling of the Cumberland County District Attorney's Office, Criminal Investigation Division testified regarding a survey of County law enforcement

29

agencies.  Of the twenty-two departments who responded, (the Borough of Camp Hill failed to respond), 81% of the departments reported little or no training is provided to their officers in identifying or handling situations involving persons suffering from serious mental illness.  These departments reported the following statistics regarding the number of incidents involving persons suffering from serious mental illness: 157 in 1998, 197 in 1999, and 266 as of November, 2000.  These same departments reported the following statistics regarding the number of incidents involving the service of Section 302 involuntary commitments: 5 in 1998, 32 in 1999, and 45 as of November 2000.

Cumberland County Chief Public Defender and advocate for persons suffering from mental illness, Taylor P. Andrews, Esquire, testified regarding the deinstitutionalization of the mentally ill population and the increase in the number of mentally ill individuals incarcerated in prisons and jails in this country.   Statistics appear to show that as mental health institutions were closed as a result of the deinstitutionalization of the mentally ill, there is a corresponding increase in the number of persons suffering from mental illness living in communities, and consequently an increase in such persons becoming involved in the Criminal Justice System who end up being housed in our prisons and jails.  Mr. Andrews also testified regarding efforts by law enforcement in major metropolitan areas to deal with this trend.  Models have been developed which create crisis response teams comprised of specially trained and equipped police officers, trained mental health professionals and sometimes even family members, who work together to arrive at peaceful resolutions to incidents and conflicts involving the mentally ill.  He also testified regarding teams of human service professionals who monitor and dispense medications to individuals in need of treatment who are living in community environments.

Additionally, Mr. Andrews discussed the involuntary treatment standard contained in Pennsylvania's Mental Health Procedures Act.  He explained that the standard requires any

30

person suffering from mental illness to commit some outward act evidencing a clear and convincing threat to themselves or others before they can be required to receive treatment. This often results in loved ones being forced to watch a person's mental health condition deteriorate over time until the mentally ill individual becomes threatening and violent, before the "system" can intervene in providing treatment. He followed this discussion with examples of Model Laws written by the Treatment Advocacy Center and proposed amendments to Pennsylvania's Mental Health Procedures Act drafted to address these inadequacies. He also discussed studies linking mental health disorders to homelessness, which often occurs as family members become frustrated with medication noncompliance and sometimes repeated acts of violence.

Cumberland County Mental Health/Mental Retardation Department Executive Director Robert Goril testified regarding funding and programs available in Central Pennsylvania to provide services to persons suffering from mental illness. Cumberland County MH/MR is responsible for contracting with agencies to provide crisis intervention services in Cumberland County. The agency has a contract with the Holy Spirit Hospital to provide these services. He explained that due to inadequate levels of funding available to provide services to persons suffering from mental illness, services such as treatment and diagnostic programs, crisis intervention unit staffing levels, available bed space, availability of psychiatrists, etc. have all been scaled back over the last ten to fifteen years. He identified the inability to locate and retain any psychiatrist willing to practice and provide service to consumers in the greater Carlisle area as an example of the sort of problem his department faces.

Mark Zengerle, psychologist at the Cumberland County Prison (CCP) testified that statistics regarding the number of imprisoned individuals suffering from mental illness in Cumberland County is relatively consistent with national statistics. At any particular point in time, approximately 17% of the prison's population suffers from some degree of mental illness.

31

In 2000, the figure was 19%. Prison pharmacy records show that approximately 48% of the annual cost of medication provided to inmates housed at CCP is attributable to the dispensing of psychotropic medication. As studies regarding mental health disorders help researchers better understand and treat these disorders, new, more effective medications are being developed. These medications are more expensive, so while the percentage of the pharmacy budget has been relatively consistent over the past three years, the actual dollars spent has increased approximately $20,000. While some inmates refuse medication, with the use of psychotropic medication, prior to release on parole, inmates suffering from treatable mental disorders are usually stabilized. However, it is common for these individuals to return to prison after short periods of parole due to the lack of available after-care services, inadequate supervision of parolees, and the individual's failure to continue on their prescribed medication. He also indicated that most persons entering CCP who are suffering from a mental disorder, are dually diagnosed as substance abusers. It is even more difficult to develop adequate aftercare programs for these individuals as there are even fewer programs available and their supervision needs to be intensive.

## FINDINGS OF FACT

1. Ryan Schorr was suffering from severe mental illness, which was diagnosed as bipolar manic.

2. Ryan Schorr's mental illness was treatable with psychotropic medications given under the direction of a doctor.

3. Ryan Schorr had chosen not to take his psychotropic medications at least several months prior to this incident, which led to a relapse and deterioration of his mental health.

4. Beginning on or around November 17, 2000, Ryan Schorr's mental condition began spiraling downward to such an extent that he was legally commitable under the provisions of

32

Section 302 of the Mental Health Procedures Act and a valid involuntary commitment order was issued by the County Mental Health Administrator.

5. On November 18, 2000, Officers Hart and Berresford were certified police officers in good standing with the Municipal Police Officers Education and Training Commission and employed by the West Shore Regional Police Department.

6. Officers Hart and Berresford, while on uniformed patrol on November 18, 2000, had access to and were equipped with their firearms and ASP batons.

7. Ryan Schorr had been successfully taken into police custody pursuant to a Section 302 involuntary commitment order, and escorted to the Holy Spirit Hospital Emergency Department (Secure Room 17) without incident by West Shore Regional Police Department Officers Berresford and Hart at approximately 8:25 a.m. on November 18, 2000.

8. While at the Holy Spirit Hospital Emergency Department, Ryan Schorr allowed limited assessment, but declined professional treatment and medication.

9. Ryan Schorr escaped the Emergency Department by pushing past the Crisis Worker, and fled the Holy Spirit Hospital through the automatic doors located immediately adjacent to Secure Room 17. Holy Spirit Hospital security was not present.

10. Due to low staffing levels resulting from low pay, the fear of injury to staff members, the lack of restraint training, and the fear of civil liability, community mental health facilities/crisis intervention units utilize minimal levels of restraint to detain persons involuntarily committed.

11. Treatment of persons having chronic mental illness in Cumberland County is severely hampered by the lack of public funding and the availability of mental health facilities, such that persons who are in need of mental health treatment often find themselves subject to the Criminal Justice System because of the lack of alternatives.

33

12. Pennsylvania law lacks provisions which would allow court monitoring of and adequate sanctions for mentally ill individuals who refuse to voluntarily submit to prescribed, medically required treatment.

13. At the present time, in Cumberland County, there are no procedures which would require trained crisis intervention/mental health workers and/or interested family members to routinely participate in the attempts of law enforcement officials to serve legal involuntary commitment orders upon persons suffering from mental illness.

14. Service of commitment orders upon individuals suffering from mental illness can be dangerous, volatile situations, in which it is very difficult to anticipate the reaction of the mentally ill individual.

15. Despite the potential for danger to the mentally ill individual, the police, and the community at large, law enforcement officers are not required to take training for dealing with persons with mental illness.

16. During the morning hours of November 18, 2000, until the time of his death, Ryan Schorr, as a result of his mental illness, presented a clear and present danger to himself and/or others.

17. Ryan Schorr's voluntary use of the drug, Ecstasy, was of such a concentration that it significantly contributed to the deterioration of his mental health condition and accentuated the violent reaction he had toward the police officers who were attempting to effect a legal mental health commitment which had been ordered to promote Ryan Schorr's general welfare.

18. Officers Berresford and Hart, knowing that Ryan was inside of his home, entered Ryan Schorr's apartment legally pursuant to exigent circumstances – concern regarding the safety of Matthew Gaumer and concern that Ryan Schorr did pose a danger to himself or others.

34

19. Officer Berresford, while performing his lawful duty, was violently attacked and seriously injured as a result of actions taken by Ryan Schorr.

20. Ryan Schorr violently attacked and caused extensive bodily injury to Officer Hart while he was performing his lawful duty.

21. During Ryan Schorr's brief absence from the apartment following the initial attack on the police officers, Officer Hart exercised sound judgment in waiting in the bedroom of 445 Meadow Drive in Wormleysburg Borough, Cumberland County, given the circumstances known to him and the injuries to his wounded partner, Officer Berresford, while attempting to obtain police and medical backup by radio.

22. Ryan Schorr died as a result of multiple gunshot wounds on November 18, 2000, inflicted during a second attack on Officers Berresford and Hart.

23. Officer Hart, while performing a lawful duty, was justified in using deadly force upon Ryan Schorr because it was necessary to use such force to prevent death or serious bodily injury to himself and/or Officer Berresford when Ryan Schorr failed to desist from his aggravated, violent attack.

## RECOMMENDATIONS

1. Given the circumstances surrounding the death of Ryan Schorr, and after consideration of the General Principles of Justification contained in Chapter 5 of the Pennsylvania Crimes Code, no criminal charges should be filed against Officers Hart and Berresford of the West Shore Regional Police Department relating to Ryan Schorr's death on November 18, 2000.

2. Facilities used to house involuntarily committed individuals should improve security, increase staffing levels, and improve training regarding methods of restraint and detention of committed individuals.

35

3.  Pennsylvania law should be amended to provide some level of immunity from civil liability to mental facilities used to house individuals involuntarily committed for mental health reasons.

4.  State and local government should ensure that there are sufficient resources available for the treatment of mentally ill individuals, and that there are sufficient facilities available to house persons who suffer from mental illness in lieu of incarceration in jail or prison.

5.  The Commitment Standards of the Pennsylvania Mental Health Procedures Act should be amended to expand the definition of "clear and present danger of harm to others or himself," to include consideration of the individual's past mental health history, potential for serious debilitation of the mentally ill individual, failure of the mentally ill individual to take prescribed psychotropic medications, and the totality of circumstances supporting a conclusion of risk of suicide or self mutilation by the mentally ill individual.

6.  Police officers should receive mandatory training for identifying and dealing with persons suffering from mental illness.  Courses should be covered in the basic training academies and the mandatory in-service annual training required to retain police officer certification.

7.  Cumberland County should adopt a program, similar to those used in other major municipalities, creating a multidisciplinary response team, which is made up of law enforcement, mental health/crisis intervention professionals and, if possible, family members of the mentally ill individual to respond to incidents involving mentally ill individuals, including serving involuntary commitment orders.

36

EXHIBIT



(F)

## In The Matter Of:

*Keith I. Schorr  &  Susan Schorr   v.*
*Borough of Lemoyne, et al.*

---

*Matthew Robert Gaumer, Jr.*
*June 3, 2002*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File MG060302.VI, 107 Pages*
*Min-U-Script® File ID: 1750265890*

## Word Index included with this Min-U-Script®



Page 1

[1]      IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

[2]

[3] KEITH I. SCHORR and          . No. 1:01-CV-0930
    SUSAN SCHORR,                 .

[4]      Plaintiffs  . Judge Kane

[5]      vs.          .

[6] BOROUGH OF LEMOYNE,          .
    BOROUGH OF WORMLEYSBURG,     .

[7] WEST SHORE REGIONAL POLICE   .
    DEPARTMENT, HOWARD DOUGHERTY, .

[8] CHIEF WEST SHORE REGIONAL    .
    POLICE DEPARTMENT, CUMBERLAND .

[9] COUNTY, HOLY SPIRIT HOSPITAL, .
         Defendants  .

[10]                 .

[11]

[12]

[13]

        Deposition of: MATTHEW ROBERT GAUMER

[14]

    Taken by             : Defendants Cumberland County

[15]        and Holy Spirit Hospital

[16]  Date               : June 3, 2002, 1:04 p.m.

[17]  Place              : 3401 North Front Street
        Harrisburg, Pennsylvania

[18]

    Before               : Bethann M. Mulay, Notary Public

[19]     Registered Professional Reporter

[20]

[21]

[22]

[23]

[24]

[25]

[1] APPEARANCES:

[2]    STEPHEN S. PENNINGTON, ESQ.

[3]      For - Plaintiffs

[4] MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
    By: GREGORY J. HAUCK, ESQ.

[5]

       For - Defendants West Shore Regional

[6]        Police Department, Howard
           Dougherty, Chief West Shore

[7]        Regional Police Department

[8] METTE, EVANS & WOODSIDE
    By: JOHN F. YANINEK, ESQ.

[9]

       For - Defendants Cumberland County and

[10]       Holy Spirit Hospital

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]   .

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.



Page 3

[1]         INDEX
           WITNESS
[2]
                   Examination
[3]
    MATTHEW ROBERT GAUMER
[4]
    By Mr. Yaninek          4, 101, 106
[5]
    By Mr. Pennington        39, 71, 105
[6]
    By Mr. Hauck             60, 72
[7]
           EXHIBITS
[8]
    Gaumer Deposition
[9] Exhibit Number               Marked
[10] 1. Application for Involuntary Emergency   28
        Examination and Treatment
[11]
     2. Handwritten Letter to Ryan from Heidi   33
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]              STIPULATION
[2] It is hereby stipulated by and between
[3] counsel for the respective parties that sealing,
[4] certification and filing are hereby waived; and
[5] all objections except as to the form of the
[6] question are reserved to the time of trial.
[7]
[8]     MATTHEW ROBERT GAUMER, called as a witness,
[9] having been duly sworn, testified as follows:
[10]             EXAMINATION
[11] BY MR. YANINEK:
[12]    Q: Matt, my name is John Yaninek. I represent Holy
[13] Spirit Hospital and Cumberland County. We
[14] subpoenaed you for the purpose of a lawsuit that
[15] was started by Ryan Schorr's mother related to a
[16] shooting death. I want to ask you some
[17] questions. I got some information— We got
[18] some documents, discovery, some interviews that
[19] you had given the police and whatever. But I
[20] want to try to get your statement under oath on
[21] the record in this case. Have you ever had your
[22] deposition taken before?
[23]    A: No, I haven't.
[24]    Q: Let me give you some basic ground rules, okay.
[25] Essentially the court reporter is going to take

Page 5

[1] down everything we say verbatim. Even though
[2] you might anticipate one of my questions and
[3] know what your answer's going to be, let me
[4] finish it so she can get the question down in
[5] its entirety. And I'm going to try to do the
[6] same and make sure that you get your full answer
[7] out so it's going to be recorded accurately.
[8]     Next is that because everything is recorded
[9] in a written format, don't make nonverbal
[10] answers to questions like nodding of the head or
[11] shaking of the head or shrugging of the
[12] shoulders or say um-hum or uh-huh. To get your
[13] answers down accurately, please give a verbal
[14] response.
[15]     If the answer is I don't know, that's a
[16] perfectly acceptable answer. It's not a memory
[17] quiz here, or you're not supposed to know
[18] everything that I might ask.
[19]     Additionally, if I'm asking you a question
[20] and you don't understand the question, I want
[21] you to stop me so I can rephrase the question so
[22] you can understand it, okay?
[23]    A: Okay.
[24]    Q: We're in a pretty big room. If you don't hear
[25] the question, ask me to repeat it, or the court

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

**Page 6**

[1] reporter can read the question back for you,
[2] okay?
[3] **A:** Okay.
[4] **Q:** So if you answer my question, I'm going to
[5] assume two things. I'm going to assume that you
[6] understood the question, I'm going to assume
[7] that you heard it in its entirety, okay?
[8] **A:** Yes.
[9] **Q:** Please state your full name for the record.
[10] **A:** Matthew Robert Gaumer.
[11] **Q:** Matt, where do you live presently?
[12] **A:** Right now I live Alberta, Virginia.
[13] **Q:** What's your address?
[14] **A:** It's 222 Pinehurst Place, Alberta, Virginia.
[15] **Q:** A-l-b-e-r-t-a?
[16] **A:** Yes.
[17] **Q:** What's the zip code?
[18] **A:** 23821.
[19] **Q:** How long have you lived there?
[20] **A:** I've lived there since August.
[21] **Q:** Is it a house or an apartment?
[22] **A:** A house.
[23] **Q:** Do you own it?
[24] **A:** No. I rent it.
[25] **Q:** You rent it?

**Pa**

[1] **A:** Yes.
[2] **Q:** Are you getting a teaching job in the Harrisburg
[3] area?
[4] **A:** I'm looking right now. But for the summer, I'll
[5] be working at HACC, at Harrisburg Area Community
[6] College.
[7] **Q:** What will you be teaching at HACC?
[8] **A:** I'll be working what is called the test center.
[9] **Q:** What would your duties and responsibilities be
[10] there?
[11] **A:** More or less what my duties are if a student
[12] misses a test, the professor brings the test
[13] down to me, I put it in the computer, file it
[14] away, and log it in. And when the student wants
[15] to take it, they'll come and say the professor's
[16] name, I'll find the test form, give it to them
[17] right there in the room. When they're done,
[18] then I put it away and send it to the right
[19] department.
[20] **Q:** Just so I know how to get ahold of you, at this
[21] 1615 address in Harrisburg, are you going to
[22] enter into a lease?
[23] **A:** Yeah. I already— I actually signed one
[24] Saturday. I can give you a cell phone number,
[25] too—

**Page 7**

[1] **A:** Yes.
[2] **Q:** Do you have a phone number at this property?
[3] **A:** Yes.
[4] **Q:** Can I have it, please?
[5] **A:** It is 434-949-0297. But I'm actually moving
[6] from there June 15th.
[7] **Q:** Where are you moving to?
[8] **A:** I'm moving to Second Street.
[9] **Q:** Do you have the address?
[10] **A:** Yeah. 1615 North Second Street, Apartment 3.
[11] I'm not sure of the zip code.
[12] **Q:** Is it still Alberta?
[13] **A:** No. It's actually Harrisburg.
[14] **Q:** Oh, Harrisburg?
[15] **A:** Moving back to Harrisburg.
[16] **Q:** You're moving back here?
[17] **A:** Yes.
[18] **Q:** Probably 17110 or something like that.
[19] **A:** Yeah.
[20] **Q:** Where do you work?
[21] **A:** Right now I work at Red Oak Elementary School.
[22] I teach fourth grade.
[23] **Q:** How long have you worked at Red Oak Elementary?
[24] **A:** It will be one year.
[25] **Q:** You say you're moving back to Harrisburg?

**Pa**

[1] **Q:** Oh, great.
[2] **A:** —if that would be—
[3] **Q:** Go ahead.
[4] **A:** All right. It's 717-418-2515.
[5] **Q:** Just kind of buzz through your background. You
[6] went to school at Susquehanna High School,
[7] correct?
[8] **A:** Yes.
[9] **Q:** And you graduated with Ryan Schorr?
[10] **A:** I graduated a year ahead of him.
[11] **Q:** So you graduated in '93?
[12] **A:** '92.
[13] **Q:** Then you went to Clarion?
[14] **A:** Actually I went to the Navy first.
[15] **Q:** Did you get an honorable discharge from the
[16] Navy?
[17] **A:** Yes.
[18] **Q:** After the Navy, you went to Clarion?
[19] **A:** I went to HACC for a year, and then I
[20] transferred to Clarion.
[21] **Q:** That's where you got your degree from?
[22] **A:** Correct.
[23] **Q:** What's your degree in?
[24] **A:** Elemen — bachelor of science in education.
[25] **Q:** Just for the record, how did you come to know

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Page 10

[1] Ryan Schorr?
[2] **A:** We went to school together.
[3] **Q:** So how long did you know him, from what grade?
[4] **A:** I would say since probably eighth grade. When I
[5] was in eighth grade, he was in seventh.
[6] **Q:** After you graduated high school, did you keep in
[7] touch with Ryan after that?
[8] **A:** Yes.
[9] **Q:** Can you tell me what kind of contact you had
[10] after you graduated school?
[11] **A:** I talked to him on the phone every once in a
[12] while. When I went to see my parents, I would
[13] see him because he used to live right down the
[14] street from me off of Sixth Street.
[15] **Q:** When did you guys first start living together?
[16] **A:** It was May — I believe May '99.
[17] **Q:** How did that come about?
[18] **A:** I graduated from college, and I was living at
[19] home for a few months and was looking to move
[20] out. And we were friends, so we talked about it
[21] and decided to be roommates and found a town
[22] house together, moved in.
[23] **Q:** Before you moved in with Ryan in May of '99,
[24] were you aware that he had some psychological
[25] problems?

Page 11

[1] **A:** Yes.
[2] **Q:** Can you tell me what knowledge you had of his
[3] psychological problems pre-'99?
[4] **A:** I did know he was diagnosed as bipolar and manic
[5] depressive because he had been in the hospital
[6] one time before.
[7] **MR. PENNINGTON:** You say you didn't know or
[8] did?
[9] **A:** I did know.
[10] **MR. PENNINGTON:** You did, I'm sorry.
[11] **A:** Yeah.
[12] **BY MR. YANINEK:**
[13] **Q:** Were you aware of any incidents of him behaving
[14] in I'll just call it an abnormal way before you
[15] moved in, in '99?
[16] **A:** Yes.
[17] **Q:** Can you tell me that?
[18] **A:** I'd say the first time that I actually noticed
[19] it was a time where I was away for a little bit
[20] and I came back. And he— That's when we
[21] admitted him to Holy Spirit for the first time.
[22] And that's when he got the initial diagnosis of
[23] what he had. And the second time he wasn't —
[24] he was in a place up here off of Front Street.
[25] I forget the name of it. But I wasn't there to

Page 12

[1] see all of that. That was my other friends.
[2] But I did hear about incidents about what
[3] happened with his behavior.
[4] **Q:** Specifically the first incident you said, we had
[5] him admitted. Who was we?
[6] **A:** It wasn't myself, but I was the last person to
[7] see him that day. And I guess his mother had
[8] called the police, and they were looking for
[9] him. He was missing. And I guess the police
[10] picked him up. I'm not sure where they picked
[11] him up at. But then he was admitted to Holy
[12] Spirit the first time. I'm not sure how he got
[13] admitted or who did it, but. It wasn't to my
[14] knowledge of who did it.
[15] **Q:** Was this in '94?
[16] **A:** I believe, yes.
[17] **Q:** Was this when he was — had himself painted up
[18] in some manner?
[19] **A:** Yes.
[20] **Q:** Can you describe that for me in a little more
[21] detail?
[22] **A:** He came to my house, and his whole chest was
[23] painted in green, I believe. And the only thing
[24] he had on was a pair of shorts and I think a
[25] pair of sandals. And he had come to my house.

Page 13

[1] He called me up, and I was away for the weekend.
[2] I came back. And he called me up and said he
[3] needed a ride to get his car. And he came to my
[4] house, and he was saying a bunch of nonsense
[5] about stuff I didn't really understand or
[6] recognize.
[7] I took him to get his car thinking I was
[8] taking him to get his car. And we were off—
[9] We were— I don't know exactly where we were
[10] at. But I took— It was the woods. And he
[11] just jumped out of my car and ran to the woods.
[12] And then the next morning I got a call from
[13] a police officer who was asking his whereabouts
[14] and everything. And his mom had called me. And
[15] then they found him walking on the side of the
[16] road, I believe.
[17] **Q:** To your knowledge, was it his mother who had
[18] 302 initiated in '94?
[19] **A:** I believe so.
[20] **Q:** You didn't have anything to do with—
[21] **A:** No.
[22] **Q:** —filling out any papers and stuff?
[23] **A:** Not at all.
[24] **Q:** Just let me finish before you start in just for
[25] her benefit. You said that there was a second

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

**Page 14**

[1] incident that you were aware of before you moved
[2] in together in '99. Can you describe that for
[3] me, please?
[4]    A: The only thing it's more or less I guess hearsay
[5] of what I heard. I didn't actually experience
[6] any of the second time. But there was an
[7] incident where he was kind of— I more or less
[8] heard this from my friends and said how he came
[9] to my one friend's house and was speaking, you
[10] know, about business — a business he had and
[11] just talking about he figured out some kind of
[12] meaning of life and, you know, more or less
[13] along those lines.
[14]    And he stayed at my friend's house for
[15] maybe a day or two. And I don't know how he got
[16] admitted to where he was at. I'm very unsure
[17] about the second time because I was away at
[18] college. That's basically all I know about
[19] that.
[20]    Q: Was the second incident did you talk about or
[21] did you learn about him having some idea that he
[22] had figured out some mathematical equation?
[23]    A: Yes. That's—
[24]    Q: It was the key to life or something like that?
[25]    A: Right, correct.

**Page 15**

[1]    Q: Before you were about to move in with him, were
[2] you aware that he was on medication to control
[3] his behaviors?
[4]    A: Yes, I was aware he was on his medication. And
[5] he had told me how he talked to a I guess
[6] psychiatrist, or I don't know the exact word for
[7] it, but he talked to someone I don't know how
[8] often, but he had appointments to meet with
[9] people every now and then. I wasn't sure what
[10] exactly he was on, but I was aware he was taking
[11] medication.
[12]    Q: Did you see bottles of medication in your
[13] apartment when you had lived together?
[14]    A: No, I didn't.
[15]    Q: When you had lived together, did he ever say
[16] that he needed to go see the doctor—
[17]    A: No.
[18]    Q: —or anything like that?
[19]    A: No.
[20]    Q: Where did he work when you lived together?
[21]    A: He worked at Applebee's off of Carlisle Pike.
[22]    Q: What did he do there?
[23]    A: He was a waiter.
[24]    Q: How long did he hold that job to your knowledge?
[25]    A: When we first moved in together or like as a

**Page**

[1] whole?
[2]    Q: As a whole.
[3]    A: I'd say about a year.
[4]    Q: So he had the job before you guys moved in
[5] together?
[6]    A: Correct.
[7]    Q: Am I correct in that he left the job about two
[8] weeks before this incident on November 18th?
[9]    A: Correct, yes.
[10]    Q: I read in your interview with the police
[11] officers that there was a period of time I guess
[12] towards the fall of '99 where you had discovered
[13] that Ryan wasn't taking his medication. Is that
[14] accurate?
[15]    A: Right, yes.
[16]    Q: How did you find out or come to know that he
[17] wasn't taking his medications?
[18]    A: I actually asked him about it because he wasn't
[19] totally the way he was then. But I could kind
[20] of sense a change in him, so I did ask him about
[21] it. And he had told me then that he was going
[22] to call or, you know, he was going to call the
[23] doctor and set up an appointment. So I more or
[24] less just let it go at that.
[25]    Q: When was the first time you noticed where I

**Pa**

[1] guess you'd say he wasn't himself and then you
[2] had asked him whether he's taking his
[3] medications?
[4]    A: I'd say in October.
[5]    Q: October '99?
[6]    A: Yes.
[7]    Q: Were you aware of any times his mother had
[8] discussed with him the issue of him not taking
[9] his medications?
[10]    A: Maybe once or twice he would talk about it with
[11] me and kind of complain about it a little bit.
[12]    Q: What would he say?
[13]    A: He would say how his mother was getting on his
[14] case about taking his medication and then seeing
[15] someone about it. And I in return would not
[16] truly take the side of his mom but kind of give
[17] my own advice about it, how I thought it would
[18] be a good idea if he would.
[19]    Q: Did he ever tell you that he just wasn't going
[20] to take it anymore because he didn't need it?
[21]    A: He did say it once or twice how he felt like he
[22] was doing better without it and how things were
[23] going better.
[24]    Q: Do you remember when that was? Was that in
[25] October?

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

**Page 18**

[1] **A:** I'd say October, yes.

[2] **Q:** Are you aware of a time where his mother may

[3] have set up an appointment to have him see a

[4] doctor sometime in the fall of '99?

[5] **A:** I was aware of it, but I was unsure what

[6] happened with it.

[7] **Q:** Did you ever have discussions or any kind of

[8] communication with his mother about Ryan and his

[9] health and welfare?

[10] **A:** Not until that night.

[11] **Q:** Not until November?

[12] **A:** Correct.

[13] **Q:** Did you notice any changes in October and

[14] November in his behavior, personality?

[15] **MR. PENNINGTON:** Are you talking about

[16] 2000?

[17] **MR. YANINEK:** '99. This happened in '99,

[18] didn't it?

[19] **MR. HAUCK:** No. It happened in 2000.

[20] **A:** 2000. That's what I meant. I apologize.

[21] **MR. YANINEK:** I got my dates wrong, too.

[22] **BY MR. YANINEK:**

[23] **Q:** When we were talking about November and October,

[24] that was really October and November 2000?

[25] **A:** Yes, correct.

**Page 19**

[1] **Q:** You had been living with him for almost a year

[2] and four months or so before you noticed these

[3] changes in him?

[4] **A:** I was actually— We moved together in May, so

[5] that was only about six months.

[6] **Q:** So it would have been May of 2000, not May of

[7] '99?

[8] **A:** Correct.

[9] **MR. PENNINGTON:** Excuse me a minute, can we

[10] just agree on that that all the references to

[11] the fall of '99 he first noticed a change in

[12] October '99, those should all be 2000?

[13] **A:** 2000, yeah.

[14] **MR. PENNINGTON:** So you lived with him for

[15] roughly seven months?

[16] **A:** Correct.

[17] **MR. PENNINGTON:** And not a year and seven

[18] months?

[19] **A:** Right. I just got the dates mixed up.

[20] **MR. YANINEK:** That's all right. As I said,

[21] it's not a test.

[22] **BY MR. YANINEK:**

[23] **Q:** Let's go back now to the fall of 2000. Can you

[24] tell me if you noticed any change in his

[25] behavior and specifically what kind of change if

**Page 20**

[1] you noticed any?

[2] **A:** I did notice a change in his behavior. He

[3] wasn't very centered on going to his job,

[4] working. He started on his whole ordeal where

[5] he had his own business. I guess it was kind of

[6] like a— He was doing something artistic or—

[7] I didn't really understand it too much.

[8] He started talking about he was meeting

[9] with people who want to give him money to pay

[10] into his business. And he even asked me if I

[11] wanted to give him money towards the business

[12] and if I did I needed to give him like a

[13] thousand dollars. He started talking about he

[14] had to meet — he had to go over to different

[15] countries.

[16] And actually maybe a few days before the

[17] incident, the main incident happened, he said he

[18] was going down to see the president and he

[19] needed my Visa card and he needed money and

[20] everything. And then it's— that's when I said, and

[21] he got kind of a little irate with me a little

[22] bit and was mad that I wasn't helping him in

[23] that way.

[24] **Q:** When he would say stuff about wanting to start

[25] this business and things that may have seemed

**Page 21**

[1] not grounded in reality so to speak, did you

[2] ever confront him or tell him or try to focus

[3] him or anything like that?

[4] **A:** Well, I didn't actually get into it. I had

[5] other friends who actually had called home and

[6] actually talked to him more about it because I

[7] didn't really want to get into too much since I

[8] was the one actually living with him. But other

[9] people had talked to him personally about it and

[10] tried to get him grounded.

[11] I did say how— I tried to reason with him

[12] and ask him how is this actually going to work

[13] and actually tried to get him to show me

[14] everything he was trying to do. But I didn't

[15] actually tell him — like totally look down upon

[16] him and say this is totally not going to work

[17] or, you know. I was just— I didn't really

[18] know what was going on with him. So I was kind

[19] of more laid back with it since I was the one

[20] who was actually living with him.

[21] **Q:** Is that the reason why he left his job, because

[22] he was thinking that he was going to pursue this

[23] business venture?

[24] **A:** I am— I'm not sure. I'm not sure. I just

[25] heard the one day where he said he wasn't

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

**Page 22**

[1] working anymore. But he didn't really give me a
[2] reason why he wasn't going to work there
[3] anymore.
[4]    Q: Was he showing up for work? Do you know if he
[5] maybe got fired, or was it something voluntary
[6] on his part that he left?
[7]    A: I am not sure.
[8]    Q: Do you know what he was doing in those two weeks
[9] prior to November 18th when he wasn't working?
[10]    A: To tell you the truth, I am not really sure what
[11] he was actually doing because I was working. I
[12] was trying to do my job. I would see him in and
[13] out. Like he would be gone for hours on end and
[14] come back real late at night when I was
[15] sleeping.
[16]    All I really actually did know that he was
[17] trying to start this business, and he was trying
[18] to talk with different people about like
[19] financing him more or less. And I think that
[20] was his basic job right there, to try to get
[21] this business ready. And he was working. He
[22] had like a notebook, and he was working in it
[23] and doing stuff in there. But I— He was so in
[24] and out I wasn't really sure his whereabouts
[25] half the time.

**Page 23**

[1]    Q: Now, you guys I guess shared expenses as
[2] roommates or whatever. How was he being able to
[3] or if he was being able to basically pay his
[4] half of the expenses if he quit his job?
[5]    A: Well, at the end I more or less I got stuck with
[6] the phone bill. I had to pay that off. We were
[7] basically out of the town house, so we didn't
[8] have to pay for that anymore. And I think— I
[9] think the electric was in his name and the cable
[10] was actually paid. But he did owe me some money
[11] which I initially had to pay myself.
[12]    Q: I guess the answer to my question is that when
[13] he stopped working he wasn't able to pay his
[14] expenses as he was before?
[15]    A: Correct.
[16]    MR. PENNINGTON: Objection as to form. Go
[17] ahead.
[18]    A: Correct.
[19]       BY MR. YANINEK:
[20]    Q: Let's talk about the days leading up to November
[21] 18th. You talked about an incident where he had
[22] called you from the airport. Could you describe
[23] that again for me? Is that when he was talking
[24] about meeting the president?
[25]    A: Yes. He had called me in the morning, and I was

[1] on my way to work. And he had told me he was at
[2] the airport, he was going to meet the president.
[3] And that's when he asked me for my Visa card, my
[4] number and everything. And I told him I didn't
[5] feel comfortable giving it to him.
[6]    That's where he became a little irate with
[7] me and accused me of not helping him out. I
[8] tried to reason with him and told him, you know,
[9] I didn't feel comfortable giving anyone, you
[10] know, not just him, my Visa card number for
[11] something I wasn't sure about and more or less
[12] told him I had to go to work and I had to get
[13] going, so. And then that was the end of the
[14] phone conversation.
[15]    Q: When was the next contact you had with him aft
[16] that?
[17]    A: Next contact was I believe was that night when
[18] he had come back to the house with my friend
[19] Brian. And the door was locked, and I was
[20] sleeping, and that's when he broke the window in
[21] the back of the house to get in.
[22]    Q: Brian's last name is what?
[23]    A: Keefer.
[24]    Q: There's something in here about somebody being
[25] arrested for disorderly conduct in Hershey. Who

[1] was that?
[2]    A: I believe that was Ryan.
[3]    Q: Ryan?
[4]    A: Ryan Schorr. The reason why my friend Brian was
[5] with him is because he went and picked him up.
[6]    Q: Did you find out anything more about that, how
[7] he got arrested?
[8]    A: The only thing I really heard about that, he was
[9] at the Hotel Hershey, I believe, or I'm not sure
[10] what hotel he was at. And they had called the
[11] police on him because I guess disorderly
[12] conduct. And the police had picked him up. And
[13] then I believe my friend Brian went and picked
[14] him up then from the police department, I
[15] believe, and then brought him back to the house.
[16] That's how he got back.
[17]    Q: You said that Ryan broke into the rear of the
[18] house?
[19]    A: Right. He broke the window.
[20]    Q: Is there any reason why? Didn't he have his
[21] key, or did you normally leave the doors
[22] unlocked for him? I don't understand.
[23]    A: Well, it was pretty late. I went out with my
[24] friends, and I came back at about 1:30 in the
[25] morning. So he wasn't there, so I just normally

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Page 26

[1] locked the doors and everything. And I guess he
[2] didn't have his key because I heard pounding on
[3] the door first, but I was dead asleep. And then
[4] I heard the last of that. Then I heard windows
[5] breaking in the back, and I wasn't sure if
[6] someone was breaking in or what was it until I
[7] heard voices. So I locked my door.
[8]     Q: After you heard the break-in, what happened
[9] next?
[10]     A: Well, then I heard Ryan's voice. I wasn't sure
[11] what he was saying. But then my friend Brian
[12] came up to my door and knocked on my door and
[13] said it was him, it was Brian, you know, for me
[14] to let him in. So then I did unlock my door and
[15] let him in. And he was kind of telling me more
[16] or less kind of in short about what happened
[17] about the hotel and about him having to pick him
[18] up and, you know, how he was, you know, worried
[19] about Ryan and wasn't sure what to do.
[20]     Q: Did Ryan say anything to you that night?
[21]     A: That night I did see him, and then he started,
[22] you know, talking about how I wasn't helping
[23] him. And he was at the top of the stairs, I was
[24] at the bottom. And him and I got in a little
[25] verbal I guess argument. And I was just trying

Page 27

[1] to tell him, you know, that, you know, he needs
[2] to slow down. Or I'm not really sure what I did
[3] say but I guess along the line where I felt like
[4] he was totally I guess overboard with
[5] everything. And, you know, I wasn't really sure
[6] what to do at that point.
[7]     Q: What did you do?
[8]     A: I initially went downstairs. My friend Brian
[9] stayed with me. And I guess that's when I did
[10] call 911. I wasn't sure what to do at the time.
[11] I didn't feel like he was a danger to other
[12] people, but I did feel he was a danger to
[13] himself.
[14]     But that's when I did initially call 911
[15] and talked to an officer. And they had told me
[16] that he couldn't really do anything unless—
[17] They said it was his house and I guess he has a
[18] right to break the window or whatever. But they
[19] really couldn't do anything until, I don't know,
[20] he broke a law of some sort.
[21]     Q: After you couldn't do anything and you called
[22] 911, what happened next?
[23]     A: Then I called his mother up.
[24]     Q: What did you tell her or talk to her about?
[25]     A: I told her what had happened in the past week

Page 28

[1] and what happened that night. And then his mom
[2] told me that she would meet me outside and that
[3] she felt that we should go to Holy Spirit
[4] Hospital.
[5]     Q: Is that the next morning?
[6]     A: That was about 2:00 in the morning, 2:30 the
[7] same night.
[8]     Q: What time did she get there to get you
[9] approximately?
[10]     A: I'd say about 3:00.
[11]     Q: Then she took you to Holy Spirit. Is that what
[12] happened next?
[13]     A: Correct.
[14]     MR. YANINEK: Can we mark this Gaumer 1.
[15]     (Gaumer Deposition Exhibit #1 marked for
[16] identification)
[17]     BY MR. YANINEK:
[18]     Q: Matt, I'm going to show you what's been marked
[19] Gaumer Deposition Exhibit 1. Have you ever seen
[20] that document before?
[21]     A: I do remember this, filling it out that night,
[22] but I haven't seen it since.
[23]     Q: Is this a document that you actually filled out
[24] at Holy Spirit Hospital or a copy of it anyway?
[25]     A: Yes, I did.

Page 29

[1]     Q: Is this your handwriting on the document? I'm
[2] talking about the first page where it says, Page
[3] 1 of 7.
[4]     A: The first page?
[5]     Q: Yes.
[6]     A: The first page doesn't look like my writing.
[7] But starting from this page, this is my writing.
[8]     Q: You're pointing to Page 3 of 7, the top of that.
[9] Is that correct?
[10]     A: Correct.
[11]     Q: I'm going to just flip you back one page where
[12] it says Page 2 of 7. It starts out with this
[13] big notice on the top. It says, any person who
[14] provides any false information on purpose when
[15] he completes this form may be subject to
[16] criminal prosecution and may face criminal
[17] penalties including conviction of a misdemeanor,
[18] that form, okay.
[19]     MR. PENNINGTON: Is that a question?
[20]     MR. YANINEK: No. I'm just referring him
[21] to that.
[22]     BY MR. YANINEK:
[23]     Q: The first box is checked on Page 2 of 7. Did
[24] you check that box?
[25]     A: Yes.

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

---

**Page 30**

[1] Q: That box says, clear and present danger to
[2] others shall be shown by establishing that
[3] within the past 30 days the person has inflicted
[4] or attempted to inflict serious bodily harm on
[5] another and there is reasonable probability that
[6] such contact will be repeated. A clear and
[7] present danger of harm to others may be
[8] demonstrated by proof that the person has made
[9] threats of harm and has committed acts in
[10] furtherance of the threat to commit harm or
[11] clear and present danger to himself may be shown
[12] by establishing that within the past 30 days.
[13]     When you checked that, what did you mean
[14] when you were checking that?
[15] A: I think what it says there last, clear and
[16] present danger to himself shall be shown. I did
[17] not feel— I felt he was in danger of harming
[18] himself because he was — he wasn't himself.
[19] There was no way that he could know what he was
[20] really doing to himself.
[21] Q: Let's go to the next page. You had said this
[22] top portion in handwriting was your handwriting?
[23] A: Correct.
[24] Q: Can you read it for me since it's handwriting?
[25] A: It says 5:00 a.m. 11/18 Ryan broke the kitchen

**Page 31**

[1] window to get into the house. After he was in,
[2] he threatened me and verbally wanted me to
[3] fight. He then pushed me once. I then left the
[4] situation so nothing else would happen. I feel
[5] very unsafe around him and also feel he is a
[6] danger to himself. He also verbally threatened
[7] his mother several times on the phone.
[8] Q: When you had said before that you didn't feel
[9] threatened but you wrote in here then, you said,
[10] I feel very unsafe around him, how do you
[11] reconcile those two statements?
[12] MR. PENNINGTON: Objection as to form.
[13]         BY MR. YANINEK:
[14] Q: If you can.
[15] A: Well, I felt unsafe being in the situation
[16] because I was unsure what he would do to himself
[17] or to anything, the surroundings around him. I
[18] just— It was a situation where I didn't feel
[19] safe being in my own house. Considering, you
[20] know, his illness and considering the stage he
[21] was in, I felt unsafe about, you know, being in
[22] my own home.
[23] Q: You said he pushed you once. When did he push
[24] you?
[25] A: We were at the top of the stairs. I don't think

**Page**

[1] he necessarily tried to push me but kind of
[2] pushed me away because I guess I was saying
[3] things to him he didn't really want to hear and
[4] kind of one of those where, you know, I don't
[5] want to hear it, just leave me alone and kind of
[6] did one of those and went into his room.
[7] Q: Did he actually touch you with his hand and mov
[8] you aside?
[9] A: A little bit, not like very forcefully but kind
[10] of get away. I don't know, it's kind of hard to
[11] explain, but. And we did— I did tell you how
[12] we did get into a verbal argument.
[13] Q: You said that you got to Holy Spirit around
[14] 3:00. How long did it take you to fill out all
[15] these papers and stuff?
[16] A: It took about two hours. I was there for quite
[17] a long time.
[18] Q: What did you do after you had filled out the
[19] paperwork?
[20] A: I filled it out. I went back— His mom dropped
[21] me off back at the house. I had called a friend
[22] before to see if I could stay at his house. I
[23] did see Ryan one last time when I was getting
[24] the stuff to leave. And that's when he came up
[25] to me and apologized to me and said he was sorry

**Page**

[1] about everything. And we kind of talked calmly
[2] about stuff. And I just told him I was going to
[3] my sister's house because she needed help. I
[4] didn't really want to get into it. And I
[5] gathered a few things and I left.
[6] MR. PENNINGTON: John, I'm sorry, did he
[7] say that that occurred at the hospital or at the
[8] apartment?
[9] MR. YANINEK: The apartment.
[10] A: In the apartment.
[11]         BY MR. YANINEK:
[12] Q: About what time was that when you last saw Rya
[13] at the apartment?
[14] A: I'd say about 5:30.
[15] (Gaumer Deposition Exhibit #2 marked for
[16] identification)
[17]         BY MR. YANINEK:
[18] Q: Matt, I'm going to show you a letter that's been
[19] produced through the investigation, give you a
[20] chance to look at it, and we'll talk about it
[21] once you get a chance to read it.
[22] (Pause)
[23]         BY MR. YANINEK:
[24] Q: Matt, I presented you what was marked as Gaum
[25] Deposition Exhibit Number 2. You had a chance

---

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

---

**Page 34**

[1] to review it. Do you recognize the handwriting
[2] on Gaumer Deposition Exhibit Number 2?
[3] **A:** Yes, I do.
[4] **Q:** Whose handwriting is that?
[5] **A:** My ex-girlfriend, Heidi.
[6] **Q:** Heidi, what was her last name?
[7] **A:** Bowen.
[8] **Q:** You were dating her when you were living with
[9] Ryan?
[10] **A:** Correct.
[11] **Q:** Did you know that she was going to write this
[12] letter?
[13] **A:** No, I didn't.
[14] **Q:** Did you ever see this letter before today?
[15] **A:** I never actually— No, I didn't. I never
[16] actually saw the full letter. I knew what
[17] basically was in it from her, but I never
[18] actually read it.
[19] **Q:** Do you know when she wrote this letter?
[20] **A:** I believe it's in October.
[21] **Q:** October of 2000?
[22] **A:** 2000, correct.
[23] **Q:** How often would Heidi have had contact with
[24] Ryan?
[25] **A:** She would come up maybe every other weekend.

**Page 35**

[1] **Q:** Where was she living at the time?
[2] **A:** She was going to school in Clarion.
[3] **Q:** One of the questions that I have related
[4] specifically to Ryan is that there's a reference
[5] in here in this letter about Ryan using money to
[6] buy drugs for his own use. Can you tell me the
[7] knowledge you have of Ryan's illegal drug use?
[8] **MR. PENNINGTON:** Objection as to form.
[9] **BY MR. YANINEK:**
[10] **Q:** You can answer.
[11] **A:** Which means?
[12] **MR. PENNINGTON:** Just between us. It means
[13] nothing. You can go ahead and answer the
[14] question.
[15] **A:** I was aware of him I guess using marijuana, but
[16] anything other than that, I wasn't — had no
[17] knowledge about.
[18] **BY MR. YANINEK:**
[19] **Q:** To your knowledge, was Heidi aware of him using
[20] anything other than marijuana?
[21] **MR. PENNINGTON:** Objection as to form.
[22] **A:** No.
[23] **BY MR. YANINEK:**
[24] **Q:** And this would have been in the fall of 2000?
[25] **A:** Correct.

**Page 36**

[1] **Q:** Do you know how often Ryan would use marijuana
[2] in the fall of 2000?
[3] **A:** I would see him a few times a week, few times a
[4] week.
[5] **Q:** Two or three times a week, more?
[6] **A:** About two, three times a week. But it always
[7] varied because I would have my work schedule, he
[8] would have his. So sometimes we'd miss each
[9] other. Sometimes we would be there at the same
[10] time.
[11] **Q:** So he could have been doing it more, you just
[12] didn't see?
[13] **MR. PENNINGTON:** Objection as to form. He
[14] could have been doing it less.
[15] **A:** Correct. I mean, I can't really say if he was
[16] or I can't really say he wasn't because it's
[17] something I have no knowledge about.
[18] **BY MR. YANINEK:**
[19] **Q:** You did observe him use marijuana about two or
[20] three times per week?
[21] **A:** Correct.
[22] **Q:** Can you just basically tell me how he would use
[23] it? Would he smoke it in a cigarette or some
[24] other — by some other means?
[25] **A:** By some other means, probably use a bowl or a

**Page 37**

[1] pipe.
[2] **Q:** Use a bowl or a pipe?
[3] **A:** Correct.
[4] **Q:** Do you know how much marijuana quantity wise he
[5] would go through in a week?
[6] **A:** I'm unsure.
[7] **Q:** Do you have an estimate?
[8] **MR. PENNINGTON:** Objection as to form.
[9] Just make sure that that's different than a
[10] guess, okay? If you have an estimate based upon
[11] your knowledge, fine. But if it's a guess,
[12] don't respond or let him know that.
[13] **A:** It would be a guess. I'm not sure.
[14] **BY MR. YANINEK:**
[15] **Q:** Give me a guess then.
[16] **MR. PENNINGTON:** Objection as to form.
[17] **A:** I'd say maybe a week he would get like an eighth
[18] if you're familiar with that amount. That would
[19] probably be as far as I know because I don't
[20] know who he got it from. I don't know when he
[21] got it. I don't know anything about that.
[22] **BY MR. YANINEK:**
[23] **Q:** When you say an eighth, an eighth of an ounce?
[24] **A:** Correct.
[25] **Q:** I just want to clear this up. I think you

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

Page 38

[1] answered it basically. I'm going to ask it in a
[2] more specific fashion. Do you have any
[3] knowledge of him using any type of stimulants or
[4] amphetamines?
[5]    A: No, I don't.
[6]    Q: Cocaine?
[7]    A: No.
[8]    Q: Just so I understand, you obviously said Heidi
[9] is your ex-girlfriend. Have you ever seen Heidi
[10] or know where she is presently?
[11]    A: I know where she is. I haven't seen her in a
[12] few months.
[13]    Q: Is she in Harrisburg?
[14]    A: No. She's actually still in Clarion.
[15]    Q: Is she still a student out there?
[16]    A: She graduated and then I believe she's going for
[17] a master's.
[18]    Q: Was Ryan dating anyone in the fall of 2000?
[19]    A: No, he wasn't.
[20]    Q: There's a woman by the name of Tammy Besko. Was
[21] he dating her at some time?
[22]    A: He was back in high school. That was his high
[23] school girlfriend. And he was talking to her on
[24] the phone, but I wouldn't say he was dating her.
[25]    Q: If I'm correct, wasn't she in Maryland or

Page 39

[1] something the fall of 2000?
[2]    A: Yeah, down in Ocean City, I believe.
[3]    MR. YANINEK: Do you guys have any
[4] questions? While I'm going through some stuff,
[5] go ahead.
[6]    MR. HAUCK: Can we take a break?
[7]    MR. YANINEK: Sure.
[8]    (Recess taken)
[9]        EXAMINATION
[10]        BY MR. PENNINGTON:
[11]    Q: Matt, I'm Steve Pennington. I'm one of the
[12] lawyers that represents Ryan's estate. You
[13] talked about his use of marijuana. Did he ever
[14] talk to you about using that as a way of dealing
[15] with his bipolar illness?
[16]    A: He never really said it was a way to combat it,
[17] but he did say it did calm him down and how it
[18] made him feel more at ease.
[19]    Q: Did he say he used any other drugs to achieve
[20] that purpose?
[21]    A: No.
[22]    Q: Did you ever talk to his mom about his use of
[23] drugs?
[24]    A: No, I didn't.
[25]    Q: Now, the last time you saw him before he died

Pag

[1] was around 5:30 a.m. on the 18th of November,
[2] 2000?
[3]    A: Correct.
[4]    Q: Could you say one way or another if at that time
[5] he was on any drugs?
[6]    A: I don't think he was because that's—
[7]    Q: You didn't observe him smoking a pipe or a joint
[8] or using a bong?
[9]    A: No. I was there for about 10 minutes, got my
[10] stuff, said a little bit to him, and got out of
[11] there.
[12]    Q: Now, you had talked earlier about having a fight
[13] with him. And we're going to get to the 302
[14] papers. But when you saw him last, describe his
[15] demeanor.
[16]    A: You mean at 5:30?
[17]    Q: 5:30.
[18]    A: He seemed he was more calmed down, more I gue
[19] in a way himself. He seemed like the Ryan, the
[20] person I knew.
[21]    Q: Now, do you know if this is after he had left
[22] Holy Spirit?
[23]    A: This was before.
[24]    Q: Before he was taken to Holy Spirit?
[25]    A: This was right after I filled out the 302 I

Pa

[1] guess it's called.
[2]    Q: Did he know at that point that you had done
[3] that?
[4]    A: No, he didn't.
[5]    Q: At that time were you afraid of him in terms of
[6] being a physical threat to you?
[7]    A: Not at all.
[8]    Q: Did he say or do anything that would lead anyone
[9] to believe that he would be a threat to others?
[10]    A: No, he didn't. If anything, he apologized to me
[11] and said how much he was sorry about the things
[12] that had happened in the past few days.
[13]    Q: Now, when you saw him, and of course at that
[14] point you knew you had filled out this 302, your
[15] purpose was to help Ryan at that point?
[16]    A: Absolutely.
[17]    Q: Now, could we look at Gaumer 1. It's the 302.
[18]    A: Yes.
[19]    MR. PENNINGTON: John, could you give him
[20] your pen just—
[21]    MR. YANINEK: Sure.
[22]        BY MR. PENNINGTON:
[23]    Q: Go to Page 2 of 7. Now, you checked the first
[24] box, correct?
[25]    A: Correct.

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

**Page 42**

[1]  Q: And I think in your testimony, though, when
[2] asked why you did that, you referred to clear
[3] and present danger to himself, correct?
[4]  A: Correct.
[5]  Q: Now, look at this first box. I want to make it
[6] clear. The first paragraph talks about a clear
[7] and present danger to others. Did you ever
[8] intend to check this box for the purpose of
[9] indicating that he was a clear and present
[10] danger to others?
[11]  A: No.
[12]  Q: Could you just put a check by the part of that I
[13] would say first two paragraphs that you were
[14] concerned about that night?
[15]  A: The very last part.
[16]  Q: Just read it again.
[17]  A: Clear and present danger to himself shall be
[18] shown by establishing that within the past 30
[19] days.
[20]  Q: Now, when you filled this out, was there any
[21] staff at the hospital there that helped you go
[22] through this?
[23]  A: Yes.
[24]  Q: Who was that, do you know?
[25]  A: I totally forget her name. I know it was a

**Page 43**

[1] woman, but I totally forget her name.
[2]  Q: Do you know if she was a nurse, a professional,
[3] a secretary, a clerk?
[4]  A: I think she was a professional. I know she
[5] wasn't a nurse or a secretary, but someone who
[6] was, I guess, a professional in that field, I
[7] guess, because I did talk to her in length about
[8] what had happened.
[9]  Q: Do you know if she took any notes?
[10]  A: I am not sure.
[11]  Q: Is it your recollection that you told her that
[12] Ryan represented a clear and present danger to
[13] himself that night?
[14]  A: Yes.
[15]  Q: At any time during that night I guess from the
[16] time you saw him on the steps until you filled
[17] this out, were you in fear for your safety from
[18] Ryan Schorr?
[19]  A: No, I wasn't.
[20]  Q: During the whole time that you knew him, was
[21] there any time that you felt afraid of him or
[22] threatened by him?
[23]  A: Never.
[24]  Q: Did he ever physically assault you?
[25]  A: Never.

**Page 44**

[1]  Q: Now, are you aware of any instance where Ryan
[2] Schorr physically assaulted anyone?
[3]  A: No.
[4]  Q: Now, he would complain about his mother?
[5]  A: Yeah. But all of us did at one time. Nothing's
[6] perfect.
[7]  Q: Do you know if he ever physically assaulted her
[8] in any way?
[9]  A: I don't.
[10]  Q: Just go to 3 of 7, Matt, if you would. Now,
[11] when you wrote, Ryan broke the kitchen window to
[12] get in the house, did you explain to the person
[13] you were talking to from Holy Spirit all the
[14] circumstances surrounding that?
[15]  A: In what reference?
[16]  Q: Well, the fact that he had came home, pounded on
[17] the door, couldn't get in—
[18]  A: Yes.
[19]  Q: —broke the window, was with your friend Brian?
[20]  A: Yes.
[21]  Q: Did you explain that to her?
[22]  A: Yes.
[23]  Q: Did she give you any advice what to put down in
[24] this paragraph?
[25]  A: Not really.

**Page 45**

[1]  Q: I think you've already made it clear that you
[2] indicated to her you felt Ryan was a, I want to
[3] use the right phrase, a danger to himself.
[4] Mrs. Schorr was there as well?
[5]  A: Yes, she was.
[6]  Q: Did she indicate to the hospital worker the same
[7] thing?
[8]  A: She— I think she went along the lines where I
[9] guess— Come to think of it, I think she was
[10] the one who filed the second time he went to the
[11] hospital. And she didn't really get into it
[12] much because it was more or less what I— She
[13] didn't see anything that happened in the past.
[14] She didn't even see him I think two weeks prior
[15] to everything that happened.
[16]  Q: Do you know why?
[17]  A: I think she tried to contact him many times but
[18] never got ahold of him, like never knew where he
[19] was actually at. So she really didn't say too
[20] much.
[21]  Q: Now, you say the second time. You're not
[22] talking about when you were in college, you're
[23] talking about—
[24]  A: Yes.
[25]  Q: —that day?

. Keith ... Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaume
June 3, :

---

**Page 46**

[1]    A: Yes, when I was in college.

[2]    Q: Now, when you left the apartment that morning,
[3]  and I mean at 5:30 a.m. on the 18th, and I'm
[4]  sure either John or I asked you this, what did
[5]  he say to you during the time that you were
[6]  there, if you can recall the exact words?

[7]    A: He told me that he was sorry for everything that
[8]  had happened. He told me he felt bad about it
[9]  and he hoped that we could still be friends.

[10]    Q: Now, that day, November 18th of 2000, did you
[11]  ever have any conversations with the police
[12]  prior to when he was shot and killed?

[13]    A: Just that 911 call.

[14]    Q: And that was done around 2:00 a.m. did you say?

[15]    A: Correct.

[16]    Q: Outside of talking to this staff person at Holy
[17]  Spirit, did you talk to anyone else at Holy
[18]  Spirit?

[19]    A: No, I didn't.

[20]    Q: Would it be fair to say then or would it be
[21]  correct to say that your two contacts were the
[22]  911 call to the police and discussions with
[23]  regard to the 302 form with the Holy Spirit
[24]  staff person?

[25]    A: Yes.

**Page 47**

[1]    Q: What police did you call to 911?

[2]    A: To tell you the truth, I'm not sure. I just
[3]  called 911, and they just dispatched it to
[4]  someone. I probably believe it was probably
[5]  West Shore. I'm just— I'm not sure. It's
[6]  kind of vague.

[7]    Q: Now, over the course of your relationship with
[8]  — your friendship with Ryan, I think you've
[9]  testified that you noticed him acting you used
[10]  the word strangely, if we could just use that,
[11]  would it be two times? And I'm talking about
[12]  general periods of time, not specific instances.

[13]    A: Yes.

[14]    Q: Outside of when he was in the throes of his
[15]  bipolar illness, how would you describe your
[16]  relationship with Ryan?

[17]    A: It was kind of on edge because I was very unsure
[18]  of how he was going to act or what he was going
[19]  to do or what his next move. So I guess you
[20]  could describe it kind of being on pins and
[21]  needles.

[22]    Q: Why was that? Were you concerned for yourself?

[23]    A: I was more concerned about him, wondering what
[24]  he was going to do, what he was going to do to
[25]  himself, where he was going to go, if he was

**Pa**

[1]  going to hurt himself. I was just pretty
[2]  worried.

[3]    Q: Now, when you last saw him at 5:30 a.m., did he
[4]  appear to be delusional? Do you know what that
[5]  term means?

[6]    A: Yes. Not at all. He seemed like himself.

[7]    Q: Now, between the time you moved in, in May of
[8]  2000 and November of 2000, had the police been
[9]  there?

[10]    A: Not at all.

[11]    Q: Did you ever call the police over concerns about
[12]  Ryan?

[13]    A: No, I didn't.

[14]    Q: Any of the neighbors call the police?

[15]    A: No.

[16]    Q: Now, are you aware that Mrs. Schorr, Ryan's
[17]  mother, made a call to the police?

[18]    A: No, I'm not.

[19]    Q: Did you ever talk to her about her calling the
[20]  police—

[21]    A: No, I didn't.

[22]    Q: —later that day?

[23]    A: Actually I don't— I didn't really know if she
[24]  did call the police, but I know she did contact
[25]  them, and that's I think how she found out about

**Pa**

[1]  it.

[2]    Q: Was this after the fact you found out, or was it
[3]  during that time?

[4]    A: It was actually what I believe I was— His mom
[5]  had called me where I was staying at, and
[6]  another call came on the line like call waiting.
[7]  And I guess that's when she found out that he
[8]  was shot. And then it came back on, and she was
[9]  pretty hysterical. And that's when I got off
[10]  the phone and drove over to the town house.

[11]    Q: What time was he shot, do you know?

[12]    A: I'm not really sure. It was sometime in the
[13]  morning. Just all recollection time I didn't
[14]  really know what time it was. It was just a lot
[15]  of stuff happening at once.

[16]    Q: Would you say that after 5:30 a.m., a couple
[17]  hours past?

[18]    A: Yeah, a couple hours. I'd say no earlier than
[19]  9:00.

[20]    Q: You talked to Mrs. Schorr once between that tin
[21]  and then a second time?

[22]    A: Yes. She did call me because they were — they
[23]  needed to get into the town house because I
[24]  guess this was after the fact he left the
[25]  hospital. And I was the only one who had a key.

---

Matthew Robert Gaumer, Jr.
June 3, 2002



Keith I. Schorr & Susan Schorr   v.
orough of Lemoyne, et al.

Page 50

[1] So she was calling me in order to get a key to
[2] get into the house.
[3]    Q: There's been testimony that she told the police
[4] she was concerned that when Ryan went back
[5] you're in the apartment. Would that make sense
[6] to you?
[7]    A: It might have made sense because I don't think I
[8] told her I was leaving. So I think maybe she
[9] may have thought I may have been in there.
[10]    Q: So you talked to her while you were there at
[11] 5:30 a.m.?
[12]    A: No. She had dropped me off, and then she
[13] didn't— I didn't speak with her until about
[14] 9:00.
[15]    Q: And she called you?
[16]    A: Yeah. She had called around and then found— I
[17] was staying at a friend's house, and she found
[18] the phone number.
[19]    Q: But when she talked to you, she knew that you
[20] were staying at this friend's house?
[21]    A: She did at that time, yes.
[22]    Q: Did she ever tell you that she told the police
[23] she was concerned about you at the apartment
[24] that morning?
[25]    A: No, not that I know.

Page 51

[1]    Q: Did you ever convey to her, say to her that she
[2] should be concerned about you staying at the
[3] apartment at any time?
[4]    A: No.
[5]    Q: Did she ever say to you she was concerned about
[6] your safety in any way being Ryan's roommate?
[7]    A: Not really, no.
[8]    Q: Now, how would you describe your relationship
[9] with Mrs. Schorr prior to November of 2000?
[10]    A: I saw her every once in a while. It wasn't bad.
[11] It wasn't close, but, you know, I was good
[12] friends with Ryan, so I did have contact with
[13] her and spoke with her.
[14]    Q: Would she ever call you and ask you about Ryan's
[15] condition?
[16]    A: No.
[17]    Q: Now, he was 302'd twice before this, once I
[18] think in—
[19]    A: I believe so.
[20]    Q: —'92 that you were aware of?
[21]    A: I believe so.
[22]    Q: Do you know if that involved any violence?
[23]    A: Not to my knowledge.
[24]    Q: And then there was the time I think in '94 when
[25] you were in college?

Page 52

[1]    A: Correct.
[2]    Q: And you had heard some rumors or some statements
[3] were made to you with regard to this?
[4]    A: Correct.
[5]    Q: Anybody mention violence?
[6]    A: Not at all.
[7]    Q: Do you know of any incident involving Ryan and
[8] violence over the time that you knew him?
[9]    A: No, not at all.
[10]    Q: Do you know if he was known by other people as
[11] having a reputation as being a violent person?
[12]    A: Not at all. He wasn't a violent person at all.
[13]    Q: Did Heidi ever tell you that Ryan had been
[14] violent with her in any way?
[15]    A: No.
[16]    Q: I probably asked this before, but Mrs. Schorr
[17] never indicated to you she was afraid of Ryan?
[18]    A: No.
[19]    Q: How many times had he had contact with the
[20] police prior to November, if you know? It
[21] doesn't have to be a precise number.
[22]    A: What do you mean by contact?
[23]    Q: Any contact where he was — like Hershey or the
[24] 302s or maybe he would be walking down the
[25] street.

Page 53

[1]    A: I believe that was the only time he ever had
[2] contact with the police.
[3]    Q: Do you know if the other two 302s the police
[4] were involved?
[5]    A: I know the first time they were because they
[6] actually were the ones that found him walking on
[7] the side of the road.
[8]    Q: You're not aware of any violence in that
[9] situation?
[10]    A: No.
[11]    Q: So your recollection is there is the first 302
[12] and then Hershey? Are there other instances
[13] where you know that Ryan had contact with the
[14] police other than—
[15]    A: No.
[16]    Q: —when they found him along the road at the
[17] Hershey— I know you said you might know— It
[18] might not be the Hershey Hotel. But let's just
[19] talk about Hershey. Those two instances?
[20]    A: Yeah. That's the only time I can recall that he
[21] had contact with the police.
[22]    Q: And do you know if there was any incident at
[23] whatever hotel it was in Hershey involving
[24] violence by Ryan?
[25]    A: I don't think so. I don't really know much

Keith I. Schorr c  Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

---

Page 54

[1] about that since I wasn't the one who went to
[2] pick him up.
[3]   Q: Now, he called you from the airport?
[4]   A: Yes.
[5]   Q: When was that in relationship to when he was
[6] killed? Was it a week, two weeks?
[7]   A: It was actually— It was that Friday because it
[8] happened— I think the 18th was a Saturday, and
[9] it was Friday morning before I was going to
[10] work.
[11]   Q: Your friend Brian went to pick him up at the
[12] airport?
[13]   A: No. He didn't get involved until he was
[14] actually at the police station that night.
[15]   Q: So he went from the— Based upon what you know,
[16] he went from the airport to Hershey?
[17]   A: I believe. I guess so. I'm not really sure
[18] where he— He was all over the place. The few
[19] days prior, he was everywhere.
[20]   Q: Okay, Matt, what I'm trying to do is just
[21] determine based upon your recollection or your
[22] knowledge if Ryan had any contact with the
[23] police when he was at the airport.
[24]   A: I'm not sure.
[25]   Q: Now, Brian Keefer, was he your friend and Ryan's

---

Page 55

[1] friend?
[2]   A: Yes.
[3]   Q: Where's he from?
[4]   A: He went to school with us at Susquehanna.
[5]   Q: Where is he at now, do you know?
[6]   A: I believe he's back living with his parents.
[7]   Q: Is it your understanding that Ryan called Brian
[8] to get a ride home, or how did that occur?
[9]   A: I think they did actually call his house.
[10]   Q: But you don't know?
[11]   A: I'm not sure. I'm not sure really how he got
[12] involved. What I do know that they did call his
[13] house and I think his — Brian's father was on
[14] the phone first. But then Brian got on and said
[15] he would go pick him up. He would probably be a
[16] better person to ask about that.
[17]   Q: You said that when you heard pounding on the
[18] door and then you heard the glass break and you
[19] locked your door, your bedroom door, why was
[20] that?
[21]   A: If you can imagine just being in a dead sleep
[22] and then all of a sudden hearing a pounding and
[23] then a window break and you're just— I woke up
[24] in disarray. I didn't know if someone was
[25] trying to break in my house.

---

Pag

[1]   Q: So you didn't know it was Ryan at that point?
[2]   A: Not until I heard voices after they actually had
[3] gotten in.
[4]   Q: I think it was Brian who first identified
[5] himself to you?
[6]   A: Correct.
[7]   Q: At that point did any fear you have dissipate?
[8]   A: Yes.
[9]   Q: Again, this verbal argument you had with Ryan on
[10] the steps, outside of him pushing his way past
[11] you, there was no violence involved?
[12]   A: No.
[13]   Q: No threat of violence?
[14]   A: No.
[15]   Q: Now, did you know that they found ecstasy in
[16] Ryan's bloodstream after this incident?
[17]   A: I did hear about that.
[18]   Q: Did you know prior to this that Ryan was taking
[19] ecstasy?
[20]   A: I didn't— I never really actually saw him.
[21] But in the few weeks prior to the incident he
[22] was hanging out with people I didn't know, and I
[23] wasn't with him. So he may have gotten it
[24] through that. But I never actually did see him
[25] actually take it, not in my presence.

---

Pag

[1]   Q: Are you familiar with the effects of that drug
[2] on a person?
[3]   A: Yes.
[4]   Q: Not through personal usage but just in your
[5] general knowledge?
[6]   A: Yes.
[7]   Q: Did you have a suspicion the two weeks prior to
[8] November that he might be on ecstasy?
[9]   A: I didn't think— I didn't think it was because
[10] of ecstasy because I saw him before when he was
[11] in this manic stage, and I did understand about
[12] manic depression bipolar because I did read up
[13] about it a lot. I didn't think it was because
[14] of him doing ecstasy but because of his illness
[15] and not taking his medication.
[16]   Q: Did you subsequently learn from anyone that he
[17] had, in fact, taken ecstasy at a time prior to
[18] his killing?
[19]   A: I heard hearsay where people said they saw him
[20] out at a club or something and said he was, you
[21] know, pretty out of the ordinary. But, you
[22] know, that's hearsay. You know, you don't
[23] really know who to believe and who not to. You
[24] know, I'm the type of person I need to actually
[25] see it myself before I'm going to believe

---

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Page 58

[1] anything.
[2]  **Q:** At no time during the two weeks prior to this
[3] did he show any signs of violence. Would that
[4] be accurate?
[5]  **A:** Accurate, yes.
[6]  **Q:** Now, there's been testimony in this case by one
[7] of the police officers that during this
[8] confrontation Ryan had grabbed a serrated knife,
[9] and I'm not sure if he said he tried to stab him
[10] or he lunged at him or he held a serrated knife
[11] over the one police officer. Did you ever see
[12] Ryan at any time brandish a knife in that
[13] fashion?
[14]  **A:** No.
[15]  **Q:** He had an air gun. Was that his?
[16]  **A:** I never heard of the air gun or ever saw it
[17] until it got brought up. I never saw that
[18] before.
[19]  **Q:** Had you been in his room before?
[20]  **A:** I did go in his room before, and he had some
[21] things from other people like CDs and stuff
[22] where I actually went into the room and got the
[23] stuff for other people. So I was—
[24]  **Q:** You never saw the air gun?
[25]  **A:** I never saw the air gun.

Page 59

[1]  **Q:** And the serrated knives, I describe them as a
[2] steak knife. Did you have these kind of knives
[3] in your house, do you know?
[4]  **A:** Yes, we did.
[5]  **Q:** They were kept in the kitchen?
[6]  **A:** Correct.
[7]  **Q:** Did you ever notice if Ryan had one in his
[8] bedroom at any time?
[9]  **A:** Not to my knowledge.
[10]  **Q:** Now, the police also testified that— Or the
[11] one officer testified that when he saw Ryan he
[12] was standing in front of his mirror with a
[13] fluffy housecoat on and a hat. Did you ever see
[14] that housecoat? Do you know what they were
[15] referring to?
[16]  **A:** Yes, I did. He was actually wearing it when I
[17] came back at 5:30.
[18]  **Q:** Just describe it for me.
[19]  **A:** I guess it's like one of those kind of, I don't
[20] know, like kind of furry kind of coats. I guess
[21] the best way to describe it you see like a pimp
[22] wearing it or something, one of those kind of
[23] coats.
[24]  **Q:** Like a '70s kind of—
[25]  **A:** Correct, like real big.

Page 60

[1]  **Q:** Is that something he would wear around the
[2] house?
[3]  **A:** He would wear it as a joke sometimes, but he
[4] wouldn't actually wear that out of the house
[5] like to, you know— I mean, more or less I
[6] wouldn't be seen with him if he was wearing it,
[7] but.
[8]  **Q:** Did you learn what kind of hat he had on that
[9] night?
[10]  **A:** No, I don't, because he wasn't wearing a hat
[11] when I saw him. All he had on was the coat.
[12]  **Q:** Was it tied?
[13]  **A:** Yeah. It was buttoned.
[14]  **MR. PENNINGTON:** That's all I would have at
[15] this point.

EXAMINATION
BY MR. HAUCK:

[18]  **Q:** My name is Gregory Hauck, and I represent the
[19] West Shore Regional Police Commission and Chief
[20] Howard Dougherty in this case. Can you please
[21] state your date of birth?
[22]  **A:** 11/5/1973.
[23]  **Q:** What's your social security number?
[24]  **A:** 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.
[25]  **Q:** I'm sorry, 39?

Page 61

[1]  **A:** 66.
[2]  **Q:** Are you married?
[3]  **A:** No, I'm not.
[4]  **Q:** Have you ever been married?
[5]  **A:** No.
[6]  **Q:** Do you have any children?
[7]  **A:** No, I don't.
[8]  **Q:** Do you currently live by yourself?
[9]  **A:** Right now I don't. I have a roommate.
[10]  **Q:** What's that person's name?
[11]  **A:** Roger Wilson.
[12]  **Q:** How long have you lived with him?
[13]  **A:** Since August of 2001.
[14]  **Q:** When you move to Harrisburg, are you going to
[15] have a roommate?
[16]  **A:** No, I'm not.
[17]  **Q:** You said that you are currently employed by a
[18] school in Virginia?
[19]  **A:** Right.
[20]  **Q:** Could you spell the name of the school?
[21]  **A:** It's Red Oak, R-e-d O-a-k.
[22]  **Q:** That's two words?
[23]  **A:** Yes.
[24]  **Q:** Why are you leaving that school?
[25]  **A:** I'm coming back to be closer to family, try to

Keith I. Schorr & Susan Schorr v.                                          Matthew Robert Gaume
Borough of Lemoyne, et al.                                                            June 3,

Page 62

[1] find a job in Pennsylvania kind of be closer to
[2] friends.
[3]    Q: You say you're going to be working for HACC?
[4]    A: For the summer, yes.
[5]    Q: Can you tell me what that is?
[6]    A: Harrisburg Area Community College.
[7]    Q: Have you ever worked for HACC before?
[8]    A: Yes, I did, last summer.
[9]    Q: Do you have any degrees beyond your college
[10] degree?
[11]    A: No, I don't.
[12]    Q: Have you ever been arrested before?
[13]    A: No, I haven't.
[14]    Q: Have you ever been convicted of a crime?
[15]    A: No.
[16]    Q: You said you first met Ryan when you were in
[17] eighth grade. Is that right?
[18]    A: Correct.
[19]    Q: How did you meet?
[20]    A: We went to the same school, and we hung out with
[21] the same people.
[22]    Q: How far apart did you live from one another?
[23]    A: At one time we lived maybe about I'd say about
[24] five miles, but then I moved around a lot. And
[25] then eventually I lived up the street from him

Page 63

[1] off of Sixth Street.
[2]    Q: So you lived on the same block, I assume?
[3]    A: I wouldn't say the same block, but in the same
[4] area because Sixth Street is the city.
[5]    Q: Was it within walking distance of Ryan's house?
[6]    A: Yes.
[7]    Q: Did you move there when you were in eighth
[8] grade?
[9]    A: No. I didn't move up the street from him until
[10] I was a junior in high school because I moved —
[11] I moved out of Susquehanna for about a year and
[12] a half. But I was still in Harrisburg but a
[13] different school.
[14]    Q: Why did you move around a lot?
[15]    A: My mom got remarried, and then she got divorced
[16] again. And there was a lot of incidents where
[17] we had lost our house and we had to move out. I
[18] did a lot of moving around.
[19]    Q: Now, you said you got to know Ryan because you
[20] went to school together?
[21]    A: Correct.
[22]    Q: Is there anything in particular in the school
[23] that led you to become acquainted with Ryan?
[24]    A: We used to get together practically every
[25] weekend, play football or play basketball or

Pag

[1] kind of play sports. So that got us together a
[2] lot.
[3]    Q: Were there any organized activities that you did
[4] together?
[5]    A: No, not organized.
[6]    Q: Did Ryan play any sports in high school?
[7]    A: He played football.
[8]    Q: Did he play any other sports?
[9]    A: Not that I know of. I think just football.
[10]    Q: Did he wrestle?
[11]    A: No.
[12]    Q: Was he involved in any other activities?
[13]    A: No, not to my knowledge.
[14]    Q: Did you play football?
[15]    A: No.
[16]    Q: Is there any activity that you were involved
[17] with in high school that would have led you to
[18] become acquainted with Ryan?
[19]    A: Not anything organized, but we did generally get
[20] along together, had some of the same interests
[21] and just— We would be with the same people on
[22] the weekends and just anything we did.
[23]    Q: When you were in high school, how often would
[24]    A: No, because he was a year under me.
[25]    Q: When you were in high school, how often woul

Pa

[1] you say that you socialized with Ryan?
[2]    A: I'd say at least once or twice a day I would see
[3] him. But when I was a freshman and a sophomore
[4] in high school, I went to a different school, so
[5] I didn't see him in school those two years. I
[6] didn't see him in school until I came back my
[7] junior year.
[8]    Q: Did you keep in touch with him while you were
[9] away from him your freshman and sophomore year?
[10]    A: Yes.
[11]    Q: How often would you socialize with him then?
[12]    A: I'd see him probably one time during the weeke
[13] maybe on Saturday or Friday or depending on what
[14] was going on.
[15]    Q: While Ryan was in high school, who did he live
[16] with?
[17]    A: He lived with his mother.
[18]    Q: Did he live with his siblings, also?
[19]    A: He lived with his sister — his younger sister
[20] and brother.
[21]    Q: Does he only have two siblings?
[22]    A: Yes.
[23]    Q: Did anyone else live with them?
[24]    A: I think he just lived with his mom. Yeah, he
[25] just lived with his mom in the house on Sixth

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

---

Page 66

[1] Street.
[2]   **Q:** Are his parents divorced?
[3]   **A:** Yes, they are. But his mom remarried.
[4]   **Q:** When did she remarry?
[5]   **A:** I couldn't tell you. I don't know.
[6]   **Q:** Was she remarried when you were in high school?
[7]   **A:** No.
[8]   **Q:** Did she remarry after 1995?
[9]   **A:** I would say so.
[10]   **Q:** Do you know where Ryan's father lived when he
[11] was in high school?
[12]   **A:** No, I don't. I never went to his father's
[13] house. I very rarely actually saw him until
[14] after high school.
[15]   **Q:** You're referring to his father?
[16]   **A:** His father, yes.
[17]   **Q:** Had you ever met Ryan's father when you were in
[18] high school?
[19]   **A:** No, I didn't.
[20]   **Q:** Did Ryan ever talk about his dad when Ryan was
[21] in high school?
[22]   **A:** He did every once in a while because him and I
[23] kind of talked about it because my mom got
[24] divorced, and his parents went through the same
[25] thing, so we talked about it a small bit.

Page 67

[1]   **Q:** What would he say about his father?
[2]   **A:** He would just say how he wished his father was
[3] more involved in his life. And I was going
[4] through the same thing, so. He wouldn't say
[5] anything real bad about him, just he wished his
[6] dad would do more.
[7]   **Q:** When he was in high school, do you know how
[8] often he talked to his father?
[9]   **A:** I'm not sure.
[10]   **Q:** Do you know how often he saw his father?
[11]   **A:** Not at all.
[12]   **Q:** Do you know how far away he lived?
[13]   **A:** I'd say at the most he probably lives about 20
[14] minutes away.
[15]   **Q:** Do you know what town his father lives in?
[16]   **A:** I'm not sure.
[17]   **Q:** Do you know what town his father lived in when
[18] you were in high school?
[19]   **A:** No.
[20]   **Q:** You said that you started living with Ryan in
[21] May of 2000. Is that right?
[22]   **A:** Correct.
[23]   **Q:** Had Ryan lived with his mother up until that
[24] point?
[25]   **A:** No.

Page 68

[1]   **Q:** Where did he live before he started living with
[2] you?
[3]   **A:** He actually— He lived in an apartment that was
[4] in I would say it would be considered
[5] Wormleysburg, right across the river here.
[6]   **Q:** Who did he live there with?
[7]   **A:** By himself.
[8]   **Q:** Do you know how long he lived in that apartment?
[9]   **A:** I'd say— I'd say about a year.
[10]   **Q:** Where did he live prior to that?
[11]   **A:** Prior to that, he did live with his mom for a
[12] little bit. And then prior to that, he was kind
[13] of bouncing around different places. Like he
[14] had lived in Lemoyne for a little bit. He lived
[15] up in Steelton for a little bit. He was kind of
[16] everywhere. He lived down in Harrisburg for a
[17] little bit. So he was kind of bouncing around.
[18]   **Q:** Did he ever live with anyone else during that
[19] time other than his mother?
[20]   **A:** Yes. When he lived in Lemoyne, he lived with
[21] two other people.
[22]   **Q:** Do you know what their names are?
[23]   **A:** I think the guy's name was Dave, and he lived
[24] with another girl. Her name was Becky.
[25]   **Q:** Do you know Dave's last name?

Page 69

[1]   **A:** No, I don't.
[2]   **Q:** Do you know Becky's last name?
[3]   **A:** No.
[4]   **Q:** How about at some of his other places where he
[5] lived, did he live with anyone?
[6]   **A:** In Harrisburg he lived by himself. I think
[7] that's all the places he lived, yeah.
[8]   **Q:** You said after high school you went into the
[9] Navy for two years. Is that right?
[10]   **A:** Yes.
[11]   **Q:** While you were in the Navy, how often would you
[12] talk to Ryan?
[13]   **A:** It was a little bit less in the Navy because I
[14] was, you know, I'd go off to deployment for
[15] months on end, or I'd come back. I'd say at the
[16] most when I was in the Navy maybe once a month.
[17]   **Q:** How would you communicate with him?
[18]   **A:** On the phone.
[19]   **Q:** Where were you stationed when you were in the
[20] Navy?
[21]   **A:** I was stationed down in Norfolk, and then I got
[22] restationed in Philadelphia.
[23]   **Q:** How often did you come home for that two-year
[24] period?
[25]   **A:** When I was not on the ship— I was stationed on

---

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

---

**Page 70**

[1] an aircraft carrier. When I wasn't on the ship,
[2] I would say once a month.
[3]    Q: Typically when you were home, would you see
[4] Ryan?
[5]    A: Sometimes I would, sometimes I wouldn't because
[6] he was actually he was away at school at the
[7] time I was in the Navy because he went to
[8] Shippensburg for a year.
[9]    Q: Did he live at Shippensburg when he went there?
[10]    A: Yes, he did.
[11]    Q: Did you ever visit him at Shippensburg?
[12]    A: Once.
[13]    Q: Do you know why he left Shippensburg?
[14]    A: I think it was because of his grades.
[15]    Q: Do you think it had anything to do with his
[16] illness?
[17]    A: No. I just think it was just him being lazy, I
[18] guess. I don't think it was his illness at all.
[19]    Q: When he was in high school, do you know if Ryan
[20] ever used illegal drugs?
[21]    A: No, just drinking, I mean beer, but that's about
[22] it.
[23]    Q: Did he ever use marijuana?
[24]    A: Not in high school he didn't. He was totally
[25] against it.

**Page 71**

[1]    Q: How about at Shippensburg, do you know if he
[2] ever used illegal drugs?
[3]    A: I'm not sure at school because I didn't see him.
[4]    Q: Had you ever heard anything that led you to
[5] believe he had used illegal drugs when he was at
[6] Shippensburg?
[7]    A: No.
[8]    MR. PENNINGTON: Can I just follow-up?
[9]       REEXAMINATION
[10]       BY MR. PENNINGTON:
[11]    Q: Matt, we talked about— I'm trying to get this
[12] chronology down, and I just want to make sure I
[13] have it straight.
[14]    MR. PENNINGTON: Counsel, I apologize if
[15] I'm repetitive.
[16]       BY MR. PENNINGTON:
[17]    Q: You went back to the apartment at 5:30 a.m., and
[18] the next contact you had with anybody from the
[19] Schorr family was when Mrs. Schorr called you?
[20]    A: Correct.
[21]    Q: And did she tell you— What did she tell you in
[22] this telephone conversation?
[23]    A: That's when she had told me that he had left the
[24] hospital and locked himself up in our town
[25] house. And she was calling me because I was the

---

**Page**

[1] only one that had a key. So maybe to my
[2] knowledge, what she was asking if, you know, I
[3] would give the key to the police.
[4]    Q: What did you tell her?
[5]    A: I said I would. And that's when the call
[6] waiting went off, and that's when she found out
[7] that he had been shot.
[8]    Q: So it was at the same—
[9]    A: It was at the same time.
[10]    Q: He was probably already dead at the time she
[11] asked if you could bring the key over?
[12]    A: Probably, yes.
[13]    Q: She did indicate to you, however, that she had
[14] been trying to get ahold of you?
[15]    A: Yes.
[16]    Q: Find you?
[17]    A: Yes.
[18]    Q: And that she had called a bunch of your friends?
[19]    A: Yes.
[20]    Q: Did she give you any indication how long she ha
[21] been trying to get ahold of you?
[22]    A: No, she didn't.
[23]    MR. PENNINGTON: That's it. Thank you.
[24]       REEXAMINATION
[25]       BY MR. HAUCK:

**Page**

[1]    Q: You had said that Ryan was first diagnosed with
[2] his bipolar disorder when Ryan was in high
[3] school?
[4]    A: Not in high school. The first incident where we
[5] talked about where he came to my house and
[6] painted and the police had picked him up at the
[7] side of the road and he was at Holy Spirit for I
[8] think about two weeks, that's when he was first
[9] diagnosed.
[10]    Q: What year was that?
[11]    A: '92, I believe.
[12]    Q: Now '92 was the year you graduated.
[13]    A: Not '92, I'm sorry. I'd say '94.
[14]    Q: Had you just come back from the Navy at that
[15] time?
[16]    A: Yes.
[17]    Q: So it was right after you were discharged from
[18] the Navy?
[19]    A: Correct.
[20]    Q: What were you doing at the time?
[21]    A: I just moved back home with my mother, and I
[22] going to Harrisburg Area Community College.
[23]    Q: Around the time of this incident, had you been
[24] interacting with Ryan on a somewhat regular
[25] basis?

---

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

**Page 74**

[1] **A:** Yes.

[2] **Q:** How often would you see him at that time?

[3] **A:** I'd see him a few times a week.

[4] **Q:** Had anyone ever suspected up to that point in [5] time that Ryan had bipolar disorder?

[6] **A:** No, they didn't.

[7] **Q:** Who had filled out the application for the 302 [8] commitment order?

[9] **A:** Which time?

[10] **Q:** The first time in 1994.

[11] **A:** I couldn't really tell you who exactly did it.

[12] **Q:** Do you know if he was put on medication at that [13] time?

[14] **A:** I'm not sure about the first time, but I know [15] the second time he was admitted I was aware that [16] he was put on medication. But I'm not sure [17] about the first time.

[18] **Q:** Do you know after the first time if he saw a [19] doctor regularly?

[20] **A:** I don't think he did, but he might have. I'm [21] not sure because a few months after that [22] incident that's when I went away to school.

[23] **Q:** You also talked about a second incident where he [24] was committed pursuant to a 302 order. Is that [25] right?

**Page 75**

[1] **A:** Correct.

[2] **Q:** What year was that?

[3] **A:** I believe that's when I was away at school and [4] everything happened. I believe that was [5] probably '96.

[6] **Q:** So you would have been a sophomore in college at [7] the time?

[8] **A:** Correct.

[9] **Q:** How did you hear about that incident?

[10] **A:** A friend of mine who his name is Tim he had [11] actually went to his house and stayed for like [12] two nights, and he actually called me up and [13] told me about it and told me he was in the [14] hospital up here. I forget the actual name of [15] the place, but it's off of Front Street. And [16] that's when I— I came home maybe a week later, [17] and I went to see him.

[18] **Q:** Was Ryan living with his mother at that time?

[19] **A:** I'm not sure. I'm not sure.

[20] **Q:** Do you know that a 302 commitment order was [21] definitely issued at the time of the second [22] incident?

[23] **A:** I don't know if it definitely was, but I [24] believe— I believe probably it would have had [25] to have been because I don't think he would have

**Page 76**

[1] voluntarily committed himself.

[2] **Q:** Do you know who would have requested the 302 [3] commitment?

[4] **A:** I believe it was his mother.

[5] **Q:** Do you know if there were any involuntary [6] commitment orders after that?

[7] **A:** Before mine?

[8] **Q:** Yes.

[9] **A:** No, there wasn't.

[10] **Q:** Is it possible that there was another one?

[11] **A:** I don't think— I don't think it was possible [12] because I think if he would have been I think we [13] would have all known about it.

[14] **Q:** If I told you that the grand jury investigator's [15] report indicated there had been four involuntary [16] commitments, would you think that that report [17] was incorrect?

[18] **A:** Yes.

[19] **Q:** After Ryan's first incident, do you know if any [20] doctors had advised Ryan that he shouldn't live [21] on his own?

[22] **A:** No.

[23] **Q:** No, you don't know?

[24] **A:** No, I don't know that if that was said.

[25] **Q:** Do you know if Ryan ever saw a doctor on a

**Page 77**

[1] regular basis?

[2] **A:** Yes.

[3] **Q:** Do you know when that began?

[4] **A:** It began when he — a year before him and I [5] started living together when he lived by himself [6] over in Wormleysburg. I believe he told me [7] how— He used to tell me about appointments he [8] had made with a certain doctor where he talked [9] to. And that's when I was aware of him being on [10] medication.

[11] **Q:** Do you know the doctor's name?

[12] **A:** No, I don't.

[13] **Q:** So that would have been in about May of '99 he [14] started seeing a doctor regularly?

[15] **A:** Yes.

[16] **Q:** Do you know if before that he had seen doctors [17] regularly?

[18] **A:** I don't have the knowledge of him seeing a [19] doctor on a regular basis before that.

[20] **Q:** Do you know when he was first prescribed [21] medication for his disorder?

[22] **A:** I'm not sure the exact time it was. I just [23] found out maybe a few months. Like it kind of [24] came up out of the blue where he told me that he [25] was on medication.

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Gaume
June 3, 2

**Page 78**

[1]  Q: That was just before you started living together
[2] that you found out about that?
[3]  A: I would say it was a few months prior when he
[4] was—
[5]  Q: Prior to when you started living together?
[6]  A: Started living together, yes.
[7]  Q: Do you know the name of the medications that he
[8] took?
[9]  A: At one point he did tell me that he was taking
[10] Lithium. But he had told me how, you know, he
[11] had trouble sleeping on it and how it, you know,
[12] he didn't really feel good on it. And that's
[13] the only— But he did change to something else,
[14] but I'm not— I'm not sure what he had changed
[15] to. That's the only thing that sticks in my
[16] head.
[17]  Q: Did his disorder impact his life in any way?
[18]  A: Yes.
[19]  Q: How so?
[20]  A: It just totally changed his personality, changed
[21] the person he was. Obviously, you know, he
[22] couldn't work. He didn't work. He had these
[23] false assumptions that he had this big business
[24] and had money coming in. So it really— He was
[25] really disoriented. I guess you could say his

**Page 79**

[1] reality wasn't really— It was reality to
[2] himself, but not reality to another person
[3] looking onto it. It really did change his life.
[4]  Q: When he took his medication, was he able to live
[5] his life normally?
[6]  A: I would say at times he did, but at times, no.
[7] It was kind of a shot in the dark. You know,
[8] sometimes he would be all right, and sometimes
[9] it didn't seem like maybe it was helping as
[10] much.
[11]  Q: Are the answers to my last two questions based
[12] on your observations from living with him?
[13]  A: Yes.
[14]  Q: And prior to that time as well?
[15]  A: And prior, yes.
[16]  Q: Would you say that the disease impacted him
[17] socially?
[18]  A: Yes.
[19]  Q: In what way?
[20]  A: Well, in a way he would be out — I guess out
[21] and about with other people, and he would be
[22] talking about, you know, stuff that, you know,
[23] wasn't really real. And I think some people
[24] would kind of think he was, you know, kind of
[25] crazy I guess. And I think some people would

**Pa**

[1] try and avoid him at some cost. And it kind of
[2] affected some of his friendships with people.
[3] And I would hear about it later like I saw Ryan
[4] here and he said this and said this. They would
[5] talk to me about it. I really had no control
[6] over it.
[7]  Q: Did his disease impact any career that he might
[8] have had?
[9]  A: I think if he would have regulated it and I
[10] think if he would have did what he was supposed
[11] to do he might have had a more stable life I
[12] guess. But I think he could have done whatever
[13] he wanted to do as long as he took care of
[14] himself.
[15]  Q: Do you know what career ambitions Ryan had?
[16]  A: Well, the only thing that I really remember, he
[17] used to have in the basement he used to like to
[18] make candles. He did want to start his own
[19] business with, you know, like candles and art
[20] supplies and pictures and things like that. I
[21] do know he wanted to do that.
[22]  Q: Would that business involve making art and
[23] selling it or just selling it?
[24]  A: Both.
[25]  Q: Had Ryan ever taken any art classes?

**Pa**

[1]  A: No. But he did have friends who knew how to do
[2] those sort of things and kind of would go to
[3] their house, and they would teach him how to do
[4] it.
[5]  Q: Did you ever see any of Ryan's artwork?
[6]  A: I saw some of his candles.
[7]  Q: Anything else?
[8]  A: That was it.
[9]  Q: Do you know if he had any intentions of ever
[10] going back to college?
[11]  A: He talked about it.
[12]  Q: What would he say?
[13]  A: How he wanted to go back to school and take
[14] classes. And he even went to HACC and did take
[15] a class for a little bit. But then he dropped
[16] out. He did— He always talked about going
[17] back to school.
[18]  Q: Would he talk about going back to Shippensburg
[19]  A: He talked about first going to a community
[20] college around here.
[21]  Q: And that's HACC?
[22]  A: Yes.
[23]  Q: When you said he took a class at HACC, was he
[24] enrolled in a program where he would get a
[25] degree?

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

**Page 82**

[1] **A:** I think not in a degree but just basic classes.
[2] **Q:** Do you know what classes he took?
[3] **A:** To my knowledge, he took a math class because he
[4] was pretty good in math. I'm not sure what
[5] exact class it was, but.
[6] **Q:** Did he take that class when you were living with
[7] him?
[8] **A:** No.
[9] **Q:** It was before you were living with him?
[10] **A:** Correct.
[11] **Q:** Do you have any idea what year he took that
[12] class?
[13] **A:** I'd say I think it was the first year I went
[14] away to college, I think in '95, fall of '95.
[15] **Q:** So would that have been one year after Ryan had
[16] been dismissed from Shippensburg?
[17] **A:** Yes.
[18] **Q:** Do you know if he took any other college
[19] classes?
[20] **A:** Not to my knowledge.
[21] **Q:** Do you know if at any time prior to his death
[22] Ryan provided any financial support to his
[23] parents?
[24] **A:** No.
[25] **Q:** No, he didn't?

**Page 83**

[1] **A:** No, he didn't.
[2] **Q:** Did he provide any financial support to his
[3] siblings?
[4] **A:** No.
[5] **Q:** Did his parents provide him with any financial
[6] support?
[7] **A:** Not to my knowledge.
[8] **Q:** Did he own a car?
[9] **A:** Yes, he did.
[10] **Q:** Do you know did he buy that car?
[11] **A:** I think he got it through— His mother had
[12] known a friend who had a used car, and I think
[13] she did help him get the car.
[14] **Q:** So his mother did provide him with some
[15] financial support?
[16] **A:** I think in a sense sometimes. I don't know how
[17] much she gave him towards. I don't know— I
[18] think he might have even gave her money back.
[19] But I think she initially got the car for him
[20] and he paid her back.
[21] **Q:** Did she ever help him pay for his expenses while
[22] the two of you were living together?
[23] **A:** No.
[24] **Q:** Did his father?
[25] **A:** No.

**Page 84**

[1] **Q:** When is the first time that you became aware
[2] that Ryan used illegal drugs?
[3] **A:** I guess I would say I guess the year before I
[4] went away to school to Clarion University. So I
[5] believe that was '94.
[6] **Q:** How did you become aware that he used drugs?
[7] **A:** We would go to a party or a get-together, and I
[8] would see him.
[9] **Q:** And you saw him using marijuana?
[10] **A:** Yes.
[11] **Q:** Did you ever hear that he used any other drugs
[12] besides marijuana?
[13] **A:** No, I didn't.
[14] **Q:** Would it be fair to say that Ryan used marijuana
[15] beginning in 1994 up until his death?
[16] **A:** Yes.
[17] **Q:** Were there any periods during that time frame
[18] where his drug use was more frequent?
[19] **A:** Not to my knowledge. It was never, you know,
[20] excess or too little. It was always about the
[21] same.
[22] **Q:** I think earlier you said he used marijuana about
[23] two or three times a week. Is that right?
[24] **A:** Correct.
[25] **Q:** Would you say that that was consistent

**Page 85**

[1] throughout the time period between 1994 and
[2] November of 2000?
[3] **A:** Yes.
[4] **Q:** Do you think that Ryan should have been living
[5] on his own?
[6] **MR. PENNINGTON:** Objection as to form. You
[7] can answer that.
[8] **A:** I don't think he shouldn't have been. I think
[9] he was totally capable of living on his own
[10] because prior to him and I living together he
[11] lived on his own for quite a while, so I think
[12] he was stable and he could provide himself
[13] fairly well. So, I mean, I don't see any reason
[14] why he shouldn't have.
[15] **BY MR. HAUCK:**
[16] **Q:** Do you think it would have made any difference
[17] in Ryan's life if he would have been living
[18] under someone's supervision?
[19] **MR. PENNINGTON:** Objection.
[20] **MR. HAUCK:** What basis?
[21] **MR. PENNINGTON:** Well, you're asking him to
[22] speculate not laying any foundation he has any
[23] expertise to answer that other than his opinion.
[24] But didn't we stipulate at the beginning usual
[25] stipulations?

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Matthew Robert Saline
June 3, 2

---

**Page 86**

[1] MR. YANINEK: I don't know if we
[2] necessarily did, but it is—
[3] MR. PENNINGTON: I think—
[4] MR. HAUCK: If you're objecting as to form,
[5] I will try to rephrase.
[6] MR. PENNINGTON: Well, again, I would say
[7] that it just lacks a foundation. I don't know
[8] what his — what the foundation would be other
[9] than his personal opinion as a roommate to
[10] render that opinion.
[11] MR. HAUCK: Could you read back the
[12] question.
[13] (The court reporter read back the previous
[14] question.)
[15] BY MR. HAUCK:
[16] Q: You can answer that.
[17] A: Well, I mean, I guess you got to think about, I
[18] mean, whose supervision would it be. I mean, if
[19] he's under his mom's supervision may be
[20] different from my supervision. I guess you got
[21] to think about it as, I mean, he was his own
[22] person. He's going to do what he wants to do.
[23] I don't think it would matter whose supervision
[24] it would be under. So I don't think it would
[25] have been any different.

**Page 87**

[1] Q: Do you think if he lived with his mom, for
[2] example, do you think he would have been more
[3] career oriented?
[4] A: No.
[5] Q: Do you know if his mom ever suggested that Ryan
[6] live with her?
[7] A: I don't think she ever suggested, but when he
[8] did have problems, she, you know, told him, you
[9] know, that he could live with her. But I don't
[10] think she ever told him that it was a good idea,
[11] you know, to live with her.
[12] Q: When did she tell Ryan that he could live with
[13] her?
[14] A: I think after the second time he was in the
[15] hospital.
[16] Q: Do you know if she ever at any time other than
[17] that suggested that Ryan live with her?
[18] A: No.
[19] Q: Do you know if Ryan's father ever suggested that
[20] he live with him?
[21] A: I don't think he did.
[22] Q: When is the first time that you met Mrs. Schorr?
[23] A: When we were friends in high school, Ryan and I.
[24] Q: After high school, would you ever talk to
[25] Mrs. Schorr?

**Page**

[1] A: Not without him. You know, I would see her, you
[2] know, if we would swing by his house. You know,
[3] I'd— Not long periods of time, like say hello,
[4] how are you doing, you know, just small I guess
[5] chitchat but nothing out of the ordinary.
[6] Q: How many times a year would you say that you sa
[7] Mrs. Schorr after high school?
[8] A: I'd say around maybe 10 times, 10 times a year
[9] at the most.
[10] Q: How would you describe Ryan's relationship with
[11] his mother?
[12] A: Like they would get along, but, you know, they
[13] would have their differences just like, you
[14] know, any I guess mother and son have. You
[15] know, I'm not perfect with my mother all the
[16] time. But it wasn't horrible. But, you know,
[17] it wasn't the best, like perfect. You know, it
[18] was just kind of a regular relationship.
[19] Q: What kind of things did they have differences
[20] about?
[21] A: I think about him I guess his like job
[22] orientation about him finding a good job, and
[23] just she was just worried about him being stable
[24] and just, you know, doing good in life.
[25] Q: Can you give me an example of something that

**Pa**

[1] Mrs. Schorr would have suggested about Ryan's
[2] career?
[3] A: I guess about him going back to school and kind
[4] of getting a career kind of centering on
[5] something. And he would get a little frustrated
[6] by it and just kind of, you know, tell her to
[7] just let him try to handle his life and, you
[8] know. I think that would be what the biggest
[9] part would be about.
[10] Q: Is it fair to say that Mrs. Schorr put pressure
[11] on Ryan to go back to college?
[12] A: I wouldn't really say pressure, but, you know,
[13] she would bring up the idea.
[14] Q: How would Ryan react to that?
[15] A: Sometimes he'd be all right. Sometimes he would
[16] get a little frustrated, a little irritable
[17] about it because he would talk to me about it a
[18] little bit.
[19] Q: Did you ever overhear them arguing?
[20] A: Never personally, on the phone, but I wouldn't
[21] hear the other end, but just on the phone.
[22] Q: So this was while you were living together?
[23] A: Sometimes. I think more along the lines they
[24] would fight about him taking his medicine. And
[25] that's how I found out that he wasn't taking it

---

Filius & McLucas Reporting Service, Inc.    **Min-U-Script®**    (25) Page 86 - Pa

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

---

**Page 90**

[1] and how she would pressure him about making an
[2] appointment to see a doctor, see a doctor.
[3]    **Q:** How often would you say Ryan and his mom saw one
[4] another while you were living with him?
[5]    **A:** Saw, I'd say at the most maybe once every two
[6] weeks at the most.
[7]    **Q:** Did she ever come and visit your house?
[8]    **A:** She did once, but I wasn't there.
[9]    **Q:** Did he ever go visit his mother?
[10]    **A:** Very rarely.
[11]    **Q:** How many times would you say during May of 2000
[12] to November of 2000 that he went to see his
[13] mother?
[14]    **A:** Once a month at the most.
[15]    **Q:** Did they talk on the phone?
[16]    **A:** Sometimes.
[17]    **Q:** How often would they talk on the phone?
[18]    **A:** Probably once every two weeks.
[19]    **Q:** How about his father, did Mr. Schorr ever come
[20] to visit Ryan while you two were living
[21] together?
[22]    **A:** No, he didn't.
[23]    **Q:** Did Ryan ever go see his dad?
[24]    **A:** No. Well, every once in a while, but very
[25] rarely.

**Page 91**

[1]    **Q:** So between May of 2000 and November of 2000, how
[2] many times did he go see his father?
[3]    **A:** I'd say maybe like three times.
[4]    **Q:** Do you know if they ever spoke on the phone?
[5]    **A:** Not very often, maybe between May and October,
[6] he may have spoke to him maybe once a month.
[7]    **Q:** So between May 2000 and October 2000, you would
[8] estimate that he spoke to his dad once a month?
[9]    **A:** Once a month. He had it seemed to me a better
[10] relationship with his mother than his father.
[11]    **Q:** How would you describe his relationship with his
[12] father?
[13]    **A:** I would say like kind of distant. Like his
[14] father would still be involved, but I don't
[15] think he would do too much for him.
[16]    **Q:** What does Ryan's father do for a living?
[17]    **A:** I don't know.
[18]    **Q:** Do you know where he lives? Do you know where
[19] Ryan's father lived while you were living with
[20] Ryan?
[21]    **A:** No, I don't. I don't really know his father too
[22] much at all. I've only spoken to him a few
[23] times in my life. I have more — a better
[24] relationship with his mother. His father was
[25] out of his life for awhile.

**Page 92**

[1]    **Q:** Have you ever seen his father?
[2]    **A:** Yes.
[3]    **Q:** How many times?
[4]    **A:** I'd say since I've known Ryan I'd say at the
[5] most five times.
[6]    **Q:** Do you know why Ryan and his father had a
[7] distant relationship?
[8]    **A:** I don't know. That's just something that
[9] happened in his family that, you know, I don't
[10] really get into other people's business too
[11] much. You know, that kind of was between his
[12] family. I didn't really pressure Ryan to talk
[13] about it because I kind of knew how he felt
[14] because I kind went through the same thing, and
[15] people don't really want to talk about that too
[16] much.
[17]    **Q:** On the day of Ryan's death did Mrs. Schorr ever
[18] speak with Ryan?
[19]    **A:** I don't think she did. I think she tried to
[20] call him, but I don't think he picked up the
[21] phone. So I don't think she did, I mean not
[22] that I know of.
[23]    **Q:** At any times that she called your house and you
[24] were there, did she ask to speak with Ryan?
[25]    **A:** I never— I never picked up the phone. Like

**Page 93**

[1] she never— She didn't call when I was there.
[2] Are you talking about that same night?
[3]    **Q:** Yes.
[4]    **A:** I was the one who actually called her.
[5]    **Q:** During that conversation, did she ever ask to
[6] speak to Ryan?
[7]    **A:** No.
[8]    **Q:** Do you know why she didn't?
[9]    **A:** I think because we both felt that something
[10] needed to be done. So she more or less got off
[11] the phone so she could — because she came and
[12] picked me up. And she didn't go inside. She
[13] told me she was going to wait outside. So I
[14] kind of waited and looked for her. And then I
[15] went outside. So I don't even think he knew
[16] that she was even there like she even came and
[17] got me.
[18]    **Q:** Do you know it was intentional on her part not
[19] to let Ryan see her?
[20]    **MR. PENNINGTON:** Objection.
[21]    **MR. HAUCK:** On what basis?
[22]    **MR. PENNINGTON:** You have to establish a
[23] foundation that he would know that. Otherwise
[24] it is just speculation on his part.
[25]    **MR. HAUCK:** Could you read back the

---

Page 90 - Page 93  (26)          **Min-U-Script®**     Filius & McLucas Reporting Service, Inc.

Keith I. Schorr  &  Susan Schorr   v.
Borough of Lemoyne, et al.

Matthew Robert Gaumer
June 3, 2

---

Page 94

[1] question.

[2] (The court reporter read back the previous

[3] question.)

[4]                    BY MR. HAUCK:

[5] Q: You can answer that.

[6] A: I think she did plan on him not seeing her

[7] because I think things would have maybe have

[8] been different if he would have actually saw her

[9] come pick me up. I don't think it would have

[10] been a good situation.

[11] Q: Why do you think that?

[12] A: Well, I mean, the state he was in, he wasn't

[13] himself. I mean, he was — wasn't even himself

[14] to me let alone his mother, so. And we just

[15] wanted to make sure he didn't leave the house.

[16] And we're sort of afraid if he would have saw

[17] her, he might have left the house. So we wanted

[18] him to stay in one place.

[19] Q: Do you know if Mrs. Schorr was concerned that

[20] Ryan would have reacted angrily if he had seen

[21] her?

[22] A: I don't think she was concerned he would act

[23] angrily. I think she was more concerned about

[24] him just staying there so we could go to the

[25] hospital and get this arranged so we could get

---

Page 95

[1] him help. I think she was more concerned about

[2] him getting help.

[3] Q: When you left the hospital, where did

[4] Mrs. Schorr go?

[5] A: She drove me to the town house and dropped me

[6] off.

[7] Q: Where did she go after that?

[8] A: I think she went home. I'm not sure where she

[9] went after that.

[10] Q: You said earlier I think that she called you

[11] later that morning?

[12] A: Yeah.

[13] Q: Do you know where she was when she called you?

[14] A: She was at home, I believe.

[15] Q: Why do you think that?

[16] A: Because when I was talking to her, the call

[17] waiting came on, and that's how they found out

[18] that he was shot. So I believe she was at home

[19] because they called her house.

[20] Q: How big was Ryan?

[21] A: He was a pretty big guy. He was about say at

[22] least like 6, 2, weighed about 220, 215. You

[23] know, he was a pretty stocky guy. Like he

[24] wasn't really like obese, but, you know, he was

[25] a pretty big guy.

---

Pag

[1] Q: Do you know how much money Ryan made at

[2] Applebee's?

[3] A: I'm not sure. I think it varied upon the week,

[4] you know, because he was a waiter, so he made

[5] tips.

[6] Q: Do you know how many hours he worked in a

[7] typical week?

[8] A: I think he worked like five days a week. And I

[9] think his shifts were probably about six hours.

[10] Q: So would you say he probably worked about 30

[11] hours a week?

[12] A: At least.

[13] Q: Thirty-five hours a week?

[14] A: Yeah.

[15] Q: Can you give me an estimate?

[16] A: I'd say about 30, 35 hours a week. I mean, it

[17] always changed. You know, I don't really know

[18] what exact hours he worked because he did his

[19] thing, I did mine. As long as he was working, I

[20] didn't really worry about it.

[21] Q: Can you say with some degree of confidence that

[22] he worked about 30 to 35 hours a week?

[23] A: Yes.

[24] Q: Did Ryan have any assets that were worth more

[25] than $500?

---

Pag

[1] A: Not to my knowledge, no.

[2] Q: Well, he had a car, right?

[3] A: He had a car, yes.

[4] Q: And he owned his car?

[5] A: It was a used car, so, yeah, I believe he bought

[6] it used.

[7] Q: Was that worth more than $500?

[8] A: I believe so.

[9] Q: Did he have any expensive furniture?

[10] A: Not really. Most of the furniture was mine.

[11] Q: Do you know if he had any investments?

[12] A: I don't think so.

[13] Q: Do you know if he had a bank account?

[14] A: He did have a bank account.

[15] Q: Do you know how many bank accounts he had?

[16] A: Just one.

[17] Q: Now, you've said that while you lived with him

[18] you and Ryan shared expenses. Is that right?

[19] A: Yes.

[20] Q: How much was your rent in total per month?

[21] A: Six hundred dollars.

[22] Q: So each of you paid $300 each per month?

[23] A: Yes.

[24] Q: Did you make any rental payments on Ryan's

[25] behalf?

---

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr  &  Susan Schorr  v.
Borough of Lemoyne, et al.

Page 98

[1]  **A:** No, I didn't.

[2]  **Q:** Did anyone make rental payments on his behalf?

[3]  **A:** Not to my knowledge.

[4]  **Q:** So at the time of his death, Ryan didn't owe you

[5] any money for rent?

[6]  **A:** Not from rent, no.

[7]  **Q:** Did he owe you money for anything at the time of

[8] his death?

[9]  **A:** Yes. He owed me money for the phone bill.

[10]  **Q:** Is that it?

[11]  **A:** That was it because the electric was in his

[12] name, and the cable was paid, so. The phone

[13] because he made some phone calls prior to the

[14] time like a lot of long distance phone calls

[15] which I had to end up paying.

[16]  **Q:** How much money were those phone calls?

[17]  **A:** I'd say they were at least over a hundred

[18] dollars like total.

[19]  **Q:** I'm sorry, in total?

[20]  **A:** In total.

[21]  **Q:** So Ryan owed you about a hundred dollars when he

[22] died?

[23]  **A:** I'd say probably about 150.

[24]  **Q:** Did you ever get paid for that debt?

[25]  **A:** No, I didn't.

Page 99

[1]  **Q:** Do you know if Ryan had any debts at the time of

[2] his death?

[3]  **A:** Not to my knowledge. I don't think he did.

[4]  **Q:** Do you know if he took out any loans when he

[5] went to Shippensburg?

[6]  **A:** I think he did take out a loan when he was at

[7] Shippensburg, but I don't know the basis for it.

[8] I don't know if he paid for it. I have no idea.

[9]  **Q:** Do you know if he made a monthly payment while

[10] you two were living together in satisfaction of

[11] a loan from Shippensburg?

[12]  **A:** No, I don't.

[13]  **Q:** Did Ryan have any credit cards?

[14]  **A:** No.

[15]  **Q:** No?

[16]  **A:** No.

[17]  **Q:** Was there a reason why he didn't have any credit

[18] cards?

[19]  **A:** I don't think he ever really needed one or

[20] didn't really want one.

[21]  **Q:** Have you talked to Ryan's mother since the

[22] shooting?

[23]  **A:** I talked to her a few weeks after it, but I

[24] haven't talked to her I would say in almost a

[25] year.

Page 100

[1]  **Q:** Do you know if she's seen any counselors because

[2] of her son's death?

[3]  **A:** I have no idea.

[4]  **Q:** Did you ever talk to his father after Ryan's

[5] death?

[6]  **A:** No.

[7]  **Q:** Did you go to his funeral?

[8]  **A:** Yes.

[9]  **Q:** Was his father there?

[10]  **A:** Yes.

[11]  **Q:** Did you talk to him there?

[12]  **A:** Yes, I did talk to him then.

[13]  **Q:** Was that the only time you talked to him after

[14] Ryan's death?

[15]  **A:** Yes.

[16]  **Q:** What did he say to you?

[17]  **A:** I mean, it was a funeral, so I mean, we just

[18] talked about Ryan, didn't talk about anything

[19] else. You know, it was a day of grieving, I

[20] guess, you know, just talked about that.

[21]  **Q:** How would you describe Ryan's mother?

[22]  **A:** I mean, she was very concerned about Ryan and

[23] everything he did. She would get on his case

[24] about stuff, I mean, but I guess all mothers who

[25] care, that's what they do. I think, you know,

Page 101

[1] she tried with him and tried to make amends with

[2] him and tried to have a good relationship with

[3] him. There is nothing really bad that I can

[4] think, you know, to say about her.

[5]  **Q:** How about Ryan's father?

[6]  **A:** I didn't know him too much. All I really know

[7] about him is when he was growing up to my

[8] knowledge that he was kind of not really in his

[9] life, but. I can't honestly tell you what he

[10] was really like because I don't even know.

[11]  **Q:** When Ryan was in high school, do you know if his

[12] parents had been involved in a custody dispute

[13] over Ryan?

[14]  **A:** I did not know that.

[15]  **Q:** I'm sorry, I said did you know if.

[16]  **A:** No.

[17]  **Q:** No, you don't know?

[18]  **A:** No, I don't.

[19]  **MR. HAUCK:** I don't have any other

[20] questions.

[21]              REEXAMINATION

[22]              BY MR. YANINEK:

[23]  **Q:** I'm just going to go over some of the jobs that

[24] you knew Ryan had, okay? We talked about he

[25] worked at Applebee's as a waiter, right?

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Matthew Robert Gaume
June 3, ?

---

Page 102

[1] **A:** Yes.
[2] **Q:** He worked at the Gingerbread Man in
[3] Wormleysburg. Was that as a waiter, too?
[4] **A:** Yes.
[5] **Q:** He worked at PHEAA, the student loan something
[6] in Harrisburg here?
[7] **A:** Yes.
[8] **Q:** What did he do at PHEAA?
[9] **A:** I think he was in charge of like the accounts
[10] that would come in. I'm not really sure what he
[11] actually did there.
[12] **Q:** He made pizzas over here at Sisco's, right?
[13] **A:** Yes. He made them, and he was a deliverer.
[14] **Q:** You guys worked at Boscov's?
[15] **A:** He did.
[16] **Q:** What did he do at Boscov's?
[17] **A:** I think he worked in the back, you know, when
[18] trucks would come to deliver stuff.
[19] **Q:** Loading and unloading?
[20] **A:** Yes.
[21] **Q:** Of all these jobs, do you know of any one that
[22] lasted more than a year?
[23] **A:** I think Applebee's he was there for a little
[24] over a year.
[25] **Q:** Any others?

Page 103

[1] **A:** And Gingerbread Man, I believe he was there for
[2] almost two years. The other ones, no.
[3] **Q:** Did you have any contact with anyone about your
[4] deposition today other than the stuff you got in
[5] the mail through counsel or service or stuff
[6] like that?
[7] **A:** Like in what sense?
[8] **Q:** Contact from the Schorrs, their attorneys?
[9] **A:** No.
[10] **Q:** You mentioned Heidi Bowman, your ex-girlfriend—
[11] **A:** Bowen.
[12] **Q:** —in Clarion. Do you have an address for her?
[13] **A:** No, I don't.
[14] **Q:** Do you have a phone number?
[15] **A:** I have a cell phone. That's about it.
[16] **Q:** Can you tell me the number?
[17] **A:** 717-805-2835.
[18] **MR. HAUCK:** Could I jump in real quick.
[19] Could you spell her last name?
[20] **A:** B-o-w-e-n.
[21] **BY MR. YANINEK:**
[22] **Q:** You said about somebody telling you about Ryan's
[23] use of ecstasy and you didn't have any firsthand
[24] knowledge of it but somebody said to you
[25] something about him using it. Do you remember

---

Page

[1] who that somebody was?
[2] **A:** I'm not sure. It would be when I was out in a
[3] bar or club or something and someone would come
[4] out of the blue. And he was hanging out with
[5] people I didn't really know, so.
[6] **Q:** One other thing, you had said that you had done
[7] some studying on bipolar psychological behavior.
[8] What kind of study did you have?
[9] **A:** Just things I would read like a newspaper
[10] article. Or I'd be at a hospital and they have
[11] those pamphlets, I would pick that up and, you
[12] know, just — because I was unsure about what it
[13] was. And I just— I wanted to know what it was
[14] all about.
[15] **Q:** Do you know what bank he banked with?
[16] **A:** I believe it was Members First Pennsylvania
[17] Credit Union.
[18] **Q:** PSECU?
[19] **A:** Yes.
[20] **Q:** He probably started that account when he work
[21] for PHEAA?
[22] **A:** I don't think he started that until he worked
[23] for Applebee's because I was a member of it, and
[24] he had asked me about it. And I had given him
[25] the phone number and everything to get an

Page

[1] account.
[2] **MR. YANINEK:** I don't have any further
[3] questions.
[4] **REEXAMINATION**
[5] **BY MR. PENNINGTON:**
[6] **Q:** Just one question, Matt. When Mrs. Schorr
[7] dropped you off that morning and you went in the
[8] apartment, you spent about how much time there
[9] before you left?
[10] **A:** I'd say about 15 minutes.
[11] **Q:** Your decision to leave, was it yours alone? Was
[12] it in conference with a person at Holy Spirit?
[13] Did you and Mrs. Schorr talk about it?
[14] **A:** It was mine alone. I thought that would be the
[15] best thing to do.
[16] **Q:** When you left, did you know the police were
[17] going to be coming back at some point?
[18] **A:** I knew— Yes, I did. That's one of the reasons
[19] why I left.
[20] **Q:** Did you have any concern at that point that it
[21] may result in violence?
[22] **A:** Not at all. I never thought it would turn out
[23] that way.
[24] **MR. PENNINGTON:** Thank you.
[25] **MR. YANINEK:** I've just got a couple

---

Matthew Robert Gaumer, Jr.
June 3, 2002

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Page 106

[1] follow-ups.

[2] **REEXAMINATION**
[3] **BY MR. YANINEK:**

[4]    **Q:** Matt, you gave a recorded statement to the
[5] police I believe on November 28th of 2000. Is
[6] that correct?

[7]    **A:** I believe so.

[8]    **Q:** Any other statements that you've given to any
[9] other people regarding Ryan Schorr, this
[10] incident?

[11]    **A:** No.

[12]    **Q:** Did you testify at the grand jury?

[13]    **A:** Yes, I did.

[14]    **Q:** Any other testimony other than the grand jury
[15] and here?

[16]    **A:** No.

[17]    **MR. YANINEK:** I have no further questions.

[18]    **MR. HAUCK:** I have no more.

[19]    (The deposition concluded at 3:27 p.m.)

[20]
[21]
[22]
[23]
[24]
[25]

Page 107

[1]    COMMONWEALTH OF PENNSYLVANIA :

[2]    COUNTY OF YORK                    :

[3]       I, Bethann M. Mulay, Reporter and Notary
       Public in and for the Commonwealth of

[4]    Pennsylvania and County of York, do hereby
       certify that the foregoing deposition was taken

[5]    before me at the time and place hereinbefore set
       forth, and that it is the testimony of:

[6]

              MATTHEW ROBERT GAUMER

[7]

          I further certify that said witness was by

[8]    me duly sworn to testify the whole and complete
       truth in said cause; that the testimony then

[9]    given was reported by me stenographically, and
       subsequently transcribed under my direction and

[10]   supervision; and that the foregoing is a full,
       true and correct transcript of my original

[11]   shorthand notes.

[12]

          I further certify that I am not counsel for

[13]   or related to any of the parties to the
       foregoing cause, or employed by them or their

[14]   attorneys, and am not interested in the subject
       matter or outcome thereof.

[15]

[16]      Dated at York, Pennsylvania this 11th day
       of June, 2002.

[17]

[18]

[19]

[20]          Bethann M. Mulay
              Registered Professional Reporter

[21]          Notary Public

[22]

          The foregoing certification of this

[23]   transcript does not apply to any reproduction of
       the same by any means unless under the direct

[24]   control and/or supervision of the certifying
       reporter.

[25]

# APPLICATION FOR
# INVOLUNTARY EMERGENCY EXAMINATION
# AND TREATMENT

## Mental Health Procedures Act of 1976
### Section 302

( BLANKS BELOW MAY BE COMPLETED FOLLOWING ADMISSION.)

| NAME | | | AGE | SEX |
|---|---|---|---|---|
| LAST Schorr | FIRST Ryan | MIDDLE | 25 | M |

ADDRESS  445 Meadow Drv., Camphill, Pa  17011

| NAME OF COUNTY PROGRAM | NAME OF BSU | BSU NO. |
|---|---|---|
| Cumberland /Perry MHMR | Cumb /Perry MHMR | |

| NAME OF FACILITY | ADMISSION DATE | ADMISSION NO. |
|---|---|---|
| | | |

## INSTRUCTIONS

1. Part I must be completed by the person who believes the patient is in need of treatment. If this person is not a physician, police officer, the County Administrator or his delegate, he or she must request authorization or a warrant through the County Administrator.

2. If the authorization or a warrant through the County Administrator is required, call or visit the Office of the County Administrator. Authorization to take a patient for examination without a warrant is to be documented in Part II. If a warrant is required, Part III must be completed by the County Administrator or a person designated by the Administrator to sign the warrants.

3. When the patient is taken to the examination facility, the rights described in Form MH 783-A must be explained. Part IV should be signed by the person who explains these rights to the patient.

4. Part V is to be completed by the County Administrator (or representative) or by the Director of the Facility (or representative) upon arrival of the patient at the facility.

5. Part VI is to be completed by the examining physician.

6. If additional sheets are required at any point in completing this form, note on this form the number of additional sheets which are attached.

7. If the patient is subject to criminal proceedings/detention, briefly describe below.

DEPOSITION
EXHIBIT
/

MH 783