

● IMPORTANT NOTICE ●

> ANY PERSON WHO PROVIDES ANY
> FALSE INFORMATION ON PURPOSE
> WHEN HE COMPLETES THIS FORM
> MAY BE SUBJECT TO CRIMINAL
> PROSECUTION AND MAY FACE
> CRIMINAL PENALTIES INCLUDING
> CONVICTION OF A MISDEMEANOR.

## Part I
## APPLICATION

I believe that _____Ryac Schorr_____
(PERSON'S NAME)

is severely mentally disabled: (Check and complete all applicable for this patient.)

A person is severely mentally disabled when, as a result of mental illness, his/her capacity to exercise self-control, judgment and discretion in the conduct of his/her affairs and social relations or to care for his/her own personal needs is so lessened that he/she poses a clear and present danger of harm to others or to himself or herself.

[✓] Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated. A clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm; or

Clear and present danger to himself shall be shown by establishing that within the past 30 days;

[ ] (i) the person has acted in such manner as to evidence that he/she would be unable, without care, supervision and the continued assistance of others, to satisfy his/her need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under the act; or

[ ] (ii) the person has attempted suicide and that there is reasonable probability of suicide unless adequate treatment is afforded under this act. For the purpose of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

[ ] (iii) the person has substantially mutilated himself/herself or attempted to mutilate himself/herself substantially and that there is reasonable probability of multilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit multilation and has committed acts which are in furtherance of the threat to commit mutilation.

in detail the specific behavior within the last 30 days which supports your belief (include location, da
time whenever possible, and state w observed the behavior):

5:00 a.m. 11/18/00 Ryan broke the kitchen window
get in the house. After he was in he
threatened me and verbally wanted me to
fight. He then pushed me once. I then left
the situation so nothing else would happen.
I feel very unsafe around him and also
feel he is a constant danger to himself.
He has also verbally threatened his mother several ti
                                                                              of the p

I understand that I __may__ be required to testify at a court hearing concerning the information I gave.

On the basis of the information I gave above, I believe that ____Ryan Scherr_____
                                                                              (PERSON'S NAME)

s in need of involuntary examination and treatment. I request that: (Check A or B — Notice that B can __only__ b
checked by a physician, a police officer, the County Administrator or his/her delegate).

A.  [V]  The County Administrator issue a warrant authorizing a policeman c
         someone representing the County Administrator or take the patient to
         facility for examination and treatment.

_____        __11 / 18 / 00__
SIGNATURE OF APPLICANT                    DATE

Matthew R. Gruver 745 Meadow Dr. Carlisle PA 17011   (717) 731-0644
PRINT NAME AND ADDRESS OF APPLICANT           TELEPHONE NO.

B.  [ ]  That this facility examine the patient to determine his/her need fc
         treatment.

_____        _____
SIGNATURE OF PHYSICIAN, POLICE OFFICER,           DATE
COUNTY ADMINISTRATOR, OR REPRESENTATIVE

_____        _____
PRINT NAME AND TITLE OF PHYSICIAN, POLICE OFFICER,   TELEPHONE NO.
COUNTY ADMINISTRATOR OR REPRESENTATIVE

_____
ADDRESS



Authorization for Transportation to an Approved Facility
Examination Without a Warrant
(Under Section 302(a) (2))

For use in emergency situations when the Administrator orally authorizes a responsible person to take a patient to a designated facility for examination without a warrant. When such authorization of a County Administrator or designee is obtained by telephone, the documentation below is required:

_____     _____
NAME OF PERSON REQUESTING AUTHORIZATION          DATE/TIME OF CALL/AUTHORIZATION

_____
REASON FOR ORAL AUTHORIZATION

_____
NAME AND TITLE OF PERSON GIVING THE AUTHORIZATION

I  swear  or  affirm  that I personally obtained authorization for transporting the patient to

_____ from the above-named
(FACILITY)

Administrator or his/her representative and that I was advised that documentation of this telephone call is maintained in the Administrator's files.

_____     _____
NAME AND ADDRESS                                 RELATIONSHIP TO PATIENT



# PART III
# WARRANT

**(Check A or B)**

A. ☒  Based upon representations made to me by _Matthew Gaumer_
(NAME OF APPLICANT)

I hereby order that _Ryan Schorr_ shall be taken to

and examined at _Holy Spirit Hospital_ and if required,
(NAME OF FACILITY)

shall be admitted to a facility designated for treatment for a period of time not to exceed 120 hours.

Name of facility designated for treatment if other than the facility conducting the examination:

_Michael D. Chambers_                          _11.18.00_
SIGNATURE OF COUNTY ADMINISTRATOR OR HIS/HER REPRESENTATIVE          DATE

_Michael D. Chambers_
PRINT NAME OF COUNTY ADMINISTRATOR OR HIS/HER REPRESENTATIVE

## DENIAL OF WARRANT

B. ☐  The request of the petitioner for a warrant is denied:

_____

_____

_____

_____

SIGNATURE OF COUNTY ADMINISTRATOR OR REPRESENTATIVE          DATE

---

# PART IV
# THE PATIENT'S RIGHTS

I affirm that when the patient arrived at _Holy Spirit Hospital_
(NAME OF FACILITY)

I explained his rights to him/her. These rights are described in Form MH 783-A. I believe that he/she:

☐ does understand these rights.

☒ does not understand these rights.

_Cindia L Highfield (MSW)_                          _11/18/00_
SIGNATURE OF PERSON EXPLAINING RIGHTS          DATE

_Cindia L Highfield_
PRINT NAME OF PERSON EXPLAINING RIGHTS

PART I

## ACTIONS TAKEN TO PROTECT THE
## PATIENT'S INTEREST

I affirm that to the best of my knowledge and belief the following actions which were taken constituted reasonable steps needed to assure that while the patient is detained the health and safety needs any of any his/l [?]dents are met and that his/her personal property and the premises he/she occupies are secure.

Describe the actions taken below. Use additional sheets if required.

Pt's roommate Matthew Gainer and brother Susan Scharr will secure pt's personal belongings.

_____

_Andia J. Highfield  ACSW_
SIGNATURE OF COUNTY ADMINISTRATOR/REPRESENTATIVE
OR THE DIRECTOR OF THE FACILITY OR REPRESENTATIVE

_11/18/00_
DATE

_Chandice L Highfield_
PRINT NAME OF COUNTY ADMINISTRATOR/REPRESENTATIVE/
DIRECTOR OF THE FACILITY OR REPRESENTATIVE

01948F

MH 783 - 1[?]

# PART VI
## PHYSICIAN'S EXAMINATION

I affirm that _Ryan Schorr_ arrived at this facility at _0830_
(EXACT TIME)

as examined by me at _0845_.
(EXACT TIME)

## RESULTS OF EXAMINATION

FINDINGS: (Describe your findings in detail. Use additional sheets if necessary).

Patient Hallucinating. Want me to send for His Bodyguard + Limosine. Refuses to talk to me. He Bipolar. Stopped meds in June per Mother. Patient Aggitated + Shouting.

TREATMENT NEEDED: (Describe the treatment needed by the patient. Continue on additional sheets if necessary).

In Patient Mental Health Evaluation and Treatment.

In my opinion: (Check A or B)

A. [✓] The patient is severely mentally disabled and in need of treatment. should be admitted to a facility designated by the County Administrator a period of treatment not to exceed 120 hours.

B. [ ] The patient is not in need of emergency involuntary treatment. He shall returned to a place which he shall reasonably designate.

_____
SIGNATURE OF EXAMINING PHYSICIAN

11/18/00 .
DATE

David J. Spurrier
PRINT NAME OF EXAMINING PHYSICIAN

01948G

PAGE 7 OF 7

MH 783 - 10

EXHIBIT
G

## In The Matter Of:

*Keith I. Schorr  &  Susan Schorr    v.*
*Borough of Lemoyne, et al.*

---

*Gary W. Berresford*
*May 28, 2002*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File GB052802.V1, 86 Pages*
*Min-U-Script® File ID: 2460416066*

## Word Index included with this Min-U-Script®

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Gary W. Berr
May 2£

---

Page 1

[1]        IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3] KEITH I. SCHORR and          . No. 1:01-CV-0930
    SUSAN SCHORR,
[4]        Plaintiffs    . Judge Kane
[5]        vs.
[6] BOROUGH OF LEMOYNE,
    BOROUGH OF WORMLEYSBURG,    .
[7] WEST SHORE REGIONAL POLICE    .
    DEPARTMENT, HOWARD DOUGHERTY, .
[8] CHIEF WEST SHORE REGIONAL    .
    POLICE DEPARTMENT, CUMBERLAND .
[9] COUNTY, HOLY SPIRIT HOSPITAL, .
            Defendants   .
[10]
[11]
[12]
[13]
        Deposition of:  GARY W. BERRESFORD
[14]
    Taken by                    : Plaintiffs
[15]
    Date                        : May 28, 2002, 10:37 a.m.
[16]
    Place                       : 3401 North Front Street
[17]        Harrisburg, Pennsylvania
[18] Before                     : Bethann M. Mulay, Notary Public
        Registered Professional Reporter
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1] APPEARANCES:
[2]  WILLIAMS, CUKER & BEREZOFSKY
     By: GERALD J. WILLIAMS, ESQ.
[3]        -and-
     STEPHEN S. PENNINGTON, ESQ.
[4]
[5]        For - Plaintiffs
[6]  MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
     By: DAVID J. MacMAIN, ESQ.
[7]        For - Defendants West Shore Regional
           Police Department, Howard
[8]        Dougherty, Chief West Shore
           Regional Police Department
[9]
[10] METTE, EVANS & WOODSIDE
     By: JOHN F. YANINEK, ESQ.
[11]       For - Defendants Cumberland County and
           Holy Spirit Hospital
[12]
[13] LAW OFFICES OF MARK K. EMERY
     By: MARK K. EMERY, ESQ.
[14]       For - Gary W. Berresford and Harry S.
           Hart, Jr.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr    v
Borough of Lemoyne, et al

Page 3

[1]                INDEX
                WITNESS

[2]
                    Examination
[3]
    GARY W. BERRESFORD
[4]
    By Mr. Williams        4, 78
[5]
    By Mr. Yaninek         65
[6]
    By Mr. MacMain         80
[7]
                EXHIBITS
[8]
    Plaintiff's Deposition
[9] Exhibit Numbers            Marked
[10] 1. 3/9/99 Memo to Chief of Police and    25
    Officers in Charge from Silvia Herman,
[11]    Mental Health Specialist
[12] 2. Floor Plan of First Floor        39
[13] 3. Floor Plan of Second Floor       43
[14] 4. Tape Summaries                   58
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]                STIPULATION
[2] It is hereby stipulated by and between
[3] counsel for the respective parties that reading,
[4] signing, sealing, certification and filing are
[5] hereby waived; and all objections except as to
[6] the form of the question are reserved to the
[7] time of trial.
[8]
[9]    GARY W. BERRESFORD, called as a witness,
[10] having been duly sworn, testified as follows:
[11]        EXAMINATION
[12]        BY MR. WILLIAMS:
[13]    Q: Officer Hart, my name is Jerry Williams, and
[14] Steve Pennington is with me. We represent, as
[15] your counsel said, the Schorr family in this
[16] litigation.
[17]    A: I'm Officer Berresford.
[18]    Q: I'm sorry, Officer Berresford. We're here to
[19] ask you some questions about the incident
[20] involving Ryan Schorr and yourself and Officer
[21] Hart. The process is called a deposition as
[22] you're probably aware. Have you ever given a
[23] deposition before?
[24]    A: No, sir.
[25]    Q: Have you testified in court before?

Page 5

[1]    A: Yes, sir.
[2]    Q: The same basic rules apply, but I'll just give
[3] you some ground rules. The primary one is we
[4] want to be sure that you give answers to us
[5] today to questions that you hear and understand.
[6]    A: Okay.
[7]    Q: So if I ask you a question that you don't hear
[8] or you don't understand, let me know, and I'll
[9] do my best to correct the situation. Do you
[10] understand that, sir?
[11]    A: Yes, sir.
[12]    Q: As you can obviously tell, a court reporter is
[13] present. She's taking down our questions and
[14] your answers, so to keep the record clear, we
[15] ask that all your responses be in words as
[16] opposed to gestures or uh-huhs or huh-uhs, and
[17] that's so that we will be able to read the
[18] record and understand it later. Do you
[19] understand that?
[20]    A: Yes, sir.
[21]    Q: I don't think your deposition will last too
[22] long, but if at any time you need a break or
[23] wish to speak to counsel or stretch your legs or
[24] want a drink of water, whatever you want to
[25] break for, if you let us know that, we will

Page 6

[1] accommodate that. Do you understand that, sir?
[2]    A: Yes.
[3]    Q: You don't need to guess at any answers. I don't
[4] know or I don't remember is a perfectly
[5] legitimate response. But all of our questions
[6] will be premised on a request that you give us
[7] your best recollection as you sit here today.
[8] Is that understood by you?
[9]    A: Yes.
[10]    Q: Now, Officer Berresford, you are currently
[11] employed by the West Shore Police Department?
[12]    A: Yes, sir.
[13]    Q: Are you currently on active duty?
[14]    A: Yes, sir.
[15]    Q: Were you off active duty because of any injuries
[16] you sustained back in November 2000?
[17]    A: I was off duty till May of 2001.
[18]    Q: Have you been continuously on active duty since?
[19]    A: Yes, sir.
[20]    Q: What is your rank within the department?
[21]    A: I'm a patrolman.
[22]    Q: Are you a full-time officer of the department?
[23]    A: No, sir. I'm part time.
[24]    Q: Can you tell me first of all how many hours or
[25] shifts you typically work in your capacity?

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Gary W. Berr
May 28

**Page 7**

[1] A: I work approximately two to three shifts every
[2] two weeks.
[3] Q: And the shifts are how long?
[4] A: Eight hours.
[5] Q: So, I'm sorry, I just don't recall your answer,
[6] two or three shifts over what period of time?
[7] A: Over a two-week period.
[8] Q: Do you work on particular days or as called, or
[9] on what basis do you put in your shifts?
[10] A: As assigned by the chief of police.
[11] Q: Do you receive those assignments by telephone,
[12] or how do you get them?
[13] A: He prepares a written schedule basically for a
[14] six-month period.
[15] Q: Does that arrangement differ from the
[16] arrangement under which you worked back in
[17] November of 2000?
[18] A: No, sir.
[19] Q: Still pretty much the same?
[20] A: Yes, sir.
[21] Q: And also the same as the number of shifts you
[22] typically worked in a two-week period, two or
[23] three?
[24] A: Yes, sir.
[25] Q: Now, are there full-time officers of the West

[1] A: I've held it for 11 and a half years.
[2] Q: In a nutshell, can you describe the duties of
[3] that position for us?
[4] A: I am responsible for all daily borough
[5] activities.
[6] Q: Do your responsibilities include any supervisio
[7] or administration of police services within the
[8] borough?
[9] A: The borough does not have a police departme
[10] Q: Is the borough served by the West Shore Police
[11] Department?
[12] A: Yes, it's served by them.
[13] Q: That's operated by a regional commission. Is
[14] that correct?
[15] A: Yes.
[16] Q: As borough manager, do you have any interpla
[17] interaction with the commission?
[18] A: No.
[19] Q: Is there anyone within the borough who has
[20] interaction or interplay with the commission?
[21] A: There are two persons appointed to the
[22] commission from the borough.
[23] Q: With respect to Wormleysburg, who are they?
[24] A: Dr. William Cornell, and he's the mayor and als
[25] chairman of the commission. And the other one

**Page 8**

[1] Shore Police Department?
[2] A: Yes, sir. There are ten.
[3] Q: Ten. How many full-time officers are there?
[4] A: There's ten.
[5] Q: Part-time officers, I'm sorry.
[6] A: There's four.
[7] Q: Who are they besides yourself?
[8] A: There's Officer Hart, Officer Ressler, and
[9] Officer Mauro.
[10] Q: Was Officer Hart also a part-time officer back
[11] in November 2000?
[12] A: Yes.
[13] Q: Now, in addition to your work with the police
[14] department, do you hold any other jobs or
[15] positions?
[16] A: Yes.
[17] Q: What are they?
[18] A: I am the borough manager of Wormleysburg
[19] Borough, and I am a community service officer
[20] for the Lower Allen Township Police Department.
[21] Q: Let's talk about them briefly one at a time.
[22] The borough manager position, is that an elected
[23] position?
[24] A: No. It's appointed.
[25] Q: How long have you held it?

[1] is Harry Lukens. He is the president of borough
[2] council.
[3] Q: While we're on the subject of the commission,
[4] you know, how many members are there?
[5] A: There are five.
[6] Q: Why don't you just tell me what boroughs and
[7] what — representatives of what boroughs or
[8] other entities make up the commission.
[9] A: The commission is made up by two appointees
[10] Wormleysburg Borough, two appointees of Lemoyne
[11] Borough, and a citizen at large.
[12] Q: The citizen comes from the region so to speak?
[13] A: It has to be a property owner or a resident of
[14] either Lemoyne or Wormleysburg Borough.
[15] Q: Currently who is that citizen at large?
[16] A: Michael Serluco.
[17] Q: Of which borough is he a citizen?
[18] A: He lives in Lemoyne. He has a business in
[19] Wormleysburg.
[20] Q: Was he the citizen at large back in November o
[21] 2000, if you know?
[22] A: Yes.
[23] Q: Tell me about your other job besides the police
[24] job and the borough manager job. There's
[25] another police-related job you told us about.

Page 11

[1] A: Community service for Lower Allen Township
[2] Police Department. That position basically is I
[3] provide — help provide security at the Capital
[4] City Mall.
[5] Q: How long have you had that position?
[6] A: I've had that position for almost nine years.
[7] Q: How many hours a week or month do you have to
[8] devote to that position?
[9] A: I work about ten hours a week.
[10] Q: Was that also true back in November of 2000?
[11] A: Yes.
[12] Q: Maybe I should have asked you this before, but
[13] when did you first become an officer within the
[14] West Shore Police Department?
[15] A: I became an officer with the West Shore Regional
[16] Police Department on the day of its creation,
[17] January 1st, 1995.
[18] Q: Before that, were you an officer with either
[19] Wormleysburg or Lemoyne?
[20] A: Before that I was an officer with Wormleysburg
[21] Police Department.
[22] Q: For how long were you with Wormleysburg?
[23] A: I was with Wormleysburg about a year and a half.
[24] Q: In making the transition from a police officer
[25] for the borough to a police officer within the

Page 12

[1] regional department, were you grandfathered so
[2] to speak? Did you just become a West Shore
[3] Regional Police officer?
[4] A: Yes.
[5] Q: You didn't have to take a test—
[6] A: No.
[7] Q: —or do anything? So take me back to the
[8] beginning of your tenure as a borough police
[9] officer. Did you have to undergo any training
[10] before you became an officer?
[11] A: I graduated from police academy in 1978.
[12] Q: When you say the police academy, which
[13] institution are you talking about?
[14] A: That was the Municipal Police Officer's
[15] Education and Training Commission, and that
[16] class that I graduated from was held at the
[17] Beaver County Community College.
[18] Q: This is an organization sanctioned by the state
[19] to provide training to police officers?
[20] A: Yes. It's so we can retain our license and have
[21] our license.
[22] Q: You graduated in '78?
[23] A: Yes.
[24] Q: What about after your graduation in 1978, I'm
[25] going to ask you what training in police work

Page 13

[1] you received, but I'm going to ask you for now
[2] to leave aside any on-the-job training you may
[3] have received.
[4] A: I went to numerous Department of Community
[5] Affairs training seminars that they held
[6] throughout my term as a police officer which
[7] actually started in May of '75 and then the
[8] updates that we're required to take from
[9] Municipal Police Officer's Education and
[10] Training Commission.
[11] Q: How periodically were the updates?
[12] A: They're once a year.
[13] Q: If you can summarize, what do the updates
[14] consist of?
[15] A: Legal updates from the motor vehicle code and
[16] crimes code. And then they are items chosen by
[17] the commission to be taught that year. Some
[18] have been things like stress management, force
[19] continuum.
[20] Q: When you say force continuum, you mean the use
[21] of different types of force depending on the
[22] situation?
[23] A: Progression of force, right. There have been
[24] survival techniques. We give firearms training.
[25] That's through the department. And ASP baton

Page 14

[1] training and pepper spray training we've had
[2] through the department, CPR, first aid.
[3] Q: Let me ask you about two of the items you've
[4] mentioned as parts of the updates or aspects of
[5] the updates. ASP baton training, first of all,
[6] can you tell us what an ASP baton is?
[7] A: An ASP baton is a steel baton that's
[8] collapsible, and it can be extended with a flick
[9] of the wrist. It has a spring on it. I think
[10] the one I carry is about 24 inches long.
[11] Q: First of all, your training in the use of the
[12] ASP baton, did you receive a certificate of any
[13] sort?
[14] A: Yes.
[15] Q: Was the training part of these updates that
[16] you've talked about?
[17] A: No. That was departmental training.
[18] Q: Training provided by the West Shore—
[19] A: Yes, police department.
[20] Q: —Police Department? When did you complete that
[21] training?
[22] A: That training was completed— I think the first
[23] time I— They do it every year, but I think the
[24] first time we did it was in — I believe it was
[25] in 1999.

Keith I. Schorr & Susan Schorr  v.                                    Gary W. Berr
Borough of Lemoyne, et al.                                            May 28

---

**Page 15**

[1]   Q: At least since 1999 you've carried an ASP baton
[2] as part of your regimen as a West Shore police
[3] officer?
[4]   A: Yes, sir.
[5]   Q: I don't want to get into too much detail, but
[6] can you give me this, Let me ask you this, does
[7] the West Shore Regional Police Department place
[8] the use of an ASP baton specifically along the
[9] continuum of force somewhere?
[10]   A: The state does. I can't tell you if the police
[11] department itself did because the state's
[12] continuum would oversee anything — supersede
[13] anything that—
[14]   Q: I understand that. Where within the state's
[15] conception of a continuum of force does the ASP
[16] baton lie?
[17]   A: It would be nonlethal force. It would be above
[18] the physical touching force.
[19]   Q: So at a point where the use of your hands to
[20] restrain a suspect or a subject is not
[21] sufficient, that's when you might use the baton?
[22]   A: Yes, sir.
[23]   Q: Now, you indicated that you had received some
[24] training in the use of pepper spray?
[25]   A: Yes, sir.

**Page 16**

[1]   Q: When did you receive that training?
[2]   A: That was only about two months ago.
[3]   Q: Where did you receive it?
[4]   A: That was at the West Shore Regional Police
[5] Department. I'd like to correct that. That was
[6] with the West Shore Regional Police Department.
[7] With the Lower Allen Township Police Department
[8] it was about four years ago.
[9]   Q: So I'll just break that. You had previously
[10] received training in the use of pepper spray but
[11] with Lower Allen?
[12]   A: Yes.
[13]   Q: As of November 2000, did you carry pepper spray
[14] with you in your capacity as a West Shore police
[15] officer?
[16]   A: No, sir.
[17]   Q: As of November 2000, did any West Shore police
[18] officers carry pepper spray as part of their
[19] standard issue, if you know?
[20]   A: I'm not sure.
[21]   Q: As someone who had received training in pepper
[22] spray before November 2000, were you permitted
[23] to carry pepper spray at West Shore?
[24]   A: I don't know. I never asked.
[25]   Q: Now that you've received your certification—

[1] Is it a certification or a certificate that you
[2] get in your training for pepper spray, or is it
[3] just documented that you got the training?
[4]   A: Yes, I did get one. I got two now.
[5]   Q: Since you got the one from West Shore, do you
[6] carry pepper spray as part of your regimen when
[7] working with the West Shore Department?
[8]   A: No, sir.
[9]   Q: How is it determined who carries pepper spray
[10] and who doesn't within the West Shore Police
[11] Department?
[12]   A: I don't know.
[13]   Q: Besides pepper spray, baton, and firearms, have
[14] you been trained in the use of any other
[15] implements of force as a police officer?
[16]   A: Only the nightstick.
[17]   Q: I guess you should tell us how the nightstick
[18] differentiates from an ASP baton.
[19]   A: A nightstick is a solid piece of wood that
[20] doesn't collapse.
[21]   Q: Does it occupy the same place along the
[22] continuum of force as the ASP baton does?
[23]   A: Yes, sir.
[24]   Q: Am I correct that in November of 2000 you did
[25] have a nightstick as a West Shore police

[1] officer?
[2]   A: No, sir.
[3]   Q: I'm incorrect or—
[4]   A: I did not carry one.
[5]   Q: Did not carry one?
[6]   MR. MacMAIN: Are you talking about this
[7] particular incident or generally on patrol in
[8] November of—
[9]            BY MR. WILLIAMS:
[10]   Q: With respect to the particular incident that
[11] brings us here, your encounter with Ryan Schorr,
[12] you did not have a nightstick, correct?
[13]   A: No, I did not.
[14]   Q: And you've already told me this, but you also
[15] did not have pepper spray, correct?
[16]   A: That's true.
[17]   Q: But you did have an ASP baton?
[18]   A: Yes, sir.
[19]   Q: I should have asked you this before, did you
[20] tell me where the use of pepper spray fits along
[21] the continuum of force?
[22]   A: In our training pepper spray was to be actually
[23] between the physical touching and the ASP baton
[24] or nightstick.
[25]   Q: So if you are qualified to use it and if you

---

**Filius & McLucas Reporting Service, Inc.**    **Min-U-Script®**         (7) Page 15 - P

Page 19

[1] have it, you use pepper spray before you use the
[2] ASP baton?
[3] A: Yes.
[4] Q: Generally speaking?
[5] A: Yes.
[6] Q: You've described for me some — a lot of aspects
[7] of your training as a police officer. As you
[8] know, the incident that brings us here is an
[9] incident involving Ryan Schorr who I'll describe
[10] as an emotionally disturbed person for purposes
[11] of this deposition. And I want to ask you if
[12] you can tell me whether you have had any
[13] training specifically dealing with encounters
[14] with emotionally disturbed persons?
[15] A: Other than on the job?
[16] Q: First other than on the job.
[17] A: Other than on the job prior to the Ryan Schorr
[18] incident?
[19] Q: Yes.
[20] A: I do not recall any training, officially
[21] training.
[22] Q: I understand. Now, you made the distinction
[23] which I asked you to do between off-the-job
[24] training and on-the-job training, so can you
[25] tell me what on-the-job training you had with

Page 20

[1] respect to encounters with emotionally disturbed
[2] persons, if any?
[3] A: It would be on-the-job training having to do
[4] with handling incidents of serving 302 warrants
[5] or handling calls where the people were
[6] emotionally — I'm going to call them
[7] emotionally incapacitated due to anger,
[8] frustration, or whatever. And that's in my 27
[9] years of being a police officer.
[10] Q: So essentially you're experienced with such
[11] encounters?
[12] A: Right.
[13] Q: Let me ask you about that a little bit. Before
[14] your encounter with Ryan Schorr in November of
[15] 2000, you had served 302 warrants before?
[16] A: Yes.
[17] Q: If we just stay with your tenure either as a
[18] Wormleysburg officer or a West Shore officer,
[19] can you give us any numerical estimate as to how
[20] many times you had been called on to serve a 302
[21] warrant?
[22] A: My estimate would be probably two or three
[23] times.
[24] Q: We're talking about a five-year period roughly.
[25] Is that accurate?

Page

[1] A: Yeah. That would be — more like a nine-year
[2] period.
[3] Q: I'm sure we are clear, but just so our record is
[4] clear, by a 302 warrant, you mean what?
[5] A: That is a warrant issued by crisis at one of the
[6] hospitals to pick up a person and bring them to
[7] the hospital for an involuntary commitment, I
[8] believe 72 hours.
[9] Q: Did you have that type of warrant at the time
[10] that you encountered Ryan Schorr at his
[11] apartment on Meadow Avenue or Street?
[12] A: Yes.
[13] Q: Now, just to complete the picture, what about
[14] after November of 2000, have you had any formal
[15] training in encounters with emotionally
[16] disturbed persons?
[17] A: Yes.
[18] Q: What training have you had?
[19] A: There was training in the 2001 update school
[20] that the state sponsored and in 2002.
[21] Q: This is training with the — by the MPOETC?
[22] A: Correct.
[23] Q: When you attend these updates, generally do you
[24] get a certificate of your completion of the
[25] training?

Page

[1] A: No. They send our certification into MPOETC to
[2] be put on our record.
[3] MR. MacMAIN: Jerry, just so you're clear
[4] in asking the question, in the documents we
[5] produced, his personnel file had all of his
[6] certificates and schools in addition to the
[7] other courses he's attended.
[8] MR. WILLIAMS: I acknowledge that, but I
[9] just want to sort of get a feel for it myself.
[10] BY MR. WILLIAMS:
[11] Q: Officer, when you attend updates, do you elect
[12] the topics for the updates that you're going to
[13] attend, or are they assigned to you?
[14] A: They're assigned to me.
[15] Q: Are they the same for everybody, or do they vary
[16] from officer to officer, if you know?
[17] A: For our department, it's the same for all.
[18] Q: So everyone who attended the updates in 2001 and
[19] 2002 received some training in dealing with
[20] emotionally disturbed persons?
[21] A: Yes.
[22] Q: Can you describe for us the training that you
[23] got in those updates?
[24] A: They discussed the different types of mental
[25] illness and how you attempt to deal with the

Keith I. Schorr & Susan Schorr   v.

· Borough of Lemoyne, et al.

Gary W. Berre

May 28,

**Page 23**

[1] mentally ill and how you recognize mental
[2] illness. In 2001 that one was mostly for people
[3] that are autistic and sometimes they're not
[4] recognized as being autistic and maybe appear to
[5] be drunk or something else, to become more
[6] sensitive there might be another issue than what
[7] you really think there is.
[8]    **Q:** In either update was there any discussion of the
[9] illness we've heard associated with Ryan Schorr,
[10] bipolar illness?
[11]    **A:** Yes.
[12]    **Q:** What training with respect to bipolar illness
[13] did you receive?
[14]    **A:** They touched on what bipolar is along with all
[15] the other stuff. Then everything was basically
[16] how you deal with the mentally ill. You try not
[17] to— You don't use loud voices, and you try to
[18] talk it out and convince them to come with you
[19] and not argue against. If they say they're
[20] hearing voices, you don't argue that point. You
[21] can even acknowledge that, yes, we feel you do
[22] but we don't hear those voices.
[23]    **Q:** Were you provided with any written materials
[24] with respect to this aspect of your training?
[25]    **A:** Yes. There was a handbook given out.

**Page 24**

[1]    **Q:** Do you recall the title of it?
[2]    **A:** No, I don't.
[3]    **Q:** Do you still have possession of this handbook
[4] that was given?
[5]    **A:** Yes.
[6]    **Q:** The training and the two updates you told us
[7] about, I know it was under the auspices of
[8] MPOETC.
[9]    **A:** Yes.
[10]    **Q:** But who actually provided it? Was there an
[11] outside consultant or someone else, if you know?
[12]    **A:** I don't believe it was an outside consultant.
[13]    **Q:** Was it a police officer so far as you could
[14] tell?
[15]    **A:** I believe it was.
[16]    **Q:** I asked you generally about training dealing
[17] with encounters with emotionally disturbed
[18] persons. Did you receive any specific training
[19] on 302 procedures?
[20]    **A:** No.
[21]    **Q:** Making that question even more general, have you
[22] received any departmental training on 302
[23] procedures?
[24]    **MR. MacMAIN:** You're talking just formal
[25] written as opposed to on the job?

[1]    **MR. WILLIAMS:** Yes, as opposed to on the
[2] job, yes.
[3]    **A:** No, there's been no formal training on the job
[4] or otherwise.
[5]    **BY MR. WILLIAMS:**
[6]    **Q:** I guess I should have asked you this, too, have
[7] you been trained in the use of tasers or any
[8] electronic stunning device?
[9]    **A:** No, sir.
[10]    **Q:** Can I take it then that you weren't carrying
[11] such a device in November of 2000 when you
[12] encountered Ryan Schorr?
[13]    **A:** I was not carrying such a device.
[14]    **Q:** Do any officers, any West Shore officers, carry
[15] tasers or electronic stunning devices?
[16]    **A:** No, sir.
[17]    **MR. WILLIAMS:** I think I know the answer to
[18] this, but we should probably mark it anyway.
[19] Can we mark this as— Let's just mark the
[20] exhibits continuously, so we'll make this
[21] Plaintiff's 1.
[22]    (Plaintiff's Deposition Exhibit #1 marked
[23] for identification)
[24]    **BY MR. WILLIAMS:**
[25]    **Q:** Officer, I've given you a memo dated March 9th

[1] 1999, and I recognize it's not by you or to you,
[2] but I'm only giving it to you for some reference
[3] because as you can see this references a
[4] breakfast meeting that was to be held in that
[5] year. So let me just ask you some very basic
[6] questions. First of all, did you, yourself,
[7] attend this breakfast meeting?
[8]    **A:** No, sir.
[9]    **Q:** Do you know if anyone from the West Shore
[10] Department attended it one way or the other?
[11]    **A:** No, I wouldn't know.
[12]    **Q:** Fine. Now, I want to discuss with you the
[13] incidents — or the incident involving Ryan
[14] Schorr which brings us here. Let me ask you,
[15] first of all, what you recall to be your first
[16] — the first word you received that there was a
[17] need for you to have some dealings with Ryan
[18] Schorr on November 18th, 2000.
[19]    **A:** When I came into work that morning, I was
[20] advised by the shift that I was relieving that
[21] they had had an incident with the gentleman up
[22] on Meadow Drive and that the mother was in the
[23] process of getting a 302 warrant so we'd
[24] probably be getting a call soon to get the 302
[25] warrant and go serve it. So that would be the

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

---

**Page 27**

[1] first time I heard about anything happening.
[2]  Q: What next happened, again just not your whole
[3] day but just as it applied to Ryan Schorr?
[4]  A: I received a telephone call from crisis up at
[5] Holy Spirit Hospital. The crisis worker said
[6] that she had the warrant for Ryan Schorr, and
[7] she wanted to know if I needed a copy before I
[8] serve it or whether I would serve it without the
[9] copy in hand. I said, no, it is one of the
[10] things that you've said he wants the warrant in
[11] hand when you're serving. So she said, do you
[12] want me to fax it or do you want to come pick it
[13] up. I told her I'd go pick it up.
[14]  Q: Before you take me to that point, tell me about
[15] the procedure for getting this phone call. Did
[16] it come to you directly, or was it dispatched?
[17]  A: It came over the telephone to the police
[18] station. No, excuse me, it was— I got a call
[19] from county to call her. That's what it was,
[20] yes.
[21]  Q: So county dispatch called you, and you called
[22] her?
[23]  A: Called her, right.
[24]  Q: So you went to pick up the warrant?
[25]  A: I went and picked the warrant up off the crisis

**Page 28**

[1] worker.
[2]  Q: What was your understanding as to what the
[3] warrant authorized you to do?
[4]  A: It was to pick up Ryan and take him over to Holy
[5] Spirit Hospital emergency room and hand him over
[6] to crisis.
[7]  Q: Before that time, had you had any encounter with
[8] Ryan Schorr in the past?
[9]  A: I had not.
[10]  Q: When you say I had not in that way, I have to
[11] ask you, did Officer Hart have any prior
[12] contact, if you know?
[13]  A: No. It was the shift before us.
[14]  Q: Did anyone from the shift before you tell you
[15] about dealings they had had with Ryan Schorr on
[16] that shift?
[17]  A: Yeah. They said that he had come home, his
[18] roommate wouldn't let him in. He broke the
[19] kitchen window and climbed in through there.
[20]  Q: Who was it on the prior shift that had given you
[21] this information?
[22]  A: I think it was Daniel Hair.
[23]  Q: This information that you received from the
[24] prior shift, did they get it from telephone
[25] information or from some direct contact with

---

**Page 29**

[1] Ryan Schorr, if you know?
[2]  A: I don't believe they got it direct. Somebody
[3] called.
[4]  Q: You picked up the warrant. Was Officer Hart
[5] with you?
[6]  A: He was not with me at the time.
[7]  Q: What did you do after you got the warrant?
[8]  A: When I got the warrant, I proceeded over to
[9] Meadow Drive. I radioed Officer Hart that I was
[10] going over to Meadow Drive and to meet me there.
[11] I waited at the corner of Meadow and Yverdo
[12] Drive in my cruiser until Officer Hart came.
[13] Then we drove down and parked in front of Ryan's
[14] apartment.
[15]  Q: Let me just ask you a couple questions about
[16] that. Why did you radio Officer Hart as opposed
[17] to some other officer?
[18]  A: Officer Hart was the only other officer working
[19] with me.
[20]  Q: Were you the only two on that shift?
[21]  A: Yes.
[22]  Q: So you arrived at the Schorr apartment together,
[23] though. Is that correct?
[24]  A: Yeah. We pulled up together, right.
[25]  Q: What time of day was that?

**Page 30**

[1]  A: I'm not sure to be honest with you.
[2]  Q: That's fine. Between the time you picked up the
[3] warrant and the time you arrived at Meadow
[4] Avenue, had you had any further communications
[5] first of all from the county or from Holy
[6] Spirit?
[7]  A: I do not believe so.
[8]  Q: Just in that little window of time, had you had
[9] any communications with anyone else involving
[10] Ryan Schorr?
[11]  A: I don't believe so.
[12]  Q: So what happened next after you and Officer Hart
[13] arrived in your separate cruisers now at the
[14] Meadow Avenue apartment?
[15]  A: We went up to the front door of Ryan's
[16] apartment. We knocked on the door, and Ryan
[17] answered the door. We told him that we needed
[18] to talk to him, could we come in. He said, yes,
[19] so we came in. And we explained to him that we
[20] had a 302 warrant to — and we needed to drive
[21] him over to Holy Spirit Hospital. He said, my
[22] mother did this, didn't she. I says, I don't
[23] know. I says, all I'm telling you is we need to
[24] drive you over to Holy Spirit Hospital. And I
[25] said, you can talk to them over there.

---

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Gary W. Berr
May 28

**Page 31**

[1] And he started talking about working for
[2] the president and other things. And I kept
[3] putting that off by saying, well, you can tell
[4] that to them over here, we're only here to drive
[5] you over, that's all we're here for is just to
[6] drive you over.
[7] And so he said, okay. He put his shoes on.
[8] We went out. I said, I have to check you to
[9] make sure you don't have anything on you. And I
[10] checked him, and he was fine.
[11] **Q:** He did not resist your—
[12] **A:** No.
[13] **Q:** —patting him down?
[14] **A:** No. And I put him in the back of my police
[15] cruiser, and I drove him over to Holy Spirit
[16] emergency room. Officer Hart followed in his
[17] car.
[18] **Q:** Let me ask you, do you recall any observations
[19] you made of his physical condition at this time?
[20] I mean, did he have any wounds or cuts on his
[21] body?
[22] **A:** I don't remember any.
[23] **Q:** So he was seated in the rear of your cruiser,
[24] and then what happened?
[25] **A:** I drove him over to Holy Spirit Hospital, and he

**Page 32**

[1] was saying again things about the president and
[2] stuff. And I kept telling him, you know, you
[3] talk to them over there. He needed to make some
[4] phone calls. I said to tell them over there,
[5] they'll work with you on it.
[6] I took him over. And we took him into the
[7] emergency room, the reception area. And we told
[8] the receptionist what we were there for. She
[9] started asking him questions for checking him in
[10] which— Anyway, he got mad, and he wanted to
[11] make a phone call, and she said that he couldn't
[12] make the phone call.
[13] **Q:** I'm sorry, said that he could or couldn't?
[14] **A:** Said he couldn't make the phone call. And he
[15] got mad, and he said make — something about
[16] making the phone call or I'll kill you, he did
[17] say that, which Officer Hart and I backed him up
[18] a few feet away from the window. And she said,
[19] take him on back. So we took him back.
[20] **Q:** By the way, the she that you're talking with
[21] now, the check-in person, do you have a name for
[22] her?
[23] **A:** No. I don't know who she was.
[24] **Q:** Go ahead.
[25] **A:** We took him back. He was fine, you know, just

[1] that outburst, and then he was fine. Took him
[2] back, and then the nurse, I believe she was a
[3] nurse in charge at the emergency room, told us
[4] to take him to the room that they put 302s in.
[5] And so we walked him into there.
[6] **Q:** Can you describe that room?
[7] **A:** It had a chair in it, and it had like a bed.
[8] That was all that was in it, the one door with a
[9] little window in it. And the crisis worker came
[10] down. And the nurse and the crisis worker
[11] reviewed his file, and they were talking back
[12] and forth.
[13] **Q:** You and Officer Hart were still there?
[14] **A:** Yeah, we were still there waiting to see what w
[15] needed to do, if anything. And there was a male
[16] nurse or aide, I don't know what his position
[17] was, and the charge nurse said to call for the
[18] security guy. He came down. And they told us
[19] to go ahead and take the — told us to go ahead
[20] and shut the door, lock it.
[21] And the security gentleman said he wanted
[22] the chair out of there, he didn't want to leave
[23] the chair in. So I went in and took the chair
[24] out, locked the door and shut it, tried it to
[25] make sure it was locked.

[1] And then the security gentleman got a page
[2] from a sister, and he said he had to leave. So
[3] he left.
[4] **Q:** When you say a sister, do you mean a nun?
[5] **A:** One of the nuns at the hospital. So then the
[6] crisis worker went back behind the desk at the
[7] emergency room, and I believe the nurse, the
[8] male nurse or whatever it was, went back
[9] behind — there's like a room behind that with
[10] glass. And Officer Hart and I stood there for
[11] awhile. And finally Officer Hart walked up to
[12] the desk and says, do you need us anymore. The
[13] charge nurse, whatever it was said, no, you can
[14] go. So we left.
[15] **Q:** At the time that you locked the door to the 302
[16] room, if we can call it that, was Ryan Schorr
[17] acting out in any way at that moment?
[18] **A:** As I remember it, he was laying on the bed or
[19] sitting on the bed. But I remember him being on
[20] the bed when I looked in the window.
[21] **Q:** So at that point at the point where they said
[22] they didn't think they needed you, you and
[23] Officer Hart left and went about your duties for
[24] the day?
[25] **A:** Right.

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, ét :

Page 35

[1] Q: How long after that did you — did your next
[2] communication about Ryan Schorr occur?
[3] A: Next communication to me or next communication I
[4] heard about Ryan?
[5] Q: Let's take the last one first, the next
[6] communication you heard about Ryan.
[7] A: Probably I'm going to estimate maybe an hour
[8] later Officer Hart was down at the — our end of
[9] the Market Street bridge because Harrisburg City
[10] wanted us to block it off for their parade. I
[11] was out in Lemoyne doing parking meters. And we
[12] got a call that Ryan was back at his apartment.
[13] Q: From whom did that call come, if you know?
[14] A: It came from county, and I believe it was called
[15] into them, if I remember correctly, by his
[16] mother.
[17] Q: Who communicated with the county? Was it
[18] Officer Hart or someone else?
[19] A: Responding back that we were going to go?
[20] Q: Yes.
[21] A: I believe it was Officer Hart because I was out
[22] on my portable radio, and it wasn't getting back
[23] to the car as I remember.
[24] Q: What happened next?
[25] A: Officer Hart and I drove back up to Meadow Drive

Page 36

[1] in separate cars again, parked pretty much the
[2] same place out front, went up, knocked on the
[3] door, didn't get any answer. And as I remember,
[4] we got— No. I got Mrs. Schorr's number and
[5] called her because I wanted to see if she was
[6] sure Ryan was in the apartment.
[7] And so I called her on my cellular phone,
[8] and she said that she had just talked to him so
[9] she knew he was in there. And she thought maybe
[10] his roommate was in there, and she had some
[11] concern for his safety if he was.
[12] Q: Did she say specifically what concern she had,
[13] or was she any more specific than that?
[14] A: No. That was just about it. And I asked her if
[15] she had a key that we could get in. She told me
[16] maybe I could get a key from maintenance. And I
[17] said, well, how do you get ahold of maintenance.
[18] She said she'd try to make a call about it or
[19] something. So we went back to pounding on the
[20] door, calling his name, and nothing. We got
[21] nothing.
[22] Q: You heard no response from Ryan. Did you hear
[23] anything else from within the apartment?
[24] A: No, I didn't hear anything. His mother also
[25] suggested that we go around back because on the

Page 37

[1] call from the midnight shift he had broken the
[2] kitchen window, and she thought maybe we could
[3] go back through there, through the window.
[4] We went back, and the hole was all jagged,
[5] so we weren't going to go through there. So I
[6] reached down and tried the patio door, and it
[7] slid open. Now, when it slid open, I could hear
[8] the music.
[9] Q: Now, let me just stop you there for a second.
[10] The patio door which is in the rear of the
[11] building?
[12] A: Yes.
[13] Q: It was unlocked obviously when you tested it?
[14] A: Yes.
[15] Q: But was it ajar? I mean, was it open, or was it
[16] closed but unlocked?
[17] A: Closed and unlocked.
[18] Q: So when you tested and it opened, then what
[19] happened?
[20] A: We stepped in and called Ryan's name. I noticed
[21] to the left that the cellar door was open and
[22] the light was on in the cellar. So for safety
[23] purposes, I reached over and shut that door so
[24] that if he was down there and came storming up
[25] he would have to at least open the door which

Page 38

[1] would give us a little more reaction time.
[2] Q: In discovery we've been given a couple of
[3] drawings. I'm going to mark one of them now.
[4] Maybe it will help us discuss this part of the
[5] day. In the earlier encounter with Brian Schorr
[6] when you first took him to the hospital, did you
[7] handcuff him in any — or restrain him in any
[8] way?
[9] A: No.
[10] Q: When you I guess I'll say and/or Officer Hart
[11] received a communication that he was back in his
[12] apartment after you left him at the hospital,
[13] were you given any description of his condition
[14] or state of mind at that time?
[15] A: No.
[16] Q: Were you given any description of his state of
[17] mind or his status at any time before you
[18] entered the house other than the conversation
[19] you had with his mother which you've told us
[20] about?
[21] A: No.
[22] Q: When you entered the patio door in the rear of
[23] the building, into what room were you?
[24] A: It was like a kitchen or maybe dining room.
[25] MR. WILLIAMS: We're going to mark this as

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

Gary W. Berre
May 28,

Page 39

[1] P-2, I guess.

[2]    (Plaintiff's Deposition Exhibit #2 marked
[3] for identification)

[4]          BY MR. WILLIAMS:

[5]    Q: Now, Officer, you have P-2 in front of you.
[6] That is a drawing which says first floor?

[7]    A: Exhibit 2?

[8]    Q: Yes. First of all, for my own sake, I want to
[9] locate the patio door you described. Can you
[10] tell me where that would be?

[11]    A: On the drawing it would be on the right-hand
[12] side, the line right by the table.

[13]    Q: Can you just I guess make some little mark on
[14] there indicating patio door? We'll agree that
[15] it's not to scale and we're not holding you to
[16] an exact location. So when you entered, you
[17] entered in through — into a kitchen area. Is
[18] that accurate?

[19]    A: Yeah.

[20]    Q: The broken window, is that that window that
[21] appears above the sink in this drawing?

[22]    A: Yes.

[23]    Q: Now, when you entered this kitchen area, you
[24] indicated earlier you could hear the music?

[25]    A: Yes.

Page 40

[1]    Q: What are you referring to?

[2]    A: Someone was playing a radio, record player or
[3] CD, something, some music.

[4]    Q: Could you tell from where in the apartment it
[5] was coming?

[6]    A: It sounded like it was coming from upstairs.

[7]    Q: Once you got into the kitchen, I think you said
[8] you started calling Ryan's name?

[9]    A: Yes, we did.

[10]    Q: What happened then?

[11]    A: Nothing.

[12]    Q: When you entered, did you enter— In what order
[13] did you enter, do you remember? Were you first?

[14]    A: I was first.

[15]    Q: Were both your firearms holstered at that point?

[16]    A: Yes.

[17]    Q: How did you proceed once you got in and you
[18] called Ryan's name and got no response?

[19]    A: I proceeded in past the table. I guess that
[20] would be the left-hand side of the table. And
[21] I— As I said, I shut the basement door because
[22] I saw light on down there, shut that door. Then
[23] we proceeded on past the table to the bottom of
[24] the stairs, the stairs to go upstairs.

[25]    Q: Were you still calling Ryan's name at this

P.

[1] point?

[2]    A: Yes. We'd only taken like two steps and called
[3] his name.

[4]    Q: Then what happened?

[5]    A: Then we got to the bottom of the stairs. There,
[6] as I remember, was a little coffee table or
[7] something there by the couch, and there was a
[8] big pair of scissors there.

[9]    Q: Now, you're referring to part of this drawing
[10] that's labeled living room?

[11]    A: Yes, living room.

[12]    Q: So did you actually go into the living room to—

[13]    A: No.

[14]    Q: From the bottom of the steps, you looked in and
[15] you saw this—

[16]    A: Yeah. Right there in the living room right
[17] there at the corner, as I remember, was a table.
[18] One of the things on it was a big pair of
[19] scissors.

[20]    MR. MacMAIN: Do you want him to draw a
[21] table?

[22]    MR. WILLIAMS: Yes. If it's not depicted
[23] there, draw it.

[24]          BY MR. WILLIAMS:

[25]    Q: Now, what significance did the big pair of

P.

[1] scissors have to you, if any?

[2]    A: Officer safety. Officer Hart took them and
[3] threw them back toward the coffee table couch to
[4] get them away.

[5]    Q: Fine. What happened next?

[6]    A: Then we called for Ryan at the bottom of the
[7] stairs, no answer, went up two stairs, called
[8] again, and proceeded that way up the stairs
[9] about two steps and call Ryan's name.

[10]    Q: At this stage could you hear anything other than
[11] the music?

[12]    A: No, no. That is all there was, was music.

[13]    Q: You heard no running water, for example?

[14]    A: No, I didn't hear— The music was loud, and
[15] when we got about halfway up the stairs, the
[16] volume was turned up.

[17]    Q: Even louder?

[18]    A: Even louder.

[19]    Q: So now at this stage you are proceeding up the
[20] stairs?

[21]    A: Yes.

[22]    Q: And both officers proceeded up the stairs?

[23]    A: Yes.

[24]    Q: You and Officer Hart?

[25]    A: Yes.

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Page 43

[1] Q: Tell me what happened next.

[2] A: Proceeded up the stairs about two steps, then
[3] called for Ryan. Both Officer Hart and I were
[4] calling for him. I got to the top of the
[5] stairs, and I looked right to left to see if I
[6] could see anything. I believe the bathroom was
[7] right in front of — when you go upstairs right
[8] into the bathroom. And I looked to the left and
[9] around the corner, and that's where I saw Ryan
[10] standing in front of a mirror with I think it
[11] was a fuzzy, light-colored housecoat. I believe
[12] he had a little hat on.

[13] Q: When you say he was standing in front of the
[14] mirror, where was the mirror?

[15] A: The mirror would have been—

[16] MR. WILLIAMS: We'll mark this second floor
[17] drawing as P-3.

[18] (Plaintiff's Deposition Exhibit #3 marked
[19] for identification)

[20] A: We came up the steps.

[21] BY MR. WILLIAMS:

[22] Q: Were you still in front, by the way?

[23] A: I was still in front, yes, came up the steps,
[24] and I looked around to the left it would be 180
[25] degrees, and Ryan was standing in front of the

Page 44

[1] dresser looking in the mirror.

[2] Q: So he was inside this room that's labeled
[3] Schorr's bedroom?

[4] A: Yes.

[5] Q: Now, then what happened?

[6] A: I was standing in the doorway. Ryan was there
[7] looking at himself. His robe was open. He had
[8] no other clothes on. And I said, Ryan, we need
[9] to take you back to the hospital. As soon as I
[10] said that, he took about two steps, grabbed me,
[11] and pulled me back into the bedroom.

[12] Q: Did he grab your arms or grab you by the
[13] shoulders? How did he grab you?

[14] A: He grabbed— His left hand grabbed my right
[15] hand. His right hand— I don't remember what
[16] he grabbed there.

[17] Q: That's fair enough.

[18] A: And he pulled us — pulled me in, and then we
[19] fell to the floor.

[20] Q: The floor of the bedroom?

[21] A: The floor of the bedroom.

[22] Q: Between the mattress and the dresser?

[23] A: Between the mattress and the closet, pretty much
[24] right at the very corner of the mattress toward
[25] the dresser. I mean, I wasn't back real far.

Page 45

[1] We were just right out by the edge of the
[2] mattress.

[3] Q: When this first happened, were you aware at the
[4] time of anything Officer Hart was doing?

[5] A: No. At that point— When Ryan had grabbed my
[6] gun hand, my gun came out of the holster, so
[7] then Ryan and I were struggling with my gun.

[8] Q: Now, can you explain to me how that happened?
[9] How did your gun fall out of your holster?

[10] A: Well, when he pulled my arm, it pulled my gun
[11] out because I had my hand on my gun.

[12] Q: Now, why did you have your hand on your gun?

[13] A: Officer safety.

[14] Q: Is that I'll say standard operating procedure in
[15] this kind of situation?

[16] A: As far as I'm concerned, it is, yes.

[17] Q: I understand. I'm just asking— I mean, I'm
[18] not attacking you. I'm just asking you to
[19] explain that to us.

[20] A: A lot of times officers have their hand on their
[21] gun because when something happens it's very
[22] quick. I mean, you hope you don't have to use
[23] it.

[24] Q: I understand. Let me just ask you a couple of
[25] questions about that narrow point. Your gun was

Page 46

[1] not strapped into its holster. Is that
[2] accurate?

[3] A: The thumb strap was undone, right.

[4] Q: And had you undone it, or was it just
[5] inadvertently undone?

[6] A: No. I would have undone it.

[7] Q: Again, just to be able to anticipate needing to
[8] use the firearm. Is that accurate?

[9] A: Right.

[10] Q: What about the safety on the pistol, was that
[11] engaged or not?

[12] A: There's no safety.

[13] Q: So the gun was holstered, but it was loaded, I
[14] assume?

[15] A: Yes.

[16] Q: Is that accurate?

[17] A: Yes.

[18] Q: When he grabbed your gun hand, your gun came
[19] out, and did it fall to the floor, or what
[20] happened to the gun?

[21] A: No. I still retained possession of it, but he
[22] also obtained possession of it, so we both were
[23] possessing it at the same time.

[24] Q: Was your finger on the trigger?

[25] A: No.

Keith, I. Schorr & Susan Schorr    v.
· Borough of Lemoyne, et al.

Gary W. Berr
May 28

Page 47

[1] Q: Tell me what happened next as the two of you
[2] tussled.
[3] A: As we tussled over the gun, we were both— I
[4] was on my knees. I believe he was on his knees,
[5] also. And we were cheek to cheek. I mean, we
[6] were really close. And we're struggling with
[7] this gun.
[8]     And I'm trying to do everything I can to
[9] make my gun not work. I was trying to get my
[10] finger — trying to get a finger behind the
[11] trigger so if he pulled the trigger it wouldn't
[12] go all the way back. I was trying with my other
[13] hand to tighten the grip on the top so the slide
[14] wouldn't slide. Of course I was trying to keep
[15] the barrel away from both of us really.
[16]     I then tried to move my hand up to secure
[17] the hammer so that if he pulled the trigger the
[18] hammer wouldn't come back. I was trying to find
[19] the best way to grip the gun to try to disable
[20] it.
[21] Q: What model and caliber was the gun?
[22] A: It's a .40 caliber Sig P24 I think. And so we
[23] were struggling with the gun.
[24] Q: Were the two of you saying anything to each
[25] other at this time?

Page 48

[1] A: I was telling him to leave go of the gun, leave
[2] go of the gun. And at that point I think that's
[3] about all that was said.
[4] Q: Was he saying anything to you?
[5] A: I don't remember him saying anything to me at
[6] that point. So as we struggled with the gun, I
[7] saw that he was getting his finger onto the
[8] trigger, nothing I could do to stop that. So
[9] again I was trying to if he pulled it try to
[10] disable it from going off.
[11] Q: In what direction was the gun pointed when you
[12] saw his finger getting on the trigger?
[13] A: The gun was pointed away from him in front of my
[14] face. It would have been pointed to the left.
[15] So I saw him he had his finger on the trigger.
[16] I'm trying my best to disable the gun from
[17] firing if he pulls the trigger. I saw that
[18] wasn't going to happen. I also saw my one
[19] finger was at the end of the gun, and he pulled
[20] the trigger.
[21] Q: Did you actually see him pull the trigger?
[22] A: I saw him pull the trigger.
[23] Q: Which finger was shot?
[24] A: It was my ring finger on the left hand.
[25] Q: Then what happened besides a lot of pain on your

[1] part?
[2] A: There was no pain. There was no pain.
[3] Q: Well, tell me what happened.
[4] A: Then I yelled at him to let go of the gun,
[5] you've already shot me. He said, I don't give a
[6] fuck. We continued to wrestle with the gun. I
[7] lost control of the gun because by that time my
[8] gun was soaked with my blood and probably some
[9] of his.
[10] Q: Was he hit with the bullet in any way, do you
[11] know, when he pulled the trigger?
[12] A: No, he wouldn't have been hit with that bullet.
[13] Q: Why would he have been bleeding?
[14] A: I believe he would have been bleeding because
[15] unbeknownst to me Officer Hart was trying to get
[16] him off of me and taking some nonlethal
[17] approaches to doing that. And that's my guess
[18] because I can't believe I bled that much. I
[19] mean, I bled a lot, but.
[20] Q: Right. I understand.
[21] A: So then I lost control of the gun to Ryan.
[22] Q: Did he actually have the gun then in his hands?
[23] A: He had the gun, and then he started to pistol
[24] whip me and Officer Hart.
[25] Q: Meaning hit you with the gun?

[1] A: Yeah. He was using the gun to beat us, right.
[2] Q: Did he attempt to fire the gun again that you
[3] could see?
[4] A: I did not see him try to fire the gun again.
[5] Q: And I recognize that this is all happening very
[6] fast, but when he was hitting you, was it with
[7] the barrel of the gun or the butt of the gun or
[8] what?
[9] A: I believe it was the butt of the gun. I
[10] remember— I think he was holding the barrel.
[11] Q: Did the gun go off again?
[12] A: No.
[13] Q: What happened next in this struggle?
[14] A: I struggled— I got up and I struggled with
[15] Ryan as Officer Hart was struggling with Ryan,
[16] also. He eventually— I don't know whether he
[17] threw the gun on the bed or it got knocked out
[18] of his hand or what, but the gun ended up on the
[19] bed. And I'm trying to subdue Ryan. Harry is
[20] trying— Officer Hart is trying to subdue Ryan.
[21] And basically him and I were wearing out and
[22] Ryan wasn't.
[23] Q: Was Ryan saying anything at this stage?
[24] A: If he was, I didn't— I was so entranced in the
[25] battle for my life, that I didn't— I don't

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

Page 51

[1] know.

[2] Q: What happened next?

[3] A: After what seemed like a long time, but it
[4] probably really wasn't, Ryan ran out of the
[5] room. At that point he was totally naked, and
[6] he ran out of the room. Officer Hart got on his
[7] radio and called for backup and told me to sit
[8] down on the bed since I had been shot. Then all
[9] of a sudden Ryan comes running back in the room
[10] with a couple pots and pans.

[11] Q: All right, let me ask you this, at the time that
[12] he first ran out of the room, at that time did
[13] you know where he went?

[14] A: No.

[15] Q: Did you at any time later find out where he
[16] went?

[17] A: Yes.

[18] Q: Where did you find out he went?

[19] A: I found out he went downstairs, ran out the
[20] front door, got into my patrol car, sat there
[21] for seconds or a minute or two or whatever and
[22] then came back in the house.

[23] Q: But at the time it was happening, you didn't
[24] know where he was?

[25] A: No. I was hoping far away.

Page 52

[1] Q: But then after some passage of time which can
[2] you estimate it at all when—

[3] A: No. It was all such a blur. My whole time
[4] thing is distorted from that.

[5] Q: But he came back?

[6] A: He came back.

[7] Q: And he had pots and pans?

[8] A: He had a pot and pan in each hand.

[9] Q: Both you and Officer Hart were in the bedroom at
[10] this time?

[11] A: Yes.

[12] Q: And you were sitting on the bed?

[13] A: Yes.

[14] Q: And Officer Hart was making a radio call?

[15] A: Yeah. He was standing at the bottom of the bed
[16] making a radio call.

[17] Q: And he was making a radio call for backup?

[18] A: For backup, ambulance, stuff like that.

[19] Q: The bedroom door, was it still open?

[20] A: Yes, it was open.

[21] Q: So what happened after Ryan Schorr came in
[22] wielding the pots and pans?

[23] A: When he came in, he went for Officer Hart
[24] because he was right in front of him, so he went
[25] for him. I jumped up, and I tried to pull Ryan

Page 5:

[1] back off of Officer Hart. And Ryan had no
[2] problem pushing me off each time, and I'd land
[3] on the floor, get back up. That probably
[4] happened two or three times.

[5] Then when I went to get up, I heard Harry
[6] yell for Ryan to stop. And Harry had his gun
[7] out. And Ryan didn't stop. He kept coming—
[8] He was coming at him. And I heard Harry shoot
[9] him twice, and he dropped to the floor.

[10] Q: I want to ask you just a little more detail
[11] about that scene. But let me just backtrack a
[12] little bit. When Ryan Schorr first came into
[13] the room with the pots and pans, do you recall
[14] observing anything about his physical
[15] appearance?

[16] A: He was naked. He had blood on him.

[17] Q: Where was the blood?

[18] A: As I remember, it was pretty much all over him.

[19] Q: Did he say anything when he came in with the
[20] pots and pans?

[21] A: I don't remember him saying anything.

[22] Q: I guess I should ask you, did he make any sounds
[23] at all regardless of whether he said anything?

[24] A: Not that I remember.

[25] Q: Now, you indicated that after you made two or

Page 5·

[1] three attempts to pull him off of Officer Hart
[2] you heard Officer Hart say, stop. And then
[3] eventually you I guess saw him shoot him twice.
[4] Is that accurate?

[5] A: Yes.

[6] Q: Maybe if you could look at P-3, if you could
[7] even draw on there where Officer Hart was and
[8] where Ryan Schorr was at the time these shots
[9] were fired. Maybe you could put like an S in a
[10] circle for Schorr and an H in a circle for Hart.
[11] May I see it now, just so— For the record,
[12] you've depicted Officer Hart as being I guess
[13] between the mattress and the wall of the
[14] bedroom. Is that accurate?

[15] A: Yes.

[16] Q: How did Officer Hart get there? Is that where
[17] he was standing when Ryan came in?

[18] A: He was standing where this depiction shows where
[19] Ryan was standing when Ryan first came in and he
[20] moved — he moved back.

[21] Q: So he was standing at the foot of the mattress
[22] near I guess that's the rear wall, correct?

[23] A: That would be—

[24] Q: The rear wall if the front wall is where the
[25] bedroom door is?

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Gary W. Berr
May 2:

Page 55

[1]　MR. MacMAIN: Can we just say he moved back
[2] towards the corner?
[3]　MR. WILLIAMS: Yes.
[4]　　　　BY MR. WILLIAMS:
[5]　Q: Then after Ryan came in, you're indicating that
[6] he moved back toward the corner of the bedroom?
[7]　A: Yeah.
[8]　Q: But still between the mattress and the wall?
[9]　A: Yes.
[10]　Q: How far away from Ryan Schorr was Officer Hart
[11] when he fired the gun, if you know, or can
[12] approximate?
[13]　A: I would say approximately 5 feet.
[14]　Q: At the time that he was shot, did Ryan Schorr
[15] still have the pots and pans in his hands?
[16]　A: I don't know.
[17]　Q: Was there ever a time I'll call it during the
[18] second encounter, after Ryan returned and came
[19] up to the room, was there ever a time when he
[20] had anything in his hands other than the pots
[21] and pans?
[22]　A: Not that I saw.
[23]　Q: I guess, you know, you've told us that at one
[24] point he had your gun in his hands, and you told
[25] us about the pots and pans. Did you see Ryan

Page 56

[1] Schorr with any other object in his hands?
[2]　MR. MacMAIN: Either of the two encounters
[3] are you asking did he have anything else
[4] besides—
[5]　MR. WILLIAMS: At any part of the total
[6] encounter.
[7]　A: He did grab a BB gun and use that as a club on
[8] Officer Hart. I did see that.
[9]　　　　BY MR. WILLIAMS:
[10]　Q: When was that?
[11]　A: That was the first encounter.
[12]　Q: Where did he grab this BB gun from?
[13]　A: As I remember it, it was over by the dresser,
[14] between the dresser and the wall, and right
[15] beside it was a sword. I was glad he grabbed
[16] the rifle rather than the sword.
[17]　Q: He didn't fire the air rifle?
[18]　A: No. He used it as a club.
[19]　Q: Let me ask you before I go on to another area,
[20] the wound to your hand and finger, what
[21] happened? What treatment did you receive and—
[22]　A: It was amputated.
[23]　Q: Is it on your right hand or your left hand?
[24]　A: Left hand.
[25]　Q: Did you require treatment for any other injuries

[1] besides the injury to your finger?
[2]　A: Mental health.
[3]　Q: Without getting into any details, what kind of
[4] treatment did you receive?
[5]　A: I'm still seeing a psychiatrist, and I'm on
[6] medication.
[7]　Q: What medication?
[8]　A: It's for depression. I don't know the name of
[9] it.
[10]　Q: That's fine. There is one other I guess detail
[11] that I wanted to ask you about. In the very
[12] first encounter, your gun ended up on the bed,
[13] as I recall.
[14]　A: Yes.
[15]　Q: At any time before the end of your encounter
[16] with Ryan Schorr, did you do anything with that
[17] gun? Did you re-holster it, for example?
[18]　A: No.
[19]　Q: Did you pick it up?
[20]　A: No.
[21]　Q: Did Officer Hart pick it up or do anything with
[22] it that you know?
[23]　A: Not that I know of.
[24]　Q: So after the incident was over and the backup
[25] arrived and people began investigating the

[1] scene, the gun was still on the bed so far as
[2] you know?
[3]　A: Yes.
[4]　MR. WILLIAMS: We'll mark this as P-4.
[5]　(Plaintiff's Deposition Exhibit #4 marked
[6] for identification)
[7]　　　　BY MR. WILLIAMS:
[8]　Q: Let me ask you, first of all, have you ever seen
[9] this document before?
[10]　A: No.
[11]　Q: I'll represent to you that it was provided by
[12] the county in discovery and that we acknowledge
[13] that you didn't prepare it and these are someone
[14] else's summaries. I'm just giving it to you so
[15] you have a point of reference for some questions
[16] that I want to ask you about. If you take a
[17] look at this, the first part of these summaries
[18] where it says Tape Number 1, do you see that
[19] paragraph?
[20]　A: Yes.
[21]　Q: I wanted to ask you about one reference here.
[22] And it's the part that's in parentheses there
[23] where it says, Hart and Berresford specifically
[24] state on the radio that they are taking a
[25] visitor to avoid upsetting Schorr. Do you have

Gary W. Beresford
May 28, 2002

Keith I. Schorr & Susan Schorr v
Borough of Lemoyne, et al

Page 59

[1] any understanding of what that refers to?

[2] **A:** I don't remember doing it, but I might — I can
[3] say I might have done that because I didn't
[4] consider Ryan a prisoner; so, therefore, I
[5] probably wouldn't have identified him as a
[6] prisoner.

[7] **Q:** I see. The reference to a visitor if it
[8] happened would have been a reference to Ryan
[9] Schorr as a visitor?

[10] **A:** Yeah. And it could be that I used it also for
[11] what they're saying. I just don't recall. It
[12] could be just the fact that I didn't have him
[13] cuffed and he wasn't what I considered a
[14] prisoner. He was cooperating and everything.

[15] **Q:** Now, the next couple sentences in that same
[16] paragraph I wanted to ask you about, too. The
[17] next sentence says, call from Carol Jerger of
[18] Holy Spirit stating that Schorr escaped and he
[19] is, quote, belligerent and homicidal. First of
[20] all, do you see that sentence?

[21] **A:** I see it.

[22] **Q:** The next sentence says, county does not notify
[23] the officers of this last fact. So I guess my
[24] question is, did you have any indication from
[25] the county or Holy Spirit that Schorr was either

Page 60

[1] belligerent or homicidal or violent in any way?

[2] **A:** No.

[3] **Q:** Now, the next paragraph, the summary — the
[4] purported summary — somebody's summary of Tape
[5] Number 2 I wanted to ask you about the sentence
[6] that's in italics, or I guess it's really a
[7] clause that's in italics. It says, also
[8] includes a radio transmission where the officers
[9] are warned that Mom told 911 that Schorr is
[10] agitated because he got a message on his machine
[11] from Holy Spirit about his committal. Do you
[12] recall such a transmission or receiving such a
[13] warning as this is described?

[14] **A:** I don't remember hearing that.

[15] **Q:** Did you receive any kind of a warning or any
[16] kind of communication from anybody that Ryan
[17] Schorr may have been in a violent state or mood
[18] when he returned back to his apartment?

[19] **A:** No.

[20] **Q:** At any time after the death of Ryan Schorr, have
[21] you yourself, Officer, had any contact with
[22] anyone from Holy Spirit about the incident and
[23] how it unfolded?

[24] **A:** No.

[25] **Q:** Have you had any such contact with anyone from

Page 61

[1] the county MH-MR department about it?

[2] **A:** No.

[3] **Q:** Let me take you back to November 2000 and ask
[4] you some more general questions about operations
[5] of the West Shore Police Department. Can you
[6] tell me whether there was in place any
[7] procedure, any particular procedure, for calling
[8] for backup in connection with the attempt to
[9] execute a 302 warrant?

[10] **MR. MacMAIN:** Are you referring to a
[11] written procedure as opposed to an informal or—

[12] **MR. WILLIAMS:** Well, I'll break it down.

[13] **BY MR. WILLIAMS:**

[14] **Q:** First a written policy if you're aware.

[15] **A:** I'm not aware of it.

[16] **Q:** What about an oral or unwritten policy with
[17] respect to calling for backup?

[18] **A:** No, no.

[19] **Q:** Were there any directives or guidelines which
[20] advised you not to call for backup?

[21] **A:** No.

[22] **Q:** I may be using backup in a confusing way. I
[23] don't just mean backup from other police units,
[24] but I include in that question backup from other
[25] types of professionals or other personnel. Was

Page 62

[1] there any such policy?

[2] **A:** There's no policy.

[3] **Q:** Were you aware of any resources that you could
[4] utilize as backup in connection with executing a
[5] 302 warrant?

[6] **A:** From professionals you mean?

[7] **Q:** Let's start with that, from professionals.

[8] **A:** I knew of no one that would assist me with that.

[9] **Q:** So was the only possible backup of which you
[10] were aware police backup?

[11] **A:** Yes.

[12] **Q:** I asked you a lot of questions earlier in your
[13] deposition about training and programs and so
[14] forth, but let me ask you this, within the West
[15] Shore Regional Police Department, before
[16] November 18th, 2000, did you ever attend any
[17] programs or training events specifically
[18] concerned with the Americans with Disabilities
[19] Act?

[20] **A:** With the police department?

[21] **Q:** Yes.

[22] **A:** No.

[23] **Q:** Did you ever take part in any effort to evaluate
[24] the department's compliance with the Americans
[25] with Disabilities Act or any of its provisions?

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Keith I. Schorr & Susan Schorr    v.
Borough of Lemoyne, et al.

Gary W. Ben
May 2

Page 63

[1] A: That I would evaluate?

[2] Q: Well, that you would participate in evaluation

[3] no matter who was doing it.

[4] A: No.

[5] Q: Regardless of whether or not you participated in

[6] it, were you aware of any such evaluation within

[7] the department?

[8] A: No, I wouldn't be aware of it.

[9] Q: Who would be, the chief?

[10] A: The chief would be aware, maybe the corporals.

[11] Q: How many corporals are there?

[12] A: Two.

[13] Q: What are their names?

[14] A: Corporal Karns, Corporal Heck.

[15] Q: Were they the corporals back in November of 2000

[16] as well?

[17] A: Yes.

[18] Q: I guess I should have asked you about this as

[19] well about the structure of the department. Are

[20] there sergeants and lieutenants in the

[21] department, also?

[22] A: No.

[23] Q: So it's the patrol officers, the corporals, and

[24] the chief?

[25] A: Yes.

[1] Q: In the cabin of the cruiser, no weapons?

[2] A: No.

[3] Q: How about the keys to the cruiser, did you hav

[4] them?

[5] A: I have those.

[6] Q: So Ryan Schorr would not have had access to

[7] trunk?

[8] A: Right.

[9] Q: It's not equipped with a button that you can

[10] push?

[11] A: It does have a button, but as far as I know, it

[12] only works if the key's on.

[13] Q: If the key's engaged, all right.

[14] MR. WILLIAMS: That's all I have, Officer.

[15] Thank you.

[16] **EXAMINATION**

[17] **BY MR. YANINEK:**

[18] Q: Officer, I want to take you back to first I

[19] guess when you first dropped off Ryan Schorr at

[20] the Holy Spirit Hospital. Do you understand?

[21] A: Yes.

[22] Q: You said that he had an argument with the

[23] receptionist.

[24] A: Yes.

[25] Q: Could you give me a little bit more detail on

Page 64

[1] MR. WILLIAMS: If I can just caucus, we may

[2] be done.

[3] (Discussion held off the record)

[4] BY MR. WILLIAMS:

[5] Q: Just a couple of brief questions and these

[6] relate to your cruiser, Officer. You left it

[7] unlocked when you left it to go to—

[8] A: Yes.

[9] Q: Was that a deviation from your usual practice,

[10] or is that something you normally do?

[11] A: It's normal. It was normal until the terrorist

[12] act of the 11th. Now we have to lock them.

[13] Q: But up until that time, it didn't violate any

[14] regulation or policy—

[15] A: No.

[16] Q: —to leave the cruiser unlocked?

[17] A: No.

[18] Q: Did the cruiser have in it any weapons?

[19] A: Yes.

[20] Q: Did it have a shotgun in it?

[21] A: Yes.

[22] Q: Any other weapons?

[23] A: No.

[24] Q: Where was the shotgun kept within the cruiser?

[25] A: In the trunk.

[1] maybe what was said or what was the exchange

[2] between Ryan Schorr and the receptionist?

[3] A: As I remember it, Ryan wanted her to make a

[4] phone call for him or let him make a phone call

[5] for this meeting with the president. And she

[6] wanted to do the paperwork, and that made him

[7] mad. And he told her something along the line

[8] of let me make the phone call or make the phone

[9] call or I'll kill you.

[10] Q: Or I'll kill you to the receptionist?

[11] A: Yes.

[12] Q: Were there any other threats of violence other

[13] than one during the time that you had seen

[14] Ryan Schorr at the hospital?

[15] A: Not that I remember.

[16] Q: From the time that he said that to the

[17] receptionist, was there a cooling off period

[18] when he was actually placed in the room? Did he

[19] change his mood?

[20] A: He had that flare-up at the desk, and then that

[21] was it. She said, take him right back. So we

[22] did. And then they told us to put him in the

[23] room. He didn't like being there, but I don't

[24] remember him like saying anything other than he

[25] had this meeting and he needed to get moving to

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr  v
Borough of Lemoyne, et al

Page 67

[1] go to this meeting and everything.

[2]    Q: Did he struggle with you going back to the room?

[3]    A: No. He didn't even struggle with us when we

[4] backed him up from the receptionist's window.

[5]    Q: Did he say anything to you while you escorted

[6] him back to the room?

[7]    A: I don't remember him saying anything. If he

[8] did, I don't remember.

[9]    Q: Did he say anything to you when you put him in

[10] the room?

[11]    A: I don't remember him saying anything.

[12]    Q: Did you say anything to him as you were putting

[13] him in the room?

[14]    A: I believe it was all directional in nature, in

[15] here, Ryan, go in there or something like that.

[16]    Q: Was he compliant with you at that time?

[17]    A: Yes.

[18]    Q: It's my understanding that you put him in a room

[19] and you locked the door.

[20]    A: Yes, after the security guard had told me to

[21] take the chair out.

[22]    Q: Was he put in there and the door closed, and

[23] then did you have to go back in again?

[24]    A: No, no. It was just as I was getting ready to

[25] close the door, the security officer said he

Page 68

[1] wanted the chair out of there, so I took it out.

[2]    Q: Did you lock the door, or did the security

[3] guard?

[4]    A: I locked it. No, by then, he was gone. He got

[5] paged just about then when he said he wanted the

[6] chair taken out and left.

[7]    Q: Is there a lock on the outside of the door—

[8]    A: Yes.

[9]    Q: —to lock that door? Is that how you did it?

[10]    A: Yes.

[11]    Q: Just turn the knob?

[12]    A: I think it was a little turn thing.

[13]    Q: When you locked Ryan Schorr in the room, where

[14] was he your last observance?

[15]    A: I believe he was either sitting or laying on the

[16] bed as I remember.

[17]    Q: Is that the last time you saw him before you saw

[18] him back at the house?

[19]    A: Yes.

[20]    Q: Did the receptionist direct you to put him back

[21] into the room, or was that something that one of

[22] the nurses told you to do?

[23]    A: I believe she told us to take him back. I don't

[24] remember anyone else being there.

[25]    Q: What interaction, if any, did you see Ryan

Page 69

[1] Schorr having with any actual nurses or health

[2] care providers before you left?

[3]    A: I didn't see him react with any of them. I

[4] mean, like I said, the nurse and the crisis

[5] worker were going over his records. I do

[6] remember the nurse she did make the statement

[7] about not going in the room without — you know,

[8] we got to make sure that somebody else goes in

[9] the room when we go in, things like that. I

[10] heard her say those things to the other

[11] employees. But I don't— It seems— Wait a

[12] minute. I think they wanted to ask him some

[13] questions, initial questions, and he didn't want

[14] to answer them I think it was. He was agitated

[15] about—

[16]    Q: Was that a nurse asking the questions or a

[17] receptionist?

[18]    A: Well, that— It started with the receptionist,

[19] but I think back in the holding cell it was the

[20] nurse that was trying to get some information,

[21] and he didn't want to answer.

[22]    Q: When you say holding cell, do you mean the room

[23] that he was in?

[24]    A: Yeah.

[25]    Q: Was she talking to him through the door, or were

Page 70

[1] you in there with him and her at one time?

[2]    A: I was standing on the inside of the door. She

[3] was on the outside of the room.

[4]    Q: And she was asking him questions?

[5]    A: She was asking him some questions. I don't

[6] remember what kinds of questions, but she was

[7] asking him some questions. He didn't want to

[8] really talk.

[9]    Q: Did he just then go back and lay down or sit

[10] down or whatever?

[11]    A: He walked— He was like walking around until we

[12] shut the door. Then that's when I remember he

[13] sat or laid down on the bed.

[14]    Q: I want to take you now back to the home the

[15] second time you were at the home, ask you some

[16] questions about that period of time. Did you

[17] ever have any training or whatever on how to

[18] enter a home, a dwelling, with your partner?

[19]    A: Oh, yeah.

[20]    Q: Where did you get that training from?

[21]    A: Mostly on the job. I believe we had a short

[22] course on it at the police academy.

[23]    Q: Is there a specific technique in entering a

[24] dwelling with a partner and how you go from room

[25] to room?

Keith I. Schorr & Susan Schorr    v.
Borough of Lemoyne, et al.

Gary W. Ber
May 2

**Page 71**

[1] A: Well, you don't stand side by side. Yeah,
[2] there's a procedure. Your head's got to spin
[3] like a top.
[4] Q: Do you know the reason for the procedure, why
[5] you go through this drill?
[6] A: Well, one is you don't want to get your partner
[7] or you in the line of fire if somebody gets
[8] there. You want to be able to cover half the
[9] room while he covers the other half, don't want
[10] anybody coming up behind you.
[11] Q: Is it fair to say that when you're going to
[12] enter a dwelling or a home as in this case when
[13] you make a decision to enter inside them that
[14] there may be some kind of danger inside there?
[15] A: Oh, yes.
[16] Q: Is it part of the procedure to then remove the
[17] leather strap on your holster to free up your
[18] firearm?
[19] A: I won't say it's an official procedure. If you
[20] feel— I mean, I've went into places that I
[21] didn't feel I needed to do that. But this was
[22] unknown. And I wasn't getting a response back.
[23] And I was told somebody else might be there with
[24] him. So I felt it was okay to buckle that
[25] strap.

**Page 72**

[1] Q: Unbuckle it basically?
[2] A: Yeah, just open it.
[3] Q: And that would then free the weapon from just
[4] being able to, you know, pull it out freely?
[5] A: Right, right. Yeah, I could pull it out if I
[6] needed it quick, right.
[7] Q: If you needed it quick, is that what you said?
[8] A: Yeah, if I needed it quick.
[9] Q: Is it fair to say that you did that because —
[10] you did that in anticipation of some unknown
[11] danger when entering the building?
[12] A: Yes.
[13] Q: In your career as a police officer have you ever
[14] had an incident where you discharged your
[15] firearm previous to this?
[16] A: No.
[17] Q: Have you ever been involved in an incident where
[18] another officer had discharged a firearm?
[19] A: No.
[20] Q: Did you ever have an actual communication with
[21] Ryan Schorr's mother before you entered the
[22] home?
[23] A: Yes. I called her on my cellular phone when I
[24] couldn't get Ryan to answer the door.
[25] Q: In that conversation did she say something with

[1] respect to she thought that Ryan's roommate was
[2] in danger?
[3] MR. WILLIAMS: I object to the form of the
[4] question.
[5] A: She thought he might be in there, and she
[6] questioned whether he was safe.
[7]             BY MR. WILLIAMS:
[8] Q: Did she give you any more specifics as to why
[9] she may have felt Ryan's roommate was in danger?
[10] A: No, she didn't tell me why she thought that. I
[11] mean, I in my mind guessed why she thought that,
[12] but she didn't tell me.
[13] Q: Well, what was your guess?
[14] A: Well, earlier that morning when Ryan had brok
[15] into the kitchen his roommate and him had—
[16] Ryan had been I guess upset about getting locked
[17] out, and they got into I guess some kind of
[18] altercation.
[19] Q: Back to positioning of you and Officer Hart in
[20] the home, you said you were first to go into the
[21] home?
[22] A: Yeah. It wasn't wide enough to— I mean, we
[23] had to— He went behind me. There just wasn't
[24] a lot of room.
[25] Q: Did you ever work with Officer Hart before in

[1] entering a home or a residence, dwelling,
[2] whatever kind of a building?
[3] A: No.
[4] Q: Did you make the decision to go first, or did h
[5] say will you go first? How did that work out?
[6] A: I just went first.
[7] Q: Generally speaking when entering into a hom
[8] a dwelling, is it more dangerous for the person
[9] who enters first?
[10] A: Yes.
[11] Q: One of the things you said, you were going up
[12] the stairs and you heard the music get louder,
[13] is that accurate?
[14] A: Yes.
[15] Q: You assumed then that somebody was actually
[16] turning up the music?
[17] A: Yes.
[18] Q: You said you got up to the top of the stairs an
[19] you saw Ryan Schorr looking in the mirror?
[20] A: Yes.
[21] Q: And he was naked except he was wearing thi
[22] fluffy like pink housecoat or a white housecoat,
[23] was it?
[24] A: It was a light colored. I think it was a fuzzy
[25] housecoat, and he might have had a hat on. I'm

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

**Page 75**

[1] not sure.
[2] **Q:** What did that tell you? What judgments did you
[3] make from that?
[4] **A:** Confirmed he had mental illness.
[5] **Q:** Where was Officer Hart when you were I guess
[6] near to where you could see Ryan Schorr?
[7] **A:** He was behind me on the stairs. As to exactly
[8] where, I don't know because I wasn't looking
[9] back at him.
[10] **Q:** After the shooting, I presume there was an
[11] investigation done by the West Shore Police?
[12] **A:** No.
[13] **Q:** It was done by someone else?
[14] **A:** An investigation was done by the Pennsylvania
[15] State Police and the Cumberland County District
[16] Attorney's office.
[17] **Q:** From this incident from an administrative
[18] perspective, did anyone counsel you after it and
[19] say that you did things well or not so well or
[20] poorly?
[21] **A:** I was not counseled in that manner, no.
[22] **Q:** When you were off for that — from I guess
[23] November of 2000 to May of 2001, were you
[24] collecting workers' compensation?
[25] **A:** I only— They only paid I believe it was four

**Page 76**

[1] weeks.
[2] **Q:** As part of the workers' compensation, did they
[3] pay whatever medical bills that you had?
[4] **A:** Yes.
[5] **Q:** Did you have any out-of-pocket expenses for
[6] medical care, psychological care other than that
[7] came through workers' comp?
[8] **MR. EMERY:** I don't know if this has
[9] anything to do with your case. Obviously that
[10] information will be provided in our case. I
[11] don't mind you going a little bit, but we're
[12] getting a little off the topic a little here.
[13] **MR. YANINEK:** I think I can ask the
[14] question.
[15] **MR. EMERY:** You can ask the question, but
[16] if there's going to be an end to it, I don't
[17] know what this could possibly have to do with
[18] the federal case.
[19] **A:** The psychological I'm getting now I'm paying for
[20] myself. The initial psychological was paid for
[21] by workers' comp carrier.
[22] **BY MR. YANINEK:**
[23] **Q:** Prior to this incident in November of 2000, did
[24] you ever have the need for psychological or
[25] psychiatric counseling before?

**Page 7**

[1] **A:** No. No, I've never had to.
[2] **Q:** When you found out that you had to go back and
[3] basically get Ryan Schorr again, did you ask any
[4] questions before you went back to anyone either
[5] through Cumberland County Dispatch or on the
[6] phone to his mother or whoever as to how he got
[7] loose or how he was back at the house?
[8] **A:** Well, I didn't ask about how he got loose
[9] because that's a common occurrence, so everybody
[10] knows why he got loose. But the— I was
[11] thought— I thought I was given all of the
[12] information by county, everything they had. So
[13] I was relying on the people that were supposed
[14] to have that information and give it to me to
[15] give it to me. It didn't happen.
[16] **Q:** When you said it's a common occurrence, have you
[17] ever taken someone to Holy Spirit Hospital for a
[18] 302 proceeding and they leave the hospital?
[19] **A:** Our department has. I hear all the radio calls.
[20] **Q:** You've heard of that happen before?
[21] **A:** Yeah. It's very common.
[22] **Q:** Have you ever had a personal experience of being
[23] involved with a 302 call other than this one—
[24] **A:** No.
[25] **Q:** You have to just let me finish. I know you know

**Page 7**

[1] the answer to my question. —where you've been
[2] involved with a 302 call and the person that
[3] you'd taken to the hospital on a 302 warrant has
[4] then left the hospital?
[5] **A:** I have not.
[6] **MR. YANINEK:** I don't have any further
[7] questions.
[8] **MR. WILLIAMS:** I just have a couple short
[9] follow-ups.
[10] **REEXAMINATION**
[11] **BY MR. WILLIAMS:**
[12] **Q:** First of all, from whom are you getting your
[13] psychotherapy currently?
[14] **A:** Tressler Lutheran Services.
[15] **Q:** Did you just indicate that you did not have all
[16] the information you needed from the county, or
[17] did I mishear you?
[18] **A:** No. That's exactly what I said.
[19] **Q:** What information do you believe that you should
[20] have had that you didn't have?
[21] **A:** Information that he had become homicidal, I was
[22] not given that, that his attitude had changed,
[23] that there was any difference between him the
[24] first time and the second time, that I should
[25] expect a bigger problem than I had which I

Keith I. Schorr  &  Susan Schorr   v.
Borough of Lemoyne, et al.

Gary W. Berre
May 28

**Page 79**

[1] really didn't have any problem the first time. I
[2]    I found that unique because— I mean, I
[3] have— I have had to go back other times, and
[4] this is in the past, and pick people up, and
[5] they weren't changed. They just had left and
[6] went home. And I'm not talking about around
[7] here. I worked in Beaver County first.
[8]    So it was something that was very
[9] important. If I would have received that
[10] information, I won't be ashamed to say, it
[11] probably wouldn't have went this way.
[12]    **Q:** Well, how would you have acted differently if
[13] you can tell us?
[14]    **A:** To be honest, if I'd have gotten the word
[15] homicidal, I wouldn't have been there with just
[16] Mr. Hart.
[17]    **Q:** What would you have done?
[18]    **A:** Called for backup and handled it totally
[19] different.
[20]    **Q:** Before entering the house?
[21]    **A:** Oh, yeah.
[22]    **MR. WILLIAMS:** I have nothing further.
[23] Thank you, Officer.
[24]    **MR. MacMAIN:** I had a few areas I wanted to
[25] follow up with.

**Page 80**

[1]                **EXAMINATION**
[2]              **BY MR. MacMAIN:**
[3]    **Q:** You were talking about your police experience,
[4] and I think we left off about '93, '94 with
[5] Wormleysburg Borough. Between 1978 and that
[6] time period, had you worked as a police officer
[7] elsewhere?
[8]    **A:** From 1975 to 1993, I had worked at some other
[9] departments both full and part time.
[10]    **Q:** And that was continuous as a police officer
[11] between '75 and '93?
[12]    **A:** From September of '90 to I think it was about
[13] April of '91, I did not work as a police
[14] officer.
[15]    **Q:** So if my math's correct, from '75 through 2002,
[16] 27 years, maybe take a year away, you've worked
[17] as a police officer?
[18]    **A:** Yes.
[19]    **Q:** You said you've received some training regarding
[20] pepper spray both at Allen Township as well as
[21] West Shore Regional?
[22]    **A:** Lower Allen, right.
[23]    **Q:** Were you given any information regarding the use
[24] of pepper spray and its effect upon people who
[25] have mental disabilities?

[1]    **A:** Both classes stated that there are numerous
[2] incidences where mace and pepper spray do not
[3] work on people that have mental illness, that
[4] have — that have been drinking or on drugs.
[5] And I have heard that to be true through I'm
[6] going to say the grapevine.
[7]    **Q:** You were asked some questions about during th
[8] past several years how many 302 warrants you
[9] actually either served personally or were
[10] present when they were served, and I think you
[11] had said two to three. Is that correct?
[12]    **A:** Yeah, since I've been up here, correct.
[13]    **Q:** Prior to that, had you served prior mental
[14] health I don't know if they're called 302s?
[15]    **A:** Yes. It was all Pennsylvania.
[16]    **Q:** How many?
[17]    **A:** In the period I was in western Pennsylvania it
[18] was — I am going to estimate that I served
[19] eight, around eight.
[20]    **Q:** Now, you said you didn't have any formal
[21] classroom book training on how to perform or
[22] serve a 302 warrant.
[23]    **A:** Right.
[24]    **Q:** How did you know how to do it?
[25]    **A:** On-the-job training going with officers when I

[1] was a rookie. When they had one to serve, you'd
[2] go with them, back them up, see how it's done.
[3]    **Q:** As of November of 2000 when this took place,
[4] there any question in your mind how to perform a
[5] 302 warrant service?
[6]    **A:** No.
[7]    **Q:** Did you feel you were qualified and trained
[8] properly in order to know how to do that?
[9]    **A:** Yes.
[10]    **MR. WILLIAMS:** Object to the form of the
[11] question.
[12]              **BY MR. MacMAIN:**
[13]    **Q:** Besides formal 302 warrants, have you had
[14] experience dealing with people who have
[15] emotional or mental difficulties?
[16]    **A:** Yes.
[17]    **Q:** Can you either give me by way of number or by
[18] way of percentage how many calls you've handled
[19] over your 20 plus years of police work in which
[20] people were suffering from some type of
[21] suspected emotional illness?
[22]    **A:** I would say at least 50 percent of the calls I
[23] handle are people that have some type of mental
[24] problem.
[25]    **Q:** Now, when you say mental problem, do you me

Gary W. Berresford
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et

**Page 83**

[1] both—
[2]   A: They're not thinking straight either due to
[3] mental illness or their anger or whatever has
[4] distorted their thought process and they act
[5] irrationally which is dangerous.
[6]   Q: How have you come to learn how to handle people
[7] over 50 percent of the calls that have some type
[8] of emotional disturbance?
[9]   A: On-the-job training.
[10]   Q: During the course of your 20 plus years as an
[11] officer, have you had any difficulty dealing
[12] with people in over 50 percent of your calls
[13] that have some type of emotional disability?
[14]   A: Very rarely. I usually have been successful in
[15] talking them down to where we can talk
[16] reasonably.
[17]   Q: In fact, the first call at the Schorr residence,
[18] you had no difficulty at all with Mr. Schorr,
[19] correct?
[20]   A: No. I think on that call everything I did
[21] worked fine. I did not distress him, and he was
[22] more willing to go with us.
[23]   Q: You said since this incident you've attended two
[24] required training courses in dealing with people
[25] with mental disabilities, correct?

**Page 84**

[1]   A: Yes.
[2]   Q: Was there anything in those courses that you
[3] learned that was different than what you already
[4] knew from your on-the-job training in how to
[5] deal with people with such disabilities?
[6]   A: No.
[7]   Q: How big are you, Officer?
[8]   A: 5, 5 and a half.
[9]   Q: How much do you weigh?
[10]   A: 180.
[11]   Q: Is that your same height and weight
[12] approximately as November of 2000?
[13]   A: November of 2000 I probably weighed 195.
[14]   Q: Officer, do you have any personal experience
[15] either through family or friends with people who
[16] suffer from mental disabilities?
[17]   A: My sister-in-law has constant delusions, so she
[18] has mental illness. And my mother-in-law spent
[19] time in a mental hospital.
[20]   Q: This all occurred prior to November of 2000?
[21]   A: Yes.
[22]   Q: Did that give you a better understanding of how
[23] to deal with people or at least understand the
[24] problem of mental illness?
[25]   MR. WILLIAMS: Object to the form of the

**Page**

[1] question, but go ahead, Officer.
[2]   A: Yes.
[3]   MR. MacMAIN: I have no further questions.
[4]   MR. YANINEK: I have no additional.
[5]   (The deposition concluded at 12:34 p.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Case 1:01-cv-00930-YK    Document 91-3    Filed 02/28/2003    Page 30 of 50

Keith I. Schorr & Susan Schorr  v.                                         Gary W. Ber
Borough of Lemoyne, et al.                                                 May 2

Page 86

[1]    COMMONWEALTH OF PENNSYLVANIA :

[2]    COUNTY OF YORK

[3]       I, Bethann M. Mulay, Reporter and Notary
          Public in and for the Commonwealth of

[4]    Pennsylvania and County of York, do hereby
       certify that the foregoing deposition was taken

[5]    before me at the time and place hereinbefore set
       forth, and that it is the testimony of:

[6]
               GARY W. BERRESFORD

[7]
               I further certify that said witness was by

[8]    me duly sworn to testify the whole and complete
       truth in said cause; that the testimony then

[9]    given was reported by me stenographically, and
       subsequently transcribed under my direction and

[10]   supervision; and that the foregoing is a full,
       true and correct transcript of my original

[11]   shorthand notes.

[12]
               I further certify that I am not counsel for

[13]   or related to any of the parties to the
       foregoing cause, or employed by them or their

[14]   attorneys, and am not interested in the subject
       matter or outcome thereof.

[15]

[16]     Dated at York, Pennsylvania this 10th day
         of June, 2002.

[17]

[18]

[19]

[20]       Bethann M. Mulay
           Registered Professional Reporter

[21]       Notary Public

[22]

               The foregoing certification of this

[23]   transcript does not apply to any reproduction of
       the same by any means unless under the direct

[24]   control and/or supervision of the certifying
       reporter.

[25]

EXHIBIT
(H)

## In The Matter Of:

*Keith I. Schorr  &  Susan Schorr   v.*
*Borough of Lemoyne, et al.*

---

*Harry S. Hart, Jr.*
*May 28, 2002*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File HH052802.V1, 71 Pages*
*Min-U-Script® File ID: 2968915828*

## Word Index included with this Min-U-Script®

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Harry S. H
May 28

Page 1

[1]    IN THE UNITED STATES DISTRICT C
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3]  KEITH I. SCHORR and        . No. 1:01-CV-0930
      SUSAN SCHORR,         .
[4]        Plaintiffs  . Judge Kane
[5]      vs.          .
[6]  BOROUGH OF LEMOYNE,     .
      BOROUGH OF WORMLEYSBURG,    .
[7]  WEST SHORE REGIONAL POLICE    .
      DEPARTMENT, HOWARD DOUGHERTY, .
[8]  CHIEF WEST SHORE REGIONAL    .
      POLICE DEPARTMENT, CUMBERLAND .
[9]  COUNTY, HOLY SPIRIT HOSPITAL, .
        Defendants   .
[10]
[11]
[12]
[13]
        Deposition of:  HARRY S. HART, JR.
[14]
      Taken by          : Plaintiffs
[15]
      Date            : May 28, 2002, 12:48 p.m.
[16]
      Place           : 3401 North Front Street
[17]      Harrisburg, Pennsylvania
[18]  Before          : Bethann M. Mulay, Notary Public
        Registered Professional Reporter
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1] APPEARANCES:
[2]  WILLIAMS, CUKER & BEREZOFSKY
      By:  GERALD J. WILLIAMS, ESQ.
[3]        -and-
        STEPHEN S. PENNINGTON, ESQ.
[4]
        For - Plaintiffs
[5]
        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
[6]  By:  DAVID J. MacMAIN, ESQ.
[7]      For - Defendants West Shore Regional
          Police Department, Howard
[8]        Dougherty, Chief West Shore
          Regional Police Department
[9]
        METTE, EVANS & WOODSIDE
[10] By:  JOHN F. YANINEK, ESQ.
[11]      For - Defendants Cumberland County and
          Holy Spirit Hospital
[12]
        LAW OFFICES OF MARK K. EMERY
[13] By:  MARK K. EMERY, ESQ.
[14]      For - Gary W. Berresford and Harry S.
          Hart, Jr.
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

Page 3

[1]                INDEX
              WITNESS

[2]

                    Examination

[3]

   HARRY S. HART, JR.

[4]

   By Mr. Williams          4, 65

[5]

   By Mr. Yaninek           55, 70

[6]

   By Mr. MacMain           65

[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]                STIPULATION
[2] It is hereby stipulated by and between
[3] counsel for the respective parties that reading,
[4] signing, sealing, certification and filing are
[5] hereby waived; and all objections except as to
[6] the form of the question are reserved to the
[7] time of trial.
[8]
[9]    HARRY S. HART, JR., called as a witness,
[10] having been duly sworn, testified as follows:
[11]           EXAMINATION
[12]          BY MR. WILLIAMS:
[13]    Q: Officer, thank you for patiently waiting through
[14] the first deposition. I'm Jerry Williams.
[15] Steve Pennington and I represent the Schorr
[16] family in some litigation that's been filed
[17] against the West Shore Regional Police
[18] Commission, Holy Spirit, and Cumberland County.
[19] And we're here to take your deposition to see
[20] what you can tell us about the incident that
[21] gives rise to that case.
[22]    Officer Berresford took us through a lot of
[23] sort of the background facts, so I hope to be
[24] less time with you, but I do have quite a few
[25] questions for you. Let me ask you first have

Page

[1] you ever given a deposition?
[2]    A: No.
[3]    Q: But have you testified in court before?
[4]    A: Yes, I have testified in court.
[5]    Q: So the rules are really not that much different
[6] between a deposition and testimony at trial.
[7] But just to go through them briefly, as you
[8] probably know, lawyers can be very long winded,
[9] so it's best for the record if you wait until
[10] we're finished our question before you start
[11] your answer, okay?
[12]    A: Um-hum.
[13]    Q: Now, you actually just violated a rule because—
[14]    A: Um-hum. I just violated it again.
[15]    Q: Since the record is being taken down by the
[16] court reporter, you have to give your answers in
[17] words and not through um-hums or nods or shakes
[18] of your head, okay, sir?
[19]    A: Yes.
[20]    Q: And now you're back on track. Again, remember,
[21] wait until the question no matter how long it is
[22] is over before you start with your answer, okay?
[23]    A: Yes.
[24]    Q: Really for the same kind of reason, because we
[25] want you to — we want to be able to rely on

Page 6

[1] your answers as answers to questions that you've
[2] heard and you've understood, you have to let me
[3] or anybody else know if you don't hear the
[4] question or if you don't understand it, okay?
[5]    A: Yes.
[6]    Q: If you do that, we'll be happy to rephrase the
[7] question or say it louder or do whatever it
[8] takes to correct the situation, all right, sir?
[9]    A: Yes, that's all right.
[10]    Q: If at any point you want to take a break, that's
[11] fine. Just let me know. I'll ask you to just
[12] take as a given that for every question I'm
[13] asking you I'm only asking you for your best
[14] recollection as you sit here today. If you
[15] don't know an answer or don't remember it, it's
[16] perfectly acceptable for you to say so, okay?
[17]    A: Okay.
[18]    Q: Now, Officer, I think I know or at least
[19] understand that you are a part-time officer with
[20] the West Shore Police Department. Is that
[21] accurate?
[22]    A: That's correct.
[23]    Q: How frequently do you work? How many shifts do
[24] you work in a two-week period?
[25]    A: I normally work three, sometimes four days a

Page 3 - Page 6  (4)              **Min-U-Script®      Filius & McLucas Reporting Service, Inc.**

Case 1:01-cv-00930-YK   Document 91-3   Filed 02/28/2003   Page 34 of 50

Keith I. Schorr  &  Susan Schorr   v.                                    Harry S. H
Borough of Lemoyne, et al.                                               May 28

Page 7

[1] week.
[2]  Q: Eight hours per day?
[3]  A: That's correct.
[4]  Q: Were you working with the same frequency back in
[5] November of 2000?
[6]  A: Yes, I was.
[7]  Q: Have you been a part-time officer during the
[8] whole time that you've worked for the West Shore
[9] Police Department?
[10]  A: Yes.
[11]  Q: How long have you worked for the West Shore
[12] Police Department?
[13]  A: Since it was founded I believe in the mid 1995,
[14] early 1995.
[15]  Q: Before that, were you a borough officer?
[16]  A: Prior to that, I worked five years part time
[17] with Lemoyne Borough Police which became part of
[18] West Shore Regional. And prior to that, I
[19] worked 25 years with New Cumberland Borough
[20] Police, retired as a sergeant from there in July
[21] of 1990.
[22]  Q: During your 25 years with the New Cumberland
[23] department, were you a full-time officer?
[24]  A: Yes, sir, I was.
[25]  Q: During the five years or so that you worked with

Page 8

[1] the Lemoyne department, was that as part time or
[2] full time?
[3]  A: That was part time.
[4]  Q: Now, you've had a long career as a police
[5] officer, so I'll try to — this next set of
[6] questions I'll try to break it down a little
[7] bit. Before you ever became a police officer,
[8] did you go to a police academy or have some sort
[9] of formal training? ___
[10]  A: No, sir.
[11]  Q: At the time you became an officer, that was not
[12] required. Is that accurate?
[13]  A: That's correct.
[14]  Q: At any time did you attend a police academy or
[15] some formal training program?
[16]  A: Yes, sir.
[17]  Q: When was that?
[18]  A: I was hired in 1965 by New Cumberland Borough,
[19] and sometime within the two years after I was
[20] hired I was sent to Harrisburg City Police
[21] school which was the only one in the immediate
[22] area at that time. And in 1969 I attended the
[23] Municipal Police Officer's Training Academy at
[24] Hershey which was conducted by the Pennsylvania
[25] State Police at that time.

[1]  Q: You got your certificate from the MPOETC or
[2] you?
[3]  A: No. That wasn't in effect at that time. That
[4] didn't come into effect until the late '80s.
[5]  Q: Well, tell me about the training— I don't mean
[6] tell me about all the courses. But tell me how
[7] long the training at the Harrisburg City Police
[8] school was and how long the training with the
[9] municipal officers—
[10]  A: I'm not sure the total hours at Harrisburg.
[11] That continued for approximately three to four
[12] months. It was like a half a day per week. It
[13] was conducted by officers from Harrisburg City.
[14]  Q: What about the municipal officers training?
[15]  A: The municipal officers course, that was a
[16] three-month course. Mine was slightly
[17] abbreviated due to the fact that it started in
[18] early December and continued through the
[19] Christmas, New Year holidays. But it was still
[20] the basic municipal course that was conducted at
[21] that time.
[22]  Q: Was it 1969 when you finished that?
[23]  A: No. It was 1970 when I finished it. I started
[24] in I think December of '69.
[25]  Q: I understand. Now, after 1970, did you receive

[1] formal training as a police officer anywhere?
[2]  A: I had various courses through the police acade
[3] at Hershey and then other courses at HACC, plus
[4] some conducted by the FBI.
[5]  Q: Well, again, let me try to break it down. Tell
[6] me about the courses with the FBI. What courses
[7] did you receive?
[8]  A: When I say the FBI, this wasn't at the FBI
[9] academy at Quantico course that everybody takes
[10] these days. But they were the FBI agents in
[11] local offices would present courses one to two
[12] evenings a week anywhere from two nights a week
[13] to maybe like over a four-week period one or two
[14] nights per week four or five hours.
[15]  Q: What kind of subject matter?
[16]  A: General criminal investigation, suicide
[17] investigations, things of that nature. State
[18] police also conducted some on things like
[19] accident investigations and things like this,
[20] crimes code courses and criminal code courses.
[21]  Q: You also indicated you had some additional
[22] training at HACC, correct, over the years?
[23]  A: Yes, sir.
[24]  Q: Was this by nature of updates on your training,
[25] if I can use that term? What was the nature of

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et al

Page 11

[1] the HACC training?

[2] A: The one course I took there was a two-week
[3] police photographer's course. I don't recall
[4] exactly what all of them were. I didn't go
[5] through my certificates prior to this.

[6] Q: That's fine. Now, I'm trying to figure out the
[7] best way to ask this question. After you became
[8] a West Shore police officer, just so far as
[9] training is concerned, were you grandfathered in
[10] so to speak, or were you required to get any
[11] additional training?

[12] A: No. I was grandfathered in, but every year we
[13] have our update courses which are mandated under
[14] MPOETC.

[15] Q: I understand. You've had those every year since
[16] you've been an officer?

[17] A: Yes, every year since they started which I'm not
[18] sure, but I know it was in the late '80s because
[19] I believe I took the initial ones when I was
[20] still at New Cumberland.

[21] Q: Now, I want to focus on November 2000 because
[22] that's when the incident that brings us here
[23] occurred. So let me ask you first of all some
[24] questions I asked Officer Berresford. Before
[25] November of 2000, had you ever received any

Page 12

[1] formal training — I'm not talking about
[2] on-the-job experience — but formal training in
[3] dealing as a police officer with people who had
[4] mental illness or some sort of emotional
[5] disturbance?

[6] A: Probably the only formal training I had was a
[7] light touching upon it with the various schools
[8] that I attended, but I had no in-depth
[9] instruction.

[10] Q: Am I safe or accurate in assuming that before
[11] November 2000 you had had occasions to serve
[12] what are called 302 warrants, warrants for
[13] involuntary psychiatric treatment?

[14] A: Yes, sir.

[15] Q: Let me break that down, too. First of all,
[16] during your tenure as either a Lemoyne officer
[17] or a West Shore officer, can you estimate how
[18] many times you were called upon to serve such
[19] warrants roughly?

[20] A: Very few, maybe a half a dozen in the entire
[21] period.

[22] Q: Of about 10 years?

[23] A: Yes.

[24] Q: If I go longer throughout your whole career, can
[25] you give me a rough estimate as to how many

Page 13

[1] you've served?

[2] A: Probably several dozen.

[3] Q: Again, not referring to your experience but only
[4] formal training, did you ever receive any formal
[5] training in the execution of 302 warrants?

[6] A: Not that I can recall, no.

[7] Q: Briefly, after November 2000, have you had
[8] received formal training in encounters with
[9] emotionally disturbed persons?

[10] A: The last two update classes which were mandated
[11] under MPOETC, that was covered in both classes.

[12] Q: Who taught those classes, if you know?

[13] A: I don't know offhand.

[14] Q: Did either of the classes deal with the specific
[15] illness that's been associated with Ryan Schorr,
[16] bipolar illness?

[17] A: Not that I can recall. The first class dealt
[18] mainly with au— I'm not sure how you pronounce
[19] it.

[20] Q: Alzheimer's?

[21] A: Autistic.

[22] Q: Autism?

[23] A: Yes, autism. That's what the first class
[24] basically dealt with. This year's was just more
[25] of like a general overlay of several different

Page 14

[1] mental illnesses.

[2] Q: Can you tell us in general terms what was
[3] conveyed in these updates about mental illness
[4] and encounters with the police?

[5] A: Well, I'm not sure where you're going with that
[6] question. I mean, I don't completely understand
[7] it.

[8] Q: What instructions did they give you that you
[9] recall?

[10] A: Basically to talk to the people which I have
[11] always done over the years. It's been my
[12] experience that that's really until the person
[13] becomes physical with you it's the only way to
[14] handle the situation is to talk.

[15] Q: Now, as of November 2000, you were qualified in
[16] the use of your firearm. Is that correct?

[17] A: Yes, sir.

[18] Q: Had you been qualified in the use of any other
[19] implement of force, if I can use that term?

[20] A: When I was with New Cumberland, I was an
[21] instructor in the PR-24 baton. And then I was
[22] certified as instructor with the ASP baton with
[23] Lemoyne Borough. Both of those certifications
[24] have since expired. Our department carried the
[25] ASP baton, and we were instructed in the use of

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Harry S. I
May 2

Page 15

[1] that yearly by another instructor from the
[2] department.
[3]    Q: And you were carrying an ASP baton in November
[4] 2000 when you encountered Ryan Schorr?
[5]    A: That's correct.
[6]    Q: As well as your firearm of course, correct?
[7]    A: Correct.
[8]    Q: Any other weapons or implements of force?
[9]    A: Just my hand.
[10]    Q: Now, let me ask you a couple more background
[11] general questions first of all. Can you tell me
[12] whether in November 2000 there was any written
[13] policy at — within the West Shore Police
[14] Department with respect to the service of 302
[15] warrants, and that is how to do them or what
[16] procedures to use? Was there any written order
[17] or directive or policy relating to that subject?
[18]    A: Not that I'm aware of.
[19]    Q: What was the unwritten policy of the department
[20] if there was any?
[21]    A: By law you're required to serve a 302 commitment
[22] when you find the individual same as you're
[23] required to serve an arrest warrant if you know
[24] of them and you see an individual that's issued
[25] for. And if there were two or more officers on

[1] advise you not to call for backup except in
[2] certain situations?
[3]    A: No, sir.
[4]    Q: Other than possible backup from other West S
[5] officers or other departments, if necessary,
[6] were there other agencies or types of personnel
[7] from whom you could get backup on a 302 if you
[8] needed it other than police officers?
[9]    A: Not that I'm aware of.
[10]    Q: Now, I guess again we'll stay with this,
[11] focusing on this time, November of 2000. What
[12] was your understanding as to what you were
[13] authorized to do once under authority of a 302
[14] warrant? What did a 302 warrant authorize you
[15] to do?
[16]    A: To take the person into custody who was name
[17] the warrant and transport them to the mental
[18] health institution.
[19]    Q: Did you have an understanding as to any
[20] authority you received to enter a person's home
[21] under a 302 warrant?
[22]    A: My understanding was that if they were known
[23] be there we were to take them into custody which
[24] meant we would have to enter to do that if they
[25] were inside.

Page 16

[1] duty, then they would proceed to serve the
[2] warrant. If it was normally only one officer on
[3] duty, then he would request assistance from
[4] another department. And if they felt that they
[5] needed more help once they arrived there, then
[6] they would request additional assistance.
[7]    Q: Let me ask you a little more detail about that.
[8] If as there was in this case two officers were
[9] available to make — to serve the warrant and if
[10] a decision was made that backup was necessary,
[11] what was your understanding as to where that
[12] backup would come from? Would it be other West
[13] Shore officers or officers from other
[14] departments or where?
[15]    A: If there were other West Shore Regional officers
[16] on duty, they would respond first unless you
[17] requested more than what were available from
[18] your own department. Then it would come from
[19] the nearest available, whether it be East
[20] Pennsboro, Camp Hill, New Cumberland, wherever
[21] officers were available.
[22]    Q: Was there any policy or guideline set as to when
[23] to ask for backup?
[24]    A: No, sir.
[25]    Q: Were there any policies or directives that

[1]    Q: Now, I want to ask you about the encounters yc
[2] and Officer Berresford had with Ryan Schorr.
[3] But before I do that, let me ask you, can you
[4] approximate for me how long before your
[5] encounter with Ryan Schorr had been the last
[6] time you had to serve a 302 warrant?
[7]    A: I really have no idea.
[8]    Q: That's fine. Now, I'll ask you, how did you
[9] first learn that you had to have any dealings
[10] with Ryan Schorr in November of 2000?
[11]    A: I got a phone call from Holy Spirit Hospital
[12] mental health shortly after we came on duty at
[13] 7:30 that morning.
[14]    Q: Indicating that a warrant had been issued, a
[15] 302, ordering—
[16]    A: That one would be issued for his commitment.
[17]    Q: Officer Berresford said that he went and
[18] picked up the warrant. Is that accurate?
[19]    A: That's correct.
[20]    Q: Then the two of you rendezvoused near Ryan
[21] Schorr's apartment in separate cruisers. Is
[22] that accurate?
[23]    A: Correct.
[24]    Q: And then you both approached his apartment to
[25] bring him to the hospital. Is that accurate?

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

---

**Page 19**

[1] A: Yes.

[2] Q: When you met Ryan Schorr that first time, is it
[3] accurate that he offered no resistance to you,
[4] he was compliant with your directives?

[5] A: Basically compliant. He was I don't want to say
[6] argumentative because he really wasn't
[7] argumentative. He wanted to give us an excuse
[8] or two as to why he couldn't go with us.

[9] Q: He didn't want to go with you?

[10] A: No.

[11] Q: But he did?

[12] A: No. When we told him he needed to come with us
[13] over to Holy Spirit, he didn't willingly say,
[14] okay, I'll go with you. He started to give us
[15] excuses why he couldn't.

[16] Q: He was transported physically in Officer
[17] Berresford's cruiser?

[18] A: Correct.

[19] Q: And you accompanied them to the hospital—

[20] A: Yes.

[21] Q: —in your cruiser?

[22] A: I followed over in mine.

[23] Q: Can you take up the story then? What happened
[24] at the hospital at that — on that occasion in
[25] your recollection?

**Page 20**

[1] A: What do you mean take up the story?

[2] Q: Well, I just mean, after you arrived at the
[3] hospital, what happened?

[4] A: Mr. Schorr was placed in a secure room right
[5] inside the door of the emergency exit. And the
[6] door to that room has a glass panel in it that
[7] only opens from the outside. And when he was in
[8] the room, he was — we exited the room, and he
[9] was pacing up and down.

[10] When we arrived at the hospital, there was
[11] a female nurse and I believe a male nurse there,
[12] and I believe the female nurse was the one that
[13] was in charge from the way she acted. She
[14] directed us to place him in that room which we
[15] did. We then all went outside the room.

[16] Shortly after that a woman from the mental
[17] health unit arrived, and she and the female
[18] nurse were standing off from the side of the
[19] door and talking about the paperwork she had for
[20] Mr. Schorr. And the female nurse then turned to
[21] the male nurse and instructed him to get
[22] security down here right away, that they needed
[23] them there.

[24] Q: Let me just interrupt you for one second. Do
[25] you know why she asked for security?

---

**Page 2**

[1] A: No.

[2] Q: When you placed — you and Officer Berresford—
[3] When I say you, I mean both of you in these
[4] questions. When you placed him in the room, did
[5] he say anything to you?

[6] A: Not that I recall. He was just pacing from one
[7] end to the other.

[8] Q: Was he in any sort of restraints at that time?

[9] A: No.

[10] Q: After this female said to the male, get
[11] security, what happened then?

[12] A: Shortly after that the male security officer
[13] arrived. The nurse was talking to him for 15,
[14] 30 seconds, something like that.

[15] Q: Do you recall any part of their conversation?

[16] A: I was standing off to the side as far away as I
[17] am from that gentleman. I don't know what they
[18] were saying. I was standing outside the door
[19] where I could look in.

[20] Q: I understand.

[21] A: And shortly after that the security officer told
[22] the female nurse that he just got a page from
[23] one of the sisters — he did name her, but what
[24] her name was I don't recall — and that he had
[25] to go see what she wanted. The nurse said

**Page 2?**

[1] something to him. He told her he had to go see
[2] what the sister wanted and turned around and
[3] walked away.

[4] And shortly after that I was again looking
[5] in the room watching Ryan, and I turned around,
[6] and the lady from mental health, the female
[7] nurse, and the male nurse were all gone. They
[8] just disappeared.

[9] And I turned around and looked, and off to
[10] the right there's a curved desk, and the lady
[11] from mental health was sitting behind that
[12] writing, and the male and female nurse were
[13] behind that in a glass enclosed room.

[14] At that time I walked over to the desk, and
[15] I think the female nurse came back out, and I
[16] asked her if she needed us anymore, and she
[17] said, no, you can leave. So Officer Berresford
[18] and I left.

[19] Q: And went about your duties?

[20] A: Yes.

[21] Q: When was the next time you heard anything with
[22] respect to Ryan Schorr?

[23] A: Well, after we left the hospital, I proceeded
[24] down into the bottleneck because we were
[25] detailed to close off the Market Street bridge

---

Page 19 - Page 22  (8)

**Min-U-Script®**     Filius & McLucas Reporting Service, Inc

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Harry S. [illegible]
May 2[illegible]

**Page 23**

[1] due to the Harrisburg parade that day. And I
[2] proceeded to set the barricades up there. And
[3] maybe 15, 20 minutes after I got there I was
[4] completed there, and I was getting back in the
[5] car to leave, and I heard county talking to an
[6] East Pennsboro car about somebody who was in the
[7] mental health unit at Holy Spirit ER just bolted
[8] out the door. They call it an elopement. And
[9] they described— They described Mr. Schorr at
[10] that time.
[11]   Q: What specifically did they say about Ryan Schorr
[12] other than that he had eloped?
[13]   A: Basically that. And East Pennsboro started to
[14] look for him.
[15]   Q: What happened next so far as your involvement?
[16]   A: They didn't ask for any assistance. And Gary
[17] said he was going — on our channel said that he
[18] was going to go up and look around the apartment
[19] area. So I went on about patrol duties. And
[20] after a while Gary called me to meet him back up
[21] there at Mr. Schorr's residence. He said that
[22] he had been told that he was back up at the
[23] apartment unit or housing complex. So I went
[24] back up.
[25]   Q: You met Officer Hart there?

[1] was a broken window in the kitchen area of the
[2] house at the back that we could crawl in that to
[3] get into the unit.
[4]   Q: So what did you do?
[5]   A: We walked around to the back, and I told Gary
[6] there's a door unlocked or open I thought we
[7] ought to try to go in, but I wasn't about to
[8] crawl in an open window, broken window. We got
[9] to the back. The one patio door was standing
[10] open 6 to 10 inches. It wasn't shut tight and
[11] latched.
[12]   Q: Is this something that you saw?
[13]   A: Yes.
[14]   Q: What did you do?
[15]   A: I pushed it open and stepped into the kitchen
[16] and began calling Ryan's name.
[17]   Q: Were you the first officer into the house?
[18]   A: I think so.
[19]   Q: When you entered the house, was your firearm
[20] holstered?
[21]   A: Yes. It was holstered and snapped.
[22]   Q: At any point while you were on the first floor
[23] after entering the house did you unsnap the
[24] holster?
[25]   A: No.

**Page 24**

[1]   A: Mr. Berresford.
[2]   Q: I mean Officer Berresford there.
[3]   A: Yes.
[4]   Q: Then what happened?
[5]   A: When I arrived, we tried the front door, and it
[6] was locked. The inner door apparently was
[7] locked. Storm door was locked. We knocked and
[8] pounded for awhile and didn't get any answer.
[9]   Q: Let me stop you there and ask you, before you
[10] went to the front door to knock on it, had you
[11] had any other communication with anybody about
[12] Ryan Schorr?
[13]   A: Not that I recall, no.
[14]   Q: Go ahead. So you knocked on the door. Did you
[15] get any response?
[16]   A: No.
[17]   Q: What happened then?
[18]   A: Gary went back to his car and apparently called
[19] Mrs. Schorr. I don't know if he had the number
[20] prior or if county gave him a message to call
[21] her or what, talked to her for a awhile. I
[22] walked over to his car then. And Gary said that
[23] she said that Ryan was in there, she had just
[24] talked to him on the phone and if we didn't get
[25] him now he was going to be gone and that there

[1]   Q: Why not?
[2]   A: No need to.
[3]   Q: As I understand, when you first entered the
[4] apartment, you were in like a kitchen area. Is
[5] that accurate?
[6]   A: Yes.
[7]   Q: Then at some point shortly after there then bo
[8] you and Officer Berresford were in the house,
[9] correct?
[10]   A: Correct.
[11]   Q: And then what did you do?
[12]   A: Well, as I recall, you come into the kitchen
[13] area, and there's along— The door is this way,
[14] and the wall this way. And the steps from the
[15] second floor come down with like a landing that
[16] goes across into the living room.
[17]   Q: I think we have an exhibit just in case you nee
[18] a reference. What did we mark that as, 2. I'll
[19] just ask you, that drawing that we marked as
[20] Plaintiff's 2, is that an accurate depiction of
[21] what the downstairs looked like?
[22]   A: I don't know about the exact arrangement of t
[23] furniture, but the layout of the rooms and the
[24] stairway is exact.
[25]   Q: Good, okay. So you're in the kitchen area.

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

Page 27

[1] Then what happened?
[2]  A: We were in the kitchen area, and we could hear
[3] music from the second floor. And we kept
[4] calling Ryan's name out and telling him the
[5] police were here to talk to him, we needed to
[6] talk to him, to come downstairs, stepped across
[7] this way to look in the living room to make sure
[8] that there wasn't any — see who, if anybody,
[9] was in there and didn't see anybody there.
[10]     This table here beside the couch there was
[11] a large pair of scissors like tailor scissors
[12] laying, and I picked those up and dropped them
[13] down behind the couch so they were out of view
[14] and didn't present any weapons use for anybody.
[15]     And Gary went up a couple of steps, and
[16] both of us were still calling out to Ryan as to
[17] who we were and that we needed to talk to him.
[18] Gary started up the steps, and I went up like
[19] two steps, three behind him the whole way to the
[20] top.
[21]  Q: Was your holster still snapped at this point?
[22]  A: Yes. When we got to the top of the steps, Gary
[23] stepped around to the left and into the bedroom
[24] here.
[25]  Q: And I think maybe we should be looking at

Page 28

[1] another drawing. This is the second floor now.
[2] Is that exhibit—
[3]  A: Yes, that's reasonably close. Again, it shows
[4] the layout of the rooms. The furniture's about
[5] right.
[6]  Q: So when you say Gary stepped into the bedroom—
[7]  A: Well, as I said, I was two or three stairs
[8] behind him, two or three steps on the stairs.
[9] When he got to the top, he turned to his left,
[10] and I stepped up onto the landing.
[11]  Q: So at this point you were both atop the stairs?
[12]  A: Well, when he got to the top, he turned and
[13] stepped to his left, and I lost sight of him. I
[14] thought he stepped into the room. I found out
[15] later he did but not very far. And as I stepped
[16] up on the landing, he was out of my sight.
[17]  Q: Could you hear him saying anything at that
[18] point?
[19]  A: I didn't hear anybody say anything. And this
[20] music was very loud. As I found out later, on
[21] this dresser here there was I don't know if it
[22] was a radio, a stereo, or what, but the volume
[23] was up very loud.
[24]     And as I stepped in here, Gary was down on
[25] his hands and knees on the floor, and Mr. Schorr

Page 2

[1] was down on his hands and knees with his head
[2] and the upper part of his chest over top of
[3] Gary's head and chest and his arms down under
[4] like this.
[5]  Q: Well, when we say like this, it's hard to get
[6] that on the record.
[7]  A: His arms were down under Gary's chest and neck
[8] area.
[9]  Q: He was behind?
[10]  A: No. He was on top.
[11]  Q: Oh, he was on top, okay. I understand.
[12]  A: Gary was on his hands and knees face down. And
[13] Mr. Schorr was on his hands and knees face down
[14] with his head and upper part of his chest over
[15] top of Gary Berresford's. And Mr. Schorr's arms
[16] and hands were down under their bodies.
[17]  Q: I understand. Now, at that moment when you saw
[18] them together in this way, did you observe or
[19] see officer — Gary's gun?
[20]  A: No, I didn't. I'm not positive, but I believe
[21] Gary's right handed and he wears his weapon on
[22] his right side, and his left side was towards
[23] me.
[24]  Q: What did you do when you saw this having come
[25] around?

Page 3

[1]  A: When we started up the steps, I drew my ASP
[2] baton and had that in my hand in a closed
[3] position. And when I stepped in the room and
[4] saw Gary and Mr. Schorr, I don't remember it,
[5] but I extended the baton. I think I hollered
[6] stop. And I hit Mr. Schorr across the back of
[7] the shoulders and down over the ribs on the left
[8] side two or three times trying to get him to
[9] break his hold because I thought he had ahold of
[10] Gary's shirt holding him down or else had ahold
[11] of his neck trying to choke him.
[12]  Q: Let me ask you about those baton blows that you
[13] utilized. Did any of them break Schorr's skin?
[14] Was he bleeding at all after that?
[15]  A: I don't know. At this time he had a long white
[16] bathrobe on. It looked like a heavy Turkish
[17] material. I couldn't see his body itself.
[18]  Q: So when you had to strike him, you were striking
[19] him on the part covered by the robe. Is that
[20] accurate?
[21]  A: That's accurate, yes.
[22]  Q: Did you hit him in the head at all?
[23]  A: No.
[24]  Q: Did striking those blows have any effect?
[25]  A: It didn't appear to.

Page 27 - Page 30  (10)        Min-U-Script®    Filius & McLucas Reporting Service, In

Keith I. Schorr  &  Susan Schorr   v.
Borough of Lemoyne, et al.

Harry S. H
May 28

**Page 31**

[1]  Q: What happened next?

[2]  A: I held on to the baton and took my right arm
[3]  down and put my right arm around Mr. Schorr's
[4]  head and chin area like this and pulled up and
[5]  back on his head and chin trying to get him back
[6]  up off of Gary so Gary could get free and get up
[7]  on his feet. As I said, I thought at that time
[8]  he was trying to choke him or hold him down.

[9]  Q: Were you able to do that?

[10]  A: His head and neck started to come back partway
[11]  maybe 6 to 10 inches at the most. And at that
[12]  time there was a gunshot.

[13]  Q: We know that Gary was injured as a result of
[14]  that gunshot, but what did you see at the time?
[15]  Tell us what you saw and observed.

[16]  A: All I saw at that time was the two men on their
[17]  knees in front of me. At that time I was
[18]  partially down on my knees pulling back.

[19]  Q: Did there come a moment where you saw the gun
[20]  from which this shot had come?

[21]  A: Not at that time, no.

[22]  Q: After you heard the gunshot, what happened?

[23]  A: I knew it was a gunshot, and I knew that
[24]  Mr. Schorr had a gun because Gary said, you son
[25]  of a bitch, you shot me. Mr. Schorr replied

**Page 32**

[1]  something. What it was, I don't remember. And
[2]  I left go of the baton and jammed both hands
[3]  down into the pile to try to get control of the
[4]  firearm because Gary had said he'd been shot.

[5]  Before I did that, my first instinct I
[6]  started to reach for my handgun, and my first
[7]  instinct was to shoot Mr. Schorr through the
[8]  back. And I thought, if I do that, I'm going to
[9]  kill Gary, so I didn't do that. I reached down
[10]  and tried to control the firearm to keep it
[11]  pointed away from anybody and get it out of
[12]  Mr. Schorr's grip.

[13]  Q: Were you able to get your hands on the firearm?

[14]  A: Yes, I could feel it.

[15]  Q: So where was it? Was it between them? Was it
[16]  on the floor?

[17]  A: It was down under both of them. Both of them
[18]  had a hand or hands on it. Plus I had both of
[19]  my hands wrapped around theirs and the firearm.

[20]  Q: And this was after the gunshot at this point?

[21]  A: Yes.

[22]  Q: Because you didn't go by your first instinct to
[23]  use your firearm, did it remain snapped in your
[24]  holster at that moment?

[25]  A: Yes, it did.

[1]  Q: Now all three of you have some portion of you
[2]  hands on this gun. What happened next?

[3]  A: All three of us were struggling for control of
[4]  it, and somehow, I don't know exactly how, all
[5]  three of us were back up on our feet, and we
[6]  fell into a pile on the bed here.

[7]  Q: Bed in the room that's labeled Schorr's bedroo
[8]  A: That's correct. And at that time I still have a
[9]  grip on the firearm. As we went down on the
[10]  bed, I don't know who was on top, but I do
[11]  recall I had ahold of the firearm and I was
[12]  jamming the muzzle down in the mattress so if
[13]  there was another round chamber it couldn't hit
[14]  any one of the three of us.

[15]  And we struggled there on the bed for
[16]  awhile. I'm sorry, I'm out of sequence there.
[17]  When we came up off the floor, Mr. Schorr had
[18]  control of the firearm.

[19]  Q: And what do you mean by that? Did you see hi
[20]  with the gun?

[21]  A: He had it in his hand because he brought it up
[22]  and came down and hit Gary on top of the head
[23]  with it.

[24]  Q: How did he have it when—

[25]  A: Then he came back across like that and hit me

[1]  down across my nose which broke my nose and
[2]  broke my glasses, though it didn't knock them
[3]  off I guess because it pushed them back. And
[4]  then he came up and swung at Gary again. And
[5]  then after that, the three of us ended up on the
[6]  bed because I grabbed for the gun, and I guess
[7]  that's when I got it and jammed it down in the
[8]  mattress.

[9]  Q: Now, when he was hitting the two of you with
[10]  this gun, how did he have it gripped? Was it by
[11]  the handle?

[12]  A: I think he had it by the grip, but I'm not
[13]  positive anymore.

[14]  Q: Was he saying anything during this stage of the
[15]  struggle?

[16]  A: Not that I recall.

[17]  Q: I think we know this, but I'll just ask you, he
[18]  didn't fire the gun again, did he?

[19]  A: No.

[20]  Q: So now both you and Gary have been hit by th
[21]  gun, and you've managed to get your hands on it,
[22]  and you're struggling on the bed. What happened
[23]  next?

[24]  A: Somehow Mr. Schorr and I both lost control of
[25]  the gun. I don't know how. But he gave me a

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

---

Page 35

[1] shove, and I went backwards into this closet
[2] door here.
[3]    Q: Again in the same bedroom?
[4]    A: In the same bedroom. I went backwards and down
[5] almost in the sitting position back against the
[6] closet door. And I don't know what happened
[7] with him and Gary, but the next I remember
[8] Mr. Schorr was standing up off the bed, and I
[9] remember thinking to myself, you can't lay here
[10] and die like this, you have to get up. And I—
[11]    Q: Take your time.
[12]    A: And I stood up, and Mr. Schorr took— This room
[13] here is very small, and he took like one or two
[14] steps, and he was right in front of me. And his
[15] hand came up, and I could see the blade of a
[16] serrated steak knife.
[17]    Q: He had a knife at that point?
[18]    A: Yes. Where he got it from, I don't know if it
[19] was in a pocket in the robe or if it was just
[20] laying there in the room or what. But he had a
[21] 4 and a half, 5 inch serrated steak knife like
[22] almost everybody has in their kitchen.
[23]    Q: But at this stage he did not have the gun, but
[24] you saw him with this knife?
[25]    A: Yes. And his hand came up like this, and I

---

Page 36

[1] hollered, he's got a knife now. And I grabbed
[2] for his hand and his wrist and got ahold of his
[3] wrist and hit his forearm a couple of times, and
[4] the knife disappeared.
[5]    Q: Did you hit his forearm with your fist or with
[6] your baton?
[7]    A: No, with my fist. I no longer had my baton.
[8] After I reached for the gun, I lost control of
[9] that.
[10]    Q: I understand.
[11]    A: Somehow again he and I ended up on the floor,
[12] and I stood up. Or either that when I hit his
[13] wrist he went down, and I was standing on the
[14] edge of his robe. And he scrambled like on his
[15] hands and knees away from me towards the door of
[16] the bedroom and left his robe behind because I
[17] was standing on it. At that point he was
[18] completely nude.
[19]    And right inside the door here when I first
[20] stepped into the room on the left there was an
[21] air rifle leaning half on the floor and half
[22] against the wall with the cocking mechanism
[23] open. That's how I recognized it as an air
[24] rifle. And when we scrambled—
[25]    Q: Describe that a little bit for me. When you say

---

Page 37

[1] the cocking mechanism was open, what do you
[2] mean?
[3]    A: The pump mechanism to pump air into the chamber
[4] for the air rifle. It's the lever. Normally
[5] it's hinged under the barrel. I believe that's
[6] the way this one was. Some of them have a brake
[7] mechanism where the barrel opens and there's a
[8] spring plunger that charges it with air.
[9]    Q: So you saw this air rifle. Then what happened?
[10]    A: I saw that when I initially went into the room.
[11] But, like I say, I recognized it as an air
[12] rifle, so I didn't pay that much attention to
[13] it. As he scrambled away from me and stood up,
[14] he reached over and picked that up, swung it at
[15] me. I threw my arm up, and it hit me across the
[16] forearm here. I took a half a step or a step
[17] back, and I hollered, stop, stop, stop. He
[18] swung once or twice more, and it didn't hit me,
[19] threw it down and turned and started out the
[20] door.
[21]    At that point I drew my firearm, and I
[22] thought to myself, don't shoot him, he's a
[23] mental patient and he's running away from you,
[24] don't shoot him. And he went out the door and
[25] turned right, and I didn't hear or see anything

---

Page 38

[1] of him after that.
[2]    Q: So what did you then do at that time?
[3]    A: I took my radio off my side, called county
[4] control, told them we had an officer-involved
[5] shooting, an officer had been hit, and we needed
[6] assistance from another police, that we needed
[7] medical personnel there.
[8]    I then looked at Gary, and I think at that
[9] point— I'm not sure if he was on the edge of
[10] the bed. It seems to me he was still like half
[11] kneeling beside the bed and holding his hand.
[12]    Q: But in any event he was near the bed?
[13]    A: Yes. And I told him to sit down on the edge of
[14] the bed and just stay there, we're staying right
[15] there until help got there.
[16]    Q: Where were you?
[17]    A: I was standing right by the end of the bed maybe
[18] out in here a little bit, about halfway maybe
[19] between the corner of the bed and the dresser.
[20] I also saw Gary's firearm laying on the bed, and
[21] I picked it up, and I thought about giving it to
[22] Gary. But I realized he had been hit in the
[23] hand and he probably wouldn't be able to control
[24] it anyway. So I was going to drop the magazine
[25] out and empty the chamber so it would be useless

---

Page 35 - Page 38   (12)          **Min-U-Script®**     **Filius & McLucas Reporting Service, In**

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Harry S. H

May 28

Page 39

[1] to anybody else. And when I did, the magazine
[2] — checked it, the magazine was already out, and
[3] there wasn't another round in the chamber.
[4]   Q: Do you know how the magazine got dropped out?
[5]   A: I don't know how. I believe during the struggle
[6] the magazine release was probably pushed.
[7]   Q: It releases if what, I'm sorry?
[8]   A: I say I believe the magazine release which is a
[9] button on the side of the frame was pushed, and
[10] probably the weight of the magazine and the
[11] other cartridges made it drop out.
[12]   Q: What did you do with the gun?
[13]   A: I made sure it was empty and laid it back down
[14] on the bed and left it lay there.
[15]   Q: Then what happened?
[16]   A: We stood there, and we could hear sirens coming.
[17]   Q: How much time had passed now since Schorr had
[18] left the bedroom? Are you able to estimate?
[19]   A: Maybe minute and a half, two minutes maximum.
[20]   Q: Then what happened?
[21]   A: I stood there by the end of the bed, like I
[22] said, and told Gary we're staying right here
[23] until help gets here because we have no idea
[24] where he's at. And I still had my firearm in my
[25] hand. I had put my radio back in my belt. And

[1] again.
[2]   Q: By reference to our Exhibit 3 here, you were b
[3] the edge of the bed between the bed and the
[4] dresser. Is that accurate?
[5]   A: No. I was probably right about here.
[6]   Q: Oh, even with the closet door?
[7]   A: Well, about halfway between the closet door a
[8] the bed just off this corner of the bed. I
[9] don't know how to describe that corner.
[10]   Q: I understand. The corner that you're pointing
[11] to—
[12]   A: If you had a pencil or something, I could put a
[13] mark on it.
[14]   Q: I think that's the smartest thing to do. Maybe
[15] do a little star where you were.
[16]   A: I'm not too good at stars but how about—
[17]   Q: An asterisk.
[18]   A: Gary was somewhere over in here sitting on th
[19] edge of the bed.
[20]   Q: You made a little blue circle for Gary where
[21] Gary was. Then what happened next?
[22]   A: As I said, after a short period of time,
[23] Mr. Schorr appeared back in the doorway. Like I
[24] said, he was completely nude. If I remember
[25] right, the stairway was carpeted. I know the

Page 40

[1] I stood there with my firearm like this watching
[2] the doorway.
[3]   MR. MacMAIN: Indicating you had your two
[4] hands on the gun pointing it towards the door.
[5] I'm just describing it for the record.
[6]     BY MR. WILLIAMS:
[7]   Q: Now, why did you do that? Why did you assume
[8] that posture?
[9]   A: Because the man had attacked us and I had no
[10] idea at that point in time where he was.
[11]   Q: Now, did you close the bedroom door?
[12]   A: No.
[13]   Q: Why not? I'll ask you that.
[14]   A: Because if he did come back, I wanted to see
[15] him.
[16]   Q: So now when you were anticipating his possible
[17] return with your firearm, where were you at this
[18] point within the bedroom?
[19]   A: As I said, I was standing just off the end of
[20] the bed here. I don't know how to describe it
[21] exactly, just off the end of the bed because
[22] Gary was right to my left. And, like I said, I
[23] told him to set on the edge of the bed because I
[24] wanted him to be watching the door in case he
[25] had to do anything to try to defend himself

[1] landing was and the bedroom. Now, I didn't hear
[2] a sound, but he just appeared in the doorway.
[3] And he had what I believe was a frying pan in
[4] his left hand and a large commercial type sauce
[5] pan in his right hand, real heavy aluminum.
[6]   Q: Was he saying anything or making any sounds
[7] this point?
[8]   A: No.
[9]   Q: What did he do?
[10]   A: As he stepped in through the doorway, I pointe
[11] my firearm directly at him and, I said, stop,
[12] police, stop, police at least three to four
[13] times. And he just kept coming forward at me.
[14]   Q: He didn't stop or hesitate at all?
[15]   A: No.
[16]   Q: How was he coming toward you? Was he runn
[17] or how would you describe his gait or motion
[18] toward you?
[19]   A: I really wouldn't say it was a run, but it was a
[20] very fast walk. If you were speaking of a
[21] horse, you'd say it was a trot.
[22]   Q: I understand that. Was he saying anything at
[23] this point?
[24]   A: No. He never said a word once he stepped bac
[25] up to the doorway.

Harry S. Hart, Jr.                                        Keith I. Schorr & Susan Schorr
May 28, 2002                                              Borough of Lemoyne, et a

**Page 43**

[1] **Q:** So you ordered him to stop three, four times, as
[2] you said, and he kept coming. Then what
[3] happened?
[4] **A:** He took the cook pot in his right hand and swung
[5] it over and down and hit me right on top of the
[6] head here a little more on the left side but on
[7] top here. And at that point I stepped— I
[8] still had my firearm, and I stepped back and
[9] over, and I was back approximately in the middle
[10] of the width of the bed.
[11] **Q:** Maybe you could put like a double asterisk or
[12] something where you were at this point after he
[13] hit you. What happened next?
[14] **A:** At that point when I stepped back, I turned a
[15] little like this.
[16] **Q:** To your left?
[17] **A:** Well, to my right—
[18] **Q:** To your right, okay.
[19] **A:** —with my right side a little more towards the
[20] doorway to the bedroom. He took a step or two
[21] right in front of me and brought the pot up like
[22] this. And at that point I began to fire my
[23] weapon.
[24] **MR. MacMAIN:** Indicating he pulled the pot
[25] over his head as though he was going to strike

**Page 44**

[1] you.
[2] **A:** As though he was going to strike me again. And
[3] I knew at that point I didn't have any other
[4] choice because I knew if I got hit again I was
[5] going out and down and then he would have my
[6] weapon again. He had already shot one police
[7] officer.
[8] **BY MR. WILLIAMS:**
[9] **Q:** Now, how far away from you was he when you began
[10] to fire your weapon?
[11] **A:** A length of an arm and a half.
[12] **Q:** Now, do you know how many times in total you
[13] fired your gun?
[14] **A:** I thought I fired four times. I've since been
[15] told I discharged five rounds.
[16] **Q:** Did Schorr go down immediately, or what
[17] happened?
[18] **A:** No. Apparently when I fired the first round,
[19] from what I've been told, it just went along his
[20] body like here. I was trying to shoot center of
[21] mass which is the way we're instructed on the
[22] range. And then apparently I must have fired
[23] one, two, three, and the next two hit almost
[24] center mass. And he started to bring the pot up
[25] again, and then I fired two more times, and he

**Page 45**

[1] fell to my left and against the wall at the end
[2] of the room and to the floor.
[3] **Q:** What's the caliber and model of your firearm?
[4] **A:** It's a Sig Sauer. I'm not sure of the model. I
[5] keep getting them confused. They have so darn
[6] many model numbers. It's a .40 caliber Smith &
[7] Wesson.
[8] **Q:** Is it a semiautomatic?
[9] **A:** Semiautomatic.
[10] **Q:** Now, what do you recall happening after Schorr
[11] finally went down?
[12] **A:** I took a step or two away from him and towards
[13] the area between the bed and the dresser and
[14] turned and watched him. I just had this feeling
[15] he was going to stand up again. I knew he
[16] wasn't, but I just had that feeling.
[17] And shortly thereafter, maybe 30 seconds at
[18] the most, why an East Pennsboro officer came in
[19] the door downstairs and called out. I said,
[20] we're upstairs. I said something about the
[21] perpetrator is down or something like that. And
[22] shortly thereafter he appeared in the doorway.
[23] **Q:** Now, I've asked you questions like this before,
[24] but let me just make sure I have it covered.
[25] Before you had to use your firearm, at any point

**Page 46**

[1] before you had to use your firearm, had anybody
[2] from the county or Holy Spirit or dispatch or
[3] anyone told you anything about Ryan Schorr other
[4] than that he had eloped? Did anybody tell you
[5] anything about his condition or mental state?
[6] **A:** No, sir.
[7] **Q:** Did anybody give you any cautions or advice to
[8] use in approaching him?
[9] **A:** No, sir.
[10] **Q:** I guess I should ask you this question, did you
[11] subsequently learn anything about him that would
[12] have caused you to do anything different if you
[13] had known about it?
[14] **A:** Yes, sir.
[15] **Q:** What is that?
[16] **A:** Since all the investigations that arose out of
[17] this incident, I have been told that he had been
[18] previously or that day diagnosed as homicidal.
[19] **Q:** If you had known that, what would you have done
[20] differently, if anything?
[21] **A:** We wouldn't have entered, not without more
[22] people being there. And first we would have
[23] contained the property and tried to talk him
[24] into coming out.
[25] **Q:** Now, Officer, if you had called for other

---

Page 43 - Page 46  (14)                    **Min-U-Script®**    **Filius & McLucas Reporting Service, Inc**

Case 1:01-cv-00930-YK    Document 91-3    Filed 02/28/2003    Page 44 of 50
Keith L. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Harry S. H
May 28

Page 47

[1] people, how would you have done that? What
[2] would you have done? Would you have called the
[3] West Shore department or—
[4]    A: I had to call county control and have them
[5] dispatch additional police units and ask them to
[6] contact my chief and see if he could come to the
[7] scene and take charge of it.
[8]    Q: When you say county control, I think I have an
[9] understanding of what that is, but why don't you
[10] tell me what it is.
[11]    A: There have been so many name changes over the
[12] years. Right now I guess it's operated under
[13] the Office of Emergency Preparedness. It's the
[14] control center. It's in the basement of the
[15] Cumberland County Prison. It comes under the
[16] purview of the Cumberland County Board of
[17] Commissioners.
[18]    Q: It's like a central dispatch?
[19]    A: Yes, basically that's what it amounts to for
[20] police, fire, and ambulance servicing.
[21]    Q: You would use it for any sort of request for
[22] backup, not just one involving an emotionally
[23] disturbed person?
[24]    A: Yes, sir.
[25]    Q: I showed Gary this. I'll show it to you, also.

[1]    Q: But before that, you weren't aware of that fact?
[2]    A: No, sir.
[3]    Q: Before you encountered Ryan Schorr Novembe
[4] 18th, you weren't aware of that fact?
[5]    A: No, sir.
[6]    Q: Now, if you had been aware of that fact, would
[7] that have changed your approach in any way?
[8]    A: I believe so, yes.
[9]    Q: In what way?
[10]    A: Again, I would have requested more assistance
[11] because I believe that would have agitated him
[12] more to start with.
[13]    Q: Is that something that's consistent with your
[14] experience with emotionally disturbed persons?
[15]    A: What is that?
[16]    Q: That they would be agitated if they know the
[17] police are coming.
[18]    A: Most of them, yes.
[19]    Q: There's a reference in this same paragraph it
[20] says— I guess it's the third line. It says,
[21] notification of Harrisburg PD with warning that
[22] he, Schorr, may be violent. Do you see that?
[23]    A: Yes.
[24]    Q: Were you aware of any such notification before
[25] you met Ryan Schorr?

Page 48

[1] This is Plaintiff's Exhibit 4. I just want to
[2] ask you about a couple things on there. As I
[3] told him, I know you didn't make this up, and
[4] you've never seen this document before, have
[5] you?
[6]    A: No.
[7]    Q: So I'm only giving it to you for some
[8] references. You see where it says Tape Number
[9] 2, that paragraph? _ _
[10]    A: Yes.
[11]    Q: There's a sentence in italics that says, also
[12] includes a radio transmission where the officers
[13] were warned that Mom told 911 that Schorr's
[14] agitated because he got a message on his machine
[15] from Holy Spirit about his committal. I guess
[16] my question to you is, do you know what that
[17] refers to?
[18]    A: No. I heard about that after the grand jury was
[19] completed.
[20]    Q: When you say you heard about that, what do you
[21] mean?
[22]    A: This fact that Holy Spirit allegedly called
[23] Mr. Schorr's home and left a message on his
[24] machine that the policemen were out to return
[25] him to the hospital.

[1]    A: No, sir.
[2]    Q: You were injured in the encounter with Ryan
[3] Schorr?
[4]    A: Yes.
[5]    Q: Were you required to get medical treatment,
[6] first of all?
[7]    A: Yes.
[8]    Q: What kind of medical treatment?
[9]    A: I received a tetanus shot, and I had I think 12
[10] stitches in my nose and my top front of my head.
[11]    Q: Were you required to take any time off from
[12] duty?
[13]    A: I wasn't required to, but I did.
[14]    Q: How long did you take off?
[15]    A: I believe about a month and a half.
[16]    Q: And you returned to duty after that?
[17]    A: Yes, sir.
[18]    Q: And you've been on duty continuously since?
[19]    A: Yes.
[20]    Q: Other than the medical treatment, have you
[21] required any other sort of treatments,
[22] counseling, or anything of that nature?
[23]    A: I was under the treatment of a psychologist fro
[24] the time I think about four days after the
[25] incident until mid May of 2001.

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr  v
Borough of Lemoyne, et al

Page 51

[1]   Q: I don't want you to tell me anything about what
[2] you and the therapist may have said, but who was
[3] — who provided this treatment to you?
[4]   A: I knew you were going to ask me that. I can't
[5] think of his name right now.
[6]   MR. EMERY: Harry, is it Jeff Verrechio?
[7]   A: Yeah, that's it, Jeffrey Verrechio.
[8]            BY MR. WILLIAMS:
[9]   Q: Is he in Harrisburg?
[10]   A: He's in the Camp Hill area.
[11]   Q: Is he a psychologist or a doctor, an M.D.?
[12]   A: Psychologist.
[13]   Q: Have you finished your treatment with him?
[14]   A: I may have to go back after this, seriously.
[15]   Q: I understand that completely, sir.
[16]   A: I'm not trying to be smart about it, but this
[17] kind of stirred things up a bit.
[18]   Q: You're not being smart at all. We all
[19] understand that this is a very stressful thing
[20] to you.
[21]   A: I understand that.
[22]   Q: Now, after this incident, you were required to
[23] talk to a lot of people who were investigating
[24] and looking into it, correct?
[25]   A: Correct.

Page 52

[1]   Q: Let me just ask you about a couple of specifics.
[2] First of all, from the police side of things or
[3] the district attorney's side of things, who did
[4] you have to speak to, if you know, if you can
[5] recall?
[6]   A: I'm not sure anymore. Initially I spoke to an
[7] investigator from the district attorney's office
[8] and a Pennsylvania State Police officer, a
[9] female officer.
[10]   Q: The county has produced a taped interview with a
[11] the state police officer. That was taped with
[12] the female officer. Is that what you recall?
[13]   A: Yes, sir.
[14]   Q: Did you have any conversation with anyone from
[15] Holy Spirit or the county about these events?
[16]   A: Myself?
[17]   Q: Yes.
[18]   A: No, sir.
[19]   Q: Did anyone working on your behalf other than
[20] possibly your attorney have any discussion with
[21] anybody from the county or Holy Spirit, if you
[22] know?
[23]   A: Not that I'm aware of.
[24]   Q: How about within the West Shore Police
[25] Department itself, did you have to talk to

Page 53

[1] anybody about these events?
[2]   A: No, sir.
[3]   Q: Did you have to complete a report of your own, a
[4] written report?
[5]   A: No, sir.
[6]   Q: Am I accurate in assuming that you received no
[7] disciplinary action as a result of this event?
[8]   A: That's correct, I did not.
[9]   Q: Were you given any counseling or advice with
[10] respect to your handling of this situation?
[11]   A: By whom?
[12]   Q: Anybody within the West Shore Police Department.
[13]   A: No, sir.
[14]   Q: Did anybody else give you any counseling or
[15] advice other than the therapy you've told us
[16] about?
[17]   A: No, sir.
[18]   Q: Was this the first time you had to use your
[19] firearm in your duties as a police officer?
[20]   A: First time I discharged it.
[21]   Q: Okay, yes. There were other occasions where you
[22] may have had to draw it. Is that what you mean?
[23]   A: Yes.
[24]   Q: But the first time you ever actually had to fire
[25] your weapon?

Page 54

[1]   A: Yes, sir.
[2]   Q: Were you ever the subject of any disciplinary
[3] proceeding arising from an encounter with an
[4] emotionally disturbed person during your police
[5] career?
[6]   A: No, sir.
[7]   Q: Before the second encounter with Schorr when you
[8] were advised that he had eloped, did this news
[9] surprise you in any way?
[10]   A: No.
[11]   Q: Why not?
[12]   A: Because it's happened before.
[13]   Q: In your experience how frequently has it
[14] happened?
[15]   A: I'd say two to three a year anyway.
[16]   Q: From Holy Spirit?
[17]   A: Yes.
[18]   Q: Again, I apologize for asking this because I
[19] think I know the answer, but did you personally
[20] have any contact with Susan Schorr, Ryan
[21] Schorr's mother, on that day?
[22]   A: No.
[23]   Q: Any such contact was through Gary, correct?
[24]   A: Yes.
[25]   Q: Did you have any contact with Ryan's roommate,

Case 1:01-cv-00930-YK    Document 91-3    Filed 02/28/2003    Page 46 of 50
Keith I. Schorr & Susan Schorr  v.                                    Harry S. H
Borough of Lemoyne, et al.                                            May 28



**Page 55**

[1] Matthew Gaumer?

[2] **A:** No, sir.

[3] **Q:** Either before or after the incident, correct?

[4] **A:** None at all.

[5] **MR. WILLIAMS:** I understand. I have no

[6] further questions. Thank you, Officer.

[7] **EXAMINATION**

[8] **BY MR. YANINEK:**

[9] **Q:** Officer, my name is John Yaninek. I represent

[10] Holy Spirit Hospital and the county. I just

[11] have a couple of questions. On the subject you

[12] said you heard or had some knowledge of people

[13] escaping or eloping from Holy Spirit on other

[14] occasions, what knowledge — what personal

[15] knowledge do you have of that?

[16] **A:** From hearing radio transmissions from Cumberland

[17] County Control, communications to East Pennsboro

[18] Township to try to find the individual because

[19] that's the area the hospital is located in.

[20] **Q:** Do you have any personal knowledge of you

[21] actually taking a 302 person to Holy Spirit and

[22] them eloping prior to the Schorr incident?

[23] **A:** No, sir.

[24] **Q:** Prior to the Schorr incident, when was the last

[25] thing or communication you heard over the radio

**Page 56**

[1] related to an elopement at Holy Spirit?

[2] **A:** I don't recall.

[3] **Q:** You said that you had knowledge of two to three

[4] a year. How do you base that figure? Where do

[5] you get that figure from?

[6] **A:** From what I've heard on radio transmissions.

[7] **Q:** So how many radio transmissions did you hear of

[8] where there was an elopement at Holy Spirit in

[9] your career?

[10] **A:** In my career I have no idea. It's a long period

[11] of time.

[12] **Q:** Were there two or three in the year previous to

[13] 2002, or do you just get that number of hearing

[14] — are you averaging that number over the course

[15] of your career? How are you getting that

[16] figure?

[17] **A:** Like I said, just from radio transmissions that

[18] I've heard while I was working.

[19] **Q:** In the year 2000 how many transmissions do you

[20] think you heard that there was an elopement at

[21] Holy Spirit?

[22] **A:** I don't know, sir.

[23] **Q:** In '99 do you have a number that you have heard?

[24] **A:** As I said, sir, probably average two or three a

[25] year. I've never wrote them down, so I have no

[1] way of substantiating that.

[2] **Q:** So when you say two or three, that's not a

[3] definite figure, that's just your speculation?

[4] **A:** Yes, sir.

[5] **Q:** I want to take you to the point in time where

[6] you had taken Ryan Schorr to the hospital. Do

[7] you understand where I am at now?

[8] **A:** I believe so.

[9] **Q:** When you had him at the hospital, did he say

[10] anything to any of the Holy Spirit employees

[11] that was out of the ordinary?

[12] **A:** He said something to the lady at the admittance

[13] desk, but I didn't hear that. I was standing a

[14] little off to the side. And at that point she

[15] said, take him back to the ER. She got up and

[16] walked out from her desk and away from him.

[17] **Q:** Did you hear any of Ryan Schorr's exchanges v

[18] any Holy Spirit employees while at the hospital?

[19] **A:** No, sir.

[20] **Q:** Did he exhibit any violent-type behavior while

[21] at the hospital?

[22] **A:** Not violent to me. Like I said, he was pacing

[23] up and down in the room area there like he was

[24] agitated, but he didn't— There was a chair in

[25] the room which the security guard and Gary went

[1] in and removed before the security guard left to

[2] answer his page. But he didn't try to pick that

[3] up and throw it or anything. He didn't kick the

[4] walls or try to kick the door open or anything

[5] like that. He just seemed very agitated.

[6] **Q:** Did you escort him into that room?

[7] **A:** Yes, sir, Gary and I both.

[8] **Q:** Did he give you any trouble in going back to

[9] that room?

[10] **A:** No, sir.

[11] **Q:** Did he say anything to you regarding whether

[12] wanted to go or not go to that specific room?

[13] **A:** Nothing about the room per se, no.

[14] **Q:** Can you remember what he said, if anything at

[15] all?

[16] **A:** The only thing he said that I recall was before

[17] we left his home to go to the hospital was that

[18] he couldn't go to the hospital because he had an

[19] appointment with the president, he had to go

[20] keep that appointment.

[21] **Q:** Do you remember anything else other than tha

[22] that he may have said?

[23] **A:** No, sir.

[24] **Q:** I want to take you now back to the house the

[25] second time before the shooting, okay. You had

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et

**Page 59**

[1] said when answering some questions before that
[2] you had entered the home and you had not
[3] unsnapped your holster at that time. Do you
[4] remember that, saying that?
[5]    A: Yes.
[6]    Q: And I think you said that it wasn't necessary.
[7] Am I correct?
[8]    A: I didn't feel it was at that time, no.
[9]    Q: When you say that you didn't feel it was
[10] necessary at that time, do you feel that at that
[11] time you didn't feel a sense of danger?
[12]    A: No, sir.
[13]    Q: Let me re-ask that question. Did you feel in
[14] danger at that period of time that you — when
[15] you were entering the house?
[16]    A: No, sir, I didn't feel in danger.
[17]    Q: Can you tell me at what point in time when you
[18] were going through that house did you feel that
[19] you or your partner may be in danger?
[20]    MR. WILLIAMS: Object to the form of the
[21] question. Go ahead, Officer.
[22]    A: The first time I had any feeling that something
[23] wasn't right was when Ryan wouldn't answer us.
[24] We kept calling his name and telling him we
[25] needed to talk to him.

**Page 60**

[1]         BY MR. YANINEK:
[2]    Q: When were you calling his name, when you were in
[3] the house?
[4]    A: Yes, from the time that I entered the kitchen
[5] the whole way up the stairway to the second
[6] floor.
[7]    Q: When you were going up the stairwell to the
[8] second floor, did you have your holster
[9] unsnapped at that time?
[10]    A: No, sir.
[11]    Q: Did you have the baton in your hand?
[12]    A: Yes, I did.
[13]    Q: What's the purpose of that, having the baton in
[14] your hand?
[15]    A: In case I needed to use it as a defensive
[16] weapon, it was already in my hand. It wasn't in
[17] the holster on my belt. You can unfold it
[18] faster that way.
[19]    Q: Is it fair to say that you took the baton and
[20] had it in your hand because there was a
[21] possibility of you or your partner being in some
[22] danger?
[23]    MR. WILLIAMS: Object to the form of the
[24] question.
[25]    MR. MacMAIN: You can answer if you

**Page**

[1] understand the question.
[2]    MR. YANINEK: Could you read the question
[3] back for me.
[4]    (The court reporter read back the previous
[5] question)
[6]    A: Yes, I would think that's fair to say, always a
[7] possibility when you're taking somebody into
[8] custody.
[9]         BY MR. YANINEK:
[10]    Q: When you got to the top of the stairwell and you
[11] saw — you looked into the room on the second
[12] floor, Ryan Schorr's room, and saw your partner
[13] on the floor with Mr. Schorr, did you feel at
[14] that point your partner may be in danger?
[15]    A: Yes.
[16]    Q: Did you feel that Ryan Schorr at that time might
[17] be both a danger to your partner and yourself?
[18]    A: Yes.
[19]    Q: You could have left the home at that point and
[20] called for backup instead of helping your
[21] partner?
[22]    A: No.
[23]    Q: Why not?
[24]    A: Because that would be abandoning him.
[25]    Q: From a moral perspective, you would have been

**Page**

[1] abandoning your partner. But from an ability to
[2] leave that house, you could have? No one was—
[3]    A: Physically I could have, yes. I could have
[4] called for help right from there with my
[5] portable, too, but it would have taken more time
[6] from assisting my partner.
[7]    Q: Would you agree that you put yourself at risk
[8] when you made that decision to assist your
[9] partner?
[10]    MR. WILLIAMS: Object to the form of the
[11] question.
[12]    A: Well, in a way I did, but we were both at risk
[13] when we went to serve the warrant to start with.
[14]         BY MR. YANINEK:
[15]    Q: You said you had struck Mr. Schorr two or three
[16] times with the baton in the back. Is that
[17] correct?
[18]    A: That's correct.
[19]    Q: When you struck him over the back, you were
[20] behind him?
[21]    A: I was to his side, to his right side.
[22]    Q: I know this seems fairly obvious to you, but
[23] after you struck him two or three times over the
[24] back with the baton, you still had access to
[25] leave the room if you had chose to do that?

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Harry S. F
May 2

---

Page 63

[1] A: Yes, I could have physically. I wasn't being
[2] restrained there in any way.
[3] Q: But you had made a decision that you were going
[4] to help your partner?
[5] A: Correct.
[6] Q: Because that's the way you were trained?
[7] A: Plus that's the way I am.
[8] Q: Officer, I just want to ask you a couple
[9] follow-up questions on the injuries you received
[10] as a result of this whole struggling process
[11] with Ryan Schorr. You said you had a broken
[12] nose and 12 stitches?
[13] A: Correct.
[14] Q: Were the stitches around your nose?
[15] A: Several were in my nose, my right eyebrow, and
[16] my left scalp up on the temple area.
[17] Q: The medical care, was that provided to you by
[18] workers' compensation?
[19] A: It was covered by workman's compensation, yes.
[20] Q: Did you make the workers' compensation claim for
[21] lost hours?
[22] A: Yes, I did.
[23] Q: Do you remember how long they paid you workers'
[24] compensation?
[25] A: I believe it was— I think it was probably two

Page 64

[1] and a half to three months total. It was based
[2] on my part-time work like a 40-hour week.
[3] Q: Over the course of November to May of 2001, how
[4] often did you have to see a psychologist? How
[5] many times do you think you saw him?
[6] A: I saw the psychologist two times in the week
[7] following the incident and then one hour a week
[8] per week after that until mid May.
[9] Q: Basically two times initially and then weekly
[10] after that?
[11] A: Yes.
[12] Q: Were his counseling fees covered by your
[13] workers' compensation?
[14] A: Yes, sir.
[15] Q: Other than the psychological element of this
[16] incident, do you have any physical problems from
[17] the incident?
[18] A: I still have the broken nose which has given me
[19] a little problem. But every doctor that's
[20] examined it says it isn't worthwhile pursuing
[21] surgery on it.
[22] Q: What kind of problem do you have?
[23] A: With my breathing, inhaling through my nose,
[24] it's slightly deviated, and it's blocking the
[25] nasal passage a little bit.

---

[1] Q: Anything else?
[2] A: No, sir.
[3] MR. YANINEK: Thank you.
[4] MR. WILLIAMS: I just have one or two
[5] follow-ups, Officer.
[6]                REEXAMINATION
[7]              BY MR. WILLIAMS:
[8] Q: During any time before he was shot, did you s
[9] Ryan Schorr bleeding?
[10] A: Not that I recall, no.
[11] MR. WILLIAMS: That's all I have. Thank
[12] you.
[13] MR. MacMAIN: I just have a few.
[14]                EXAMINATION
[15]              BY MR. MacMAIN:
[16] Q: You were asked way back in the beginning ab
[17] any formal training you received regarding how
[18] to deal with emotionally disturbed people, and I
[19] think you had said you had a number of courses
[20] that touched on the subject?
[21] A: Yes.
[22] Q: So it wasn't a course that was devoted solely t
[23] that, but it was covered as part of the
[24] curriculum of how to deal with emotionally
[25] disturbed people?

[1] A: That's correct.
[2] Q: Can you tell me about how many courses you
[3] had over the course of your career that touched
[4] on the subject?
[5] A: Maybe two. They haven't been very many.
[6] Q: I think you had said that you had actually
[7] handled about six 302 incidents during your
[8] tenure either with West Shore and Lemoyne and
[9] you had served several dozen others in your
[10] other police experience?
[11] A: Yes, that's correct.
[12] Q: As of November of 2000, was there any hesita
[13] or question in your mind how to serve a 302
[14] warrant?
[15] A: No, sir.
[16] Q: Can you give me an estimate of the number of
[17] calls either by number or by percentage you've
[18] handled over the course of your 20 plus years of
[19] police experience in which the person you were
[20] dealing with had some type of mental illness?
[21] A: You mean on a percentage basis?
[22] Q: Percentage, number, whatever is easiest for yo
[23] to—
[24] A: Maybe 5 to 7 percent.
[25] Q: Have you had problems in any of those calls

---

Harry S. Hart, Jr.
May 28, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Page 67

[1] knowing how to handle the situation?
[2]   A: No. This is the first one that ever blew up
[3] like this.
[4]   Q: How about either by number or by percentage the
[5] number of calls you handled as a police officer
[6] in which the person may be emotionally upset,
[7] either intoxicated, high, passionately angry,
[8] something along those lines?
[9]   MR. WILLIAMS: Object to the form, but go
[10] ahead, Officer.
[11]   A: Probably 50 to 60 percent because even something
[12] like a barking dog complaint or a traffic
[13] accident people are emotionally upset most of
[14] the time.
[15]             BY MR. MacMAIN:
[16]   Q: How are you trained either formally or through
[17] on-the-job training how to handle a call like
[18] that?
[19]   A: Through the training I underwent at the academy
[20] and then through field experience.
[21]   Q: Would it be the same type of approach that you
[22] would handle a call in which it was a 302
[23] commitment?
[24]   A: Basically, yes.
[25]   Q: Would it be the same way you'd handle a call in

Page 68

[1] 5 to 7 percent of which someone is suffering
[2] from some type of mental illness?
[3]   A: Yes.
[4]   Q: You were asked some questions about backups and
[5] whether there was any formal written policy in
[6] terms of when you could call or how you would
[7] call for backups, and I think you said there
[8] wasn't a specific written policy, correct?
[9]   A: That's correct.
[10]   Q: How do you know as a police officer whether and
[11] when you need to call for backup? Is it
[12] something you learn on the job?
[13]   A: Basically something you learn on the job,
[14] depends on the type of incident and your
[15] previous experience, if you have any, with the
[16] individual.
[17]   Q: You said since this incident you've attended two
[18] formal courses through MPOETC in dealing with
[19] people with emotional problems. Was there
[20] anything in those courses you learned that was
[21] different from what you already knew as a police
[22] officer with over 20 years of experience?
[23]   A: No, sir.
[24]   Q: Is there anything you learned from those
[25] training courses that would have caused you to

Page 69

[1] handle this incident differently based on what
[2] you knew at the time this incident took place?
[3]   A: No, sir.
[4]   Q: One thing for clarification, you said that you
[5] had been certified as an ASP instructor but the
[6] certification elapsed?
[7]   A: Correct.
[8]   Q: At the time of the incident you were certified
[9] to use an ASP, you just weren't certified as an
[10] ASP instructor?
[11]   A: That's correct.
[12]   Q: You were also asked some questions on that
[13] second call about entering into that house. Do
[14] you recall those questions?
[15]   A: I believe so, yes.
[16]   Q: What was the reason why you went — you opened
[17] the door and went into the house?
[18]   A: To see if Mr. Schorr was there and if anybody
[19] else was there that might have been in any
[20] danger.
[21]   Q: Did you consider that to be a situation which
[22] you entered under exigent circumstances?
[23]   A: Yes.
[24]   MR. MacMAIN: That's all the questions I
[25] have.

Page 7

[1]   MR. YANINEK: I just have a follow-up.
[2]             REEXAMINATION
[3]             BY MR. YANINEK:
[4]   Q: He just asked about exigent circumstances. How
[5] would you define exigent circumstances?
[6]   A: Circumstances where you really don't have any
[7] hard, fast rules to follow like that's a glass.
[8] You have to look at the whole issue and see what
[9] the situation may be, then go from there.
[10]   Q: Sometimes those circumstances are dangerous?
[11]   MR. WILLIAMS: Object to the form.
[12]   A: Yes, sometimes they are.
[13]   MR. YANINEK: I have no further questions.
[14]   MR. WILLIAMS: I have nothing further.
[15]     (The deposition concluded at 2:19 p.m.)

Min-U-Script®    Filius & McLucas Reporting Service, I

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Harry S. Ha
May 28,

Page 71

[1]   COMMONWEALTH OF PENNSYLVANIA :

[2]   COUNTY OF YORK                    :

[3]       I, Bethann M. Mulay, Reporter and Notary
      Public in and for the Commonwealth of

[4]   Pennsylvania and County of York, do hereby
      certify that the foregoing deposition was taken

[5]   before me at the time and place hereinbefore set
      forth, and that it is the testimony of:

[6]

           HARRY S. HART, JR.

[7]

           I further certify that said witness was by

[8]   me duly sworn to testify the whole and complete
      truth in said cause; that the testimony then

[9]   given was reported by me stenographically, and
      subsequently transcribed under my direction and

[10]  supervision; and that the foregoing is a full,
      true and correct transcript of my original

[11]  shorthand notes.

[12]

           I further certify that I am not counsel for

[13]  or related to any of the parties to the
      foregoing cause, or employed by them or their

[14]  attorneys, and am not interested in the subject
      matter or outcome thereof.

[15]

[16]      Dated at York, Pennsylvania this 10th day
      of June, 2002.

[17]

[18]

[19]

[20]      Bethann M. Mulay
          Registered Professional Reporter

[21]      Notary Public

[22]

           The foregoing certification of this

[23]  transcript does not apply to any reproduction of
      the same by any means unless under the direct

[24]  control and/or supervision of the certifying
      reporter.

[25]