


**In The Matter Of:**

*Keith I. Schorr  &  Susan Schorr    v.*
*Borough of Lemoyne, et al.*

---

*Howard E. Dougherty*
*August 22, 2002*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File HD082202.PRN, 63 Pages*
*Min-U-Script® File ID: 2691147523*

**Word Index included with this Min-U-Script®**

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

Howard E. Dou
August 22




IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and   . No. 1:01-CV-0930

SUSAN SCHORR,   .

    Plaintiffs   . Judge Kane

  vs.   .

BOROUGH OF LEMOYNE,   .

BOROUGH OF WORMLEYSBURG,   .

WEST SHORE REGIONAL POLICE   .

DEPARTMENT, HOWARD DOUGHERTY,   .

CHIEF WEST SHORE REGIONAL   .

POLICE DEPARTMENT, CUMBERLAND   .

COUNTY, HOLY SPIRIT HOSPITAL,   .

    Defendants   .

Deposition of : HOWARD E. DOUGHERTY

Taken by   : Defendants

Date   : August 22, 2002, 2:06 p.m.

Place   : 3401 North Front Street

    Harrisburg, Pennsylvania

Before   : Debra L. Heary, Notary Public

    Registered Professional Reporter

Page 2

APPEARANCES

  WILLIAMS, CUKER & BEREZOFSKY

  By:  GERALD J. WILLIAMS, ESQ.

       and

  STEPHEN S. PENNINGTON, ESQ.

    For - Plaintiffs

  MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

  By:  DAVID J. MacMAIN, ESQ.

    For - Defendants West Shore Regional

    Police Department, Howard Dougherty,

    Chief West Shore Regional Police

    Department

  METTE, EVANS & WOODSIDE

  By: JOHN F. YANINEK, ESQ.

    For - Defendants Cumberland County and

    Holy Spirit Hospital

Page 3

INDEX

WITNESS

HOWARD E. DOUGHERTY   Examination

By Mr. Williams   4, 56

By Mr. Yaninek   50

By Mr. MacMain   58

[1]            STIPULATION

[2] It is hereby stipulated by and between

[3] counsel for the respective parties that

[4] reading, signing, sealing, certification and

[5] filing are hereby waived; and all objections

[6] except as to the form of the question are

[7] reserved to the time of trial.

[8]    HOWARD E. DOUGHERTY, called as a witness,

[9] being duly sworn, testified as follows:

[10]          EXAMINATION

[11]   BY MR. WILLIAMS:

[12]    **Q:** Chief, we met briefly outside. I'm Gerry

[13] Williams. And Steve Pennington and I represent

[14] the plaintiffs in this case, which has been

[15] filed against you and several others arising

[16] out of the death of Ryan Schorr. Have you

[17] given a deposition before?

[18]    **A:** Yes.

[19]    **Q:** So I'm not going to give you a long recital of

[20] all the rules. But I will just remind you that

[21] if you don't hear one of my questions or don't

[22] understand it, let me know so that I can

[23] correct it. Okay?

[24]    **A:** Yes.

[25]    **Q:** And obviously, as you also know probably,

[1] that's because we want to be able to rely on

[2] the idea that you've given answers that you

[3] meant to give to questions that you've heard

[4] and understood. Okay?

[5]    **A:** Yes.

[6]    **Q:** Chief, how long have you been chief of the We

[7] Shore Regional Police?

[8]    **A:** Since its inception January 1st, 1995.

[9]    **Q:** Give me, if you would, sort of a nickel tour of

[10] your career as a policeman up until that time.

[11]    **A:** Upon completion of my two tours in Vietnam, I

[12] came back and began as a policeman in a small

[13] community named Port Allegany, Pennsylvania,

[14] which is in Northwestern Pennsylvania.

[15]    **Q:** What year was that?

[16]    **A:** 1971, I believe.

[17]    **Q:** In what branch did you do your tours in

[18] Vietnam?

[19]    **A:** United States Army. I served there for 10

[20] years, six of which was police chief. I was

[21] named police chief December 29th, 1975.

[22]    And I believe it was April of 197- or '81,

[23] I went to Lower Saucon Township as their police

[24] chief and was also director of public safety

[25] there for three years.

Howard E. Dougherty
August 22, 2002



Keith Schorr & Susan Schorr    v.
Borough of Lemoyne, et al.

---

Page 6

[1] And in 1985, January of '85, I went to
[2] Lemoyne Police Department, which was eventually
[3] absorbed by West Shore and made into the West
[4] Shore Police Department.
[5] Q: And between '85 and '95, what ranks—
[6] A: Chief of police.
[7] Q: For the entire time?
[8] A: Yes. I've been a police chief since 1975.
[9] Q: So again, I think I am clear, but just so our
[10] record is clear, from '85 to '95, you were
[11] chief of the Lemoyne police?
[12] A: Yes.
[13] Q: Which was then one of the boroughs that was
[14] consolidated into the West Shore Regional
[15] Police?
[16] A: Correct.
[17] Q: Maybe I should have asked you this first, but
[18] in what year were you born, sir?
[19] A: 1949.
[20] Q: So you first became a police chief in your 20s.
[21] Is that accurate?
[22] A: Yes.
[23] Q: All right. Now, I'd like to ask you a few
[24] questions about the sort of overall
[25] organization and structure of the West Shore

Page 7

[1] Regional Police as it's currently constituted.
[2] First of all, we understand that it's —
[3] it enforces the law in three boroughs; is that
[4] correct?
[5] A: Two.
[6] Q: Two. Wormleysburg and Lemoyne?
[7] A: Correct.
[8] Q: Was it ever three?
[9] A: No.
[10] Q: Okay. And how many police officers are there
[11] currently?
[12] A: There are 10 full-time and four part-time.
[13] Q: And are you one of the 10 full-time?
[14] A: Yes.
[15] Q: And were there the same or a different number
[16] of police officers back in November of 2000?
[17] A: I think it's stayed pretty well the same, yes.
[18] Q: Roughly the same size?
[19] A: Yes, yes.
[20] Q: And with respect to the part-time police
[21] officers, do they work — do they all work a
[22] typical number of hours in a week or month?
[23] A: It depends upon their other employment and
[24] other factors, their family life, and so on and
[25] so forth. So they're scheduled in when they're

Page 8

[1] available.
[2] Q: All right. Is there a minimum number of hours
[3] that they work in a given period?
[4] A: I would say the majority of them work at least
[5] three to four 8-hour shifts every two weeks.
[6] Q: Now, would those characterizations apply to
[7] Officers Berresford and Hart in this case?
[8] A: Yes.
[9] Q: And do they work approximately that number of
[10] hours?
[11] A: Yes. Usually a minimum of those hours.
[12] Q: You indicated that they are assigned as the
[13] need arises, the part-time police officers.
[14] Can you tell me how that process works? Who
[15] makes the decision to schedule a part-time
[16] officer, first of all?
[17] A: I do the scheduling. The scheduling can
[18] depend upon vacation of the full-time officers.
[19] Tuesdays we have a changeover in the shift
[20] where the movement is.
[21] And usually on a Tuesday afternoon, the
[22] 4:00 shift is a period they usually work —
[23] normally it's like vacation or peak times when
[24] additional help is needed.
[25] Q: Is there a minimum number of officers that you

Page 9

[1] want or need to have on duty per shift?
[2] A: There is no minimum per our collective
[3] bargaining agreement. However, we try to
[4] maintain at least two.
[5] Q: For each shift?
[6] A: Yes.
[7] Q: Are the part-time officers part of the
[8] collective bargaining unit?
[9] A: No.
[10] Q: How— What is the— How would you describe
[11] their employment relationship with the
[12] commission other than part-time employees?
[13] A: They're the same as a full-time employee only
[14] they don't fall under the collective bargaining
[15] agreement.
[16] Q: Are they members of any union?
[17] A: No.
[18] Q: Who's the bargaining representative for the
[19] full-time employees? I don't mean the
[20] individual, but who's the union—
[21] A: It's the West Shore Police Association.
[22] Q: All right. Are the part-time officers subject
[23] to the same disciplinary procedures as the
[24] full-time officers?
[25] A: Yes.

---

Keith L. Schorr & Susan Schorr   v.
**Borough of Lemoyne, et al.**

⬤                                   ⬤

......... E. Dou....
August 22, :

---

**Page 10**

[1]  Q: Do they have the same grievance and appeal
[2] rights as the full-time officers, if you know?
[3]  A: I would say no, because the collective
[4] bargaining agreement specifically specifies for
[5] a full-time employee.
[6]  Full-time officer or a part-time officer
[7] would fall under — what's that called — the
[8] police tenure act, I believe it is.
[9]  Q: I understand. Now, are there differences in
[10] qualifications for hire between the part-time
[11] officers and the full-time officers?
[12]  A: No.
[13]  Q: And again, in a nutshell, can you tell me what
[14] the basic qualifications for hire are?
[15]  A: In the Commonwealth of Pennsylvania, set by the
[16] Municipal Police Officers Training Education
[17] Commission, they must be certified in Act 120
[18] or grandfathered in such.
[19]  And then each year, they must maintain
[20] their continuing education or as we call it Act
[21] 120 or mandatory in-service training as well
[22] as, of course, if you hire a new person now,
[23] you have to have a psychological and medical
[24] and so on and so forth.
[25]  Q: All right. Does the regional commission pay

**Page 11**

[1] any money for the continuing education of
[2] officers?
[3]  A: Yeah. We send them to their training, yes, the
[4] commission does, yes.
[5]  Q: I mean, but does that involve an expenditure by
[6] the commission, if you know?
[7]  A: Yeah. We pay the wages of the officers and any
[8] costs associated, yes.
[9]  Q: In other words, it's not something that the
[10] officer is asked to pay for him or herself.
[11] Correct?
[12]  A: No.
[13]  Q: And that's true both for the full-time and the
[14] part-time officers?
[15]  A: Yes.
[16]  Q: The West Shore police, are you— Is the West
[17] Shore police funded by borough taxes from
[18] Wormleysburg and Lemoyne? Is that how it
[19] works?
[20]  A: Yes, the majority of the funding comes from
[21] that.
[22]  Q: Is that the sole source of funding, or there
[23] are other sources of funding?
[24]  A: There are other sources of funding such as
[25] parking ticket revenue, somebody might want a

---

**Pag**

[1] copy of an accident report or a police report.
[2] But the majority — the vast majority is
[3] through the allocations of the two
[4] municipalities.
[5]  Q: All right. Are any funds received by the West
[6] Shore police for, I'll say, special projects or
[7] grants, anything of that nature?
[8]  A: From?
[9]  Q: From governments other than the two borough
[10] governments, I'll start with that.
[11]  A: We might have gotten a grant. I think we got
[12] one grant from the state. We had an original
[13] start-up grant from the state. And I think
[14] that was for $99,000.
[15]  And then I think we got one additional
[16] grant from the state, which was a minor amount
[17] of money. It was either, like, $5,000 or
[18] $10,000.
[19]  Q: The start-up grant from the state of
[20] Pennsylvania was—
[21]  A: Yes.
[22]  Q: —had to do with the start-up of the West Shore
[23] Regional Police?
[24]  A: Yes, yes.
[25]  Q: And the second smaller grant, was that

**Pag**

[1] earmarked for any purpose?
[2]  A: It was, but I don't remember what it was.
[3]  Q: Fine. And to your knowledge, have you received
[4] any grants or other forms of support from the
[5] Federal Government?
[6]  A: No.
[7]  Q: And when I say grants or other forms of
[8] support, I don't just mean grants. I mean, for
[9] example, monies that might help the police
[10] requisition or obtain equipment.
[11]  A: No.
[12]  Q: Is the money for those purposes; that is, to
[13] get equipment, from the general budget, so to
[14] speak?
[15]  A: Yes.
[16]  Q: Which depends on the same sources you've just
[17] told me about?
[18]  A: Correct.
[19]  Q: I want to go back briefly to the discussion we
[20] were having about any differences between the
[21] full-time officers and the part-time officers.
[22]  Are there any differences in the
[23] assignments that the part-time officers get?
[24] By that, I mean are there some jobs that you
[25] would not send a part-time officer on or would

---

Howard E. Dougherty
August 22, 2002

Keith L. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

---

Page 14

[1] only send a part-time officer on?

[2]   A: No.

[3]   Q: When a part-time officer is on duty, he has the

[4] same duties and obligations as any full-time

[5] officer who's on duty?

[6]   A: Correct.

[7]   Q: I recognize that what I'm about to ask you now

[8] you've covered in some written answers to

[9] discovery, but I want to see if we can talk a

[10] little bit more about it.

[11]     Obviously, one occasional duty of West

[12] Shore police officers is to execute orders and

[13] warrants under Section 302 of the Mental Health

[14] Procedures Act. Correct?

[15]   A: Correct.

[16]   Q: And can you tell us approximately, not holding

[17] you to specific numbers but approximately, with

[18] what frequency that happens in a month or a

[19] year typically?

[20]   A: I can't really answer your question to give you

[21] a number. I would say it's an extreme light

[22] amount. It's minimal.

[23]   Q: Okay. And—

[24]   A: That is, compared to other duties that we

[25] perform or calls or complaints or so on and so

---

Page 15

[1] forth.

[2]   Q: Understood. But in a—

[3]   A: I think we did an analysis for the Cumberland

[4] County District Attorney's office. And if my

[5] memory serves me correct, it was like three,

[6] four, five a year, if my memory is correct.

[7]   Q: I understand. And I'll tell you that that

[8] conforms with my recollection of what you told

[9] us before, too.

[10]   A: Okay.

[11]   Q: That analysis that you just referred to done

[12] for the county, that took place before the Ryan

[13] Schorr incident, if we can call it that; is

[14] that right?

[15]   A: No, it took place afterwards.

[16]   Q: All right. Before the Ryan Schorr incident,

[17] did you ever submit any information to the

[18] county about 302 commitments that you recall?

[19]   A: Not that I recall.

[20]   Q: Now, is there any record kept of the number of

[21] 302 commitments?

[22]   A: Yes.

[23]   Q: And what record is kept?

[24]   A: We do complaint logs on everything we do. And

[25] that's where we develop the information that we

---

Page 16

[1] submitted to the District Attorney's office.

[2]   Q: Understood. And what are the complaint logs

[3] themselves kept for a specified amount of time?

[4]   A: Yes. Under the Pennsylvania Municipal

[5] Retention Act, yes.

[6]   Q: What is the period of time applicable?

[7]   A: I think seven years or something, if my memory

[8] serves me correct.

[9]   Q: But whatever it is, West Shore's retention of

[10] the complaint logs conforms with the Retention

[11] Act?

[12]   A: Yes, yes.

[13]   Q: Can you tell us, when a — I'll call it a "job"

[14] — when a 302 job is called in, is there a set

[15] procedure to determine which officers will

[16] respond to it?

[17]   A: Normally, it would be the officer within the —

[18] we split zones. Usually there's an officer in

[19] 1, 2, 3, and there's another officer in 4, 5,

[20] 6. And whatever zone it is, that's normally

[21] the primary officer who will answer that call.

[22]   Q: These are geographical zones within your

[23] jurisdiction?

[24]   A: Yes, yes.

[25]   Q: And when you say whatever zone it is, does that

---

Page 17

[1] mean where the person who is the subject of the

[2] 302 is?

[3]   A: Yes.

[4]   Q: All right.

[5]   A: Wherever we're going to respond to.

[6]   Q: All right. And again, it wouldn't make a

[7] difference whether the relevant officer was a

[8] full-time or a part-time employee?

[9]   A: No.

[10]   Q: In general now, are there written procedures —

[11] West Shore Regional Police procedures regarding

[12] the execution of orders and warrants under

[13] Section 302?

[14]   A: No. We follow the 302 Mental Health Act. The

[15] Act itself tells you what you must do.

[16]   Q: Is the Act or any literature related to the Act

[17] given to officers at the West Shore—

[18]   A: During the basic training of all police

[19] officers, 302 commitments are covered. And

[20] then, of course, throughout the years with the

[21] Act 120 or the mandatory in-service training,

[22] they talk about officer safety, things of that

[23] nature.

[24]     And then, of course, the last few years

[25] they've gotten it into special needs and other

---

Keith I. Schorr  &  Susan Schorr  v.
Borough of Lemoyne, et al.

Howard E. ...
August 22.

**Page 18**

[1] health issues.

[2]    Q: All right. Now, when you refer to basic

[3] training in that answer, are you talking about

[4] the training that's provided by the — and

[5] mandated by the municipal police officer—

[6]    A: Yes. Act 120.

[7]    Q: All right. Maybe we should rehearse one rule

[8] of depositions, which is that lawyers ask

[9] long-winded questions. So try to let me finish

[10] my question before you start your answer.

[11] Okay?

[12]    A: Okay.

[13]    Q: That's mainly for the sake of our court

[14] reporter, who's trying to take it all down. So

[15] again, just so I'm clear, and I think you've

[16] told me now, so pardon me, but the basic

[17] training — when you refer to basic training,

[18] you're talking about the Act 120 training?

[19]    A: Yes.

[20]    Q: And the mandatory in-service training, what do

[21] you refer to when you say that?

[22]    A: Either mandatory in-service or Act 180.

[23]    Q: And again, these are the trainings and

[24] continuing education mandated by law in

[25] Pennsylvania?

**Page 19**

[1]    A: Correct.

[2]    Q: And separate and apart from that, is there any

[3] or has there been any training provided only to

[4] West Shore police officers with respect to

[5] handling special needs people?

[6]    A: I would say yes. And the reason I would say

[7] that is because every call we go on is actually

[8] a special needs person. It might be a barking

[9] dog, but to you it's the largest problem in the

[10] world.

[11]    And we are taught to deal with people, to

[12] maintain our composure, to calm them down, and

[13] resolve the issue as reasonably as possible.

[14]    And throughout the years in our officer

[15] safety courses, which are put on by MPOETC and

[16] the mandatory in-service training, those issues

[17] are covered over and over and over again.

[18]    Q: All right. But you're referring to the general

[19] need and the experience that a police officer

[20] gets in dealing with somebody who's in an

[21] upsetting situation, correct, a traumatic

[22] situation?

[23]    A: Everybody's situation is always traumatic, sir.

[24]    Q: Right. I understand that, and I appreciate

[25] that. I just want to make sure I know what

F

[1] you're referring to.

[2]    Now, have you, yourself, as chief

[3] promulgated written procedures — and I'll

[4] first ask this in a general way — written

[5] policies or procedures that are distributed

[6] only to West Shore police officers as opposed

[7] to the general requirements of all police

[8] officers?

[9]    A: Yes. And I believe you have a copy of that.

[10]    Q: All right. And other than what you've supplied

[11] in discovery, is there anything else?

[12]    A: No, sir.

[13]    Q: All right. Have you ever had the occasion to

[14] issue any memoranda about 302 jobs?

[15]    A: I don't remember. I've been around a long

[16] time.

[17]    Q: Fine. But you don't have any specific memory

[18] of having done so?

[19]    A: No.

[20]    Q: Have you, whether it's in writing or not now,

[21] in the context of this question, have you ever

[22] set any policies for West Shore police officers

[23] with respect to what they should do if they

[24] believe they need additional help in executing

[25] a 302 order or warrant?

P

[1]    A: Our officers are— First of all, normally, you

[2] would never go alone. You would always take at

[3] least a second officer with you. In this

[4] particular situation, when they went the first

[5] time in the morning, the two officers went.

[6]    When they went back in the afternoon, two

[7] officers went. There was— If they thought it

[8] was going to be in the afternoon something

[9] worse than what it was in the morning, I'm sure

[10] they would have called for additional backup

[11] from a neighboring department.

[12]    It's commonplace we do that if we need

[13] additional help. So I would say they would

[14] call if they needed help. There is no

[15] restriction on them calling for additional

[16] help.

[17]    Q: So if I understand, you're referring to sort of

[18] a practice within the West Shore. And if I

[19] understand it, you're telling me first of all,

[20] there's no restriction on an officer's ability

[21] to call for outside help?

[22]    A: Correct.

[23]    Q: And if he calls for outside help, it's usually

[24] from a neighboring department?

[25]    A: Correct.

Howard E. Dougherty
August 22, 2002



Keith Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Page 22

[1]  **Q:** And can you give me some examples of the
[2]  neighboring departments that West Shore police
[3]  officers would call on if they anticipated the
[4]  need to do it?
[5]  **A:** In the Schorr case, the closest two departments
[6]  would have been East Pennsboro or Camp Hill.
[7]  It could have been New Cumberland. It could
[8]  have been Lower Allen. It could have been the
[9]  city of Harrisburg.
[10]  However, we normally keep it within the
[11]  county because we have a mutual aid pact
[12]  through the county where we can call the
[13]  others.
[14]  **Q:** So East Pennsboro is within the county?
[15]  **A:** Yes.
[16]  **Q:** And Lower Allen?
[17]  **A:** Is in the county.
[18]  **Q:** And any other neighboring departments?
[19]  **A:** That's about it right there that we have.
[20]  **Q:** Understood. Now, would West Shore police
[21]  officers have access to outside help from
[22]  agencies other than police departments for
[23]  purposes of assistance with 302 jobs?
[24]  **A:** Who do you mean?
[25]  **Q:** Well, I don't mean anyone in particular. But

Page 23

[1]  I'll give you some hypothetical examples. Are
[2]  there any agencies within Cumberland County
[3]  that police officers can call on that you're
[4]  aware of?
[5]  **A:** I'm trying to— I'm going to try to answer
[6]  this in a way in which I'm not being facetious
[7]  or rude. One would think we could call mental
[8]  health to assist us in these, but they were
[9]  never available and they didn't help us. So
[10]  was there anybody there to help? Really, no.
[11]  **Q:** I understand. Now, does your answer imply that
[12]  there had been occasions where MH — I'll use
[13]  the abbreviation MH — was asked for help by
[14]  West Shore police officers?
[15]  **A:** Yes. There may have been those, yes.
[16]  **Q:** And can you describe for us what those, without
[17]  identities of the people, but can you sort of
[18]  generally describe what kinds of incidents and
[19]  examples you're talking about?
[20]  **A:** It might be a 302 commitment. You would ask
[21]  them to send someone. No one was available.
[22]  **Q:** All right. If they were to send someone, would
[23]  it be from a particular unit within the county?
[24]  **A:** I would think they would send it from the
[25]  mental health Crisis.

Page 24

[1]  **Q:** All right. And was there a particular person
[2]  whom the officers would contact?
[3]  **A:** No. They would call Crisis.
[4]  **Q:** Crisis, okay. That's sort of a central—
[5]  **A:** Crisis would tell you that they only have one
[6]  worker on, they can't help you. And they were
[7]  tied up at the hospital, they weren't
[8]  available. The normal.
[9]  **Q:** All right. Can you give me any estimation of
[10]  how often this kind of frustrating contact
[11]  would happen?
[12]  **A:** Every time until the Schorr incident.
[13]  **A:** Every time there was a need — some need arose
[14]  in the 302 job—
[15]  **A:** If you would call, you didn't get an open door.
[16]  It was frustrating.
[17]  **Q:** After the Schorr incident, has it changed?
[18]  **A:** Yes.
[19]  **Q:** In what way has it changed?
[20]  **A:** I told my officers unless someone from mental
[21]  health is there, we do not serve the warrant.
[22]  **Q:** And have they had the occasion to implement
[23]  that policy—
[24]  **A:** Yes.
[25]  **Q:** —since then? And has the county supplied

Page 25

[1]  someone from MH?
[2]  **A:** Someone has come, very begrudgingly, but they
[3]  come.
[4]  **Q:** What kind of a worker or professional comes
[5]  when they come?
[6]  **A:** They send usually one of the people from Holy
[7]  Spirit Hospital Crisis.
[8]  **Q:** And what is the role of such a person on these
[9]  302 jobs?
[10]  **A:** We feel that if we get in a situation that—
[11]  They're not the front line. Please don't
[12]  misunderstand me. But they're there to support
[13]  us and to help with any mental health needs
[14]  that they can do with the assessment and
[15]  telling us of danger, those things.
[16]  **Q:** Okay. And have your officers found that to be
[17]  helpful since the Ryan Schorr incident?
[18]  **A:** I don't know if they find it to be helpful, but
[19]  they're required to do it.
[20]  **Q:** I understand. And again, so I continue to be
[21]  clear, it's usually one crisis intervention
[22]  worker that comes out when these calls are
[23]  made?
[24]  **A:** Yes. And who has no clue of what we're doing.
[25]  **Q:** Understood. Now, when you say usually — when

**Min-U-Script®**    **Filius & McLucas Reporting Service, Inc**

Keith I. Schorr & Susan Schorr  v.                                              Howard E. Doug
Borough of Lemoyne, et al.                                                         August 22,

---

Page 26

[1] you say they have no clue, do you mean — well,
[2] how do you mean that? What facet don't they
[3] understand?
[4]    A: The safety issues, how you enter, so on and so
[5] forth.
[6]    Q: Anything in particular about that that they
[7] misunderstand?
[8]    A: No. We keep them back, but they don't
[9] understand really what we're doing.
[10]    Q: And I guess my question is, how is it that you
[11] know that they don't understand that? Have
[12] your officers complained about it?
[13]    A: They'll even say that.
[14]    Q: Oh, okay. All right.
[15]    A: The first incident we did this with was a few
[16] days after the Schorr shooting. And we had a
[17] female from Crisis come with us. And she was
[18] scared to death, really didn't do anything. It
[19] was just—
[20]    Q: Now, can you approximate for me how many times
[21] since the Ryan Schorr incident there's been a
[22] 302 job where a crisis intervention worker,
[23] however begrudgingly and however cluelessly,
[24] has come out?
[25]    A: I have no idea.

Page 27

[1]    Q: But again, that would be reflected on your logs
[2] someplace?
[3]    A: Right.
[4]    Q: And because of your policy now, every incident
[5] — every 302 job since the Ryan Schorr
[6] incident, a call is made for an MH person; is
[7] that correct?
[8]    A: Yes.
[9]    Q: And did you implement that policy because of
[10] the Ryan Schorr incident?
[11]    A: Yes.
[12]    Q: And tell us why you did it. What about the
[13] Ryan Schorr incident made you feel that it was
[14] appropriate to implement this policy?
[15]    A: The newspaper coverage was very one-sided, I
[16] felt. We were criticized very heavily for the
[17] way in which we handled the incident. Mental
[18] health, whom let him out, never really took the
[19] brunt of what we did.
[20]    And I felt if mental health came and they
[21] were a part of seeing what we have to see on
[22] the front line, they would be a little bit more
[23] astute in paying attention to their customers
[24] and keeping them in the facility where they're
[25] supposed to be.

---

P

[1]    Q: Have you found that the policy has been helpful
[2] in that respect at least?
[3]    A: We haven't had enough of them. I don't know.
[4]    Q: Okay. Let me go backwards one more time
[5] because you told us about these frustrating
[6] contacts with MH before the Ryan Schorr
[7] incident.
[8]    And I should have asked you this question.
[9] Do you have any idea of what percentage of 302
[10] jobs involved one of these calls to MH where
[11] you couldn't get somebody to help?
[12]    A: I don't have any idea.
[13]    Q: Okay.
[14]    A: They're still frustrating now because they
[15] still don't want to send anybody. Let me make
[16] that clear.
[17]    Q: I understand.
[18]    A: We tell them we won't do it until they come.
[19]    Q: I understand. Do you know if it were the
[20] majority of incidents before the Ryan Schorr—
[21]    A: I can't say.
[22]    Q: One way or the other?
[23]    A: I can't say.
[24]    Q: Do you know whether a call was made to MH in
[25] connection with the Ryan Schorr incident?

P.

[1]    A: I don't know.
[2]    Q: All right. I guess the persons who would know
[3] that the best would be Officers Berresford or
[4] Hart?
[5]    A: Correct.
[6]    Q: And is it the officer doing the job who would
[7] typically make these calls to MH or is there
[8] some central person that would call?
[9]    A: The officer would most likely contact the
[10] communications center to make the call.
[11]    Q: And the officers told us a little bit about the
[12] communication center, but bear with me and tell
[13] me again. When you refer to the communication
[14] center, what are you talking about?
[15]    A: Cumberland County Communication.
[16]    Q: Which again, is sort of like a central
[17] dispatch?
[18]    A: It's a 911 center.
[19]    Q: All right. Where is it physically located?
[20]    A: In North Middleton Township near Carlisle.
[21]    Q: You've told us that now that these calls to MH
[22] are made, if — when they send somebody, it's
[23] usually somebody from Holy Spirit. Has there
[24] ever been anyone from somewhere else other than
[25] a Holy Spirit person?

---

Howard E. Dougherty
August 22, 2002

Keith L. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

---

Page 30

[1] **A:** I don't know.

[2] **Q:** Who would know that, if anyone?

[3] **A:** I presume we'd have to go back and look at all

[4] of the logs and make a determination. And the

[5] officer might say that MH responded, but it

[6] might not tell who the individual is.

[7] **Q:** Understood. I want to ask you a few questions

[8] about the Ryan Schorr incident itself. And let

[9] me just start it this way. When did you first

[10] hear about the Ryan Schorr incident?

[11] **A:** I was in the police station when the call came

[12] through.

[13] **Q:** And which call are you referring to?

[14] **A:** The original -- the call of the officer down,

[15] officer needed assistance.

[16] **Q:** And what was done in response to that call?

[17] **A:** One of my corporals was there with me. We

[18] immediately responded to the scene.

[19] **Q:** Who was your corporal?

[20] **A:** Corporal James E. Heck, Jr.

[21] **Q:** So it was the two of you who responded to the

[22] scene?

[23] **A:** Yes.

[24] **Q:** You went out in one or two cars?

[25] **A:** One, I drove.

---

Page 31

[1] **Q:** And how long after the call came in did you

[2] arrive at the scene?

[3] **A:** I have no idea. You'll have to check with the

[4] communications center.

[5] **Q:** Okay. That's fair.

[6] **A:** Rapidly.

[7] **Q:** And the scene, of course, is Ryan Schorr's

[8] apartment?

[9] **A:** Meadow Drive in Camp Hill, yes. Actually, it's

[10] in the Borough of Wormleysburg.

[11] **Q:** When you arrived there, what did you observe?

[12] **A:** When I arrived there, there was a — there were

[13] two observed in front of the building— There

[14] were two West Shore Regional cars in front of

[15] the building. I believe there was an East

[16] Pennsboro car and a Camp Hill car.

[17] **Q:** Now, the two West Shore cars were the cars of

[18] Berresford and Hart. Correct?

[19] **A:** Correct.

[20] **Q:** And the East Pennsboro and Camp Hill cars, were

[21] the policemen in them when you arrived or—

[22] **A:** No.

[23] **Q:** Do you recall who the policemen were? I

[24] recognize we have the records.

[25] **A:** No, I don't. I don't remember who they were.

---

Page 32

[1] There were so many policemen, I don't remember.

[2] **Q:** Fine. What else did you observe when you first

[3] arrived at the scene?

[4] **A:** Just as we were pulling in, they said that the

[5] — something to the effect that there was no

[6] longer a threat. I didn't know what had taken

[7] place in the house at that particular time —

[8] the apartment.

[9]     As I walked into the town house, I walked

[10] through the front door and I stepped in the

[11] front door. I looked up, and two officers —

[12] two policemen were coming down the stairs all

[13] bloody. One was holding his hand up, and blood

[14] was running down his arm.

[15]     At that particular time, to be honest with

[16] you, I didn't recognize either officer. I

[17] wouldn't have known who they were if it hadn't

[18] been for the fact they had West Shore patches

[19] on their shoulders.

[20] **Q:** That's because of the blood?

[21] **A:** Yeah, they were that bloody. I told them, go

[22] out and sit down out front on the stoop,

[23] ambulances were on the way.

[24]     EMS walked up to the top of the stairs,

[25] looked in the bedroom. Ryan Schorr was on the

---

Page 33

[1] floor back against the wall, I think. I don't

[2] really totally remember.

[3]     I told the officers not to let anybody in

[4] the room, secure the crime scene, went

[5] downstairs. Other than when EMS came in to

[6] check Schorr, I told the officers to secure the

[7] building.

[8]     I had them call Cumberland County CID.

[9] Since our officers were involved in the

[10] incident, I felt an outside agency should

[11] investigate.

[12] **Q:** When you arrived at the scene, besides the

[13] police vehicles you described, were there any

[14] other vehicles? Had EMS arrived at that point?

[15] **A:** No.

[16] **Q:** Were there any other official vehicles at the

[17] scene?

[18] **A:** I can't— They're the only two I remember.

[19] **Q:** Fine. Now, how long did you remain at the

[20] scene?

[21] **A:** I remained at the scene until EMS came. Made

[22] sure that — assigned Corporal Heck to make

[23] sure that the crime scene was preserved.

[24]     And when the officers went to the

[25] hospital, I went to notify the wives of the

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Eric L. Schorr  &  Susan Schorr  v.
Borough of Lemoyne, et al.

Howard E. Doug
August 22,

**Page 34**

[1] officers, the wife of Berresford and Harry
[2] Hart's girlfriend, so that they could meet them
[3] at the hospital. And Heck was taking care of
[4] the scene, so I went to the hospital.
[5]   Q: Understood. And which hospital was it?
[6]   A: Harrisburg.
[7]   Q: And did you see the officers at that time?
[8]   A: Yes.
[9]   Q: Did they— Did either or both of them tell you
[10] what had happened at the hospital?
[11]   A: No.
[12]   Q: When did you first speak to the officers about
[13] what had happened with Ryan Schorr?
[14]   A: I didn't.
[15]   Q: Is that for a reason?
[16]   A: Yes.
[17]   Q: And what is the reason?
[18]   A: Because I didn't want to take the criminal
[19] investigation. If I ask them questions, under
[20] administrative law that makes them immune from
[21] any prosecution. And I didn't want to do that.
[22]   Q: All right. When you got to the hospital, did
[23] you find out anything about the physical
[24] condition of the officers?
[25]   A: Yes.

**Page 35**

[1]   Q: And what did you find out?
[2]   A: Berresford, I believe it was his left hand had
[3] a hole in his hand here (indicating) and his
[4] finger was just dangling. They were going to
[5] transfer him to Polyclinic Hospital, I believe
[6] it was, for surgery to remove the finger.
[7]     He also had several places on him where he
[8] was — they stitched him up, several gashes
[9] where he was hit.
[10]     Hart had a large contusion on the bridge
[11] of his nose. I believe his nose was broke. It
[12] looked that way to me anyway. He also had a
[13] gash on the top of his head.
[14]     I think Berresford had a long gash on the
[15] top of his head that took several stitches to
[16] close. Both of them were banged up pretty
[17] good.
[18]   Q: And I had the chance to ask the officers this,
[19] so I know the answer generally, eventually they
[20] returned to duty, both of them. Correct?
[21]   A: Correct.
[22]   Q: And are they both on duty now? Not at this
[23] moment, but are they—
[24]   A: Correct.
[25]   Q: They're active West Shore police officers?

P

[1]   A: Yes. Earlier in your testimony, you told me
[2] that you felt that the press coverage was
[3] one-sided — I think that was your phrase —
[4] press coverage of this Schorr incident and that
[5] MH did not take the same hit that the West
[6] Shore police did. Is that a fair
[7] characterization?
[8]   A: Yes.
[9]   Q: Can you tell me just a little bit more about
[10] that? In what manner do you think the press
[11] coverage was one-sided?
[12]   A: The press coverage appeared as though the
[13] officers just walked in and gunned the man
[14] down. That isn't really what occurred.
[15]   Q: And so let me give you this opportunity to tell
[16] me, what is your view of what happened that
[17] day?
[18]   A: My view of what happened was the officers tried
[19] to do everything they could to try to resolve
[20] the matter without the use of deadly force and
[21] finally were required to use it in order to
[22] save their own lives.
[23]   Q: Now, there are, I recognize, policies
[24] applicable to the West Shore police with
[25] respect to the use of force. Correct?

Pa

[1]   A: Correct.
[2]   Q: And the West Shore police follow, in general
[3] terms now, the notion of a continuum of force.
[4] Is that accurate?
[5]   A: Yes.
[6]   Q: Does that use of force policy have any
[7] reference to — I'll call this a small question
[8] — to the small question of when an officer
[9] should remove or should unclasp the strap on
[10] his gun — on his holster of his gun?
[11]   A: No, I don't believe it does. I don't recall it
[12] anyway.
[13]   Q: Is there, in practice, an informal policy with
[14] respect to when an officer should do that?
[15]   A: I think it has to be at the officer's
[16] discretion. And I think it has to be whether
[17] they perceive a threat or not. I think that
[18] would be the issue.
[19]   Q: And whether or not they perceive a threat —
[20] the threat that they would perceive, if they
[21] were to do that, would be a threat that might
[22] force them to use their gun at some point. Is
[23] that accurate?
[24]   A: It could be.
[25]   Q: Could it be anything else or—

Howard E. Dougherty
August 22, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et a

Page 38

[1] **A:** Well, you know, when you say use the gun, you
[2] mean to draw the gun or to discharge the gun?
[3] **Q:** To draw the gun.
[4] **A:** Yes. To draw the gun.
[5] **Q:** Which I agree is different from discharging.
[6] **A:** Yes, yes.
[7] **Q:** When should an officer draw his gun?
[8] **A:** Imminent threat.
[9] **Q:** Of some sort of physical harm?
[10] **A:** Yes. Or the possible injury of a third person.
[11] **Q:** After you left the scene— Well, after you
[12] left the hospital the day of the Ryan Schorr
[13] incident, did you have any other direct
[14] personal involvement in the situation involving
[15] the Ryan Schorr shooting?
[16] **A:** I went back to the scene, and yes, I did.
[17] There was a window which was broke out in the
[18] kitchen. And they were trying to secure the
[19] crime scene to close it up because they were
[20] done there and they might have to come back.
[21] And I went and got the maintenance man,
[22] because I used to live in that complex, and got
[23] a new window put in. It's not much, but I was
[24] involved.
[25] **Q:** When was that?

Page 39

[1] **A:** This was later in the day, but I have no idea
[2] when.
[3] **Q:** Was it the same day?
[4] **A:** Same day, same day.
[5] **Q:** All right. But after that day, you didn't have
[6] any— Well, first of all, you didn't have any
[7] physical presence at the site anymore. Is that
[8] accurate?
[9] **A:** That's correct. I never went back there again.
[10] **Q:** And were you personally involved in any
[11] investigation or evaluation of what had
[12] happened?
[13] **A:** No. That was done by the District Attorney's
[14] office.
[15] **Q:** All right. Were you, yourself, interviewed by
[16] the District Attorney's office or anyone from
[17] there?
[18] **A:** I don't ever remember being interviewed by
[19] them. I kind of slipped through the cracks.
[20] **Q:** Did you submit any writing to the District
[21] Attorney's office?
[22] **A:** No.
[23] **Q:** And were you asked to?
[24] **A:** No.
[25] **Q:** Okay.

Page 40

[1] **A:** I feel the reason for that is I wasn't really
[2] directly involved in the investigation. I
[3] really didn't do anything.
[4] **Q:** I understand.
[5] **A:** That's the reason why.
[6] **Q:** No, I understand. I asked you quite a few
[7] questions about how many police officers are
[8] employed by the West Shore Regional Police.
[9] But can you tell me how many employees in
[10] general they have?
[11] **A:** We have 16.
[12] **Q:** Including the police officers?
[13] **A:** Including the police officers. We have two
[14] civilian personnel.
[15] **Q:** And what are their jobs?
[16] **A:** One does the accounts receivable/accounts
[17] payable/payroll, a general secretary. She's
[18] the administrative assistant. And the other
[19] lady does crime scene investigations and then
[20] does general office work and processing of
[21] evidence, so on and so forth.
[22] **Q:** Are they both — both those civilians full-time
[23] employees?
[24] **A:** Yes.
[25] **Q:** Before the Ryan Schorr incident that ended in

Page 41

[1] Schorr's death, had you known Ryan Schorr?
[2] **A:** No.
[3] **Q:** Had you had any involvement in any police
[4] encounters with Ryan Schorr?
[5] **A:** Not— I hadn't, no.
[6] **Q:** I understand. And I think we have some
[7] information that— Well, let me ask you this.
[8] Do you know whether other West Shore police
[9] officers had had any prior involvement with
[10] Ryan Schorr?
[11] **A:** It was my understanding they were there the
[12] night before, if my memory is correct.
[13] **Q:** All right. Other than that possible prior
[14] involvement, are you aware of any other—
[15] **A:** I'm not aware of any, no.
[16] **Q:** Did you ever have any conversations with either
[17] of Ryan Schorr's parents, Susan or Keith
[18] Schorr?
[19] **A:** No.
[20] **Q:** At our little caucus here, a question was
[21] raised, but I think you've already told us
[22] this. On the day of the Ryan Schorr incident,
[23] you, yourself, were on duty. Correct?
[24] **A:** No.
[25] **Q:** Oh, you were not. I'm sorry.

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.



Howard E. Dough
August 22, 2

Page 42

[1] A: I was in the station.
[2] Q: You just happened to be in the station?
[3] A: I was in the station. The corporal just
[4] happened to be in the station.
[5] Q: All right. Who was the officer in charge at
[6] the time of the Schorr incident, if you know?
[7] A: It would probably be Gary, because I think it
[8] was his zone. I don't know for sure on that
[9] because I never really looked. But he would
[10] have been in charge of that particular
[11] incident.
[12] Q: Was— I mean, if you and the corporal just
[13] happened to be in the station at that time, was
[14] there a police officer who was scheduled to be
[15] in the police station at the time or not?
[16] A: No. We were just there. I go in every
[17] Saturday and every Sunday.
[18] Q: All right. So if I understand it then, it's
[19] not always the case that there's a police
[20] officer in the station?
[21] A: Correct.
[22] Q: So who's in the station?
[23] A: No one.
[24] Q: All right. And is that because calls can come
[25] in through—

Page 43

[1] A: The 911 center.
[2] Q: —the 911 center?
[3] A: Our office is open from 7 a.m. to 3:30 p.m. —
[4] or 3 p.m. — excuse me — Monday through
[5] Friday.
[6] Q: Let me just caucus outside for a minute or two,
[7] and we'll be able to wrap this up.
[8] (A recess was taken.)
[9] BY MR. WILLIAMS:
[10] Q: Chief, just a couple more things. You told us
[11] that when you were in the station on the day of
[12] the Ryan Schorr incident, you heard the officer
[13] down call. Had you heard any other calls
[14] related to Ryan Schorr on that particular day?
[15] A: No.
[16] Q: The officer down call that you heard, I guess
[17] you should tell us how it is that you would
[18] hear it in the station. Do you hear all the
[19] calls that go into central?
[20] A: Yes. We have a— Actually, I was out in the
[21] officer's bay area at that particular time.
[22] And Corporal Heck and I were doing a project.
[23] And we heard the actual radio call from
[24] the officer saying that an officer was down,
[25] asking for help and EMS — for additional

Pag

[1] assistance in EMS. And that's when we went.
[2] Q: But, I mean, divorcing it a little bit from the
[3] Ryan Schorr call, if it had been a garden
[4] variety 911 call and you happened to be there,
[5] would you have heard it?
[6] A: I would have heard it, yes.
[7] Q: Now, we have been told in some other discovery
[8] from the county that at various times before
[9] the Ryan Schorr incident, the county held
[10] various breakfast meetings and other meetings
[11] and educational opportunities for local police
[12] agencies to come and discuss the needs of
[13] emotionally disturbed persons. Let me ask you
[14] first of all, do you recall any such meetings
[15] or breakfasts?
[16] A: I don't recall.
[17] Q: Did you ever attend any?
[18] A: I have no idea.
[19] Q: Okay.
[20] A: I attend so many, I really can't say.
[21] Q: I understand. So do you know whether or not
[22] you were invited to any by the county?
[23] A: I don't recall. I apologize, but I just don't.
[24] Q: No apology necessary. That's a perfectly
[25] legitimate answer. Now, when we were

Pag

[1] discussing the — I'll call them the preRyan
[2] Schorr contacts with MH by the West Shore
[3] police, which you described as frustrating, I
[4] probably should have asked you this.
[5]   Besides the people at MH, people from —
[6] through the county MH, were you aware before
[7] the Ryan Schorr incident of any other possible
[8] sources of help other than local neighboring
[9] police departments?
[10] A: Such as?
[11] Q: Again, I don't have any examples in mind. I
[12] just wanted to know if you knew of any?
[13] A: Immediately, no.
[14] Q: Now, let's focus on the time now before the
[15] Ryan Schorr incident. Was there in place any
[16] policy or practice at West Shore which would
[17] require — I may be misusing the term — but
[18] which would require an officer to have contact
[19] with an emotionally disturbed person's family
[20] when they were attempting to execute a warrant
[21] on them?
[22] A: I don't understand your question.
[23] Q: Well, I don't blame you. That's a very
[24] confusing question. Were there any practices
[25] or policies in place whereby an officer dealing

Howard E. Dougherty
August 22, 2002

Keith I. Schorr & Susan Schorr v
Borough of Lemoyne, et a



Page 46

[1] with an emotionally disturbed person would
[2] contact a family member of that person?
[3]    A: Any policy?
[4]    Q: Let's start with that, any policy?
[5]    A: No.
[6]    Q: And when you say no, there was no policy,
[7] you're referring to a formal, written policy?
[8]    A: Formal, written policy.
[9]    Q: All right. But was there a custom or practice
[10] whereby an officer would do that?
[11]    A: I'm going to say no. And the reason— Let me
[12] preface my answer.
[13]    Q: Sure.
[14]    A: Normally, when you do a 302 commitment, the
[15] majority of the time, the 302 commitment is
[16] signed by the family. I would say the vast
[17] majority of the time.
[18]    Therefore, when we serve the commitment
[19] and take them to the facility, the facility
[20] normally calls and tells them where they are.
[21] We normally don't have contact with the
[22] individuals, no.
[23]    Q: All right. And I think the focus — I know the
[24] focus of my question was intended to be a
[25] little bit different. And that is, was there a

Page 47

[1] policy or practice to utilize family members
[2] for help in dealing with the emotionally
[3] disturbed person?
[4]    A: There is not a written policy, no. Through my
[5] past experience, I've found that that sometimes
[6] makes the situation worse, particularly if the
[7] family member was the one who signed the
[8] commitment, because then the child or whomever
[9] the person is, they have a tendency to be
[10] aggressive towards those individuals.
[11]    So I would think that that wouldn't always
[12] be the best policy, because I feel that that
[13] could cause additional problems at the
[14] particular time in which you're trying to — I
[15] don't want to say take them into custody but to
[16] take them in for evaluation.
[17]    Q: I understand. It could aggravate the
[18] situation?
[19]    A: Yes, it can.
[20]    Q: Again, in some discovery from some other
[21] parties, we've heard about the formation since
[22] the Ryan Schorr incident of various crisis
[23] intervention policy teams and committees,
[24] groups attempting to improve the way in which
[25] emotionally disturbed persons have contact with

Page 48

[1] the mental health and police systems. Are you
[2] aware of those organizations?
[3]    A: Yes.
[4]    Q: What is your awareness of that?
[5]    A: They're trying to develop teams which will go
[6] out with the initial responding officers in
[7] order to be able to help them with an
[8] individual who's combative or might not even be
[9] combative but to help them.
[10]    Q: When you say "they're" trying to do that, who
[11] do you mean, the county?
[12]    A: It's Cumberland County.
[13]    Q: And have you, as chief of the West Shore
[14] police, been asked to participate in any of the
[15] planning of such teams or—
[16]    A: They had a representative on this committee who
[17] was appointed by the West Shore — not the West
[18] Shore, the Cumberland County Chiefs of Police.
[19] He resigned sometime this year, and I was asked
[20] to replace him, which I did.
[21]    Q: And what's the name of the organization or the
[22] committee or the group or whatever it is?
[23]    A: I think it's the policy justice committee or—
[24] I don't remember the exact name.
[25]    Q: I understand. And does it meet on a regular

Page 49

[1] basis or—
[2]    A: Yeah. They're formulating policy now and
[3] developing it and getting it ready to
[4] distribute.
[5]    Q: And whatever it is, will it involve a crisis
[6] intervention team going out with the officers?
[7]    A: That's what they're proposing.
[8]    Q: And who would have to approve such a procedure?
[9]    A: (No response)
[10]    Q: Well, that's another bad question. The team or
[11] the committee is likely to be proposing such a
[12] team, I think you've told me. But what — how
[13] would such a team become a reality? What steps
[14] would the procedure have to go through?
[15]    A: It will be imposed, I would imagine, through
[16] the District Attorney's office. That's— I'm
[17] reasonably sure that's what it was when they
[18] were developing it.
[19]    And the employees on this team — I say
[20] employees, the responding people — would be
[21] through the District Attorney's office, if
[22] that's— I think that's what it was.
[23]    Q: All right. That's all we have, Chief. Thank
[24] you.
[25]    A: Thank you.

Keith I. Schorr & Susan Schorr, v.
Borough of Lemoyne, et al.



Howard E. Doug
August 22,

---

Page 50

EXAMINATION

BY MR. YANINEK:

[1] Q: Chief, my name is John Yaninek. I represent
[4] Holy Spirit Hospital, and I also represent
[5] Cumberland County. I have a few questions to
[6] ask you.
[7]     With regard to 302 service of writs,
[8] around the time of the Ryan Schorr incident —
[9] when I say incident, I mean his death — did
[10] you personally serve 302 warrants?
[11] A: Have I?
[12] Q: No. During that time period, not ever. Was it
[13] within your job description, your duties and
[14] responsibilities as the chief of West Shore
[15] Regional Police, to serve 302s?
[16] A: I do everything that everyone else does.
[17] Q: Okay.
[18] A: Not on as regular a basis as they do, but I do
[19] everything everyone else does.
[20] Q: When, previous to the Ryan Schorr incident, had
[21] you had an opportunity to serve a 302 order?
[22] A: I don't remember. I can't really answer that.
[23] I don't know.
[24] Q: Would it have been within that year or—
[25] A: I can't say.

Page 51

[1] Q: I guess the reason for my question is that you
[2] made certain statements related to how the
[3] department couldn't get any help from the
[4] people at Crisis.
[5]     I wanted to know if those were from your
[6] personal knowledge and experience or from
[7] something that maybe some of the other officers
[8] may have told you?
[9] A: From both.
[10] Q: Okay.
[11] A: The best example I can give you is after the
[12] Schorr incident, it seems to me it was a day or
[13] two afterwards, we had a 302 commitment come
[14] in. We called the hospital.
[15]     They said, we don't have anybody to send
[16] you. We're sorry. And I told them, we're not
[17] going to serve the thing. Send down the county
[18] administrator. The county administrator won't
[19] come. I said, well, we're not going to serve
[20] the commitment until someone comes.
[21]     So I went — I was off duty, went to the
[22] office, waited for that person to come, which
[23] took a period of time, and then we went and
[24] served the commitment.
[25] Q: I want to kind of focus your attention—

---

P

[1] A: So even after the incident, we still had
[2] problems getting people to do it.
[3] Q: Okay. I understand what you're saying as far
[4] as after the incident is concerned. My
[5] question really deals with before the incident
[6] — prior to the incident.
[7] A: All right.
[8] Q: What experience— Do you have any personal
[9] memory of an experience that you had where you
[10] tried to deal with Crisis and you were told for
[11] some reason that they couldn't help you?
[12] A: I don't recall right now. You know, to say one
[13] case, I can't do that, no.
[14] Q: In that same mind-set, prior to the Schorr
[15] incident, do you recall an incident where
[16] perhaps one of your officers came to you and
[17] complained about a situation where they didn't
[18] get the assistance they needed from Crisis?
[19] A: Yes.
[20] Q: Can you—
[21] A: I can't tell you what they are.
[22] Q: Okay.
[23] A: You know, we handle 5,000 calls a year. They
[24] all run together. I hate to admit that, but
[25] they do.

P:

[1] Q: So would it be fair to say then your knowledge
[2] of a problem with Crisis prior to the Schorr
[3] incident is more centered around what one of
[4] your other officers may have told you about the
[5] problems with Crisis?
[6] A: That and the fact of the amount of people who
[7] walk away.
[8] Q: And how did you obtain knowledge of that?
[9] A: Of the walk-aways? Radio transmissions, the
[10] officers informing me of another walk-away from
[11] Holy Spirit.
[12] Q: Prior to the Schorr incident, how many
[13] walk-aways did your department have an
[14] involvement with?
[15] A: I can't give that you. But if you check with
[16] East Pennsboro Township, they did an analysis
[17] of walk-aways that were reported to them by
[18] Holy Spirit. And they have a detailed
[19] breakdown on all of them.
[20] Q: My question is as far as your knowledge
[21] specific to any walk-aways which may have
[22] occurred at Holy Spirit.
[23] A: More than one. I can tell you that.
[24] Q: But you can't give me a specific amount?
[25] A: No, no.

---

Howard E. Dougherty
August 22, 2002

Keith I. Schorr & Susan Schorr
Borough of Lemoyne, et

Page 54

[1]   **Q:** I want to shift your attention to some of the
[2] measures that you took as a police chief
[3] subsequent to Ryan Schorr's — the Schorr
[4] incident. You talked about making sure that
[5] you got somebody from MH and MR to come with
[6] you to serve a 302. You follow me?
[7]   **A:** Yes.
[8]   **Q:** And is it fair to say you took that action as a
[9] result of the Ryan Schorr incident?
[10]  **A:** Yes.
[11]  **Q:** And is it fair to say that you took that action
[12] in hopes that it would somehow perhaps prevent
[13] another incident of Ryan Schorr — another Ryan
[14] Schorr type incident in the future?
[15]  **A:** Yes. And let me preface that. The way we
[16] serve a 302 commitment today is no different
[17] than we served a 302 commitment prior to Ryan
[18] Schorr's death. That's extremely important to
[19] tell you that.
[20]     The only reason we have mental health
[21] there is: Number 1, as an insulation, so to
[22] speak, because no one can say if we have an
[23] outside observer who can say that we did
[24] everything according to the numbers which is
[25] very important; Number 2, I think if they see

Page 55

[1] the difficulty we have in sometimes taking
[2] these people in for this evaluation, I think
[3] they would have a better understanding of why
[4] they should be more secured. And they would be
[5] more cognizant of walk-aways.
[6]   **Q:** Just let me summarize. Is it fair to say then
[7] that this subsequent remedial measure that you
[8] took was in hopes of preventing another Ryan
[9] Schorr type incident?
[10]  **A:** No, I didn't say that.
[11]  **MR. MacMAIN:** Let me— I think he
[12] explained it was not a substantive remedy,
[13] rather, it was more procedural. But you can
[14] answer the question.
[15]  **A:** Say your question again. I can't remember it.
[16]  **MR. YANINEK:** Could you read it back?
[17]  (Question from Page 55, Lines 6 through 9
[18] read by reporter.)
[19]       **BY MR. YANINEK:**
[20]  **Q:** Did you have something more to say?
[21]  **A:** No.
[22]  **Q:** I don't have any further questions.
[23]  **MR. MacMAIN:** I have a few.
[24]  **MR. WILLIAMS:** Let me ask my follow-ups in
[25] case you want to follow up on that.

Page

[1]  **MR. MacMAIN:** Sure.
[2]       **REEXAMINATION**
[3]       **BY MR. WILLIAMS:**
[4]   **Q:** Is there— Who's the chief at East Pennsboro?
[5]   **A:** Dennis McMasters.
[6]   **Q:** And is it Chief McMasters who would have this
[7] walk-away analysis?
[8]   **A:** Yes.
[9]   **Q:** Has he shared it with you, Chief?
[10]  **A:** Yes.
[11]  **Q:** What do you recall it saying?
[12]  **A:** I don't remember. I believe I sent it out in
[13] the discovery information because when I
[14] received it, I stuck it in my file.
[15]  **Q:** All right.
[16]  **A:** You have everything that I have.
[17]  **Q:** I understand and respect that. Can you though,
[18] as you sit here today, give us any estimate,
[19] based on your own experience or recollection,
[20] as to what the volume of walk-aways is at Holy
[21] Spirit?
[22]  **A:** I don't remember. I wish I did, but I don't.
[23]  **Q:** All right. And when you were sort of
[24] describing the walk-away analysis and giving
[25] that to John as one of the reasons you had, I

Page 57

[1] guess, come to be frustrated with MH, you
[2] suggested that, you know, maybe if they saw
[3] what the police have to go through, they would
[4] be a little more secure over at Holy Spirit.
[5] Do you recall saying that?
[6]   **A:** Yes.
[7]   **Q:** And I guess my question is, what did you mean
[8] by that? What lack of security did you
[9] perceive at Holy Spirit?
[10]  **A:** I don't see a— What I'm saying is, if they
[11] saw the steps that we have to go through to
[12] take them in for the evaluation and how
[13] difficult it is for us to do this at times
[14] because people sometimes lock themselves in,
[15] they barricade themselves, they do different
[16] things, I think if they're there and they see
[17] what we have to do, I think it will help.
[18]     They're going to say, you know, we better
[19] take this step, this step, this step, because
[20] this could happen again. And I feel it would
[21] be a prevention thing.
[22]  **Q:** All right. But, I mean, what would they do to
[23] prevent the number of walk-aways?
[24]  **A:** To ensure that things are secured properly and
[25] the individuals are secured properly and things

Page 54 - Page 57  (16)

Keith I. Schorr & Susan Schorr 
Borough of Lemoyne, et al.

Howard E. Dough 
August 22, 2

---

Page 58

[1] of that nature.
[2] **Q:** I understand. And is it your belief that that
[3] wasn't done prior to the Ryan Schorr incident?
[4] **A:** With the Ryan Schorr incident, I don't believe
[5] it was done.
[6] **Q:** And what's the basis of that belief?
[7] **A:** Because he walked away and he was dangerous.
[8] **Q:** And do you have a belief of what they could
[9] have done to prevent his walking away?
[10] **A:** I don't— I can't say what they could have
[11] done. It's all— We can all be an armchair
[12] quarterback. I think they have to evaluate
[13] their system and determine what they have to
[14] do. I don't think they've done that.
[15] **Q:** Thank you. That's all I have.
[16] MR. MacMAIN: I've got a few questions,
[17] some of which have just been answered.
[18]                 **EXAMINATION**
[19]              **BY MR. MacMAIN:**
[20] **Q:** You said the officers, in terms of dealing with
[21] emotionally disturbed persons, get training
[22] during Act 120 or basic training?
[23] **A:** Correct.
[24] **Q:** They get courses during their Act 180 or yearly
[25] update courses. That topic may be part of a

Page 59

[1] larger topic?
[2] **A:** Yeah, it could be something like officer
[3] safety, it could be force continuum, whatever
[4] it may be.
[5] **Q:** And then officers, in addition to the mandatory
[6] yearly updates, also attend nonmandatory
[7] courses?
[8] **A:** Yes.
[9] **Q:** And that's all paid for by the department?
[10] **A:** Correct.
[11] **Q:** And would it be fair to say that on-the-job
[12] handling of calls would also be considered
[13] training?
[14] **A:** Yes.
[15] **Q:** You had said after this Schorr incident that
[16] you now have someone from mental health come
[17] out to the scene. Subsequently, do they do
[18] anything differently than what was done prior
[19] to the Schorr incident?
[20] **A:** No.
[21] **Q:** You said that you weren't involved in the
[22] investigation which was undertaken by the
[23] District Attorney's office. Why not?
[24] **A:** Because with our officers being involved, I
[25] felt that it had to be an outside neutral

---

Pag

[1] agency doing the investigation. And I
[2] completely stayed out of it.
[3] **Q:** After the investigation was completed and the
[4] grand jury issued its opinion, did you reach
[5] any conclusions regarding the actions of your
[6] officers?
[7] **A:** Yes. I used the grand jury document to
[8] determine if our officers had acted maliciously
[9] or had violated any law. And the grand jury's
[10] conclusion was that the officers acted in
[11] self-defense and that the procedures of the
[12] department had been followed.
[13] **Q:** And did you reach the same conclusion? Was
[14] there any violations of policy or inappropriate
[15] conduct or behavior by the officers?
[16] **A:** No.
[17] **Q:** You were asked about whether on occasion
[18] officers may contact family members in a 302
[19] commitment. You said sometimes maybe they
[20] should, sometimes maybe they shouldn't.
[21] **A:** It can be— Depends on the situation.
[22] **Q:** So if, for example in this incident, when the
[23] officers called Ryan's mother, there would be
[24] an opportunity for a family member to say, be
[25] careful, this person is dangerous, wait for

Pag

[1] backup, things of that nature?
[2] **A:** Yes, it could be.
[3] **Q:** And do you have any knowledge whether Ms.
[4] Schorr gave any type of information or advice
[5] to the officers prior to going into the
[6] premises?
[7] **A:** No, I don't.
[8] **Q:** And would it be fair to say the family member
[9] would certainly know more about their son than,
[10] say, the officers who had never dealt with him
[11] prior to this day?
[12] **A:** Correct.
[13] **Q:** At any point prior to the Schorr incident, had
[14] there ever been any problems brought to your
[15] attention regarding the way 302 calls were
[16] handled by your officers?
[17] **A:** No.
[18] **Q:** Had there been any lawsuits about 302
[19] commitments or dealing with emotionally
[20] disturbed persons?
[21] **A:** No.
[22] **Q:** To your knowledge, had there been any
[23] complaints of any nature by citizens against
[24] either officer Hart or Berresford prior to the
[25] Schorr incident?

---

**Filius & McLucas Reporting Service, Inc.**    **Min-U-Script®**

Howard E. Dougherty
August 22, 2002

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.



Page 62

[1]  **A:** No.

[2]  **Q:** In, say, 10 years prior to this incident, had

[3]  there ever been a shooting involving a West

[4]  Shore Regional Police Department officer?

[5]  **A:** No.

[6]  **Q:** Over the course of your career as a police

[7]  professional, have you had training and

[8]  experience in dealing with persons under the

[9]  influence of controlled substances?

[10]  **A:** Yes.

[11]  **Q:** Have you had training or experience with

[12]  persons under the influence of Ecstasy?

[13]  **A:** Yes.

[14]  **Q:** Do you have an understanding of what effect

[15]  Ecstasy would have on the individual?

[16]  **A:** Yes. It's mind-altering and it also gives

[17]  illusions of grandeur.

[18]  **Q:** That's all the questions I have.

[19]  **MR. WILLIAMS:** I don't have any follow-up.

[20]  **MR. YANINEK:** I don't have any other

[21]  questions.

[22]  **MR. WILLIAMS:** Thank you, Chief.

[23]    (The proceedings concluded at 3:31 p.m.)

[24]

[25]

Page 63

COMMONWEALTH OF PENNSYLVANIA   :
                              : SS
COUNTY OF DAUPHIN             :

   I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:
         HOWARD E. DOUGHERTY
   I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.
   I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
   Dated at Harrisburg, Pennsylvania this 1st day
of September, 2002.
         Debra L. Heary
      Registered Professional Reporter
            Notary Public
(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

**Min-U-Script®**    Filius & McLucas Reporting Service, Inc.

EXHIBIT
J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR,   :
In their own right and as personal   :
representatives of the Estate of RYAN K.   :
SCHORR,   :
   :
       Plaintiffs,    .   :
   :
   :
     vs.   :  No. 1:CV-01-0930
   :
WEST SHORE REGIONAL POLICE   :
COMMISSION, HOWARD DOUGHERTY,   :
CUMBERLAND COUNTY, ROBERT   :
GORIL and HOLY SPIRIT HOSPITAL,   :
   :
       Defendants.   :

## OBJECTIONS AND RESPONSES TO
### PLAINTIFFS' FIRST SET OF INTERROGATORIES ADDRESSED
### TO DEFENDANT WEST SHORE REGIONAL POLICE COMMISSION

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant West Shore

Regional Police Commission ("the West Shore Police Department"), by and through undersigned

counsel, Montgomery, McCracken, Walker & Rhoads, LLP, hereby responds to Plaintiffs' First

Set of Interrogatories as follows:

### GENERAL CONDITIONS

1.     These responses are made without in any way waiving or intending to waive, but

on the contrary intending to preserve and preserving:

     A.     all objections to competency, relevancy, materiality, privilege, and

admissibility as evidence for any purpose in any subsequent proceedings or the trial of this or

any other action;

8.    For each of the years 1998, 1999 and 2000, state the number of warrants or orders issued under §302 of the Mental Health Procedures Act served, issued or carried out by West Shore Regional Police Commission officers.

**RESPONSE:**

Subject to, and without waiver or limitation of, the foregoing objections, the West Shore Police Department responds as follows:

In years 1998, 1999 and 2000, the West Shore Police Department served the following number of warrants or orders issued under §302 of the Mental Health Procedures Act: (a) 1998 - 7; (b) 1999 - 4; and (c) 2000 - 4.

-10-

9.    With respect to the activities referenced in Interrogatory no. 8 state the number of times (in each year) which (a) resulted in the use of force by police officers, and/or (b) resulted in physical injury to any police officer or to any civilian or subject of an order or warrant issued under §302.

**RESPONSE:**

Subject to, and without waiver or limitation of, the foregoing objections, the West Shore

Police Department responds as follows:

In years 1998, 1999 and 2000, the number of times in which the use of force resulted

from the serving of warrants or orders issued under §302 of the Mental Health Procedures Act

was: (a) 1998 - 0; (b) 1999 - 0; and (c) 2000 - 1. In years 1998, 1999 and 2000, the number of

times in which physical injury resulted to a police officer or civilian from the serving of warrants

or orders issued under §302 of the Mental Health Procedures Act was: (a) 1998 - 0; (b) 1999 - 0;

and (c) 2000 - 1.

-11-

19.    Identify with specificity the name of any employee designated by the defendant to coordinate compliance with Title II of the ADA.  Include job title and date of such designation.

**OBJECTION:**

The West Shore Police Department objects to such interrogatory as it is so broad as to seek information which is not relevant to the subject matter of this action, as to which information would be inadmissible at trial, and which is not reasonably calculated to lead to admissible evidence.

**RESPONSE:**

Subject to, and without waiver or limitation of, the foregoing objections, the West Shore Police Department responds as follows:

None.


Dated: January 2, 2002

David J. MacMain (Pa. Atty. I.D. No. 59320)
Gregory J. Hauck (Pa. Atty. I.D. No. 82958)
MONTGOMERY, MCCRACKEN,
   WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109-1099
(215) 772-1500

Attorneys for Defendants West Shore Regional
Police Commission and Chief Howard E. Dougherty

-21-

## VERIFICATION

I, Howard E. Dougherty, on behalf of the West Shore Regional Police Commission,

verify that the statements in the foregoing Objections and Responses to Plaintiffs' First Set of

Interrogatories Addressed to Defendant West Shore Regional Police Commission are true and

correct to the best of my knowledge, information and belief.  I understand that I am making this

Verification subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn

falsification to authorities.

Dated:  December 27, 2001

Howard E. Dougherty



EXHIBIT
K

# MANDATORY INSERVICE TRAINING
## 1991 THROUGH 2002

**(91-102) Civil-Criminal Liability, Authority and Jurisdiction (3 hour Required)**
This is a 3 hour course of instruction on the areas of civil and criminal liability and how these issues effect police officers. The course includes a discussion of civil rights violation situations and defenses in civil suits. In addition, the course will cover the Municipal Police Jurisdiction Act in detail. MPOETC mandated course and passing a test is required to successfully complete the course.

**(91-103) Use of Force (3 hour Required)**
This is a three hour course of instruction on the principles of justification for the use of force and deadly force by police officers in Pennsylvania. The course includes an in-depth review of Chapter 5 of the Crimes Code as well as a discussion of the Supreme Court's decision in Tennessee v. Garner. In addition, this course will cover other topics such as the use of tactics, judgement, and restraint in situations, in order to limit the use of force to that which is "necessary and reasonable". MPOETC mandated course and passing a test is required to successfully complete the course.

**(91-104) Evidence, Arrest, and Legal Update (3 hour Required)**
This course involves three separate 1 hour blocks of instruction on the preservation and collection of evidence, laws of arrest, and a legal update. The topics in the Evidence course include protecting the crime scene, methods of collecting and packaging physical evidence, and documenting the chain of custody.

The Arrest course includes an in-depth discussion of Probable Cause, the officer's authority to arrest with or without a warrant, and balancing the power of arrest with discretion and respect for state laws and the U.S. Constitution.

Since police officers must constantly stay abreast of law changes and recent court decisions, the Legal Update course will provide officers with instruction on the recent changes in the Crimes Code, Rules of Criminal Procedure along with a review of federal and state court decisions that effect law enforcement officers in Pennsylvania. MPOETC mandated course and passing a test is required to successfully complete the course.

**(91-105) Search and Seizure (Vehicles) (3 hour Required)**
This is a three hour course on the laws and rules of Search and Seizure as they apply to vehicle searches. The course includes an in-depth review of the Fourth amendment, applicable court cases, and focuses on the exceptions to search warrant requirements when searching vehicles in field situations. MPOETC mandated course and passing a test is required to successfully complete the course.

**(92-201) Legal Update (3 hour Required)**
This four hour course, required for all municipal police officers in Pennsylvania, covers significant changes during the last three years in Pennsylvania's Vehicle Code; changes in the Crimes Code of Pennsylvania since December 1990; and a review of the Use of Force by police officers.

**(92-202) Search & Seizure, Non-Motor Vehicle (3 hour Required)**
This three hour course, required for all municipal police officers in Pennsylvania, covers establishing probable cause for a search; procedures to be followed to obtain a search warrant; procedures to be followed during a non-vehicle search; and a review of appropriate case law.

W 00196



**(92-301) Officer Safety I (3 hour Elective)**
This three hour elective course, is designed to make police officers aware of safety concerns confronting law enforcement officers today with a focus on mental and physical preparation. Issues discussed during the course include scene awareness, complacency, vehicle pursuits, and handgun retention.

**(92-302) Officer Safety II (3 hour Elective)**
This three hour elective course, is designed to prepare police officers to successfully respond to situations encountered in the field, such as traffic stops. Using a video/discussion method, the course includes topics such as tactical considerations when making low, unknown, and high risk vehicle stops with the safety of the officer and motorist in mind.

**(92-303) Traffic Update (3 hour Elective)**
This three hour elective course covers emerging issues in traffic enforcement including recent changes in laws pertaining to the licensing of drivers, proper procedures when first responding to traffic accidents involving hazardous materials, and enhancing DUI enforcement efforts, with a focus on the successful presentation of cases in court.

**(92-304) Law Enforcement and Victim Witness (3 hour Elective)**
This three hour elective course covers methods and techniques to be followed to maximize the effective interface between police officers and victims. Specific topical course areas include - Types of Victim Injuries; Handling Victim Crisis Reactions; Special Victim Concerns; and The Pennsylvania Victim Service System.

**(92-305) Domestic Violence (3 hour Elective)**
This three hour elective course includes techniques of response to "Domestic Violence" calls which will assist & protect victims, reduce perpetrator recidivism, minimize officers' and their Departments' liability, and increase officer safety in domestic violence situations.

**(93-201) Ethnic Intimidation (3 hour Elective)**
This course will provide participants with the ability to: 1) define Ethnic Intimidation; 2) List the current Pennsylvania statutes covering Ethnic Intimidation; 3) Identify the underlying offenses of Ethnic Intimidation; 4) Identify the importance of a proper police response to crimes/incidents appearing to be motivated by hate; 5) Define the terminology used in Ethnic Intimidation; and 6) Complete mandated Ethnic Intimidation incident and crime reporting requirements.

**(93-202) Legal Updates (3 hour Elective)**
This course will provide participants with an update in the following areas: 1) recent significant statutory changes; 2) Recent significant court decisions impacting police officers; 3) a review of the Use of Force; 4) Stages of on-the-job citizen contact; and 5) The appropriate use of Miranda warnings.

**(93-306) Officer Safety III (3 hour Elective)**
This course is designed to make police officers aware of various safety concerns and tactical considerations confronting law enforcement officers "on the street" today, with the emphasis being on mental and physical preparation.

The focus of the course is on creating an awareness of incidents that are occurring in the field and on teaching concepts such as containment, caution, teamwork, and flexibility, should officers find themselves in a similar situation as those depicted on the video that accompanies this course.

2

W 00197

Topics include metal and physical preparation, critical incident stress management, robbery in-progress calls, and building search techniques.

**(93-401) Case Preparation** (3 hour Elective)
This course is designed to assist officers in properly documenting, preparing, and presenting a case in court. Although this course is the first elective course in the Crime Track segment of the MPOETC Mandatory In-Service Training Program Curriculum, the scope of the course includes preparing case for all levels of court proceedings, so patrol officers are encouraged to participate in the course, as well as criminal investigators and county detectives.

The focus of the course is on the importance of having the proper mental preparation, approach, demeanor, documentation, and preparation, in order to professionally present a case in the courtroom.

Course topics include professional attitude, credibility, case documentation and organization, defense counsel tactics, and testifying in court.

**(93-501) Essentials of Management** (12 hour Elective)
This two consecutive day, twelve hour course will provide participants with the ability to: 1) Identify the differences between Strategic and Operational Decision Making; 2) Complete an Issue Survey for their own jobs; 3) Make a job-related decision using the Criterion Referenced Decision Making process; 4) Use an objective problem solving method; 5) Describe an objective method to anticipate and prevent future problems; and 6) Apply a creative technique to developing alternatives.

**(94-201) Legal Updates -** (3 hour Required)
This three hour course covers: Significant changes in Pennsylvania's Crimes and Vehicle Codes, for the period July 1, 1992 through June 30, 1993; Significant Case Law, based on decisions available for the same time period; Use of Force by police officers in the performance of their duties; and Civil and Criminal Liability possibly affecting municipal police officers in the performance of their duties.

**(94-308) Officer Safety IV - Domestic Response for Law Enforcement -** (3 hour Elective)
Similar to the other courses in the MPOETC Officer Safety Curriculum, this course utilizes video vignettes in a stop tape/discussion format to address safety concerns when responding to domestic violence calls. Emphasizing a complete approach to officer safety, the course also discusses other issues, such as mental & physical preparation, and diet & nutrition. In addition to addressing tactical considerations when responding to domestic disturbance calls, each scenario contains issues for discussion that relate to the Commission's 1992 (92-305) Domestic Violence course.

**(94-307) Vehicle Code Update -** (6 hour Elective)
This course is an intensive review of the significant legislative changes to Title 75 from June, 1992, up to and including changes as of August 31, 1993. Using a slide presentation, the course also includes in-depth segments on the Uniform Commercial Driver's License Act, DUI, Equipment violations, and includes a brief review of recent court cases concerning police civil liability that is directly related to traffic enforcement.

**(94-402) Report Writing Made Easy -** (6 hour Elective)
Using a mixture of video segments and practical writing exercises, this course will focus on writing narratives for police reports. The course covers a variety of topics ranging from an overview of the communication process, to the role of non-verbal communication in gathering information, to focusing on the basic writing skills that are job-related and necessary for every police officer. The goals of this course

W 00198



are to simplify the writing of police reports and to enhance the officer's writing techniques; which will be helpful in preparing reports for supervisors, investigators, prosecutors, and other professionals that use police reports on a daily basis.

**(94-502) Essentials of Leadership - (9 hour Elective)**
This course is designed to provide participants with: A definition of what leadership is; An awareness of the qualities of effective leaders; A definition of management; A comparison of the similarities and differences between "Leaders" and "Managers"; An awareness of different styles of management and leadership; An awareness of effective leadership methods and techniques; and An opportunity to develop methods of improving leadership capabilities. Course duration, originally planned for twelve hours, is currently being reviewed.

**(95-201) Legal Update (3 hour Required)**
This course will continue, as past Legal Update courses have, to cover recent significant changes in the Crimes Code, Vehicle Code, Rules of Criminal Procedure; as well as significant Court decisions. A portion of the course will also be concerned with statutes pertaining to mandatory submission of fingerprints.

**(95-202) Cultural Diversity Awareness (6 hour Required)**
This course will be directed toward increasing officers' awareness of the diversity of different cultural groups in Pennsylvania; and the impact of such diversity on police officers in the performance of their duties.

**(95-309) Officer Safety Awareness V - Stopping Problem Vehicles (3 hour Elective)**
The proposed course design will utilize video vignettes in a stop tape/discussion format as was done in the previous courses in the officer safety curriculum. The focus will be on safety concerns when stopping problem vehicles (large trucks, vans, and motorcycles) for traffic violations in unknown risk situations.

**(95-403) Interviewing Victims and Witnesses using a Cognitive Approach (3 hour Elective)**
The course design will utilize a video in conjunction with a practical exercise to involve course participants in conducting two interviews. The goal of this course is to provide police officers with a technique to help them in understanding the intense emotions that crime victims experience after a crisis, and to introduce officers to a different interviewing technique that will help them to obtain more information from cooperative subjects by enhancing the memory recall of both victims and witnesses. Topics will range from, traits of a good interviewer, "psychological first aid" as the initial step when interviewing crime victims, to the four stages of a cognitive interview.

**(95-503) Effective Management Communication (12 hour Elective)**
This course will focus on: Communications Theory; Effective Listening Techniques; Upward, Downward & Lateral Communications; Communicating with the Media; Developing a Personal Communications Plan. This course will also demonstrate that effective communications is a critical element of management.

**(96-201) Update  (3 hour Required)**
This three hour course provides an update to all police officers on: Changes in Title 18 (Crimes Code), Changes in Title 75 (Vehicle Code), Changes in Title 42 (Judicial Code), Recent significant US Supreme Court & PA Supreme & Superior Court decisions. There will also be a segment on Use of Force for Police Officers.

4

W 00199

**(96-310) Officer Safety Awareness VI (3 hour Elective)**
This course will use video to examine *"weapons that do not appear to be weapons*[] and provide an introduction to incident command and control, tactical considerations for handling suspicious calls, and gang awareness.

**(96-404) Crime Scene Investigation I (3 hour Elective)**
This course reviews the basic principles of protection, identification, and preservation from the Commission[]s 91-104 course. Also included are a practical study of crime scene investigation legal issues, the role of the first officer on the scene and why the actions of the first officer on the scene are critical to the overall investigation.

**(96-405) Crime Scene Investigation II (3 hour Elective)**
This course is designed for investigators or patrol officers who also have evidence technician responsibilities. The course will cover the basic stages of crime scene search, and how to identify, collect and package evidence. The role of the crime lab, and how to submit evidence will also be discussed.

**(96-504) Managing Personnel Effectively (9 hour Elective)**
This course will provide the information needed to anticipate and avoid many of the Liabilities associated with the practices of Supervising and Managing personnel; real world methods of Motivating subordinates; an understanding of what Performance Appraisals and Evaluations should include; proven Roll Call & other Training Methods; effective uses of Discipline and Positive Performance management; and as time allows, an overview of what Assessment Centers are, how they may be used in selection and promotions.

**(97-201) Updates (3 hour required)**
As in prior years, this course will provide an overview of the recent changes in *Pennsylvania*[]*s Crimes Code, Vehicle Code, Rules of Criminal Procedure*, significant *Commonwealth* and *Supreme Court* decisions. The program is to include the new pursuit legislation.

**(97-311) Officer Safety VII (3 hour elective)**
The course design will continue to utilize video vignettes in a stop tape/discussion format as was done in the previous courses in the officer safety curriculum. The focus of the course will be on a de-escalation of force philosophy. Topics will include an awareness of less lethal weapon technology, i.e. "beanbag rounds", application in the force continuum, the "winning mind", and tactical communications (a variation of *Verbal Judo*).

**(97-312) Accident Investigation (6 hour elective)**
This course is intended to provide participants with an overview of accident investigation procedures, and may serve as a foundation for, or introduction to, a more lengthy Accident Investigation course (such as those offered by IUP in the non-mandatory grant program, or TIPS). Initial course topical areas include: Essential report writing elements of the accident report form (Form #...), Accident diagrams, An introduction to the basics of accident reconstruction, and Other topical areas will be determined as Committee work progresses.

**(97-406) Interview and Interrogation (6 Hour elective)**
Builds upon the Commission's 1995 Cognitive Interviewing course to cover interrogation techniques. The course design may utilize a video package including vignettes of actual interviews and interrogations. The goal of this course is to provide a realistic and proven process for the investigator to use when conducting interviews of victims and witnesses or when interrogating criminal suspects, as well as address pertinent legal issues. [The Federal Bureau of Investigation has recently revised their course which could serve as a starting point for our course development process. Course was suggested by Commission member Bob Reutter. A MPOETC course was initially slated to be delivered in 1996, as a follow-up to our "403" course, but was delayed due to the timeliness of a crime scene investigation course.]

5

W 00200

**(97-505) Effective Management Communication (9 hour Elective)**
We propose to re-do this 12 hour course from 1995 into a 9 hour course to be offered with the Updates course for managers. Because of the length of the course it was taken in 1995 by very few people. The concepts of the course provides excellent information to police managers. Until the course development committee meets a revised description cannot be given. The current course description is: Communications Theory; Effective Listening Techniques; Upward, Downward & Lateral Communications; Communicating with the Media; Developing a Personal Communications Plan. This course will also demonstrate that effective communications is a critical element of management.

**(98-201) Updates (3 hour required)**
As in prior years, this course will provide an overview of the recent changes in Pennsylvania's Crimes Code, Vehicle Code, Rules of Criminal Procedure. It is anticipated that there will be significant changes in the Rules of Criminal Procedure to follow the numerous changes in the Crimes and Vehicle Codes recently.

**(98-202) Ethics (6 hour required)**
The course would use realistic scenarios and/or case studies on the ethical dilemmas that police officers face today, in order to teach "ethical decision-making". The course would build on the Commission's current Ethics Workshop used in the Basic Program and on other "Police Ethics" courses, such as the course developed by the Office of Law Enforcement Ethics at the FBI Academy or the Anti-Corruption course developed by the Philadelphia Police-Advanced Training Unit. Another option would be to purchase a copyright waiver for a commercial program such as the ones developed by the National Institute of or the Southwestern Law Enforcement Institute, Center for Law Enforcement Ethics.

**(98-314) Officer Safety VIII: Emergency Driving (3 hour elective)**
The course design will utilize video vignettes in a stop tape/discussion format to provide course participants with an awareness of the capabilities and limitations of drivers, vehicles, and the road system. Although we cannot conduct skills training in the classroom, we plan to provide awareness training on a variety of topics in this high civil liability area, including the recent pursuit legislation and new technology to help minimize risks to the public and the police, such as "stop sticks".

**(99-201) Legal Updates  (3 hour required)**
This is a course that ALL police officers, as well as all others under MPOETC's jurisdiction, will be required to successfully complete during 1999. The three hour course concentrates on two main areas - new laws that police officers will need to be aware of, and recent Court decisions from the United States Supreme Court and Pennsylvania's Supreme as well as Superior Courts. The course is currently being developed by subject matter experts under MPOETC staff supervision.

**(99-315) Officer Safety Awareness IX - Tactical Response for Patrol Officers (3 hour elective)**
The course design utilizes video vignettes in a stop tape/discussion format as was done in the previous eight courses in the Commission's officer safety curriculum. The focus of this elective course is on responding to armed robbery situations. The course addresses high risk incidents from the standpoint of a first responder and includes tactical considerations for possible outcomes such as vehicle and foot pursuits, barricaded gunman and hostage situations. Other topics include pre-planning, scene awareness, "invisible" deployment, and containment.

**(99-407) Current Issues in Criminal Investigation (6 hour elective)**
This six hour course will cover a variety of current issues facing Law Enforcement Officers. This course will cover such topics as White Collar/Financial Crimes, Extremist Groups: Current Activities and Tactics, Investigation of Missing and Exploited Children, Investigating School Violence, Conducting Prostitution Investigations and Search and Seizure Issues pertaining to the above topics.

**(99-506) Career & Personal Survival (3 hour elective)**
This three hour course will begin by describing the kinds of personal, and somewhat sensitive, problems that police officers may experience arising from the work they do to protect and serve the public. The course will help officers to see which other people are impacted when an officer has a problem, and in what

6

W 00201



ways they are affected; what seems to bring these problems on; some of the observable signs to look for at the beginning of a problem; the severe nature of the consequences of police officers not properly handling these kinds of problems; the kinds of officers who have been most severely affected by these kinds of problems in the past; what has prevented officers from helping each other with these kinds of problems; and ends with realistic methods to assist officers who are experiencing these kinds of problems.

**(99-507) Conflict Resolution for Police** (6 hour elective)
This six hour course, under development by contract with Penn State University, will focus on skills for resolving internal and external day-to-day type interpersonal and multi-party conflicts involving citizens and the police that police officers encounter in patrol and investigative functions throughout the state. The course will encompass relevant cultural diversity issues associated with resolving every-day conflicts in policing.

**(00-201) Legal Updates** (3 hour required)
This is a course that ALL police officers under MPOETC's jurisdiction, will be required to successfully complete during 2000. The three hour course concentrates on two main areas - new laws that police officers will need to be aware of, and recent Court decisions from the United States Supreme Court and Pennsylvania's Supreme, as well as, Superior Courts. The course will be developed by subject matter experts under MPOETC staff supervision.

**(00-409) Current Issues in Y2K -** (6 hour elective)
Potential topics include the following:

    a.  Hate Crimes - The course may focus on the following: An overview, history and definition of the nature of bias crimes, bias crime indicators and offender typologies; legal issues, legislation, statutes; and guidelines for effective response and investigation;

    b.  Domestic Terrorism - This course could cover issues related to Extremist groups in the U.S. which could include: An overview of Terrorism/Extremism; History and Tactics of Extremist Groups; Countermeasures, and Officer Safety Concerns.

**(00-410) Case Preparation for Summary Trials and Preliminary Hearings -** (6 hour elective)
This course will focus on hearings and trials before a District Justice. This program will address how to prepare and present a case, develop case strategies and anticipate defenses, the Rules of Evidence, and how to prepare witnesses and to present testimony in an appropriate manner. The course will also address Burdens of Proof, i.e Prima Facie versus Beyond a Reasonable Doubt. In addition, the course content will include how to prepare and deliver closing arguments in Summary trials.

**(00-316) Survival Tactics for Injured Officers -** (3 hour elective)
This course will include an examination and review of the following: emergency medical actions an officer can use when he or his partner is injured in a violent encounter; weapon management; and issues dealing with mind set. The use of video support is anticipated.

The emergency medical portion of this course will review previous training, and suggest possible field applications.

The weapons management portion will examine some methods of operating the weapon while injured and serve as awareness level information.

The mind set portion will deal with the various issues related to perceptual disturbances, memory impairment, and how to manage anger.

7

W 00202

**(00-510) Advanced Leadership Through Integrity - (6 hour elective)**
Integrity is an absolute requirement for police. We have seen a number of instances where a police officer's word is not accepted by the courts in the same manner as it has been in the past. One leading reason for this is the perceived loss of integrity the police community has suffered as a result of media coverage of virtually every possible instance of alleged misconduct by police.

Most police departments are organized in a semi-militaristic style, with management providing role models for the entire department. This "top down" style of leadership requires management to create the proper public and personal image for all members of the department, then "walk the talk" they have created. This course provides tools, methods and techniques for police managers to use in developing these essential skills. These skills have been emphasized as critical at the IACP Convention in Salt Lake City, as well as, at the ASLET International Training Seminar in Albuquerque.

This course will include advanced current training oriented towards the emerging Y2K police leadership needs in Decision Making, Community Policing Concepts, and Communication Dynamics for the future.

**(01-201) Legal Update (3 hour required)**
As in prior years, this required course will address law changes and recent court decisions impacting on police officers.

**(01-202) Law Enforcement and Special Needs Populations (3 hour required)**
This course will provide awareness level training to enable police officers to recognize the nature of various disabilities while ensuring the safety of both the public and officers involved.

**(01-317) Safety Awareness XI: Immediate Action-Rapid Deployment for Patrol Officers (6 hour elective)**
It is not unusual for a tactical team to arrive at the scene of a barricaded incident and find that patrol personnel have contained the suspect within a secure perimeter. There is generally time for the tactical team to deploy their personnel without serious concern of suspect escape. Once the incident has been isolated, time enables patrol and/or tactical personnel to formulate a structured and deliberate plan.

But, there are also scenarios that require immediate action and rapid deployment of patrol personnel prior to the arrival of the tactical team. In these cases delayed deployment could have catastrophic consequences. These scenarios often involve an ongoing "shots fired" or "downed officer/citizen rescue." The situation may also necessitate the immediate and rapid deployment of law enforcement personnel to contain and prevent the escape of an armed and dangerous person.

This eleventh course in the Commission's Officer Safety series will address the basic concepts and principles of rapid deployment techniques for patrol officers. The use of video support will be needed and has been requested.

**(01-511) Equality in Policing the Community (6 hour elective)**
The Commission's *Leadership and Integrity in the Police Environment* course looked at the issues of communication, courtesy, and decision-making; skills critical to survival and success in the milieu of policing. *Equality in Policing the Community* takes the development of these three basic skills to the next level adding the factor of sensitivity to the equation as it relates to interaction between the police and the community. The well publicized issue of racial profiling will be addressed from the opinion that the practice of racial profiling itself contradicts the oath sworn to, is in conflict with the intent of policing, and impacts negatively on police profession. The practice can also encourage other negative behaviors by officers.

8

W 00203



**(02-201) Legal Update (3 hour required)**
Significant changes in Pennsylvania's Crimes Code; Vehicle Code; Rules of Criminal Procedure occurring between July 1, 2000 and June 30, 2001.

**(02-202) Police Encounters With the Mentally Ill (3 hour required)**
Police Encounters With the Mentally Ill is a follow-up to the 2001 Special Needs Mandatory In-Service Course. This course will examine Civil Rights Laws as they pertain to police encounters with mentally ill (PEMI), Use of Force case law, and statutes that apply to PEMI, Recognizing Impairment and possible causes.

The course will present selected impairments such as Psychotic Episodes, Schizophrenia, Affective Episodes, Bipolar Depression, Personality disorders such as antisocial paranoid and borderline, and substance induced mental impairments.

Finally this course will look as use of force options such as less lethal force options, alternative options such as 302 commitments and referrals, and how to determine which option is appropriate.

**(02-318) Health and Fitness for Law Enforcement (3 hour elective)**
The course will consist of an introduction, Fitness and Law Enforcement, Fitness Lifestyle Area Planning and Exercise Planning.

**(02-411) Technology and the First Responding Law Enforcement Officer (3 hour elective)**
Technology has made rapid advancements in recent years, but the problem is that criminals are using computers and other high-tech means, such as Internet storage sites, Personal Digital Assistants, micro hard drives, and other media to commit crimes, exploit children, deny services, steal data, and conduct industrial espionage.

This program is designed for first responders and will address Crime Trends, Technology, Terminology, and applicable Pennsylvania statutes. The course will also discuss Search and Seizure issues and provide officers with resources to assist them with investigating computer crimes. A list of Dos and Don'ts when seizing computers and handling an electronic crime scene are key components of this course.

Although the course will be taught in a traditional classroom setting, a variety of teaching methods will be used to enable officers to recognize and seize high-tech devices.

**(02-512) Leadership for Law Enforcement (3 hour elective)**
Leadership for Law Enforcement is a three-hour course for individuals from non-supervisory and supervisory levels within the police organization. Leadership concepts will be revisited and new concepts introduced; example, the department's responsibility to train and discipline, communication, liability assessed on leadership and futuristic leadership.

Number of Courses            58

W 00204

EXHIBIT
(L)

# OFFICER INJURIES

| Officer Harry Hart | Officer Gary Berresford |
|---|---|
| **A.** Laceration on top of head requiring 6 stitches | **A.** Laceration to top of head requiring 11 stitches |
| **B.** Laceration on top of nose requiring 6 stitches | **B.** Laceration to left side of facial cheekbone |
| **C.** Broken nose | **C.** Abrasions to top of head, face and back. |
| **D.** Multiple abrasions, lacerations and bruises about his body | **D.** Bite mark on top of right hand |
| | **E.** Left ring finger required amputation due to gunshot wound |









W 00030

EXHIBIT
M    Page 1

2003 WL 148919
--- F.3d ----
(Cite as: 2003 WL 148919 (3rd Cir.(Pa.)))
H

United States Court of Appeals,
Third Circuit.

Charmaine BROWN; Oral Douglas, in their
individual capacities and as
Administrators of the Estate of Shacquiel A. Douglas,
Appellants
v.
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF HEALTH EMERGENCY
MEDICAL SERVICES
TRAINING INSTITUTE; City of Philadelphia; Mark
Stewart, individual and official
capacity; John Caffey, individual and official capacity

No. 01-3234.

Argued April 18, 2002.
Sur Panel Rehearing Submitted Sept. 12, 2002.
Filed Jan. 22, 2003.

Parents of infant who died of asphyxia two days after being transported to hospital by city emergency medical technicians (EMT) who responded to 911 call reporting that the child was choking on a grape brought § 1983 action against the EMTs and the city, alleging violation of their son's due process rights. The United States District Court for the Eastern District of Pennsylvania, Herbert J. Hutton, J., 2001 WL 884555, granted summary judgment for defendants, and parents appealed. After panel rehearing, the Court of Appeals, Nygaard, Circuit Judge, held that: (1) the Due Process Clause does not require states to provide rescue services, or to provide adequate or competent rescue services when they have chosen to undertake these services; (2) state action by emergency medical personnel violates the Fourteenth Amendment guarantee of substantive due process only when it shocks the conscience; (3) EMTs actions did not shock the conscience, and thus, did not violate infant's substantive due process rights; and (4) city could not be held liable under § 1983 for harm to the infant.

Affirmed.

Superseding 2002 WL 1815859.

West Headnotes

[1] Negligence ☞282
272k282

[1] Negligence ☞283
272k283

Although an individual generally has no duty to rescue, once voluntarily undertaken, a rescue must not be performed negligently.

[2] Constitutional Law ☞291.6
92k291.6

The Due Process Clause does not require states to provide rescue services. U.S.C.A. Const.Amend. 14.

[3] Constitutional Law ☞291.6
92k291.6

The Due Process Clause does not require states to provide adequate or competent rescue services when they have chosen to undertake these services. U.S.C.A. Const.Amend. 14.

[4] Constitutional Law ☞253(1)
92k253(1)

State action by emergency medical personnel who must act in haste and under pressure violates the Fourteenth Amendment guarantee of substantive due process only when it shocks the conscience. U.S.C.A. Const.Amend. 14.

[5] Constitutional Law ☞253(1)
92k253(1)

[5] Constitutional Law ☞291.6
92k291.6

The "special relationship" exception to the general rule that the due process clause does not require a state to provide protective services or to rescue is applicable when the state takes a person into its custody and holds him there against his will or, where the state, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself. U.S.C.A. Const.Amend. 14.

[6] Constitutional Law ☞291.6
92k291.6

[6] Municipal Corporations ☞747(4)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 148919                                                                                      **Page 2**
(Cite as: 2003 WL 148919 (3rd Cir.(Pa.)))

268k747(4)

Actions of city emergency medical technicians (EMT) in responding to 911 call reporting that an infant was choking on a grape did not shock the conscience, and thus, did not violate substantive due process rights of the infant, who died of asphyxia two days later, even though they allegedly could not locate reported address on map and were lost when they left fire station because of alleged failure to familiarize themselves with neighborhood in which they were providing emergency services, and allegedly failed to use recognized protocols for choking situations when they arrived, where they attempted to ascertain the location through all available means and attempted to arrive at the scene as rapidly as they could. U.S.C.A. Const.Amend. 14.

[7] Civil Rights ⬨═►206(4)
78k206(4)

The first question in any case alleging municipal liability under § 1983 for a failure to train is whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. 42 U.S.C.A. § 1983.

[8] Civil Rights ⬨═►206(4)
78k206(4)
Knowledge

The inadequacy of a municipality's police training may serve as the basis for § 1983 liability for the municipality only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. 42 U.S.C.A. § 1983.

[9] Civil Rights ⬨═►206(2.1)
78k206(2.1)

It is possible for a municipality to be held independently liable under § 1983 for a substantive due process violation even in situations where none of its employees are liable, but there still must be a violation of the plaintiff's constitutional rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[10] Civil Rights ⬨═►206(4)
78k206(4)

It is not enough, for municipal liability under § 1983, that a municipality adopted with deliberate indifference a policy of inadequately training its

officers; there must be a direct causal link between the policy and a constitutional violation. 42 U.S.C.A. § 1983.

[11] Civil Rights ⬨═►206(3)
78k206(3)

[11] Civil Rights ⬨═►206(4)
78k206(4)

City could not be held liable under § 1983 for harm to infant who died two days after city emergency medical technicians (EMT) were allegedly delayed in responding to 911 call reporting that the infant was choking on a grape and who allegedly failed to use recognized protocols for choking situations when they arrived, even if the harm was caused by city policies involving EMTs that were enacted with deliberate indifference, as the city had no due process obligation to provide rescue services and the harm was therefore not constitutional harm as required for municipal liability under § 1983. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

David J. Berney, (Argued), Nancy G. Rhoads, Sheller Ludwig & Badey, Philadelphia, PA, for Appellants.

Jane L. Istvan, (Argued), Richard G. Feder, City of Philadelphia Law Department, Philadelphia, PA, for Appellees.

BEFORE: NYGAARD, AMBRO, and KRAVITCH, [FN*] Circuit Judges.

OPINION OF THE COURT

NYGAARD, Circuit Judge.

*1 We vacated our prior opinion in this appeal and granted panel rehearing to clarify certain issues raised by the Appellants in their petition for *en banc* reconsideration.

Appellants, Charmaine Brown and Oral Douglas, filed a civil rights complaint against the Commonwealth of Pennsylvania Department of Health, the City of Philadelphia and two emergency medical technicians, Mark Stewart and John Caffey. Litigation arose out of the tragic death of Appellants' one-year-old son. The District Court granted summary judgment for the City because there was no genuine issue of material fact and concluded that deliberate indifference by city policymakers had not been demonstrated. The District Court also granted

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 148919                                                    Page 3
(Cite as: 2003 WL 148919, *1 (3rd Cir.(Pa.)))

summary judgment for Stewart and Caffey because it concluded that the Appellants' federal claim was barred by a prior state judgment. We will affirm, although for different reasons than given by the District Court. [FN1]

## I.

Shacquiel Douglas, the one-year-old son of Charmaine Brown and Oral Douglas, was at the residence of Angela Morris, his maternal aunt. While there, Shacquiel choked on a grape. Morris dialed "911" at 11:06:22 a.m. and informed the operator that her nephew was choking on a grape. The 911 operator called Appellees Mark Stewart and John Caffey, who were emergency medical technicians at Engine 73, Fire House at 76th Street and Ogontz Avenue in Philadelphia. The operator then informed Morris that "[r]escue is gonna come help you." At 11:10:24 a.m., Morris again called 911 to determine when the EMTs would arrive. Morris was informed that "[r]escue was on the way." At 11:14:50 a.m., when the EMTs still had not arrived, Morris placed a third call to the 911 operator and was again told that help was on the way.

Stewart and Caffey arrived at Morris's residence at 11:16:35 a.m., ten minutes after the initial 911 call had been placed. They transported Shacquiel to Germantown Hospital and tried to restore Shacquiel's breathing during the trip. Once at the hospital, the grape was removed from Shacquiel's throat. He was then transferred to St. Christopher's Hospital for Children where he died two days later due to "asphyxia by choking."

Appellants filed a civil complaint in the Court of Common Pleas of Philadelphia County against Stewart and Caffey alleging a state tort cause of action based on the same facts as their federal claim. The Court of Common Pleas granted Stewart and Caffey's motion for summary judgment and dismissed all claims against them.

Appellants, in their individual capacities and as administrators of Shacquiel's estate, next filed a civil rights lawsuit in federal court under 42 U.S.C. § 1983 against the City of Philadelphia, and Stewart and Caffey in their individual and official capacities. [FN2] Count I of the Complaint asserts a § 1983 claim against Stewart and Caffey for alleged violations of their son's life, liberty, personal security, and bodily integrity without due process of law in violation of the Fourteenth Amendment and for deprivation of their son's rights, privileges, and immunities secured by the laws and Constitution of the Commonwealth of Pennsylvania. Count II asserts a § 1983 claim against the City for violations of the Commonwealth Constitution and the Fourth and Fourteenth Amendments. The claims arising under the Commonwealth Constitution and the Fourth Amendment were dismissed, so only the Fourteenth Amendment claim remained.

*2 The District Court granted the City of Philadelphia's motion for summary judgment because it found that Appellants had failed to raise a genuine issue of material fact and because Appellants had not shown "deliberate indifference" by City policymakers. *Brown v. City of Philadelphia*, No. Civ.A. 99-4901, 2001 WL 884555, at *6 (E.D.Pa. July 31, 2001). The District Court also granted Stewart and Caffey's motion for summary judgment because it concluded that Appellants' federal lawsuit against Stewart and Caffey was barred under principles of claim preclusion by the prior state court judgment. *Id.* at * 10. It is from this order that Brown and Douglas now appeal.

## II. Deprivation of a Constitutional Right

The threshold issue presented by any § 1983 case is whether a plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution. *See Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Appellants allege that 42 U.S.C. § 1983, and the substantive component of the Fourteenth Amendment's Due Process Clause, provide them a cause of action under the federal Constitution.

The requirements for establishing a constitutional claim under 42 U.S.C. § 1983 are clear. The pertinent language of the statute provides that:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.
By its own terms, the statute does not create substantive rights. Instead, it only provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The initial point of reference for our analysis is *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, the Supreme Court addressed a claim brought by a mother and her child under 42 U.S.C. § 1983 against the county department of social services alleging that the child had been denied due process of law when the department failed to intervene and protect him from the injuries he suffered at the hands of his violent father. The Court reaffirmed that "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196, 109 S.Ct. 998. The Court instructed:

> If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*3 *Id.* at 196-97, 109 S.Ct. 998.

The Court also found no duty to protect or rescue in the history of the amendment, noting that "the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.' " *Id.* at 196, 109 S.Ct. 998 (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). The Clause was intended "to protect the people from the State, not to ensure that the State protected them from each other." *Id.* Since the State is not constitutionally required by the Due Process Clause to provide protective services, the Court found that there can be no liability when the State fails to provide such services, even if it would have prevented the private injury from occurring. *Id.* at 196-97, 109 S.Ct. 998.

[1] It is a basic tenet of tort law that although an individual generally has no duty to rescue, once voluntarily undertaken, a rescue must not be performed negligently. *See, e.g.,* Restatement (Second) of Torts §§ 314, 323 (1965). One might infer from the general rule that, although the State is not constitutionally required to provide rescue services, once the State undertakes a rescue, federal constitutional law requires that it do so competently.

Such an inference, however, incorrectly conflates state tort law and federal constitutional law. The Supreme Court has repeatedly stated that "the Due Process Clause of the Fourteenth Amendment ... does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202, 109 S.Ct. 998 (collecting cases). Although state tort law might provide a remedy for a state's negligent rescue attempt, it neither logically nor legally follows that federal constitutional law must do the same. *See Berg v. County of Allegheny*, 219 F.3d 261, 268 (3d Cir.2000) ( "Section 1983 is not a source of substantive rights and does not provide redress for common law torts - the plaintiff must allege a violation of a federal right.").

[2][3] We have not decided whether the Due Process Clause requires states to provide adequate or competent rescue services when they have chosen to undertake these services. Other appellate courts addressing this question have held that states have no constitutional obligation to provide competent rescue services. *See Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir.1991) ("Government generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody."); *Bradberry v. Pinellas County*, 789 F.2d 1513, 1517 (11th Cir.1986) ("The Constitution, as opposed to local tort law, does not prohibit grossly negligent rescue attempts nor even the grossly negligent training of state officers."); *see also Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (en banc); *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983). We agree with the reasoning of these decisions and join these Circuits in holding that there is no federal constitutional right to rescue services, competent or otherwise. Moreover, because the Due Process Clause does not require the State to provide rescue services, it follows that we cannot interpret that clause so as to place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them.

### III. Exceptions to *DeShaney's* General Rule

*4 In *DeShaney*, the Supreme Court expressed two exceptions to its general non-liability rule. It held that there was an affirmative duty to protect "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs," thereby

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

creating a special relationship. 489 U.S. at 200, 109 S.Ct. 998. The "special relationship" exception is implicated when the state restrains an individual so as to expose the individual to harm. *Sargi v. Kent City Bd. of Educ.,* 70 F.3d 907, 910-11 (6th Cir.1995) ("A special relationship can only arise when the *state* restrains an individual.") (emphasis in original). *DeShaney* also left open the possibility that the state may be liable for constitutionally protected rights, even in the absence of a special relationship with an individual, when the state, through its affirmative conduct, creates or enhances a danger for the individual. 489 U.S. at 201, 109 S.Ct. 998. This "state-created danger" exception applies when the state, through some affirmative conduct, places the individual in a position of danger. *See Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998).

The "special relationship" exception is not at issue here. However, the "state-created danger" exception, permitting liability when the State caused the harm or made the victim more vulnerable to an existing harm, is relevant to our inquiry. This exception was not clearly defined by the Court in *DeShaney,* but has been developed by the lower courts based upon the Court's statement in *DeShaney* that

> [w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

489 U.S. at 201, 109 S.Ct. 998.

We adopted the state-created danger theory of liability in *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996). To state a claim for a civil rights violation under the state-created danger theory, we held that a plaintiff must show: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actors acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the State and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party to cause harm. *Id.* at 1208 (citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995)). The "relationship" required by the third element of this test

is different than the "relationship" in the "special relationship" exception to *DeShaney.* In the context of the state-created danger theory, the "relationship" requirement implies that there was contact between the parties such that the plaintiff was a foreseeable victim in the tort sense, and not in the custodial sense because the State has deprived the individual of the liberty necessary to care for himself. *Id.* at 1209 n. 22.

*5 Determining the appropriate lens through which we must view actions in the state-created danger context, though, is a vexing problem. *See Ziccardi v. City of Philadelphia,* 288 F.3d 57, 64 (3d Cir.2002). The Supreme Court has specifically pointed out that the Due Process Clause is not implicated by an official's negligent act. *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Additionally, the Court has instructed that "deliberate indifference" is the necessary standard in order to establish § 1983 liability of a municipality. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[I]ndefensible passivity," and "nonfeasance" do not rise to the level of a constitutional violation. *D.R., v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1376 (3d Cir.1992)(en banc). In light of these holdings, we have required a plaintiff to show that a state actor acted with deliberate indifference to a known or obvious danger. *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 910 (3d Cir.1997). We first explained that there is little difference between the terms "deliberate indifference," "reckless disregard," or "reckless indifference." *Morse,* 132 F.3d at 910, n. 10. Each of these terms requires a state official's action that falls somewhere between intent and negligence. *Id.*

In *Fagan v. City of Vineland,* 22 F.3d 1296 (3d Cir.1994) (*Fagan II* ), sitting *en banc* we rejected the "reckless indifference" standard and further defined the substantive component of the Due Process clause, instructing that it "can only be violated when ... [state] conduct amounts to an abuse of official power that 'shocks the conscience.' " 22 F.3d at 1303. The *Fagan II* litigation involved a high-speed police chase that resulted in the serious physical injury to, and death of, civilians. In *Kneipp,* we recognized the somewhat narrow holding of *Fagan II,* where we held that: "the *Fagan II* shocks the conscience standard is limited to police pursuit cases, and accordingly, we are not bound to follow that standard in the case before us [which involves the police leaving a drunk woman alone to walk home on a cold night]." 95 F.3d

at 1207-08.

The same year that we issued our opinion in *Morse,* the Supreme Court issued its decision in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1997). The issue before the Supreme Court in *Lewis* was "whether a police officer violated the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* at 836, 118 S.Ct. 1708. The Court noted the difference between state action that deprives an individual of constitutional rights and state action that is merely tortious or negligent: "[i]t should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848, 118 S.Ct. 1708. The Supreme Court held that "in such circumstances," only state conduct that is "shocking to the conscience" will suffice. The Supreme Court was referring to high pressure situations where state actors must act quickly when it established the "shocks the conscience" standard "in such circumstances." *Id.* at 853, 118 S.Ct. 1708.

*6 In *Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir.1999), a social worker allegedly wrongfully removed two children from a parent suspected of child abuse. Citing *Lewis,* we held that to establish liability, a state official's action "must be so ill-conceived or malicious that it 'shocks the conscience.' " 174 F.3d at 368. We applied the "shock the conscience" standard in *Miller* because although a social worker normally did not have to act in a "hyperpressurized environments [like] a prison riot or high-speed chase ... he or she will rarely have the luxury of proceeding in a deliberate fashion." *Id.* at 375. Then, in *Ziccardi,* we stated that our decision in *Miller* "mandates [a standard] at least *something* more than subjective deliberate indifference in circumstances requiring somewhat urgent state action." *Ziccardi,* 288 F.3d at 65 (emphasis in original). *Ziccardi* involved a law suit brought by a quadriplegic who alleged that paramedics caused his quadriplegia by mishandling him after an accidental injury. Our opinion in *Ziccardi* stopped short of requiring a 'shocks the conscience' standard in all substantive due process cases, however.

[4] We derive from these cases the principle that the "shocks the conscience" standard should apply in all substantive due process cases if the state actor had to

act with urgency. This has been the law for police pursuit cases, *see, e.g., Fagan II,* and, social workers when they are acting with urgency to protect a child, *see, e.g., Miller; Croft v. Westmoreland County Children & Youth Services,* 103 F.3d 1123 (3d Cir.1997). We now hold that the same 'conscience shocking' standard applies to the actions of emergency medical personnel-who likewise have little time for reflection, typically making decisions in haste and under pressure. With this standard in mind, we will examine the Appellant's claims, and the facts upon which they are based.

IV.

A. Stewart and Caffey

Appellants allege that EMTs Stewart and Caffey violated their son's constitutional rights in that: (1) Stewart and Caffey failed to "exercise the well-established and universally recognized protocols for choking situations"; (2) neither Stewart nor Caffey attempted to "reach down and directly" remove the grape from Shacquiel's throat; (3) Stewart and Caffey did not arrive at the Morris residence in a more timely manner because they could not locate Weaver Street on the station map; (4) when Stewart and Caffey left the station house to look for the Morris residence, they were lost; and (5) Stewart and Caffey were never provided "information on the neighborhood in which they were responsible for providing emergency services," and they failed to familiarize themselves with the neighborhood. *Brown,* 2000 WL 562743, at *1.

The District Court concluded that the federal action against Stewart and Caffey was barred by the prior state court action. Appellants argue that the District Court erred in determining the *res judicata* effect of the state action. We do not reach Appellant's contention because we find that: (1) under the general rule of *DeShaney,* Shacquiel Douglas had no constitutional right to be rescued or to be provided with competent rescue services, and (2) *DeShaney's* two exceptions are inapplicable. Thus, no viable federal claim exists against Stewart and Caffey.

*7 [5] The "special relationship" exception is applicable "when the State takes a person into its custody and holds him there against his will" or, where "the State, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney,* 489 U.S. at 199-200, 109 S.Ct. 998. Such circumstances are not present here. Attempting,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

however, to state a claim under the "state-created danger" exception, appellants allege that:
(a) [Stewart and Caffey's] actions created foreseeable and fairly direct harm to the decedent and the plaintiffs; (b) their actions evidenced willful disregard of harm to the decedent and the plaintiffs; (c) a relationship existed between the parties; and (d) their actions created and/or increased a danger to the decedent that otherwise would not have existed.
Compl. at ¶ 36.

[6] We need to consider only one of the *Kneipp* elements to understand why Appellants' state-created danger claim fails. First, the allegation that Stewart and Caffey acted with "willful" disregard is misplaced. As noted, in cases where the state actor is acting with urgency, the standard is whether the actions shock the conscience of the court. On this record, there are no actions that meet this standard. The record depicts an attempt by Stewart and Caffey to ascertain the location of the victim through all available means, as well as their concerted effort to reach him as quickly as possible. The delay in reaching Shacquiel was not caused by Stewart and Caffey purposely delaying their rescue efforts or acting in an otherwise outrageous manner. Instead, the record depicts EMTs who attempted to arrive at the scene of the incident as rapidly as they could. Although Stewart and Caffey may have ultimately failed to rescue Shacquiel successfully from a pre-existing danger, we have already said that they had no constitutional obligation to do so. We cannot say that their actions in attempting a failed rescue shocks the conscience. Thus, Appellants have not demonstrated a viable state-created danger claim. We will, therefore, affirm the District Court's award of summary judgment to Stewart and Caffey.

B. City of Philadelphia

Appellants also allege that the City of Philadelphia violated Shacquiel's constitutional rights under the "policy or custom" theory of § 1983 municipal liability. A municipality may be held liable if a constitutional violation was caused by action taken pursuant to a municipal policy or custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But a municipality cannot be liable solely as an employer because there is no *respondeat superior* theory of municipal liability in § 1983 actions. *Id.* "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury

that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018.

*8 [7][8] The Supreme Court has recognized that "under certain circumstances" a municipality may be liable under § 1983 for a failure to adequately train its police officers. *City of Canton v. Harris,* 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The first question in any case alleging municipal liability for a failure to train is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385, 109 S.Ct. 1197. Furthermore "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197.

[9][10] It is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable. *Fagan v. City of Vineland,* 22 F.3d 1283, 1292 (3d Cir.1994)(*Fagan I* ). [FN3] In *Fagan I* we held "that a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution." *Id.* at 1294. However, for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights. *Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (emphasizing "the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred."). It is not enough that a municipality adopted with deliberate indifference a policy of inadequately training its officers. There must be a "direct causal link" between the policy and a constitutional violation. *Canton,* 489 U.S. at 385, 109 S.Ct. 1197.

[11] This is where Appellants' municipal liability claim fails. They allege that the City of Philadelphia had a number of policies involving EMTs which were enacted with deliberate indifference and which caused harm to them and their son. Even if we accept everything Appellants allege as true, they will have still failed to establish that the City's policies caused *constitutional* harm. The City was under no constitutional obligation to provide competent rescue services. The failure of the City and its EMTs to rescue Shacquiel Douglas from privately-caused harm

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

was not an infringement of Appellants' constitutional rights. [FN4] There has been no constitutional harm alleged. Hence, there is no municipal liability under § 1983.

## V.

In summary, states are not constitutionally obligated to provide rescue services, nor are they constitutionally required to provide competent rescue services voluntarily undertaken. Because Appellants have failed to show any actions that shock the conscience of the court, they can prove no violation of their federal constitutional rights. We will affirm.

FN* Honorable Phyllis A. Kravitch, Circuit Judge for the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

FN1. We may affirm the District Court on any basis which has support in the record. *Bernitsky v. United States,* 620 F.2d 948, 950 (3d Cir.1980).

FN2. The Commonwealth of Pennsylvania Department of Health was also sued, but that claim was dismissed because it was barred by Eleventh Amendment sovereign immunity. *Brown v. Pennsylvania,* No. 99-4901, 2000 WL 562743, at *3 (E.D.Pa. May 8, 2000). This dismissal was not appealed.

FN3. We note that there is a split among the courts of

appeals on this issue. Some courts have explicitly rejected our holding in *Fagan I. See Trigalet v. City of Tulsa,* 239 F.3d 1150, 1154-55 (10th Cir.2001), *cert. denied,* 534 U.S. 814, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001); *Young v. City of Mount Ranier,* 238 F.3d 567, 579 n. 9 (4th Cir.2001); *Evans v. Avery,* 100 F.3d 1033, 1040 (1st Cir.1996); *Thompson v. Boggs,* 33 F.3d 847, 859 n. 11 (7th Cir.1994). One panel of this court has even questioned the panel opinion in *Fagan I. See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 n. 13 (3d Cir.1995). But other courts have agreed with our opinion in *Fagan I. See Fairley v. Luman,* 281 F.3d 913 (9th Cir.2002), *petition for cert. filed,* --- U.S. ----, 123 S.Ct. 659, --- L.Ed.2d --- (2002) (No. 01-1882). This debate has no bearing upon the present case, however, because we find no constitutional violation by either the City or its employees.

FN4. This case is different from our recent decision in *Ziccardi v. City of Philadelphia,* 288 F.3d 57 (3d Cir.2002). The paramedics in that case allegedly rendered the plaintiff a quadriplegic by forcefully pulling him off the ground by his arms and throwing him over their shoulders. *Id.* at 59. The allegation in *Ziccardi* was not that paramedics had failed to rescue the plaintiff from a pre-existing injury- as is the allegation in the present case-rather it was that the paramedics actually caused the injury in the first place.

--- F.3d ----, 2003 WL 148919 (3rd Cir.(Pa.))

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Date of Printing: FEB 19,2003

## KEYCITE

CITATION:Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Medical Services Training
Institute, --- F.3d ----, 2003 WL 148919 (3rd Cir.(Pa.), Jan 22, 2003) (NO. 01-3234)
### History
### Direct History

  1  Brown v. City of Philadelphia, 2001 WL 884555 (E.D.Pa. Jul 31, 2001) (NO. CIV. A. 99-4901)
       *Order Affirmed by*
  2  Brown v. Commonwealth of PA Dept. of Health Emergency Medical Services Training Institute,
        300 F.3d 310 (3rd Cir.(Pa.) Aug 08, 2002) (NO. 01-3234)
       *Rehearing Granted, Judgment Vacated by*
  3  Brown v. Pennsylvania Dept. of Health Emergency Medical Services Training Institute,
        300 F.3d 311 (3rd Cir.(Pa.) Sep 09, 2002) (NO. 01-3234)
       *AND On Rehearing*
=>       4  **Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Medical Services
              Training Institute, --- F.3d ----, 2003 WL 148919 (3rd Cir.(Pa.) Jan 22, 2003)
              (NO. 01-3234)**

  5  Brown v. City of Philadelphia, 2001 WL 884555 (E.D.Pa. Jul 31, 2001) (NO. CIV. A. 99-4901)
       *Affirmed on Other Grounds by*
=>       6  **Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Medical Services
              Training Institute, --- F.3d ----, 2003 WL 148919 (3rd Cir.(Pa.) Jan 22, 2003)
              (NO. 01-3234)**

### Related References (U.S.A.)
  7  Brown v. Com., 2000 WL 562743 (E.D.Pa. May 08, 2000) (NO. 99-4901)

© Copyright 2003 West, Carswell, Sweet & Maxwell Asia, Ltd. and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.



Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana,
Indianapolis Division.

TAMRA ROSS, individually and as Personal
Representative of the Estate of
Kenneth Wayne Ross, Plaintiff,
v.
TOWN OF AUSTIN, Town of Austin Police
Department, and Austin Police Chief
Marvin Richey, Defendants.

No. NA 01-15-C-B/K.

Sept. 23, 2002.

Peter C. King, Columbus, IN, for Plaintiff.

Kirk A. Horn, Mandel Pollock & Horn, Indianapolis, IN, for Defendants.

ENTRY GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

SARAH EVANS BARKER, District Judge.

*1 Plaintiff Tamra Ross filed suit under 42 U.S.C. § 1983 against Defendants Town of Austin, Town of Austin Police Department, and Austin Police Chief Marvin Richey, alleging that Defendants' failure to train police officers in the proper use of deadly force and the proper hostage negotiation procedure resulted in a violation of her decedent's Fourteenth Amendment substantive due process rights. Defendants move for summary judgment, arguing that Plaintiff's decedent suffered no constitutional injury. For the reasons set forth below, we *GRANT* Defendants' Motion for Summary Judgment and *DENY* as moot both Plaintiff's and Defendants' Motions to Strike. [FN1]

> FN1. It is our practice to consider motions to strike simultaneously with a motion for summary judgment. In considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant, the Plaintiff in this case. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). Even when we remove from consideration all evidence challenged by Plaintiff in her Motions to Strike and take into consideration all evidence challenged by Defendants in their Motions to Strike, however, we *GRANT* Defendants' Motion for Summary Judgment. Therefore, we *DENY* as moot all Motions to Strike.

*Factual Background*

Plaintiff Tamra Ross ("Mrs.Ross"), a resident of Scott County, Indiana, is the widow of Kenneth Wayne Ross as well as the personal representative of his estate. (Compl.¶¶ 1-2.) Defendant Town of Austin ("Town") is an Indiana municipal corporation. (Compl.¶ 4 .) Defendant Town of Austin Police Department ("APD") is an Indiana law enforcement agency and a duly authorized Department of the Town of Austin. (Compl.¶ 5.) Defendant Marvin Richey ("Chief Richey") is an Indiana resident and was, from July 1998 to March 2002, Chief of Police of the APD. (Compl.¶¶ 6-7.)

On February 28, 2000, APD Captain Lonnie Noble ("Captain Noble") responded to a call from police dispatch that shots had been fired in the parking lot of Austin Elementary School. (Compl.¶ 9.) The shooter, Gregory Miller ("Miller"), then fled the scene and his target, his estranged wife, Sue Miller. (Compl.¶ 10.) While en route to the school, Captain Noble observed a multi-car collision at the intersection of State Road 256 and Highway 31 in Austin, Indiana. (Pl.'s Resp. to Defs.'s Statement of Material Facts at ¶ 5.) After observing Miller emerge from one of the vehicles carrying a shotgun, Captain Noble proceeded in his squad car a few feet south of the intersection. He turned into the parking lot of the Hucks Convenience Store because he believed Miller was headed in that direction. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 7.) Captain Noble exited his squad car and ordered Miller to drop his gun, which Miller refused to do. (Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 10, 12.)

At this point, the parties' descriptions of the incident differ with regard to some minor details. The following material facts, however, are undisputed. As Captain Noble pursued Miller around various obstacles in the Hucks parking lot and into the adjacent parking lot of the Main Package Store, Miller had his shotgun at his hip, aimed at Captain Noble. ( *See* Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 14-17; 24.) Although Captain Noble was aware that deadly force could have been used legally under these circumstances to disarm or disable Miller, he did not feel that he had a clear shot. (*See* Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 16; 24-25.) [FN2]

> FN2. Plaintiffs vigorously challenge whether Captain Noble, in fact, had a clear shot. They do not, however, dispute his perception of the situation. (Pl.'s Statement of Add'l Material Facts at ¶¶ 97, 103, 111,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

122-24.)

*2 In the parking lot of the Main Package Store, Miller raised his shotgun at Captain Noble, forcing Captain Noble to take cover behind Kenneth Ross's pick-up truck. (Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 19-20.) While Captain Noble's view of Miller was at least partially obscured by the truck, Miller entered the front door of the Main Package Store. (Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 22.) Captain Noble remained behind the pick-up truck, which he used for cover, and called for assistance. He did not pursue Miller into the store. (Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 23.)

Once inside the Main Package Store, Miller confronted Kenneth Ross, an employee of the storre, in the back storage room, outside the view of the surveillance camera. (See Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 26-29.) The parties strongly disagree as to whether Miller shot Kenneth Ross immediately upon confronting him or whether Miller held Kenneth Ross hostage for some time before committing a murder/suicide. (Cf. Defs.'s Statement of Material Facts with Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 26-29.) This disagreement is immaterial, however, because in deciding a motion for summary judgment, we view the facts in the light most favorable to the plaintiff, Mrs. Ross, and therefore, will treat the event as a hostage situation. Kenneth Ross is never seen on the video surveillance tape again. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 28.)

Scott County dispatch made at least three telephone calls to Miller once he was inside the Main Package Store with Kenneth Ross. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 29.) During one of those phone calls, Captain Noble authorized dispatch to place Miller in telephone contact with his estranged wife, who he had shot at earlier that morning. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 32.) Their conversation ended abruptly, after which nothing further was heard over the telephone line. (See Pl.'s Resp. to Defs.'s Material Facts at ¶¶ 35; 37.) At this time, the Indiana State Police took control of the investigation. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 39.) When entry was gained to the Main Package Store, Miller's body was found where it was last scene on the surveillance videotape--in the front room, behind the counter, crouched over the phone. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 42; photographs of the scene.) Ross's body was found in the back room. (Photographs of the scene.)

Although Captain Noble is not a Defendant in this case, his response to the above-described incident forms the basis of Mrs. Ross's failure-to-train claims. Captain Noble has been employed by the APD since 1994. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 43.) He received his basic training at the Indiana Law Enforcement Academy in 1995. (Pl.'s Statement of Add'l Material Facts at ¶ 50 .) In addition, for the calendar years preceding February 28, 2000, Captain Noble completed at least the minimum amount of in-service training required by the state. (Defs.'s Resp. to Pl.'s First Req. for Produc. of Docs., Ex. B.) In 1995, he received training in "Techniques for Surviving Life and Death Encounters." (Id.) In the subsequent years, in addition to continuing to qualify his firearm, he received training in such skills ranging from "Defensive Tactics 'Nunchaku' " to "How to Develop, Manage, and Supervise ERT." (Id.) He did not, however, receive specific instruction regarding the use of firearms in combat situations or the handling of hostage situations. (See Pl.'s Resp. to Defs.'s Material Facts at ¶ 44, quoting exchanges from the Aff. of L. Noble.)

*3 On January 15, 2001, Mrs. Ross filed a Complaint against Defendants in Scott County Circuit Court alleging a violation of 42 U.S.C. § 1983. (Compl. ¶ 70.) She argued that Defendants were deliberately indifferent to Kenneth Ross's substantive due process rights under the Fourteenth Amendment of the United States Constitution, because they failed to train the officers of the APD, and specifically Captain Lonnie Noble, in the use of deadly force to stop a fleeing felon or in the handling of hostage situations. (Compl. ¶ 71.) On January 26, 2001, Defendants removed this case to this court on the basis of federal question jurisdiction. 28 U.S .C. § 1441(a).

### Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249-52.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *Celotex*, 477 U.S. at 322; *Waldridge*, 24 F.3d at 920.

### Legal Analysis

*4 Mrs. Ross claims a violation of § 1983 of the Civil Rights Act, which provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom or usage, of any State or Territory." 42 U.S.C. § 1983. To state a claim under § 1983, plaintiff must show that (1) the offending conduct was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiffs of rights secured by the Constitution. *See Smith v. City of Chicago*, 820 F.2d 916, 917 (7th Cir.1987). In this case, neither party disputes the fact that Captain Noble acted under color of state law when he responded to an emergency call from police dispatch. Thus, the legal issue before us is whether Mrs. Ross's decedent, Kenneth Ross,

suffered a constitutional injury. Defendants will have violated the substantive component of the Due Process Clause of the Fourteenth Amendment only if their actions can be properly characterized as arbitrary, or conscience shocking, in the constitutional sense. *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).

In addition, to maintain a § 1983 action against an institutional state actor for the actions of its agents, a plaintiff must demonstrate (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not expressly authorized, is so permanent and well-settled as to constitute a custom or usage; or (3) that the plaintiff's constitutional injury was caused by a person with final policy- making authority. *Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 817 (7th Cir.2001). Therefore, to recover Mrs. Ross first must show that the decedent's harm was caused by a constitutional violation. Then, she must prove that an institutional state actor--the Town, the APD, or Chief Richey, in this case--was responsible for that constitutional violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 121-22 (1992).

### Constitutional Injury

Although Defendants do not dispute the tragedy of Kenneth Ross's untimely death, they contend that summary judgment is appropriate in this case because he suffered no constitutional injury. Although the Due Process Clause of the Fourteenth Amendment forbids the state from abusing its power to deprive individuals of life, liberty, or property, it does not impose an affirmative obligation on the state to guarantee certain minimal levels of safety and security. *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195-96 (1989). Mrs. Ross, however, argues that the "state-created danger exception" to *DeShaney* applies in this case. Under the state-created danger exception, plaintiffs "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger, or renders citizens more vulnerable to a danger [than] they otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.1993). Mrs. Ross contends that by failing to require the police force to use deadly force on behalf of victims of violent crime, and by failing to train the police force to handle hostage situations, the Defendants created a dangerous situation and thereby rendered its citizens more vulnerable to danger than they otherwise would have been. (Pl.'s Memo. in Opp. to Summ. J. at 6-8).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2002 WL 31160139, *4 (S.D.Ind.))

*5 A two-part test sets forth the elements of a state-created danger claim. *Wallace v. Adkins,* 115 F.3d 427, 430 (7th Cir.1997). First, the court must determine what actions the state actor affirmatively took. Then, it must examine what dangers the plaintiff would otherwise have faced. In considering the second element, however, the question is not what dangers the plaintiff would have faced had the state actor behaved as he wanted them to, but what dangers he would have faced absent the affirmative acts actually taken. *Id.*

### Non-Use of Deadly Force

In support of summary judgment, Defendants argue that, under the circumstances, Captain Noble had no constitutional duty to use deadly force to disarm or disable the gunman, Gregory Miller. We agree. In *DeShaney,* the Department of Social Services may have been aware of the danger plaintiff faced (child abuse), yet it placed him back in the custody of his natural father. 489 U.S. at 201. Although the plaintiff's father subsequently beat him so severely as to render him "profoundly retarded," the Court held that the state played no part in the creation of plaintiff's danger, nor did the state do anything to render him any more vulnerable to that danger. *Id.* at 193, 201 ("when [the state] returned [plaintiff] to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.")

In this case, even if Captain Noble knew that Kenneth Ross would be in danger once Miller entered the Main Package Store, he, like the Department of Social Services in *DeShaney,* did not affirmatively create Kenneth Ross's danger. Gregory Miller did. (*See* Pl.'s Memo. in Opp. of Summ. J., Ex. 1, Dep. of L. Noble p. 80, l. 14-18.) In another factually analogous case, *Losinski v. County of Trempealeau,* 946 F.2d 544 (7th Cir.1991), the court did not find § 1983 liability where a sheriff's deputy, aware of the risk of violence, failed to intervene in a domestic dispute until the husband shot his estranged wife. [FN3] Although the deputy fell short of protecting the wife from a known danger, the court concluded that he did not initiate state action. *Id.* at 550-51 (observing that the "factual settings [*DeShaney* ] identifies as warranting an exception ... involve incarceration or a functional equivalent, where the state actually creates the risk of harm through confinement.")

FN3. In *Losinski,* a sheriff's deputy accompanied a woman, at her request, to her estranged husband's

home to collect her belongings. Aware of the husband's violent tendencies, the deputy stood in the hallway as the couple argued. He did not intervene until the husband produced a loaded gun and shot the wife. 946 F.2d at 547-48.

Nor did Captain Noble do anything to render Kenneth Ross more vulnerable to danger than he would have been had Captain Noble or the APD not acted at all. A disturbed Gregory Miller would still have been "striding" down State Road 256 with a loaded shotgun. (*See* Pl.'s Memo. in Opp. of Summ. J., Ex. 1, Dep. of L. Noble p. 47; 60-61.) Captain Noble did not place Kenneth Ross in a place or position of danger; he simply failed adequately to protect Kenneth Ross, as a member of the public, from a dangerous man. In the Seventh Circuit, one has no constitutional right to state protection from criminals or madmen. *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982); *see also DeShaney,* 489 U.S. at 201; *Jackson v. City of Joliet,* 715 F.2d 1200, 1205 (7th Cir.1983) (no constitutional right to basic rescue services).

### Handling of Hostage Situation

*6 With regard to Captain Noble's decision to allow Gregory Miller to speak with his estranged wife, which allegedly increased the shooter's anxiety level and made him more prone to violence, we again hold, under similar reasoning, that such a judgment call does not rise to the level of a constitutional injury. If, as noted above, Kenneth Ross had no constitutional right to police protection from violent crime or to basic rescue services, it follows that he would have no constitutional right to hostage negotiation services. *Taylor v. Watters,* 655 F.Supp. 801, 806-07 (E.D.Mich.1987) (holding that the failure of police to rescue successfully an endangered hostage did not constitute a deprivation of a liberty interest); *see also Bryson v. City of Edmond,* 905 F.2d 1386 (10th Cir.1990) (where a gunman opened fire on a post office, killing some people instantly and rendering the initial survivors hostages, and police decided to wait an hour and a half before attempting to enter the building, court held that the limitations on the victims' liberty were imposed by their assailant, not by the police, and the police's delayed response did not constitute a constitutional injury).

In *Salas v. Carpenter,* 980 F.2d 299 (5th Cir.1992), the most factually analogous case, a sheriff's department took control of a hostage situation on jurisdictional grounds, refusing the assistance of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

more experienced local police department as well as the assistance of "a leading hostage negotiation authority and instructor." *Id.* at 302. The sheriff's efforts failed to prevent the gunman from shooting the hostage. Although the court found that the sheriff's department lacked an official hostage negotiation policy and any deputies with actual hostage negotiation experience, the court held that "the Fourteenth Amendment does not require [the sheriff] to train and equip members of the sheriff's department for special SWAT or hostage negotiation duties." *Id.* at 302, 309-310. We agree and find, therefore, that Kenneth Ross had no constitutional right to hostage rescue services.

### Captain Noble's actions did not "shock the conscience"

In support of summary judgment, Defendants argue further that even assuming Mrs. Ross establishes a constitutional right to police protection from violent crime or to police rescue from hostage situations, Captain Noble's actions did not "shock the conscience" so as to result in a violation of the Due Process Clause. Although we have determined above that Kenneth Ross had no such constitutional rights, we briefly address Mrs. Ross's claim that Captain Noble's arbitrary actions "channeled" the shooter, Gregory Miller, into the Main Package Store. (Pl.'s Memo. in Opp. to Summ. J. at 10.)

In *Lewis,* the Supreme Court stated that the kind of official action most likely to "shock the conscience" would be "conduct *intended to injure* in some way unjustifiable by any government interest" or " *deliberate* decisions of government officials to deprive a person of life, liberty or property." 523 U.S. at 849 (emphasis added) (internal citations omitted). We evaluate the state actor's conduct in context, and in a fluid, dangerous context, the required level of culpability is greater than deliberate indifference to a known danger. "As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Id.* at 850; *see also Schaefer v. Goch,* 153 F.3d 793, 797 (7th Cir.1998). In the Seventh Circuit, the "yardstick" used to determine § 1983 liability in a fluid, dangerous context is "reasonable action based upon the specific circumstances confronting the officers on the scene, subject to their immediate capabilities and the possible limitations inherent to a ... street patrol response." *Reed,* 986 F.2d at 1127. Extraordinary measures are not required. *Id.*

\*7 Mrs. Ross contends that Captain Noble's lack of training and inexperience forced him to act arbitrarily in deciding whether to protect the lives of the people inside Huck's or whether to protect the life of Kenneth Ross. Captain Noble, however, did not act arbitrarily with respect to particular individuals. *See DeShaney,* 489 U.S. at 198. Unlike the deputy sheriff in *Ross v. U.S.,* 910 F.2d 1422 (7th Cir.1990), who barred anyone from entering Lake Michigan to rescue a 12-year-old boy, Captain Noble did not greatly increase the risk of harm to one class of citizens (e.g., people in danger of drowning in *Ross* ) in favor of protecting another class of citizens (e.g., private rescuers in *Ross* ). Nor did he restrict Kenneth Ross's access to self-help. *See Ross,* 910 F.2d at 1430-31. Tragically, Kenneth Ross was a member of the public who happened to be in the wrong place at the wrong time.

Although the exact sequence of events is disputed in this case, neither party suggests that Captain Noble had time to do anything but react to the situation around him. [FN4] Mrs. Ross maintains only that his reactions should have been better informed, that he should have known how to manipulate the gunman's position vis-a-vis the public around him to avoid endangering Kenneth Ross. However,

> FN4. Captain Noble, in his deposition, described this scene this way: "Everything happened in seconds. I mean, you know, it was just split decisions. Everything happened in seconds." (Dep. of L. Noble at p. 52, l. 8-10.)

the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.... When unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed. *Lewis,* 523 U.S. at 853 (internal citations omitted).

While Captain Noble's spur-of-the-moment decisions to refrain from using deadly force to disable or disarm Gregory Miller and to put Miller in touch with his estranged wife during a hostage negotiation may not have been advised, they were at most negligent, and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2002 WL 31160139, *7 (S.D.Ind.))

"liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Daniels v. Williams,* 474 U.S. 327, 328 (1986). Because Captain Noble did not "knowingly and affirmatively create a dangerous situation for the public" or intend to cause harm to Kenneth Ross, his actions do not shock the conscience. *Reed,* 986 F.2d at 1127; *Schaefer,* 153 F.3d at 798. Therefore, as Captain Noble's actions did not result in a constitutional injury to Kenneth Ross, we *GRANT* Defendant's Motion for Summary Judgment.

### Failure to Train

Defendants contend, correctly, that a claim against a municipality for failure to train its officers cannot stand once the underlying claim alleging a constitutional injury has fallen. *See Schaefer,* 153 F.3d at 799. Out of respect for Mrs. Ross's situation, however, we address her failure-to-train claim specifically.

**\*8** Mrs. Ross claims that the Town of Austin failed to train its police officers in the proper use of deadly force and proper hostage negotiation procedure, and that these failures caused Captain Noble to deprive Kenneth Ross of his constitutional rights. Although we did not find that Kenneth Ross suffered an injury protected by the Constitution, even if we were to assume that the police training was so inadequate as to give rise to a constitutional injury, we must conclude that it would not give rise to § 1983 liability. Under *City of Canton v. Harris,* 489 U.S. 378 (1989), "only where a municipality's failure to train its employees 'in a relevant respect' evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389.

The phrase "in a relevant respect" directs us, in resolving the issue of municipal liability, to focus on the adequacy of the training program in relation to the tasks the particular officer(s) must perform. A failure-to- train claim could be made about almost any encounter resulting in injury, yet would not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. *City of Canton,* 489 U.S. at 390-91. In addition to the duties of a "Patrolman," a "Captain" in the APD is charged with certain administrative responsibilities. [FN5] Mrs. Ross has not alleged, however, that Captain Noble is a member of any special force.

FN5. A Captain "shall be responsible for the general good order and discipline of their respective shifts." (Rules and Regs. at 8.)

In the Seventh Circuit, "deliberate indifference" requires that the municipality act intentionally or with criminal recklessness. *Salazar v. City of Chicago,* 940 F.2d 233, 238 (7th Cir.1991) (defining recklessness in the constitutional sense to mean "the state actor must ignore a known and significant risk of death.") In a failure-to-train case, the need for enhanced training must be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that a jury could reasonably attribute to policymakers a deliberate indifference to training needs. *Erwin v. County of Manitowoc,* 872 F.2d 1292, 1298 (7th Cir.1989). Mrs. Ross cannot avoid summary judgment merely by proving that the injury could have been averted had Captain Noble received more or better training, i.e., training sufficient to equip him to avoid the particular conduct that resulted in injury. *Id.; see also City of Canton,* 489 U.S. at 391.

Mrs. Ross alleges that the Town's training of police officers was deficient in the following respects: the Town Board allocated no, or at least insufficient, monies for training; the training curriculum did not include "combat engagement" or "hostage negotiations;" and the Town Board did not insist that Chief Richey comply with police chief training required by state law. (Pl.'s Memo. in Opp. of Summ. J. at 11-15.) Although the Town Board did not provide a line item in its budget for police training and there is a dispute as to which governmental body paid for the training, the parties do not dispute that it did occur. (*Cf.* Pl.'s Resp. to Defs.'s Material Facts at ¶ 45 *with* Aff. of Donald Campbell, Clerk-Treasurer for Town of Austin; Pl.'s Resp. to Defs.'s Material Facts at ¶ 44 & Defs.'s Resp. to Pl.'s First Req. for Produc. of Docs., at Req. # 1, Ex. A & B, Annual Reports of Training Status 1995-1999.) Therefore, Ross's argument that the "Austin Town Board was aware that no training was occurring," does not merit further consideration.

**\*9** In support of her second allegation, Ross presents the affidavit of Charles Braun, a hostage negotiation specialist, who opined, based on a review of Captain Noble's training records, that he received inadequate training in "the proper use of force, apprehending dangerous fleeing felons, and the handling of hostage taking situations," and that this deficiency led directly to his failure to prevent Miller from shooting Kenneth

Ross. (Evidence in Supp. of Pl.'s Memo. in Opp. of Summ. J., Ex. 5 at ¶ 16.) Mrs. Ross acknowledges that Captain Noble completed basic training at the law enforcement academy. (Pl.'s Resp. to Defs.'s Material Facts at ¶ 44.) She argues, however, that because he was not required to receive special training in the areas of deadly force and hostage negotiation, his training was deficient. (Pl.'s Memo. in Opp. of Summ. J. at 13.) We cannot accept this reasoning, however, because "[t]o do so would ignore the training the officers did receive" and fall prey to the "more or better" scenario warned against in *City of Canton. Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir.1997).

State law governs the training of APD officers and requires each officer to complete a minimum of 16 hours of in-service training in each calendar year. Ind.Code Ann. § 5-2-1-9(g) (West 2002). Such training may be in *any* subject area included in the law enforcement academy's basic training course or other job related subjects that are approved by the board. *Id.* (emphasis added). Captain Noble received at least the minimum amount of training for the calendar years 1995-1999. (Annual Reports of Training Status 1995-1999.) [FN6] No argument was made in this case that the Indiana state standards for training police to handle the use of deadly force and hostage negotiations are in any way deficient under the Federal Constitution. *See Palmquist*, 111 F.3d at 1345; *Johnson v. City of Milwaukee*, 41 F.Supp.2d. 917, 930 (E.D.Wis.1999) (interpreting *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir.1992), to hold that where the **state** imposes minimum training standards on municipalities, evidence showing adherence to those standards barred any finding that the city's policymakers were deliberately indifferent to the need for better training.) *Johnson* went on to find that, while it is possible that the state's minimum standards do not adequately address the issue raised by Plaintiff's expert, under *Tapia*, compliance by a municipality with state standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference. 41 F.Supp.2d at 930 . We concur with the reasoning in *Johnson*, and conclude, therefore, that summary judgment on this failure to train claim is warranted. [FN7]

FN6. In addition, the APD Rules and Regulations ("Rules and Regs.") provide that "officers shall attend and comply with all training courses as may be set or designated by the Board of Police Commissioners and/or the Chief of Police," and that "all Police Officers will practice on the pistol range until they

pass minimum requirements set by the Chief of Police for marksmanship." (Rules and Regs. at 16.) Captain Noble qualified his weapon each year. (Aff. of L. Noble, p. 93, l. 19-22.) With regard to the use of deadly force, the Rules and Regulations specify only how it must be limited; they do not mandate the use of deadly force under any circumstances. (Rules and Regs. at 18-19, 22-24.)

FN7. Our conclusion is supported by the fact that the Austin Police Department was unaware of any hostage situation occurring prior to February 28, 2000. (Dep. of M. Richey, Chief of Police, at p. 23-25 .) While a hostage situation is always theoretically possible, we find that Mrs. Ross has failed to allege facts from which a reasonable jury could find that the Defendants ignored a known and significant risk of death, and therefore, were deliberately indifferent to the need to train their officers in this "relevant respect." *See Salazar*, 940 F.2d at 238.

Ross's final argument in support of her failure to train claim is that Chief Richey, the "gatekeeper" of training policy, neither participated in the police chief executive training program nor identified the risk of constitutional injury posed by his failure to require, as part of the police training curriculum, the use of deadly force in combat situations and the handling of hostage situations. (Pl.'s Memo. in Opp. of Summ. J. at 23-30.) In addition, Ross argues that by refusing to insist that Chief Richey execute his duties to full extent of the law and department policy, the Town ratified his unconstitutional actions. (Pl.'s Memo. in Opp. of Summ. J. at 12-13.) Our finding that the municipality was not deliberately indifferent to the need for better training, however, renders this argument moot. [FN8]

FN8. Mrs. Ross also alleges that Chief Richey is responsible in his individual capacity for the death of Kenneth Ross. An individual cannot be held liable under § 1983 unless he caused or participated in the alleged constitutional deprivation. *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir.1996). As Chief Richey was involved in neither the decision to use deadly force nor the hostage negotiation, the only basis for a claim against him would be failure to train. Although we found above that the training Captain Noble received was not constitutionally deficient, Mrs. Ross alleges that Chief Richey remains liable because he did not attend the training for police chiefs mandated by Indiana law. *See* Ind.Code Ann. § 5-2-1-9(i)-(k) (West 2002). We find, however, that while Chief Richey's failure to attend the required police chief executive training program was unfortunate, Mrs. Ross has failed to demonstrate a

sufficient causal nexus between the claimed injury and Chief Richey's failure to receive training related in large part to the specific administrative duties of the police chief. *See City of Canton,* 489 U.S. at 391-92 (discussing how the federal courts are ill-suited to predicting whether the injury could have been avoided had the officer been well-trained); *Palmquist,* 111 F.3d at 1346. In addition, while Chief Richey may have been negligent in cancelling his application to the training program in anticipation of retirement, the Constitution does not guarantee due care on the part of state officials. *Daniels,* 474 U.S. at 332.

### Conclusion

*10 Defendants Town of Austin, Town of Austin Police Department, and Police Chief Marvin Richey have moved for summary judgment, arguing that Plaintiff Tamra Ross could not establish a prerequisite to suit under § 1983, that Defendants violated a constitutional right of Plaintiff's decedent, Kenneth Ross. For the reasons explained above, we find that Kenneth Ross had no constitutional right to police protection from violent crime or to hostage negotiation services, and that even if he did, Captain Noble's decisions to refrain from using deadly force to disable a gunman, and to put the gunman in contact with his estranged wife during a hostage negotiation did not "shock the conscience" so as to create a constitutional injury. [FN9] Therefore, as no underlying constitutional injury exists, it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish her claim against Defendants for failure to train. [FN10] Therefore, Defendants' Motion for Summary Judgment is *GRANTED* and both Plaintiff's and Defendants' Motions to Strike are *DENIED* as moot.

> FN9. In the alternative, Defendants raise the affirmative defense that Captain Noble is entitled to qualified immunity. However, because we find that Captain Noble did not commit a constitutional violation, a prerequisite for a claim of qualified immunity, it is unnecessary for us to address this issue. *See Klash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir.1996).

> FN10. Mrs. Ross argues that genuine and material issues of fact exist with regard to: (1) whether the field of fire available to Noble had he engaged the shooter was clear at any point so that Noble could use force to prevent Miller from entering Main Package Store and taking Kenneth Ross's life; (2) the time of death of Kenneth Ross; and (3) whether Noble's order to place the shooter in contact with his estranged wife, minutes after the shooter attempted to murder her, placed Ross, as a hostage, in greater likelihood of deadly harm. While a genuine dispute over these facts may exist, these issues of fact are not material to the disposition of the case. Because Ross has no constitutional right to police protection from violent crime or to hostage negotiation services, these facts, which go to the competency of Captain Noble's attempted rescue of Kenneth Ross, are immaterial.

2002 WL 31160139 (S.D.Ind.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

KeyCite                                                                    **Page 9**

Date of Printing: FEB 19,2003

## KEYCITE

CITATION:Ross, Tamra v. Town of Austin, 2002 WL 31160139 (S.D.Ind., Sep 23, 2002) (NO. NA01-0015-C-BG)

**History**

=>        1  **Ross, Tamra v. Town of Austin,** 2002 WL 31160139  (S.D.Ind. Sep 23, 2002)
              (NO. NA01-0015-C-BG)

© Copyright 2003 West, Carswell, Sweet & Maxwell Asia, Ltd. and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.