EXHIBIT
C

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.

Frederick WILLIAMS Plaintiff,
v.
Scott MUSSER, et al. Defendants.

No. 94 C 4140.

July 16, 1997.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

Background

*1 This case arises from a collision which occurred between the plaintiff and Officers Scott Musser and Paul Henry. The collision occurred during the officers' attempts to apprehend the plaintiff after he fled from them while they were attempting to stop him for a routine traffic violation. Counts I and II of the plaintiff's Third Amended Complaint, brought pursuant to 42 U.S.C. § 1983, allege that the actions of Officers Musser and Henry constituted an unreasonable use of force and an unreasonable seizure, thereby violating the plaintiff's Fourth and Fourteenth Amendment rights. Both Musser and Henry are named as defendants in their individual capacities. Counts VI and VII allege that the Village of Lansing is liable under section 1983 for failure to train and supervise the officers.

The complaint also alleges various state law claims against the defendants, including battery, willful and wanton conduct, and negligent failure to train and supervise. Currently before the court is a motion for summary judgment by defendants Musser, Henry, Other Unknown Police Officers, and the Village of Lansing. After reviewing the briefs of the parties, the court grants Officer Henry's motion for summary judgment on Counts II, III, IV, and V. The court denies Officer Musser's motion for summary judgment on all counts. The court grants the Village of Lansing's motion for summary judgment on Counts III through VII. Finally, the court denies the defendants' motion to strike.

Facts Pertaining to the Pursuit and Collision

On Saturday May 28, 1994 at approximately 2:00 p.m., Officer Charles Maricich, a Village of Lansing police officer, observed the plaintiff driving his motorcycle without a license plate. It is undisputed that the weather was sunny and clear on this day. Def. 12(m) at ¶ 4; Pl. 12(n) at ¶ 4. The plaintiff was driving south on Torrence avenue near Thornton-Lansing Road. Officer Maricich stopped the plaintiff on Torrence Avenue. The parties dispute whether Officer Maricich activated his car's lights and sirens in order to stop the plaintiff. Maricich at 27-31; Williams at 157-60. The parties also dispute whether Officer Maricich spoke to the plaintiff over his loudspeaker. Id. Officer Maricich testified that he motioned for the plaintiff to pull into a nearby White Hen parking lot. Maricich at 29. It is undisputed that the plaintiff did not do this, but instead he re-entered traffic on Torrence Avenue and accelerated southbound. Officer Maricich followed the plaintiff. The parties dispute whether he activated his car's lights and sirens, and whether he notified dispatch of the plaintiff's flight. Maricich at 31; Pl. 12(n) at ¶ 7.

The parties do not dispute the path of the pursuit, but they do dispute the speeds with which their vehicles were traveling. The plaintiff turned on Glenwood-Lansing Road and proceeded west. Officer Maricich testified that the plaintiff's speed approached 100 m.p.h. on Glenwood-Lansing Road, but the plaintiff testified that he was traveling at 50 m.p.h. Maricich at 32; Williams at 172.

*2 The plaintiff turned north on Cottage Grove Road. It is undisputed that at this point, the plaintiff observed a patrol car pursuing him with its lights and sirens activated. Williams at 187-88. It is also undisputed that the plaintiff accelerated when he saw the patrol car. Williams at 195. The plaintiff admits that he was attempting to elude the patrol car at this time. Pl. 12(n) at ¶ 11. It is undisputed that at certain times, the plaintiff's speed on Cottage Grove exceeded 50 m.p.h. Williams at 191-92.

It is also undisputed that the plaintiff then proceeded east on Thornton- Lansing Road. Officer Maricich continued to pursue the plaintiff. The plaintiff pulled into a parking lot at the intersection of Thornton-Lansing Road and Stony Island and stopped. Officer Maricich stopped his patrol car as well. At this time, Officer Scott Musser, a Village of Lansing police officer, activated his lights and sirens and joined in the pursuit. Officer Musser turned into the parking lot and stopped his patrol car behind the plaintiff's motorcycle. At this time, Officer Musser exited his

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 403509
(Cite as: 1997 WL 403509, *2 (N.D.Ill.))

patrol car, drew his gun and approached the plaintiff. The plaintiff fled once again, re-entering Stony Island Avenue and proceeding south.

Officer Musser entered his patrol car and pursued the plaintiff on Stony Island Avenue. The parties dispute the speed of the pursuit at this time. Musser at 64; Pl. 12(n) at ¶ 19. It is undisputed that there was no other traffic on Stony Island Avenue at this time. Pl. 12(n) at ¶ 19.

The plaintiff then turned left onto 186th Street and proceeded east. Officer Musser testified that he continued his pursuit of the plaintiff at speeds in excess of 100 m.p.h. Musser at 72. Officer Henry began pursuing the plaintiff, by traveling west on 186th Street. It is undisputed that the plaintiff drove into a church parking lot at speeds of 20-30 m.p.h. Def. 12(m) at ¶ 24; Williams at 231. Officer Henry followed the plaintiff at about 30 m.p.h. Henry at 82; Pl. 12(n) at ¶ 25. The plaintiff decelerated to 10-15 m.p.h. at the rear of the parking lot. Henry at 84; Pl. 12(n) at ¶ 25.

The plaintiff exited the parking lot by driving over a curb and into a residential yard between two houses at about 10 m.p.h. Henry at 85; Williams at 229, 231. Officer Henry followed the plaintiff through the residential yard at approximately 5-10 m.p.h. Henry at 87; Pl. 12(n) at ¶ 27. The plaintiff traveled through the yard and onto 185th Court where he drove east at 10-20 m.p.h. Def. 12(m) at ¶ 29; Williams at 231. The plaintiff began to decelerate as he approached Hickory Avenue. Def. 12(m) at ¶ 29; Williams at 233.

Officer Musser did not follow the plaintiff into the church parking lot. Musser at 31. Instead, he continued to travel east on 186th Street, and then he turned north onto Hickory. Musser at 90. Officer Musser testified that he was traveling at 20-25 m.p.h. and that he was decelerating. Musser at 91-92. The parties dispute whether Officer Musser knew of the plaintiff's's location at this time. Musser at 91-92; Pl. 12(n) at ¶ 32. Officer Musser testified that he next observed the plaintiff at 185th and Hickory, and that he began to brake. Musser at 93, 95-96. It is undisputed that Officer Henry began to brake as he approached 185th Court and Hickory and spotted Officer Musser's car traveling northbound on Hickory. Henry at 25; Pl. 12(n) at ¶ 34.

*3 The plaintiff, Officer Henry, and Officer Musser collided at the intersection of 185th Court and

Hickory. Williams at 71; Henry at 5; Musser at 96-97. The only other eyewitness to the collision was Officer William Alcott, a Lynwood police officer. Cortez at 22; Pl. 12(n) at ¶ 36. Officer Alcott was behind Officer Musser, and heading eastbound on 186th Street and then north on Hickory. Alcott at 22; Pl. 12(n) at ¶ 39.

At some point, the plaintiff either jumped off his motorcycle or was knocked off due to the impact. The plaintiff suffered injuries to his hip as a result of this accident.

The parties dispute whether the plaintiff had come to a stop prior to the collision. Both Mr. Stephan Neese, the defendants' accident reconstruction expert, and Officer Alcott testified that the plaintiff was still moving forward. Neese at 33, 87; Alcott at 52-55. The plaintiff testified that he had already stopped. Williams at 107, 233, 289. The plaintiff's accident reconstruction expert, Mr. Willard Alroth, testified that the plaintiff might have been moving forward at 5 m.p.h. or less. Alroth at 85, 102-03.

Mr. Alroth opined that Officer Henry was braking before the collision and that it appeared that he was attempting to avoid the collision. Alroth at 96, 108, 179. Alroth also testified that he was unaware of any evidence to suggest that Officer Henry intentionally collided with the plaintiff. Alroth at 178-79. Mr. Neese testified that Officer Henry was either stopped, or was within two feet of being stopped when the collision occurred. Neese at 119.

The parties dispute whether Officer Musser was braking at the time of impact. Mr. Alroth testified that Officer Musser could have been braking at this time. Alroth at 115. He opined that Officer Musser's speed at the time of impact was 5-10 m.p.h. but might have been only 1 m.p.h. Alroth at 152-53. Officer Alcott also testified that Officer Musser was braking at the time of the collision. Alcott at 53. Mr. Neese testified that Officer Musser was traveling at 6-9 m.p.h. at the time of impact and that he was braking at the time. Neese at 33, 69, 140. The plaintiff testified that Officer Musser came to a complete stop approximately five to ten feet away from the plaintiff's motorcycle and then accelerated, apparently intentionally colliding with the plaintiff. Williams at 290-92.

Facts Pertaining to the Liability of Defendant Lansing For Failure to Train and Supervise

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997 WL 403509
(Cite as: 1997 WL 403509, *3 (N.D.Ill.))

The following facts are undisputed. Officer Musser received his basic training ("PTI training") at the Police Training Institute in Champaign, Illinois. There, he received training in the areas of police pursuits, defensive driving, and the use of force to effect an arrest. Musser at 20-30. After being hired by the Lansing Police Department, he, like all new officers, was placed on a one-year probation period. Musser at 18. He also received continuing education in the areas of use of force, deadly force, and civil liability. Musser at 37-38.

*4 Officer Henry received his PTI training at the Illinois State Police Academy in Springfield, Illinois. He testified that at the academy, he received pursuit training which consisted of his watching videos of police pursuits and receiving instruction on the factors to consider during a pursuit. Henry at 28- 30. He also received written materials on the subject of fresh pursuits. Henry at 31. Once Officer Henry was hired by the Lansing Police Department, he received instruction on the Lansing policy manual which included information on the Lansing fresh pursuit policy, explained below. Henry at 36-38.

Sergeant Michael Dohl was the shift commander on May 28, 1994. He monitored part of the pursuit over the radio. Sergeant Dohl received his PTI training at the University of Illinois in Champaign. Dohl at 5-6. He was promoted to sergeant in 1993. Dohl at 6. He attended supervisor school at Northwestern University Traffic Institute. Dohl at 11-12.

Chief of Police Dean Stanley testified that Lansing officers are required to attend basic training at a certified police academy, to complete a 10-12 week field training program, and to complete an eighteen month probationary period. Stanley at 20-21, 24, 33. It is undisputed that the Lansing Police Department gives its officers a copy of the Lansing fresh pursuit policy, asks them to read it, and asks that they understand it in its entirety and obtain any needed clarification from their supervisor. Pl. 12(n) at ¶ 65. What the parties do dispute is whether this procedure is sufficient.

The Lansing fresh pursuit policy consists of a "considerations" section which includes seven factors which the officer must consider in deciding whether to pursue a fleeing suspect. [FN1] The policy also provides directives for engaging in fresh pursuits. *See* Exhibit F to Pl. 12(n) at 76-77. The procedures provide that "[a]ll due caution must be used in fresh pursuits.... Intentionally damaging a suspect vehicle

with a squad car also will not be tolerated." *Id.* It also provides that "[t]his department expects an officer to terminate his involvement in fresh pursuits whenever the risks to his/her own safety and the safety of others outweighs [sic] the danger to the community if the suspect is not apprehended." *Id.* at 77.

FN1. The Lansing policy provides that officers must ask the following questions before deciding whether to pursue a fleeing suspect:
(1) Does the seriousness of the crime warrant a chase at unsafe speeds?
(2) What is the possibility of apprehensions?
(3) Will the pursuit take place on residential streets, a business district, or a freeway?
(4) What are the traffic conditions?
(5) What are the weather conditions?
(6) What condition is the squad car in?
(7) Is the pursuing Officer alone or does he/she have the assistance of another Officer?
*See* Exhibit F to Pl. 12(n) at 74-75.

Thomas Walton, a police practices expert retained by the defendants, testified that in his opinion, the training received by the officers in this case satisfied the Illinois Local Government Law Enforcement Officers Training Board standards. Walton at 211-16. He also testified that in his opinion, the additional directives and guidelines provided by the Lansing police department were sufficient. Walton at 215-16.

Geoffrey Alpert, the police practices expert retained by the plaintiff, testified that he did not know whether the Lansing fresh pursuit policy complied with Illinois law because he is unfamiliar with what the law requires. Alpert at 66. The parties agree that there is no federal law requiring police departments to have fresh pursuit policies. The experts dispute whether there is some "national standard" which would requires police departments to have a particular type of pursuit policy. Def. 12(m) at ¶ 72; Pl. 12(n) at ¶ 72. Mr. Alpert testified that he has not seen the curriculum for the Illinois police academy pursuit training, and that because of this, he has no opinion as to whether this training is sufficient. Alpert at 73-74. Plaintiff attempts to create a disputed issue by citing to Officer Henry's testimony that the police academy did not instruct the officers on "departmental policy" on pursuits, but rather left this to the individual departments. Pl. 12(n) at ¶ 73. Officer Henry's testimony on the lack of "departmental policy" pursuit training at the academy does not, however, constitute evidence that whatever "non-departmental" pursuit training the police academy provided was inadequate.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Discussion

*5 In the present case, the defendants make several arguments in support of their motion for summary judgment. Defendants Musser and Henry argue that they are entitled to summary judgment on Counts I and II because the plaintiff's constitutional rights were not violated. They further argue that they are entitled to summary judgment on these counts based on the doctrine of qualified immunity. Defendant Lansing argues that it is entitled to summary judgment on Counts VI and VII because it did not act with "deliberate indifference" and because no causal connection exists between the allegedly inadequate training and the collision which occurred in this case. All three defendants argue that they are entitled to summary judgment on Counts III through V because the plaintiff has not presented evidence that the defendants acted "willfully and wantonly."

Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When determining whether a genuine issue of material fact exists, the court must draw all reasonable inferences in favor of the non-movant. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The non-movant cannot rely on "mere allegations or denials [in] his pleadings" to create issues of fact. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Rather, the non-movant must present evidence which rebuts the facts presented by the movant. *See Akerberg v. Metro. Rail*, 773 F.Supp. 111 (N.D.Ill.1991). In addition, the "mere possibility that a factual dispute may exist, without more," is not sufficient. *Posey*, 702 F.2d at 106.

Finally, courts should be "careful" to not grant summary judgment in cases in which intent is a "genuinely contestable" issue of material fact. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997). Rather, summary judgment is appropriate if the plaintiff "fails to indicate any motive or intent to support plaintiff's's position." *Scheib v. Grant*, 22 F.3d 149, 155 (7th Cir.), *cert. denied*, 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 280 (1994).

Counts I and II: Section 1983 Liability of Officers
Musser and Henry

The plaintiff argues that the collision between his motorcycle and Officer Musser's and Henry's squad cars constituted an unreasonable seizure in violation of his Fourth Amendment rights. The defendants argue that they cannot be held liable because they are entitled to qualified immunity.

The doctrine of qualified immunity shields government officials from civil liability arising from their performance of "discretionary functions," so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Donovan v. Milwaukee*, 17 F.3d 944, 947 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In order to determine whether a government official should receive immunity, the court must determine: (1) whether the alleged conduct violates the constitution, and (2) whether the constitutional standards were "clearly established" at the time the conduct occurred. *Donovan*, 17 F.3d at 947. In determining whether the standards were "clearly established" at the time the conduct occurred, the plaintiff bears a heavy burden of proof, since this doctrine is designed to shield "all but the plainly incompetent or those who knowingly violate the law" from liability. *Id.* at 952 (quoting *Huges v. Meyer*, 880 F.2d 967, 971 (7th Cir.1989), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990)). The plaintiff may satisfy this burden by:
*6 (1) pointing to a closely analogous case that established a right to be free from the type of force the police officers used on him, or (2) showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.

*Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.1996) (citing *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir.1993)).

*Was The Collision A Seizure?*

The court must first determine whether Officer Musser's and Officer Henry's conduct violated the Fourth Amendment. A Fourth Amendment seizure occurs whenever there is "a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). This means that in order for the plaintiff to establish that either officer "seized" him, the plaintiff must show that the collision with that officer's patrol car was the means intended by that officer to end the chase. *See Horta v. Sullivan,* 4 F.3d 2, 10 (1st Cir.1993). Because the plaintiff's constitutional claim requires proof of intent, the plaintiff must produce specific factual support for his allegation that the officer intended to stop the plaintiff by colliding with him. *See Hill v. Shelander,* 992 F.2d 714, 717 (7th Cir.1993). A collision which results from an officer's negligence alone is not a "seizure" for Fourth Amendment purposes. *See Campbell v. White,* 916 F.2d 421, 422-423 (7th Cir.1990). In fact, the Seventh Circuit has made clear that a distinction exists between "an accidental or tortious act which happens to be committed by a government official and an intentional detention that rises to the level of a constitutional violation." *Id.*

*Officer Henry*

In the present case, viewing the record in the light most favorable to the plaintiff, there is no basis for a jury to conclude that a collision between the plaintiff's motorcycle and Officer Henry's car was the means intended by Officer Henry to end the pursuit. *See Horta,* 4 F.3d at 11; *Campbell,* 916 F.2d at 423; *Roach v. City of Fredericktown,* 882 F.2d 294, 296 (8th Cir.1989).

Officer Henry testified that he began to brake in an attempt to stop his squad car before it collided with the plaintiff. Henry at 9. Mr. Stephan Neese, the defendants' accident reconstruction expert, testified that Officer Henry was either stopped or was within two feet of being stopped when the collision occurred. Neese at 119. Plaintiff's own expert, Mr. Willard Alroth, opined that Officer Henry was braking before the collision and that it appeared that he was attempting to avoid the collision. Alroth at 96, 108, 179. He also testified that he was unaware of any evidence to suggest that Officer Henry intentionally collided with the plaintiff. Alroth at 178-79. Moreover, the plaintiff has admitted that "Officer Henry began to brake as he approached the intersection of 185th Court and Hickory when he first observed Musser's squad car traveling northbound on Hickory." Pl. 12(n) at ¶ 34. Based on the record here, the plaintiff has not produced sufficient facts which would lead a reasonable jury to conclude that Officer Henry intended to collide with the plaintiff. It is simply "not sufficient that [Officer Henry] pursued

and the pursuit resulted in a collision ...." *Horta,* 4 F.3d at 10.

*7 Thus, the court finds that the plaintiff has not shown that Officer Henry "seized" him and thus there is no Fourth Amendment violation. *See Horta,* 4 F.3d at 10-11 (officer's pursuit of motorcycle was not a seizure even though pursuit resulted in a collision between the motorcycle and a second officer's vehicle). *See also Campbell,* 916 F.2d at 423 (no seizure where officer's pursuit of fleeing motorcyclist accidentally resulted in collision). Accordingly, the court grants Officer Henry's motion for summary judgment on Counts II, III, IV, and V.

*Officer Musser*

The record is disputed with respect to Officer Musser. The parties dispute whether Officer Musser was braking at the time of impact. Officer Musser testified that as soon as he saw the plaintiff, he began braking. Musser at 95- 96. Officer Alcott, who was driving behind Officer Musser at the time of the collision, testified that Officer Musser was braking at the time of the collision. Alcott at 53. Mr. Neese also opined that Officer Musser was braking at the time of the collision. Neese at 33, 69, 140.

On the other hand, the plaintiff testified that his motorcycle had come to a stop before the collision, and that Officer Musser came to a complete stop and then accelerated into the plaintiff. Williams at 107, 233, 289, 290-92. This testimony is sufficient to raise a genuine dispute as to whether Officer Musser was braking and attempting to avoid the collision at the time of impact, or whether he intentionally collided with the plaintiff. For purposes of this summary judgment motion, the court must view all disputed facts in favor of the non-movant. The court must therefore assume for purposes of this opinion that plaintiff and Officer Musser had come to a complete stop before the collision, and that Officer Musser then accelerated into the plaintiff. This conduct, if proven, would clearly constitute a seizure for Fourth Amendment purposes.

In order for a seizure to rise to the level of a constitutional violation, it must be "unreasonable" under the circumstances. *Brower,* 109 S.Ct. at 1383. In fact, any claim that a police officer used excessive force during the course of a seizure is analyzed under the objective reasonableness standard of the Fourth Amendment. *Frazel v. Flanigan,* 102 F.3d 877 (7th Cir.1997). This means that the court must balance

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



"'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (quoting *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In order to determine the reasonableness of the force used, courts consider:

(1) the severity of the crime, (2) whether there was "an immediate threat to the safety of the officers or others;" and (3) whether the suspect was, ... "actively resisting arrest or attempting to evade arrest by flight."

*Seekamp v. Michaud,* 109 F.3d 802, 806 (1st Cir.1997) (quoting *Graham,* 490 U.S. at 396). Reasonableness "is not capable of precise definition or mechanical application." *Donovan,* 17 F.3d at 949 (quoting *Graham,* 490 U.S. at 396). Moreover, courts must "bear in mind 'the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham,* 490 U.S. at 396-97).

*8 Accepting the plaintiff's version of the facts as true, the court finds sufficient evidence from which a reasonable jury could find that the force applied by Officer Musser was objectively unreasonable. The officers were attempting to stop the plaintiff for a mere traffic violation: his failure to have a license plate. Moreover, accepting the plaintiff's version of the facts as true, there would have been very little "immediate threat to the safety of the officers or others," since the plaintiff's motorcycle and Officer Musser's car were allegedly stopped prior to the collision. Finally, although the plaintiff was fleeing prior to the collision, the court must assume for purposes of this motion that the plaintiff was no longer "actively resisting arrest or attempting to evade arrest by flight," by the time the collision occurred, since the plaintiff's motorcycle was allegedly stopped by this time. Based on the foregoing facts, a reasonable jury could find that the seizure in the present case was unreasonable under the circumstances. *See e.g., Frazel,* 102 F.3d at 882-85.

Finally, the court finds that as of the date of this collision, May 28, 1994, it was clearly established that individuals have a right "to be free of excessive force during an arrest." *Frazel,* 102 F.3d at 887 (noting that this doctrine has "long been established"). Moreover, it should also have been clear to a

reasonable officer that intentionally colliding with a stopped motorcycle during a traffic stop would constitute an unreasonable use of force. Accepting the plaintiff's version of the facts as true, the force allegedly used under these circumstances was "so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Clash v. . Beatty,* 77 F.3d 1045, 1048 (7th Cir.1996). For the above reasons, the court finds that Officer Musser is not entitled to summary judgment on the issue of qualified immunity. Accordingly, the court denies Officer Musser's motion for summary judgment on Count I. [FN2]

FN2. The court also denies Officer Musser's motion for summary judgment on Counts III, IV, and V.

### Counts VI and VII: Liability of Defendant Lansing For Failure to Train and Supervise

Counts VI and VII of the complaint allege that the Village of Lansing failed to adequately train and supervise Officers Musser and Sergeant Dohl. [FN3] The crux of the plaintiff's argument is that the Village should have provided Officer Musser with some "decision-making training" in the area of fresh pursuits. [FN4]

FN3. With respect to Officer Henry, the court has already held that there is insufficient evidence to suggest that Officer Henry violated the plaintiff's Fourth Amendment rights. Any claim that the Village of Lansing failed to properly train Officer Henry is thus rendered moot. Accordingly, the court's analysis will focus on the training received by Officer Musser and Sergeant Dohl.

FN4. More specifically, plaintiff alleges that Officer Musser was inadequately trained in the areas of "fresh pursuits, including high speed pursuits, of citizens operating vehicles, including motorcycles." *See* Count VI ¶ 16 of Second Amended Complaint. They also allege that Officer Musser was not adequately trained to "terminate high speed pursuits in residential neighborhoods where the subject of the pursuit was sought only for violations of traffic codes." *Id.* at ¶ 19.

Plaintiff also alleges that Sergeant Dohl was not adequately trained to supervise officers "engaged in vehicular fresh pursuits of citizens, or to "order patrol officers to terminate high speed pursuits in residential neighborhoods where the subject of the pursuit was

sought only for violations of traffic codes" or "through private property such as yards where the subject of the pursuit was only sought for violations of traffic codes" or "where the subject was on a motorcycle." *Id.* at ¶¶ 20-23.

*9 A city can be liable under section 1983 for a failure to train its police officers only if the failure to train constitutes "deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1988). A failure to properly train an officer is a "policy" actionable under section 1983 when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. *See also Erwin v. City of Manitowoc,* 872 F.2d 1292 (7th Cir.1989). This is a "stringent standard" which is not satisfied by showing that training was "grossly negligent or reckless." *Smith v. City of Joliet,* 965 F.2d 235, 237 (7th Cir.1992). A municipality will also be liable when "the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to" policymakers. *Canton* 489 U.S. at 390 n. 10.

*Adequacy of Training*

The court must first determine whether the training program was adequate in relation to the "tasks the particular officers must perform." *Smith,* 965 F.2d at 237.

First of all, if the court accepts the plaintiff's version of the facts as true, Officer Musser intentionally caused his squad car to collide with the plaintiff's stopped motorcycle. If proven, this conduct would amount to a blatant violation of the plaintiff's Fourth Amendment rights. Under these circumstances, the Village of Lansing could have provided an infinite amount of decision-making training in the context of fresh pursuits, none of which would have prevented the alleged intentional collision. Moreover, the Village of Lansing's written policy on fresh pursuits clearly prohibits this type of conduct by providing that "[i]ntentionally damaging a suspect vehicle with a squad car also will not be tolerated." *See* Exhibit F to Pl. 12(n) at 76-77.

The plaintiff contends that the Village of Lansing should have provided its officers with additional "decision-making training" in the area of fresh pursuits. More specifically, plaintiff contends that the Village of Lansing should have provided its officers with "practical training" in the classroom on how to "interpret" and apply Lansing fresh pursuit policy. Alpert at 81-82. [FN5] The plaintiff directs the court to Mr. Alpert's testimony to this effect. Alpert at 78-82, 103-03. Plaintiff then points to Chief Stanley's testimony that the Village of Lansing did not provide this type of training. Stanley at 35. However, as the defendants point out, in order to assume that the Village of Lansing should have provided this type of training, one must also assume that the officers' PTI training was insufficient. In fact, Mr. Alpert could not opine that the officers' PTI training was insufficient, because he testified that he had not seen the curriculum. Alpert at 73-74. The plaintiff cannot create a genuine dispute as to the adequacy of the Village of Lansing's training if plaintiff does not know to what extent that training was conducted by the Illinois police academy.

> FN5. Plaintiff admits that the officers' emergency vehicle operation training ("EVOT") was adequate. Alpert at 82. This type of training, apparently handled during PTI training at the police academy, allows the officers to practice various driving maneuvers on a race track. Alpert at 79.

*10 Moreover, it is undisputed that the training the officers received **complied with state law.** [FN6] In *Tapia v. City of Greenwood,* 965 F.2d 336, 339 (7th Cir.1992), as in the present case, the plaintiff has provided no evidence to show that the Village of Lansing "failed to adhere to the minimum standards for training police officers under [Illinois] law." The defendants' police practices expert, Mr. Thomas Walton, testified that in his opinion, the training received by all of the officers in this case satisfied Illinois law. Walton at 211-16. The plaintiff's police practices expert, Mr. Geoffrey Alpert, testified that he did not know whether the Lansing fresh pursuit training complied with Illinois law. Alpert at 66. He also testified that he did not know whether the Illinois police academy's training on pursuits was sufficient under Illinois law because he had not seen the curriculum. Alpert at 73-74. Based on the record, there is no genuine dispute of fact as to whether the Illinois police academy training program satisfied state law.

> FN6. In Illinois, police officer training is governed by Illinois state law. *See* 50 ILCS § 705; 50 ILCS § 710.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

With respect to the training received by Sergeant Dohl, it is undisputed that Sergeant Dohl's training satisfied Illinois law. Moreover, the plaintiff has not shown any way in which Sergeant Dohl's supervisor training was insufficient.

### Deliberate Indifference

Nor has the plaintiff provided the court with any evidence that the Village's training policy evidenced a deliberate indifference toward the public. The language of the Lansing policy itself evidences a concern for the public when it provides that: "[a]ll due caution must be used in fresh pursuits ... [t]his department expects an officer to terminate his involvement in fresh pursuits whenever the risks to his/her own safety and the safety of others outweighs the danger to the community if the suspect is not apprehended." See Exhibit F to Pl. 12(n) at 76-77.

Chief Stanley testified that Lansing officers are given a copy of the Lansing fresh pursuit policy and asked to read it. Stanley at 37. They are told that if they do not understand the policy, they are required to get clarification from their supervisor. Id. They must also sign a card stating that they have read and "totally understand" the policy. Id. The court cannot say that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390. See also Smith v. City of Joliet, 965 F.2d 235, 237 (7th Cir.1992) (plaintiff failed to produce sufficient evidence that alleged city "policy of deliberately inadequate training" caused the defendant officers to use excessive force against him ). The fact that the Village of Lansing has a policy of accepting

its officers' signed statements that they have read and understood the fresh pursuit policy is not evidence of any "deliberate indifference" on the part of the Village of Lansing.

*11 Moreover, there is no evidence in the record of any "pattern" of constitutional violations which "would put the municipality on notice that its employees' responses to a recurring situation [were] insufficient to protect the constitutional rights involved." Id. See also Board of County Comm'rs v. Brown, 520 U.S. 397, ---- - ----, 117 S.Ct. 1382, 1390-91, 137 L.Ed.2d 626 (1997). Chief Stanley testified that in the twenty-two years that he has been chief, approximately ten collisions have occurred during fresh pursuits by Lansing officers. Stanley at 5, 50. The plaintiff did not, however, produce any evidence as to the cause of any of these collisions. Nor has he produced any evidence to suggest that these collisions were the result of constitutionally prohibited conduct by Lansing officers. Accordingly, the court grants the Village of Lansing's motion for summary judgment.

### Conclusion

For the reasons set forth above, the court grants Officer Henry's motion for summary judgment on Counts II, III, IV, and V and denies Officer Musser's motion for summary judgment on Counts I, III, IV, and V. The court also grants the Village of Lansing's motion for summary judgment on Counts III through VII. [87-1]. The court denies the defendants' motion to strike. [108-1].

1997 WL 403509, 1997 WL 403509 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

KeyCite                                                                    **Page 18**

Date of Printing: FEB 19,2003

**KEYCITE**

CITATION:Williams v. Scott Musser, 1997 WL 403509 (N.D.Ill., Jul 16, 1997) (NO. 94 C 4140)
**History**
**Direct History**

=>        1  Williams v. Scott Musser, 1997 WL 403509  (N.D.Ill. Jul 16, 1997) (NO. 94 C 4140)

**Related References (U.S.A.)**
2  Williams v. Musser, 1995 WL 27394  (N.D.Ill. Jan 23, 1995) (NO. 94 C 4140)
3  Williams v. Musser, 1996 WL 197487  (N.D.Ill. Apr 19, 1996) (NO. 94 C 4140)

© Copyright 2003 West, Carswell, Sweet & Maxwell Asia, Ltd. and Thomson Legal & Regulatory Limited, ABN 64
058 914 668, or their Licensors. All rights reserved.

1995 WL 352995
(Cite as: 1995 WL 352995 (D.N.J.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.

Mozelle DANSBY and Daisy Dansby, Plaintiffs,
v.
BOROUGH OF PAULSBORO, et al., Defendants.

**Civ.A. No. 92-4558 (JEI).**

June 7, 1995.

Reed Smith Shaw & McClay by Marilyn Heffley,
Philadelphia, PA, for plaintiffs.

Labrum & Doak by John L. White, Woodbury, NJ,
for defendants Borough of Paulsboro and
Individually Named Borough Council Members.

Edelstein, Mintzer & Sarowitz by Stephen Ledva,
Westmont, NJ, for defendants Paulsboro Police Dept.
and Individually Named Police Officers.

Angelini, Viniar & Freedman by Michael A.
Angelini, Woodbury, NJ, for defendants on Punitive
Damages.

OPINION

IRENAS, District Judge:

*1 Plaintiff Mozelle Dansby ("Dansby" or "the
plaintiff") is an African- American and a long-time
resident of Paulsboro, New Jersey. In the fall of
1991, Dansby ran for Paulsboro Borough Council
("the Borough Council"). The present civil rights
action involves alleged injustices that plaintiff claims
were visited upon him during the course of his
campaign. Defendants, the Borough of Paulsboro
("Paulsboro" or "the Borough"), the Paulsboro Police
Department ("the Police Department," and along with
the Borough, "the municipal defendants"), John
Burzichelli, the former Mayor of Paulsboro, and
individually named members of the Police
Department and the Borough Council, [FN1] now
move for summary judgment on all claims. These
motions will be granted in part and denied in part.

I. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. Rule 56(c), "summary

judgment is proper 'if the pleadings, depositions,
answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of
law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). At the summary judgment stage, it is not the
role of the judge to weigh the evidence or to evaluate
its credibility, but to determine "whether there is a
genuine issue for trial." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249 (1986). There is no issue for
trial unless there is sufficient evidence favoring the
nonmoving party such that a reasonable jury could
return a verdict for that party. Id.

The substantive law governing the dispute will
determine which facts are material, and only disputes
over those facts "that might affect the outcome of the
suit under the governing law will properly preclude
the entry of summary judgment." Anderson, 477 U.S.
at 248 (1986). Finally, a genuine issue for trial does
not exist "unless the party opposing the motion can
adduce evidence which, when considered in light of
that party's burden of proof at trial, could be the basis
for a jury finding in that party's favor." J.E. Mamiye
& Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d
Cir. 1987) (Becker, J., concurring).

II. BACKGROUND

The current record in this case is rife with disputed
issues of fact. Although this section will in many
instances set forth the respective factual contentions
of the parties, for the purpose of analysis the Court
will accept as true that version of the facts most
favorable to Dansby.

Dansby has lived in Paulsboro for over 25 years, and
has been politically active throughout that time.
(Dansby Dep. "A" at 6-8.) [FN2] He has run for both
the Paulsboro School Board ("the School Board") and
the Borough Council on several occasions, but has
never been elected to office. (Id. at 9-10.) He is a
registered Democrat, but has always considered
himself an independent, and ran for Borough Council
as an independent in 1991. (Id. at 8-10.) Paulsboro is
a relatively small community, and many of its
residents, including many of the defendants herein,
knew Dansby before the events at issue occurred.
(See, e.g., Burzichelli Dep. at 29; Damminger Dep. at
10; DiStefano Dep. at 37.) Paulsboro is also a racially
divided town, with the majority of the black
community living "on the other side of the tracks"
from the predominantly white Billingsport section of
the town. (See Armistead Dep. at 13.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**\*2** There is some conflict in the record as to Dansby's platform in the 1991 campaign. Although early in his deposition, Dansby stated that his campaign did not express dissatisfaction with the Police Department, (Dansby Dep. "A" at 68), he also stated that he had filed a police brutality complaint against the department, (*id.*), and later in his deposition stated that part of his campaign was to stop police harassment of the Paulsboro citizenry, (Dansby Dep. "B" at 20 & 24-25). Other deponents have testified that Dansby's campaign was critical of the Police Department, (Augustino Dep. at 41; Burzichelli Dep. at 53-54; Morina Dep. at 51), and one stated that Dansby criticized "Communistic" or "Nazi" police practices by Paulsboro police, (Schmutz Dep. at 125). Furthermore, while Dansby specifically testified that he did not make racial statements during his campaign, (Dansby Dep. "B" at 21), other deponents have stated that both Dansby in particular and the black community in Paulsboro in general expressed dissatisfaction with the way they were treated by the predominantly white Police Department, (Armistead Dep. at 33; Augustino Dep. at 41; Kidd Dep. at 36-39). Some testified that Dansby's campaign expressed sentiments such as "Let's not let the whiteys rule" and "End whitey rule in Paulsboro." (Morina Dep. at 51; Augustino Dep. at 63).

In early September 1991, Dansby began posting campaign signs on utility poles in Paulsboro. Patrolman Dennis Morina observed this activity, and informed Sergeant Thomas Sullivan. Morina testified that he advised Sullivan of Dansby's actions because he recalled a directive informing police officers to report to their supervisors if they saw individuals posting signs on utility poles. (Morina Dep. at 30.) In response to Morina's inquiry, Sullivan telephoned Atlantic Electric, the owner of the utility poles. (Sullivan Dep. at 63.) Sullivan spoke to Ron Jones, an Atlantic Electric dispatcher, who informed him that posting signs on Atlantic Electric poles was prohibited. (*Id.* at 66.) Sullivan stated that Jones requested that the Paulsboro police ask Dansby to take down the signs or contact Atlantic Electric to receive permission to post signs. (*Id.* at 67-68.) However, Richard Moeller, an Atlantic Electric supervisor, testified that the Paulsboro police asked Atlantic Electric to have the signs removed. (Moeller Dep. at 32.)

Sergeant Moeller and Patrolman Morina then drove to Dansby's residence to inform him that posting signs on the Atlantic Electric poles was prohibited. Sullivan told Dansby that he would have to remove his signs from the poles,but Dansby refused. (Dansby Dep. "A" at 25.) Instead, he telephoned Atlantic Electric himself and was told that he could leave the signs on the poles. (Dansby Dep. "B" at 61.) [FN3] On September 20, 1991, Dansby received a letter from Moeller informing him that the information provided to him was incorrect and requesting the removal of all political posters from Atlantic Electric poles in Paulsboro. (Defendant's Ex. "M".) A copy of this letter was sent to Mayor Burzichelli. (*Id.*)

**\*3** On October 4, 1991, Officer Hershey received a call from Moeller, who indicated that he had received complaints from residents that Dansby was posting his signs on utility poles in Billingsport. (Hershey Dep. at 55-56.) Hershey checked the Billingsport area for Dansby's posters, but found only one, which was not on a utility pole. (*Id.* at 60.) Hershey then went to Dansby's residence to inform him of the complaint. (*Id.* at 61.) In response, Dansby stated that he would comply, but only if all other posters, political or otherwise, were also removed from the poles. (*Id.* at 62.) Hershey apparently issued Dansby a summons for this incident, (*see* Hershey Dep. at 41; Dansby Dep. "B" at 54), but Dansby never took down his signs and the summons was never prosecuted.

There is considerable evidence in the record regarding the prevalence of posters on utility poles in Paulsboro. Several witnesses testified that political posters, as well as posters for other events such as carnivals, were commonly hung on utility poles throughout Paulsboro. (*See, e.g.,* Dansby Dep. "A" at 60; Armistead Dep. at 9; Augustino Dep. at 44; DiStefano Dep. at 90; Giampola Dep. at 18-19.) Some witnesses who have run for political office in Paulsboro, however, testified that they stopped posting signs on utility poles because sometime prior to 1991, Atlantic Electric had notified them that the practice was prohibited. (Burzichelli Dep. at 12-13; Damminger Dep. at 15-16; Giampola Dep. at 29.) Although none of the witnesses specifically identified the source of this information, Atlantic Electric's position appears to be embodied in a position paper dated April 9, 1987. (Defendants' Ex. "K".) Nonetheless, other candidates posted signs on utility poles as recently as 1990, (Loomis Dep. at 11), and Dansby testified that when he posted his signs in 1991, other campaign signs were already on the poles. (Dansby Dep. "A" at 62.)

There is also considerable evidence regarding Paulsboro's lax enforcement of the prohibition against posting signs on utility poles. Several police officers testified that they had observed signs on utility poles but had not taken any action, although all denied having actually seen an individual put the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

signs on the poles. (*See* Hershey Dep. at 44;
Augustino Dep. at 119; Morina Dep. at 36- 39.)
Officer Hershey testified that during his more than
fifteen years on the Paulsboro police force, he could
not recall a summons being issued for the posting of
signs on utility poles except for the case of Dansby.
(Hershey Dep. at 41-42.) Patrolman Morina testified
that he saw Dansby posting signs on a subsequent
occasion and once again informed Sergeant Sullivan,
(Morina Dep. at 43-44), although no action was taken
on this report.

Dansby also sought to use a mobile public address
system, or "sound truck," in connection with his
campaign. Paulsboro Local Ordinance § 44-30(H)
makes it unlawful "[t]o use or operate or cause to be
used or operated any mechanical device, apparatus or
instrument for the intensification of the human voice
in any private or public place, in such manner as the
peace and good order of the neighborhood is
disturbed." (Plaintiff's Ex. 26.) Several witnesses
testified that the "custom" in Paulsboro was for a
person who desired to use an amplification system to
write a letter to the Borough Council, have the
request placed on the Borough Council agenda, and
appear at the next Borough Council meeting for
approval. (Burzichelli Dep. at 17; Damminger Dep.
20-21; Giampola Dep. at 21; Sabetta Dep. at 15-16;
Schmutz Dep. at 82.) However, the Borough Council
would occasionally waive the requirement of prior
written notice and vote on a request if presented at a
meeting. Apparently requests to use such devices
were routinely granted. (Burzichelli Dep. at 35.)

*4 Council members testified that guidelines used in
determining whether to grant permission to use an
amplification system were unwritten, and that the
final decision on such an application was within the
discretion of the Borough Council. (Haynes Dep. at
54; Loomis Dep. at 77.) However, the Borough
Council would normally consider whether the system
was mobile or immobile, whether local residents
condoned its use, and whether the user had
represented that the system would not be disruptive
to the surrounding community. (Loomis Dep. at 76-
78.)

In October of 1991, Dansby sent a letter to Mayor
Burzichelli and all members of the Borough Council
indicating that from October 17, 1991, to November
5, 1991, from 12:00 noon until 8:00 p.m., he intended
to use an amplified public address system in
connection with his campaign. (Plaintiff's Ex. 24.)
Although the letter was not sent in time to be placed
on the Borough Council's agenda for its October 15,
1991, meeting, it was contained in a packet of

materials distributed to council members before the
meeting. (Damminger Dep. at 41-42.) Dansby
appeared at the meeting and asked the Borough
Council to consider his request. (Minutes of Oct. 15,
1991, Borough Council Meeting ("Minutes"),
Defendants' Ex. "L" at 2.) Apparently, several of the
council members thought Dansby's letter deficient
because it stated that he "will be using" an
amplification system, rather than requesting
permission to use one. (*Id.;* Damminger Dep. at 46;
Giampola Dep. at 52.) Mayor Burzichelli referred the
matter to Mr. Angelini, the Borough Solicitor, who
stated that the use of an amplification system was
prohibited by section 44-30(H). (Minutes at 2.)

Dansby responded that at its previous meeting, the
Borough Council had given two other groups
permission to use amplification systems. (*Id.*)
Councilman Haynes confirmed that such action had
taken place, (Haynes Dep. at 47), although the
Borough Council weighed the above
factors enumerated above. (Loomis Dep. at 76.)
Mayor Burzichelli also recognized this fact, and that
he himself had used an amplification system in a
previous campaign after receiving permission from
the Borough Council. (Minutes at 3.) Dansby
responded that he was asking for the same
permission, and Councilman Kidd made a motion to
grant Dansby permission to use the sound system
according to the terms stated in the letter. (*Id.*) The
motion, however, died for lack of a second. (*Id.*)

Councilman Kidd stated that he thought it was
improper for the Borough Council to deny Dansby's
request for permission. (*Id.* at 3-4) Dansby then
stated that he thought that the denial was a result of
discrimination against him, and that he planned to use
his sound equipment anyway. (*Id.* at 4-5.) Solicitor
Angelini replied that he resented being accused of
discrimination, and the public potion of the council
meeting was closed shortly thereafter. (*Id.* at 5-7.)

Lieutenant Schmutz had attended the October 15,
1991, Borough Council meeting as a representative
of the Police Department. (Schmutz Dep. at 92.)
Patrolman Augustino recalls receiving a written
directive sometime thereafter stating that the
Borough Council had denied Dansby's request to use
a public address system, and that any officer
observing Dansby engaging in such activity should
report directly to Schmutz. (Augustino Dep. at 56-
57.) Schmutz, while admitting that he suggested this
course of action to Police Chief DiStefano, denies
that an oral or written directive was issued. (Schmutz
Dep. at 114.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



1995 WL 352995
(Cite as: 1995 WL 352995 (D.N.J.))

Page 4

*5 Despite the Borough Council's ruling, Dansby began using a mobile public address system on October 17, 1991. On October 29, 1991, at approximately 6:00 p.m., John Carrow, a Paulsboro citizen and former Fire Chief, complained to the Paulsboro police about Dansby's use of a public address system to campaign from his car. (Carrow Dep. at 26-34.) Schmutz was at the police station when Carrow made this complaint. (Carrow Dep. at 31; Schmutz Dep. at 110.) While Carrow testified that his only complaint was that Dansby was blocking traffic, (Carrow Dep. at 32-33), Schmutz testified that Carrow complained about the volume of the system, (Schmutz Dep. at 112.)

As a result of Carrow's complaint, Schmutz advised the two patrolman on duty, Officers Augustino and Lynch, that if they saw a vehicle using a public address system, they should report this activity directly to Schmutz. (Schmutz Dep. at 113-14.) Schmutz also began to look for Dansby. (Id.) Patrolman Augustino saw Dansby using the public address system and informed Schmutz of Dansby's location. (Augustino Dep. at 55-59; Schmutz Dep. at 115.)

Schmutz, Augustino, and Lynch responded to the scene, and Schmutz pulled Dansby over. (Dansby Dep. "B" at 66; Augustino Dep. at 65-68.) While Schmutz testified that he first gave Dansby a warning that Dansby ignored, (Schmutz Dep. at 126-27), it is undisputed that Schmutz eventually told Dansby he was taking him to the station for a violation of the borough ordinance. (Dansby Dep. "B" at 67; Schmutz Dep. at 131.) Schmutz then pulled away with Dansby following him, and Augustino behind Dansby. (Dansby Dep. "B" at 68-69.)

After travelling less than thirty feet, Dansby pulled over to the side of the road, allegedly because he wanted to leave his car behind due to his fear that the car and the public address system might be vandalized at the police station. (Dansby Dep. "B" at 79-81.) Schmutz testified that Dansby began broadcasting again, (Schmutz Dep. at 137), but Dansby testified that he simply left the car and told Schmutz that he was leaving his car keys with a friend. (Dansby Dep. "B" at 70.) At some point, Augustino, Schmutz, and Dansby all left their respective vehicles, and Dansby began to walk away from Augustino and Schmutz. Schmutz then grabbed Dansby by the arm and told him he was under arrest. (Dansby Dep. "A" at 87; Augustino Dep. at 77; Schmutz Dep. at 141.)

Dansby alleges that once Schmutz grabbed him, he spun Dansby around and pushed him up against a three- to four-feet tall fence. (Schmutz Dep. "A" at 87.) Augustino then grabbed Dansby's other arm and placed him in handcuffs. (Dansby Dep. "B" at 74.) Both officers held Dansby in a compliance thumblock, and Schmutz accused Dansby of hitting a police officer. (Id. at 74-77.) The officers, on the other hand, state that when Schmutz grabbed Dansby's arm, Dansby turned and stuck him in the eye. (Augustino Dep. at 77-78; Schmutz Dep. at 148-49.)

Dansby was then taken to the Paulsboro police station and handcuffed to a chair in an open area. (Augustino Dep. at 80.) Augustino testified that suspects were normally placed in a cell, but that he handcuffed Dansby to the chair at Schmutz's direction. (Id. at 83-84.) Dansby remained seated and handcuffed for approximately two hours while Augustino processed him. (Id. at 87; Dansby Dep. "B" at 87.) Dansby alleges that while he was in the police station, Schmutz called Dansby's employer, the New Jersey Department of Corrections, and informed them that Dansby had been arrested for assaulting a police officer and violating a borough ordinance. (Dansby Dep. "B" at 80.) Schmutz denies making this telephone call. (Schmutz Dep. at 163-64.)

*6 At some point, Schmutz called Chief DiStefano, who came to the police station. (Schmutz Dep. at 159-63.) Upon completion of his processing, Dansby was charged with violating Borough Ordinance § 44-30(H), aggravated assault upon a police officer, *N.J.S.A.* 12-1(b)(5)(a), and resisting arrest, *N.J.S.A.* 2C:29-2(a)(1), and released. The next day, an article appeared in the *Gloucester County Times* recounting the charges against Dansby. (Plaintiff's Ex. 27.) Although no one has admitted releasing this information, Augustino testified that the police chief has sole authority to release such information to the press. (Augustino Dep. at 88.)

Dansby was tried on these charges in the Paulsboro Municipal Court. The case was heard before the Honorable James Faison, J.M.C., an African-American municipal court judge in Camden who had been appointed presiding judge in Paulsboro because "Paulsboro had received an enormous amount of bad press with respect to racial relations involving the police department and the African- American community." (Plaintiffs' Ex. 23 at 74.) Judge Faison found Dansby not guilty of violating the borough ordinance, because the state had not met its burden of proving that he operated the public address system in a manner that was "disruptive of the peace and good

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

order of the neighborhood." (Defendant's Ex. "G" at 82.) Nonetheless, he found that Lieutenant Schmutz had probable cause to issue Dansby a summons for violation of the ordinance. (*Id.*) Judge Faison also found that the aggravated assault charge merged with the resisting arrest charge, and that the government had not met its burden of proof with regard to that charge. (*Id.* at 86.) The judge did, however, find Dansby guilty of the lesser included charge of obstructing justice, N.J.S.A. 2C:29- 1(a), for his failure to accompany Schmutz to the police station. (*Id.*) The court required Dansby to pay fines and court cost of $205, with no probation or incarceration. (Plaintiff's Ex. 22 at 93-94.)

Dansby then filed both the case at bar and a complaint in the Superior Court of New Jersey, Law Division, Gloucester County. Plaintiff's motion to file a late Tort Claim Notice against the municipal defendants in the state court action was denied. (Defendants' Ex. "J".) The record does not reflect the ultimate outcome of this state court litigation.

Dansby's current complaint alleges, pursuant to 42 U.S.C. § § 1981 and 1983, violations of his First Amendment rights to freedom of speech and assembly, his Fourth Amendment right to be free from unreasonable searches and seizures, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment rights to due process, equal protection, and "the right to be free from unjustified and excessive use of force." (Complaint ¶ 32.) He also alleges a conspiracy to violate these rights pursuant to 42 U.S.C. § 1985, and brings pendent state law claims under the New Jersey Constitution and the New Jersey common law of malicious prosecution, false arrest, false imprisonment, "deliberate indifference of supervisory personnel," "failure to train and supervise," intentional infliction of emotional distress, slander, and conspiracy. Finally, Dansby's wife, Daisy Dansby ("Mrs. Dansby"), brings a state law claim for loss of consortium.

*7 Dansby claims that as a result of his altercation with Schmutz and Augustino, he suffered injuries to his shoulder, neck, arms, and lower back. (Dansby Dep. "A" at 45.) He and Mrs. Dansby also claim that they suffered emotional distress and humiliation as a result of these events. (Dansby Dep. "B" at 86-87; Daisy Dansby Dep. at 12-25.) Mrs. Dansby claims the loss of certain marital services. (Daisy Dansby Dep. at 37-55.)

The record is also contains evidence regarding the training of Paulsboro police officers. Apparently,

officers in Paulsboro received no training regarding the enforcement of borough ordinances or the statute prohibiting the posting of signs on utility poles, and a one-day training session on cultural sensitivity. (Augustino Dep. at 31 & 91; DiStefano Dep. at 24-25.) Plaintiff's counsel has also supplied the Court with a number of citizen's complaints and newspaper articles regarding alleged civil rights violations by Paulsboro police officers. (Plaintiff's Exs. 28 & 29.) Various officers testified to the number of civil rights complaints against them, with perhaps the most notable being the matter of George Kearney, who was found hung to death in his cell. (Augustino Dep. at 91-105; Hershey Dep. at 76-88; Morina Dep. at 71-88; Schmutz Dep. at 44-54.)

III. LEGAL ANALYSIS

Plaintiffs' complaint presents a multitude of claims, some of which may be disposed of summarily. For instance, plaintiffs' complaint purports to bring claims pursuant to the Eight Amendment. However, the constitutional ban on cruel and unusual punishment applies only to those who have been convicted of a crime. Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977); Huffaker v. Bucks County Dist. Att'ys Office, 758 F. Supp. 287, 290 (E.D. Pa. 1991). All the acts in this case took place before Dansby's conviction, and therefore do not implicate the Eighth Amendment.

Plaintiff's complaint also alleges causes of action pursuant to 42 U.S.C. § 1981. While § 1981 is usually invoked to protect the rights of racial minorities to make and form contracts, it also ensures that minorities shall receive "the full and equal benefit of all laws ...." 42 U.S.C. § 1981(a). While Dansby may have established a *prima facie* case under § 1981, [FN4] his race-based claims do not differ significantly from his equal protection claims pursuant to 42 U.S.C. § 1983. See Mahone v. Waddle, 564 F.2d 1018, 1029-30 (3d Cir. 1977), cert. denied, 438 U.S. 904 (1978). Therefore, the Court will treat these claims identically.

Defendants seek summary judgment on plaintiff's pendent state law claims on the ground that plaintiff failed to comply with the notice provisions of the New Jersey Tort Claims Act, N.J.S.A. 59:8-1 to -11. In the proceeding before the Superior Court, the judge ruled that plaintiffs had not filed a timely Tort Claim Notice and barred all state law claims against the municipal defendants. (Defendants' Ex. "J".) This ruling is res judicata upon this Court, and the motion of the municipal defendants on the state law claims is granted. However, because the notice provisions of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works


the Tort Claims Act do not apply to individual officers or to constitutional claims, the pendent claims against the individual defendants as well as the constitutional claims against the municipal defendants are not barred by the Tort Claims Act. *See Chatman v. Hall,* 128 N.J. 394, 418-20, 608 A.2d 263 (1992); *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J. Super. 337, 633 A.2d 985 (App. Div. 1993). [FN5]

*8 Finally, plaintiff seeks to sue all individually named defendants in both their "individual" and "official" capacities. However, all individually named defendants are municipal, rather than state, employees. Their employers therefore enjoy no Eleventh Amendment immunity from suit in federal court, and are indeed named defendants in this suit. Under such circumstances, a suit against the individual defendants in their "official" capacities is redundant, and will be dismissed. *See Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991); *Marshall v. Borough of Ambridge,* 798 F. Supp. 1187, 1198 (W.D. Pa. 1992); *Kohn v. Mucia,* 776 F. Supp. 348, 356 (N.D. Ill. 1991).

A. Posting of Signs

At the time of the events at issue in this case, *N.J.S.A.* 27:5-1 provided, in pertinent part, [FN6]
   Whoever shall paint or place upon, or in any manner affix to, a fence, structure, pole, rock, tree or other object which is the property of another, whether within or without the limits of a public highway, or maintain thereon any words, device, trademark, advertisement or notice not required by law to be posted thereon, without first obtaining the consent in writing of the owner or tenant of the property, or of the body having control of the highway if placed on a highway, shall, upon complaint of the owner or tenant, or of any police officer or other person, be liable to a penalty of twenty-five dollars ($25.00) upon conviction in the municipal court of the municipality wherein the violation occurred.
*N.J.S.A.* 27:5-3 provided that municipal police officers are to report to the chief of police any violation of section 27:5-1 within the municipality, and that the chief of police "shall notify the person violating said section ... to abate the nuisance forthwith."

Plaintiff has produced absolutely no evidence that the individual members of the Borough Council or individual police officers other than Officers Sullivan, Morina, and Hershey participated in the decision to require Dansby to take down his signs. A

civil rights claim must show an individual defendant's personal involvement in the alleged constitutional violation. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). Because plaintiff has failed to do this, the motions of all individual defendants except Sullivan, Morina, and Hershey will be granted.

Dansby has not brought a facial challenge to section 27:5-1, and admits that he acted in violation of the letter of the statute. He also admits that the Paulsboro police acted in accordance with section 27:5-3. However, he alleges that the police violated his Fourteenth Amendment right to equal protection of the laws because they selectively enforced the statute. As the Third Circuit recently stated, "it has long been established that discriminatory enforcement of a statute or law by state and local officials is unconstitutional." *Holder v. City of Allentown,* 987 F.2d 188, 197 (3d Cir. 1993). Under this analysis, "a law which is 'fair on its face and impartial in its appearance' may nonetheless constitute 'illegal discrimination against persons' 'if it is applied and administered by public authority with an evil eye and an unequal hand.'" *Id.* (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 373-74 (1886)). To establish a selective enforcement claim, a plaintiff must show (1) that others similarly situated have not been prosecuted, and (2) that the decision to prosecute was "made on the basis of an unjustifiable standard," either the target's membership in a protected class or exercise of a fundamental right. *United States v. Schoolcraft,* 879 F.2d 64, 68 (3d Cir.), *cert. denied,* 493 U.S. 995 (1989). Selective enforcement may occur even where a statute contains mandatory language, if it is enforced in a discretionary manner. *Holder,* 987 F.2d at 197 (citing *Cox v. Louisiana,* 379 U.S. 536, 557-58 (1965)).

*9 For the purposes of this motion, Dansby has shown that the Paulsboro police did not ask others who posted political signs on utility poles in Paulsboro to remove those signs, or report those people to Atlantic Electric. [FN7] He has also shown that the action taken against him may have been because of either his race or his exercise of his free speech rights, both "unjustifiable standards" for enforcement. However, Officers Morina and Sullivan simply came to Dansby's house and told him to take down his signs, and while Officer Hershey may have issued Dansby a summons, the summons was never prosecuted, and there is no evidence that either event led Dansby to take down the signs. We must determine whether these actions constituted an "enforcement" of the statute that caused a constitutional injury.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

If this were a due process claim, we would find that Dansby did not suffer a constitutional "deprivation" and would grant the motion for summary judgment. *See Mannington Mills, Inc. v. Shinn, 877 F. Supp. 921 (D.N.J. 1995).* Given the nature of the rights at issue, however, we find that a constitutional injury may have occurred. The equal protection clause serves in part to protect against "the injuries and stigma inflicted upon the race disfavored by the violation." *Freeman v. Pitts, 112 S.Ct. 1430, 1443 (1992).* Thus, courts have held that "[e]very citizen has a right to be free from *investigation* and prosecution because of his religious or political beliefs or race." *Martinez v. Winner, 771 F.2d 424, 441 (10th Cir.)* (emphasis added), *modified, 778 F.2d 553 (10th Cir. 1985), vacated on other grounds, 475 U.S. 1138 (1986). See also United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993)* (consensual police interview based solely on race "is deserving of strict scrutiny, and raises serious equal protection concerns.") Indeed, the *Martinez* court specifically held that a race-based investigation that did not lead to prosecution "would entitle Martinez to nominal damages, if no other form of relief." *771 F.2d at 441* (citing *Carey v. Piphus, 435 U.S. 247, 266-67 (1978)).*

Courts have also interpreted the First Amendment to prohibit state action that has a "chilling effect" on protected speech. *Hohe v. Casey, 868 F.2d 69, 72- 73 (3d Cir.), cert. denied, 493 U.S. 848 (1989); Lysaght v. New Jersey, 837 F. Supp. 646, 653 (D.N.J. 1993).* While the sign-posting statute may not be facially invalid, its selective enforcement may have First Amendment implications even where the speaker is not prosecuted. Because attempted enforcement of the sign posting statute may have violated Dansby's equal protection or free speech rights, we will deny the motion for summary judgment as to Dansby's claims against defendants Sullivan, Morina and Hershey.

These defendants also claim qualified immunity from suit. Officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* In this case, however, reasonable officials in the defendants' position should have known that selective enforcement of a statute based on the race or political views of the alleged perpetrator would certainly violate the Constitution. *See Acierno v. Cloutier, 40 F.3d 597, 620 (3d Cir. 1994)* (in banc). Therefore, based on the current record, we find that Sullivan, Morina and Hershey are not entitled to qualified

immunity on claims arising from the attempted enforcement of the sign posting statute.

**\*10** Plaintiff has also stated a claim pursuant to *42 U.S.C. § 1985(3).* A valid *§ 1985(3)* claim requires proof of a conspiracy to deprive a person of constitutional rights on the basis of the person's race or class. *See Griffin v. Breckenridge, 403 U.S. 88, 100-02 (1971).* Here, Dansby has presented evidence to show that Sullivan and Morina may have conspired to deprive plaintiff of his rights on the basis of his race, but has not presented evidence that Hershey conspired with anyone in enforcing the sign-posting statute. Therefore, the motion of Sullivan and Morina for summary judgment on the *§ 1985(3)* claim is denied, but Hershey's motion is granted.

**B.** *The Public Address System*

**1)** *First Amendment*

Borough Ordinance 44-30(H) prohibits the use of public address systems "in such manner as the peace and good order of the neighborhood is disturbed." The Supreme Court has held that statutes placing time, place, and manner restrictions on speech are constitutional if they are content-neutral, are narrowly tailored to meet a significant government interest, and leave open adequate alternative means of communication. *Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).* Borough Ordinance § 44-30(H) is content neutral because it does not distinguish on the basis of the message of the speaker, *id. at 791,* and leaves open adequate alternative means of communication because it does not ban any particular manner of expression at any particular place and time, *id. at 802-03.* Furthermore, the ordinance forwards the significant government interest in protecting the people of Paulsboro from undue noise or traffic, and is narrowly tailored to meet this goal because it does not burden substantially more speech than is necessary to further the goal. *Id. at 796-99.* [FN8]

Although the ordinance is facially constitutional, on the basis of the current record, the Paulsboro "custom" of requiring those seeking permits to use public address systems to appear before Borough Council and request permission renders the statute unconstitutional as implemented and enforced by the Borough. The Supreme Court has repeatedly held that written or unwritten policies requiring a potential speaker to procure a permit from a public official before engaging in speech in a public place are an unconstitutional prior restraint on speech "in the absence of narrowly drawn, reasonable and definitive

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

standards for the officials to follow." *Niemotko v. Maryland,* 340 U.S. 268, 271 (1951) (unwritten custom requiring those desiring to engage in speech activity in public park to obtain permission from the Park Commissioner); *Saia v. New York,* 334 U.S. 558, 560 (1948) (ordinance forbidding use of sound amplification system without permission of Chief of Police). While Borough Council members stated that they considered certain criteria in deciding whether to grant permission to use a public address system, (*see* Loomis Dep. at 76-78), these criteria are neither "definitive" nor "narrowly drawn."

**\*11** The former Mayor and the individual Borough Council members argue that even if the scheme is unconstitutional, they cannot be held liable for their participation in it. The Third Circuit has held that municipal legislators are entitled to absolute immunity for legislative actions. *Aitchison v. Raffiani,* 708 F.2d 96, 98-100 (3d Cir. 1983). However, this immunity applies only to legislative, as distinct from managerial or administrative, duties of those who hold positions as municipal legislators. *Abraham v. Pekarski,* 728 F.2d 167, 174 (3d Cir.), *cert. denied,* 467 U.S. 1242 (1984). Under this test, courts both within and outside of this circuit have concluded that absolute legislative immunity does not apply to acts by municipal legislators such as those at issue here. *See Hughes v. Tarrant County,* 948 F.2d 918 (5th Cir. 1991) (no absolute immunity for individualized decisions based on specific facts); *Freeman v. McKellar,* 795 F. Supp. 733 (E.D. Pa. 1992) (city council vote to terminate public employee administrative rather than legislative in nature); *Brown v. Smythe,* 780 F. Supp. 274 (E.D. Pa. 1991) (effort to remove fellow borough council member from meeting due to exercise of free speech rights not entitled to absolute immunity); *Polenz v. Parrott,* 694 F. Supp. 599 (E.D. Wis. 1988) (denial of liquor license an administrative act), *aff'd,* 883 F.2d 551 (7th Cir. 1989).

Therefore, the Mayor and Borough Council members are entitled to only to the qualified immunity provided to all municipal officials. Under this test, they may be liable on two fronts. First, the discretionary regime of granting permits in Paulsboro is so clearly unconstitutional that a reasonable official would know that it violates the First Amendment. The Mayor and Borough Council members may therefore be liable for continuing and participating in this scheme. Furthermore, they may be liable if Dansby can prove that they cast their vote on the basis of impermissible criteria, such as his race or the content of his speech. Dansby has not, however, adduced any competent evidence to show that these individuals conspired to violate his rights, and summary judgment on that claim will be granted.

*2) False Arrest, Malicious Prosecution and Excessive Force*

The liability of the individual police officers does not stem from First Amendment concerns, but rather from the enforcement of Borough Ordinance § 44-30(H). Therefore, the claim against individual policemen hinges on whether (1) Dansby's activity gave Officers Schmutz and Augustino probable cause to arrest him for a violation of the ordinance and (2) whether the officers used excessive force in arresting Dansby.

First, defendants have argued that under New Jersey principles of issue preclusion, we must find probable cause because Judge Faison concluded that it existed. Pursuant to 28 U.S.C. § 1738, this Court must give the same preclusive effect to a state court judgment as it would be given in the state that issued the judgment, even where a § 1983 action provides the only route for a plaintiff to present constitutional claims before a federal court. *Allen v. McCurry,* 449 U.S. 90 (1980). Under New Jersey law, four elements must be established to invoke the doctrine of issue preclusion: the precluded issue must be identical to the issue in the prior litigation, the issue must have been actually litigated, the issue must have been decided by a valid, final judgment, and the determination of that issue must have been essential to the prior judgment. *E.P. by P.O. v. Union County Regional High Sch. Dist. 1,* 741 F. Supp. 1144, 1149 (D.N.J. 1989).

**\*12** We find that Judge Faison's determination of probable cause was not essential to his decision, because he ultimately concluded that the government failed to meet its burden of proving Dansby's guilt beyond a reasonable doubt. The existence *vel non* of probable cause is irrelevant to this conclusion, and the issue is a question of fact for the jury. This determination is the touchstone of both Dansby's constitutional and common law false arrest claims. *See Hunter v. Bryant,* 112 S.Ct. 534, 536-37 (1991) (constitutional); *Pine v. Okzewski,* 112 N.J.L. 429, 170 A. 825 (E. & A. 1934) (common law).

However, Judge Faison did find Dansby guilty beyond a reasonable doubt of obstructing justice, a determination that is entitled to preclusive effect in this Court. Although the Third Circuit has stated that a favorable termination is not an essential element of a false arrest claim, *see Rose v. Bartle,* 871 F.2d 331, 351 (3d Cir. 1989), Dansby committed this offense in

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



plain sight of the officers, giving them probable cause to arrest him for it. We will grant the officers' motion for summary judgment on the constitutional and common-law false arrest claims insofar as they relate to Dansby's detention after he walked away from the officers. [FN9]

Dansby also claims that the officers used excessive force in effectuating his arrest. Whether an officer's use of force is "excessive" must be measured under an objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395 (1989). Reasonableness is judged "from the perspective of a reasonable officer on the scene ...." *Id.* at 396. Here, we have drastically differing accounts of the situation confronted by the officers on the scene. The officers claim that Dansby struck Schmutz, which could justify the use of force in making the arrest, while Dansby alleges that he was simply walking away from the scene when the officers applied force to him, an application of force that a factfinder might find unreasonable. Therefore, summary judgment on this claim must be denied. Once again, however, the record contains no evidence that Augustino and Schmutz conspired to deny these rights, and to that extent summary judgment will be granted.

Finally, Dansby states both a constitutional and a common-law cause of action for malicious prosecution stemming from the proceeding in the Paulsboro Municipal Court. [FN10] Defendants first argue that they cannot be held liable for malicious prosecution because that cause of action will lie only against a prosecutor. However, the cause of action will clearly lie against anyone who maliciously causes criminal proceedings to be instituted against the plaintiff. *See Losch v. Borough of Parkesburg,* 736 F.2d 903 (3d Cir. 1984) (malicious prosecution claim against police officers); *Earl v. Winne,* 14 N.J. 119, 132, 101 A.2d 535 (1953) (malicious prosecution may lie against law enforcement officials).

Under both the Constitution and common law, the plaintiff in a malicious prosecution action must prove (1) that the defendant initiated a criminal proceeding against the plaintiff (2) that was motivated by malice and (3) without probable cause, and (4) that the proceeding was terminated favorably to plaintiff. *Lee v. Mihalich,* 847 F.2d 66, 69-70 (3d Cir. 1989); *Lind v. Schmid,* 67 N.J. 255, 262, 337 A.2d 365 (1975). Plaintiff has only claimed that Lieutenant Schmutz caused the complaint and summons to be filed against Dansby, so all other defendants' motion for summary judgment on this count will be granted. As to Lieutenant Schmutz, plaintiff has presented

evidence adequate to create a factual issue as to whether his actions were without probable cause and with malice. Furthermore, Schmutz is not entitled to qualified immunity on this claim because the right to be free from malicious prosecution is clearly established. *See Losch,* 736 F.2d at 910.

*13 The final question is whether the Municipal Court proceedings were "terminated favorably" to Dansby. Judge Faison found plaintiff not guilty of the charge of violating the Borough Ordinance, found that the charges of aggravated assault against a police officer and resisting arrest merged, and found plaintiff not guilty of these charges but guilty of the lesser included offense of resisting arrest. Although arising from the same occurrence, the charges of violating the Borough Ordinance and aggravated assault/resisting arrest are sufficiently "distinct" that a conviction of one does not equal an unfavorable termination of the other. *See Janetka v. Dabe,* 892 F.2d 187, 189-90 (2d Cir. 1989). Therefore, the acquittal of the Borough Ordinance charge is a favorable termination, and plaintiff may proceed with his malicious prosecution claim on that charge. The aggravated assault and resisting arrest charges are not distinct, however, and although plaintiff was acquitted of these charges, he was found guilty of a lesser included offense. Such a termination is not "favorable" to a defendant. *See Alt v. Parker,* 112 N.C. App. 307, 313, 435 S.E.2d 773 (1993), *cert. denied,* 335 N.C. 766, 442 S.E.2d 507 (1994). *See also Janetka,* 892 F.2d at 190 (finding charges distinct in part because "neither charge is a lesser included offense of the other.").

### C. *Intentional Infliction of Emotional Distress*

Dansby brings a state law claim for the intentional infliction of emotional distress. Defendants assert that this claim is not cognizable under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 *et seq.* N.J.S.A. 59:9-2(d) prohibits an award "against a public entity or public employee for pain and suffering resulting from any injury," unless the injury results in "permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $1,000.00." In *Ayers v. Jackson Township,* 106 N.J. 557, 525 A.2d 287 (1987), the New Jersey Supreme Court concluded that the tort of intentional infliction of emotional distress is an "injury" within the meaning of the Tort Claims Act, and that subjective damages in recovery for this tort are barred by the terms of N.J.S.A. 59:9-2(d). *Id.* at 572-77. Thus, emotional distress claims are barred by the Tort Claims Act unless accompanied by the type of serious physical

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

injury contemplated by underline section 59:9-2(d). Although Dansby does allege that he suffered some physical injury, such as neck and back pain, this injury does not constitute "permanent loss of a bodily function" or "permanent disfigurement," and Dansby has presented no evidence that his medical bills for these injuries exceeded $1,000. Therefore, defendant's motion for summary judgment on the intentional infliction of emotional distress count will be granted.

Furthermore, even if this claim were not barred by the Tort Claims Act, the Court would find that Dansby had failed to establish the elements of the tort under New Jersey law. New Jersey has adopted the *Restatement (Second) of Torts* definition of intentional infliction of emotional distress. *Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 365-66, 544 A.2d 857 (1988)*. The Restatement defines the tort of intentional infliction of emotional distress as "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another." *Restatement (Second) of Torts § 46(1)(1965)*. A plaintiff must prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley, 111 N.J. at 366* (quoting *Restatement (Second) of Torts § 46* cmt. d).

*14 The Court cannot find small-town politics and a mill-run false arrest claim "atrocious" and "utterly intolerable in a civilized community." Furthermore, the record when view most favorably to plaintiff indicates that defendants did not intend to inflict emotional distress upon plaintiff, but instead intended to thwart his campaign either because of his race or his views. The claim of intentional infliction of emotional distress, as a separate state law cause of action, simply has no merit. [FN11]

D. *Slander*

Dansby's complaint states a claim for defamation against all defendants, although his moving papers suggest that the only alleged slanders occurred when Schmutz reported the arrest to Dansby's employer and when the Police Department "leaked" his arrest to *The Gloucester County Times*. Furthermore, at oral argument, counsel for plaintiff conceded that the source of the information for the newspaper story could not be pinpointed, and limited the slander claim to Schmutz's comments. Therefore, the motion of all defendants except Schmutz on this claim will be granted.

Schmutz first argues that he may not be held liable

for defamation because the information relayed to Dansby's employer was true. Truth is an absolute defense to a defamation action. *Ward v. Zelikovsky, 136 N.J. 516, 643 A.2d 972 (1994)*. Dansby was placed under arrest for violation of a borough ordinance, resisting arrest and aggravated assault upon a police officer, and Schmutz simply relayed that fact to plaintiff's employer, the New Jersey Department of Corrections. [FN12]

Plaintiff responds that Schmutz's call implied that Dansby had actually committed the crimes for which he was arrested, because Schmutz was the arresting officer and could legally effectuate the arrest only with probable cause. Furthermore, because the crimes of aggravated assault and resisting arrest personally involved Schmutz, his statement regarding the arrest implies personal knowledge that the charged acts actually occurred. *See Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990)* (First Amendment does not preclude defamation liability for statement of opinion that "implies a knowledge of facts which lead to the conclusion that" plaintiff committed the object of the defamation).

Plaintiff's own version of the facts precludes the application of this doctrine here. Schmutz merely informed Dansby's employer that Dansby was under arrest for certain crimes, and did not state that he himself had personal knowledge of the crimes or even that he had effectuated the arrest. Indeed, the receiver of the call would be just as likely to believe that Schmutz was simply acting as a police spokesperson as that he was the arresting officer. Because this statement does not imply a knowledge of any fact except that Dansby was under arrest, a fact that was true, Schmutz may not be held liable for slander.

New Jersey courts have also required plaintiffs who bring defamation claims against public officials to prove "actual malice." *Burke v. Deiner, 97 N.J. 465, 475, 479 A.2d 939 (1984)*. Under this standard, the plaintiff must present clear and convincing evidence that the defendant acted either with knowledge that the stated facts were false or with reckless disregard of their truth. Here, Schmutz had probable cause to arrest Dansby because he was eventually convicted of obstructing justice, a crime that occurred in Schmutz's presence. Because reporting an arrest with probable cause cannot constitute knowledge that the underlying acts were false or reckless disregard of the truth, Dansby has failed to show actual malice.

E. *Municipal Liability*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*15 Dansby seeks damages from both municipal defendants on the basis of their deliberate indifference to the constitutional rights of Paulsboro citizens and their failure to adequately train the Paulsboro police force. In *Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994)*, the Third Circuit restated the familiar principles for holding a municipality liable under § 1983. A municipality may be liable "where action pursuant to a municipal policy or custom causes a constitutional tort." *22 F.3d at 1291* (citing *Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978)*). Where the plaintiff alleges that the municipality failed to train law enforcement personnel, it may be held liable "if the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come in contact." *Id.* (citing *City of Canton v. Harris, 489 U.S. 378, 388 (1989)*). To succeed on such a claim, a plaintiff must (1) identify the deficiency in training, (2) prove that the deficiency caused the constitutional violation, and (3) prove that the failure to remedy the deficiency reflected deliberate indifference on the part of the municipality. *Malignaggi v. County of Gloucester, 855 F. Supp. 74, 77 (D.N.J. 1994)*. Deliberate indifference "must reflect a conscious choice made by city policymakers." *Fagan, 22 F.3d at 1291*.

The record in this case is replete with testimony that Paulsboro maintained an unwritten "custom" of requiring those who wished to use a public address systems to appear before the Borough Council and request permission, which the Borough Council could grant in its discretion. This prior restraint on speech is precisely the type of unconstitutional "custom" that may expose a municipality to liability under *Monell*, and Paulsboro's motion for summary judgment on that claim will be denied.

However, plaintiff's allegations against the Borough and the Police Department [FN13] regarding failure to train are inapposite in this case. While plaintiff has adduced evidence that the Paulsboro police received no training on the enforcement of municipal ordinances or the sign-posting statute, this Court simply cannot believe that a small municipality must provide each police officer with extensive training on every obscure state statute and local ordinance. Indeed, plaintiff's assertion that the statutes at issue were rarely, if ever, enforced undercuts his argument that municipal policymakers were deliberately indifferent to the rights of citizens that were violated by the enforcement of these laws.

Plaintiff has also advanced a claim regarding the failure to train officers to prevent false arrests or the use of excessive force. This claim stems primarily from numerous citizens' complaints with racial overtones filed against Paulsboro police, the testimony of the police officers themselves regarding the number of complaints filed against them, and negative press coverage describing these complaints and their racial overtones.

*16 Although sensational, this evidence does not support a failure to train claim. Fundamentally, while the complaints and press coverage show that Paulsboro has a litigious population, plaintiff has not provided the Court with any evidence that these complaints had merit. Plaintiff has not provided the Court with the number of complaints filed or the number that resulted in settlements or verdicts favorable to the complaining party. While the current record would allow a factfinder to conclude that Paulsboro policymakers knew that tensions existed between its police force and its black community, it does not show that Paulsboro policymakers knew that the police were violating the civil rights of black community members and exhibited deliberate indifference to these violations.

Indeed, the one iota of hard evidence in the record regarding the training of Paulsboro police does not support plaintiff's position. The record shows that Paulsboro police officers received one day of sensitivity training in light of the filing of the numerous citizens' complaints. However, while plaintiff argues that this action constitutes *per se* failure to train, a more logical inference is that Paulsboro policymakers in fact undertook their obligation to train the members of the police force. Because plaintiff has not offered any evidence to show that this action was anything but a reasonable response to the racial conditions in Paulsboro at the time, Paulsboro's motion for summary judgment on the failure to train claims will be granted.

F. *Punitive Damages*

Dansby seeks punitive damages from all defendants. However, the Borough is immune from punitive damages for civil rights violations. *Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981); Garrett v. Clarke County Bd. of Educ., 857 F. Supp. 949, 953 (S.D. Ala. 1994.)* Nonetheless, it is equally clear that punitive damages may be recovered from an individual municipal officer upon a showing of "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30, 56 (1983)*. Because we find that a factfinder could make such a finding in connection with all the alleged constitutional violations that have

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

survived summary judgment, we will deny the individual defendants' motion for summary judgment on punitive damages.

## IV. CONCLUSION

All defendants' motions for summary judgment on plaintiff's Eighth Amendment, intentional infliction of emotional distress, and slander claims are granted. The motions of the municipal defendants on plaintiff's pendent state law claims, and the motions of the individual defendants on plaintiff's claims against these defendants in their official capacities, are also granted. Because no claims survive against the Police Department or Chief DiStefano, their motions are granted and they are dismissed from the case. The motions of the individual defendants are granted except for the motions of Officers Morina, Sullivan, and Hershey on the claims relating to the posting of signs and the motions of Mayor Burzichelli, the individual Borough Council members, and Officers Schmutz and Augustino on the claims relating to the use of the public address system. The Borough's motion is granted except for the claim that the "custom" surrounding the grant of public address system permits violates the First Amendment. The Borough's motion on punitive damages is granted, and the individual defendants' motion on this issue is denied.

**\*17** An appropriate order will enter on even date herewith.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter having come before the Court on May 30, 1995, upon defendants' Motions for Summary Judgment, the Court having reviewed the papers submitted in support and in opposition, and having heard the arguments of the parties, and for the reasons set forth in an Opinion issued on even date herewith, and for good cause shown,

IT IS, on this 7th day of June, 1995,

ORDERED THAT:

1. All defendants' motions for summary judgment on plaintiff's claims under 42 U.S.C. § 1983 for violations of his Eighth Amendment rights, and on plaintiff's state law claims for the intentional infliction of emotional distress and slander, are hereby GRANTED.

2. The motions of the Borough of Paulsboro and the Paulsboro Police Department for summary judgment on all plaintiff's remaining pendent state law claims are hereby GRANTED.

3. The motions of all individually named defendants for summary judgment on all claims against them in their official capacities are hereby GRANTED.

4. The motions of the Paulsboro Police Department and Police Chief John DiStefano for summary judgment on all plaintiff's remaining claims are hereby GRANTED, and these defendants are accordingly DISMISSED from the case.

5. The motions of defendants Sergeant Thomas Sullivan and Patrolman Dennis Morina for summary judgment on all plaintiff's remaining claims are hereby GRANTED except to the extent that they seek summary judgment on plaintiff's claims of selective enforcement of former N.J.S.A. 27:5-1 and conspiracy to selectively enforce that statute, to which extent said motions are DENIED.

6. The motion of defendant Sergeant Richard Hershey for summary judgment on all plaintiff's remaining claims is hereby GRANTED except to the extent that he seeks summary judgment on plaintiff's claims of selective enforcement of former N.J.S.A. 27:5-1, to which extent said motion is DENIED.

7. The motions of defendants Mayor John Burzichelli and Paulsboro Borough Council Members Robert Damminger, Jeanne Giampola, Lawrence Hayes, James Sabetta, and Michael Loomis for summary judgment on all plaintiff's remaining claims are hereby GRANTED except to the extent that they seek summary judgment on plaintiff's claims under 42 U.S.C. § 1983 for violations of plaintiff's First Amendment rights due to the Paulsboro "custom" regarding the acquisition of permits to use public address systems, to which extent said motions are DENIED.

8. The motion of defendant Sergeant Bruce Augustino for summary judgment on all plaintiff's remaining claims is hereby GRANTED except to the extent that he seeks summary judgment on plaintiff's claims of (1) false arrest from the time plaintiff was pulled over to the time he walked away from defendants Sergeant Bruce Augustino and Lieutenant Bryan Schmutz, and (2) the use of excessive force during the course of plaintiff's arrest, to which extent said motion is DENIED.

**\*18** 9. The motion of defendant Lieutenant Bryan

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1995 WL 352995
(Cite as: 1995 WL 352995 (D.N.J.))

Schmutz for summary judgment on all plaintiff's remaining claims is hereby GRANTED except to the extent that he seeks summary judgment on plaintiff's claims of (1) false arrest from the time plaintiff was pulled over to the time he walked away from defendants Sergeant Bruce Augustino and Lieutenant Bryan Schmutz, (2) the use of excessive force during the course of plaintiff's arrest, and (3) malicious prosecution for the violation of Borough Ordinance § 44-30(H), to which extent said motion is DENIED.

10. The motion of defendant the Borough of Paulsboro for summary judgment on all plaintiff's remaining claims is hereby GRANTED except to the extent that it seeks summary judgment on plaintiff's claims under 42 U.S.C. § 1983 for violations of plaintiff's First Amendment rights due to the Paulsboro "custom" regarding the acquisition of permits to use public address systems, to which extent said motion is DENIED.

11. The motion of defendant the Borough of Paulsboro for summary judgment on plaintiff's claims for punitive damages is hereby GRANTED, but the motions of all remaining individual defendants for summary judgment on plaintiff's claims for punitive damages in connection with all claims that have survived this Order are hereby DENIED.

> FN1. The complaint names Chief John DiStefano, Lieutenant Bryan Schmutz, Sergeant Thomas Sullivan, Sergeant Bruce Augustino, Sergeant Richard Hershey, and Patrolman Dennis Morina of the Police Department, and Robert Damminger, Jeanne Giampola, Lawrence Haynes, James Sabetta, and Michael Loomis of the Borough Council.

> FN2. The current record contains voluminous deposition testimony. Dansby's two-day deposition appears at Defendants' Exs. "A" and "B", and will be referred to as "Dansby Dep. 'A'" and "Dansby Dep. 'B'," respectively. The remainder of the deposition testimony, except for the testimony of Lieutenant Schmutz, appears in Plaintiff's exhibits. Lieutenant Schmutz's deposition appears at Defendants' Ex. "H".

> FN3. While Dansby testified that he believed Jones provided him with this information, (id.), Moeller testified that

Mike Rode, an Atlantic Electric supervisor, had informed Dansby that he could post signs on the poles. (Moeller Dep. at 34.)

> FN4. Defendants argue that plaintiff's § 1981 claims must fail because the complaint fails to allege that Dansby is a member of a racial minority. However, the extreme degree of racial tension in Paulsboro and Dansby's role in it are patently obvious to anyone who reads the record presented to this Court. Because defendants have more than adequate notice of Dansby's racial allegations to avert any possible prejudice, the Court will treat the allegations as if they were raised in the pleadings. See Fed. R. Civ. P. 15(b).

> FN5. N.J.S.A. 59:8-3 has since been amended, and the notice provisions of the Tort Claims Act now apply to public employees as well as public entities. L.1994, c. 49, § 2, effective June 23, 1994. This amendment, however, occurred well after the events at issue in this case, and merely confirms the conclusion that prior law did not require the filing of a notice of claim against a public employee.

> FN6. N.J.S.A. §§ 27:5-1 to -4 were repealed by L.1991, c. 413, § 23, effective January 17, 1992, and replaced with the Roadside Sign Control and Outdoor Advertising Act, N.J.S.A. 27:5-5 to -26. All the events at issue in this case, however, took place under the prior law.

> FN7. The police officers have argued that while they had observed many other candidates' posters hanging on the poles, Dansby was the only person they actually observed hanging posters on the poles. In a small town such as Paulsboro, this is a distinction without a difference, because everyone would know that the candidate or a member of the candidate's small circle of supporters hung that candidate's posters. Furthermore, this distinction does not explain why Dansby was the only person who was asked to take down his posters.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**FN8.** Plaintiff also argues that Borough Ordinance § 44-30(H) is facially invalid because it places undue discretion in the hands of those who enforce the law. *See Ward,* 491 U.S. at 793. However, the Court in *Ward* questioned whether such a challenge was appropriate other than to a licensing statute. *Id.* at 793-94. In any case, we note that the Supreme Court has held similar statutes neither vague nor overbroad. *See Grayned v. City of Rockford,* 408 U.S. 104, 107-08 (1972) (upholding statute that prohibited persons adjacent to public schools from making "any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof ...."); *Kovacs v. Cooper,* 336 U.S. 77, 79 (1949) (upholding against facial challenge Trenton statute prohibiting use of a sound truck "which emits therefrom loud and raucous noises" while travelling in a public way).

**FN9.** We note that this holding leaves Dansby with a very narrow false arrest claim, from the time that the officers pulled him over to the time that he walked away from the officers. Nonetheless, Dansby could recover nominal and punitive damages on this claim.

**FN10.** In support of his false arrest claim, Dansby alleges that he was handcuffed to a chair in the police station while he was processed. Because the Court has found that the officers had probable cause to take Dansby to the station, that part of his claim has been dismissed. Insofar as this allegation could be construed to state a violation of the due process rights of a pretrial detainee, we find it without merit. *See Kost v. Kozakiewicz,* 1 F.3d 176, 188 (3d Cir. 1993) (pretrial detainee must show "that he or she suffered a deprivation of 'the minimal civilized measure of life's necessities.'") (quoting *Wilson v. Seiter,* 111 S.Ct. 2321, 2326-27 (1991)).

**FN11.** This ruling may make little practical difference. While the emotional distress claim *per se* fails, plaintiff may be able to recover subjective damages on his constitutional claims. Nor does the Tort

Claims Act apply to these claims. *Mancini v. Lester,* 630 F.2d 990, 994-95 (3d Cir. 1980); *Morgan,* 268 N.J. Super. at 357.

**FN12.** Defendants have submitted evidence that it is customary for a police department to notify the employer upon the arrest of a law enforcement official. (*See* Butts Aff., Defendants' Ex. "I".) Dansby himself was required to report his arrest to the Department of Corrections. (Dansby Dep. "B" at 85.) While this would not destroy Dansby's slander claim for lack of damages, because a slander regarding the commission of a crime constitutes slander *per se, see Gnapinsky v. Goldyn,* 23 N.J. 243, 250, 128 A.2d 697 (1957), the Court notes that public policy favors law enforcement agencies promptly receiving information regarding the arrest of their employees.

**FN13.** The Police Department also claims that it is not a suable entity under New Jersey law. *See City of Newark v. Hartford Accident & Indem. Co.,* 134 N.J. Super. 537, 342 A.2d 513 (App. Div. 1975). Because we find the claims against it without merit, we need not resolve this issue.

1995 WL 352995, 1995 WL 352995 (D.N.J.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

79 F.3d 1137 (Table)
(Cite as: 79 F.3d 1137)

**H**

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. The Third Circuit provides by rule for the reporting of opinions having "precedential or institutional value. An opinion which appears to have value only to the trial court or the parties is ordinarily not published." The Federal Reporter tables are prepared from lists of cases terminated by judgment orders, unpublished per curiam opinions and unpublished signed opinions, indicating the disposition of each case, transmitted by the Court. Third Circuit Rules, App. 1, Internal Operating Procedures, Ch. 5, sec. 5.1, 28 U.S.C.A.)

United States Court of Appeals,
Third Circuit.

Mozelle Dansby, Daisy Dansby
v.
Borough of Paulsboro, a Political Subdivison of State
of New Jersey, Paulsboro
Police Department, John Distefano, Chief of Police
of Paulsboro Borough, Lt.
Bryan Schmutz, Sgt. T. Sullivan, Sgt. Bruce
Augustino, Sgt. Richard Hershey,
Patrolman Dennis Morina, all Members of Paulsboro
Police Dept.

**NO. 95-5456**
Feb 13, 1996

Appeal From: D.N.J., No. 92-cv-04458, Irenas, J.

AFFIRMED.

79 F.3d 1137 (Table)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



2001 WL 741743
(Cite as: 2001 WL 741743 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Myra **ANTHONY** and Magdaline **Wright**,
Plaintiffs,
v.
**CITY OF NEW YORK**, New York City Health
and Hospitals Corp., "John" Collegio,
"John" Migliaro, and John Does 1, 2 and 3, both
individually and in their
official capacities, Defendants.

No. 00 Civ. 4688(DLC).

July 2, 2001.

Richard A. Altman, New York, NY, for Plaintiffs.

Susan B. Eisner, Assistant Corporation Counsel, Special Federal Litigation Division, New York, NY, for Defendants.

*OPINION AND ORDER*

COTE, J.

*1 This case requires us to consider the appropriate response by the police when a frightened woman with Down's Syndrome who is home alone places a telephone call falsely reporting that she is being attacked. In this action, brought under 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1985 ("Section 1985"), the Americans with Disability Act ("ADA"), 42 U.S.C. § 12132, *et seq.,* and state law, plaintiffs Myra Anthony ("Anthony") and Magdalene Wright ("Wright") assert that defendants the City of New York ("City"), the New York City Health and Hospitals Corporation ("HHC"), and police officers Richard Collegio ("Collegio") and Gerald Migliaro ("Migliaro") violated their rights when Collegio, Migliaro, and others entered Wright's apartment and took Anthony to the psychiatric ward of Kings County Hospital, where she was kept overnight. Plaintiffs and defendants have cross-moved for partial summary judgment. [FN1] For the following reasons, defendants' motion is granted, and plaintiffs' motion is denied.

FN1. The briefs do not address every cause of action in plaintiffs' complaint.

BACKGROUND

The following facts are undisputed, unless otherwise noted. [FN2] Plaintiff Wright is a Black woman and a resident of Brooklyn, New York, and plaintiff Anthony, Wright's half-sister, is a Black woman and a citizen of the West Indies. Anthony's ability to function is limited by Down's Syndrome although, according to Wright, Anthony is sufficiently independent that she can "dress [ ] herself" and "prepare a meal for herself to eat ... with supervision." During the period relevant to this action, Anthony was staying with Wright on a medical visa to receive treatment for a hearing problem.

FN2. Anthony has submitted no testimony in support of her cross- motion for summary judgment. Anthony is presently in the West Indies and is seeking a visa to return to the United States to receive medical treatment. She will submit to a deposition immediately prior to trial if summary judgment is not granted.

The City is a municipal corporation existing under the laws of New York. HHC is a municipal corporation created under New York law. Kings County Hospital is owned and operated by HHC. Migliaro and Collegio are employed as police officers by the City of New York, and were so employed at all times relevant to this action.

On March 7, 2000, at 11:37 a.m., a call from Wright's apartment was connected to 911. The female caller identified herself as five years old, was "incoherent," and stated that a "husband" "beat on her" and "has a knife and a gun." At about 11:52 a.m., while the caller was still on the line with 911, the 911 operator heard knocking at Wright's door. By 11:55 a.m., several uniformed officers had entered Wright's apartment. Subsequently, additional officers, including Collegio and Migliaro, who are partners, and emergency medical service ("EMS") providers entered Wright's apartment. Sergeant Mendez, a supervising officer, was also at the scene.

Anthony was alone in the apartment when the police officers arrived. Collegio and Migliaro have conflicting recollections of Anthony's behavior while they were in Wright's apartment. Migliaro testified that when he first entered Wright's apartment, he observed Anthony sitting in the living room and did not remember her speaking to him or to any of the other officers. As far as Migliaro remembered, Anthony remained seated. Migliaro additionally testified that Anthony "appeared to be needing of assistance because she appeared to be slow," but he

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

"didn't notice" whether Anthony was upset and did not see her behave in a violent manner. Finally, Migliaro did not feel personally threatened by Anthony at any time, or feel that Anthony was dangerous to others, although he did believe that she was a danger to herself because "[s]he was left home unattended, and ... her mental capacity didn't seem [sic] she was able to take care of herself."

**\*2** Collegio, in contrast, asserts that Anthony was "running about," "crying," and "screaming," and that he felt threatened by her. Collegio believed that Wright was "potentially" dangerous to herself.

At some point, Wright's neighbor arrived and reported that Wright was involved with the church. Collegio, Migliaro, and other officers looked in Wright's apartment for Wright's work number or telephone numbers of members of Wright's church who might know where Wright was. Migliaro personally called six or more telephone numbers in an attempt to reach Anthony's family members.

Eventually, Sergeant Mendez directed Collegio and Migliaro to take Anthony to the hospital. Anthony was then handcuffed by Collegio or another officer. Migliaro rode with Anthony in an ambulance to Kings County Hospital. En route, ambulance workers observed that Anthony appeared to have Down's Syndrome and that she "became very aggressive" when she learned that she was being taken to the hospital but was "able to be calmed."

Wright was called at work at around 12:30 p.m. by a sister, who said that Myra had been taken out of Wright's apartment by the police. When Wright returned home, around 2:00 p.m., she saw a note on her bedroom dresser that read: "Magdalene, 70 Pct. responded to you [sic] house and took [Anthony] to Kings County Hospital to be checked out." Wright called Kings County Hospital and the 70th precinct, but neither told Wright where Anthony was. At about 2:30 p .m., Wright received a call from Migliaro, who stated that Anthony was at the psychiatric ward at Kings County Hospital.

Wright arrived at Kings County Hospital at about 3:00 p.m. When Wright arrived, Anthony was being held in a locked room. Although Wright asked that Anthony be released to her custody, Anthony was kept at Kings County Hospital for evaluation.

While at Kings County Hospital, Anthony was examined by several staff members. At 6:42 p.m.,

Anthony was interviewed by a nurse, whose notes reflect that Anthony was "uncooperative [and] fearful," and refused to answer the questions asked. At 10:40 p.m., Anthony was examined by Dr. Najira Khanani, who noted that during the interview Anthony exhibited an "egocentric delusion and seem [ed] paranoid," and "show[ed] poor insight/judgment." Based upon this evaluation, Dr. Khanani admitted Anthony as "an emergency status patient to th [e] Comprehensive Psychiatric Emergency Program (C.P.E.P.) for immediate observation, care and treatment" pursuant to Mental Hygiene Law § 9.40 ("Section 9.40"). By 11:00 p.m., blood and urine samples were taken from Anthony and Anthony was administered medicine, including Ativan, Cogentin, and Haldol, "due to [her] agitation and uncooperative behavior."

At 10:30 a.m. on March 8, a Kings County Hospital employee prepared a discharge summary which notes that Anthony had admitted that she had the telephone conversation with 911 in which she said there was a man with a gun, though she had previously denied that she had made the call, and that Anthony had "apparently randomly selected the numbers without understanding the implications" of the call. The discharge summary additionally notes that Anthony "has no psychotic symptoms" and "[d]enies feelings of depression but appeared overwhelmed by the experience of being handcuffed and brought to the hospital." Anthony was released to Wright's custody at around 11:00 a.m. on March 8.

**\*3** The complaint alleges that: (1) all the defendants violated Anthony's Fourth Amendment rights to be free from unreasonable search and seizure and excessive force, and Fourteenth Amendment due process rights; [FN3] (2) all the defendants violated Anthony's rights under the ADA; (3) Collegio and Migliaro conspired to violate Anthony's civil rights under Section 1985 on the basis of her sex, race, and disability; and (4) all of the defendants committed the common law torts of assault and battery, intentional infliction of emotional distress, and false imprisonment against Anthony. Wright alleges that all the defendants violated her constitutionally protected right of familial association. Both Wright and Anthony assert that the City, Collegio, and Migliaro committed common law trespass against them.

> FN3. Where a particular Amendment to the Constitution provides specific protection against the asserted harm, that Amendment, and not the Due Process Clause, provides the standard for relief.



*Tenenbaum v. Williams,* 193 F.3d 581, 599 (2d Cir.1999). Anthony's claims of unreasonable search and seizure and excessive force during her seizure, against the City, Collegio, and Migliaro, are properly brought under the Fourth Amendment. *See Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995) (claim of excessive force during seizure by police should be analyzed under the Fourth Amendment); Section A, *infra.* Accordingly, Anthony's Due Process claims against the City, Collegio, and Migliaro for these same asserted violations are dismissed. Anthony's *Monell* claim against HHC, on the other hand, will be addressed under both the Fourth Amendment and the Due Process Clause. *See* Section B, *infra.*

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). The movant can meet this burden by showing that there is a lack of evidence to support the non-movant's case on an issue where the non-movant bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

Cross-motions for summary judgment are treated as unilateral summary judgment motions. *Straube v. Fla. Union Free Sch. Dist.,* 801 F.Supp. 1164, 1174 (S.D.N.Y.1992). Each movant must present sufficient evidence to satisfy its burden of proof on all material facts. *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988).

A. Anthony's Section 1983 Claims Against Collegio

and Migliaro For Unreasonable Search and Seizure [FN4]

> FN4. Wright has moved for summary judgment on "derivative claims based upon the violation of her sister's constitutional rights." Plaintiffs' complaint does not, however, include such claims.

Anthony seeks summary judgment on her claim that Collegio's and Migliaro's warrantless entry into Wright's apartment and warrantless seizure of Anthony violated the Fourth Amendment. Collegio and Migliaro have moved for summary judgment on the grounds that: (1) the officers' warrantless entry into Wright's apartment was justified by exigent circumstances and Anthony's consent; (2) the officers had probable cause to seize Anthony and remove her for psychiatric evaluation; and (3) qualified immunity shields the individual defendants from liability on plaintiff's claims.

*4 Section 1983 imposes liability upon a party who "under color [of law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Accordingly, to merit summary judgment on her Section 1983 claim against Collegio and Migliaro, Anthony must establish that these defendants, acting under color of law, deprived her of a right secured by the Constitution or laws of the United States. *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 271 (2d Cir.1999).

1. Collegio's and Migliaro's Warrantless Entry into Wright's Apartment

"Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori,* 230 F.3d 44, 50 (2d Cir.2000). Athough warrantless searches are presumptively unreasonable, "[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (citation omitted). The "essential question" when considering whether a warrantless entry was appropriate is whether the police had an "urgent need to render aid or take action." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) (en banc) (citation omitted). The issue of


whether exigent circumstances existed is quickly resolved. Because it was reasonable for the officers to believe that there was an armed man in Wright's apartment who was committing a violent crime against the caller, exigent circumstances justified the officers' warrantless entry into Wright's apartment. *See Tierney,* 133 F.3d at 192 (police responded to report of a domestic dispute); *Kerman v. City of New York,* No. 96 Civ. 7865(LMM), 1999 WL 509527, at *4 (S.D.N.Y. July 19, 1999) (police responded to 911 report of emotionally disturbed person home alone and in possession of a gun).

In an attempt to create a question of fact regarding whether Anthony ever spoke to 911 on the morning in question, Anthony has produced a record of calls from Wright's apartment which does not reflect a call to 911. The "Sprint Report," which memorializes statements made to the 911 operator, does reflect, however, that a call from Wright's apartment was transferred from the operator to 911, and there is, in the record of calls from Wright's apartment, a call to the operator at the time in question.

Alternatively, Anthony seeks to exclude the Sprint Report pursuant to Rule 1002, Fed.R.Evid., on the ground that the "best evidence" of the call, the 911 tape, was not produced. Rule 1004, Fed.R.Evid., provides, however, that an original recording is not required, and other evidence of the contents of a recording are admissible, "unless the proponent lost or destroyed them in bad faith." Anthony has not alleged that the 911 tapes were destroyed in bad faith, nor has plaintiff presented any reason to believe that the Sprint Report is inaccurate. Accordingly, the Sprint Report is admissible and can be used to support defendants' motion for summary judgment.

*5 Finally, Anthony asserts that the defendants have provided no method by which to interpret the Sprint Report. This Court and other courts in this district have, however, interpreted Sprint Reports in the past without difficulty. *See, e.g., Green v. Kelly,* No. 99 CIV. 9082(DLC), 2000 WL 1871711, at *5 n. 3 (Dec. 21, 2000); *Kerman,* 1999 WL 509527, at *2. Summary judgment is granted to defendants Collegio and Migliaro on Anthony's claim that the officers' entry into Wright's apartment violated her Fourth Amendment rights. [FN5]

FN5. Because exigent circumstances justified the officers' warrantless entry into Wright's apartment, it is unnecessary to consider whether Anthony consented

to the officers' entry. It is worth noting, however, that the Sprint Report reflects that the officers' entry into Wright's apartment was peaceful, and Wright's deposition testimony reflects that her apartment door was in the same condition when she left for work on the day in question and when she returned and that there was "no sign of break and enter."

2. Collegio's and Migliaro's Warrantless Seizure of Anthony

A person is seized under the Fourth Amendment when, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' *Kia P. v. McIntyre,* 235 F.3d 749, 762 (2d Cir.2000) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)). Anthony was "seized" within the meaning of the Fourth Amendment when she was handcuffed and taken by ambulance to Kings County Hospital.

A warrantless seizure is reasonable under the Fourth Amendment when the officers have probable cause. In the criminal context, if "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, probable cause to arrest exists." *United States v. McFadden,* 238 F.3d 198, 204 (2d Cir.2001) (citation omitted). It is only the "fair probability," not a "prima facie showing," of the basis for seizure that establishes probable cause. *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998). The Fourth Amendment additionally applies to seizures in the civil context. *Kia P.,* 235 F.3d at 762. Under the Fourth Amendment, an officer may seize a person for a psychiatric evaluation if the officer has "probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir.1997). *See also Glass v. Mayas,* 984 F.2d 55, 57-58 (2d Cir.1993); *Kerman,* 1999 WL 509527, at *5. [FN6]

FN6. New York law provides that a police officer can " 'take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." ' *Kerman,* 1999 WL 509527, at *6 (quoting N.Y. Mental Hyg. L. § 9.41).

Collegio and Migliaro provided conflicting testimony regarding Anthony's demeanor while the officers were in Wright's apartment. According to Collegio,

Anthony was crying, screaming, running around, and behaving irrationally. According to Migliaro, Anthony sat in a chair in the living room, was calm, and did not speak. In considering defendants' motion for summary judgment, the facts must be viewed in the light most favorable to the plaintiffs. Accordingly, the question here is whether there was probable cause to believe that Anthony was dangerous to herself or others even if she was calm while the officers were in the apartment.

Viewing the facts that were available to the officers, even in the light most favorable to Anthony, the officers had probable cause to seize Anthony. Given that Anthony has Down's Syndrome and had reported to an emergency operator less than twenty minutes before the police arrived that she was being beaten by a "husband" who had a knife and a gun, and given that there was no one present who could provide the officers with assurance that Anthony would not suffer another episode of terror or who could provide for Anthony's safety in their absence, it was reasonable to believe that Anthony might, if left alone, conduct herself in a manner likely to result in serious harm to herself. In reaching this conclusion, the officers were entitled to consider the likelihood that Anthony would experience another hallucination and might cause serious injury to herself during that episode even though she appeared calm to them. [FN7] *See Monday,* 118 F.3d at 1102-1103 (although plaintiff appeared coherent and denied attempting to commit suicide, there was an "unacceptable risk" that plaintiff was deceiving officers). Accordingly, there was probable cause to seize Anthony. [FN8]

FN7. Even if Anthony had been in an environment where there was little risk of physical injury, there is no reason why the threat of serious psychological injury alone, including the experience of terror resulting from a frightening hallucination, would not justify the officers' intervention.

FN8. Anthony asserts that she was subjected to excessive force when she was seized by defendants but has offered no admissible evidence in support of this claim. *See Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001) ("[a]ffidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial"). To the extent that Anthony has moved for summary judgment on her excessive force claim, Anthony's motion is denied. Defendants have not moved for summary judgment on Anthony's excessive force claim.

3. Qualified Immunity

*6 Even if Anthony were able to prove that her seizure violated her constitutional rights, Collegio and Migliaro would be entitled to qualified immunity. [FN9] "A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v.. Brown,* 246 F.3d 194, 199 (2d Cir.2001). *See also Wilson v. Layne,* 526 U.S. 603, 609 (1999). In the false arrest context, summary judgment based upon qualified immunity is appropriate when "the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Martinez v. Simonetti,* 202 F .3d 625, 635 (2d Cir.2000) (citation omitted).

FN9. Defendants additionally rely on New York's Mental Hygiene Law, Section 9.59, which provides that police officers who take and transport a person to a hospital pursuant to the Mental Hygiene Law "shall not be liable for damages for injuries alleged to have been sustained by such person ... unless it is established that such injuries ... were caused by gross negligence." N.Y. Mental Hyg. L. § 9.59. Immunity from a Section 1983 claim, however, is a matter of federal law and "cannot be immunized by state law." *Howlett v. Rose,* 496 U.S. 356, 375-76 (1990). *See also Goldberg v. Town of Rocky Hill,* 973 F.2d 70, 75 (2d Cir.1992).

Under Supreme Court and Second Circuit law, it was clearly established that the State cannot involuntarily confine a person unless it has probable cause to believe that the person poses a danger to themselves or to others. *O'Connor v. Donaldson,* 422 U.S. 563, 575-76 (1975); *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993). In light of Anthony's statement to 911 and the officers' observations of Anthony, it was objectively reasonable to believe that Anthony might pose a danger to herself, even if she was behaving calmly when the officers arrived at Wright's apartment, and, based upon these observations, to take custody of Anthony and escort her in an ambulance to a hospital, where there were trained personnel who could be expected to understand her needs, respond with appropriate care, and keep her in a safe environment until the appropriate course of conduct became clear.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



Qualified immunity under these circumstances seems particularly appropriate when considering how we would judge the legality of a contrary decision by these officers. If the officers had decided to leave the apartment once they found Anthony calmly seated in a chair and after they had been unable to locate a responsible person to stay with her, the officers could have stood fairly accused of callous indifference to the special needs of a person who had recently experienced extreme mental suffering and who was, from any objective standard, unable to manage her life's affairs and activities without supervision and assistance. Had she injured herself in another episode of terror after the officers closed the door behind them, would the law have excused their conduct?

If societies are measured by the ways in which they treat their least fortunate members, it is difficult to know, under these complicated and saddening circumstances, whether it would be more civilized to take Anthony to the hospital and risk that she might suffer additional trauma in the process, or leave Anthony in Wright's apartment and risk that Anthony, while alone, might cause trauma to herself. Indeed, not even Anthony argues in her motion papers that the latter course of action would have been more appropriate. In light of the difficulty of this decision, these officers should not be held liable for making the choice that they did.

*7 Anthony asserts that defendants waived their right to raise a qualified immunity defense. Qualified immunity "is an affirmative defense that the defendants have the burden of raising in their answer." In re State Police Litigation, 88 F.3d 111, 123 (2d Cir.1996). Defendants who do not assert qualified immunity in their answer can still raise qualified immunity, or any other affirmative defense, at summary judgment, however, if plaintiffs cannot show that any "significant prejudice" to them will result. Rinaldi v. City of New York, 756 F.Supp. 111, 115 n. 3 (S.D.N.Y.1990) (Leval, J.). See also Levy v. Kosher Overseers Assn. of America, Inc., No. 92 Civ. 8377(DLC), 2000 WL 294842, at *1 n. 1 (Mar. 21, 2000) (affirmative defenses generally).

Anthony asserts that she will suffer prejudice if defendants are allowed to raise qualified immunity for the first time on summary judgment because, "had the defense been asserted, defendants Collegio and Migliaro would have been questioned in detail about it at their depositions." Given that findings of probable cause and qualified immunity both require inquiry into the objective reasonableness of the officers' decision to seize Anthony, plaintiff's claim of prejudice is unpersuasive.

Anthony additionally asserts that Collegio and Migliaro are not entitled to qualified immunity because they were performing ministerial as opposed to discretionary acts in following a direct order issued by a superior officer. The qualified immunity doctrine shields " 'government officials performing *discretionary* functions." ' *Lewis v. Cowen,* 165 F.3d 154, 166 (2d Cir.), *cert. denied,* 120 S.Ct. 70 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (emphasis supplied). Even if following a Sergeant's orders to effect an arrest is properly characterized as ministerial, which is doubtful, it is nonetheless appropriate to grant these defendants qualified immunity because they were following the facially valid orders of a superior officer, Sergeant Mendez, who would have been entitled to qualified immunity had he been named a defendant in this case. *Varrone v. Bilotti,* 123 F.3d 75, 82 (2d Cir.1997). Accordingly, even were Anthony able to prove that Collegio and Migliaro violated her constitutional rights, they would be entitled to qualified immunity.

**B. Liability of the City, Defendants Collegio and Migliaro, Sued in Their Official Capacities, and HHC under Section 1983**

Anthony seeks summary judgment on her claims that the City has a custom or policy "of arbitrarily arresting people with disabling conditions regardless of whether they pose a threat to themselves or others," and that HHC has a custom or policy of "arbitrarily confining persons with mental disabilities regardless of whether they are a threat to themselves or others, or are in need of medical attention." Defendants seek summary judgment on plaintiff's *Monell* claims on the grounds that she has not met her burden of establishing a pattern or practice of constitutional violations by the defendants.

*8 In a suit brought under Section 1983, municipalities, individuals sued in their official capacities, [FN10] and municipal corporations such as HHC, [FN11] cannot be held liable unless the plaintiff can prove that the unconstitutional action was taken pursuant to

FN10. *Monell* applies both to municipalities and to individuals acting in their official capacity. *See Brandon v. Holt,* 469 U.S. 464, 471-73 (1985); *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

FN11. HHC asserts that plaintiff's suit improperly relies on the doctrine of respondeat superior by suing HHC for the alleged constitutional violations of Kings County Hospital's employees. HHC can, however, be sued for the actions of its agencies' employees if the other requirements of *Monell* are satisfied. *See Philippeaux v. North Central Bronx Hosp.*, 871 F.Supp. 640, 652 (S.D.N.Y.1994) (DLC).

a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] ... [or] pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978)) (brackets in original). Proof of a single incident "is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)
.

In support of her *Monell* claim against the City, Anthony relies upon Collegio's testimony that Sergeant Mendez ordered him to arrest Anthony. When a plaintiff asserts that unconstitutional acts "were taken or caused by an official whose actions represent official policy," the plaintiff must establish that, as a matter of state law, the official in question "had final policymaking authority in the particular area involved." *Jeffes*, 208 F.3d at 57. *See also Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 143 (2d Cir.1999). Plaintiffs have put forth no basis to conclude that a Sergeant's actions can represent official policy. *Cf. Jeffes*, 208 F.3d at 60 (County sheriff is an official policy maker); *Dangler*, 193 F.3d at 143 (board of directors of Off Track Betting Corporation are official policy makers).

Anthony additionally asserts, in support of her *Monell* claim, that Migliaro's deposition testimony reflects the City's failure to train police officers "regarding the treatment of non-violent disabled persons." In order to establish that a municipality's failure to train violated a plaintiff's constitutional rights, the plaintiff must meet three requirements.

First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation.... Second, the plaintiff must show that the situation either presents the

employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir.1992) (citations omitted). *See also Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir.1998). Only when a municipality's "failure to train reflects a 'deliberate' or 'conscious' choice by a municipality--a 'policy' as defined by [Supreme Court] cases--can a city be liable for such a failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

**\*9** Anthony has put forth no evidence of the nature of the City's current policies and training procedures regarding officers' treatment of disabled people. Moreover, Anthony has not met any of the three requirements described in *Walker*. Finally, even assuming that officers Collegio and Migliaro violated Anthony's rights, she has put forth no evidence to prove that these violations resulted from the City's failure to train. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. Because Anthony has submitted no evidence to raise a material question of fact that would preclude entry of summary judgment for defendants on plaintiffs' *Monell* claims against the City and Collegio and Migliaro, acting in their official capacities, defendants' motion for summary judgment on these claims is granted.

HHC additionally seeks summary judgment on Anthony's claim that HHC has a custom or policy of "arbitrarily confining persons with mental disabilities." In the first instance, Anthony has produced no admissible evidence of a policy or practice of unconstitutional behavior that raises a genuine issue of material fact to defeat HHC's motion for summary judgment. *Santos*, 243 F.3d at 683. In support of her claim that HHC has a policy of violating the rights of disabled people, Anthony relies solely upon Wright's deposition testimony and affidavit, in which Wright asserts that an unidentified HHC staff member informed her that it was a "standard" and "normal" procedure to detain Anthony in Kings County Hospital. This statement cannot be used to raise a genuine issue of fact as to whether HHC has a pattern or policy of violating the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

constitutional rights of disabled people, unless Anthony can establish that it was not hearsay. *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir.1991).

Wholly apart from a failure of proof regarding any unconstitutional HHC or Kings County Hospital policy for treatment of the disabled, there is no basis to conclude that Kings County Hospital violated Anthony's rights. HHC does not dispute that Anthony was seized by Kings County Hospital during the hours she was there: Wright was informed that she could not take Anthony home, which is sufficient to constitute a seizure. *See Kia P.*, 235 F.3d at 762; *Tenenbaum*, 193 F.3d at 602; *Glass*, 984 F.2d at 58. HHC also does not dispute that Anthony was searched during her stay at Kings County Hospital, as blood and urine tests constitute searches under the Fourth Amendment. *Ferguson v. City of Charleston*, 121 S.Ct. 1281, 1287 (2001) (urine); *Roe v. Marcotte*, 193 F.3d 72, 77 (2d Cir.1999) (blood). HHC has presented unrefuted evidence, however, that its search and overnight seizure of Anthony were justified.

"The Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing standard." *Glass*, 984 F.2d at 58 (citation omitted). Because "[a]n involuntary civil commitment is a massive curtailment of liberty," the Due Process Clause also requires that a person not be involuntarily hospitalized if she is "not a danger either to herself or to others." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995). In this case, Anthony was admitted to Kings County Hospital pursuant to Mental Hygiene Law Section 9.40. Section 9.40 provides, in relevant part, that:

*10 [A] person may be retained [in a comprehensive psychiatric emergency program] for observation, care and treatment and further examination for up to twenty-four hours if, at the conclusion of [an examination within six hours after the person is received into the program's emergency room], such physician determines that such person may have a mental illness for which immediate observation, care and treatment in a comprehensive psychiatric emergency program is appropriate, and which is likely to result in serious harm to the person or others.

N.Y. Mental Hyg. L. § 9.40. Section 9.40 is constitutional on its face, *Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir.1983), and there is no reason to believe that it was unconstitutionally

applied. [FN12] Based upon the undisputed evidence in the hospital records, plaintiff was examined by several HHC staff, who found that Anthony was initially "unresponsive," and then exhibited "delusional" and "paranoid" behavior. Anthony has offered no evidence that these findings were inaccurate or unreasonable or that it was unreasonable for HHC determine, based upon these observations, that Anthony should be held at Kings County Hospital for twenty-four hours for observation pursuant to Section 9 .40, and administered medication to calm her. *See Kulak v. City of New York*, 88 F.3d 63, 74 (2d Cir.1996). *Compare with Rodriguez*, 72 F.3d at 1061-62 (whether doctors followed requirements of Mental Health Law was a disputed issue of fact). The motion by HHC to dismiss the Section 1983 claims against it is granted.

> FN12. The medical records reflect that Anthony arrived at the psychiatric ward at 2:22 p.m. on March 7, and was admitted as an "emergency status patient" at 10:40 p.m. Although it appears that Anthony was retained for just over eight hours before she was admitted, plaintiff has not claimed that her due process rights were violated by this two-hour delay.

C. ADA Claims Against the City, Collegio, and Migliaro

Anthony seeks summary judgment on her claim that defendants violated her rights under the ADA by arresting and hospitalizing her based upon her disability, and by failing to adopt policies by which officers can properly recognize and address the needs of mentally disabled people. Collegio, Migliaro, and the City have cross-moved for summary judgment on Anthony's ADA claim, primarily on the grounds that plaintiff has failed to state a claim under the ADA and that the officers' decision to seize Anthony was reasonable.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 ; *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 78 (2d Cir.2000). A plaintiff can, therefore, succeed in an ADA action if she can show that she was "excluded from participation in or denied the benefits, services, programs, or activities of a public entity," or if she was "subjected to discrimination by any such entity" on account of her

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

disability. *Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir.2000) (citation omitted).

Because there is no individual liability under Title II of the ADA, *see, e.g., Hallett v. New York State Dep't of Corr. Svcs.,* 109 F.Supp.2d 190, 199 (S.D.N.Y.2000) (collecting cases), and individual defendants cannot be named in their official capacity under the ADA, *see Menes v. CUNY University,* 92 F.Supp.2d 294, 306 (S.D.N.Y.2000) (collecting cases), plaintiff's ADA claims against Collegio and Migliaro in their individual and official capacities are dismissed. Title II of the ADA does, however, apply to "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131.

**\*11** It is undisputed that Anthony is a disabled person and that the City is a public entity covered by the ADA. It is also clear that the police officers' response to the 911 call and seizure of Anthony for psychiatric evaluation are police activities or services and are, thus, covered by the ADA. *See, e.g., Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 210-13 (1998) (prison-sponsored boot camp is covered by the ADA); *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir.1998) (post-arrest transportation to the police station is covered by the ADA); *Calloway v. Boro of Glassboro Dept. of Police,* 89 F.Supp.2d 543, 555 (D.N.J.2000) (investigative questioning at a police station is covered by the ADA). The question in this case is whether Anthony was discriminated against in the provision of these services or performance of these activities on the basis of her disability.

ADA claims related to police investigations and arrests have been brought under two different theories. The first, the "wrongful arrest" theory, is based on a claim that police "wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity." *Gohier v. Enright,* 186 F .3d 1216, 1220-21 (10th Cir.1999). *See also Lewis v. Truitt,* 960 F.Supp. 175, 179 (S.D.Ind.1997) (arresting officers allegedly arrested man because he did not respond to officers appropriately when they knew or should have known that the man could not hear); *Jackson v. Inhabitants of Sanford,* Civ. No. 94-12-P-H, 1994 WL 589617, at *6 (D.Me. Sept. 23, 1994) (plaintiff allegedly arrested for operating a vehicle under the influence of alcohol based upon slurred speech caused by a past stroke). The second, the "reasonable accommodation" theory, is based on a claim that, "while police properly

investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest." *Gohier,* 186 F.3d at 1220. *See also Gorman,* 152 F.3d at 913 (wheelchair-bound arrestee is entitled to transportation appropriate to his disability).

Anthony's claim falls under neither of these theories. Anthony's claim is that the officers' conclusion that she was a danger to herself--and, therefore, should be seized and taken for psychiatric evaluation--was due to a misperception of her disability.

Although apparently no court has considered the applicability of the ADA to such a claim, one Circuit Court has relied on its analysis of the conduct under the Fourth Amendment to determine whether a plaintiff's seizure also violated the ADA. *See Bates ex rel. Johns v. Chesterfield County,* 216 F.3d 367, 373 (4th Cir.2000). *But see Hainze,* 207 F.3d at 801 (Title II does not apply to police officers' "on-the-street" responses to incidents). For the same reasons discussed in connection with Anthony's Fourth Amendment claim, it was objectively reasonable for the officers to conclude from the totality of the circumstances that Anthony posed a danger to herself and that they were justified in removing her from Wright's apartment and taking her to the hospital. Accordingly, the motion for summary judgment on plaintiff's ADA claim by Collegio, Migliaro, and the City is granted. [FN13]

> FN13. Anthony additionally seeks summary judgment on her ADA claim against HHC. HHC has not moved for summary judgment on this claim, but it would be appropriate to grant HHC summary judgment on this claim were such a motion brought. Undisputed evidence reflects that Kings County Hospital's detention of Anthony for observation was reasonable in light of the totality of the circumstances and pursuant to New York Mental Hygiene Law § 9.40, *see Section C, supra.*

### D. Conspiracy to Deprive Civil Rights Claim Against Collegio and Migliaro

**\*12** Anthony, Collegio and Migliaro have cross-moved for summary judgment on the claim that Collegio and Migliaro conspired to deprive Anthony of her civil rights, in violation of Section 1985. In order to recover under Section 1985, a plaintiff must establish:

(1) a conspiracy (2) for the purpose of depriving a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). "[T]he conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." ' *Id.* (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993)). Anthony has put forth no more than Wright's conclusory allegations--speculating that the defendants acted as they did because the plaintiffs did not live in a white neighborhood--in support of this claim. This does not raise a material question of fact that a conspiracy motivated by racial animus existed. Accordingly, defendants' motion for summary judgment on plaintiff's Section 1985 claims is granted.

### E. All Defendants' Alleged Interference With Wright's Right of Familial Association

The parties have cross-moved for summary judgment on Wright's claim that defendants interfered with her right of familial association. Family members have, "in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Tenenbaum,* 193 F.3d at 600 (citation omitted). This substantive due process right is violated only if defendants' actions were "egregious" and only if these actions would have been unconstitutional "even had the [plaintiffs] been given all the *procedural* protections to which they were entitled." *Id.* (emphasis in original). Assuming that the right to intimate association with family members extends to the relationship between Anthony and Wright, *see Sanitation and Recycling Industry v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997), Anthony's temporary separation from Wright was not, as a matter of law, so egregious that it violated Wright's substantive due process rights, particularly considering the efforts by the police to locate Wright and that Wright remained with Anthony throughout her stay at Kings County Hospital. *Compare Tenenbaum,* 193 F.3d at 600 (temporary separation of parents and child so that child could be examined for abuse does not constitute a violation of the right of intimate association with family members) *with Lee v. New York Dep't of Correctional Servs.,* No. 97 Civ. 7112(DAB), 1999 WL 673339, at *9 (S.D.N.Y. Aug. 30, 1999) (two year false imprisonment of plaintiff's

son is sufficient to state a claim for the violation of the right of intimate association with family members). Accordingly, defendants' motion for summary judgment on Wright's claim for interference with her right of familial association is granted.

### F. State Law Claims

#### 1. Anthony's Claim of Intentional Infliction of Emotional Distress Against All Defendants [FN14]

> FN14. Unlike cases brought under Section 1983, municipalities can be held liable for the common law torts committed by their employees under respondeat superior. *Chimurenga v. City of New York,* 45 F.Supp.2d 337, 344 (S.D.N.Y.1999).

**\*13** Anthony seeks summary judgment on her claim that defendants have committed the tort of intentional infliction of emotional distress against her. Defendants assert that Anthony has not met her burden of establishing a prima facie case of intentional infliction of emotional distress.

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999). Defendants have only been found liable for the intentional infliction of emotional distress when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (citation omitted). Here, the plaintiff has, as a matter of law, provided insufficient evidence of extreme and outrageous conduct by the individual defendants, the City, or HHC. *See Kerman,* 1999 WL 509527, at *9. Defendants' motion for summary judgment on plaintiffs' claim of intentional infliction of emotional distress is granted.

#### 2. Anthony's Claim of Assault and Battery Against All Defendants

Anthony seeks summary judgment on her claim that the City, Collegio, Migliaro, and HHC committed assault and battery against her when they seized and detained her. Defendants assert that Anthony has not met her burden of establishing a prima facie case of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

assault and battery.

An assault is "an intentional placing of another person in fear of imminent harmful or offensive contact," and a battery is "an intentional wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir.1993). The same standard is used to evaluate claims of assault and battery under New York law and of excessive force under the Fourth Amendment. *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir.1991). Under federal or state law, a plaintiff must show that "the amount of force used was objectively unreasonable" based upon a consideration of "the perspective of the officer at the time of the arrest." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir.1996). Anthony has not offered any evidence that any force used against her was "objectively unreasonable." Moreover, had Anthony suffered any injuries as a result of defendants' seizure and transport of Anthony to Kings County Hospital, the defendants would be immune from state tort liability. *See* N.Y. Mental Hyg. L. § 9.59; *supra* n. 6. Summary judgment is, therefore, granted to all defendants on Anthony's claim of assault and battery. [FN15]

> FN15. Defendants did not move for summary judgment on Anthony's Fourth Amendment excessive force claim. *See supra* n. 8.

**3. Wright's Claim of False Imprisonment Against All Defendants**

*14 Both sides seek summary judgment on Anthony's false imprisonment claim against all defendants. To state a cause of action for false imprisonment under New York law, a plaintiff must show that: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff did not consent to the confinement; (3) the plaintiff was aware that he was confined; and (4) the confinement was not otherwise privileged, such as confinement pursuant to a warrant or with probable cause or immunity protection." *Curley v. AMR Corp.*,

153 F.3d 5, 13 (2d Cir.1998). As previously concluded, the officers and the City had probable cause to seize Anthony and take her to Kings County Hospital.

HHC's detention of Anthony was also lawful. "Commitment pursuant to Mental Hygiene Law article 9 is privileged in the absence of medical malpractice. Therefore, in order to prevail on her cause of action sounding in false imprisonment, the plaintiff must prove medical malpractice." *Ferretti v. Town of Greenburgh*, 595 N.Y.S .2d 494, 497 (2d Dept.1993) (citations omitted). As described above, the undisputed evidence reflects that HHC largely followed the protocol described in Mental Hygiene Law Section 9.40 during the time it held Anthony. Plaintiff has provided no evidence of medical malpractice. Because defendants' detention of Anthony was privileged, summary judgment is granted to defendants on Anthony's false imprisonment claim.

## CONCLUSION

Plaintiffs' motion for partial summary judgment is denied in its entirety, and defendants' cross-motion for partial summary judgment is granted in its entirety.

The defendants have not moved for summary judgment on: (1) Anthony's excessive force claim against Collegio, Migliaro, and the City; and (2) Anthony's ADA claim against HHC. Neither side has moved for summary judgment on Anthony's and Wright's trespass claim against Collegio and Migliaro.

A scheduling order shall be issued with this Opinion and Order.

SO ORDERED:

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**KeyCite**

**Page 24**

Date of Printing: AUG 17,2001

## KEYCITE

CITATION:Anthony v. City of New York, 2001 WL 741743 (S.D.N.Y., Jul 02, 2001) (NO. 00 CIV. 4688 (DLC))

**History**

=>    1  **Anthony v. City of New York,** 2001 WL 741743 (S.D.N.Y. Jul 02, 2001)
        (NO. 00 CIV. 4688 (DLC))

© Copyright West Group 2001

1996 WL 391986
17 A.D.D. 933, 8 NDLR P 212
(Cite as: 1996 WL 391986 (D.N.M.))
▷

United States District Court, D. New Mexico.

**Frederick J. AMIRAULT, Plaintiff,**
v.
**CITY OF ROSWELL, a Municipal Corporation of
the State of New Mexico, Defendant.**

**No. 6:95-CV-422 MV/RLP.**

July 11, 1996.

Jack L. Love, Albuquerque, NM, for plaintiff.

Steven L. Bell, Atwood, Malone, Mann & Turner,
Roswell, NM, Carl J. Butkus, Butkus & Reimer,
Albuquerque, NM, for defendant.

MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MARCH 28, 1996
MOTION TO
DISMISS OR FOR SUMMARY JUDGMENT

VAZQUEZ, District Judge.

*1 THIS MATTER comes before the Court on
Defendant's March 28, 1996 Motion To Dismiss Or
For Summary Judgment [Doc. No. 26]. Pursuant to
the local rules, the Court concludes that this matter
may be resolved on the parties' submissions without
oral argument.   D.N.M.L.R.-Civ. 7.8.   Having
reviewed the pleadings, the submissions of the parties
and the applicable law, and being otherwise fully
advised in the premises, the Court finds Defendant's
motion well taken.   For the reasons set forth below,
Defendant's motion for summary judgment is
GRANTED and this case is DISMISSED WITH
PREJUDICE.

*I. BACKGROUND*
A. Facts

At about 6:30 p.m. on June 9, 1993, Roswell, New
Mexico city police went to the home of Loraine
Amirault and her then 40-year-old son, Plaintiff
Frederick (Fred) Amirault.   The police went to the
Amirault home in response to a call they had received
from Fred Amirault's estranged girlfriend, Karrie
Rials, reporting that he was suicidal.   Before the
police arrived, Fred had left his dinner half eaten and
stated he was "going out for a ride."   Fred's mother
told the police that he wasn't upset when he left, that
he seemed alright, and that she didn't think he was

suicidal.   Having been alerted to be on the lookout
for Fred Amirault because he was a suicide risk, the
police returned to the Amirault home again at 2:30
a.m. on June 10, 1993 to inquire with his mother as to
his whereabouts;   although his mother still had not
seen or heard from him, she apparently was not
worried because he often drove around all night.

At 6:45 a.m. on June 10, 1993, just after daybreak,
Roswell Police Officer Tracey Laney encountered
Fred Amirault parked in his vehicle with the engine
running (to keep the air conditioning on) at a Roswell
baseball field. Officer Laney, who was joined shortly
after his arrival at the ball field by two other officers,
was not aware of the welfare check alert for Fred
Amirault until he requested Mr. Amirault's
identification and radioed in to determine whether he
was wanted for any reason.   In talking to Mr.
Amirault, the officers learned that he was writing a
letter to his ex-girlfriend and that he had a gasoline
can in the car with him.   The officers never
ascertained whether the can actually contained
gasoline, but asked Mr. Amirault what it was for.
He replied "Well, I was going to use it to ignite
myself, but I have changed my mind."

Mr. Amirault remained in his car at all times at the
baseball field, and the officers let him drive off after
asking him if he was all right, checking his
identification, and informing him that his mother was
worried about him and that he needed to call her.
Mr. Amirault testified that he had changed his mind
about committing suicide until he telephoned his
mother after leaving the ball field.   After speaking to
his mother, Mr. Amirault drove to ex-girlfriend
Karrie Rial's backyard and waited approximately 30
minutes for her to come home from work.   When she
arrived, Mr. Amirault poured gas on his jacket and
struck a match, lighting himself on fire.

*2 Prior to this incident, Mr. Amirault was employed
full time and had never received nor sought mental
health care for any reason.   He had lived with his
parents all his life, except for one year when he went
to college. His father died in 1978.   In January,
1993, Mr. Amirault took an overdose of pills, also in
reaction to problems with his then girlfriend, Karrie
Rials. Nevertheless, his mother testified that she
always believed him to be mentally sound and never
considered having him committed for a mental
evaluation.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1996 WL 391986
(Cite as: 1996 WL 391986, *2 (D.N.M.))

*B. Plaintiff's Allegations And Defendant's Responses*

Plaintiff alleges that, as the result of his self-inflicted injuries, he has suffered pain and mental anguish, has been partially physically and emotionally disabled, and has incurred damages in the form of lost earning capacity, lost wages, and medical expenses. Plaintiff further asserts that his alleged injuries and damages were caused by the of the breach of a duty owed him by Roswell police officers to detain him, take him into custody, and initiate emergency mental health commitment procedures. Plaintiff contends this alleged police negligence violated the federal Americans With Disabilities Act ("ADA") (Count I), [FN1] the federal Civil Rights Act (Count II), [FN2] and the New Mexico Tort Claims Act (Count III). [FN3]

FN1. 42 U.S.C. § 12101.

FN2. 42 U.S.C. § 1983.

FN3. N.M.Stat.Ann. §§ 41-4-1 to 41-4-29 (1989 Rep.Pamp.).

Defendant brings this motion pursuant to FED.R.CIV.P. 12(b)(6), or in the alternative, FED.R.CIV.P. 56. Defendant contends that, even if all of Plaintiff's allegations are assumed to be true, they fail to state viable claims under Rule 12(b)(6), and present no genuine triable issues under Rule 56. First, as to Plaintiff's ADA claim, Defendant points out that arrest and involuntary mental commitment are not rights, privileges, or immunities guaranteed or protected under any federal or state law. In the alternative, Defendant asserts summary judgment is warranted for Plaintiff's ADA claim because Plaintiff cannot show the requisite elements, i.e., that he had a disability which substantially limited one or more of his major life activities, that he was qualified for a benefit or program at issue, and that he was excluded from the benefit or program solely because of his disability.

Second, Defendant asserts that Plaintiff's civil rights claim should be dismissed because Plaintiff failed to show that the City of Roswell had an official policy or custom of discrimination against mentally ill persons or that the City's alleged failure to train constitutes deliberate indifference or reckless or grossly negligent conduct which would make future misconduct almost inevitable. Finally, Defendant maintains that immunity from actions arising from an individual's self-inflicted injury is not waived under the New Mexico Tort Claims Act.

*II. STANDARDS FOR DECISION*

In considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the pleadings must be liberally construed, all factual allegations in the complaint must be accepted as true, and all reasonable inferences drawn in the plaintiff's favor. *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984) . A complaint may be dismissed only if it appears to a certainty that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

*3 Rule 12(b) also provides:
If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
FED.R.CIV.P. 12(b)(6). Defendant has offered various exhibits of deposition testimony in support of its Motion To Dismiss Or For Summary Judgment. Moreover, Plaintiffs' Response did not object to Defendant's introduction of material outside the pleadings and also proffered opposing exhibits. Accordingly, the Court will construe Defendant's motion as one for summary judgment. *See Building & Constr. Dep't. v. Rockwell Int'l Corp.,* 7 F.3d 1487, 1495-96 (10th Cir.1993).

Summary judgment is properly regarded as an integral part of the Federal Rules, rather than a disfavored procedural shortcut. *Celotex v. Catrett,* 477 U.S. 317, 326 (1986). Summary judgment is appropriately granted when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chemical Co.,* 2 F.3d 995, 996 (10th Cir.1993); *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991).

The party moving for summary judgment bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

887, 891 (10th Cir.1991). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the movant meets this burden, the opposing party must provide the court with specific facts showing a genuine dispute for trial. Fed.R.Civ.P. 56(e); *Gray v. Udevitz*, 656 F.2d 588, 592 (10th Cir.1981). A dispute about a material fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 620 (10th Cir.1994) (*quoting Anderson*, 477 U.S. at 248). This Court's ultimate inquiry in Plaintiff's case against the City of Roswell must therefore be whether reasonable jurors could find by a preponderance of the evidence that Plaintiff is entitled to a verdict. *Anderson*, 477 U.S. at 252. When the nonmovant fails to make a sufficient showing on an essential element of his case, the moving party is entitled to summary judgment "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

### III. DISCUSSION

*4 The Court concludes that Plaintiff cannot prove essential elements of each Count of his claim, and therefore reasonable jury could not find by a preponderance of the evidence that Plaintiff is entitled to a verdict against Defendant based on the events in question. Thus, summary judgment in favor of Defendant is appropriate.

### A. Plaintiff's ADA Claim

Plaintiff makes two claims against the City of Roswell under the ADA. First, he claims that, on June 10, 1993, he was suffering from a mental disability and was therefore a disabled person under the ADA. The gravamen of this claim is that the police officer's failure to protect him from self-injury by arresting him and initiating involuntary commitment proceedings violated his right as a mentally disabled person to such assistance under the ADA. Second, Plaintiff contends that the City of Roswell illegally failed to implement the ADA by not conducting a self-evaluation with respect to the mentally disabled and by not implementing police training to prevent discriminatory treatment of the disabled.

Title II of the ADA generally prohibits a public entity

from excluding a qualified individual with a disability from services, programs, or activities of the public entity. [FN4] There is no question that the City of Roswell and its police force constitute a public entity under the ADA. [FN5] To establish a violation of Title II of the ADA, Plaintiff must prove the following:

FN4. 42 U.S.C. § 12132;  28 C.F.R. § 35.130(a).

FN5. *See* 42 U.S.C. § 12131(1)(A) ("public entity" includes any local government).

(1) that he is a qualified individual with a disability;

(2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1439 (D.Kan.1994).

For purposes of Title II of the ADA, the term "qualified individual with a disability" is defined as follows:
[T]he term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
42 U.S.C. § 12131(2).

The term disability is defined as follows:
[T]he term "disability" means, with respect to an individual--(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;  (B) a record of such impairment;  or (C) being regarded as having such an impairment.
28 C.F.R. § 35.104.

The term "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Id.* The term "record of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1996 WL 391986                                          **Page 12**
(Cite as: 1996 WL 391986, *4 (D.N.M.))

impairment" means has a history of, or has been
misclassified as having, a mental or physical
impairment that substantially limits one or more major
life activities. *Id.*

### 1. Whether Plaintiff Was Disabled Within ADA Meaning

**\*5** Based upon the record before the Court, whether
or not Plaintiff suffered a mental disability within the
meaning of the ADA (i.e., whether Plaintiff, at the
time of the incident in question, either suffered a
physical or mental impairment substantially limiting
one or more of the major life activities, had a record
of such impairment, or was regarded as having such
an impairment) remains at issue.

On one hand, the record reflects that he was
successfully employed full time at least up to the June
10, 1993 incident at issue here. In addition, the facts
are clear that, with the exception of a February, 1996
psychological evaluation undertaken to support this
litigation, Plaintiff never before or since the June 10,
1993 incident sought or received mental health care
for any reason. Furthermore, Plaintiff's mother,
who lived with him full time, testified that she
believed him to be mentally sound at all times material
to this case. On the other hand, Plaintiff's February,
1996 psychological evaluation obtained for purposes
of this litigation indicates that, at the time of the
incident in question, he suffered a major depressive
disorder which allegedly resulted in general
impairment in his ability to carry out life activities.

Hence, the Court will assume without deciding that
Plaintiff suffered a mental disability within the
meaning of the ADA at the time in question, because,
as detailed below, he failed to make a sufficient
showing on the second and third essential elements of
his ADA Title II claim. *See Celotex Corp.,* 477 U.S.
at 323 (moving party entitled to summary judgment
where a complete failure of proof concerning an
essential element of the nonmoving party's case
necessarily renders all other facts immaterial). Even
assuming that Plaintiff was mentally impaired within
the meaning of the ADA, he has nevertheless failed to
identify any police service, program, benefit, or
activity to which he was entitled under the ADA and
which was denied to him solely because of his
disability.

### 2. No Municipal Service or Benefit Was Denied Plaintiff

Plaintiff's Complaint alleges Roswell police officers
violated the ADA by not arresting him and
involuntarily committing him for protection and a
mental health evaluation. The most salient legal flaw
in Plaintiff's position is his belief that he had a right
under the circumstances on June 10, 1993 to be
deprived of his liberty and involuntarily committed, or
that protection of an individual constitutes a municipal
service, benefit, or program. It is well settled that
there is no right to be deprived of liberty or to be
involuntarily committed in a mental health institution.
*Wilson v. Formigoni,* 42 F.3d 1060, 1065-66 (7th
Cir.1994). Moreover, the existence of state
involuntary commitment procedures establishes
procedural safeguards, but does not create an
individual right or entitlement to involuntary
commitment. *Id.* [FN6]

> FN6. New Mexico's commitment procedure provides,
> in pertinent part, that
> ... [a] peace officer *may* detain and transport a person
> for emergency mental health evaluation and care in
> the absence of a legally valid order from the court
> only if ... the peace officer, based upon his own
> observation and investigation, has reasonable grounds
> to believe that the person, as a result of a mental
> disorder, presents a likelihood of serious harm to
> himself or others and that immediate detention is
> necessary to prevent such harm.
> N.M.STAT.ANN § 43-1-10 (1993 Rep.Pamp.)
> (italics added).

The Supreme Court has set forth in crystalline terms
that constitutional due process guarantees function to
limit the State's power to act in deprivation of an
individual's life, liberty, or property, not to guarantee
certain minimal levels of individual safety. *DeShaney
v. Winnebago County Dept. of Social Services,* 489
U.S. 189, 195 (1989). An affirmative duty to assume
responsibility for an individual's safety and general
well-being arises only when the State takes a person
into its custody and holds him there against his will.
*Id.* at 199. "The affirmative duty to protect arises not
from the State's knowledge of the individual's
predicament or from its expressions of intent to help
him, but from the limitation which it has imposed on
his freedom to act on his own behalf." *Id.* at 200.
Consequently, Plaintiff cannot prevail by merely
showing that the Roswell police officers knew facts
that would have justified his arrest and involuntary
mental commitment. *McKee v. City of Rockwall,
Texas,* 877 F.2d 409, 414 (5th Cir.1989).

**\*6** Furthermore, it is well settled that the individual

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

protection of a particular person or the protection of members of a particular class of persons is not considered to be a municipal service, benefit, or program. *See, e.g., City of Philadelphia v. Estate of Mary Dennis,* 636 A.2d 240 (Pa.Commw.Ct.1993) ("[T]here is generally no duty resting on a municipality or other governmental body to provide police protection to any particular person."); *Prasad v. County of Orange,* 604 N.Y.S.2d 677 (1993) (municipality's duty is to the public at large and not to any particular individual or class of individuals). *See also Torres v. State of New Mexico, et al.,* 119 N.M. 609, 894 P.2d 386 (1995) (even law enforcement officers' statutory duty to investigate crimes is for the benefit and protection of the public). Therefore, the City of Roswell, by and through its police officers, had no duty to protect Plaintiff from himself as he asserts, nor was Plaintiff denied a municipal or police service, benefit, or program to which he or any other individual or class of individuals was entitled when Roswell police officers failed to arrest and involuntarily commit him on June 10, 1993.

### 3. No Denial Of Benefits Solely Because Of Plaintiff's Disability

Since, (by not being arrested and involuntarily committed by Roswell police officers on June 10, 1993), Plaintiff was not denied any municipal service, benefit, or program, it logically follows that Plaintiff cannot show that he was denied a municipal service, benefit, or program solely because of his alleged disability. Moreover, "Title II of the ADA does not require any particular level of services for persons with disabilities in an absolute sense, only that services or benefits provided non-disabled persons must be equally made available for disabled persons." *Concerned Parents To Save Dreher Park Center v. City of West Palm Beach,* 846 F.Supp. 986 (S.D.Florida 1994).

As discussed above, neither arrest and involuntary commitment nor individual protection constitute municipal services, benefits, or programs. Therefore, both disabled and non-disabled individuals are clearly on equal footing in that regard. Finally, Plaintiff sets forth nothing more than his own conclusory allegations to show that Roswell police officers failed to arrest and involuntarily commit him on June 10, 1993 solely because he was disabled. At most, the record reflects that the lead officer on the scene that morning, Tracey Laney, was negligent in not filling out an incident report because he was due to start his vacation within a couple of hours.

Plaintiff failed to make a sufficient showing on at least two essential elements of his ADA claim, i.e., (1) denial of a municipal service, benefit, or program, (2) based solely on Plaintiff's disability. Consequently, the City of Roswell, as the moving party, is entitled to summary judgment on that claim.

### 4. ADA Self Evaluation Claim Need Not Be Reached In This Case

*7 The ADA itself does not require local governments to initiate self- evaluations or to adopt transition plans. *See Tyler v. City of Manhattan,* 849 F.Supp. 1429, 1434 (D.Kan.1994). Instead, the ADA directs the Attorney General to promulgate regulations to implement Part A of Title II of the ADA, which generally prohibits discrimination by public entities against qualified individuals with disabilities. [FN7] Although the implementing regulations generally require public entities to conduct self-evaluations, they also prohibit a public entity from excluding a qualified individual with a disability from participation in services, programs, or activities because of his/her disability. [FN8] Moreover, this mandate may be met by a variety of means. *Tyler,* 849 F.Supp. at 1434. Because the facts show no violation of Title II of the ADA occurred in this case, the Court declines to reach consideration of Plaintiff's claim that the City of Roswell failed to implement the ADA by allegedly failing to do a self evaluation.

FN7. 42 U.S.C. § 12134(a).

FN8. 28 C.F.R. § 35.130.

### B. Plaintiff's § 1983 Civil Rights Claim

To establish a valid claim of a federal Civil Rights Act violation by the municipality of Roswell, Plaintiff must prove both that his injury constitutes a Constitutional deprivation and that the City of Roswell sanctioned the actions causing such deprivation through execution of official policy or custom. [FN9] *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986) (municipal liability under § 1983 attaches only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question); *Halvorson v. Skagit County,* 42 F.3d 1257, 1260 (9th Cir.1994); *Morgan v. District of Columbia,* 824 F.2d 1058 (D.C.Cir.1987).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

FN9. Plaintiff dismissed the Roswell Police Department as a defendant in this matter. *See* October 5, 1995 Stipulated Order Dismissing Party Roswell Police Department [Doc. No. 13]. Plaintiff brings this suit only against the City of Roswell, as the municipality which employed the police officers who came into contact with Plaintiff on the morning of his June 10, 1993 attempted suicide.

The purpose of the official policy requirement is to distinguish

... [a]cts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that *municipal liability is limited to action for which the municipality is actually responsible.*

*Pembaur*, 475 U.S. at 479 (footnote omitted; italics in the original; underline emphasis added). Accordingly, the Supreme Court has carefully and consciously limited municipal liability to acts that are acts of the municipality--"that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480 (emphasis added). *See also Weimer v. Schraeder,* 952 F.2d 336, 341 (10th Cir.1991). In *Weimer,* the Tenth Circuit held that

... [i]n order to affix liability to a municipality under § 1983, the alleged unconstitutional acts must be committed by an official possessing final policymaking authority with respect to the alleged acts. The offensive policy must emanate from an officially promulgated decision or from a practice *which is well settled and permanent.* In addition, there must be a showing that the policies of the municipality were *directly connected* to the constitutional deprivation.

*8 952 F.2d at 341 (italics added).

Moreover, municipality liability under the federal Civil Rights Act cannot be premised upon a *respondeat superior* theory based on the municipality's employment of a tortfeasor. *Cannon v. City and County of Denver,* 998 F.2d 867, 877 (10th Cir.1993) (citing *Monell v. Dept. of Social Services,* 436 U.S. 658, 691 (1978)). Tortious conduct may become the basis for municipal liability under § 1983 only if the conduct is pursuant to the municipality's "official policy." *Pembaur,* 475 U.S. at 479.

However, a municipality may be liable in § 1983 actions "for constitutional violations resulting from its failure to train municipal employees." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 380 (1989). Inadequate training may represent "official policy" if the municipality fails to respond to a known need:

... [i]t may happen that in light of the duties assigned to specific officer or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city could reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton,* 489 U.S. at 390.

Nevertheless, inadequate police training may serve as the basis for liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388 (emphasis added). Deliberate indifference is "the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents." *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992).

The Tenth Circuit follows the standard set out in *City of Canton* and *Collins* establishing deliberate indifference as the threshold for holding a municipality responsible for constitutional torts committed by inadequately trained police officers. *See, e.g., Hinton v. City of Elwood, Kansas,* 997 F.2d 774, 782 (10th Cir.1993) (citing *City of Canton,* the Tenth Circuit required plaintiff to demonstrate that a municipality's inaction was the result of deliberate indifference to the right of its inhabitants); *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1481 (10th Cir.1993) (in a supervisory liability case, liability must be predicated on deliberate indifference rather than mere negligence); *Woodward v. City of Worland,* 977 F.2d 1392, 1400 (10th Cir.1992) (supervisory liability requires allegations of personal direction or of actual knowledge and acquiescence); *Medina v. City and County of Denver,* 960 F.2d 1493, 1500 (10th Cir.1992) (to survive summary judgment, plaintiff must provide evidence of specific facts that demonstrate that the City and County of Denver exhibited deliberate indifference towards him in his alleged failure to institute proper policy and in not properly training and supervising its officers); *Summers v. State of Utah,* 927 F.2d 1165, 1170 (10th Cir.1991) (citing *City of Canton,* city may be held liable to plaintiff only if the procedural deficiency alleged either was a direct manifestation of the city's formal policy or informal custom, or resulted from a failure to train city personnel that, under the circumstances, evidenced a deliberate indifference to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1996 WL 391986
(Cite as: 1996 WL 391986, *8 (D.N.M.))

citizen's rights sufficient, in itself, to constitute a policy or custom of the city).

**\*9** Moreover, the Supreme Court has placed the burden squarely on the plaintiff to prove that "the deficiency in training actually caused police officers' indifference to his or her constitutional right." *City of Canton, Ohio v. Harris,* 489 U.S. at 391. *See also D.T. by M.T.,* 894 F.2d 1176, 1188 (10th Cir.1990) (direct causal connection required). Municipal liability will not attach even if the plaintiff

    ... [p]roves that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the unusual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton,* 489 U.S. at 391. Thus, only where a failure to train reflects a *deliberate* or *conscious* choice by a municipality and is shown to have directly caused Plaintiff's injury can a city be liable for such a failure under § 1983. *Id.* at 389.

Furthermore, a single isolated incident is insufficient to establish an official policy or practice sufficient to render a municipality liable under § 1983. *Oklahoma City v. Tuttle,* 471 U.S. 808, 811, *reh'g denied,* 473 U.S. 925 (1985). *See also Butler v. City of Norman,* 992 F.2d 1053, 1055-56 (10th Cir.1993) (isolated incident of excessive force by a police officer, even coupled with municipality's failure to discipline the officer, was inadequate to form the basis of municipal liability). Finally, the Supreme Court seriously questioned whether a municipality could pursue a policy of inadequate training in *Tuttle:*

    ... [i]t is therefore difficult in one sense to even accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice--that is, proof that the policy-makers deliberately chose a training program which would prove inadequate.

471 U.S. at 823.

*1. No Constitutional Deprivation Shown In This Case*
    *a. No Right To Be Arrested Or Committed*

As discussed above, individuals have no right to be deprived of liberty or to be involuntarily committed in a mental health institution. *Wilson v. Formigoni,* 42 F.3d at 1065-66. Moreover, constitutional guarantees limiting the State's power to deprive an individual's life, liberty, or property do not in any way guarantee certain minimal levels of individual safety. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195 (1989). Therefore, even if officers could arrest an individual, they have no constitutional obligation to do so to protect him from himself or others. *Id. See also McKee v. City of Rockwall, Texas,* 877 F.2d 409, 413 (5th Cir.1989) ("This is the lesson of *DeShaney:* that law enforcement officers have authority to act does not imply that they have any constitutional duty to act.")

**\*10** Furthermore, the State's affirmative duty to assume responsibility for an individual's safety and general well-being arises only when the State takes a person into its custody and holds him there against his will. *Id.* at 199. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. As discussed above, even if the Roswell police officers knew that Plaintiff was suicidal when they let leave the ball field at 6:45 a.m. on June 10, 1993, they had no constitutional duty to protect him from himself by taking him into custody. Similarly, even if instituting a welfare check alert pursuant to his girlfriend's call constituted an expression of intent to help Plaintiff, the officers had no constitutional duty to protect him from himself by taking him into custody.

Finally, the existence of state involuntary commitment procedures establishes procedural safeguards but does not create an individual right or entitlement to involuntary commitment. *Wilson v. Formigoni,* 42 F.3d at 1065-66. Plaintiff's reliance on New Mexico's commitment procedures as the source of the Roswell police officers' duty to have taken him into custody for a psychiatric evaluation is thus not well taken. New Mexico's statutory commitment procedure provides, in pertinent part that:

    ... [a] peace officer *may* detain and transport a person for emergency mental health evaluation and care in the absence of a legally valid order from the court only if ... the peace officer, based upon his own observation and investigation, has reasonable grounds to believe that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



detention is necessary to prevent such harm.
N.M.Stat.Ann. § 43-1-10(A)(3) (1993 Rep.Pamp.)
(italics added).    The plain language of the
commitment statute explicitly vests police officers
with discretion in dealing with situations such as the
one at issue in this case.

The record indicates that the officers in this case
apparently considered whether Plaintiff presented a
likelihood of serious harm to himself and exercised
permissible discretion under the commitment
procedure in deciding (rightly or wrongly) that he was
not. Officer Eric Madsen testified that:
[W]hat standard procedure was is that if we *believed*
the person was in immediate jeopardy of great bodily
harm to himself or others, we would take custody of
that person and transport them to the medical center
to where a medical doctor would interview him.
And then if they perceived that there was a need for
psychiatrist or someone like that, they would contact
the Sunrise Unit there at the hospital and have
someone come down and talk to them.
Deposition of Eric Madsen at 25 (italics added).  In
the absence of any other evidence, the Court
concludes that the officers did not believe that Plaintiff
was in immediate jeopardy of great bodily harm to
himself or others after the spoke to him at the ball
field, and so did not take any further action, which
they correctly understood they had the discretion to do
under New Mexico's commitment statute.

### b. Plaintiff Was Not In Custody

**\*11** Despite Plaintiff's inconsistent allegations that he
was both detained *and* that the police failed to detain
him, the facts show that he was never in custody.
Plaintiff's own testimony is that, during the police
encounter at the Roswell baseball field on the morning
of June 10, 1993, Plaintiff remained in his vehicle at
all times, had the engine running for part of the time,
retained control of it at all times, and was free to
leave and did leave in his own vehicle after the
officers spoke with him.  Because the facts show that
Plaintiff was never in custody, the Roswell police
officers had no affirmative duty under any applicable
law to assume responsibility for his safety and well-
being by arresting him and subjecting him to
involuntary commitment.

### 2. No Improper Official Policy

A valid claim that inadequate training, supervision,
or policies violated the federal Civil Rights Act
requires the establishment of an underlying

Constitutional violation.  *Webber v. Mefford,* 43 F.3d
1340, 1344 (10th Cir.1994).    As discussed above,
there is no Constitutional right to be arrested or
involuntarily committed.  *Wilson v. Formigoni,* 42
F.3d at 1065- 66.  Accordingly, the failure to arrest
or involuntarily commit an individual does not
constitute a Constitutional violation.  *Id.*  Moreover,
liability for the allegedly inadequate training of the
Roswell police in the handling of mentally disabled
individuals arises only if the failure to train
demonstrates deliberate indifference to the rights of
those with whom the police come into contact.  *City of
Canton, Ohio v. Harris,* 489 U.S. at 388;  *Meade v.
Grubbs,* 841 F.2d 1512, 1528 (10th Cir.1988).

The fact that Plaintiff's injury could perhaps have
been avoided if better, different, or more training had
been provided, as Plaintiff alleges, is insufficient as a
matter of law to establish deliberate indifference.  *City
of Canton,* 489 U.S. at 391.    In addition, a single
isolated incident such as the one at issue in this case is
insufficient to establish § 1983 deliberate indifference
municipal liability.  *Tuttle,* 471 U.S. at 823.  Plaintiff
has the burden of proving that the alleged deficiency
in training actually caused police officers to be
indifferent to his constitutional right(s),  *City of
Canton,* 489 U.S. at 391, but he has failed to do so.
Other than asserting that the City of Roswell failed to
properly implement the ADA through self evaluation,
Plaintiff sets forth no facts showing that the City of
Roswell was deliberately indifferent to the rights of
mentally disabled persons whom officers might
encounter.

On the contrary, testimony of record indicates that
the City of Roswell did indeed have a policy regarding
mentally disabled persons with whom officers might
come into contact.    As set forth above, Eric Madsen
testified that standard procedure for the police was
"[t]hat if we believed the person was in immediate
jeopardy of great bodily harm to himself or others, we
would take custody of that person and transport them
to the medical center to where a medical doctor would
interview him."

**\*12** Even if the officers' decision to let Plaintiff leave
after they spoke to him on June 10, 1993 constituted
an error in human judgment, Plaintiff simply did not
show a constitutional violation underlying the incident
in question, nor did he show a constitutional violation
caused by the municipality's deliberate indifference to
his constitutional right(s).  Moreover, Plaintiff failed
to allege or show that the incident of June 10, 1993
was more than a single isolated incident of Roswell

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



police officers encountering an allegedly mentally disturbed person.

In view of all the facts, the most that can be said of the police officers involved in this case is that they stood by and did nothing when suspicious circumstances may have dictated a more active role for them. *See Deshaney,* 489 U.S. at 202. This is insufficient to carry Plaintiff's burden to prove that a deficiency in police training actually caused Roswell police to act with indifference to his asserted constitutional right(s). *City of Canton,* 489 U.S. at 391. *See also D.T. by M.T.,* 894 F.2d 1176, 1188 (10th Cir.1990) (direct causal connection required).

### C. Plaintiff's New Mexico Tort Claims Act Claim

The New Mexico Tort Claims Act ("NMTCA") grants State entities sovereign immunity from all tort liability except for specifically enumerated acts. N.M.Stat.Ann. § 41-4-4 (1989). [text unavailable.] immunity. *Hydro Conduit Corp. v. Kemble,* 110 N.M. 173, 177, 793 P.2d 855, 859 (1990). To state a claim under the NMTCA, Plaintiff's allegations must fall within one of the specific waivers of immunity. *Id.* at 177, 793 P.2d at 859; *Caillouette v. Hercules, Inc.,* 113 N.M. 492, 497, 827 P.2d 1306, 1311 (Ct.App.1992). If the NMTCA does not provide a specific waiver of immunity for Plaintiff's claims, the City of Roswell is immune from liability for torts allegedly committed in the scope of city police officer's employment. N.M.Stat.Ann. § 41-4-4(A) (1989 Rep.Pamp.); *see also Pemberton v. Cordova,* 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct.App.1987).

In the effort to fit his claim within one of the enumerated bases of liability, Plaintiff asserts that the Roswell police officers are health care providers under the Tort Claims Act. However, New Mexico courts have not included law enforcement officers in the meaning of "health care providers" under the Tort Claims Act. *M.D.R. v. State Human Services Dept.,* 114 N.M. 187, 189, 836 P.2d 106, 108 (Ct.App.1992) (health care provider means a person, corporation, organization, facility, or institution licensed or certified by the state to provide health care or professional health care services). Accordingly, the officers who encountered Plaintiff on June 10, 1993 were not "health care providers" under the state's definition.

Moreover, the NMTCA waives immunity from liability for the following conduct undertaken by a police officer:

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and the laws of the United States or New Mexico when caused by law enforcement Officers while acting within the scope of their duties.

*13 N.M.Stat.Ann § 41-4-12 (1989 Rep.Pamp.). The plain language of this provision reflects clearly that the City of Roswell cannot be deemed to have waived immunity under the NMTCA for an alleged failure to arrest and/or involuntarily commit Plaintiff. Moreover, with particular regard to law enforcement officers, it is clear that immunity is not waived under New Mexico's Tort Claims Act for self-inflicted injury, which is the linchpin of this case. N.M.Stat.Ann. § 41-4-12 (1989 Rep.Pamp.).

Finally, claims of negligent supervision are not actionable under New Mexico's Tort Claims Act absent either violation of a specifically enumerated tort under the Act or deprivation of a right secured by federal or state Constitutions or laws. *McDermitt v. Corrections Corp. of America,* 112 N.M. 247, 814 P.2d 115 (Ct.App.1991). As discussed above, failure to arrest an individual and/or initiate his/her involuntary commitment constitutes neither a deprivation of a constitutional or legal right, nor a tort waiving sovereign immunity enumerated in the New Mexico Tort Claims Act. *Wilson v. Formigoni,* 42 F.3d at 1065- 66; N.M.Stat.Ann. § 41-4-12 (1989 Rep.Pamp.). Accordingly, Plaintiff fails to state any valid claim under the New Mexico Tort Claims Act.

### IV. CONCLUSION

Plaintiff failed to make a sufficient showing on the essential elements of each of his three claims. Consequently, the City of Roswell, as the moving party, is entitled to summary judgment on every claim.

IT IS THEREFORE ORDERED that Defendant's Motion For Summary Judgment [Doc. No. 26] is granted as to each and every Count of Plaintiff's cause, which shall be dismissed in its entirety with prejudice.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1996 WL 391986                                                                    **Page 18**
(Cite as: 1996 WL 391986, *13 (D.N.M.))

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

KeyCite

Date of Printing: AUG 17,2001

## KEYCITE

CITATION:▷ Amirault v. City of Roswell, 1996 WL 391986, 17 A.D.D. 933, 8 NDLR P 212
(D.N.M., Jul 11, 1996) (NO. 6:95-CV-422 MV/RLP)

### History
### Direct History

=>        1 Amirault v. City of Roswell, 1996 WL 391986, 17 A.D.D. 933, 8 NDLR P 212
          (D.N.M. Jul 11, 1996) (NO. 6:95-CV-422 MV/RLP)
    *Affirmed by*
    2 Amirault v. City of Roswell, 120 F.3d 270, 10 NDLR P 235, 97 CJ C.A.R. 1429
          (10th Cir.(N.M.) Jul 31, 1997) (TABLE, TEXT IN WESTLAW, NO. 96-2181)

### Negative Indirect History

*Called into Doubt by*
    3 Gohier v. Enright, 186 F.3d 1216, 9 A.D. Cases 1131, 16 NDLR P 21, 1999 CJ C.A.R. 4735
          (10th Cir.(Colo.) Aug 03, 1999) (NO. 98-1149) ****

© Copyright West Group 2001