**FILED**
HARRISBURG, PA

FEB 28 2003

MARY E. D'ANDREA, CLERK
Per _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH I. SCHORR and SUSAN SCHORR, in their own right and as personal representatives of the Estate of RYAN K. SCHORR, | : | JURY TRIAL DEMANDED |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO.:  1:CV-01-0930 |
| | : | |
| WEST SHORE REGIONAL POLICE DEPARTMENT, HOWARD DOUGHERTY, CUMBERLAND COUNTY, and HOLY SPIRIT HOSPITAL, | : | |
| Defendants. | : | HONORABLE YVETTE KANE |

## EXHIBITS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 OF DEFENDANTS HOLY SPIRIT HOSPITAL AND CUMBERLAND COUNTY

Respectfully submitted,
METTE, EVANS & WOODSIDE

By: _____
JOHN F. YANINEK, ESQUIRE
Supreme Court I.D. #55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000
Attorneys for Defendants Holy Spirit Hospital
and Cumberland County

Date:  February 28, 2003

# INDEX TO EXHIBITS

## Motions for Summary Judgment of Defendants
## Holy Spirit Hospital and Cumberland County

A.    Written Statement of David Spurrier, M.D.

B.    Transcript of Deposition of Ira Somerson

C.    Transcript of Deposition of Carol Joerger, R.N.

D.    Transcript of Deposition of Cory Graby

E.    Transcript of Deposition of Candice Highfield

F.    Transcript of Deposition of Steve Bucciferro

G.    Transcript of Deposition of Mercedes Briscese

H.    Transcript of Deposition of Charles Sterling

11-18-00
1515 HOURS.

STATEMENT OF DAVID S. SPURRIER, MD
CONCERNING RYAN SCHORR.

I SAW Ryan BECAUSE OF A 302 commitment. This WAS FILLED OUT By His ROOMATE BECAUSE OF VIOLENT BEHAVIOR. I was told he has been brought by POLICE AND HAD Been aggitated BUT NOT VIOLENT IN The ED. He WAS IN ROOM 17 BEHIND a LOCKED DOOR. I went in to EXAMINE Him WITH the Security GUARD outside the Room.

The PATIENT WAS Sitting Quietly on the SIDE OF the BED. He was talking Loudly & Rapidly. He SAID He would NOT talk to me. I ASKED IF I COU examine Him & He Agreed. I EXAMINED His head AND Lungs AND he then Said that was all he would let me Do.

He Repeatedly ASKED me to get his LIMOSINE FROM the HILTON WITH His Body Guard He SAID he would NOT talk to me or take medica UNLESS His Body guard or Lawyer was present. I told him He NEEDED medication. He said h would refuse to take it. I told him that I would hold OFF as Long as he was Quiet & Cooper But IF he WAS NOT I would give Him a Shot EVEN IF WE HAD to Hold Him Down. I then Left the room AND CLOSED the DOOR.

I FILLED OUT the 302 commitment SINCE the PATIENT WAS Clearly PSYCHOTIC AND HALLUCINATING.

I DISCUSSED the Situation WITH the CRISIS WORKER. I told her I would HAVE the PATIENT

She FIRST WANTED the PATIENT HIS Rights
I WENT INTO ANOTHER room to SEE A PATIENT
I then heard Someone SHOUT that the patie
HAD RUN off. I quickly went outside, B
the PATIENT WAS NOWHERE to be seen.

THE POLICE WERE NOTIFIED.

LATER I heard the patient WAS AT
Home AND would be brought back by the
POLICE.

I then heard from the MEDICS that
2 police officers had been SHOT AND A perso
WAS DEAD — he believed AT the ADDRE
WHERE the 302 Commitment had come from

David J Spencer



1

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

4                           - - -

5    KEITH I. SCHORR and         :   JURY TRIAL DEMANDED
     SUSAN SCHORR                :
6                                :
            vs.                  :
7                                :
     WEST SHORE REGIONAL         :
8    POLICE DEPARTMENT, HOWARD   :
     DOUGHERTY, CUMBERLAND       :
9    COUNTY, ROBERT GORIL and    :
     HOLY SPIRIT HOSPITAL        :   NO. 1:CV-01-0930

10                          - - -

11                Lafayette Hill, Pennsylvania
12               Wednesday, December 4, 2002

13                          - - -

14           Deposition of IRA S. SOMERSON, CPP,

15    taken pursuant to notice, at 104 Hollyhock

16    Drive, on the above date, beginning at

17    approximately 9:55 a.m., before Michele L.

18    Murphy, RPR-Notary Public.

19                          - - -

20

21            V A R A L L O Incorporated
              Litigation Support Services
22           1835 Market Street, Suite 600
                 Philadelphia, PA 19103
23           215.561.2220  215.567.2670

24

25

| PAGE | LINE |  |
|------|------|--|
|      |      |  |

1    APPEARANCES:

2

3         STEPHEN S. PENNINGTON, ESQUIRE
          Law Offices of Stephen S. Pennington
4              One Penn Center at Suburban Station
               1617 J.F.K. Boulevard, Suite 800
5              Philadelphia, PA   19103

6              Counsel for Plaintiffs

7

8         GREGORY J. HAUCK, ESQUIRE
          Montgomery, McCracken, Walker & Rhoads, LLP
9              123 South Broad Street
               Philadelphia, PA   19109

10             Counsel for Defendant West Shore Regional
               Police Department
11

12        JOHN F. YANINEK, ESQUIRE
          Mette, Evans & Woodside
13             3401 North Front Street
               P.O. Box 5950
14             Harrisburg, PA   17110-0950

15             Counsel for Defendants Cumberland County
               and Holy Spirit Hospital
16

17                         -  -  -

18        (It was stipulated by and among counsel

19   that signing, sealing, filing and certification

20   be waived; and that all objections, except as to

21   the form of the question, are reserved until the

22   time of trial.)

23                         -  -  -

24

25             (INDEX at end of transcript)


V   VARALLO Incorporated

1

2                    (Exhibit Somerson-1 marked for

3    identification.)

4                    ... IRA S. SOMERSON, CPP, after having

5    been duly sworn, was examined and testified as

6    follows:

7    BY MR. YANINEK:

8      Q.    Mr. Somerson, I've introduced myself before.

9    My name is John Yaninek.   I represent the defendants

10   Holy Spirit Hospital and Cumberland County.   I

11   noticed your expert deposition this morning.

12                    I provided to plaintiffs' counsel and

13   you a Notice of Expert Deposition, which I have had

14   previously marked as Somerson Exhibit-1.   I'm

15   handing it to you.

16                    Have you seen that document --

17     A.    Yes.

18     Q.    -- or a copy of the document before?

19     A.    Yes, I have.

20     Q.    The document requests you bring certain items

21   with you to this deposition this morning.   Did you

22   review the document and bring the items that I

23   requested?

24     A.    Yes.

25     Q.    Just so I know what's there, can you tell me

**Ⅶ**   **V A R A L L O   Incorporated**

```
 1                  Ira S. Somerson, CPP
 2   what is there?
 3     A.    We'll have to get the file, because it's
 4   easier to show you than to remember it.
 5     Q.    Why don't you tell me what you brought with
 6   you this morning?
 7     A.    (Witness hands folder to Mr. Yaninek.)
 8     Q.    And you handed me a blue file folder, sir.
 9   What is that?
10     A.    Inside is the items that you requested.
11     Q.    Okay.
12     A.    And the first is a list, computer printed
13   out, of all trials where I've testified.  The second
14   is a computer printout of all depositions where I've
15   testified.  The third is a current copy of my
16   Curriculum Vitae.  That's what's here.
17     Q.    All right.
18             MR. PENNINGTON:  And the second blue
19   folder is the correspondence between plaintiffs'
20   counsel and Mr. Somerson with regard to his report.
21             MR. YANINEK:  Okay.
22             MR. HAUCK:  Do you have a second set of
23   that?
24             MR. PENNINGTON:  I don't.
25             MR. YANINEK:  These are all originals.
```

Ⓥ   **VARALLO Incorporated**

```
 1                  Ira S. Somerson, CPP

 2                  MR. PENNINGTON:  I mean, I'll provide it

 3  to you.

 4                  THE WITNESS:  You're at a home and I

 5  have one of these (indicating), one at a time.  So I

 6  think we can work something a little easier out for

 7  you.

 8  BY MR. YANINEK:

 9    Q.   And this expandable brown folder,

10  Mr. Somerson?

11                  MR. PENNINGTON:  Just put this in here.

12                  MR. YANINEK:  I'm sorry.

13                  THE WITNESS:  That contains each of the

14  files I was sent to review and has been listed on my

15  report that you have seen, except for the last two

16  items, which came in since writing my report.

17  BY MR. YANINEK:

18    Q.   What last two items were they?

19    A.   Report of Rolle Enterprises, Inc. and the

20  deposition of --

21                  MR. PENNINGTON:  Carol Joerger.

22                  THE WITNESS:  -- Carol Joerger.

23  BY MR. YANINEK:

24    Q.   You have with you a laptop computer in front

25  of you.  What type of information relative to this
```

1                    Ira S. Somerson, CPP

2  case is stored on your computer?

3     A.    Just what you have.

4     Q.    Okay.

5     A.    It's just an easier way for me instead --

6  because this table arrangement, I thought we'd find

7  it a little more compact if I -- but you will find

8  nothing on this computer that you don't have in

9  front of you.

10    Q.    Okay.

11    A.    I will make that guarantee to you.

12    Q.    I asked in the Notice to be provided with

13  billing records.  What folder would they be in?

14    A.    The correspondence file between...

15            MR. PENNINGTON:  It's that green sheet

16  of paper.

17            MR. YANINEK:  Okay.

18            THE WITNESS:  Which would be my diary.

19            MR. PENNINGTON:  And there's also a

20  letter in there that indicates his fee rate.  I

21  think it's right there, the agreement.

22  BY MR. YANINEK:

23    Q.    Mr. Somerson, I'm holding what appears to be

24  like a green lined piece of paper.  What is that?

25    A.    This is my diary.  That's how I refer to it

```
 1              Ira S. Somerson, CPP
 2   as.  Which has my client's name here, the date that
 3   I received this assignment, the amount of the
 4   retainer I received, my hourly rate for doing the
 5   assignment, the first work that I did in my diary
 6   and what it was that I did.  And it's just a
 7   listing.
 8              Now, I have done some additional
 9   follow-up work that I have not posted here yet,
10   simply because I'm a little bit out of the weather.
11   But I could, before today is over, finish that up
12   for you.
13              MR. HAUCK:  Do you want to mark it?
14              MR. YANINEK:  What's that?
15              MR. HAUCK:  Do you want to mark it?
16              MR. YANINEK:  Yes.  I'd like to mark
17   this, I guess, as Somerson-2.
18              (Exhibit Somerson-2 marked for
19   identification.)
20   BY MR. YANINEK:
21     Q.  Mr. Somerson, what I marked as Somerson
22   Exhibit-2, is that the green paper we were talking
23   about?
24     A.  It's a column -- they're in a green column
25   notepad.
```

Ira S. Somerson, CPP

1

2    Q.    Then if I understand correctly, you were

3    retained to do work on this case September 3rd of

4    this year?

5    A.    Yes.

6    Q.    And the rate, your hourly rate, I guess, for

7    this work was to be $225 an hour?

8    A.    Yes.

9    Q.    And you were paid a retainer of $2,500 prior

10   to beginning any work on this case?

11   A.    Yes.

12   Q.    And I guess to the end of October anyway, it

13   appears that you've expended 17 and a quarter hours

14   on this case?

15   A.    Correct.   I have not posted November yet.

16   Q.    Since this document, what additional hours

17   have you worked on this file?

18   A.    These two additional documents that I pointed

19   to you earlier, some telephone communication with

20   Mr. Pennington concerning being here today, and

21   that's it.

22   Q.    Approximately how much time do you think that

23   is, generally speaking?

24   A.    It can't be more than two hours.

25                MR. HAUCK:  Would you mind letting me

**VARALLO Incorporated**

```
 1                  Ira S. Somerson, CPP
 2   look at Somerson-2?
 3   BY MR. YANINEK:
 4     Q.    What I'd like to do is, basically, take a
 5   break and kind of look over some of this stuff.
 6     A.    Sure.
 7     Q.    And then we'll go back on the record, and
 8   I'll probably have a lot more questions for you at
 9   that point.
10                  (Short recess.)
11   BY MR. YANINEK:
12     Q.    Mr. Somerson, your Curriculum Vitae indicates
13   after your name the initials BCFE.  What do those
14   initials stand for?
15     A.    Board-certified forensic examiner.
16     Q.    What process did you have to go through to
17   become a board-certified forensic examiner?
18     A.    Pay the dues, go through a peer review.  My
19   primary reason for membership was to get the
20   information by mail and through membership and
21   attending various symposia that taught me how to be
22   a better witness.  It did not have anything to do
23   with developing better security management skills.
24     Q.    So that title or those credentials have
25   nothing to do with your expertise in security?
```

**V  VARALLO Incorporated**

                    Ira S. Somerson, CPP

1

2    A.    Not at all.  Well, other than as a witness.

3    Q.    The other initials after your name is CPP.

4  What do those initials stand for?

5    A.    Certified protection professional.

6    Q.    And what does that mean?

7    A.    That is a professional designation granted by

8  the American Society for Industrial Security, which

9  is an international organization of roughly 35,000

10  members.  I was granted that in 1977 and have

11  recertified every three years by earning points, by

12  teaching, by writing, by attending seminars, et

13  cetera, since 1977.

14    Q.    What are the requirements for the

15  certification?

16    A.    Requirements are that the -- well, I came in

17  under the grandfather clause, because I was one of

18  the first 100 accepted.  After that grandfather

19  clause, every three years I've been required the

20  same as everyone else, to take a peer review, et

21  cetera.

22    Q.    What are the current requirements?  You said

23  you were grandfathered in.  What are the current

24  requirements for that certification?

25    A.    Every three years you have to earn -- it's

 **V A R A L L O  Incorporated**

Ira S. Somerson, CPP

much like a CLE.  You have to earn nine credits, and

those credits can be earned any number of different

ways in developing professional skills.  They can be

through writing articles, they can be by attending

symposia, they can be by teaching, different

professional participation in the professional

society.

Q.    Is that to retain it or become initially

certified?

A.    To retain it.

Q.    How now would someone be initially certified?

What process would they have to go through?

A.    They would go through an application, which I

did, be peer reviewed, and then they would have to

take an examination to receive their first

certification process.

Q.    What would the examination entail?

A.    Very extensive, and I don't know, because I

never took it.

Q.    It has on your Curriculum Vitae Loss

Management Consultants, Inc.  Could you describe

what is the nature of business of Loss Management

Consultants, Inc.?

A.    It is a corporation in the Commonwealth of

**VARALLO Incorporated**

```
 1              Ira S. Somerson, CPP
 2   Pennsylvania whose sole purpose is security,
 3   management consultant or the protection of an
 4   organization's assets by risk assessment and
 5   programs designed to prevent those assets from being
 6   lost.
 7     Q.    And who are the officers of the corporation?
 8     A.    I'm a one-man corporation.
 9     Q.    And where is your actual physical location?
10     A.    650 Sentry, S-E-N-T-R-Y, Parkway, Suite 1,
11   Blue Bell, Pennsylvania 19422.
12     Q.    And is that an office, I assume, in an office
13   complex?
14     A.    Yes.
15     Q.    Do you have any employees?
16     A.    None.  That needs to be corrected, however.
17   I'm part of an international consortium of
18   independent consultants similar to myself, and we do
19   significant consulting work for multi-national
20   corporations and governments in different
21   specialties, and we come together as independents
22   and work on a task force.
23              We do not, each of us, retain employees.
24   We prefer to do it on the consortium level.  That's
25   a major part of my work.
```

 **V A R A L L O  Incorporated**

Ira S. Somerson, CPP

Q.    What percentage would you say that is of the work that you do?

A.    Well, it depends on whether you're talking about time or dollars.

Q.    Let's talk about time.

A.    Time, I would say that it's 70 percent consulting, 30 percent forensic or expert witness work.  Dollars, about 50/50.

Q.    And what amount does your corporation make yearly on the forensic work that it does?

A.    Well, I usually do, as a one-man corporation, about $300,000 in generated fees a year, exclusive of expenses.  So based on those percentages, you have a good idea as to what I'm doing.

Q.    So just to understand better, you're a corporation and forensic work alone will gross over $300,000 a year?

A.    No, sir.  My consulting and forensic work will gross over 300.  Roughly half of that will be in the expert work.

Q.    150,000, generally?

A.    It goes up and down.  It's never the same.

Q.    Right.  And you've been doing forensic work since 1983?

**VARALLO** Incorporated

```
 1                    Ira S. Somerson, CPP

 2      A.    I started in '81, really.  That's when I sold

 3   Century security systems to a national company.  I

 4   was under contract to them for two years, but during

 5   that two years, they allowed me to do consulting.

 6   By the way, when I sold it, I had 1100 employees.

 7   So I was trying to get the other way quick.

 8      Q.    How old are you, sir?

 9      A.    64.

10      Q.    Sir, in your Curriculum Vitae, there's an

11   association affiliation called International

12   Association of Healthcare Security and Safety.

13   Could you describe that affiliation?

14      A.    That's an international organization

15   representing people in the healthcare industry for

16   safety and security, of which I am a member, which I

17   participate at their symposia, which I write

18   articles to, which I lecture to and which I attend

19   the various workshops and symposia that they

20   sponsor.

21               I read their journal, their academic

22   journal that they publish quarterly, and I read

23   their magazines and newsletters as well.  It's an

24   ability to stay in the state-of-the-art of hospital

25   security or healthcare security.
```

 **V A R A L L O  Incorporated**

Ira S. Somerson, CPP

Q.    Essentially, if I understand, you probably paid a fee to obtain that information, a membership fee?

A.    Well, just about any membership has a fee associated with it, but my reward is far greater than the fee paid.

Q.    I understand.

And is the membership restricted to anyone?

A.    People who have a professional interest in hospital security for both healthcare and security in general in the hospital industry.

Q.    But is it restricted?  If I paid the fee, could I become a member?

A.    Well, there are different types of members. I do not know what type of memberships they now have.  You might be an affiliate versus a full-time member based on your qualifications.  That, I'm not familiar with.  I was granted full membership.

Q.    Have you ever worked in a healthcare security setting?

A.    As an employee?

Q.    In any capacity.

A.    As a consultant, many, many times.

**V**   **V A R A L L O Incorporated**

```
 1              Ira S. Somerson, CPP

 2    Q.    What hospitals or healthcare facilities have

 3  you worked for?

 4    A.    Well, without exaggeration, almost every one

 5  of them has a confidentiality agreement.  So the

 6  ones that I'll give you, I'll be confident are old

 7  enough and closed long enough that I don't have a

 8  problem.  I'm reading through a list of them now.

 9            The first one that -- I'm just going

10  through a long list of them, if you'll be patient

11  with me, please.

12    Q.    I'll be patient.

13    A.    Aventis-Bioservices, which has clinics

14  throughout the country; Atlantacare, one word,

15  Medical Center in Lynn, Massachusetts.

16    Q.    Is that a hospital?

17    A.    Yes, it is.

18    Q.    What type of work did you do for this

19  hospital in Massachusetts?

20    A.    Full risk assessment and program development.

21    Q.    And when did that occur, generally?

22    A.    These are in alphabetical order, so...

23            They're not dated.  I'm sorry.

24            MR. HAUCK:  Could I jump in real quick?

25            Is what you're looking at on the
```

 **V A R A L L O Incorporated**

```
 1                Ira S. Somerson, CPP
 2    computer screen in the documents that you've
 3    provided?
 4                MR. PENNINGTON:  No.  It was not asked
 5    for.
 6                THE WITNESS:  No.  This is just a list
 7    of clients that I have in the computer.  It's a
 8    sampling, because I know it was going to be asked.
 9                MR. PENNINGTON:  It has nothing to do
10    with this case whatsoever.
11                THE WITNESS:  But you asked me for some
12    references, so I just reached into the file to get
13    them for you.  If you want me to stop, I'll be happy
14    to.
15                I've done work for the Family Planning
16    Council throughout this region; Mt. Sinai Hospital
17    Medical Center in Cleveland, Ohio.  That was a full
18    risk assessment and program development.  By
19    coincidence, the Mt. Sinai Hospital of Baltimore,
20    same thing; Pastore Merigo Kenault (ph), which was
21    basically a serum manufacturer that I dealt with;
22    Planned Parenthood of Chester County; Southwest
23    Missouri State University's hospital; Temple
24    University in Philadelphia's hospital.
25    BY MR. YANINEK:
```

VARALLO Incorporated

Ira S. Somerson, CPP

1

2  Q.   What did you do for Temple?

3  A.   Same thing.

4  Q.   Full security risk assessment?

5  A.   Yeah.   Program development is how I prefer to

6  call it.

7        University of Pennsylvania, while we're

8  in Philadelphia, which I call HUP; Pennsylvania

9  Hospital, which is the same system, but it's at 8th

10 and Spruce.   Then it was separate.   There were two

11 different entities.

12        That's all I have in this partial list.

13 There are considerably more.

14 Q.   Did any of these healthcare facilities do 302

15 commitments when you were doing the evaluation; do

16 you know?

17 A.   I don't remember.

18 Q.   Do you have any specific credentials in the

19 healthcare security field?

20 A.   No.   I am not a member of the IAHSS's

21 certification program.   They've been perfectly

22 satisfied with my CPP.

23        The IAHSS deals more with people

24 employed by a hospital full time and seeks its

25 certification for personnel career development.   But

Ⅵ   VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP
 2    if you're looking for a broader perspective of
 3    different medical facilities, CPP would be the
 4    preferred designation.
 5      Q.    When you dealt with these assessments of
 6    healthcare facilities, did you take into account any
 7    reportings by the Joint Commission of Accreditation
 8    of any of the facilities?
 9      A.    I'm familiar with them.  I have some
10    ambivalent feelings about them, which you can get
11    into as we proceed.
12              But I approach all security management
13    for all facilities the same, whether it's a
14    hospital, whether it's a drug manufacturing
15    facility, a pharmaceutical, whether it's a clothing
16    or whatever it is.  There's an essential way of
17    approaching security management consulting.  We're
18    not driven by an accreditation service.  Owners are
19    pretty much run by the association that's trying to
20    accredit them.
21      Q.    And that's your feelings about the Joint
22    Commission?
23      A.    That's correct.  I approach my assignments
24    basically the same way, including this case; that
25    is, that I first assess through both scientific and
```

**V A R A L L O Incorporated**

Ira S. Somerson, CPP

qualitative or unscientific analysis what risks are
likely to occur -- and that will depend on the type
of facility -- identify and prioritize those risks,
assess the existing physical and academic and
procedural security that's in place to deter,
detect, deny and respond to those foreseeable
events, and to then recommend upgrades or
modifications to improve them from occurring.

     I don't look at a hospital as being any
more unique than a manufacturing facility.  That's
just a standard security industry methodology of
assessing risk and developing program strategy.

Q.    What was the last hospital -- you don't have
to give me a name, but when did you do your last, I
guess, risk assessment of a hospital?

A.    This past year.

Q.    So based on your answer, your previous
answer, you don't feel that a hospital is any
different from any other business or institution
with regard to security assessment or risk or
practice and procedure?

A.    No.    That is a mistake.  We approach the
methodology differently, only from the sense that
each type of operation is uniquely different.

**VARALLO** Incorporated

Ira S. Somerson, CPP

So, for instance, if I were to say to you I'm assessing the risk of a convenience store, you'll probably be looking at robbery prevention. If I were to tell you I'm assessing the risks of a department store, you would say, oh, he's after shoplifting. And if I were to tell you -- each of these have unique inherent risks, along with other more peripheral risks.

And the same thing is true of a hospital. We identify the inherent risks of its operation, and we identify those through various scientific and unscientific methodologies. We then corroborate them with scientific methodologies. We then look at where it's geographically located, what are the demographics, both within it and surrounding it. We look at its prior history and what the repetitive, the persistent repetition of events was, whether they appear to be mitigating that repetition or it's going up on a grade.

We look at a lot of factors. And when we're finished, whether, again, it's a hospital or another organization, we use the same methodology, but we've approached each for its unique operational distinction. That's quite different than the way

```
 1                    Ira S. Somerson, CPP

 2   you...

 3     Q.    How do you view the differences between the

 4   practice and procedure of security for a hospital

 5   versus a different institution, such as a private

 6   company?

 7     A.    Let's just say we're talking about a city

 8   hospital, as an example.

 9     Q.    Sure.

10     A.    That has a trauma center, that has an ER,

11   that accepts the public as part of its service to

12   the community and, therefore, it accepts young

13   people who are gang related or where retribution can

14   occur within the emergency room where, in certain

15   demographics, by the open nature of a hospital flow

16   into the facility.  These create unique inherent

17   risks.

18            Each has to be looked at.  Each has to

19   be addressed, especially based on where it is, what

20   its history is, whether it is a trauma center,

21   whether it isn't.  Each unit has to be looked at

22   that way.  And when you have, you then say, okay,

23   what are we doing to -- these words will be

24   repeated.  I hope you won't get angry with me -- to

25   deter, to deny, to detect and to respond to and/or
```

1                    Ira S. Somerson, CPP

2    recover from these foreseeable risks.

3              Now, some are more obvious and are

4    prioritized high.  Violence in the ER is a very --

5    very major problem in a downtown trauma center.

6              So you have to look at each risk and

7    then assess what you're doing to prevent it.

8              I hope I haven't been verbose.

9    Q.   No.   That's fine.  I asked you a question.

10   You're entitled to answer it.

11             In your articles and publications, I

12   direct your attention to No. 35.  It's titled Role

13   of Outside Consultants in Enhancing a Hospital

14   Security Program.  Can you tell me about that?

15   A.   I'm getting it up on my screen.  I did not

16   predict you to be asking me about that.

17             I apologize for the slight delay.

18   Q.   No problem.

19   A.   There it is.  Thank you for your patience.

20             What page did you want?

21   Q.   It was Page 5 on your Curriculum Vitae, but

22   it was Article No. 35.  It's titled Role of Outside

23   Consultants in Enhancing a Hospital Security

24   Program.

25   A.   Got it.

**VARALLO Incorporated**

Ira S. Somerson, CPP

Q.    Could you tell me what that article is about?

A.    Essentially, that article is about how you would use a consultant as part of the process or the facilitation process of assessing risks and improving the program.

Very often security directors in hospitals and security managers are part of the squeaky wheel. They're always asking for things. They're always under budget constraints, and, therefore, the outside consultant can often get them over the hump and into other areas if they use an outside consultant. That's the main thrust of that article.

Q.    So is it fair to say that there's nothing in the article related to elopements?

A.    No. I don't think I've ever written anything specifically on the subject of -- my writing is generally more security management genericized. It's intended for students. It's intended for theory that would apply against multi-types of facilities, not a particular facility.

Q.    Okay. After the deposition is completed, would it be possible that I get a copy of this article?

Ira S. Somerson, CPP

A.    Oh, that would be easy.  I just print it out on the computer.

Q.    Thank you very much.

A.    You just want that one article?

Q.    Yes, sir.

A.    Oh, yeah, I can find it.  I'll put a double asterisk after it so I can find it.  I'm assuming, by the way, that I'm getting permission from Mr. Pennington for each of these requests?

MR. PENNINGTON:  Yes.  Sure.

BY MR. YANINEK:

Q.    I see another initial after your name, CFE.

A.    That has been dropped.

Q.    Okay.

A.    The reason it's been dropped is, I no longer -- and I was for, God, 40 years a criminal investigator.  I got licensed in the Commonwealth of Pennsylvania.  I just, frankly, got too old and too busy.

Q.    So CFE stands for what?

A.    Certified fraud examiner.  I just stopped doing it and felt that it was misrepresentative to use it, so I dropped it.

Q.    What does a certified fraud examiner do?

**M**  **V A R A L L O  Incorporated**

```
 1                  Ira S. Somerson, CPP
 2    A.    Investigates frauds.
 3    Q.    What type of frauds?
 4    A.    You name it.  Mostly for corporations.  You
 5  take the largest one we now have been dealing with,
 6  I would have been part of that.
 7    Q.    I want to talk about now turning your
 8  attention to the list that you provided me with
 9  cases that you've had involvement with, other
10  forensic cases.
11    A.    Yeah.
12    Q.    I have one dated October 28th, 2002.
13    A.    Do you want to just show it to me?  It's the
14  only copy.
15    Q.    You can kind of see it up in the right-hand
16  corner.
17    A.    I'm sorry.  Which one are you referring to?
18    Q.    No; the date of your list.
19    A.    Right.  Oh, okay.
20    Q.    Mine is dated 10/28/2002.  That's when you
21  printed it off, I assume?
22    A.    Yes.
23    Q.    The one we have today is dated 11/21/2002.
24    A.    Correct.
25    Q.    Is there any changes, in your mind?  Have you
```

VARALLO Incorporated

```
 1                  Ira S. Somerson, CPP
 2    had any depositions or trials, I guess, since
 3    October 28th that would be reflected on the 11/21
 4    list that you gave me that are not reflected on the
 5    older list?
 6       A.    Maybe one or two, but nothing that would, I
 7    think, interest you.
 8       Q.    Okay.  What are the new ones?
 9       A.    Just depositions in other matters.  It's a
10    continuing.  When somebody deposes me, I just go in
11    and put yes and the date, and that updates the
12    database.  If I'm at trial, I put in yes and the
13    date, and it updates the database.  Then when I
14    do -- it just prints out the new number.  And you're
15    welcome to have that new print, but I don't think
16    you'll need to go through the trouble, because none
17    of them involve your kind of work.  I'll aver to
18    that.
19       Q.    I'm going to direct your attention to, I
20    guess it's, LMC File 7661.  I believe the caption is
21    titled Robb R. Wilson and Lora W. Wilson versus
22    Children's Hospital, et al.
23       A.    You want me to pull that up?
24       Q.    Yes.  Well, can you tell me what that case is
25    about?
```

VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP

 2    A.    No.

 3    Q.    All right.

 4    A.    But I can -- thanks to my great cheat sheet

 5    here, I can probably -- if it's not closed and it's

 6    not down in the dungeon, I can look it up in the

 7    computer.  If it's down in the dungeon, I need you.

 8    Q.    Okay.  Take your time.

 9    A.    I'm going to see -- file number, please?

10    Q.    I believe it's 7661.

11    A.    We're in luck.  Okay.  Reading you the

12    incident in summary, "Among the day August 18th,

13    1997, Steven Maloney, plaintiff, was a ticket-paying

14    fan at a baseball game between the Philadelphia

15    Phillies and the San Francisco Giants," and it goes

16    on to how he was assaulted while being at that game.

17    Q.    Okay.  So this was not an incident that

18    obviously occurred at the hospital?

19    A.    He might have been taken to the hospital.  He

20    might have received treatment at the game, but it

21    certainly wouldn't have been my keyword index

22    choice.

23    Q.    All right.  In your recollection of cases

24    that you've been involved with, either these in the

25    printouts that you provided me or other ones, have
```

VARALLO Incorporated

Ira S. Somerson, CPP

you ever had a case involving security issues at a
hospital?

     A.   Yes.

     Q.   Can you tell me, one case or more than one
case?

     A.   More than one case, and I could never do that
now.  I would have to do that research and come back
to you.  And if you would, please, put that in
writing, because somebody has to --

               MR. PENNINGTON:  We'll take care of that
stuff at the end.

               MR. YANINEK:  Okay.

               THE WITNESS:  Somebody is going to have
to pay for that.  That's deep research.  Somebody
would pay for that.

BY MR. YANINEK:

     Q.   I guess on this list, on this list that you
provided, were any of these hospital cases?

     A.   I don't remember.

     Q.   Or healthcare cases?

     A.   They would be part of the research I would
do.

               You have to remember that since 1981,
I've handled, roughly, 700 matters.  That's just



Ira S. Somerson, CPP

1  since '81.  And I've been in business for 43 years.

2  And I have every file in those 43 years, but I don't

3  have them all in a database.  So the research gets

4  into, you know, going beyond the database.  And

5  basically what I do is, I load them in and I put

6  various keywords to them.

7                Now, many, many times lawyers never tell

8  me they settle a case.  Wow.  You believe that?

9  Many times lawyers don't tell me information that

10 gives me the ability to change the database

11 appropriately.  So I would have to literally, once I

12 saw the list, call every lawyer to find out the

13 current status of that case.  Usually I send out

14 letters.  I do that once a year as it is and get

15 maybe a 30 percent response, just so I can keep my

16 inventory.

17   Q.    From the list that you provided me, it

18 indicates that you haven't testified in trial this

19 year.  Is that accurate?

20   A.    I think I have.  Now, may I -- hold on,

21 please.  I think I can probably help you with that.

22   Q.    Oh, I want to correct my question.  I think

23 from my list to the new list, there appears to be

24 one that you testified on November 18th?

**V A R A L L O Incorporated**

Ira S. Somerson, CPP

1
2  A.   Yeah.  I thought there was one.  That's why
3  I've been hesitant.
4  Q.   November 18th.
5  A.   I can tell you exactly based on just sorting
6  this, if you just give me one second.
7          Okay.  I testified -- I was deposed on
8  11/12 in a parking lot case, and that was for
9  Harrah's.
10  Q.   This is Estate of Selvaggio versus Harrah's?
11  A.   Correct.  Ugly case.
12  Q.   I assume you were retained by the plaintiff,
13  according to your record?
14  A.   Yes.  This was not a criminal case.
15  Q.   And the incident occurred, I would assume, at
16  Harrah's or on their premises?
17  A.   On their employee parking lot.
18  Q.   And was Mr. Selvaggio killed as a result of
19  the incident?
20  A.   Ms. Selvaggio was killed by her boyfriend.
21  Q.   How was she killed?
22  A.   With a shotgun.
23  Q.   She was shot by her boyfriend?
24  A.   Her boyfriend.  He was annoyed.
25  Q.   And you were retained by the estate to review

VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP
 2   the case?
 3      A.    I was basically retained to defend the
 4   casino.
 5      Q.    In your column, then, under Plaintiff, it
 6   says yes.  What does that mean on your printout?
 7      A.    Going back to it.  I apologize to you.  I did
 8   represent the Estate of Peggy Selvaggio against -- I
 9   do remember the case exactly.  The security officer
10   left the parking lot without authorization.
11   Boyfriend got on the lot, which he otherwise
12   wouldn't have, and shot Peggy Selvaggio.  I
13   represented Peggy Selvaggio's estate.
14      Q.    And you testified then that the security at
15   Harrah's was inadequate?
16      A.    In that instance, yes.
17      Q.    Was a verdict reached in the case?
18      A.    I don't know.
19      Q.    And that case was in New Jersey, I take it,
20   Atlantic City?
21      A.    Yes.
22      Q.    The next most recent case you testified at
23   trial --
24      A.    To help you along, 8/25/2000.
25      Q.    How about 10/24/2001, Samuel Stoorman,
```

**V A R A L L O Incorporated**

```
 1            Ira S. Somerson, CPP
 2  Page --
 3    A.    Yes.
 4    Q.    And you were retained by plaintiff in that
 5  case?
 6    A.    Yup.
 7    Q.    And this was in Colorado?
 8    A.    Correct.
 9    Q.    And what, generally, was this case about?
10    A.    I don't remember.  I right now have about 130
11  open files.  The rest of the, roughly, 700 are
12  closed.  That's physically impossible to remember
13  the -- but as I said, any specific question you ask,
14  I will see that you get an answer through
15  Mr. Pennington to your office.
16    Q.    Well, you have a computer in front of you.
17  Do you have any information relative to this case on
18  your computer?
19    A.    Only if the case was still open.  If not, all
20  the file drawers were destroyed and only my
21  correspondence files are left open.  Nothing would
22  be on the computer, because it would be removed.
23    Q.    Is it an open case or a closed case?
24    A.    Which one, the Stoorman case?
25    Q.    Yes.
```

**V A R A L L O  Incorporated**

```
 1                   Ira S. Somerson, CPP

 2     A.    Do you have a file number?  It's on the very

 3  end.

 4     Q.    It appears to be 7835.

 5     A.    Closed.

 6     Q.    So what you're telling me, as we sit here

 7  today, there's nothing you can tell me about this

 8  case from your computer that's in front of you about

 9  the relative nature of what this case is about?

10     A.    Only my keyword index, which is at the very

11  end of the same file, and they'll tell you,

12  essentially, what the matter was about.

13                  It was a clinic, social services

14  abortion, and a rifle -- if that's the same one.

15  No, I don't think it is.  I think I got carried

16  away.  Just a moment.

17     Q.    No problem.

18     A.    Office building tenant, assault, blunt object

19  to head, burglary.  Meaning that a burglary took

20  place and the person in the building was assaulted

21  during the burglary with a blunt object.  If that

22  person had died, there would be the word "homicide"

23  as well.

24     Q.    Okay.  So since you testified at trial in

25  that case, I assume that you gave an opinion that
```

**VARALLO Incorporated**

```
1                    Ira S. Somerson, CPP
2    the security at the building was inadequate?
3    A.    Yes.
4    Q.    And were you at the trial in Colorado to the
5    end of the trial or just for your testimony?
6    A.    For one day, just for my testimony.
7    Q.    You don't know the result of the trial?
8    A.    I don't know why, but I remember a favorable
9    result.  And I may have to retract that, but I do
10   remember getting a nice phone call.
11   Q.    Okay.
12   A.    Rare.
13   Q.    Nice phone call from the plaintiff's lawyer?
14   A.    Whoever it was that I represented.
15   Q.    The next trial testimony listed on your
16   printout is Thomas J. Duffy --
17   A.    If you give me a file number.
18   Q.    7366.  The Curtis Center, and then the
19   caption says Hoffman Surgical.  Sorry.  No; that's
20   right.  That's right.
21   A.    And the file number was?
22   Q.    7366.
23   A.    The attorney was a Thomas Duffy?
24   Q.    Yes, sir.
25   A.    I'll just go through that.
```

**VARALLO Incorporated**

1                    Ira S. Somerson, CPP

2                    File is closed.

3    Q.    Okay.

4    A.    It was received by me in 1990, a Pennsylvania

5    matter.  Hoffman Surgical was the caption.  That's

6    all I had.

7    Q.    Okay.

8    A.    Oh, this took place at the Spring Mill

9    Associates right down the street here in

10   Conshohocken.  The cross index is fire, security

11   officer services, guard services, warehouse, alarm,

12   security system.

13                    So this was, obviously, a fire case.

14   Q.    Okay.  So in that case, did you render an

15   opinion that the, I guess, building security was

16   inadequate?

17   A.    I have no idea if I did render an opinion.

18   I'd have to go back and research every one of these.

19   Q.    All right.

20   A.    Most of these, for your information, settle

21   long before I render an opinion.

22   Q.    Well --

23   A.    Which is why I'm retained in the first place.

24   Q.    Well, I'm specifically questioning you about

25   cases that you've testified at trial.  I'm taking

**V A R A L L O  Incorporated**

Ira S. Somerson, CPP

1
2   your trial list, so these -- I understand that,
3   being an attorney myself.
4       A.    Then I did, and I don't know what opinion I
5   rendered.  I do have --
6       Q.    You tend to remember those a little bit more.
7   Would you agree or not?
8       A.    Not anymore.  That's a long time ago.
9       Q.    Generally speaking, the times that you
10  testify at trial?
11      A.    You list the file numbers that you want me to
12  try and find.  I have to go into my closet and pull
13  out them and get them copied for you, but I don't
14  remember them.
15      Q.    Okay.
16      A.    And that's not evasive.  I really just don't
17  remember them.
18      Q.    Let's see if you have anything on 7785.  The
19  caption is entitled Gonzalez versus Community Realty
20  Management, et al.
21      A.    What's my file number, please?
22      Q.    7785.
23      A.    That was for Joe Assan, I would pronounce his
24  name.
25      Q.    Yes.

**V A R A L L O  Incorporated**

```
1                    Ira S. Somerson, CPP
2     A.    It's still open.  So I would not be able to
3   discuss the file at all.  Not without Joe Assan's
4   permission.
5                 I remember this case quite well.
6     Q.    All right.  Without, I think, specific about
7   the file, do you know, was this in New Jersey State
8   or Federal Court?
9     A.    Atlantic City.
10    Q.    I see.
11    A.    On a housing project.
12    Q.    It's a State Court case?
13    A.    HUD, I think.
14    Q.    The next most recent case, according to your
15  list, is 7757, Lamana versus Ogden.
16    A.    7757?
17    Q.    Yes, sir.
18    A.    It's still open.  Same would apply.  I have
19  no...
20    Q.    All right.
21    A.    This may very well be closed.  I haven't
22  heard from it in that long.  But this says open, so
23  I can't discuss it.
24    Q.    All right.  The next most recent -- this is
25  an interesting one, I guess.  7767.
```

VARALLO Incorporated

Ira S. Somerson, CPP

1

2   A.    That sounds very familiar.

3   Q.    This case, it appears, you weren't retained

4   by either plaintiff or defendant.

5   A.    Oh, that's true.

6         Yeah.  This is closed.  This is two twin

7   tower condominiums bickering with each other, two

8   management associations, on a budgetary dispute over

9   security.

10  Q.    Okay.

11  A.    If you want the truth, two immature Board

12  screaming at each other.

13  Q.    Here's another one from 2000.  7731.  It's

14  called Zepf versus Atlantic City Hilton.

15  A.    That rings a bell.  What's the number again?

16  Q.    7731.

17  A.    That's open.  This case involves an Atlantic

18  City casino.  You're picking on them.

19  Q.    And you testified at trial on behalf of the

20  plaintiff, it appears, from your list anyway?

21  A.    Well, if it says I did, then I did.  But,

22  again, did it close, did it settle, where is it?

23  They haven't told me.

24  Q.    What you testified in at trial certainly was

25  public record and open to the public.  I'm not

Ira S. Somerson, CPP

1    asking you for what confidential information that

2    you may have given to the attorney. What my

3    question is, do you remember what you testified at

4    trial?

5    A.    No.

6    Q.    Let's see if you have any information on

7    7641, Checkpoint Systems, Inc.

8    A.    7741? Oh, I remember this.

9    Q.    7641.

10   A.    Checkpoint systems would have been a patent

11   infringement case involving Checkpoint, one word,

12   and Check Point, two words, the invasion of the use

13   of the name. It really didn't have anything to do

14   with security as per se.

15   Q.    Okay.

16   A.    But any knowledge of the security industry

17   and the access control industry. That was a very

18   interesting case.

19   Q.    7697, Meyers versus Joe Schmidt, trading as

20   7-Eleven.

21   A.    Seven what?

22   Q.    It's 7697.

23   A.    It's closed. I remember it well. There was

24   a sister to this one. Same property, too.

**Ⅵ   VARALLO Incorporated**

Ira S. Somerson, CPP

Q.   What was the general nature of that case?

A.   I'm getting it for you.

Q.   Okay.

A.   Assaults, banging each other up on a parking lot outside 7-Eleven.  It seems to be a part-time hobby of young people today.

Q.   Okay.  And you testified on behalf of the plaintiff, Alan Meyers?

A.   Yes.

Q.   I assume he was assaulted then on the 7-Eleven parking lot?

A.   Correct.

Q.   And was your testimony that the security at the 7-Eleven parking lot was inadequate?

A.   Yes.

Q.   Here's one, 7709.  This is in Wyoming, of all places.

A.   I'm all over the lot.

         Oh, this was for the guy on TV that wears the --

Q.   Jerry Spence?

A.   Yeah.  That's his brother.  Fascinating firm.

Q.   This is a criminal case?

A.   Yeah.  Out in Wyoming.  Lee versus State of

42

```
 1              Ira S. Somerson, CPP
 2   California.  It was a crowd control case at a state
 3   fair.
 4      Q.   And you testified on behalf of the plaintiff?
 5      A.   Well, you have the whole spreadsheet.  I have
 6   to go back and forth.  So, yes, I did.
 7      Q.   And was your testimony that the crowd control
 8   at the fair was inadequate?
 9      A.   Yes.  Boy, was it ever.
10      Q.   Let's go to 7757.  Did I ask you about that
11   one?
12      A.   Don't know.
13      Q.   I don't think so.  Maybe I did.
14      A.   That's still open.
15      Q.   Okay.
16      A.   I can only tell you that it involved a guard
17   service.  Let me go back and tell you, this is for
18   the plaintiff.  You probably know --
19      Q.   According to your printout, it says you
20   testified for the plaintiff.
21      A.   Okay.  Because I don't have the whole...
22              Security officer services,
23   transportation, assault, fist, guard, Port
24   Authority, airport, Newark Airport.  That's the
25   various...
```

VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP
 2      Q.   I would assume that the security at Newark
 3  Airport was at issue in the case?
 4      A.   Yes.
 5      Q.   You testified that security at Newark Airport
 6  was inadequate on that occasion involving --
 7      A.   On that occasion?  When wasn't it?  Yes.
 8      Q.   Okay.  Let's look at if you have 7700.
 9      A.   That's a closed matter.
10      Q.   Okay.  You were retained by the defense,
11  according to your paper?
12      A.   Back in '98.
13      Q.   What was the general nature of that?
14      A.   Massachusetts.  I have to get it for you.
15               It's an oldie.  Oh, you remember the
16  case where the murder that took place in Boston over
17  the abortions?  They came into the abortion clinic
18  and blew away some of the employees in there?
19      Q.   Vaguely.
20      A.   It was one of those.  Nasty case.
21      Q.   So did you testify then on behalf of the
22  clinic?
23      A.   No.  Defendant.
24      Q.   The defendant, wouldn't that be the clinic?
25      A.   The clinic.
```

**VARALLO Incorporated**

Ira S. Somerson, CPP

Q.    Okay.  So was your testimony such that you opined that the clinic's security was adequate?

A.    I don't remember exactly what I opined.  I wouldn't want to mislead you, but I did opine something.

Q.    Favorable to the --

A.    That's up to their own...

Q.    Here's one, 7259, Capizzi versus Gimbels.

A.    There it is.  Closed.  Philadelphia case, Capizzi versus Gimbels, like you said.  For the plaintiff.  It was a robbery in a department store mall, armored car service.

Q.    And the plaintiff was injured, I assume, in some way personally?

A.    Shot, yes.

Q.    And do you remember what your opinion was?

A.    No.

Q.    Do you remember anything related to what you testified?

A.    No.  I'd be quite a remarkable guy if I did after all these.

Q.    7708.

A.    Closed.  Attorney was Thomas R. Yorko, Pennsylvania.  By the way, I have no idea if these

VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP
 2   law firms exist today.
 3      Q.    No.  I understand that.
 4      A.    Some of this is quite old.
 5      Q.    Do you remember what that case was about?
 6      A.    Well, if it doesn't trigger it from the
 7   keyword, no.
 8      Q.    Okay.
 9      A.    I did work for plaintiff on this.  It was a
10   property management case, purse snatched, strong-arm
11   robbery, parking lot of a strip center, and it went
12   to an arbitration.
13      Q.    So do you remember if you testified that the
14   strip mall in question had inadequate security?
15      A.    I don't remember a thing.
16      Q.    Okay.
17      A.    How many more of these are we going to be
18   going through?  Because I want to try and just --
19      Q.    Just a couple more.
20      A.    As many as you wish.  I just want to get
21   these things set up.
22      Q.    I understand.
23            How about 7597?
24      A.    Open.  State of New Jersey.  It's against the
25   casino.  Represented plaintiff, and it was an
```

**Ⓜ  VARALLO Incorporated**