```
 1              Ira S. Somerson, CPP
 2   assault in a casino.
 3     Q.   Do you remember testifying that Trump Plaza's
 4   casino had inadequate security?
 5     A.   I do not remember what I testified to.  Each
 6   time the best thing I can do is to research those
 7   that you wish me to and, with the client's
 8   permission, get you copies of whatever reports or
 9   testimony they permit me to give you, especially on
10   open matters.
11     Q.   7583?
12     A.   Closed.  I remember this one occurred in
13   Delaware County.  Oh, yeah.  This was an armed
14   robbery in front of a drugstore in Chester County.
15   It might have been Delaware County.
16     Q.   Do you remember what you testified?
17     A.   No, absolutely not.  That's an oldie.
18     Q.   Okay.  I'm going to try to talk to you about
19   some of the depositions.  We went through some of
20   .the trials.
21     A.   We're going to go through the same process
22   now for all deps?
23     Q.   Perhaps.  I don't know yet.
24              MR. PENNINGTON:  Well, I have an
25   appointment at 2:00 at the U.S. attorney's office.
```

VARALLO Incorporated

```
 1                    Ira S. Somerson, CPP
 2    I guess I should cancel that, right?
 3                    MR. YANINEK:  Off the record.
 4                    (Discussion held off the record.)
 5    BY MR. YANINEK:
 6       Q.   Mr. Somerson, the list that you gave me
 7    related to depositions is not dated.  Is there any
 8    reason --
 9       A.   (Witness indicating.)
10       Q.   This is trial.  This is depositions.
11       A.   Isn't that this?
12       Q.   I mean, the dates for the actual --
13       A.   It's just the way the construct of the
14    database was set up.  The depositions is different.
15    That's all.
16       Q.   Well, that's what I'm trying to find out.
17    I'm not suggesting anything suspect.
18       A.   No, no.  But if I have it in here, I'll be
19    glad to give it to you as we go through.
20                    We do a search routine and then print so
21    much up.  Somebody left out the date, so it doesn't
22    pop up.
23       Q.   Is there a way that you can produce a list
24    for depositions that has the dates?
25       A.   Yes.
```

Ⓥ  **V A R A L L O  Incorporated**

Ira S. Somerson, CPP

1

2    Q.    Okay.  Could you do that?

3    A.    Just give it to him as an item to be

4    provided.  Because, see, all these requests are

5    going to take time.

6    Q.    How long would it take to do that?

7    A.    I don't know how many you're going to want,

8    but to redo that and include the date is at least an

9    hour.  Just how long --

10            MR. YANINEK:  Let's go off the record.

11            (Discussion held off the record.)

12            THE WITNESS:  Now we're now looking at

13   deps?

14   BY MR. YANINEK:

15   Q.    Depositions, yes, sir.

16   A.    Your first file number?

17   Q.    Something related to hospitals.

18            Do you recall any within the last four

19   years that were related to a healthcare facility?

20   A.    No.  May very well be, but I don't recall.

21   Q.    Can you tell me how the deposition list is

22   organized?

23   A.    May I see it?

24   Q.    Page 1 and 2.

25   A.    All I do is a search, and if under the column

49

1                    Ira S. Somerson, CPP

2     of Deposed there's a yes --

3        Q.    Yes.  But the names that are retrieved don't

4     come out alphabetically, correct?

5        A.    No.

6        Q.    And they don't come out numerically in the

7     file number either?

8        A.    No, but you can sort on any one of those

9     fields, but then you can juxtapose other fields.

10    You can only sort on one column at a time.

11       Q.    Okay.  So --

12       A.    This is Access, if you're familiar with it.

13       Q.    I'm not.

14              So is it fair to say, then, that the

15    first item, 7390, listed is not the oldest item,

16    it's not chronological?

17       A.    The oldest item will be the lowest file

18    number.

19       Q.    Okay.

20       A.    The newest number will be the larger file

21    number.

22       Q.    I got you.  Because I assume that these --

23    they're in the 7000's, so you've had over 7000 --

24       A.    Since 1981, I started with 7000.  That's the

25    number I began with.

**VARALLO Incorporated**

Ira S. Somerson, CPP

Q.   So you haven't had 7000 files?

A.   Oh, no.  I began arbitrarily with the number 7000.  It was sometime much later than that that the Federal Rules required that I keep this kind of database.  So I don't remember the date, but I began to maintain this kind of file.

Q.   Let's just look at 7715.

A.   That's open.

Q.   And you provided deposition testimony?

A.   If it says so, I have, yes.

Q.   Do you know what date?

A.   I'm going to try to answer that right now. Probably when we developed this form, we didn't ask for that column, but I'm going to get it for you.

The deposition date was 8/22/2000.  And it was a club, a bar, a stage, an accident.  Oh, this is a wet T-shirt contest, and one of the male exuberants slipped on the water.

Q.   Okay.

A.   And was tragically hurt.

Q.   And you testified on his behalf?

A.   Certainly.

Q.   This is, obviously, a unique kind of case. Do you remember what you testified?

**V A R A L L O Incorporated**

```
 1                 Ira S. Somerson, CPP

 2    A.    Essentially, that there was no supervision

 3  over -- that the males were just allowed to climb up

 4  on the stage.  One of the exhibitors became a little

 5  zealous and to win -- you know, they won like a cash

 6  prize -- she started pouring bottles of water over

 7  herself and then the guy ran up on the stage,

 8  slipped, fell, did a split and got hurt pretty bad,

 9  rightfully so.

10    Q.    You testified on his behalf?

11    A.    I'm just being facetious.  Please make

12  this...

13    Q.    I understand.

14          And you opined that there wasn't proper

15  supervision of the event?

16    A.    Absolutely wasn't.  There was nobody there.

17  But off the record.  The guy got what he deserved.

18    Q.    Let's go up to 7563.

19    A.    Closed.

20    Q.    Do you remember what that case was about?

21    A.    It's in Texas.  Assault, rape, residential

22  apartment, parking lot, security officer services.

23    Q.    Okay.  And you testified, according to my

24  paper, on behalf of the plaintiff, Hope Shaw?

25    A.    Correct, on 8/16/95.
```

VARALLO Incorporated

Ira S. Somerson, CPP

Q.    She was the victim of the assault, I assume?

A.    Yes.

Q.    And you testified that the, I guess, English Swiss Village --

A.    I don't remember the content of my testimony at all.

Q.    You don't remember or believe that it might have been that the security in the parking lot was inadequate?

A.    I'm always asked to evaluate, give my time, pay for my time, to evaluate what security is, not for an opinion, but to evaluate and pay for my time. But for me to remember what my opinion was that long ago now would be a gross misrepresentation of fair testimony.

         I think you're going to find that true on just about every one of these you ask me about. I don't walk around with what I testified about in my head. Some of them, like the wet T-shirt contest, do stand out.

Q.    How about looking at 7521?

A.    Closed.

Q.    Do you remember --

A.    West Virginia.

**V** **VARALLO Incorporated**

1              Ira S. Somerson, CPP

2    Q.    -- the nature of the case?

3    A.    Getting there.  Oh, yeah.  John Nixon versus

4    Flying J.  The name rings a bell.

5    Q.    I assume it involves a truck stop?

6    A.    Yeah.  I was deposed on 2/16/95.  You wanted

7    that date.

8    Q.    Okay.

9    A.    It was a truck stop.  It was a robbery.  It

10   was assault and there was oil sold there.  It was a

11   retail establishment on the property and a service

12   station.  It was a typical service/truck stop.

13   Q.    Do you remember what the substance of your

14   testimony was?

15   A.    No.  And I represented --

16   Q.    Defendant?

17   A.    Defendant.

18   Q.    Let's go to 7519, another West Virginia case.

19   A.    Number again?  I beg your pardon.

20   Q.    7519.

21   A.    Tom Wilson.  Nice guy.  That's why I

22   remember.

23              It's closed.

24   Q.    Do you remember what the case was about or do

25   you have any information?

**V A R A L L O Incorporated**

54

Ira S. Somerson, CPP

1

2   A.   It's coming.

3   Q.   Okay.

4   A.   It's funny what you do remember.

5           It was in West Virginia.  Oh, I do very

6   well remember this one.  I represented plaintiff

7   against a guy named Skidmore, who owned truck stops

8   and convenience stores along the highway.  And he

9   had a woman working for him named Thelma Leigh

10  Blake, who was very nice too, and she was horribly

11  assaulted.  She was stabbed and left for dead with a

12  knife.

13          It was at a truck stop.  She also had to

14  take care of the laundromat, and there was a

15  robbery.

16          And I didn't think I gave you the date.

17  The date of the trial was 7/26/95.  There was also a

18  deposition of 1/6/95.  It's one of my more memorable

19  cases, as a matter of fact.  Horrible case.

20  Q.   And do you remember what opinion you gave or

21  rendered?

22  A.   Mr. Skidmore was grossly negligent, although

23  I didn't use the word "grossly," because I consider

24  that to be a legal conclusion.  I think I said

25  reprehensibly.

 **V A R A L L O  Incorporated**

```
 1                 Ira S. Somerson, CPP
 2     Q.    And how was he reprehensibly negligent?
 3     A.    Well, he just cut short all security measures
 4   and exposed the people who worked for him to high
 5   levels of risk, without any regard to their own
 6   personal safety, after repeated and persistent
 7   attacks on the property.  That one went all the way
 8   up to Supreme Court in the state.
 9               Mr. Skidmore was very politically
10   influential at the county level.  We had to get
11   around that.
12     Q.    Let's go to 7740, Estate of Donovan Blanding
13   versus Fleet Bank, N.A.
14     A.    Oh, I remember this case very well.  It's
15   closed.  It was a bank in Newark, New Jersey, Estate
16   of Donovan Blanding versus Fleet Bank.  I
17   represented Mr. Blanding.  When I say "I," my client
18   did.
19     Q.    Sure.
20     A.    I was deposed on 4/25/01.  And it was a
21   homicide, a man who pulled up to an ATM alongside of
22   the bank and was shot to death in a robbery.
23   Horrible death.
24     Q.    And do you remember what the substance of
25   your testimony was?
```

**VARALLO Incorporated**

56

Ira S. Somerson, CPP

1

2    A.    In that particular case, I do.   Bad lighting,

3  bad location of the ATM.    It should have been -- all

4  of the stereotypical complaints that one would have

5  of a poorly designed ATM.   But specific to the point

6  of giving you detail, no.   I'd have to get the file.

7    Q.    Okay.   So the location of the ATM machine

8  was --

9    A.    It isolated it from public surveillance.    It

10  kept it from police surveillance.   It kept it from

11  proper lighting exposure, made it easy for the

12  criminal actor to lay and wait for his target of

13  opportunity, et cetera, et cetera.

14             It was just a very poorly designed ATM

15  drive-up, especially when they had two excellent

16  ones on the other side of the building, which they

17  could have left open and shut that one down at

18  night.

19             As you can see, I remember that case

20  considerably more.   Pretty nasty crime.

21    Q.    Let's talk about one in Florida, 7364.

22    A.    Number?

23    Q.    7364.

24    A.    Closed.   Jack Vital, in the State of Florida.

25  I was deposed on June 29, 1990.   I went to trial on

**VARALLO Incorporated**

Ira S. Somerson, CPP

2  that on July 30, 1990.

3       I remember the case because it was a

4  very unusual one where some fans that were alongside

5  the track were slaughtered when a car went off the

6  raceway and ran over the fans.

7    Q.   And what area of your expertise did you

8  use --

9    A.   You're missing a point.  All security

10 management is the same.

11   Q.   Okay.

12   A.   What our job is to do is to look at a

13 facility and say, within a reasonable degree of

14 certainty -- and if we can't, then bring in other

15 expertise -- what could happen here, what are they

16 doing to prevent what could happen here, assess it

17 for its -- and then what do they need to do to

18 prevent the more foreseeable risks from occurring,

19 both to deter it, to detect it, to deny it, respond

20 to it and recover from it.  And all security

21 management is that, no matter what kind of property,

22 including hospitals.

23   Q.   So in that case, you gave testimony that the

24 speedway positioning of the crowd was a risk?

25   A.   Well, the crowd wasn't allowed to be there,

 VARALLO Incorporated

Ira S. Somerson, CPP

1

2 number one.  Number two, vehicles had already gone

3 off at that point previously.  Number three, there

4 were not adequate barriers to keep vehicles from

5 going into their -- and all of this was determined

6 as part of the discovery and evaluation.

7 It's unfair to say that all of these

8 things occur only because of economic consequences.

9 That's not true.  Very often it's just the wrong

10 people are retained to analyze risk and give their

11 advice to their client.  Many very fine people might

12 spend the money if they knew what the risks were.

13    Q.    In your CV it has an award, the Paul Hanson

14 Distinguished Service Award.  What's that?

15    A.    I can blown my horn, if you want an answer.

16    Q.    Go ahead, blow it.

17    A.    That has been awarded seven times in the 21st

18 Century.  It's Mike Pulitzer, giving people who have

19 significantly made a contribution to their industry.

20 And I was awarded that at an international symposia

21 in Washington in the Senate dining room.

22 It's upstairs on the wall, if you want

23 to see it.  It's something I'm extremely proud of.

24 I think it's because I gave enough money.

25    Q.    Well, how much did you give?

**VARALLO Incorporated**

Ira S. Somerson, CPP

1

2    A.    Oh, I don't know.  You know, your time and

3    your participation and your travel and your

4    volunteer services add up to dollars.  And wherever

5    they found me, you know, I was wherever they wanted.

6    I was around a lot.  And I do, I love volunteer

7    work.

8                MR. PENNINGTON:  Just keep in mind any

9    glib or facetious statement is going to be viewed

10   differently on the --

11               THE WITNESS:  I don't believe I've been

12   too glib.

13               MR. PENNINGTON:  No.  I mean -- .

14               THE WITNESS:  I just feel that --

15               MR. PENNINGTON:  It's an honor bestowed

16   upon you.

17               THE WITNESS:  It was a significant

18   honor, which I'm very proud of.  But people with

19   certain kinds of egos, I think, take them too

20   seriously.  We have to remember, we're honored at

21   these events and they're always fundraisers, so we

22   have to measure our own ego to the purpose.

23               So I'm very proud of it, that they chose

24   me instead of somebody else.

25               Is that correctly worded?

 **VARALLO Incorporated**

```
1                    Ira S. Somerson, CPP

2                    MR. PENNINGTON:  Just answer his

3     question.  That's all you need to do.

4                    THE WITNESS:  Okay, Steve.  I get

5     embarrassed.

6                    MR. YANINEK:  I'll mark this as 3.

7                    (Exhibit Somerson-3 marked for

8     identification.)

9                    THE WITNESS:  Can I get out of my

10    database?

11                   MR. YANINEK:  Sure.

12                   MR. PENNINGTON:  I think, if we can

13    agree, for the purposes of your report, let's just

14    stick to the exhibit.  It's just going to make it

15    easier.  So if he wants to refer to something in the

16    exhibit, you can just look at it.  Okay, Ira?

17                   THE WITNESS:  Mm-hmm.  I can just shut

18    it down then and look at the exhibit.

19    BY MR. YANINEK:

20    Q.   If you think you might need to keep it on --

21    A.   No.  I think it will be more efficient if I

22    just look here with you.  I really do.

23    Q.   All right.

24    A.   Good advice.

25                   MR. PENNINGTON:  Take a break for just a
```

 **V A R A L L O  Incorporated**

                    Ira S. Somerson, CPP

 1

 2  minute while he does that.

 3              MR. YANINEK:   Okay.

 4              (Short recess.)

 5  BY MR. YANINEK:

 6    Q.   Mr. Somerson, I have before you what's marked

 7  Somerson Exhibit No. 3.  Have you seen that document

 8  before?

 9    A.   Yes.

10    Q.   Is that your report in this case?

11    A.   Yes.

12    Q.   It's dated October 29, 2002.  On the first

13  page of the report, it's addressed to Mr. Williams.

14  It says Preliminary Report.  Do you see that?

15    A.   Yes.

16    Q.   Have you provided Mr. Williams with any other

17  reports other than the one before you marked

18  Exhibit-3?

19    A.   No.

20    Q.   So before October 29, 2002, did you ever send

21  him a draft to review before this report was finally

22  published?

23    A.   No.

24    Q.   Other than what I'll mark --

25              MR. YANINEK:   Mark this as 4.

 **VARALLO Incorporated**

```
 1              Ira S. Somerson, CPP

 2              (Exhibit Somerson-4 marked for

 3     identification.)

 4     BY MR. YANINEK:

 5       Q.    Other than what I've marked as Somerson-4,

 6     are those the only two documents that you ever sent

 7     to Gerald J. Williams or his law firm?

 8       A.    Yes.

 9       Q.    Can you explain to me how you put together

10     that report?

11       A.    Which one?

12       Q.    The Exhibit-3.

13       A.    Exhibit-3 is very much the way I would do an

14     analysis for a client if I were a consultant.  I

15     look at what I know to be the risks based on the

16     materials that I reviewed, what I know the inherent

17     risks of the industry are, what I know the security

18     strategies to be at the facility, and I then render

19     an opinion based upon my analysis of these data.

20       Q.    Before you rendered your opinion, did you

21     have any preliminary discussions about your opinion

22     with either Mr. Pennington or Mr. Williams or anyone

23     else from the Williams Cuker & Berezofsky --

24              MR. PENNINGTON:  Berezofsky.

25     BY MR. YANINEK:
```

 **VARALLO Incorporated**

Ira S. Somerson, CPP

1

2  Q.    -- law firm?

3  A.    Well, that is my practice when I'm retained.

4  I will often send what I'll call an issues outline

5  to a client to assist them in doing discovery and

6  investigation so that I can get an informational

7  flow that will assist me with my report.

8          It is not an opinion.  It is not

9  constructed to be an opinion, but merely an assist

10 for them so that they can get the kind of discovery

11 investigation I want.  That's what the September 9th

12 document is of 2002.

13 Q.    Other than the September 9th document and

14 October 29th document, what other communications did

15 you have with anyone from Mr. Williams' law firm?

16 A.    None, other than billing or correspondence.

17          MR. PENNINGTON:  The initial telephone

18 call.

19          THE WITNESS:  Yeah; other than routine

20 business communication.  Nothing concerning

21 opinions.

22 BY MR. YANINEK:

23 Q.    Did you have any telephone conversations --

24 A.    I do not log my telephone conversations, so I

25 can't answer you in any candor.  Any communication

64

```
1                  Ira S. Somerson, CPP
2   that I have is in that file and it would be in
3   writing.  I do not log phone calls.  I'm a
4   corporation of one person.  I just don't have the
5   resources.
6     Q.    Let me show you a letter.  I'm going to mark
7   a letter from Mr. Williams dated October 10, 2002.
8              MR. YANINEK:  I want to mark this as
9   Somerson-5.
10             (Exhibit Somerson-5 marked for
11  identification.)
12  BY MR. YANINEK:
13    Q.    Mr. Somerson, is that a letter that you
14  received from Mr. Williams in this case?
15    A.    Yeah.  I remember this letter.
16    Q.    Is that a letter you received from
17  Mr. Williams?
18    A.    Yes.
19    Q.    At the end of the letter, he requests you to
20  call him relative to the letter.  Do you see that?
21    A.    Yes.
22    Q.    And did you call him?
23    A.    I don't know.  I really do not know.
24    Q.    Is it your standard procedure in your
25  business if a client asks you to call him, to do
```

Ⓜ  V A R A L L O  Incorporated

1                    Ira S. Somerson, CPP

2   what the client asks?

3                    MR. PENNINGTON:  Objection.

4                    THE WITNESS:  The answer is no.  Clients

5   very often render advice or send me facts which puts

6   me in the middle and which I don't necessarily

7   respond to or which I've already considered or I

8   don't find necessary to or I happen to be in the

9   State of Colorado when this comes in and I don't

10  have a chance to talk to them about it.  Too many

11  intervening events occur.

12                   But my reports are, essentially, made up

13  of my own independent analysis, period.  But I do

14  remember reading this.

15  BY MR. YANINEK:

16    Q.   But you don't remember if you ever complied

17  with the request of Mr. Williams?

18    A.   If I would have relied upon it, it would have

19  been used in my report of October 29th.

20                   MR. YANINEK:  I'd like to mark this as

21  6.

22                   (Exhibit Somerson-6 marked for

23  identification.)

24  BY MR. YANINEK:

25    Q.   Mr. Somerson, I'm marking Somerson-6 --

**M   V A R A L L O  Incorporated**

Ira S. Somerson, CPP

1

2          MR. PENNINGTON:  Let me see it, please.

3   BY MR. YANINEK:

4     Q.    Is that a letter you received from

5   Mr. Williams in this case?

6     A.    You know, I just about read this one, because

7   I sort of ignored it.  I really don't remember it.

8   It's not anything that I referred to or relied upon.

9     Q.    Well, I'm asking if you received it.

10          MR. PENNINGTON:  It was in the letter

11  that you produced to me, so --

12          THE WITNESS:  Yes.

13          MR. PENNINGTON:  -- we can stipulate to

14  the fact that you received it.

15          THE WITNESS:  If it was in my file

16  folder, then I received it.

17  BY MR. YANINEK:

18    Q.    That's all I'm asking.

19    A.    Forgive me.

20    Q.    Simple question, I thought.

21    A.    Excuse me.  I misunderstood.

22    Q.    So based on the date of this letter, I would

23  assume that you had some type of a communication

24  with Mr. Williams prior to August 28th, 2002?

25    A.    Prior to August?

**VARALLO Incorporated**

Ira S. Somerson, CPP

1

2    Q.    28th, 2002, the date of this letter.

3    A.    Well, I wasn't retained until September 3rd.

4    So I'm not quite sure how that fits.

5    Q.    Okay.

6    A.    He might have been just sending me

7    information before he made the decision to retain

8    me.

9    Q.    Well, my question was not when you were

10    retained, but did you have communications with

11    Mr. Williams prior to August 28, 2002?

12    A.    All I can tell you is that according to this,

13    I was sent a check on August 26th, which I received

14    on September 3rd, and this was the covering letter

15    to that retainer check.  That's all I can factually

16    tell you.

17    Q.    So you don't know if you had a communication

18    via phone, personal meeting with Mr. Williams prior

19    to August 26, 2002?

20    A.    I do not recollect that.

21    Q.    Would there be anyone else that would take

22    such a call in your business for you?

23    A.    I'm a one-man corporation.

24    Q.    According to your report, you reviewed 11

25    items, correct?

68

Ira S. Somerson, CPP

1
2   A.    Yes.

3   Q.    Those are the only 11 items that you have

4   knowledge of related to this case?

5   A.    Prior to the report being written.

6   Q.    Subsequent to the report, you received the

7   deposition transcript, I believe --

8   A.    Of a woman named -- can you help me out with

9   her name?

10  Q.    Candice Highfield, I think?

11          MR. PENNINGTON:  No; Carol Joerger.

12          MR. YANINEK:  Carol Joerger.

13          THE WITNESS:  And the report of --

14          MR. PENNINGTON:  Rolle's report.

15          THE WITNESS:  -- the plaintiff expert.

16  BY MR. YANINEK:

17  Q.    Right.

18          Did Mr. Williams tell you there was

19  other information related to this case exchanged

20  through discovery?

21  A.    I reviewed this information I've disclosed

22  only to prepare my report.  I am unaware of any

23  other discovery.

24  Q.    That's not my question.  My question was, did

25  Mr. Williams make you aware that there was other

**VARALLO** Incorporated

Ira S. Somerson, CPP

1  information available that was obtained through

2  discovery?

3     A.   No.

4     Q.   Is it fair to say, then, he selected the

5  items that were sent to you to review?

6     A.   I don't know, because I sent him an issues

7  outline and presumed he was being responsive to it.

8     Q.   Were you aware that the parents of Mr. Schorr

9  were deposed?

10    A.   No.

11    Q.   Were you aware that Mr. Schorr's roommate at

12 the time was deposed?

13    A.   No.

14    Q.   Were you aware that the police officers

15 involved in the shooting were deposed?

16    A.   I did receive some information from the

17 police officers, but I don't recall what it is,

18 sitting here now.

19    Q.   But you didn't review their transcripts?

20    A.   No.

21           MR. PENNINGTON:  Well, I think you have

22 to refer him to the documents he had.

23           THE WITNESS:  Yes.  That's what I'm

24 looking at right now.  It's very hard to make

1                    Ira S. Somerson, CPP

2    that -- that's why I need this.

3    BY MR. YANINEK:

4      Q.    Well, I'm just trying to make sure what --

5                    MR. PENNINGTON:  Well, he is.  Gary

6    Berresford and Harry Hart are on here.  You know,

7    why don't ask him to review it.

8                    MR. YANINEK:  All right.

9                    THE WITNESS:  Berresford is on here,

10   Dougherty is on here.

11   BY MR. YANINEK:

12     Q.    When you're reviewing a case, is it important

13   to have all the information that's available through

14   discovery?

15     A.    No.

16     Q.    Why not?

17     A.    It depends on what my objective is.  If I'm

18   evaluating the security of a hospital, if I'm

19   evaluating the security program, then I would have

20   little information for the damages or the facts

21   involving plaintiff's well-being unless it pertained

22   to the security program.  All the information in the

23   file is not always relevant to my analysis.

24     Q.    Do you agree that there could be a number of

25   causes to an incident?

                    V A R A L L O  Incorporated

1                    Ira S. Somerson, CPP

2      A.    Yes.

3      Q.    So wouldn't it be important to know all the

4  information that could relate to each specific cause

5  for why the incident occurred?

6      A.    Could be, but not in this case.

7      Q.    Why not?

8      A.    This case was very clear-cut.  The elopement

9  took place on a very clear set of circumstances that

10 were known to the hospital, and I don't think a

11 deeper understanding of the family or of the

12 plaintiff would have changed my opinion about the

13 security program at the hospital.

14     Q.    And in this case, you're retained by the

15 plaintiffs' counsel.  Do you believe it would be

16 important to know if the plaintiff, the decedent in

17 this case, was at all at fault for the incident?

18     A.    My instructions were to evaluate the security

19 program of the hospital.  I did not think I was

20 qualified medically to evaluate the plaintiff.

21     Q.    Have you evaluated cases where individuals

22 have had problems, psychiatric problems, resulting

23 in their injury?

24     A.    No.

25     Q.    So is this the first case you've ever

 **V A R A L L O  Incorporated**

                    Ira S. Somerson, CPP

1

2  evaluated that someone had a psychiatric --

3     A.    I evaluate security at facilities.  I do not

4  evaluate psychiatric catalysts to an incident.  It's

5  beyond my expertise.

6     Q.    Is this the first case that you've ever

7  evaluated that involved an individual that had

8  bipolar disorder?

9     A.    No.

10    Q.    What other cases have you had?

11    A.    I don't remember, but plenty.

12    Q.    Okay.  None in the last four years?

13    A.    I don't remember.

14    Q.    You said "plenty."  But none in the last four

15 years that you could recall?

16    A.    I don't recall when, under what circumstances

17 and how many of them were literally bipolar.  That

18 is a psychiatric prognosis, and I can't offer you

19 whether they were or weren't.  I know what bipolar

20 is meant, but I'm not qualified to --

21    Q.    I'm not asking you to make the diagnosis.

22 I'm asking you, did you have involvement in a case

23 or cases within the last four years that involved an

24 individual who had a bipolar disorder?

25    A.    Based on that specific request, I'd have to

                  Ⓥ   VARALLO Incorporated

Ira S. Somerson, CPP

1     say I don't know, because I don't know at what time

2     I'm looking at a bipolar condition and whether or

3     not the circumstances surrounding the cause of the

4     incident was as a result of a bipolar disorder.

    Q.    All right. I'll be more specific.

          In the last four years, have you

evaluated a case where the plaintiff was alleged to

have had a bipolar disorder?

    A.    I don't remember.

    Q.    In the entire breadth of your work as an

expert, other than the case in question, do you

remember a case where you evaluated it on behalf of

the plaintiff where the plaintiff had or was alleged

to have been diagnosed what bipolar disorder?

    A.    The only thing I can say is that I've been

involved in cases where plaintiffs have alleged to

have had psychiatric or psychological disorders. It

was never my expertise, nor my purpose, to identify

them or analyze them. So I can't sit here today and

tell you whether they were or were not bipolar

disorders.

    Q.    Did you ever have any cases involved with

involuntary commitments, other than the case at

hand?

1                      Ira S. Somerson, CPP

2      A.    Yes.

3      Q.    Within the last four years?

4      A.    Yes.

5      Q.    Can you tell me what the name of the case is?

6      A.    No, but I know it was a hospital in

7    Philadelphia.  And I know that case is still open,

8    so I'm going to have to get clearance before I give

9    it to you.  Very interesting case.

10     Q.    Was it one that you've listed here in the

11   depositions and trials since 1989?

12     A.    I'm not even sure whether I testified on the

13   case, but it involved death by asphyxiation to

14   somebody who was under the influence of cocaine and

15   was being retained and restrained by the hospital in

16   a secure room.

17     Q.    Okay.  Was this for -- not a hospital issue,

18   but was this person brought to the hospital on an

19   involuntary 302 warrant?

20     A.    I don't know if it was a 302, but, yes, he

21   was brought in involuntarily.

22     Q.    So as we sit here today, you cannot tell me

23   if this case involved the delivery of a patient to a

24   hospital related to a potentially involuntary

25   commitment under 302?

                      Ⓥ   V A R A L L O  Incorporated

Ira S. Somerson, CPP

1

2    A.    How they're involuntarily committed is not my

3    issue.   My issue is how they're secured once they

4    get there.

5    Q.    So for the purpose of your evaluation, you

6    don't consider the regulations that a hospital has

7    to comply with when treating a patient under 302?

8    A.    There are regulations that go beyond what a

9    302 asks for and which I am personally giving advice

10   over.   There's more to security than what a 302 asks

11   for.   There's more than what a joint accreditation

12   program asks for.

13          My job is to assess risk and to develop

14   a program that protects people, assets.   And I

15   don't -- there is no one hospital, there is no one

16   security program that fits all.   So you have to take

17   each one on an individual basis.

18   Q.    Do you know the standard that a hospital must

19   abide by when involuntarily holding a patient in

20   their facility?

21   A.    That's only a mandatory minimum standard.

22   That doesn't mean they're not morally obligated to

23   do more.

24   Q.    Well, what, in your mind, is the mandatory

25   minimum standard that a hospital must use when

VARALLO Incorporated

```
1              Ira S. Somerson, CPP
2   detaining an involuntary patient?
3     A.   We answered that much earlier when we said it
4   depends on the risk assessment, it depends on the
5   circumstances, it depends on the inherent risk, it
6   depends on the facility, where it's located, a great
7   many variables that mandate how a hospital should
8   view its risks and go beyond this minimum standard.
9              As an example, would you like to live in
10  a building that only had pull stations?  Because
11  that was the township's minimum standard for fire
12  alarms.  Wouldn't you like to have had smoke
13  detectors in the basement and sprinklers and other
14  things even though they were not mandatory issues?
15             So we go beyond what are mandatory --
16  what are minimum and go to what we feel are
17  legitimate defensive strategies based on risks that
18  are identified.
19    Q.   Do you know the minimum standard then that
20  the hospital must provide when being involved with
21  an involuntary patient?
22             MR. PENNINGTON:  I'm going to object,
23  because there's medical standards, there's
24  psychiatric standards.  I think you got to be very
25  specific as to what standard you're talking about.
```

**V A R A L L O Incorporated**

```
1                  Ira S. Somerson, CPP
2            MR. YANINEK:  Okay.
3            MR. PENNINGTON:  If you're talking about
4  a security standard --
5            MR. YANINEK:  I'll rephrase the
6  question.  I'll rephrase the question.
7  BY MR. YANINEK:
8     Q.   Mr. Somerson, do you know the minimum
9  standard at which a hospital must adhere to when
10 detaining an individual subject to a 302 commitment?
11    A.   Well, it varies, but essentially, yes.
12    Q.   Well, please tell me what you know.
13    A.   Well, it depends on whether or not they have
14 security officers, whether they're using their own
15 in-house people.
16            There are certain procedures that
17 they're supposed to follow.  There are certain
18 screening that they're supposed to follow in
19 reviewing the people who they're bringing in to
20 ascertain what their conditions are, and they're
21 supposed to be under observation, so -- and to
22 inhibit elopement from occurring.  And those are
23 acceptable in different variables.  There's no one
24 fixed set standard.
25    Q.   So the laws and regulations of the
```

  **VARALLO Incorporated**

Ira S. Somerson, CPP

1

2  Commonwealth and the Federal regulations related to

3  patient care are inapplicable to detention of a 302

4  patient?

5    A.   No.  I said they're nebulous.

6    Q.   Well, I want to know what you know.

7    A.   I just answered you.  I don't know more than

8  that.  I'd have to -- I didn't expect to have to

9  study the 302 regs to be here today.

10   Q.   Well, is it important that you know what a

11 hospital is required to provide a patient who is

12 involuntarily brought to their facility?

13   A.   Yes, I do know, but you don't like my answer.

14   Q.   Well, I want to --

15   A.   I think they have to go well beyond 302.

16 They have to go well beyond the Joint Accreditation,

17 and they have to take it as a very serious risk to

18 the community, to the patient, to the people who

19 work in the hospital.  And I believe the minimum

20 standards do not accommodate that.

21   Q.   What are the minimum standards as prescribed?

22   A.   I think that depends on whether you're

23 talking Joint Accreditation or whether you're

24 talking 302.

25   Q.   Well, what does 302 minimum standards

**V A R A L L O  Incorporated**

1                    Ira S. Somerson, CPP

2    require?

3    A.    302 says that they're under supervision.    302

4    says they go through a specific screening.    I don't

5    have it memorized.    302 says that they're basically

6    controlled while they're in the environment.    And I

7    think it differs depending on the kind of

8    institution.

9                    Joint Accreditation doesn't require it

10   to be a security officer.    They'll accredit a

11   hospital that doesn't even have security officers

12   but have other trained personnel.

13                    So I'm saying it's very nebulous, it's

14   very loose, and it's set up, essentially, to

15   accommodate the healthcare industry.

16   Q.    So as far as this case is concerned and as

17   far as what you reviewed, have you found any

18   violation of any law or regulation on the part of

19   Holy Spirit Hospital in dealing with Ryan Schorr on

20   November 18, 2000?

21   A.    What I found was a total violation of

22   standard security industry practices or standard of

23   care.    I did not find violation of law because I

24   don't think the law would have even, if it was fully

25   in effect, have prevented what occurred, because it

 **VARALLO Incorporated**

```
 1              ·    Ira S. Somerson, CPP
 2   was inadequate to have done so.
 3     Q.   Okay.  So are you agreeing, then, that Holy
 4   Spirit Hospital did not violate any law or
 5   regulation in relation to the care provided to Ryan
 6   Schorr on November 18, 2000?
 7              MR. PENNINGTON:  I'm going to have to
 8   object to that.
 9              THE WITNESS:  Do I answer?
10              MR. YANINEK:  It's opinion.
11              MR. PENNINGTON:  Any law or regulation.
12   I mean, you have to be a little bit more specific
13   than that.  I mean, even your guy doesn't cite any
14   law or regulation.  He cites an accreditation thing.
15              But, I mean, you're asking him to answer
16   a question where you failed to lay any foundation.
17   You got a specific law, show it to him, or
18   regulation.
19              MR. YANINEK:  He's the expert.  He's the
20   one that's supposed to define the standard of care.
21              MR. PENNINGTON:  I mean, he's an expert
22   on security.  He's not an expert on anything other
23   than that.
24              MR. YANINEK:  Well, then I'll ask him in
25   the context of security and his opinion.
```

**VARALLO Incorporated**

1                    Ira S. Somerson, CPP

2                    MR. PENNINGTON:  Okay.

3    BY MR. YANINEK:

4        Q.    Mr. Somerson, relative to security, did you

5    find that Holy Spirit Hospital violated any law or

6    regulation related to Ryan Schorr on November 18,

7    2002?

8        A.    No.

9                    MR. HAUCK:  I think you meant to say

10   2000.

11   BY MR. YANINEK:

12       Q.    On 2000, I mean.  The answer is still the

13   same?

14       A.    Yeah.

15       Q.    Did Holy Spirit Hospital violate any

16   published standard related to security in relation

17   to the treatment of Ryan Schorr?

18       A.    Standard security practices, not standard or

19   standards of care, yes.

20       Q.    Okay.  Did Holy Spirit violate any written

21   standard related to the security in its treatment of

22   Ryan Schorr on November 18th, 2000?

23       A.    This question cannot be answered with a yes

24   or a no.  May I make a not yes or no answer?  You

25   tell me.

VARALLO Incorporated

Ira S. Somerson, CPP

1
2  Q.    Well, is there a written standard that you
3  found that they violated?
4  A.    There is no written standards in the security
5  industry --
6  Q.    Okay.
7  A.    -- that deal with the security of any
8  building unless it deals with highly technical
9  standards, like thickness of metal, thickness of
10 doors.  There are no written standards,
11 quote/unquote, for how much security is, quote,
12 enough, end quote.
13 Q.    Okay.  So how much security is required is
14 subject to interpretation?
15 A.    It's subject to an adequate analysis of the
16 risk and a reasonably-minded response to trying to
17 prevent it by detection, by deterrence, by denial.
18 Q.    Your interpretation might be different than
19 someone else's interpretation of what those risks
20 and --
21 A.    Standard security practices have evolved over
22 a long period of time, and if I were to bring in --
23 we have roughly about 80 members of the
24 International Association of Professional Security
25 Consultants.  And if I were to list for them the

**VARALLO Incorporated**

```
 1                   Ira S. Somerson, CPP
 2   risks that existed at the hospital, I believe you
 3   would have had an 80 percent acceptance of the
 4   recommendations we would have given.  That's
 5   called -- you can't get the same answer from a
 6   doctor when you go in to get an examination, but
 7   it's still a standard of care when a doctor tells
 8   you to take this medicine.
 9            So that's what we're working under, the
10   same scientific analysis and conclusions.
11     Q.   Did you read Mr. Rolle's opinions?
12     A.   Yes.
13     Q.   Would it be fair to say that he disagrees
14   with some of your propositions?
15     A.   No, he doesn't disagree.  He relies entirely
16   on the Joint Accreditation program, which, in my
17   opinion, is a very minimum standard and a very weak
18   standard in response to inherent risks of security
19   at hospitals, especially emergency environments.
20     Q.   Okay.  Did you find that Holy Spirit Hospital
21   breached any standards that the Joint Commission of
22   Accreditation for hospitals have in relation to Ryan
23   Schorr's treatment back in November 18th of 2000?
24     A.   Since on the security level I do not consider
25   the Joint Accreditation's standards or standard
```

**V A R A L L O  Incorporated**

84

```
 1              Ira S. Somerson, CPP
 2  practices to be anywhere nearly adequate in the
 3  circumstances surrounding this case, I would have a
 4  very difficult time agreeing with Mr. Rolle or
 5  agreeing with their conclusions.  He just simply did
 6  not use a process to identify risk.
 7      Q.   Although you disagree with their standard, is
 8  it true that, based on your evaluation, Holy Spirit
 9  Hospital met that standard --
10      A.   No.
11      Q.   -- back in November?
12              Okay.  How did they not meet that
13  standard, then?
14      A.   By not knowing the risks.
15      Q.   Mr. Rolle, you cited in your report --
16      A.   I'm Somerson.
17      Q.   I'm sorry.  Mr. Somerson, excuse me, you
18  recited in your report instances of other elopements
19  at the hospital?
20      A.   Yes.
21      Q.   Some of them being in the emergency room and
22  some of them being psychiatric inpatients?
23      A.   Correct.
24      Q.   How is an elopement by a psychiatric
25  inpatient similar to an emergency room elopement?
```

VARALLO Incorporated

```
 1                  Ira S. Somerson, CPP

 2      A.    Essentially, it identifies that there is a

 3   physiology or a psychology that allows people who

 4   are involuntarily restrained to think that they can

 5   elope, that there is not a sufficient methodology,

 6   either physical or psychological or procedural, in

 7   place to deter the elopement from occurring.

 8      Q.    So in your mind, elopements should be totally

 9   eliminated?

10      A.    Should be mitigated considerably more so.   I

11   mean, nothing, nothing is guaranteed.

12              In my younger life, I protected

13   dignitaries, and always knew that in spite of my

14   best efforts, we would lose a dignitary every now

15   and then.

16              But the number and the persistence that

17   I see here on Pages 2 and 3 suggest a far greater

18   weakness.

19      Q.    You don't know what the conditions of these

20   psychiatric patients were that eloped, do you?

21      A.    No.   I would love to have that.   That's why I

22   call this a preliminary report.

23      Q.    You did evaluation of a number of hospitals?

24      A.    Yes.

25      Q.    Recently you said you did one of Temple?
```

1                 Ira S. Somerson, CPP

2    A.    Yes.

3    Q.    Do they have a psychiatric unit?

4    A.    Yes.

5    Q.    Were there elopements from that unit?

6    A.    I don't remember.

7    Q.    You did one of University of Pennsylvania

8  most recently?

9    A.    I don't remember.  And I might add, it would

10  be confidential and subject to a confidentiality

11  agreement.

12    Q.    Well, generally speaking, regarding the care

13  of individuals at a hospital, are you aware that

14  elopements do exist at hospitals?

15    A.    Sure.  It's an inherent risk.

16    Q.    Are you aware of the frequency of elopements

17  at a hospital?

18    A.    No.  I'd have to study each individual

19  institution on its own basis.

20    Q.    Did you study Holy Spirit Hospital?

21    A.    No.

22    Q.    Do you know how many patients Holy Spirit

23  Hospital holds?

24    A.    No.

25    Q.    Wouldn't that be important for you to know

Ira S. Somerson, CPP

1
2   related to the number of elopements they have?

3      A.   If this case moves forward, that's one of the

4   questions I would ask and follow up on, including a

5   greater detail on these elopements.

6      Q.   Well, you came up with an opinion already, I

7   assume?

8      A.   Yes.

9      Q.   And you stated in that opinion that there

10  were persistent prior elopements?

11     A.   Yes.

12     Q.   Well, in order to understand whether or not

13  there is an elopement problem, wouldn't you need to

14  know how many individuals or patients the hospital

15  services?

16     A.   Well, a lot of my papers have been pushed

17  around, but let me try and find something for you.

18  It's in my initial report.

19     Q.   You have your report in front of you.

20     A.   Yeah, but that's -- I wrote a comment on one

21  other copy of the report.  If I could see another

22  one of my reports that's on this table, it would be

23  very helpful.  I have a handwritten note earlier

24  today on one of them.

25              THE WITNESS:  Do you have one?

 **V A R A L L O** Incorporated

```
 1                  Ira S. Somerson, CPP
 2              MR. PENNINGTON:  No, not other than you
 3     sent to me.  Why don't you just give him your best
 4     recollection.
 5              THE WITNESS:  The percentage of --
 6              MR. PENNINGTON:  Would it be on Rolle's
 7     here?
 8              MR. YANINEK:  No.  Don't give him
 9     Rolle's, because I'm asking him what he had or what
10     information he had prior to issuing an opinion.
11     BY MR. YANINEK:
12        Q.   That's the question I'm asking, sir.
13        A.   Okay.  But let's -- please.
14        Q.   No.  He's trying to give you the information.
15        A.   I'm not asking --
16              MR. PENNINGTON:  I'm not trying to do
17     that at all.  I resent that.  And if you want to get
18     mad, let me tell you something, we'll end right
19     here.  One thing we're not going to have is physical
20     intimidation.
21              You want to throw papers around and slap
22     him around, we're going to end it right now.  You
23     either act professionally or we end it right now.
24     You make the choice.  You want to be a tough guy?
25     Not with me.
```

VARALLO Incorporated

```
 1                  Ira S. Somerson, CPP
 2              THE WITNESS:  On one of these pieces of
 3    paper earlier today while waiting for everybody --
 4              MR. PENNINGTON:  He has a right to
 5    anything that he's looking for.
 6    BY MR. YANINEK:
 7      Q.   Can you answer my question without looking at
 8    Mr. Rolle's report?
 9      A.   The answer is that on one of my reports
10    today, while studying it before you arrived, I wrote
11    down the increase in elopements by a percentage and
12    showed that it was a growing problem versus a static
13    problem.  And it was just a small group of numbers.
14    And it wasn't on my Curriculum Vitae.  It was on one
15    of the pieces of paper that I reviewed.  It's on one
16    of the pieces of paper on this table.
17              That's it.  That's the whole issue here.
18      Q.   Okay.  I want to take Mr. Rolle's report
19    aside, because I believe that information is located
20    in the report.  I want to give you time to look
21    through --
22              MR. PENNINGTON:  No.  This is mine.  I'm
23    going to keep it right here, because this is what he
24    looked at.  You don't grab documents from me and
25    tell him you're going to set them aside.
```

 **V A R A L L O  Incorporated**

Ira S. Somerson, CPP

I am not going to show those documents
to him, and I resent any implication that I'm trying
to provide him with information.

MR. YANINEK:  I want to know an
answer --

MR. PENNINGTON:  If you think I've
committed an ethical violation, put it on the
record.

MR. YANINEK:  No.  I'm trying to find
out an answer to my question, whether or not he knew
how many patients there were in Holy Spirit Hospital
or the capacity for patients in the year 2000.

THE WITNESS:  I answered that.  I said I
didn't know.

BY MR. YANINEK:

Q.    Okay.  Did you know how many psychiatric
patients they dealt with on a yearly basis around
2000?

A.    No.

Q.    Did you know how many patients they had at
the emergency room before you authored your
report --

A.    No.

Q.    -- in a yearly basis?

Ira S. Somerson, CPP

1

2  A.   No.

3  Q.   Prior to rendering your report, wouldn't that

4  information have been helpful to know, how

5  persistent, quote/unquote, the elopements were at

6  Holy Spirit Hospital?

7  A.   I considered the information that I had

8  sufficient to prepare the preliminary report that I

9  rendered.  I would always like to have more

10  information, and I would be happy to do a supplement

11  report at anyone's request.

12  Q.   Okay.  I'm going to refer you to Page 6 of 8

13  of your report.

14  A.   Yes, sir.

15  Q.   Under the Opinion section.

16  A.   Yes.

17  Q.   First bullet comment, "Defendants failed to

18  assess their foreseeable security risks arising from

19  the services they performed in relationship to

20  admitting 302 involuntary commitments, especially

21  with regard to the admission of plaintiff,

22  11/18/2000."

23       What were the foreseeable security risks

24  that they failed to assess?

25  A.   Well, I have to go through the entire risk

VARALLO Incorporated

```
1              Ira S. Somerson, CPP
2   assessment, but the inherent risks of the operation
3   they ran, the demographics of the community they
4   were in, their prior history, the lack of adequate
5   defensive strategies to have prevented elopements
6   from occurring, would be the four major.  There are
7   others.  I'm not trying to do an entire risk
8   assessment for you.
9      Q.   I understand.
10             The next bullet deals with, "Defendants'
11  persistent history at the subject location provided
12  defendants notice that their security program was
13  inadequate and needed to be upgraded so that it
14  could adequately deter, detect, deny, respond to
15  and/or recover from the security risks arising from
16  elopements from the emergency department and psych
17  unit."
18             When you give that opinion, is that
19  based solely on the elopements listed on Pages 2 and
20  3?
21     A.   Yes.
22     Q.   The next bullet, "The comments and behavior
23  of plaintiff, as observed and overheard and
24  subsequently described by defendants' nursing and
25  medical staff in Room 17 of the subject location,
```

VARALLO Incorporated

Ira S. Somerson, CPP

2  exhibited an obvious potential for plaintiff to

3  elope and/or be dangerous to himself and/or other

4  persons."

5     A.    Yes.

6     Q.    Specifically, what behavior do you point to

7  that he exhibited that would have made him an

8  elopement risk prior to the elopement?

9     A.    Are you finished?

10     Q.    Yes.

11     A.    His desire to be somewhere else in a hurry,

12  him having a major agenda elsewhere, his

13  hallucinating over his self-importance, his

14  harassability and his irritability I would say would

15  be my unprofessional -- now, you must understand

16  that I did take courses in crisis resolution and I

17  do have some modicum of understanding violence in

18  the workplace.  And if I was in that room, I would

19  consider him to have been a violent risk and an

20  elopement risk.

21     Q.    So do you consider the third bullet comment a

22  psychiatric or psychological opinion?

23     A.    No; a lay person's opinion, security

24  consultant's opinion.

25     Q.    Based on what expertise?

Ira S. Somerson, CPP

A.    Based on 40 years of violence in the
workplace experience, both for the government and
for major multi-national corporations, for prisons
and for other environments.  But as a security
consultant, not as a medical person.

Q.    I want to take you to Page 7 of 8.

A.    I'm there.

Q.    The second bullet comment under Opinion on
that page, it says, "On November 18, 2000, it was
apparent that defendants had failed to adequately
train and supervise their in-service medical,
nursing, medical support staff and security officer
in the appropriate manner of conducting involuntary
commitments."

A.    Yes.

Q.    What type of training should they have had,
in your opinion?

A.    Well, first of all, they should have never
let that officer leave the ER under any
circumstances.

Q.    That was a conduct.  That was something that
he did.  What type of training --

A.    That's indicative of poor training and poor
supervision.

 V A R A L L O  Incorporated

1                    Ira S. Somerson, CPP

2    so that they could have dealt with the response more

3    adequately.

4        Q.    What do you know specifically in the amount

5    of information that should have been provided?

6        A.    Mr. Schorr was a threat of violence.

7        Q.    Okay.  Weren't they already aware of that

8    from the 302 warrant itself?

9        A.    No.  There's a difference between a 302

10   warrant where someone asks somebody to be committed

11   involuntarily for the sake of evaluation and someone

12   who elopes and now exhibits signs of violent

13   behavior.  Those are two very different things.

14       Q.    Well, do you know the basis of why the

15   original warrant was issued?

16       A.    No, I don't, other than a relative asked for

17   it to occur.

18       Q.    So you don't have any knowledge that it was

19   related to violence or threat of violence?

20       A.    It was my understanding -- and I don't

21   remember exactly where I read it -- that somebody

22   was concerned that he was a threat to himself.

23       Q.    Well, how did that change from the fact that

24   he eloped?

25       A.    If I were the security officer who went in as

VARALLO Incorporated