Ira S. Somerson, CPP

1    a backup with the woman who was giving him his

2    rights and I saw and I had that information, I would

3    not have permitted those officers to respond to

4    Mr. Schorr's home without a full and complete

5    disclosure of what I had seen, for fear of their

6    own -- of themselves being exposed to violent risks.

7    Q.    Well, what specific information are you

8    stating that the hospital should have provided the

9    police in order to assist them?

10    A.    Well, I've already stated it.  I'd be at risk

11    at stating it a different way a second time.  So I

12    would like my testimony to stand as to why I, as a

13    lay person and as a security management consultant,

14    believe that he was potentially a violent person.  I

15    do not believe the police knew that when they left

16    the hospital the first time.

17    Q.    Well, what specific information should the

18    hospital have provided?

19    A.    Everything that transpired.  Literally

20    everything.  You're sending armed police officers

21    into a private home.

22    Q.    I forgot to ask you, Mr. Somerson, did you

23    send any e-mails to Mr. Williams or his firm

24    relative to this case?

M   V A R A L L O  Incorporated

1                Ira S. Somerson, CPP

2    A.   If I had, there would be copies of them in

3  the file.  I print every mail I produce.

4    Q.   Are you planning to prepare any exhibits for

5  your testimony in a trial in this case?

6    A.   Not unless requested to do so.  At this point

7  I know of nothing.

8    Q.   And you haven't prepared any, I assume?

9    A.   Not yet.

10    Q.   Your report doesn't reference what I would

11  call in legal terms causation?

12    A.   Proximate cause?

13    Q.   Yes.  Does it?

14    A.   Yes, it does.

15    Q.   Okay.  Can you tell me where?

16    A.   Bottom of Page 8, last paragraph, last

17  bulleted paragraph, last sentence.

18    Q.   Where it says, "Properly advised local police

19  could have" --

20    A.   "This failure was likely a

21  significant-producing cause of plaintiff's ultimate

22  loss of life."

23    Q.   So are you saying the failure from that

24  bullet comment or all of the aforementioned --

25    A.   Aforementioned.  If you look at Page 7 of 8,

**Ⓜ VARALLO Incorporated**

100

```
 1                 Ira S. Somerson, CPP
 2   I mention it again, last sentence.  First bullet,
 3   last sentence.
 4                 I was shocked when you said that,
 5   because I very often never fail to do that.
 6      Q.   All right.  But, specifically, those are the
 7   only two bullets where you state that the --
 8      A.   Yeah.  I'm not usually that obtusive about
 9   it.
10      Q.   When evaluating a significant-producing
11   cause, is it important to know other
12   significant-producing causes?
13                 MR. PENNINGTON:  If any.
14   BY MR. YANINEK:
15      Q.   If any exist.
16      A.   Well, that's the point, if any exist.  And I
17   didn't -- this is as far as I've gotten into the
18   case.  And I believe the ones that I've evaluated
19   are the producing causes, and I'm perfectly
20   comfortable with my opinion as written.
21      Q.   But in order to evaluate, I guess, how
22   significant a cause is in producing an incident, is
23   it important to know other potential causes?
24      A.   Well, that's a "what if," and I don't know
25   what the "what if" is, so it's hard to answer the
```

1     Ira S. Somerson, CPP

2 question.

3    My report stands.  If there are other

4 facts made available to me and you ask me are they

5 also probable causes, then I have to evaluate them

6 on other information.  But based on what I reviewed,

7 based on my report, I'm perfectly happy and content

8 with what I've written, and I stand behind it.

9  Q.   So I guess it's fair to say you didn't

10 evaluate Mr. Schorr's illegal drug use of ecstacy as

11 a potential cause for the event's occurrence?

12  A.   If it's not listed, then I didn't.

13  Q.   And you didn't evaluate his failure to take

14 his prescribed psychotropic medication as a

15 potential cause?

16  A.   If it's not discussed, then I didn't.

17    MR. PENNINGTON:  Can I just -- if you

18 want him to leave or we can go in the other room.

19 We're talking about why he eloped or the failure of

20 security?  I'm confused at this point.

21    MR. YANINEK:  I'm talking about the

22 causation of the incident.

23    MR. PENNINGTON:  Why he ran out of the

24 door?  Why he went -- Hightower, or whatever her

25 name is, came in and he ran out the door?

**V** **VARALLO** Incorporated

```
1                  Ira S. Somerson, CPP

2              THE WITNESS:  Highfield.

3              MR. PENNINGTON:  Is that what you're

4    talking about?

5              MR. YANINEK:  No.

6              Off the record.

7              (Discussion held off the record.)

8    BY MR. YANINEK:

9      Q.   Mr. Somerson, you have a rate, an hourly

10   rate, I guess, for work.  Deposition testimony, is

11   there a different rate for that?

12     A.   It's just a fixed rate.  It doesn't apply

13   against an hourly, because I have to expose an

14   entire day.  I don't know how long the deposition --

15   I can't plan anything else for the day and I have to

16   prepare for that deposition.  So I've established a

17   set rate that I charge for either trial or

18   deposition.  And the only other expense adding to

19   that would be any per diem expenses to get to where

20   it's at.

21     Q.   I paid you today a check, or yesterday

22   actually, check for $1600?

23     A.   Yes.  Thank you.

24     Q.   And that is your rate?

25     A.   For today.
```

**Ⅶ  VARALLO Incorporated**

Ira S. Somerson, CPP

    Q.    Your daily rate for either deposition or trial testimony?

    A.    As long as I don't have to travel somewhere else.  Then the only thing to add to that would be per diem expenses at cost.

    Q.    Excluding costs and expenses, your rate to testify per day is $1600?

    A.    Yes, sir.  Sorry if that was muddled.

            MR. PENNINGTON:  Well, it was just a yes or a no.  It's a fairly simple, straight-forward question.

            THE WITNESS:  I'm sorry.

BY MR. YANINEK:

    Q.    And any amount of preparation prior to testimony would be on an hourly rate basis?

    A.    And charge there.

    Q.    And you've pointed to plaintiffs' counsel?

    A.    Yes.

            MR. YANINEK:  I'm going to let Mr. Hauck go.  I think I'm pretty much done.  I want to see if he has any questions.

BY MR. HAUCK:

    Q.    Hi, Mr. Somerson.  My name is Greg Hauck and I represent the police department in this case.



Ira S. Somerson, CPP

This report indicates that it's a preliminary report?

A.   Yes.

Q.   Do you intend at some point to prepare a supplemental or some type of additional report?

A.   As a matter of practice, I always label my reports preliminary, only so that if I'm asked by my client to render any following reports or amended reports, they flow as an amendment to.

99.9 percent of the time my preliminary report stands as my report.  But it's just an opening for procedural qualification.

Q.   Do you have any intentions right now to prepare an additional report in this case?

A.   No.

Q.   Have you been asked to prepare an additional report in this case?

A.   No.

MR. HAUCK:  I have no further questions.

MR. PENNINGTON:  I have none.

MR. YANINEK:  Let me just check.  I'm pretty sure I'm done, too.

BY MR. YANINEK:

Q.   Mr. Somerson, do you advertise in order to

**VARALLO** Incorporated

```
 1                  Ira S. Somerson, CPP
 2    obtain cases or referrals in forensic matters?
 3      A.   I'm listed in various directories.  That's as
 4    far as it goes.
 5      Q.   What directories are you listed in?
 6      A.   I have no idea.  That's a -- you pay to be in
 7    one.  The next thing you know you're in seven,
 8    because other people pick up on the name in their
 9    own directory.  I know that I'm in two.
10      Q.   Okay.
11      A.   And that is the New Jersey Law Journal, which
12    takes in the whole eastern seaboard, and the Legal
13    Intelligencer book, which covers the midatlantic
14    region area.  And now I know I'm in about 20 others,
15    just because they picked up off of that.  I have hot
16    links to my web site, which people can pick up on.
17    That's it.  I do not pay for display advertising.
18      Q.   Okay.
19      A.   Oh, I'm also listed in Atla, A-T-L-A, and the
20    DRI, Defense Research Institute's database.  But
21    everybody is.  That's just the standard.
22      Q.   Do you send out any mailings --
23      A.   No.
24      Q.   -- to --
25      A.   Absolutely not.
```

VARALLO Incorporated

Ira S. Somerson, CPP

1

2          MR. PENNINGTON:  Let him finish.

3          THE WITNESS:  I'm sorry.

4    BY MR. YANINEK:

5      Q.    Any mailings to lawyers advertising your

6    services?

7      A.    No.

8      Q.    Do you send out any what I guess would be

9    referred to unkindly as spam e-mails to law firms or

10   lawyers?

11     A.    God forbid.

12     Q.    You do not?

13     A.    I do not.

14          MR. YANINEK:  Thank you, Mr. Somerson.

15          THE WITNESS:  Thank you.  I appreciate

16   your time.

17          (Witness excused.)

18          (Deposition concluded at 12:50 p.m.)

19                          - - -

20

21

22

23

24

25

```
 1
 2                          I N D E X
 3
 4    WITNESS:                                    Page
 5    Ira S. Somerson, CPP
 6
 7       By Mr. Yaninek                        3, 104
 8       By Mr. Hauck                          103
 9
10
11                      E X H I B I T S
12    No.          Description                    Page
13    Somerson-1   Notice of Expert Deposition    3
14    Somerson-2   Copy of green sheet of billing
                   information                    7
15
      Somerson-3   October 29, 2002 report of
16                 Somerson                       60
17    Somerson-4   September 9, 2002 letter to
                   Williams from Somerson         62
18
      Somerson-5   October 10, 2002 letter to
19                 Somerson from Williams         64
20    Somerson-6   August 28, 2002 letter to
                   Somerson from Williams         65
21
22                      -  -  -
23
24
25
```

VARALLO Incorporated

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on December 4, 2002, and that this is a true and correct transcript of same.

------------------------------

MICHELE L. MURPHY

RPR-Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

VARALLO Incorporated



Schorr   v.
West Shore Regional Police Department, et al.

Ira S. Somerson, C

December 4, 20



## $

$1600 102:22; 103:8
$2,500 8:9
$225 8:7
$300,000 13:13, 18

## 1

1 12:10; 48:24
1/6/95 54:18
10 64:7
10/24/2001 32:25
10/28/2002 26:20
100 10:18
11 67:24; 68:3
11/12 31:8
11/18/2000 91:22
11/21 27:3
11/21/2002 26:23
1100 14:6
12:50 106:18
130 33:10
150,000 13:22
17 8:13; 92:25; 95:21
18 79:20; 80:6; 81:6;
94:10
18th 28:12; 30:25; 31:4;
81:22; 83:23; 95:9
19422 12:11
1977 10:10, 13
1981 29:24; 49:24
1983 13:25
1989 74:11
1990 36:4; 56:25; 57:2
1997 28:13

## 2

2 48:24; 85:17; 92:19
2/16/95 53:6
20 105:14
2000 39:13; 79:20; 80:6;
81:10, 12, 22; 83:23;
90:13, 19; 94:10
2002 26:12; 61:12, 20;
63:12; 64:7; 66:24; 67:2,
11, 19; 81:7
21st 58:17
24 95:17
26 67:19
26th 67:13
28 67:11
28th 26:12; 27:3; 66:24;
67:2
29 56:25; 61:12, 20
29th 63:14; 65:19
2:00 46:25

## 3

3 60:6; 61:7; 85:17; 92:20
30 13:8; 30:16; 57:2
300 13:20
302 18:14; 74:19, 20, 25;
75:7, 9, 10; 77:10; 78:3, 9,
15, 24, 25; 79:3, 3, 5;
91:20; 97:8, 9
35 23:12, 22
35,000 10:9
3rd 8:3; 67:3, 14

## 4

4 61:25
4/25/01 55:20
40 25:17; 94:2
43 30:2, 3; 96:7

## 5

5 23:21
50/50 13:9

## 6

6 65:21; 91:12
64 14:9
650 12:10

## 7

7 94:7; 99:25
7-Eleven 40:21; 41:6, 12,
15
7/26/95 54:17
70 13:7
700 29:25; 33:11
7000 49:23, 24; 50:2, 4
7000's 49:23
7259 44:9
7364 56:21, 23
7366 35:18, 22
7390 49:15
7519 53:18, 20
7521 52:22
7563 51:18
7583 46:11
7597 45:23
7641 40:8, 10
7661 27:20; 28:10
7697 40:20, 23
7700 43:8
7708 44:23
7709 41:17
7715 50:8
7731 39:13, 16
7740 55:12

7741 40:9
7757 38:15, 16; 42:10
7767 38:25
7785 37:18, 22
7835 34:4

## 8

8 91:12; 94:7; 95:19, 19;
96:9, 9; 99:16, 25
8/16/95 51:25
8/22/2000 50:16
8/25/2000 32:24
80 82:23; 83:3
81 14:2; 30:2
8th 18:9

## 9

98 43:12
99.9 104:11
9th 63:11, 13

## A

A-T-L-A 105:19
abide 75:19
ability 14:24; 30:11
able 38:2
abortion 34:14; 43:17
abortions 43:17
absolutely 46:17; 51:16;
105:25
academic 14:21; 20:5
acceptable 77:23
acceptance 83:3
accepted 10:18
accepts 22:11, 12
access 40:18; 49:12
accident 50:17
accommodate 78:20;
79:15
according 31:13; 38:14;
42:19; 43:11; 51:23;
67:12, 24
account 19:6
accredit 19:20; 79:10
Accreditation 19:7, 18;
75:11; 78:16, 23; 79:9;
80:14; 83:16, 22
Accreditation's 83:25
accurate 30:20
act 88:23
actor 56:12
actual 12:9; 47:12
actually 102:22
add 59:4; 86:9; 103:5
adding 105:12
additional 7:8; 8:16, 18;
96:23; 104:6, 15, 17
addressed 22:19; 61:13

adequate 44:3; 58:4;
82:15; 84:2; 92:4; 95:4, 8
adequately 92:14; 94:11;
97:3
adhere 77:9
admission 91:21
admitting 91:20
advertise 104:25
advertising 105:17;
106:5
advice 58:11; 60:24;
65:5; 75:9
advise 96:10
advised 99:18
aegis 95:18
affiliate 15:18
affiliation 14:11, 13
aforementioned 99:24,
25
afraid 96:7
again 21:22; 39:15, 22;
53:19; 100:2
against 24:21; 32:8;
45:24; 54:7; 102:13
agenda 93:12
ago 37:8; 52:15
agree 37:7; 60:13; 70:24
agreeing 80:3; 84:4, 5
agreement 6:21; 16:5;
86:11
ahead 58:16
airport 42:24, 24; 43:3, 5
al 27:22; 37:20
Alan 41:9
alarm 36:11
alarms 76:12
alleged 73:8, 14, 17
allowed 14:5; 51:3;
57:25; 95:3
allows 85:3
almost 16:4
alone 13:17; 95:21
along 21:8; 32:24; 54:8
alongside 55:21; 57:4
alphabetical 16:22
alphabetically 49:4
although 54:22; 84:7
always 24:9, 10; 52:11;
59:21; 70:23; 85:13; 91:9;
104:7
ambivalent 19:10
amended 104:9
amendment 104:10
American 78:2
Among 28:12
amount 7:3; 13:10; 97:4;
103:15
analysis 20:2; 62:14, 19;
65:13; 70:23; 82:15; 83:10
analyze 58:10; 73:20
and/or 22:25; 92:15;
93:3, 3
angry 22:24

annoyed 31:24
answered 76:3; 78:7;
81:23; 90:14
anymore 37:8
apartment 51:22
apologize 23:17; 32:
apparent 94:11
appear 21:19
appears 6:23; 8:13;
30:24; 34:4; 39:3, 20
application 11:14
apply 24:21; 38:18;
102:12
appointment 46:25
appreciate 106:15
approach 19:12, 23;
20:23
approached 21:24
approaching 19:17
appropriate 94:14
appropriately 30:12
Approximately 8:22
arbitrarily 50:3
arbitration 45:12
area 57:7; 105:14
areas 24:12
arising 91:18; 92:15
armed 46:13; 98:21
armored 44:13
around 52:19; 55:11;
59:6; 87:17; 88:21, 22;
90:18
arranged 95:4
arrangement 6:6
arrived 89:10
Article 23:22; 24:2, 3, 1
16, 25; 25:5
articles 11:5; 14:18;
23:11
ascertain 77:20
aside 89:19, 25
asphyxiation 74:13
Assan 37:23
Assan's 38:3
assault 34:18; 42:23;
46:2; 51:21; 52:2; 53:10
assaulted 28:16; 34:20
41:11; 54:11
Assaults 41:5
assess 19:25; 20:5; 23:
57:16; 75:13; 91:18, 24
assessing 20:13; 21:3,
24:5
assessment 12:4; 16:2
17:18; 18:4; 20:16, 21;
76:4; 92:2, 8
assessments 19:5
assets 12:4, 5; 75:14
assignment 7:3, 5
assignments 19:23
assist 63:5, 7, 9; 98:10
associated 15:6
Associates 36:9

Conshohocken 36:10
consider 54:23; 75:6;
83:24; 93:19, 21
considerably 18:13;
56:20; 85:10; 96:21
considered 65:7; 91:7
considering 95:22
consortium 12:17, 24
constraints 24:10
construct 47:13
constructed 63:9
consultant 12:3; 15:25;
24:4, 11, 13; 62:14; 94:6;
98:14
consultant's 93:24
Consultants 11:22, 24;
12:18; 23:13, 23; 82:25
consulting 12:19; 13:8,
19; 14:5; 19:17
contains 5:13
content 52:6; 101:7
contest 50:18; 52:21
context 80:25
continuing 27:10
contract 14:4
contribution 58:19
control 40:18; 42:2, 7
controlled 79:6
convenience 21:3; 54:8
conversations 63:23, 24
convey 96:16
copied 37:13
copies 46:8; 99:2
copy 3:18; 4:15; 24:24;
26:14; 87:21
corner 26:16
corporation 11:25; 12:7,
8; 13:10, 12, 17; 64:4;
67:23
corporations 12:20;
26:4; 94:4
corrected 12:16
correctly 8:2; 59:25
correspondence 4:19;
6:14; 33:21; 63:16
corroborate 21:14
cost 103:6
costs 103:7
Council 17:16
counsel 3:12; 4:20;
71:15; 103:18
country 16:14
County 3:10; 17:22;
46:13, 14, 15; 55:10
couple 45:19
courses 93:16
Court 38:8, 12; 55:8
covering 67:14
covers 105:13
CPP 3:4; 4:1; 5:1; 6:1; 7:1;
8:1; 9:1; 10:1, 3; 11:1;
12:1; 13:1; 14:1; 15:1;
16:1; 17:1; 18:1, 22; 19:1,

3; 20:1; 21:1; 22:1; 23:1;
24:1; 25:1; 26:1; 27:1;
28:1; 29:1; 30:1; 31:1;
32:1; 33:1; 34:1; 35:1;
36:1; 37:1; 38:1; 39:1;
40:1; 41:1; 42:1; 43:1;
44:1; 45:1; 46:1; 47:1;
48:1; 49:1; 50:1; 51:1;
52:1; 53:1; 54:1; 55:1;
56:1; 57:1; 58:1; 59:1;
60:1; 61:1; 62:1; 63:1;
64:1; 65:1; 66:1; 67:1;
68:1; 69:1; 70:1; 71:1;
72:1; 73:1; 74:1; 75:1;
76:1; 77:1; 78:1; 79:1;
80:1; 81:1; 82:1; 83:1;
84:1; 85:1; 86:1; 87:1;
88:1; 89:1; 90:1; 91:1;
92:1; 93:1; 94:1; 95:1;
96:1; 97:1; 98:1; 99:1;
100:1; 101:1; 102:1;
103:1; 104:1; 105:1; 106:1
create 22:16
credentials 9:24; 18:18
credits 11:2, 3
crime 56:20
criminal 25:17; 31:14;
41:24; 56:12
crisis 93:16
criticism 95:2
cross 36:10
crowd 42:2, 7; 57:24, 25
Cuker 62:23
Cumberland 3:10
current 4:15; 10:22, 23;
30:14
Curriculum 4:16; 9:12;
11:21; 14:10; 23:21; 89:14
Curtis 35:18
cut 55:3
CV 58:13

**D**

daily 103:2
damages 70:20
dangerous 93:3
data 62:19
database 27:12, 13; 30:4,
5, 11; 47:14; 50:6; 60:10;
105:20
date 7:2; 26:18; 27:11, 13;
47:21; 48:8; 50:6, 12, 16;
53:7; 54:16, 17; 66:22;
67:2
dated 16:23; 26:12, 20,
23; 47:7; 61:12; 64:7
dates 47:12, 24
day 28:12; 35:6; 102:14,
15; 103:8
dead 54:11
deal 82:7
dealing 26:5; 79:19
deals 18:23; 82:8; 92:10
dealt 17:21; 19:5; 90:18;

97:2
death 55:22, 23; 74:13
decedent 71:16
decision 67:7
deep 29:15
deeper 71:11
defend 32:3
defendant 39:4; 43:23,
24; 53:16, 17
defendants 3:9; 91:17;
92:10, 12, 24; 94:11; 96:10
defense 43:10; 105:20
defensive 76:17; 92:5
define 80:20
degree 57:13
Delaware 46:13, 15
delay 23:17
delivery 74:23
demographics 21:16;
22:15; 92:3
denial 82:17
deny 20:7; 22:25; 57:19;
92:14
department 21:6; 44:12;
92:16; 95:11; 103:25
depend 20:3
depending 79:7
depends 13:4; 70:17;
76:4, 4, 5, 6; 77:13; 78:22
deposed 31:7; 49:2;
53:6; 55:20; 56:25; 69:10,
13, 16
deposes 27:10
deposition 3:11, 13, 21;
5:20; 24:23; 48:21; 50:10,
16; 54:18; 68:7; 102:10,
14, 16, 18; 103:2; 106:18
depositions 4:14; 27:2,
9; 46:19; 47:7, 10, 14, 24;
48:15; 74:11
deps 46:22; 48:13
describe 11:22; 14:13
described 92:24
deserved 51:17
designation 10:7; 19:4
designed 12:5; 56:5, 14
desire 93:11
destroyed 33:20
detail 56:6; 87:5; 96:10
detaining 76:2; 77:10
detect 20:7; 22:25; 57:19;
92:14
detection 82:17
detectors 76:13
detention 78:3
deter 20:6; 22:25; 57:19;
85:7; 92:14
determined 58:5
deterrence 82:17
develop 75:13
developed 50:14
developing 9:23; 11:4;
20:13

development 16:20;
17:18; 18:5, 25
diagnosed 73:15
diagnosis 72:21
diary 6:18, 25; 7:5
died 34:22
diem 102:19; 103:6
difference 97:9
differences 22:3
different 11:3, 6; 12:20;
15:16; 18:11; 19:3; 20:20,
25; 21:25; 22:5; 47:14;
77:23; 82:18; 95:13;
97:13; 98:12; 102:11
differently 20:24; 59:10
differs 79:7
difficult 84:4
dignitaries 85:13
dignitary 85:14
dining 58:21
direct 23:12; 27:19
directories 105:3, 5
directors 24:7
directory 105:9
disagree 83:15; 84:7
disagrees 83:13
disclosed 68:21
disclosure 98:6
discovery 58:6; 63:5, 10;
68:20, 23; 69:3; 70:14
discuss 38:3, 23
discussed 101:16
Discussion 47:4; 48:11;
102:7
discussions 62:21
disorder 72:8, 24; 73:5,
9, 15
disorders 73:18, 22
display 105:17
dispute 39:8
distinction 21:25
Distinguished 58:14
doctor 83:6, 7
document 3:16, 18, 20,
22; 8:16; 61:7; 63:12, 13,
14
documents 8:18; 17:2;
62:6; 69:23; 89:24; 90:2
dollars 13:5, 9; 59:4
done 78; 17:15; 80:2;
103:21; 104:23
Donovan 55:12, 16
door 101:24, 25
doors 82:10
double 25:7
Dougherty 70:10
down 13:23; 28:6, 7;
36:9; 56:17; 60:18; 89:11
downtown 23:5
draft 61:21
drawers 33:20
DRI 105:20

drive-up 56:15
driven 19:18
dropped 25:14, 16, 24
drug 19:14; 101:10
drugstore 46:14
dues 9:18
Duffy 35:16, 23
duly 3:5
dungeon 28:6, 7
during 14:4; 34:21
duty 96:10, 14

**E**

e-mails 98:24; 106:9
earlier 8:19; 76:3; 87:2
89:3
earn 10:25; 11:2
earned 11:3
earning 10:11
easier 4:4; 5:6; 6:5; 60:
eastern 105:12
easy 25:2; 56:11
economic 58:12
ecstacy 101:10
effect 79:25
efficient 60:21
efforts 85:14
ego 59:22
egos 59:19
either 28:24; 39:4; 49:7
62:22; 85:6; 88:23;
102:17; 103:2
eliminated 85:9
elope 85:5; 93:3
eloped 85:20; 96:11;
97:24; 101:19
elopement 71:8; 77:22
84:24, 25; 85:7; 87:13;
93:8, 8, 20
elopements 24:16;
84:18; 85:8; 86:5, 14, 16
87:2, 5, 10; 89:11; 91:5;
92:5, 16, 19
elopes 97:12
else 10:20; 59:24; 62:2
67:21; 93:11; 102:15;
103:5
else's 82:19
elsewhere 93:12
embarrassed 60:5
emergency 22:14; 83:1
84:21, 25; 90:22; 92:14
employed 18:24
employee 15:23; 31:17
employees 12:15, 23;
14:6; 43:18
end 8:12; 29:12; 34:3, 1
35:5; 64:19; 82:12; 88:1
22, 23
English 52:4
Enhancing 23:13, 23

92:4, 11
hobby 41:7
Hoffman 35:19; 36:5
hold 30:21
holding 6:23; 75:19
holds 86:23
Holy 3:10; 79:19; 80:3;
81:5, 15, 20; 83:20; 84:8;
86:20, 22; 90:12; 91:6
home 5:4; 96:25; 98:5, 22
homicide 34:22; 55:21
honor 59:15, 18
honored 59:20
hope 22:24; 23:8; 51:24
horn 58:15
Horrible 54:19; 55:23
horribly 54:10
Hospital 3:10; 14:24;
15:12, 13; 16:16, 19;
17:16, 19, 23, 24; 18:9, 24;
19:14; 20:10, 14, 16, 19;
21:11, 22; 22:4, 8, 15;
23:13, 23; 27:22; 28:18,
19; 29:3, 19; 70:18; 71:10,
13, 19; 74:6, 15, 17, 18,
24; 75:6, 15, 18, 25; 76:7,
20; 77:9; 78:11, 19; 79:11,
19; 80:4; 81:5, 15; 83:2,
20; 84:9, 19; 86:13, 17, 20,
23; 87:14; 90:12; 91:6;
98:9, 17, 19
hospital's 96:14
hospitals 16:2; 24:8;
48:17; 57:22; 83:19, 22;
85:23; 86:14
hot 105:15
hour 8:7; 48:9
hourly 7:4; 8:6; 102:9, 13;
103:16
hours 8:13, 16, 24
housing 38:11
HUD 38:13
hump 24:12
HUP 18:8
hurry 93:11
hurt 50:21; 51:8

I

IAHSS 18:23
IAHSS's 18:20
idea 13:15; 36:17; 44:25;
105:6
identification 3:3; 7:19;
60:8; 62:3; 64:11; 65:23
identified 76:18
identifies 85:2
identify 20:4; 21:11, 12;
73:19; 84:6
ignored 66:7
illegal 101:10
immature 39:11
implication 90:3

important 70:12; 71:3,
16; 78:10; 86:25; 100:11,
23
impossible 33:12
improve 20:9
improving 24:6
in-house 77:15
in-service 94:12
inadequate 32:15; 35:2;
36:16; 41:15; 42:8; 43:6;
45:14; 46:4; 52:10; 80:2;
92:13
inapplicable 78:3
Inc 5:19; 11:22, 24; 40:8
incident 28:12, 17; 31:15,
19; 70:25; 71:5, 17; 72:4;
73:5; 100:22; 101:22
include 48:8
including 19:24; 57:22;
87:4
increase 89:11
independent 12:18;
65:13
Independents 12:21
index 28:21; 34:10; 36:10
indicates 6:20; 9:12;
30:19; 104:2
indicating 5:5; 47:9
indicative 94:24
individual 72:4, 24;
75:17; 77:10; 86:18
individuals 71:21; 86:13;
87:14
Industrial 10:8
industry 14:15; 15:13;
20:12; 40:17, 18; 58:19;
62:17; 79:15, 22; 82:5;
95:23; 96:6
influence 74:14
influential 55:10
inform 96:14
information 5:25; 9:20;
15:3; 30:10; 33:17; 36:20;
40:2, 7; 53:25; 67:7; 68:19,
21; 69:2, 17; 70:13, 20, 22;
71:4; 88:10, 14; 89:19;
90:4; 91:4, 7, 10; 96:18,
23; 97:5; 98:3, 8, 18; 101:6
informational 63:6
infringement 40:12
inherent 21:8, 11; 22:16;
62:16; 76:5; 83:18; 86:15;
92:2
inhibit 77:22
initial 25:13; 63:17; 87:18
initially 11:9, 12
initials 9:13, 14; 10:3, 4
injured 44:14
injury 71:23
inpatient 84:25
inpatients 84:22
inside 4:10
instance 21:2; 32:16
instances 44:18

Instead 6:5; 59:24
Institute's 105:20
institution 20:20; 22:5;
79:8; 86:19
instructions 71:18
Intelligencer 105:13
intend 104:5
intended 24:20, 20
intentions 104:14
interest 15:11; 27:7
interesting 38:25; 40:19;
74:9
international 10:9;
12:17; 14:11, 14; 58:20;
82:24
interpretation 82:14, 18,
19
intervening 65:11
intimidation 88:20
into 17:12; 19:6, 11;
22:16; 24:12; 30:5; 37:12;
43:17; 58:5; 95:21; 98:22;
100:17
introduced 3:8
invasion 40:13
inventory 30:17
investigates 26:2
investigation 63:6, 11
investigator 25:18
involuntarily 74:21;
75:2, 19; 78:12; 85:4;
97:11
involuntary 73:24;
74:19, 24; 76:2, 21; 91:20;
94:14
involve 27:17
involved 28:24; 42:16;
69:16; 72:7, 23; 73:17, 23;
74:13, 23; 76:20
involvement 26:9; 72:22
involves 39:17; 53:5
involving 29:2; 40:12;
43:6; 70:21
IRA 3:4; 4:1; 5:1; 6:1; 7:1;
8:1; 9:1; 10:1; 11:1; 12:1;
13:1; 14:1; 15:1; 16:1;
17:1; 18:1; 19:1; 20:1;
21:1; 22:1; 23:1; 24:1;
25:1; 26:1; 27:1; 28:1;
29:1; 30:1; 31:1; 32:1;
33:1; 34:1; 35:1; 36:1;
37:1; 38:1; 39:1; 40:1;
41:1; 42:1; 43:1; 44:1;
45:1; 46:1; 47:1; 48:1;
49:1; 50:1; 51:1; 52:1;
53:1; 54:1; 55:1; 56:1;
57:1; 58:1; 59:1; 60:1, 16;
61:1; 62:1; 63:1; 64:1;
65:1; 66:1; 67:1; 68:1;
69:1; 70:1; 71:1; 72:1;
73:1; 74:1; 75:1; 76:1;
77:1; 78:1; 79:1; 80:1;
81:1; 82:1; 83:1; 84:1;
85:1; 86:1; 87:1; 88:1;
89:1; 90:1; 91:1; 92:1;
93:1; 94:1; 95:1; 96:1;

instead 6:5; 59:24

97:1; 98:1; 99:1; 100:1;
101:1; 102:1; 103:1;
104:1; 105:1; 106:1
irritability 93:14
isolated 56:9
issue 43:3; 74:17; 75:3, 3;
89:17
issued 97:15
issues 29:2; 63:4; 69:7;
76:14
issuing 88:10
item 48:3; 49:15, 15, 17
items 3:20, 22; 4:10; 5:16,
18; 67:25; 68:3; 69:6

J

J 35:16; 53:4; 62:7
Jack 56:24
Jerry 41:22
Jersey 32:19; 38:7;
45:24; 55:15; 105:11
job 57:12; 75:13
Joe 37:23; 38:3; 40:20
Joerger 5:21, 22; 68:11,
12
John 3:9; 53:3
Joint 19:7, 21; 75:11;
78:16, 23; 79:9; 83:16, 21,
25
journal 14:21, 22; 105:11
July 57:2
jump 16:24
June 56:25
juxtapose 49:9

K

keep 30:16; 50:5; 58:4;
59:8; 60:20; 89:23
Kenault 17:20
kept 56:10, 10
keyword 28:21; 34:10;
45:7
keywords 30:7
killed 31:18, 20, 21
kind 9:5; 26:15; 27:17;
50:5, 7, 24; 57:21; 63:10;
79:7
kinds 59:19
knew 58:12; 85:13;
90:11; 98:16
knife 54:12
knowing 84:14
knowledge 40:17; 68:4;
97:18
known 71:10

L

label 104:7
lack 92:4

Lamana 38:15
laptop 5:24
larger 49:20
largest 26:5
last 5:15, 18; 20:14, 15;
48:18; 72:12, 14, 23; 73:7;
74:3; 95:19; 96:9; 99:16,
16, 17; 100:2, 3
later 50:4
laundromat 54:14
law 45:2; 62:7; 63:2, 15;
79:18, 23, 24; 80:4, 11, 14,
17; 81:5; 105:11; 106:9
laws 77:25
lawyer 30:13; 35:13
lawyers 30:8, 10; 106:5,
10
lay 56:12; 80:16; 93:23;
98:14
least 48:8
leave 94:20; 95:3, 5, 12,
15; 101:18
lecture 14:18
Lee 41:25
left 32:10; 33:21; 47:21;
54:11; 56:17; 96:21; 98:16
legal 54:24; 99:11;
105:12
legitimate 76:17
Leigh 54:9
less 96:3
letter 6:20; 64:6, 7, 13, 15,
16, 19, 20; 66:4, 10, 22;
67:2, 14
letters 30:15
letting 8:25
level 12:24; 55:10; 83:24
levels 55:5
licensed 25:18
life 85:12; 99:22
lighting 56:2, 11
likely 20:3; 99:20
lined 6:24
links 105:16
list 4:12; 16:8, 10; 17:6;
18:12; 26:8, 18; 27:4, 5;
29:18, 18; 30:13, 18, 24,
24; 37:2, 11; 38:15; 39:20;
47:6, 23; 48:21; 82:25
listed 5:14; 35:15; 49:15;
74:10; 92:19; 101:12;
105:3, 5, 19
listing 7:7
literally 30:12; 72:17;
98:20
little 5:6; 6:7; 7:10; 37:6;
51:4; 70:20; 80:12
live 76:9
LMC 27:20
load 30:6
local 99:18
located 21:15; 76:6;
89:19
location 12:9; 56:3, 7;

organization 10:9;
14:14; 21:23
organization's 12:4
organized 48:22
original 97:15°
originals 4:25
others 92:7; 105:14
otherwise 32:11
out 4:13; 5:6; 7:10; 25:2;
27:14; 30:13, 14; 37:13;
41:25; 47:16, 21; 49:4, 6;
52:21; 60:9; 68:8; 90:11;
101:23, 25; 105:22; 106:8
outline 63:4; 69:8
Outside 23:13, 22; 24:11,
13; 41:6
over 7:11; 9:5; 13:17, 20;
24:12; 39:8; 41:19; 43:16;
49:23; 51:3, 6; 57:6; 75:10;
82:21; 93:13
overheard 92:23
own 44:8; 55:5; 59:22;
65:13; 77:14; 86:19; 98:7;
105:9
owned 54:7
Owners 19:18

P

p.m 106:18
page 23:20, 21; 33:2;
48:24; 61:13; 91:12; 94:7,
10; 95:19; 96:9; 99:16, 25
Pages 85:17; 92:19
paid 8:9; 15:3, 7, 14;
102:21
paper 6:16, 24; 7:22;
43:11; 51:24; 89:3, 15, 16
papers 87:16; 88:21
paragraph 99:16, 17
pardon 53:19
Parenthood 17:22
parents 69:9
parking 31:8, 17; 32:10;
41:5, 12, 15; 45:11; 51:22;
52:9
Parkway 12:10
part 12:17, 25; 22:11;
24:4, 8; 26:6; 29:22; 58:6;
79:18
part-time 41:6
partial 18:12
participate 14:17
participation 11:7; 59:3
particular 24:22; 56:2
past 20:17
Pastore 17:20
patent 40:11
patience 23:19
patient 16:10, 12; 74:23;
75:7, 19; 76:2, 21; 78:3, 4,
11, 18
patients 85:20; 86:22;

87:14; 90:12, 13, 18, 21
Paul 58:13
Pay 9:18; 29:15, 16;
52:12, 13; 105:6, 17
peer 9:18; 10:20; 11:15
Peggy 32:8, 12, 13
PENNINGTON 4:18, 24;
5:2, 11, 21; 6:15, 19; 8:20;
17:4, 9; 25:10, 11; 29:11;
33:15; 46:24; 59:8, 13, 15;
60:2, 12, 25; 62:22, 24;
63:17; 65:3; 66:2, 10, 13;
68:11, 14; 69:22; 70:5;
76:22; 77:3; 80:7, 11, 21;
81:2; 88:2, 6, 16; 89:4, 22;
90:7; 100:13; 101:17, 23;
102:3; 103:10; 104:21;
106:2
Pennsylvania 12:2, 11;
18:7, 8; 25:19; 36:4; 44:25;
86:7
people 14:15; 15:11;
18:23; 22:13; 41:7; 55:4;
58:10, 11, 18; 59:18;
75:14; 77:15, 19; 78:18;
85:3; 105:8, 16
per 40:15; 102:19; 103:6,
8
percent 13:7, 8; 30:16;
83:3; 104:11
percentage 13:2; 88:5;
89:11
percentages 13:14
perfectly 18:21; 100:19;
101:7
performed 91:19
Perhaps 46:23
period 65:13; 82:22
peripheral 21:9
permission 25:9; 38:4;
46:8
permit 46:9
permitted 96:2; 98:4
persistence 85:16
persistent 21:18; 55:6;
87:10; 91:5; 92:11
person 34:20, 22; 64:4;
74:18; 94:6; 95:5, 10, 11;
98:14, 15
person's 93:23
personal 55:6; 67:18
personally 44:15; 75:9
personnel 18:25; 79:12
persons 93:4; 96:3
perspective 19:2
pertained 70:21
ph 17:20
pharmaceutical 19:15
Philadelphia 18:8;
28:14; 44:10; 74:7
Philadelphia's 17:24
Phillies 28:15
phone 35:10, 13; 64:3;
67:18
physical 12:9; 20:5; 85:6;

88:19
physically 33:12
physiology 85:3
pick 105:8, 16
picked 105:15
picking 39:18
piece 6:24
pieces 89:2, 15, 16
place 20:6; 34:20; 36:8,
23; 43:16; 71:9; 85:7
places 41:18
plaintiff 28:13; 31:12;
32:5; 33:4; 39:4, 20; 41:9;
42:4, 18, 20; 44:12, 14;
45:9, 25; 51:24; 54:6;
68:15; 71:12, 16, 20; 73:8,
14, 14; 91:21; 92:23; 93:2;
96:11
plaintiff's 35:13; 70:21;
99:21
plaintiffs 3:12; 4:19;
71:15; 73:17; 103:18
plan 102:11
Planned 17:22
Planning 17:15; 99:4
Plaza's 46:3
please 16:11; 28:9; 29:9;
30:22; 37:21; 51:11; 66:2;
77:12; 88:13
plenty 72:11, 14
point 9:9; 40:13; 56:5;
57:9; 58:3; 93:6; 96:5;
99:6; 100:16; 101:20;
104:5
pointed 8:18; 103:18
points 10:11
police 56:10; 69:15, 18;
96:14, 15, 21, 22, 25;
98:10, 16, 21; 99:18;
103:25
politically 55:9
poor 94:24, 24
poorly 56:5, 14
pop 47:22
Port 42:23
positioning 57:24
possible 24:24
posted 7:9; 8:15
potential 93:2; 100:23;
101:11, 15
potentially 74:24; 98:15
pouring 51:6
practice 20:22; 22:4;
63:3; 104:7
practices 79:22; 81:18;
82:21; 84:2; 95:23; 96:6
predict 23:16
prefer 12:24; 18:5
preferred 19:4
Preliminary 61:14;
62:21; 85:22; 91:8; 104:3,
8, 11
premises 31:16
preparation 103:15

prepare 68:22; 91:8;
99:4; 102:16; 104:5, 15, 17
prepared 99:8
prescribed 78:21;
101:14
presumed 69:8
pretty 19:19; 51:8; 56:20;
103:21; 104:23
prevent 12:5; 23:7;
57:16, 18; 82:17
prevented 79:25; 92:5
prevention 21:4
previous 20:18
previously 3:14; 58:3
primary 9:19; 95:2
print 25:2; 27:15; 47:20;
99:3
printed 4:12; 26:21
printout 4:14; 32:6;
35:16; 42:19
printouts 28:25
prints 27:14
prior 8:9; 21:17; 66:24,
25; 67:11, 18; 68:5; 87:10;
88:10; 91:3; 92:4; 93:8;
95:9; 103:15
prioritize 20:4
prioritized 23:4
prisons 94:4
private 22:5; 98:22
prize 51:6
probable 101:5
probably 9:8; 15:2; 21:4;
28:5; 30:22; 42:18; 50:14
problem 16:8; 23:5, 18;
34:17; 87:13; 89:12, 13
problems 71:22, 22
procedural 20:6; 85:6;
104:13
procedure 20:22; 22:4;
64:24
procedures 77:16
proceed 19:11
process 9:16; 11:13, 17;
24:4, 5; 46:21; 84:6
produce 47:23; 99:3
produced 66:11
producing 100:19, 22
professional 10:5, 7;
11:4, 7, 7; 15:11; 82:24
professionally 88:23
prognosis 72:18
program 16:20; 17:18;
18:5, 21; 20:13; 23:14, 24;
24:6; 70:19, 22; 71:13, 19;
75:12, 14, 16; 83:16;
92:12; 95:8
programs 12:5
project 38:11
pronounce 37:23
proper 51:14; 56:11
Properly 99:18
property 40:25; 45:10;

53:11; 55:7; 57:21
propositions 83:1
protected 85:12
protection 10:5; 12
protects 75:14
proud 58:23; 59:18
provide 5:2; 76:20;
78:11; 90:4
provided 3:12; 6:1;
17:3; 26:8; 28:25; 25
30:18; 48:4; 50:10; 6
80:5; 92:11; 95:13; 9
97:5; 98:9, 19
Proximate 99:12
psych 92:16
psychiatric 71:22;
4, 18; 73:18; 76:24; 8
24; 85:20; 86:3; 90:1
93:22
psychological 73:1
85:6; 93:22
psychology 85:3
psychotropic 101:
public 22:11; 39:25,
56:9
publications 23:11
publish 14:22
published 61:22; 81
Pulitzer 58:18
pull 27:23; 37:12; 76
pulled 55:21
purpose 12:2; 59:22
73:19; 75:5
purposes 60:13
purse 45:10
pushed 87:16
put 5:11; 25:7; 27:11
29:9; 30:6; 62:9; 90:8
puts 65:5

Q

qualification 104:1
qualifications 15:1
qualified 71:20; 72:2
qualitative 20:2
quarter 8:13
quarterly 14:22
quick 14:7; 16:24
quite 21:25; 38:5; 44
45:4; 67:4
quote 82:11, 12
quote/unquote 82:1
91:5

R

R 27:21; 44:24
raceway 57:6
ran 51:7; 57:6; 92:3;
101:23, 25
rape 51:21

setup 95:13
Seven 40:22; 58:17; 105:7
Shaw 51:24
sheet 6:15; 28:4
shocked 100:4
shooting 69:16
shoplifting 21:7
Short 9:10; 55:3; 61:4
shot 31:23; 32:12; 44:16; 55:22
shotgun 31:22
show 4:4; 26:13; 64:6; 80:17; 90:2
showed 89:12
shut 56:17; 60:17
side 56:16
significant 12:19; 59:17; 100:22
significant-producing 99:21; 100:10, 12
significantly 58:19
signs 97:12
similar 12:18; 84:25
Simple 66:20; 103:11
simply 7:10; 84:5
Sinai 17:16, 19
sister 40:25
sit 34:6; 73:20; 74:22
site 105:16
sitting 69:19
Skidmore 54:7, 22; 55:9
skills 9:23; 11:4
slap 88:21
slaughtered 57:5
slight 23:17
slipped 50:19; 51:8
small 89:13
smoke 76:12
snatched 45:10
social 34:13
Society 10:8; 11:8
sold 14:2, 6; 53:10
sole 12:2
solely 92:19
somebody 27:10; 29:10, 14, 15; 47:21; 59:24; 74:14; 97:10, 21
someone 11:12; 72:2; 82:19; 97:10, 11
SOMERSON 3:4, 8, 14; 4:1, 20; 5:1, 10; 6:1, 23; 7:1, 21, 21; 8:1; 9:1, 12; 10:1; 11:1; 12:1; 13:1; 14:1; 15:1; 16:1; 17:1; 18:1; 19:1; 20:1; 21:1; 22:1; 23:1; 24:1; 25:1; 26:1; 27:1; 28:1; 29:1; 30:1; 31:1; 32:1; 33:1; 34:1; 35:1; 36:1; 37:1; 38:1; 39:1; 40:1; 41:1; 42:1; 43:1; 44:1; 45:1; 46:1; 47:1, 6; 48:1; 49:1; 50:1; 51:1; 52:1; 53:1;

54:1; 55:1; 56:1; 57:1; 58:1; 59:1; 60:1; 61:1, 6, 7; 62:1; 63:1; 64:1, 13; 65:1, 25; 66:1; 67:1; 68:1; 69:1; 70:1; 71:1; 72:1; 73:1; 74:1; 75:1; 76:1; 77:1, 8; 78:1; 79:1; 80:1; 81:1, 4; 82:1; 83:1; 84:1, 16, 17; 85:1; 86:1; 87:1; 88:1; 89:1; 90:1; 91:1; 92:1; 93:1; 94:1; 95:1; 96:1; 97:1; 98:1, 23; 99:1; 100:1; 101:1; 102:1, 9; 103:1, 24; 104:1, 25; 105:1; 106:1, 14
Somerson-1 3:2
Somerson-2 7:17, 18; 9:2
Somerson-3 60:7
Somerson-4 62:2, 5
Somerson-5 64:9, 10
Somerson-6 65:22, 25
sometime 50:4
somewhere 93:11; 103:4
sorry 5:12; 16:23; 26:17; 35:19; 84:17; 103:9, 13; 106:3
sort 49:8, 10; 66:7
sorting 31:5
sounds 39:2
Southwest 17:22
spam 106:9
speaking 8:23; 37:9; 86:12
specialties 12:21
specific 18:18; 33:13; 38:6; 56:5; 71:4; 72:25; 73:6; 76:25; 79:4; 80:12, 17; 98:8, 18
specifically 24:18; 36:24; 93:6; 97:4; 100:6
speedway 57:24
Spence 41:22
spend 58:12
Spirit 3:10; 79:19; 80:4; 81:5, 15, 20; 83:20; 84:8; 86:20, 22; 90:12; 91:6
spite 85:13
split 51:8
sponsor 14:20
spreadsheet 42:5
Spring 36:8
sprinklers 76:13
Spruce 18:10
squeaky 24:9
stabbed 54:11
staff 92:25; 94:13
stage 50:17; 51:4, 7
stand 9:14; 10:4; 52:21; 98:13; 101:8
standard 20:12; 64:24; 75:18, 21, 25; 76:8, 11, 19, 25; 77:4, 9, 24; 79:22, 22; 80:20; 81:16, 18, 18, 21; 82:2, 21; 83:7, 17, 18, 25; 84:7, 9, 13; 95:23; 96:4, 6;

105:21
standards 76:23, 24; 78:20, 21, 25; 81:19; 82:4, 9, 10; 83:21, 25
stands 25:21; 101:3; 104:12
started 14:2; 49:24; 51:6
State 17:23; 38:7, 12; 41:25; 42:2; 45:24; 55:8; 56:24; 65:9; 100:7
state-of-the-art 14:24
stated 87:9; 98:11
statement 59:9
static 89:12
stating 98:9, 12
station 53:12
stations 76:10
status 30:14
stay 14:24
stereotypical 56:4
Steve 60:4
Steven 28:13
stick 60:14
still 33:19; 38:2, 18; 42:14; 74:7; 81:12; 83:7
stipulate 66:13
Stoorman 32:25; 33:24
stop 17:13; 53:5, 9, 12; 54:13
stopped 25:22
stops 54:7
store 21:3, 6; 44:12
stored 6:2
stores 54:8
straight-forward 103:11
strategies 62:18; 76:17; 92:5
strategy 20:13
street 36:9
strip 45:11, 14
strong-arm 45:10
stuck 96:7
students 24:20
study 78:9; 86:18, 20
studying 89:10
stuff 9:5; 29:12
subject 24:18; 77:10; 82:14, 15; 86:10; 92:11, 25; 96:12
Subsequent 68:6
subsequently 92:24
substance 53:13; 55:24
sufficient 85:5; 91:8
suggest 85:17
suggesting 47:17
Suite 12:10
summary 28:12
supervise 94:12
supervision 51:2, 15; 79:3; 94:25; 95:16
supplement 91:10
supplemental 104:6

support 94:13; 96:17
supposed 77:17, 18, 21; 80:20
Supreme 55:8
Sure 9:6; 22:9; 25:11; 55:19; 60:11; 67:4; 70:4; 74:12; 86:15; 104:23
Surgical 35:19; 36:5
surrounding 21:16; 73:4; 84:3
surveillance 56:9, 10
suspect 47:17
Swiss 52:5
sworn 3:5
symposia 9:21; 11:6; 14:17, 19; 58:20
system 18:9; 36:12
systems 14:3; 40:8, 11

T

T-shirt 50:18; 52:20
table 6:6; 87:22; 89:16
talk 13:6; 26:7; 46:18; 56:21; 65:10
talking 7:22; 13:4; 22:7; 76:25; 77:3; 78:23, 24; 101:19, 21; 102:4
target 56:12
task 12:22
taught 9:21
teaching 10:12; 11:6
technical 82:8
telephone 8:19; 63:17, 23, 24
telling 34:6
tells 83:7
Temple 17:23; 18:2; 85:25
tenant 34:18
tend 37:6
terms 99:11
testified 3:5; 4:13, 15; 30:19, 25; 31:7; 32:14, 22; 34:24; 36:25; 39:19, 24; 40:4; 41:8; 42:4, 20; 43:5; 44:20; 45:13; 46:5, 16; 50:22, 25; 51:10, 23; 52:4, 19; 74:12
testify 37:10; 43:21; 103:8
testifying 46:3
testimony 35:5, 6, 15; 41:14; 42:7; 44:2; 46:9; 50:10; 52:6, 16; 53:14; 55:25; 57:23; 98:13; 99:5; 102:10; 103:3, 16
Texas 51:21
thanks 28:4
Thelma 54:9
theory 24:21
therefore 22:12; 24:11
thickness 82:9, 9

third 4:15; 93:21
Thomas 35:16, 23; 44:24
though 76:14
thought 6:6; 31:2; 66:20
threat 97:6, 19, 22
three 10:11, 19, 25; 58:3
throughout 16:14; 17:16
throw 88:21
thrust 24:13
ticket-paying 28:13
times 15:25; 30:8, 10; 37:9; 58:17
title 9:24
titled 23:12, 22; 27:21
today 7:11; 8:20; 26:23; 34:7; 41:7; 45:2; 73:20; 74:22; 78:9; 87:24; 89:3, 10; 102:21, 25
together 12:21; 62:9
told 39:23
Tom 53:21
took 11:20; 34:19; 36:8; 43:16; 71:9
total 79:21
totally 85:8
tough 88:24
tower 39:7
township's 76:11
track 57:5
trading 40:20
tragically 50:21
train 94:12
trained 79:12; 95:13; 96:3
training 94:17, 23, 24; 95:8, 8, 9, 16, 18
transcript 68:7
transcripts 69:20
transpired 98:20
transportation 42:23
trauma 22:10, 20; 23:5
travel 59:3; 103:4
treating 75:7
treatment 28:20; 81:17, 21; 83:23
trial 27:12; 30:19; 32:23; 34:24; 35:4, 5, 7, 15; 36:25; 37:2, 10; 39:19, 24; 40:5; 47:10; 54:17; 56:25; 99:5; 102:17; 103:3
trials 4:13; 27:2; 46:20; 74:11
trigger 45:6
trouble 27:16
truck 53:5, 9; 54:7, 13
true 21:10; 39:5; 52:17; 58:9; 84:8
Trump 46:3
truth 39:11
try 37:12; 45:18; 46:18; 50:13; 87:17
trying 14:7; 19:19; 47:16; 70:4; 82:16; 88:14, 16;

**Lawyer's Notes**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN      :     JURY TRIAL DEMANDED
SCHORR,                                 :
              Plaintiffs          :
                                  :
        v.                          :     NO.:   1:CV-01-0930
                                  :
WEST SHORE REGIONAL POLICE      :
COMMISSION, HOWARD DOUGHERTY,    :
CUMBERLAND COUNTY, and HOLY      :
SPIRIT HOSPITAL,                   :
             Defendants       :

### NOTICE OF EXPERT DEPOSITION

TO:    **Ira S. Somerson**
        c/o Stephen S Pennington Esquire
        Williams, Cuker and Berezofsky
        One Penn Center at Suburban
        1617 JFK Boulevard, Station Suite 800
        Philadelphia PA 19103

PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure, the Defendants,

Holy Spirit Hospital and Cumberland County, will take the deposition of **Ira S. Somerson on**

**Wednesday, December 4, 2002, commencing at 10:00 a.m., to be held at the offices of Williams**

**Cuker Berezafsky,** One Penn Center at Suburban Station, 1617 J.F.K. Boulevard, Suite 800,

Philadelphia, Pennsylvania 19103 for the purposes of discovery or for use at trial, or for both purposes,

before a person authorized to render an oath on all matters not privileged, which are relevant and

material to the issues and subject matter involved in the above-captioned matter. **The deponent is**

**requested to bring all documents, files, diaries, notes, billing records, time sheets, correspondence,**

**draft reports, e-mail and any other document in his possession relating to the above matter.  The**

**deponent is also requested to bring a list of cases in which he has testified as an expert witness at**



EXHIBIT
Somerson-1
12-4-02  MM

trial or by deposition witness during the preceding four years and all brochures, advertisements, correspondence directed to attorneys or insurance companies relating to the retention of you for this case.

METTE, EVANS & WOODSIDE

By: _____

John F. Yaninek, Esquire
Sup. Ct. I.D. No.  55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000
Attorneys for Defendants,
Holy Spirit Hospital and Cumberland County

DATE:   November 20, 2002

2

## CERTIFICATE OF SERVICE

I, JOHN F. YANINEK, ESQUIRE, hereby certify that I am serving a copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure, by depositing a copy of same in the United States Mail at Harrisburg, Pennsylvania, with first-class postage, prepaid, as follows:

Gerald J. Williams, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1895


David J. MacMain, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Stephen S Pennington Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban
1617 JFK Boulevard, Station Suite 800
Philadelphia PA 19103

**METTE, EVANS & WOODSIDE**

By: _____

John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000

Attorneys for Defendants Holy Spirit Hospital
and Cumberland County

DATE:  November 20, 2002

·311361  1

National

| | Prepared By | |
|---|---|---|
| | Approved By | |

#7889 - GERALD J. WILLIAMS, ESQ.
STEPHEN S. PENNINGTON, ESQ.
SCHORR V. CUMBERLAND COUNTY
WILLIAMS- PHONE:  215-557-0099
FAX: 215-557-0673
PENNINGTON - PHONE: 215-557-0099
FAX: 215-557-0673

*2002*

| | | | | | |
|---|---|---|---|---|---|
| 1 | 1/1 | *review & plan record review* | 2 | ~ | |
| 2 | 10/15 | *review (1-10)* | 7. | 50 | *Petey* |
| 3 | 29 | *Completed final report* | 7. | 75 | |
| 4 | | | 17 | 25 | |

9-3-02   2500

225.

EXHIBIT

Somerson 2

12-4-02   MP

# LMC  ● ● LOSS MANAGEMENT CONSULTANTS, INC.

**Mail: P.O. Box 775, Plymouth Meeting, PA 19462 Ship: 650 Sentry Parkway, Suite One, Blue Bell, PA 19422**

October 29, 2002

Gerald J. Williams
Attorney at Law
Williams, Cuker & Berezofsky
One Penn Center at Suburban Station
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA  19103-1819

RE:    Our File #7889: Schorr v. Cumberland County, et al.
       Report and Opinion: Ira S. Somerson, BCFE, CPP ("CONSULTANT")

Dear Mr. Williams,

As per your instructions a review of the above captioned matter was conducted to evaluate the security program provided by the operators of Holy Spirit Hospital ("Defendants"), 502 North 21st Street, Camp Hill, PA ("subject location") on Saturday, November 18, 2000, at approximately 8:45AM.  On this date and approximate time two West Shore Regional police officers brought Ryan Schorr, ("Plaintiff" - deceased) to the subject location under Act 302 (50 P. S. § 7302 - involuntary commitment).  Plaintiff was not handcuffed and was escorted to Room 17, a seclusion room in the emergency department of the subject location.  Plaintiff was assessed by Carol Joerger, RN and examined by Dr. David Spurrier, MD, a doctor in the emergency department.  Hospital security was called and responded to the emergency room.  Plaintiff told staff he was waiting for his limo and body guard and that he had to go to Washington to work for the President.  Crisis worker on duty, Candice Highfield, entered Room 17 to read Plaintiff his patients rights but was shoved out of the door by Plaintiff who eloped.  Nurse Joerger called a Red Alert at the hospital and then called 911.  Nurse Joerger told 911 that the patient was in a psychosis state and was homicidal, however, the police officers who responded to Plaintiff's home were not advised by police dispatch of these conditions.  Police responded to the residence of Plaintiff and during their attempt to return Plaintiff to the subject location the Plaintiff was shot and killed ("subject incident").

**PRELIMINARY REPORT:**

To date of this preliminary report, the following materials have been reviewed:

1.      Transcript of Deposition, Charles Sterling



EXHIBIT
Somerson-3
12-4-02  HM

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP

2.    Plaintiff's First Set of Interrogatories Addressed to Defendant Holy Spirit Hospital and Defendant Holy Spirit Hospital's Response to Plaintiff's First Set of Interrogatories

3.    Transcript of Deposition, Cory Graby, 8/30/02

4.    Transcript of Deposition, Candace Highfield, 8/30/02

5.    Transcript of Deposition, Howard Dougherty, 8/22/02

6.    Transcript of Deposition, Gary Berresford, 5/28/02

7.    Transcript of Deposition, Harry Hart, Jr., 5/28/02

8.    Transcript of Deposition, Steve Buccifero, 8/30/02

9.    Holy Spirit's Responses to Plaintiff's Request for Production of Documents

10.    Holy Spirit Hospital's Responses to Plaintiff's Request for Production of Documents to Police Officers Berresford and Hart

11.    Plaintiff's Complaint, May 25, 2001

## FORESEEABILITY:

The nature and degree to which Defendants were required to provide a security program at the subject location on November 18, 2000 was directly related to the likelihood (foreseeability) that the subject incident could occur (elopement or violent/aberrant behavior by Plaintiff). The degree to which this type of incident could occur during the involuntary commitment of Plaintiff would determine what reasonable precaution, through a planned security program, Defendants should have taken to deter, detect, deny, and respond to this likelihood. It is important to review the facts surrounding Plaintiff's 302 Commitment on November 18, 2000 and determine if Defendants security program was an adequate response to the conditions that did exist to deter, detect, deny, respond to and or recover from potential risks.

■    Included in Defendants' response for production of documents were the total number of 302/Mental Health Elopements from 1996 to the date of the subject incident at the subject location:

| DATE | LOCATION |
|------|----------|
| 04/18/97 | Emergency Room |
| 08/15/97 | Psych Impatient |

File #7889: Report and Opinion                    Privileged and Confidential Client Work Product
Schorr v. Cumberland County, et al.                              Ira S. Somerson, BCFE, CPP

| DATE | LOCATION |
|---|---|
| 01/25/98 | Psych Impatient |
| 11/10/98 | Emergency Room |
| 07/03/98 | Emergency Room |
| 05/11/00 | Emergency Room |
| 11/14/00 | Psych Impatient |

**NOTE:**  The above record of persistent prior elopements from the subject location is reprehensible and clearly indicates that Defendants existing security program had failed to provide a level of security that would adequately deter and/or deny elopements from occurring.  Defendants knew or should have known that elopements and their potential for violent incidents was a predicable risk and that their existing security program was below a standard security industry practice (standard of care).

■  In establishing what if any security risks are likely to occur in an Emergency Room, it is first highly relevant to consider the "inherent" risks (resulting from operational characteristics) that will occur.

"...Substance abuse and psychiatric disorders are among the main factors contributing to violence in the emergency department..." [1]

Hospitals are therefor required to continuously assess their levels of security risk with each and every involuntary assessment they oversee.

"The key to risk assessment is the identification of threats and opportunities.  Risk cannot be measured, prioritized, or managed until it has been identified.  Risk identification involves speculating about the relevant threats (and possibly opportunities) that could affect an organization and its ability to achieve it business goals.  The three main approaches to risk identification are:

---

[1]  Violence in the Emergency Department: A survey of Health Care Workers, Christopher M.B. Fernandes, MD, Emergency Medicine and Occupational Health and Safety, and Nursing Research, St.  Paul's Hospital, Vancouver, BC, November 16, 1999, Canadian Medical Association.

File #7889: Report and Opinion
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP

**Exposure Analysis:** The identification of risks that could affects assets.

**Environmental Analysis:** The identification of risks that could affect operations.

**Threat Scenarios:** Specialized risk identification for frauds and /or disasters...

**Identifying Inherent Risk: Generating Ideas**

In the third part of Risk Identification, the auditor is supposed to "identify the inherent business risks." Two things are required:

- A thorough understanding of the business processes of the organization...

- A means to generate a reasonable list of possible risks." [2]

■   In the transcript of Deposition, Cory Graby, 8/30/02

p 8-9    Mr. Graby was a security officer for Holy Spirit Hospital. He did not carry a weapon or handcuffs. His equipment included a flashlight and latex gloves. Deponent spoke with the police officers who brought Mr. Schorr into the hospital. He had very little verbal contact with Ryan Schorr. He was not equipped with a two-way radio for communication to other hospital staff or local police.

p 10-14    Mr. Schorr was placed into Room 17 at ECU by the two police officers. Deponent entered the room to place a hospital wristband on Mr. Schorr's wrist. Deponent did not assist in physically placing Mr. Schorr into the seclusion room. Mr. Schorr stated that he did not wish to have a wristband placed on his arm. He did not appear angry or agitated at this time. Mr. Schorr stated that he planned on buying the hospital and blowing it up. He stated that he would not be touched without his bodyguard being present.

p 15    Mr. Schorr stated that he wanted his limo brought around. He said he was on a mission for the President or something to this effect. Mr. Schorr stated that he had a license to kill. Mr. Graby placed Mr. Schorr's wristband on the bed and exited the room. The door

---

[2]    Business Risk Assessment, Chapter 5, Risk Identification (pp.29-34), The Institute of Internal Auditors, David McNamee, CIA, CISA, CFE, CGFM, FIIA(M), Agust, 1999.

to the room was closed and locked. Mr. Graby stood about 10 feet outside of the room.

p 21-2    Mr. Graby was called away from the emergency department about 10-15 minutes after Dr. Spurrier examined Ryan Schorr. He does not recall where he was called away to.

■    Summary of Statement Given by Carol Joerger:
On 11/18/00 at approximately 8:30AM, two West Shore Regional police officers brought in Ryan Schorr. Mr. Schorr was not handcuffed and was escorted to Room 17 in the Emergency Room. Security for the hospital was called. Candice Highfield from nursing was standing by as Nurse Joerger proceeded to get an assessment of Mr. Schorr. Mr. Schorr was pacing back and forth and cursed at Nurse Joerger. The patient told Nurse Joerger that he had a busy afternoon and had to get to Washington to work for the President. She then exited the room. The door was locked. The police had left the premises, but the security officer was present. Nurse Highfield called Ryan's mother while Doctor Spurrier went into the room and examined Mr. Schorr. Dr. Spurrier then left. At some point after Dr. Spurrier left the room, nurse Highfield unlocked the door and entered room 17. Her purpose for entering was to advise Mr. Schorr of his rights. At this point Plaintiff shoved Nurse Highfield aside and swung the door to room 17 open and bolted outside and away from the subject location. Nurse Joerger called for a red alert and dialed 911. She told the police that Ryan Schorr eloped from the hospital and was belligerent, in a psychosis state and was homicidal.

■    Summary of Statement by David J. Spurrier, MD:
Dr. Spurrier examined Mr. Shorr who was brought into the hospital on a 302 commitment filed by his roommate because of violent behavior. Police brought him to the hospital and Plaintiff was placed in room 17 behind a locked door. Dr. Spurrier examined Ryan Schorr while security waited outside. The patient was sitting on the side of the bed and talking loudly and rapidly. He would not speak to the doctor. Dr. Spurrier asked if he could examine Mr. Schorr and he agreed. Dr. Spurrier examined his heart and lungs and was then told that this was all he was permitted to do. Mr. Shorr asked the doctor to get his limo with his body guard. The doctor told the patient he needed medication and the Plaintiff refused to take it without his bodyguard or lawyer present. Dr. Spurrier told him that he would hold off on medication as long as Mr. Schorr was quiet and cooperative. The doctor exited the room and closed the door. The doctor filled out a 302 commitment since the patient was psychotic and hallucinating and then discussed the situation with the crisis worker. Dr. Spurrier went to examine another patient and shortly thereafter was informed that Mr. Schorr had eloped.

File #7889: Report and Opinion
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP

- Howard Dougherty (Chief of the West Shore Regional Police Department), 8/22/02 stated in his deposition that when executing a 302 order or warrant, his officers are told to never go alone. Officers are told to call for backup. There is no restriction on an officer in West Shore to call for another officer's assistance outside from a neighboring department. Officers also have access to outside crisis agencies in handling 302 cases, including Cumberland County MH/MR personnel.

## Opinion:

Considering over 40 years professional hands-on experience in related security management and risk assessment matters, participation with and/or study of relevant research in the field of Security Management, reliance upon an extensive body of knowledge, benchmarking similar environs with regard to applying standard security industry practices (standard of care), CONSULTANT'S review of the above noted materials, and within a reasonable degree of professional certainty, CONSULTANT opines the following:

- Defendants failed to assess their foreseeable security risks arising from the services they performed in relationship to admitting 302 involuntary commitments, especially with regard to the admission of Plaintiff, 11/18/00.

- Defendants' persistent history (prior to the subject incident) at the subject location provided Defendants notice that their security program was inadequate and needed to be upgraded so that it could adequately deter, detect, deny, respond to and/or recover from security risks arising from elopements from the Emergency Department and Psych Unit.

- The comments and behavior of Plaintiff, as observed and overheard and subsequently described by Defendants' nursing and medical staff in Room 17 of the subject location, exhibited an obvious potential for Plaintiff to elope and/or be potentially dangerous to himself and/or other persons.

- Howard Dougherty (Chief of the West Shore Regional Police Department), expressed his concern for the risks associated with involuntary commitments and associated elopements.

- The subject incident involving Plaintiff's elopement from Room 17 of the subject location on November 18, 2000 and the ensuing violent and aberrant behavior by Plaintiff *was forseeable.*

File #7889: Report and Opinion
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP

- Defendants' failure to perform a reasonable risk assessment while overseeing Plaintiff's involuntary commitment led to a sequence of events that Defendants should have known and then been avoided.  A standard risk assessment procedure, using standard security industry practices (standard of care) would have identified Plaintiff's aberrant behavior and his potential to elope and/or become involved in violent behavior.  Consequently Defendants' failure to adequately assess their risks during Plaintiff's involuntary commitment and/or to adequately oversee its implementation was a significant producing cause of the subject incident.

## ADEQUACY OF DEFENDANTS' SECURITY PROGRAM:

### Opinion:

Considering over 40 years professional hands-on experience in related security management and risk assessment matters, participation with and/or study of relevant research in the field of Security Management, reliance upon an extensive body of knowledge, benchmarking similar environs with regard to applying standard security industry practices (standard of care), CONSULTANT'S review of the above noted materials, and within a reasonable degree of professional certainty, CONSULTANT opines the following:

- Defendants failed to adequately assess their potential for serious security risks occurring on November 18, 2000 while conducting an involuntary commitment of Plaintiff.  Considering the number of prior elopements, this failure was reprehensible.

- On November 18, 2000, it was apparent that Defendants had failed to adequately train and supervise their in-service medical, nursing, medical support staff and security officer in the appropriate manner of conducting involuntary commitments.

- Under no circumstance should the Defendants' security officer, Cory Graby, have been permitted to leave the Emergency Room area while an involuntary commitment was in process without a sufficient number of adequately trained personnel to substitute on his behalf.

- Defendants' failure to provide adequate contingency planning that would have permitted Cory Graby to remain in the Emergency Room was a significant producing cause of the subject incident.

File #7889: Report and Opinion
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP



- At all times during Plaintiff's involuntary commitment on November 18, 2000, no less than two experienced and well trained crisis workers should have been present (preferably one crisis worker and one security officer) to deter, detect, deny and/or respond to any attempt of elopement. The obvious nature of Plaintiff's attitude and demeanor made it mandatory that every effort be made to deter and deny Plaintiff from considering elopement. Ms. Highfield's entrance into Room 17 alone, considering the circumstances that did exist, was a failure of security industry practices (standard of care) and should not have been permitted to happen with less than two trained persons.

- Each of the reprehensible failures noted above by Defendants was a significant contributing cause to Plaintiff's elopement on November 18, 2000.

- Finally, it was Defendants' duty to advise in full detail the circumstances under which Plaintiff had eloped from the subject location as well as communicating to the police his mental condition. Defendants' failure to provide a detailed report to the police of Plaintiff's mental state and illness left responding police personnel, dispatched to return Plaintiff to the subject location, with inadequate information to support the manner of handling Plaintiff's recovery. This lack of adequate information and sufficient warning hampered their ability to understand the response that should have been used. Properly advised, local police could have requested that a specially trained crisis worker assist in the recovery of Plaintiff. This failure was likely a significant producing cause of Plaintiff's ultimate loss of life.

CONSULTANT reserves the right to amend this preliminary report pending his review of other facts. If there are any questions with regard to the above, please let me know. Thank you.



Very truly yours,
LOSS MANAGEMENT CONSULTANTS, INC.

Ira S. Somerson, BCFE, CPP

ISS:mvh

File #7889: Report and Opinion
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CPP

# LMC • • LOSS MANAGEMENT CONSULTANTS, INC.

**Mail: P.O. Box 775, Plymouth Meeting, PA 19462 Ship: 650 Sentry Parkway, Suite One, Blue Bell, PA 19422**

September 9, 2002

Gerald J. Williams
Attorney at Law
Williams, Cuker & Berezofsky
One Penn Center at Suburban Station
1617 J.F.K. Boulevard, Suite 800
Philadelphia, PA  19103-1819



EXHIBIT
Somerson-4
12-4-02    MH

RE:    Our File #7889: Schorr v. Cumberland County, et al.

Dear Mr. Williams,

This will acknowledge receipt of your letter, 8/28/02, and retainer.  Thank you.  As per your instructions, the following is a preliminary outline of issues - some of which your existing discovery may have already identified.  I have enclosed a copy of section 302 of the act (50 P.S. § 7302).  You probably have this, but as I am referring to my copy I have enclosed same.

■    The act does not specify what security arrangements must be made but does state (j) (7): "Before any facility is designated as the provider of involuntary emergency examination and treatment, the administrator shall have specified in writing the procedures to be followed by his office and those facilities to be designated in carrying out of the responsibilities of section 302 ©)(2) of the act (50 P.S. § 7302 ©)(2)...."  Do you have a copy of these procedures that Defendant was required to prepare?

■    Defendants security operations/department should have the following:
 •    Standing Operations Procedures (S.O.P.) that contains generic policy and procedures for security officer training.  Does this manual have any mention of what security should do in the event of an involuntary commitment?
 •    Emergency Procedures Manual that contains specific response procedures to be used for certain events.  Is an involuntary commitment and/or elopement included in these procedures?
 •    Request copies of all training curriculum for security officers to determine if they include instructions for overseeing involuntary commitments.
 •    Does the hospital have any policy/procedures for other support staff that are employed in the Emergency Room that identify what coordination should exist between security and other personnel in an emergency?

**Telephone: (610) 279-5450 or (800) 848-4308   Fax: (610) 279-3548
E-Mail: iss@securityoffice.com   Web Site: www.securityoffice.com**

- • Do security and Emergency Room personnel ever meet to discuss liaison issues during an emergency (e.g. involuntary commitment; gang related incidents, etc.)?  If yes, obtain copy of meeting agenda if they exist.

- ■ It is common for the security officer assigned to E.R. to be called away for other emergencies.  However, this must be clarified; especially after an involuntary commitment has taken place with a need to oversee same.
  - • Exactly why was the officer assigned to E.R. called away.
  - • Does the hospital have a contingency plan for security support from other staff when the security officer is called away?
  - • How many security officers were assigned to the hospital on the date and time of the subject incident?  Was it sufficient staffing for the foreseeable risks of the hospital for that day of the week and time?  Did the officer get called away due to the hospital not having adequate coverage?
  - • If the officer in E.R. was absent for personal reason (e.g. personal break, lunch, etc.) what procedures existing to relieve this officer?

- ■ What process was immediately taken to identify the potential danger presented by the Plaintiff's involuntary commitment?
  - • When first admitted, was the Plaintiff examined?
  - • Did they ascertain his risk potential?
  - • Did they provide the Plaintiff with any medication to mitigate threat potential?
  - • Subject, other than being placed in a locked room, was not placed in any physical restraints.  Why?  Who made this determination?
  - • How long was Plaintiff in the locked room before being seen by anyone once placed in the room?
  - • How long after Plaintiff was placed in the locked room, did the female person who opened the door take to respond to Plaintiff (when elopement occurred)?  Was she briefed in any way of Plaintiff's condition?
  - • What training (crisis intervention/resolution) did the female person who went to visit with Plaintiff have?

- ■ If the female person who opened the door was not briefed of Plaintiff's condition, why did she do this *alone* (including no security officer in the E.R.)?

- ■ What policy and procedures (security and general hospital personnel) exist in the event of an elopement.
  - • How soon after the elopement did Defendant take to respond.  What was their response (in detail)?
  - • Was there training and simulated exercises that trained personnel what to do in the event of an elopement?  Other emergencies?

File #7889: Issues Outline                              Privileged and Confidential Client Work Product
Schorr v. Cumberland County, et al.                      Ira S. Somerson, BCFE, CFE, CPP

- Obtain incident histories of other elopements at Defendant's hospital. Did Defendant maintain a relational database that stored their incident history? If yes, I will provide you with a list of questions to be asked and what reports to generate from this relational database. What was the name of the software used to track incidents?

I wanted you to have this as soon as possible. I will be out of the office all week, but available by cell phone (215-570-6235) or you can leave a message on my voice mail (610) 279-5450 which I monitor throughout each day.

Very truly yours,
LOSS MANAGEMENT CONSULTANTS, INC.


Ira S. Somerson, BCFE, CFE, CPP
President

ISS:mvh
Enclosure
cc:    Stephen S. Pennington, Esquire

File #7889: Issues Outline
Schorr v. Cumberland County, et al.

Privileged and Confidential Client Work Product
Ira S. Somerson, BCFE, CFE, CPP



# Williams
# Cuker
# Berezofsky

**ATTORNEYS AT LAW**

www.wcblegal.com

● One Penn Center
at Suburban Station
1617 J.F.K. Boulevard
Suite 800
Philadelphia, PA
19103-1819

215.557.0099
215.557.0673 fax

○ 51 Haddonfield Road
Suite 160
Cherry Hill, NJ
08002-4804

856.663.5155
856.663.5133 fax

Mark R. C
Gerald J. \
Esther E. I
Beth G. Co
Andrew E
Wendy E.
Kevin Hav
Gerald J. (
Michael A

Of Counsel
Jamie C. F

† Member, Per
‡ Member, Nev

October 10, 2002

7889
10-11-02

Ira S. Somerson, BCFE, CFE, CP
President
Loss Management Consultants, Inc.
P.O. Box 775
Plymouth Meeting, PA 19462



EXHIBIT
Somerso(
12-4-02

Re:  ***Schorr v. West Shore Police Commission, et al.***
***Your File #7889***

Dear Ira:

Yesterday, we took the deposition of Carol Joerger, the "charge nurse" in the Emergency Department at Holy Spirit on the Saturday on which Ryan Schorr was killed. Although, of course, we will send you the transcript itself when it is prepared, I thought it important to give you advance notice of some of the things she said.

First, we related that Candace Highfield, the crisis intervention worker who entered Ryan's "seclusion room" alone, was approaching the room just as Joerger was returning from a break. Joerger did not realize that Highfield was going to enter the room. If she had, she would have stopped her, because she simultaneously noticed that the security guard was no where in the area. This is contrary to "standard operating procedure," and in Joerger's 16 years' experience, a guard is always int he ER when a "302" patient is there, until the patient is completely "processed." Joerger said that this was particularly important in Ryan's case, as she believed that he was "delusional" (not violent, but agitated and threatening violence if he were not permitted to leave).

As things happened, Highfield's attempted entry and Ryan's elopement were sudden, and occurred before Joerger could stop Highfield. Joerger then called a red alert.

When the security guard, Cory Graby arrived with the Red Alert team, Joerger asked him why he had left. He told her, "he was the only guard for the whole hospital" (we know from Mr. Sterling's deposition that this was in fact, true, on weekends at Holy Spirit).

Ira S. Somerson, BCFE, CFE, CP
Page Two
October 10, 2002

Joerger testified that both Pat Smith, the nurse who would have assumed "charge" responsibilities during Joerger's break, and Dr. Spurrier, the ER physician, denied "clearing" Gray to leave the ER. This contradicts Graby's testimony, which was that he had received "clearance" from the clinical staff (although he could not recall why he had to leave the ER). However, you should also know that Holy Spirit's lawyer told me that he anticipates that Ms. Smith would testify that Joerger is incorrect about her denial, and will testify that she gave Graby permission to leave (again without recalling why). According to Joerger, only the nurse assigned to the patient (in this case, Joerger) or the doctor should clear a guard to leave ER.

When you have had a chance to review this information, please give me or Steve Pennington a call (I will be in a deposition) at 215-557-0099. We are also interested in knowing where you are in your analysis, generally.

Thanks.

Very truly yours,

GERALD J. WILLIAMS

GJW:rap
cc:    Stephen S. Pennington, Esquire



# Williams Cuker Berezofsky

**ATTORNEYS AT LAW**

www.wcblegal.com

● One Penn Center
  at Suburban Station
  1617 J.F.K. Boulevard
  Suite 800
  Philadelphia, PA
  19103-1819

  215.557.0099
  215.557.0673 fax

○ 51 Haddonfield Road
  Suite 160
  Cherry Hill, NJ
  08002-4804

  856.663.5155
  856.663.5133 fax

Mark R. Cu
Gerald J. W
Esther E. B
Beth G. Co
Andrew E.
Wendy E. C
Kevin Hav
Gerald J. G
Michael A.

Of Counsel
Jamie C. Ra

† Member, Penn
‡ Member, New

August 28, 2002

Ira S. Somerson
Loss Management Consultants, Inc.
P.O. Box 775
Plymouth Meeting, PA 19462



**EXHIBIT**
Somerson-(
12-4-02 MP

    Re:   ***Schorr v. Cumberland County, et al.***

Dear Mr. Somerson:

    I enclose herewith this firm's check in the amount of $2,500.00, in payment of your retainer, pursuant to your letter of understanding dated August 26, 2002.

    As you know, in this case we represent the family of a young man who suffered from a bipolar illness. He had no history of violent behavior, despite several previous contacts with the mental health system through the "302" (involuntary commitment) process. On the day of his death, he eloped from a private hospital which served as the County's "delegate" for the processing of 302 commitments. Although he had not exhibited any overtly violent behavior, he was agitated after being placed in a locked room within the emergency department. When the "Crisis Intervention" worker opened the door in order to complete the "paperwork," he brushed past her and eloped. No security guard was in the area; the security guards who had assisted in his placement in the room had been called to another location within the hospital. After the elopement, the hospital called the police (the same policemen who had brought him there in the first place), who found him at his home. Eventually, the policemen, who were part-time, and in our view, inappropriately trained, confronted him in his home, on the second floor, in his bedroom. During a struggle, one of the policemen was wounded in his hand with his own service pistol. Our decedent fled his bedroom, only to return a few minutes later, apparently wielding pots or pans in his hand. He was shot several times and killed.

    Our claims against the hospital revolve around our allegation that the decedent was "mishandled" at the hospital, and that the security in the emergency department was lacking. Furthermore, the hospital's follow-up to the elopement was, in our belief, inadequate from any

Ira S. Somerson
Page 2
August 28, 2002

perspective, including that of the policemen, who lacked information on the decedent's condition and how to handle it. All of this took place in the context of the hospital's history which, apparently, included a relatively high volume of 302 elopements — to the extent that local police departments documented the number, and that the police department in question had stopped even attempting to utilize the crisis intervention unit of the county and the hospital, because it had found the unit to be "useless." As you know, the burden of proof we must meet with respect to our claims against the hospital is that it was "grossly negligent."

A substantial amount of discovery has already taken place in this case. It is my understanding that you will inform us regarding the issues you believe should be addressed by someone with your expertise. Once you have identified these issues, we will supply you with the discovery materials relevant to them. In the meantime, I am enclosing herewith a copy of the complaint.

Please let me or my co-counsel, Steve Pennington (215-557-7112) know if you have any questions.

Many thanks.

Very truly yours,

GERALD J. WILLIAMS

GJW:rap
enclosures
cc:    Stephen S. Pennington, Esquire w/o/enc.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .
KEITH I. SCHORR and                    .  No. 1:01-CV-0930
SUSAN SCHORR,
                Plaintiffs             .  Judge Kane
                                       .
        vs.                            .
                                       .
BOROUGH OF LEMOYNE,                     .
BOROUGH OF WORMLEYSBURG,                .
WEST SHORE REGIONAL POLICE
DEPARTMENT, HOWARD DOUGHERTY,           .
CHIEF WEST SHORE REGIONAL
POLICE DEPARTMENT, CUMBERLAND           .
COUNTY, HOLY SPIRIT HOSPITAL,           .
                Defendants             .
. . . . . . . . . . . . . . .


Deposition of  :   CAROL JOERGER

Taken by       :   Defendants

Date           :   October 9, 2002, 10:59 a.m.

Place          :   210 Senate Avenue
                   Camp Hill, Pennsylvania

Before         :   Debra L. Heary, Notary Public
                   Registered Professional Reporter

2

APPEARANCES

     WILLIAMS, CUKER & BEREZOFSKY
     By:  GERALD J. WILLIAMS, ESQ.

         For - Plaintiffs

     MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
     By:  GREGORY HAUCK, ESQ.

         For - Defendants West Shore Regional
             Police Department, Howard Dougherty,
             Chief West Shore Regional Police
             Department

     METTE, EVANS & WOODSIDE
     By:  JOHN F. YANINEK, ESQ.

         For - Defendants Cumberland County and
             Holy Spirit Hospital

ALSO PRESENT

     Fran Charney, RN, Director Risk Management

3

## I N D E X
### WITNESS

CAROL JOERGER                                    Examination

  By Mr. Williams                                    4, 41

  By Mr. Hauck                                         38


### EXHIBITS

Joerger Deposition
Exhibit Numbers                                  Page

1        Event report form                         9

2        Typed statement                           9

4

1                         STIPULATION

2          It is hereby stipulated by and between

3      counsel for the respective parties that

4      sealing, certification and filing are hereby

5      waived; and all objections except as to the

6      form of the question are reserved to the time

7      of trial.

8          CAROL JOERGER, called as a witness,

9      being duly sworn, testified as follows:

10                        EXAMINATION

11  BY MR. WILLIAMS:

12  Q.    Miss Joerger--

13  A.    You can call me Carol.

14  Q.    Carol, my name is Gerry Williams.  And I

15      represent the family of Ryan Schorr in this

16      case, which has been filed against Holy Spirit

17      and some others.  Have you ever given a

18      deposition before?

19  A.    No.

20  Q.    Let me just give you some very basic rules so

21      that it will go as quickly and easily as

22      possible.  I'm going to ask you some questions.

23      These other gentlemen may also ask you some

24      questions if they choose.

25          Our questions and your answers are being

1    taken down by the court reporter.  Your answers

2    are under oath, as you realize.

3         And the whole process altogether is a

4    deposition, which is a form of testimony just

5    as you might give in court but it's not in

6    court.  But it has the same seriousness.  Do

7    you understand that, first of all?

8  A.  Yes.

9  Q.  And in order to make it--  Since we want--

10    We're making a record of your testimony so that

11    we can use it later either to prepare for trial

12    or at trial itself.  We want the record to be

13    clear.  So basically, here are some rules of

14    thumb to follow.

15         If you don't hear a question or don't

16    understand a question, let the lawyer know and

17    we'll be glad to correct it so that you do hear

18    the question and do understand it.  Is that

19    okay?

20  A.  Sure.  Yes.

21  Q.  And answers like I don't remember or I don't

22    recall are perfectly fine.  We're not asking--

23    It's not a test.  We're just asking for your

24    best and honest recollection of events that

25    you're asked about.  Do you understand that?

Exam./Williams - Joerger                    6

1   A.   Yes.

2   Q.   As with the last witness, your deposition is

3        going to be pretty short, I think, but you can

4        take a break any time you want.  Just let me

5        know.  Okay?

6   A.   Okay.

7   Q.   One thing that's a little harder with some

8        lawyers than others is try to wait until the

9        question is finished before you start your

10       answer so we don't drive the court reporter

11       insane.  Okay?

12  A.   Okay.

13  Q.   Because if we talk over each other, that's what

14       will happen.  And then she'll yell at us.  All

15       right?

16  A.   Okay.

17  Q.   And you need to give all of your answers in

18       words not shakes of your head or even uh-huhs

19       or huh-uhs, things you use in ordinary

20       conversation.  And again, that's because the

21       record is going to be a paper record.  And we

22       want to be able to interpret it properly later.

23       Okay?

24  A.   Okay.

25  Q.   All right.  Now, Carol, we understand from some

Exam./Williams - Joerger                    7

1    documents that have been given to us and some

2    previous testimony that you were on duty at

3    Holy Spirit on Saturday, November 18th, which

4    is the day that Ryan Schorr was in the

5    emergency room at Holy Spirit Hospital.   Is

6    that accurate, first of all?

7  A.   That's correct.

8  Q.   And in what capacity were you working on that

9    day?

10 A.   I was actually the charge nurse that day.

11 Q.   And what does it mean to be the charge nurse?

12 A.   The charge nurse basically -- responsibilities

13    are you usually have, like, five other nurses

14    working with you.  And you kind of, even though

15    they're responsible for their patients that

16    they get, the charge nurse also gets some

17    patients, too.

18          You're--  Basically, you oversee anything

19    that comes down in the ER.  Like, the decisions

20    are made by me, because I'm responsible for

21    basically everybody in the department.  So

22    that's what a charge nurse is.

23 Q.   And do you serve as the charge nurse on some

24    kind of rotating basis or is it by seniority or

25    on some other basis?

Exam./Williams - Joerger                    8

1   A.    Actually, it's by experience.  There's only a

2         few of us who actually do the actual charge

3         nurse, not everybody gets -- because not

4         everybody is qualified to be a charge nurse.

5         So it's by your experience and how you get

6         along with your staff members.

7   Q.    All right.  And are you always the charge nurse

8         when you're on duty or does someone decide

9         who's the charge nurse on a particular shift?

10  A.    No.  I have my other charge nurse.  If she's

11        on, then she's actually the charge nurse.  But

12        when she's off, I'm actually her charge relief.

13  Q.    I understand.  Who is the other charge nurse?

14  A.    Annie Breustch.

15  Q.    How do you spell--  Is that a he or she?

16  A.    It's a she.

17  Q.    Okay.  How do you spell her last name?

18  A.    It's B-r-e-u-s-t-c-h.

19  Q.    And I see from your ID patch you're a

20        registered nurse?

21  A.    Yes.

22  Q.    And you're assigned to the emergency room at

23        Holy Spirit?

24  A.    Correct.

25  Q.    And that was also the case back in November

Exam./Williams - Joerger                    9

1        2000?

2  A.     Right.

3  Q.     How long have you been an RN?

4  A.     Almost 19 years.

5  Q.     And how long have you worked at Holy Spirit?

6  A.     16 years.

7  Q.     And how long have you been assigned to the

8         emergency room at Holy Spirit?

9  A.     Going on almost 11.

10 Q.     All right.

11            MR. WILLIAMS:  Now, I guess we'll make it

12        easier if I ask the court reporter to mark

13        these two documents Joerger 1 and 2.

14            (Joerger Exhibit #1 and #2 were marked for

15        identification.)

16 BY MR. WILLIAMS:

17 Q.     I've put two exhibits in front of you, Ms.

18        Joerger.  And I guess I'll ask you first of all

19        to give me a kind of, if you can, a generic

20        identification of them beginning with Exhibit

21        1.  What is that document?

22 A.     This is actually a -- what we call a PERFs

23        form, like, a Miix it's called.  Anytime

24        anything happens in the actual emergency room

25        or in the hospital pertaining to a person, you

Exam./Williams - Joerger                    10

1          just want to have some type of documentation

2          for -- just basically for the record of just

3          briefly what happened.

4     Q.   I understand.  And this particular Miix form or

5          event report form, as it's titled, did you

6          complete this?

7     A.   Yes.

8     Q.   All right.  Now, what is Exhibit 2?

9     A.   Exhibit 2 is -- I was asked by the police,

10         after everything was said and done with Ryan,

11         to write up a little bit of a synopsis of what

12         happened from the morning until the end that I

13         had dealt with him.

14    Q.   And is that what Exhibit 2 is?

15    A.   Right.  Correct.

16    Q.   And did you, yourself, type this up?

17    A.   Yes.

18    Q.   So just as far as their time relationship is

19         concerned, which came first, 1 or 2?

20    A.   One.

21    Q.   And maybe I'll try to be a little more specific

22         with you.

23    A.   Okay.

24    Q.   Can you tell me when Exhibit 1 was prepared?

25    A.   Oh, that was probably prepared at -- from the

Exam./Williams - Joerger

1     minute that he was -- left the emergency room,

2     after everything was taken care of, and then I

3     had taken this out.  This would be the last

4     thing that you would do.

5  Q.   I understand.  So "he", of course, is Ryan

6     Schorr?

7  A.   Ryan Schorr.

8  Q.   And you would have prepared Exhibit 1 right

9     after he eloped, for lack of a better term?

10  A.   Right.  Correct.

11  Q.   Now, Exhibit 2, when approximately was that

12     prepared?

13  A.   Well, I had gone home, actually, because I

14     believe my shift was over because I was just

15     working 7 to 3.  And I had received a phone

16     call from somebody -- I don't recall who it was

17     -- telling me what had happened.

18         So I had come back in on my own.  And so

19     this probably was written up probably around, I

20     would say, 4 or 5:00.

21  Q.   On the same day?

22  A.   Correct.

23  Q.   But later in the day?

24  A.   Right.

25  Q.   And as you said at the request of the police?

Exam./Williams - Joerger                    12

1   A.    Yes.

2   Q.    Do you recall which police agency asked you to

3         do this?

4   A.    You know what, I really don't recall.  I don't

5         recall at all.  I don't remember his name.

6   Q.    That's fine.  But do you know if he worked for

7         the West Shore police or some other department

8         or for the county?

9   A.    I want to say--  I think he was more of a

10        detective than he was--  It wasn't West Shore

11        Regional Police, I do remember that.

12  Q.    All right.  And it was not a uniformed police

13        officer?

14  A.    No, not a uniformed police.

15  Q.    Now, first of all, let me ask you this

16        question.  Apart and independent of these

17        documents that I've put in front of you, do you

18        have your own recollection of your encounters

19        or observations of Ryan Schorr back on November

20        18th, 2000?

21  A.    Just a little bit.  You know, I did have to

22        read this to kind of remind me.  But it all

23        fell into -- as soon as I read it.

24  Q.    That's fair enough.  That's perfectly fine.

25        Let me ask you, you know, as you sit here

Exam./Williams - Joerger

```
 1        today, what do you recall about what I'll call
 2        "the Ryan Schorr incident" from the beginning
 3        of your involvement?
 4   A.   Do you mean, like, how he was behaving?
 5   Q.   Yes, everything.  Let me be smarter and break
 6        it down a little bit.  When did you first see
 7        Ryan Schorr on November 18th?
 8   A.   I saw Ryan Schorr as he was walking with the
 9        police going towards Room 17.
10   Q.   And that is when he was first brought in
11        roughly?
12   A.   Correct.  Right.
13   Q.   And did you make any observations at that time?
14        How was he behaving?
15   A.   Fine.  He was fine.  He had no handcuffs on.
16        He was walking--  I don't really recall.  He
17        was walking.  I do know he was walking freely
18        on his own.
19   Q.   Meaning the police didn't have their hands on
20        him; is that correct?
21   A.   Yes, that is correct.
22   Q.   Now, at that stage, did you have any
23        conversations with Ryan Schorr?
24   A.   I didn't have any conversations with him until
25        he was escorted into Room 17.
```