Q. All right. I'm going to get to that point in a second. But before he was in Room 17--
A. No.
Q. --you had no conversations with him?
A. No.
Q. Is that correct?
A. That's correct.
Q. And did you have any conversations with the policeman who accompanied him?
A. No.
Q. All right. Now, Room 17, this is one of the seclusion rooms in the ER?
A. Yes.
Q. And you saw Ryan enter that room?
A. Yes.
Q. And then what was your next involvement with Ryan?
A. My next involvement was I had brought my nursing assessment that we have to do, and I had gone in the room to talk to him.
Q. And tell me what you recall about that conversation.
A. He was pacing back and forth. He was very loud, yelling. He was very -- cursing and swearing, every other word was F this.

Q. Was he directing-- Staying just with the swear words for a second, was he directing them to you in particular?
A. Yes, because I was specifically talking to him.
Q. I understand. Go on. I didn't mean to interrupt you.
A. He was delusional.
Q. Meaning what?
A. He had what I would call delusions of grandeur where he thought he was a millionaire. He felt that he was a personal friend of the president's, that he had to get to his limousine at the Hotel Hilton because he had many interviews with the president. So, I mean, he -- I mean, basically--
Q. He communicated these delusions to you?
A. Yes.
Q. When you were having this interview or conversation with him, whatever it is, were you alone or was there someone else with you?
A. West Shore Regional Police were still standing there.
Q. In the room or outside of the room?
A. No, they were inside. Crisis was standing there. She was outside.

Q. "Crisis" meaning the Crisis Intervention worker of Holy Spirit?
A. Yeah, Candice.
Q. Candice Highfield?
A. Correct.
Q. All right.
A. She was standing there. And our security guard, Cory, was standing there.
Q. Okay. And again, "there" is outside the room.
A. Outside, yes.
Q. Were they in a place where they could see you?
A. Oh, we were, like, I mean, maybe not even, like, four inches away from each other.
Q. All right. Okay. So go on with your conversation with Ryan, if there is more.
A. I was-- I had tried to obtain a type of history from him, basically, you know, why he was there, but he wasn't very cooperative because of his thinking.

I mean, he was so-- He wanted to get this done because he had to go to Washington DC. He was very-- Let's see here-- I just lost my train of thought. I'm sorry.

I told you he was delusional. He was swearing. He was screaming back and forth. I

had-- He had told me that he was going to basically make our lives hell if we didn't let him go.

Q. Did he describe how he would do that?

A. Yes. He said that he had a license to kill. And he said that he would come back and put a bomb in the hospital and blow everybody up.

I proceeded to ask him if I could take his vital signs, which is part of my assessment. And he blatantly said no, which I respect that. So I did not pursue that. And that's--

Q. At what stage in the conversation did he make these threats? Was it, for example, before or after you asked him about the vital signs?

A. You know, I don't really remember.

Q. That's fine. I recognize you're a professional, but did the threats frighten you?

A. To be honest, no.

Q. So I have to ask why not?

A. Because I guess from being a nurse for so long as I've been, I have been familiar with patients like Ryan Schorr. And it doesn't frighten me.

I just know-- I know where I need to stand my ground, and I know where I don't need

to cross the boundaries. Like, when he said to me no vital signs, it was no vital signs.

Q. Was he physically confrontational with you? Did he put his hands on you or threaten to do so?

A. No.

Q. All right. At the time you spoke with Ryan Schorr, had you, even though he was not cooperative in giving you any history, had you acquainted yourself with any part of his history from any other source?

A. You mean prior to talking to Ryan?

Q. Yes.

A. I do remember West Shore Regional Police telling me something I don't recall. I didn't speak to the Crisis worker, Candice, until after I did my own assessment.

Q. Okay.

A. But--

Q. All right. I understand. Now, the assessment, this is your nursing assessment?

A. This is my nursing assessment, yeah.

Q. I don't want to jump out of sequence too much, but did you ever learn anything about Ryan Schorr's previous history of any psychiatric or

mental health treatment?
A. I didn't know that until after.
Q. I understand. But afterwards, what did you learn?
A. I learned that he was a patient who had -- that was Bipolar. I had learned that he had stopped his medication a couple months prior to this incident. And I had learned that he was in treatment at our mental health program with one of the psychiatrists.
Q. First of all, from whom did you learn this information?
A. From Crisis.
Q. Meaning the Crisis Intervention worker?
A. Right.
Q. Candice specifically?
A. Candice. When she wrote her assessment of the patient, then I read it afterwards.
Q. I understand. Now, at the time that you spoke with Ryan Schorr, did he appear to you to be on any -- under the influence of any drugs or other substance?
A. No.
Q. Now, after you talked to him, did you complete your assessment in the room or out of the room

-- the written part of the assessment?

A. Oh, I completed it in the room.

Q. And then what did you do?

A. And then I walked out of the room, and I shut the door. It's locked from the outside. And then I proceeded to go over to Dr. Spurrier. He was going to be the ER physician to see him.

And I gave him a brief assessment of the patient, basically what he was going to be going into. And then I handed him the chart. And that was it.

Q. I understand. Now, up until this time -- and when I say that, I mean the time at which you handed Dr. Spurrier the chart -- had you had any conversations with Cory Graby, the security officer, about Ryan Schorr?

A. I don't recall, no.

Q. Do you recall Cory Graby asking you for clearance to leave the ER at any time?

A. No, I do not.

Q. Do you know yourself, from your own knowledge or recollection, whether Cory Graby asked anyone if he could be cleared from the emergency room?

A. No, I do not.

Q. In connection with a 302 commitment or a potential 302 commitment, is there a procedure which deals with the presence of a security officer in the ER?

A. Yes, there is.

Q. And what is that procedure?

A. Well, the procedure is basically when a patient comes in, you basically know that you're going to be using the secured room, which would be 17. You usually will call security and just let them know briefly that this patient is coming in. A very brief, you know, history.

And basically, security is usually present when the patient gets there. Usually security does not leave the area unless you give them permission to go.

Q. Until when, I mean--

A. They stay a while. They usually-- They have stayed up to an hour -- will stay right there with you.

Q. But rather than concentrating on the length of time, I'd like to talk about, you know, specific events in the process. Is the security guard usually there when the doctor evaluates the patient?

A. The security guard is usually outside the door.
Q. Right. When the doctor evaluates the patient?
A. Yes.
Q. And I guess we understand that there comes a time in the process if the doctor determines that the patient needs commitment, there comes a time where Crisis has to read the patient his or her rights. Is that accurate?
A. Yes. Right.
Q. And is the security officer typically present at that point?
A. I'm trying to think. I want to say they should be, but yes, they are, yes.
Q. Now, are you aware of any written directive or policy that says they should be there at that point?
A. No.
Q. All right. Fair enough. Now, after you left the room having completed your nursing assessment and left the seclusion room and had given the chart to Dr. Spurrier, what was your next involvement with or observation of Ryan Schorr?
A. Well, the door was closed. I noticed basically that he was quiet. He had stopped yelling. He

was pacing back and forth in the room. I mean, he wasn't acting out, he was just pacing back and forth. And then I had gone on break.

Q. And how long is the break period?

A. Like, 15 minutes.

Q. All right. Then what happened -- or I guess I should ask you this. When you took your break, where were you, where did you take it?

A. Over in the nursing lounge, which is, like, it's out of the department. It's just, like -- it's out of the department, but it's, like, down the hall.

Q. I understand. So what happened next?

A. After I came back from my break?

Q. Well, I guess you told me you came back from your break.

A. Right. I came back from my break--

Q. And where did you go?

A. --and I went and I sat down at the one desk that's, like, in front of the ER. And I was able to see Room 17. And I just sat there. And I was doing some charting on a chart, and--

Q. From that -- I'll call the station. You may not call it a station.

A. Yeah, a station.

Q. But from that station, could you see into the room to observe Ryan Schorr?
A. Yes.
Q. And did you? I mean, did you see him?
A. Yes. He was actually sitting on the bed.
Q. All right. And quiet at that point?
A. Quiet.
Q. All right. Then what happened?
A. And then I just happened to look up, and I saw Candice, the Crisis worker, walk towards the door. It was really, like, a fast motion.

And she opened the door, not a lot just a little, and I saw him grab the door, Ryan Schorr, and he shoved her. And when he shoved her, she went back a couple of feet. And then he took off.
Q. All right. Now, as Candice approached the room, was she alone?
A. Yes.
Q. And at that point, did you-- Well, let me ask it a couple of ways. First of all, now, as you sit here, do you know whether or not security was present outside the room when Candice approached it?
A. No, security wasn't present.

Q. And do you recall whether or not you noticed that back on Saturday, November the 18th, 2000?

A. I'm sorry. I don't understand.

Q. As you saw Candice walking to the room, did you take note of the fact that security wasn't present at that point?

A. Oh, yes, absolutely.

Q. And did you say anything to Candice or anyone about it?

A. No, because actually it happened so fast. I mean, she did not indicate to me that she was even going towards the room.

Q. All right. If you had known that she was going to the room, would you have said anything about the absence of security?

A. I would have said, stop, Candice, wait. We need to get somebody.

Q. All right. And is that what you typically make sure happens, that someone's there?

A. Yes, you need to have a backup.

Q. All right. And why is that?

A. Basically for the safety of the department and the safety of the patient.

Q. So this thing happened very quickly. And you saw Candice pushed back--

A. Right.
Q. --and Ryan bolting off?
A. Right.
Q. What did you do next?
A. First of all, I said, Candice, are you okay? And she said she was fine. And I turned around to the secretary, I said, call a red alert, and I picked up the phone and I dialed 911.
Q. Now, that's two things, I think. The red alert, what does it mean to call a red alert?
A. Red alert is people that are in the hospital who are specifically trained -- they go to a class -- where they respond to any type of, like, an emergency in the hospital.

I mean, it could be a wide range of things, from a patient just acting out to someone really getting out of control.

And what happens is when you call that red alert, it just -- it makes the people aware that are trained in this that we need your help and you need to come now. So that's basically what they did.
Q. And how many people responded to the red alert?
A. Usually there is about anywhere from, like, 7 to 10 people that respond.

Q. On this particular event, do you know how many people responded?

A. No, I don't know specifically. But I know there were a lot of people that responded.

Q. Let me just refer you to Exhibit 1, because I think you make some reference to it. And I just want to see if I understand the writing, I guess, is what I need to understand.

A. Okay.

Q. Under factual description of the event, do you see that?

A. Yes.

Q. There's a line there, I guess, the third line, it says something people responded to the red alert. Do you see that?

A. Right.

Q. Can you translate that for me? What does that say?

A. It says three people responded.

Q. Okay. And having seen that, does that correspond to your memory as to how many people responded to this particular red alert?

A. Yes.

Q. All right. Do you recall as you sit here today who they were?

A. Oh, no.

Q. All right. Do you recall as you sit here today, I guess, what type of people were they? I mean, were they nurses, aides, what?

A. Actually, no, I don't.

Q. Fair enough. Now, did anyone from security respond to the red alert?

A. Oh, yes.

Q. And who?

A. Cory. And I'm really not sure of any other security. I mean, I just can't remember.

Q. I understand. Now, when Cory arrived, did you have the occasion to ask him why he had not been present in the ER?

A. Not at that time I didn't.

Q. Did you at some other time ask him?

A. I'm not really sure if I did.

Q. And I asked that question, again, I'm going to refer you to Exhibit 1 because you'll tell me, but I thought you might have made some reference to that. You see the same line where you say three people responded to the red alert?

A. Yes.

Q. Okay. And the next thing I think it says,

"security not present in ECU at time of red alert." Is that what that says?

A. Yes.

Q. And "ECU" stands for what?

A. Emergency care unit.

Q. All right. And then you have, I guess, a phrase or a clause that gives the explanation as to why or it says something about why the guard wasn't there. Can you just read that to me?

A. "Due to security guard stated he was the only one in the hospital for 11/18/00." And actually, reading that, I do remember that.

Q. So having read that, you recall that Cory told you he left because he was the only one in the hospital -- the only security officer?

A. Correct. Right.

Q. Did he tell you why he had to leave or where he had gone?

A. No, because I was on break.

Q. You were on break at the time he had left?

A. Right, so I'm not sure who he spoke to.

Q. I understand. You're not sure who he spoke to before he left?

A. Correct.

Q. All right. Well, when you're on break, who takes over as charge?

A. Usually one of the nurses that you just designate.

Q. And do you recall who you designated on that occasion?

A. I designated, I believe, Pat Smith.

Q. Now, my question before, it may have been a little confusing. I didn't mean did Cory tell you why he had left or where he had gone before he did so. But I mean after the fact, did he ever tell you where he had gone to?

A. I don't recall.

Q. Fine. Did you ever talk to Pat about-- Pat Smith?

A. Right.

Q. --about Cory's absence from the ECU or why it had occurred?

A. No, I did not.

Q. All right. Did she ever tell you that she had given him clearance to leave?

A. No, she did not.

Q. Did you ever talk to her about that subject?

MR. YANINEK: Let me just clarify that answer. She never told you anything about it

or did she tell you that she didn't give him permission? The way that question and answer came out, it's confusing. So I object to it and just ask if you can clear it up.

MR. WILLIAMS: I understand. And I think I understood the witness, but I'll-- You're right, I--

MR. YANINEK: On paper it's going to look differently.

A. She told me she never gave permission.

BY MR. WILLIAMS:

Q. That's my question to you, or I understand what you're saying. And when did she say this to you?

A. This was after I had come back from break.

Q. Meaning when you came back from break, you noticed that Cory wasn't there?

A. When I had come back from break-- I can't recall. I don't remember. I just remember sitting down at the desk prior to this all happening with Ryan Schorr.

Q. But at some point on this day, November 18th, Pat Smith told you that she had never given Cory--

A. Correct.

Q. --permission? Did Cory ever tell you that he had received clearance to leave? I may have asked you that before.
A. No.
Q. Now, this reference to his statement that he was the only one in the hospital on that day, was that an unusual occurrence that there was only one guard in the hospital?
A. Yes.
Q. In your experience, there was usually more than one guard?
A. Yes.
Q. How many guards were there usually?
A. In my experience, there's usually at least two or three.
Q. And that's--
A. There's definitely two, and sometimes you have three.
Q. All right. And on the day shift as well as other shifts?
A. Yes.
Q. And that was so back in November of 2000 as well as today?
A. Oh, yes.
Q. All right. Did Cory give you any explanation

as to why on this particular day he was the only guard who was there?

A. No.

Q. All right. Now, if you turn to Exhibit 2, I think you told me that this is sort of your summary of the whole thing that you did for the police; is that correct?

A. Right.

Q. Now, I want to ask you about some particular parts of it. And really, it's toward the end of your summary, beginning with the part where you describe how you called the red alert. Do you see where you say, "I yelled for a red alert to be called."

A. Yes.

Q. Who actually called for the red alert?

A. One of the secretaries.

Q. And then, as you told me before, your statement says you picked up the phone and called 911. Correct?

A. Correct.

Q. And either from your own recollection or referring to this statement, whichever you prefer which is better, tell me about that conversation with the 911 dispatcher.

A. I called 911 and he got on and said, what's your emergency? I told him -- identified myself, who I was, from what hospital. I had told him that we had a gentleman that was a 302 that just had left the hospital -- bolted out of the hospital.

I explained to him-- I told them what he was wearing down to basically his shoes and stuff. And I told them that he was in a psychotic state and basically that he was not cooperative but he needed to be found.

Q. All right. Now, let me ask you first of all for a definition of a term as you used it. You indicated to the dispatcher that Ryan was "in a psychotic state".

A. Yes.

Q. So my question is, what does that mean?

A. Psychosis basically means that he's not in a state of reality. He's in his own little world.

With Ryan, he was delusional. So he was above and beyond, thinking that he was a millionaire, the president's friend, those kind of things. I mean, not -- just totally not within a reality context.

Q. I understand your answer, I think. Now, you told me that you indicated to the dispatcher that he was not cooperative but needed to be brought in. Is that accurate?

A. Yes.

Q. And did you say why he needed to be brought in?

A. I said that he needed to be brought in because of his psychotic state and the fact that I feared for the fact that he was homicidal and I thought for his own safety because he was not in the right thinking.

Q. I understand. And your statement here also uses the description "homicidal" as to Ryan at this time.

A. Correct.

Q. So let me ask you about your definition of that term, too. What did you mean by "homicidal"?

A. That my-- What I meant by that was the fact that he was not in a reality orientation, that he would probably hurt somebody based on what Ryan had said to me in the emergency room.

Q. And were you referring to these threats to blow up the hospital?

A. Correct, and the license to kill.

Q. Were you referring to anything else besides

those statements that he made to you?
A. No.
Q. All right. And I guess I'll ask you about one other term since it's in the statement. Did you describe him as "belligerent"?
A. Yes.
Q. And what does that mean?
A. Meaning that he was-- Profanity was just, like, every other word.
Q. Did the dispatcher ask you-- Besides what was he wearing and for a general description, did the dispatcher ask you for any other information?
A. No.
Q. Did you, yourself, talk directly to -- this is before the death of Ryan Schorr -- any policemen about him or his condition?
A. Oh, no.
Q. All right. Just a few handwriting interpretation questions. Can you tell me-- If you look at Exhibit 1, there is a Line Number 11 there.
A. Okay.
Q. It says, "Department manager signature indicates review." Whose signature or name is

that?

A. That's the head of our department, our nurse manager, Sister Martin.

Q. All right. I see it. She's a nun?

A. Yes.

Q. And Line Number 14, there's an entry for witness. What is that witness' name?

A. Rodney Buckles.

Q. And who is Rodney Buckles?

A. He's one of our emergency room techs. He was on that day with me.

Q. And when you identified him as a witness, what did he witness?

A. He witnessed Ryan bolting out the door.

Q. Where was Rodney when Ryan bolted?

A. Actually, Rodney was standing right at the door, because Rodney wanted to run after him.

Q. All right. I understand. And in Line 15 where it asks for address, you say "aware". Does that mean the hospital has a record of Ryan's address?

A. You know what? That actually "aware" word goes with Line 12. "Dr. Spurrier aware."

Q. I see. I should have seen that. Okay. Then let me ask you, why did you leave the address

line blank? That's Rodney's address? He's a hospital employee?

A. Yeah, so that's why I put the hospital phone number.

Q. I understand. That's all the questions I have. Thank you.

A. Okay. Thank you.

EXAMINATION

BY MR. HAUCK:

Q. Hi, Carol. My name is Greg Hauck, and I represent the West Shore Regional Police Department in this case.

I want to ask you some follow-up questions on the testimony that you just gave. Can you describe for me the room that Ryan was placed in? Are there windows on it so that you can see into it?

A. There's one elongated window on the door that you can see into it.

Q. And from your nurses' station, you could see through that window into the room?

A. From where I was sitting, yes.

Q. Can a person inside the room see outside the window?

A. If they're up against the door, they can.

Q. But only if they're up against the door?
A. Yeah. Otherwise, they can't see out.
Q. When you were taking your assessment, I think you said that there was a security guard and the West Shore Regional Police were standing outside the room; is that right?
A. Yes.
Q. Was the door open then?
A. It was wide open, yes.
Q. And you also said, I think, that the security guard from the hospital is not supposed to leave until he gets permission?
A. Yes, that's correct.
Q. Who typically would give the security guard permission to leave the area?
A. Usually the nurse who basically collaborates with the physician. It's kind of a joint thing.
Q. When you say "the nurse", do you mean the charge nurse?
A. No. The nurse actually that's responsible for the patient.
Q. On Exhibit 1, there's a notation that three people responded to the red alert. And you also said that the security guard, Cory,

responded to the red alert.

A. Yes.

Q. Is Cory one of the three people?

A. I'm not really sure.

Q. So there could have been four people that actually responded?

A. Yeah. Exactly.

Q. But you don't know?

A. No, I don't remember.

Q. When Ryan initially came into the emergency room, you said that Ryan was calm. Is that fair?

A. Yes.

Q. But later, as he stayed at the hospital, he became agitated?

A. Yes.

Q. What do you think caused him to become agitated over that time period?

A. Well, based on my assessment, I feel that it was more his delusions of thinking that he had places to go and the fact that we were holding him back.

Q. And in your report, you said that when he left from the hospital, you would have considered him homicidal?

A. Yes.

Q. What led you to think that he was homicidal?

A. Based on the fact that he told me he had a license to kill and that he wanted to come back and hurt us. And his plan was to bomb the place. And he did tell us that he would make us pay for what we did to him.

Q. And I think you also said that you were fearful that he could hurt himself?

A. Yes.

Q. And what made you think that?

A. Because he wasn't thinking in a reality situation. I mean, his thinking was very bizarre. And I feared for him because he wasn't thinking straight.

Q. That's all the questions I have.

MR. YANINEK: I don't have any questions.

REEXAMINATION

BY MR. WILLIAMS:

Q. I do have one brief follow-up on one of Greg's questions. You used the term "the nurse who was responsible for the patient" might give clearance in conjunction with the position. For Ryan Schorr, who was the nurse responsible for Ryan Schorr?

A. That was my patient.

Q. And I guess I should ask you this, too. Do you know one way or the other whether Dr. Spurrier cleared Cory Graby from the ECU?

A. I know actually for a fact he did not.

Q. And how do you know that?

A. Because when this situation with Ryan happened, he ran out, I remember Dr. Spurrier saying to me, I don't know who cleared security away from the door, but I never gave permission. I remember that statement from him because he said it to me directly.

Q. All right. That's all I have.

MR. HAUCK: No more questions.

MR. YANINEK: I have no questions.

(The proceedings concluded at 11:50 a.m.)

COMMONWEALTH OF PENNSYLVANIA :
: SS
COUNTY OF DAUPHIN :

I, Debra L. Heary, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

CAROL JOERGER

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Harrisburg, Pennsylvania this 21st day of October, 2002.

Debra L. Heary
Debra L. Heary
Registered Professional Reporter
Notary Public

Notarial Seal
Debra L. Heary, Notary Public
Lower Paxton Twp., Dauphin County
My Commission Expires Feb. 16, 2003

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

# Event Report Form

*Confidential*

An event is any situation that is not consistent with the routine operation of the facility or routine care of a patient. The event may involve a patient, visitor or volunteer.

[Name and Address imprint:] 333505 E
SCHORR, RYAN K
445 MEADOW DR
CAMP HILL PA 17011
04/01/1975 731-0644
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 SPURRIER DAV
SCHORR, RYA 299 22517929

No. 3123367

1. Date of event 11/18/00 2. Time of event (military) 0908 3. Facility code 11/18/00 4. Attending MD Dr Spu...
5. Age 25 6. Sex M ☐ Inpatient ☐ Outpatient ☐ Visitor ☐ Volunteer ☐ Home Health ☒ Other ER
7. Diagnosis and/or procedures at time of event 302 commitment / pt. delusional psych
8. **Factual** description of event @ 0908 Red alert called when crisis worker attempted to open Rm#17 door pt shoves her + bolted out the door. 13 people responded to Red alert. Security not present in ECC at time of Red alert due to Security guard states he was the only one in the hospital.

**Equipment/Device Information**
If equipment was involved:
Name of equipment
Model #
Serial #
Lot #
Equipment sent to:

9. Date of report 11/18/00 10. Reporting department/unit ER RN
11. Dept. manager signature (indicates review) [signature] 11/19/00
12. Physician advised (identify) Dr Spurrier 13. Physician signature (optional)
14. Witness Rodney Buckles 15. Address aware Tel. No. 972-4300
16. Person preparing report (print) Carol Joerger RN

DEPOSITION EXHIBIT
Joerger #1
10/9/02 DH
PENGAD-Bayonne, N.J.

On Saturday November 18, 2000 @ 0830 West Shore Regional two police officers brought in Ryan Schorr . Ryan walked in with them did not have hand cuffs on, was escorted into rm. 17 I proceeded to walk towards the rm. Questioning the officers the reason the pt. was here? I had positioned myself partially standing in the rm. and in the doorway. Security was called and Cory from security came. Candice from crisis was here standing at the doorway as I proceeded to question Ryan so that I could fill out my nursing assessment. Ryan was pacing back and forth in the room as I proceeded my assessment. Ryan was cursing at me stated that he would not answer any questions. Ryan told me that he had a lot of money in the bank and he had an important job and he only had to get to the Hotel Hilton where his limousine was. The limousine was then going to take him to Washington Dec. where he was to see the president. Ryan told me that he had a very busy afternoon. Cory from security was still in the ECU. I proceeded to close the door of rm. 17, which is a locked rm. from the outside. West shore regional police had left. Ryan proceeded to pace the room without rooms being spoken. Candice the crisis worker was on the telephone talking to Ryans mother. I being the nurse told Dr. Spurrier about who Ryan, the pt., a very brief history of why he came to the hospital. I was not present in the dept. when Dr. Spurrier went in to see Ryan in rm. 17.

At 0905 Candice from crisis walked towards rm 17 I was situated at the front desk where I could see Candice, Candice open the door a crack when she I identified her name and title when I saw Ryan shove . swing open the door and bolted out the front door. I yelled for a red alert to be called, and I picked up the phone and dialed 911 I spoke to the dispatcher told him what hospital I was from, gave him my name, told the dispatcher That we had a 302 on pt. after asking his name I gave it to him. I told the dispatcher exactly what he was wearing from head to toe I also told them that he bolted out the door and that he was beligerent , in a psychosis state and was homicidal. Dr. Spurrier was aware that pt had bolted. Thank you Carol Joerger,RN

DEPOSITION
EXHIBIT
Joerger #2
10/9/02 DH
PENGAD-Bayonne, N. J.

**#**

**#1** 9:14
**#2** 9:14

**1**

**1** 9:13, 21; 10:19, 24; 11:8; 27:5; 28:19; 36:21; 39:23
**10** 26:25
**11** 9:9; 36:22
**11/18/00** 29:12
**11:50** 42:16
**12** 37:23
**14** 37:6
**15** 23:5; 37:18
**16** 9:6
**17** 13:9, 25; 14:2, 11; 21:10; 23:21
**18th** 7:3; 12:20; 13:7; 25:2; 31:22
**19** 9:4

**2**

**2** 9:13; 10:8, 9, 14, 19; 11:11; 33:4
**2000** 9:1; 12:20; 25:2; 32:22

**3**

**3** 11:15
**302** 21:1, 2; 34:4

**4**

**4** 11:20

**5**

**5:00** 11:20

**7**

**7** 11:15; 26:24

**9**

**911** 26:8; 33:19, 25; 34:1

**A**

**a.m** 42:16
**able** 6:22; 23:21
**above** 34:22
**absence** 25:15; 30:17
**absolutely** 25:7
**accompanied** 14:9
**accurate** 7:6; 22:8; 35:4
**acquainted** 18:10
**acting** 23:2; 26:16
**actual** 8:2; 9:24
**actually** 7:10; 8:1, 2, 11, 12; 9:22; 11:13; 24:5; 25:10; 28:5; 29:13; 33:16; 37:16, 22; 39:21; 40:6; 42:5
**address** 37:19, 21, 25; 38:1
**afterwards** 19:3, 18
**again** 6:20; 16:9; 28:18
**against** 4:16; 38:25; 39:1
**agency** 12:2
**agitated** 40:15, 17
**aides** 28:4
**alert** 26:7, 10, 10, 11, 19, 23; 27:15, 22; 28:7, 23; 29:2; 33:12, 14, 16; 39:24; 40:1
**Almost** 9:4, 9
**alone** 15:20; 24:18
**along** 8:6
**altogether** 5:3
**always** 8:7
**Annie** 8:14
**Apart** 12:16
**appear** 19:20
**approached** 24:17, 24
**approximately** 11:11
**area** 21:15; 39:15
**around** 11:19; 26:6
**arrived** 28:12
**assessment** 14:19; 17:9; 18:17, 20, 21, 22; 19:17, 25; 20:1, 8; 22:20; 39:3; 40:19
**assigned** 8:22; 9:7
**aware** 22:14; 26:19; 37:19, 22, 23
**away** 16:13; 42:9

**B**

**B-r-e-u-s-t-c-h** 8:18
**back** 8:25; 11:18; 12:19; 14:23; 16:25; 17:6; 23:1, 2, 14, 15, 17; 24:15; 25:2, 25; 31:15, 16, 18; 32:22; 40:22; 41:4
**backup** 25:20
**based** 35:20; 40:19; 41:3
**basic** 4:20
**basically** 5:13; 7:12, 18, 21; 10:2; 15:15; 16:17; 17:2; 20:9; 21:7, 8, 13; 22:24; 25:22; 26:21; 34:8, 10, 18; 39:16
**basis** 7:24, 25
**became** 40:15
**become** 40:17
**bed** 24:5
**beginning** 9:20; 13:2; 33:11
**behaving** 13:4, 14
**belligerent** 36:5
**besides** 35:25; 36:10
**best** 5:24
**better** 11:9; 33:24
**beyond** 34:22
**Bipolar** 19:6
**bit** 10:11; 12:21; 13:6
**bizarre** 41:14
**blank** 38:1
**blatantly** 17:10
**blow** 17:7; 35:22
**bolted** 34:5; 37:15
**bolting** 26:2; 37:14
**bomb** 17:7; 41:5
**boundaries** 18:1
**break** 6:4; 13:5; 23:3, 4, 7, 14, 16, 17; 29:20, 21; 30:1; 31:15, 16, 18
**Breustch** 8:14
**brief** 20:8; 21:12; 41:20
**briefly** 10:3; 21:11
**brought** 13:10; 14:18; 35:4, 6, 7
**Buckles** 37:8, 9

**C**

**call** 4:13; 9:22; 11:16; 13:1; 15:9; 21:10; 23:23, 24; 26:7, 10, 18
**called** 4:8; 9:23; 33:12, 14, 16, 19; 34:1
**calm** 40:11
**came** 10:19; 23:14, 15, 17; 31:3, 16; 40:10
**can** 4:13; 5:11; 6:3; 9:19; 10:24; 27:17; 29:9; 31:4; 36:20; 38:14, 16, 19, 23, 25
**Candice** 16:3, 4; 18:16; 19:16, 17; 24:10, 17, 23; 25:4, 8, 16, 25; 26:5
**capacity** 7:8
**care** 11:2; 29:5
**CAROL** 4:8, 13, 14; 6:25; 38:10
**case** 4:16; 8:25; 38:12
**caused** 40:17
**certification** 4:4
**charge** 7:10, 11, 12, 16, 22, 23; 8:2, 4, 7, 9, 10, 11, 12, 13; 30:2; 39:20
**chart** 20:10, 14; 22:21; 23:22
**charting** 23:22
**choose** 4:24
**clarify** 30:24
**class** 26:13
**clause** 29:7
**clear** 5:13; 31:4
**clearance** 20:19; 30:21; 32:2; 41:23
**cleared** 20:23; 42:4, 9
**closed** 22:24
**collaborates** 39:16
**coming** 21:12
**commitment** 21:1, 2; 22:6
**communicated** 15:16
**complete** 10:6; 19:24
**completed** 20:2; 22:19
**concentrating** 21:21
**concerned** 10:19
**concluded** 42:16
**condition** 36:17
**confrontational** 18:3
**confusing** 30:9; 31:3
**conjunction** 41:23
**connection** 21:1
**considered** 40:24
**context** 34:25
**control** 26:17
**conversation** 6:20; 14:22; 15:19; 16:15; 17:12; 33:25
**conversations** 13:23, 24; 14:4, 8; 20:15
**cooperative** 16:18; 18:9; 34:11; 35:3
**correspond** 27:21
**Cory** 16:8; 20:15, 18, 22; 28:10, 12; 29:14; 30:9; 31:17, 24; 32:1, 25; 39:25; 40:3; 42:4
**Cory's** 30:17
**counsel** 4:3
**county** 12:8
**couple** 19:7; 24:15, 21
**course** 11:5
**court** 5:1, 5, 6; 6:10; 9:12
**Crisis** 15:24; 16:1, 1; 18:16; 19:13, 14; 22:7; 24:10
**cross** 18:1
**cursing** 14:24

**D**

**day** 7:4, 9, 10; 11:21, 23; 31:22; 32:6, 19; 33:1; 37:11
**DC** 16:21
**deals** 21:3
**dealt** 10:13
**death** 36:16
**decide** 8:8
**decisions** 7:19
**definitely** 32:17
**definition** 34:13; 35:16
**delusional** 15:7; 16:24; 34:21
**delusions** 15:9, 16; 40:20
**department** 7:21; 12:7; 23:10, 11; 25:22; 36:24; 37:2; 38:12
**deposition** 4:18; 5:4; 6:2
**describe** 17:4; 33:12; 36:5; 38:15
**description** 27:10; 35:13; 36:11
**designate** 30:4
**designated** 30:5, 7
**desk** 23:19; 31:20
**detective** 12:10
**determines** 22:5
**dialed** 26:8
**differently** 31:9
**directing** 15:1, 2
**directive** 22:14
**directly** 36:15; 42:12
**dispatcher** 33:25; 34:14; 35:2; 36:10, 12
**doctor** 21:24; 22:2, 5
**document** 9:21
**documentation** 10:1
**documents** 7:1; 9:13; 12:17
**done** 10:10; 16:21
**door** 20:5; 22:1, 24; 24:11, 12, 13; 37:14, 17; 38:18, 25; 39:1, 8; 42:10
**down** 5:1; 7:19; 13:6; 23:12, 19; 31:20; 34:8
**Dr** 20:6, 14; 22:21; 37:23; 42:3, 8
**drive** 6:10
**drugs** 19:21
**Due** 29:11
**duly** 4:9
**duty** 7:2; 8:8

**E**

**easier** 9:12
**easily** 4:21
**ECU** 29:1, 4; 30:17; 42:4
**either** 5:11; 33:22
**elongated** 38:18
**eloped** 11:9
**else** 15:20; 35:25
**emergency** 7:5; 8:22; 9:8, 24; 11:1; 20:24; 26:14; 29:5; 34:2; 35:21; 37:10; 40:10
**employee** 38:2
**encounters** 12:18
**end** 10:12; 33:10
**enough** 12:24; 22:18; 28:6
**enter** 14:14
**entry** 37:6
**ER** 7:19; 14:12; 20:7, 19; 21:4; 23:20; 28:14

orientation 35:19
others 4:17; 6:8
Otherwise 39:2
out 11:3; 18:23; 19:25; 20:4; 23:2, 10, 11; 26:16, 17; 31:3; 34:5; 37:14; 39:2; 42:8
outside 15:23, 25; 16:9, 10; 20:5; 22:1; 24:23; 38:23; 39:6
over 6:13; 11:14; 20:6; 23:9; 30:2; 40:18
oversee 7:18
own 11:18; 12:18; 13:18; 18:17; 20:21; 33:22; 34:19; 35:10

**P**

pacing 14:23; 23:1, 2
paper 6:21; 31:8
part 17:9; 18:10; 20:1; 33:11
particular 8:9; 10:4; 15:3; 27:1, 22; 33:1, 9
parties 4:3
parts 33:10
Pat 30:7, 14, 14; 31:23
patch 8:19
patient 19:5, 18; 20:9; 21:7, 11, 14, 25; 22:2, 6, 7; 25:23; 26:16; 39:22; 41:22; 42:1
patients 7:15, 17; 17:22
pay 41:7
people 26:11, 19, 23, 25; 27:2, 4, 14, 19, 21; 28:3, 22; 39:24; 40:3, 5
perfectly 5:22; 12:24
PERFs 9:22
period 23:4; 40:18
permission 21:16; 31:2, 10; 32:1; 39:12, 15; 42:10
person 9:25; 38:23
personal 15:11
pertaining 9:25
phone 11:15; 26:8; 33:19; 38:3
phrase 29:7
physically 18:3
physician 20:7; 39:17
picked 26:8; 33:19
place 16:11; 41:6
placed 38:15
places 40:21
plan 41:5
point 14:1; 22:11, 16; 24:6, 20; 25:6; 31:22
police 10:9; 11:25; 12:2, 7, 11, 12, 14; 13:9, 19; 15:21; 18:14; 33:7; 38:11; 39:5
policeman 14:9
policemen 36:17
policy 22:15
position 41:23
possible 4:22
potential 21:2
prefer 33:24
prepare 5:11
prepared 10:24, 25; 11:8, 12
presence 21:3
present 21:13; 22:10; 24:23, 25; 25:6; 28:14; 29:1
president 15:14
president's 15:12; 34:23
pretty 6:3
previous 7:2; 18:25
prior 18:12; 19:7; 31:20
probably 10:25; 11:19, 19; 35:20
procedure 21:2, 6, 7
proceeded 17:8; 20:6
proceedings 42:16
process 5:3; 21:23; 22:5
Profanity 36:8
professional 17:17
program 19:9
properly 6:22
psychiatric 18:25
psychiatrists 19:10
Psychosis 34:18
psychotic 34:10, 15; 35:8
pursue 17:11
pushed 25:25
put 9:17; 12:17; 17:6; 18:4; 38:3

**Q**

qualified 8:4
quickly 4:21; 25:24
quiet 22:25; 24:6, 7

**R**

ran 42:8
range 26:15
rather 21:21
read 12:22, 23; 19:18; 22:7; 29:9, 14
reading 29:13
reality 34:19, 25; 35:19; 41:12
realize 5:2
really 12:4; 13:16; 17:15; 24:11; 26:17; 28:10, 17; 33:10; 40:4
recall 5:22; 11:16; 12:2, 4, 5; 13:1, 16; 14:21; 18:15; 20:17, 18; 25:1; 27:24; 28:2; 29:14; 30:5, 13; 31:19
received 11:15; 32:2
recognize 17:16
recollection 5:24; 12:18; 20:22; 33:22
record 5:10, 12; 6:21, 21; 10:2; 37:20
red 26:7, 9, 10, 11, 18, 23; 27:14, 22; 28:7, 22; 29:1; 33:12, 13, 16; 39:24; 40:1
REEXAMINATION 41:18
refer 27:5; 28:19
reference 27:6; 28:21; 32:5
referring 33:23; 35:22, 25
Regional 12:11; 15:21; 18:14; 38:11; 39:5
registered 8:20
relationship 10:18
relief 8:12
remember 5:21; 12:5, 11; 17:15; 18:14; 28:11; 29:13; 31:19, 19; 40:9; 42:8, 11
remind 12:22
report 10:5; 40:23
reporter 5:1; 6:10; 9:12
represent 4:15; 38:11
request 11:25
reserved 4:6
respect 17:10
respective 4:3
respond 26:13, 25; 28:7
responded 26:23; 27:2, 4, 14, 19, 22; 28:22; 39:24; 40:1, 6
responsibilities 7:12
responsible 7:15, 20; 39:21; 41:22, 24
review 36:25
right 6:15, 25; 8:7; 9:2, 10; 10:8, 15; 11:8, 10, 24; 12:12; 13:12; 14:1, 11; 16:6, 14; 18:7, 20; 19:15; 21:19; 22:2, 9, 18; 23:6, 17; 24:6, 8, 17; 25:13, 18, 21; 26:1, 3; 27:16, 24; 28:2; 29:6, 17, 22; 30:1, 16, 20; 31:7; 32:19, 25; 33:4, 8; 34:12; 35:11; 36:3, 19; 37:4, 16, 18; 39:6; 42:13
rights 22:8
RN 9:3
Rodney 37:8, 9, 15, 16, 17
Rodney's 38:1
room 7:5; 8:22; 9:8, 24; 11:1; 13:9, 25; 14:2, 11, 14, 20; 15:23, 23; 16:9; 19:25, 25; 20:2, 4, 24; 21:9; 22:19, 20; 23:1, 21; 24:2, 18, 23; 25:4, 12, 14; 35:21; 37:10; 38:15, 21, 23; 39:6; 40:11
rooms 14:12
rotating 7:24
roughly 13:11
rules 4:20; 5:13
run 37:17
Ryan 4:15; 7:4; 10:10; 11:5, 7; 12:19; 13:2, 7, 8, 23; 14:14, 17; 16:15; 17:22; 18:7, 12, 24; 19:20; 20:16; 22:22; 24:2, 13; 26:2; 31:21; 34:14, 21; 35:13, 21; 36:16; 37:14, 15; 38:15; 40:10, 11; 41:24, 25; 42:7
Ryan's 37:20

**S**

safety 25:22, 23; 35:10
same 5:6; 11:21; 28:21
sat 23:19, 21
Saturday 7:3; 25:2
saw 13:8; 14:14; 24:9, 13; 25:4, 25
saying 31:13; 42:8
Schorr 4:15; 7:4; 11:6, 7; 12:19; 13:2, 7, 8, 23; 17:22; 18:8; 19:20; 20:16; 22:23; 24:2, 14; 31:21; 36:16; 41:24, 25
Schorr's 18:25
screaming 16:25
sealing 4:4
seclusion 14:12; 22:20
second 14:2; 15:2
secretaries 33:17
secretary 26:7
secured 21:9
security 16:7; 20:15; 21:3, 10, 13, 14, 24; 22:1, 10; 24:22, 25; 25:5, 15; 28:6, 11; 29:1, 11, 16; 39:4, 10, 14, 25; 42:9
seniority 7:24
sequence 18:23
seriousness 5:6
serve 7:23
shakes 6:18
shift 8:9; 11:14; 32:19
shifts 32:20
shoes 34:8
Shore 12:7, 10; 15:21; 18:14; 38:11; 39:5
short 6:3
shoved 24:14, 14
shut 20:4
signature 36:24, 25
signs 17:9, 14; 18:2, 2
Sister 37:3
sit 12:25; 24:22; 27:24; 28:2
sitting 24:5; 31:20; 38:22
situation 41:13; 42:7
smarter 13:5
Smith 30:7, 15; 31:23
somebody 11:16; 25: 35:20
someone 8:8; 15:20; 26:17
someone's 25:19
sometimes 32:17
soon 12:23
sorry 16:23; 25:3
sort 33:5
source 18:11
speak 18:16
specific 10:21; 21:23
specifically 15:4; 19:1 26:12; 27:3
spell 8:15, 17
Spirit 4:16; 7:3, 5; 8:23 9:5, 8; 16:2
spoke 18:7; 19:19; 29: 23
Spurrier 20:6, 14; 22:2 37:23; 42:3, 8
staff 8:6
stage 13:22; 17:12
stand 17:25
standing 15:21, 24; 16 8; 37:16; 39:5
stands 29:4
start 6:9
state 34:10, 15, 19; 35:
stated 29:11
statement 32:5; 33:18 23; 35:12; 36:4; 42:11
statements 36:1
station 23:23, 24, 25; 24:1; 38:20
stay 21:18, 19
stayed 21:19; 40:14
Staying 15:1
still 15:21
stipulated 4:2
STIPULATION 4:1
stop 25:16
stopped 19:6; 22:25
straight 41:15
stuff 34:9
subject 30:23
substance 19:22
summary 33:6, 11
supposed 39:11
Sure 5:20; 25:19; 28:1( 17; 29:22, 23; 40:4
swear 15:1
swearing 14:25; 16:25
sworn 4:9
synopsis 10:11

D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR, Plaintiffs

vs.

BOROUGH OF LEMOYNE, BOROUGH OF WORMLEYSBURG, WEST SHORE REGIONAL POLICE DEPARTMENT, HOWARD DOUGHERTY, CHIEF WEST SHORE REGIONAL POLICE DEPARTMENT, CUMBERLAND COUNTY, HOLY SPIRIT HOSPITAL, Defendants

No. 1:01-CV-0930

Judge Kane

Deposition of : CORY GRABY

Taken by : Defendants

Date : August 30, 2002, 1:50 p.m.

Place : 210 Senate Avenue
Camp Hill, Pennsylvania

Before : Debra L. Heary, Notary Public
Registered Professional Reporter

APPEARANCES

WILLIAMS, CUKER & BEREZOFSKY
By: GERALD J. WILLIAMS, ESQ.

For - Plaintiffs

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
By: DAVID J. MacMAIN, ESQ.

For - Defendants West Shore Regional Police Department, Howard Dougherty, Chief West Shore Regional Police Department

METTE, EVANS & WOODSIDE
By: JOHN F. YANINEK, ESQ.

For - Defendants Cumberland County and Holy Spirit Hospital

ALSO PRESENT

Fran Charney, RN, Director Risk Management

3

INDEX

WITNESS

| CORY GRABY | Examination |
|---|---|
| By Mr. Williams | 4 |
| By Mr. MacMain | 33 |

EXHIBITS

| Graby Deposition Exhibit Numbers | | Page |
|---|---|---|
| 1 | Security - Standby incident report | 23 |
| 2 | Red alert incident report | 25 |

FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623 York 717-845-6418 PA 1-800-233-9327

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

CORY GRABY, called as a witness, being duly sworn, testified as follows:

EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Graby, we just met. I'm Gerry Williams, and I represent the plaintiffs in this case which has been filed by the family of Ryan Schorr against Holy Spirit Hospital and some other people and organizations.

I'm going to ask you some questions. The other attorneys may or may not ask you some questions, depending on what they want to do.

But my questions and your answers will be taken down by the court reporter. And the whole megillah is called a deposition. Have you ever experienced a deposition before?

A. No.

Q. I think you'll find it's a pretty simple

process. I'll just give you some rules to go by.

First of all, if you don't understand one of my questions or don't hear one of my questions, just let me know that and I'll ask the question over again or ask it in a different way to correct the situation. Do you understand that?

A. Yes.

Q. And secondly, this is not a test or something where somebody's going to be evaluating you in that sense. We just want your honest answers to the best of your recollection.

So if you don't remember something or you don't know something, that's a perfectly legitimate answer. Do you understand that?

A. Yes.

Q. And you do have to give all of your answers in words as opposed to gestures or little shortcuts like saying um-hum or uh-huh.

And that's so that our record is clear, because we may be reading this weeks or months from now and we won't understand what those things mean unless you express them in words. Understand?

A. Yes.
Q. And another rule which you are following very well is try to wait for me to finish my question before you start your answer so we're not talking over each other, making the court reporter's job even harder. Okay?
A. Yes.
Q. And last, I guess I should tell you, as you know you took an oath. So this testimony that you're giving us today is at the same level, the same kind of testimony you would have to give in a courtroom. Do you understand that?
A. Yes.
Q. Now, sir, are you presently employed by Holy Spirit Hospital?
A. Yes, I am.
Q. As a security officer?
A. Yes.
Q. And how long have you been a security officer at Holy Spirit?
A. Approximately five and a half years.
Q. And what's your educational background?
A. I graduated high school. I have three years of college.
Q. All right. When did you graduate from high

school?
A. 1990.
Q. And how old are you?
A. I'm currently 30 years old.
Q. Before you attained your position as a security officer at Holy Spirit, did you work security in any other place?
A. Yes.
Q. And what was your previous experience in security?
A. I worked at Central Penn Business School as a security officer there.
Q. How long had you worked there approximately?
A. Approximately three years.
Q. And after you were hired by Holy Spirit as a security officer, did you receive any training for that job?
A. Yes.
Q. What training did you receive?
A. At Holy Spirit Hospital?
Q. Yes.
A. Let's see, we received training in what's called Act 235, which is weapons certification in the State of Pennsylvania. On the job, we received training in something called red alert

training.

And I have certification in IAHSS, International Association of Healthcare Safety and Security, basic and advanced certifications in that. I guess those would be the official training.

Q. All right. In your duties as a security officer at Holy Spirit, do you carry a weapon?

A. No.

Q. And on your person, do you carry any restraints, handcuffs, anything like that?

A. No.

Q. What equipment do you carry, if any, as a security officer?

A. Equipment: a flashlight -- a very small flashlight -- gloves. That's pretty much about it.

Q. All right. Are the gloves latex gloves?

A. Latex gloves, yes.

Q. For contact with patients if that's necessary?

A. Yes.

Q. Now, we understand that you had some contact, however brief, with the subject of this litigation, Ryan Schorr; is that correct?

A. Yes.

Q. I may jump around a little bit, but let me ask you to start just by telling me your recollection of your dealings with Ryan Schorr. And our timing is sometime around November 2000. Does that conform with your memory?
A. Yes.
Q. Tell me your recollection of your encounter with Ryan Schorr.
A. To what degree?
Q. Well, I guess, tell me what you remember from the first time you saw him to the last time you saw him on that day.
A. Let's see, when I initially encountered Mr. Schorr, we said very little verbal contact with him initially. I spoke with the police officers who brought him in. And I'm trying to recall the events.
Q. That's all right. Do you recall who the police officers were?
A. I don't recall their names, no.
Q. Do you recall what department they were from?
A. Yes.
Q. Which one?
A. West Shore Regional.
Q. Fine. Go ahead.

A. The patient, prior to his arriving, had been already searched. And he was placed into our Room 17 at ECU. I think my initial contact came when I entered the room to actually place a patient wristband on the patient. What do you want to know?
Q. Yes, I understand the difficulty in answering my question the way I asked it. Let me try to break it down a little bit. You indicate that you entered the room to put an ID bracelet on Ryan Schorr. Correct?
A. Yes.
Q. Is that something you had done before as a security officer?
A. Yes.
Q. The room we're talking about is what's called a seclusion room or a locked -- it's a locked room where psychiatric patients are?
A. Yes and no.
Q. Tell me the yes part and the no part.
A. Yes, psychiatric patients can certainly be placed in there. But the room can also be used for regular patient care as well as a variety of other patients that we encounter in the hospital.

Q. All right. But the room itself as it was in November of 2000, it was a room that could be locked, a person could be locked in that room; is that correct?

A. That's correct.

Q. And in Ryan Schorr's situation, because of his situation, his condition, he was at least at some point locked in that room. Is that accurate or not?

A. That's accurate, yes.

Q. All right. Now, did you-- Before you entered the room to give him the ID bracelet, did you assist in any way in placing him in the room?

A. If my presence alone being there was considered assisting, then yes.

Q. So you were there, but you didn't physically guide him into the room or--

A. No.

Q. Who did, if anyone?

A. To the best of my recollection, ECU staff, perhaps the police. I'm not--

Q. That's fine. And once he was in the room, you, of course, were then outside the room within the emergency department. Is that accurate?

A. Yes.

Q. And what happened next?

A. At some point, I must have been approached by the secretary and asked to place the -- put the wristband on him.

Q. Okay.

A. And then I proceeded into the room.

Q. Now, when you went into the room on that occasion with the bracelet, you went in by yourself?

A. I was accompanied by an ECU tech.

Q. A tech?

A. A tech, yes.

Q. And who was the tech, if you recall?

A. Rodney Buckles.

Q. And what was the role of the tech?

A. To assist.

Q. All right. And what happened when you entered the room with the ID bracelet?

A. Mr. Schorr just acknowledged that he didn't wish to have the bracelet placed upon him.

Q. How did he express that to you?

A. He verbally stated it. I don't recall exactly what he said.

Q. Do you recall anything about the tone of his voice or the manner in which he spoke?

A. Not specifically.
Q. How about generally?
A. Generally, his-- I guess his demeanor overall was just indicating that he just didn't feel like being -- having -- being touched or being, you know, anyone approaching him that close, that type of thing.
Q. Did you attempt to touch him to put the bracelet on?
A. No.
Q. Did he express anger to you in any way?
A. I'm trying to recall if -- not anger, no.
Q. All right. I guess I should ask you this. Did he express any emotion to you?
A. I'm-- I believe that was the point where he indicated that -- he just started speaking that he didn't want-- I believe that's when he indicated certain statements about the hospital and things of that nature. I don't recall exactly what he said.
Q. All right. And maybe we'll discuss some of those things in a minute. Let me just ask you one more question about the kind of atmosphere. Did he raise his voice to you? Did he speak more loudly than what seemed normal?

A. Than what seemed normal, no.

Q. And I don't mean normal for a psychiatric patient. I just mean normal for a normal person.

A. His tone may have been elevated.

Q. All right. Did he appear physically agitated or shaking in any way?

A. Not to a noticeable degree.

Q. All right. Fair enough. Now, I think you told me that at some point he made some statements about the hospital?

A. Yes.

Q. Let me see if I can put some flesh on that. Did at some point he tell you that he planned on buying the hospital and then blowing it up?

A. Yes.

Q. And is that the statements -- or is that the type of statement you're talking about?

A. Yes.

Q. And did he indicate to you that he wouldn't be touched without his bodyguard being present?

A. Yes, he did.

Q. Do you recall any other types of statements he made either about himself or the hospital at that time?

A. Yes.

Q. What do you recall?

A. He stated to the effect that he wanted to have his limo brought to him so he could be taken to, I believe it was, down in Washington or to the president. I don't recall specifically who it was.

Q. Did he give some indication that he was on a mission for the president or something?

A. I believe so, yes.

Q. Did he indicate to you that he had a license to kill?

A. I believe so, yes.

Q. Now, I interrupted you a little bit, but when you went in to give him the ID bracelet and he refused, what did you do?

A. I placed the bracelet on the bed and exited the room.

Q. And when you left the room, obviously you closed the door or someone closed the door after you and the tech left. Right?

A. I believe at that point the door was closed, yes.

Q. And then where were you after you left the room?

A. I was -- remained probably about within 10 feet outside of the room.

Q. Now, while you were there -- this is after you left the room, and while you were still there -- did any other hospital personnel enter the room?

A. The doctor did enter the room.

Q. Would this be Dr. Spurrier?

A. Yes.

Q. Now, you did not enter the room with Dr. Spurrier or did you?

A. I stood in the doorway.

Q. All right. So you could see what was happening?

A. Yes.

Q. And what did you observe, if anything, about the encounter between Dr. Spurrier and Ryan Schorr?

A. Dr. Spurrier conducted a routine examination. As far as what they verbally discussed, I don't recall what was said.

Q. Did you observe anything about Ryan Schorr in that exchange? Did he raise his voice, for example, in that?

A. I don't recall.