Exam./Williams - Graby                                    1

1   Q.   All right.  Did he appear agitated or violent

2        in any way?

3   A.   Not violent, no.

4   Q.   Agitated?

5   A.   I'm just trying to recollect.

6   Q.   That's all we're asking.

7   A.   Perhaps slightly agitated.

8   Q.   All right.  Now, did you--  Were you still

9        there when Dr. Spurrier exited the room?

10  A.   Yes.

11  Q.   And do you know where Dr. Spurrier went or what

12       he did after he left the room?

13  A.   I don't know exactly.

14  Q.   What did you do after Dr. Spurrier left the

15       room?

16  A.   I believe I conversed briefly with the doctor

17       and the ECU staff, the nurse for the patient.

18  Q.   What do you recall about those conversations,

19       what you said, what they said?

20  A.   I don't recall exactly what was talked about in

21       that conversation, but I believe we were just

22       discussing the patient.

23  Q.   Do you recall anything about what was said

24       about the patient?

25  A.   I don't recall specifically anything that was

Exam./Williams - Graby                    18

1          said, no.

2    Q.    All right.  Was there any discussion about the

3          possibility of calling a red alert?

4    A.    That wasn't discussed at the time.

5    Q.    Was it considered at the time?

6    A.    Red alert is always a fallback, more or less.

7          If a problem arises that's too great to be

8          handled by the people present, then a red alert

9          will be called.

10   Q.    I understand.  It's always an option?

11   A.    It's always an option.

12   Q.    But in this particular case, you don't recall

13         specifically discussing using that option with

14         either Dr. Spurrier or the ECU staff?

15   A.    I don't recall specifically stating that, no.

16   Q.    And, you know, your answer is fair enough, you

17         say you don't specifically recall that, but it

18         leads me to have to ask you a follow-up.  Do

19         you have a general recollection of its having

20         been discussed?

21   A.    It may have been only in the case that when I

22         had to leave the ECU, if -- something to the

23         effect may have been said, if things escalate

24         or if it becomes a problem, call a red alert.

25         As a reminder, it's always there.

Exam./Williams - Graby                                    19

1    Q.    And we'll get to that point, but let me ask you

2          this, what is your understanding of what would

3          happen when a red alert is called?

4    A.    In general?

5    Q.    In general, yes.

6    A.    Generally, a red alert is called for -- to

7          assist in subduing a combative patient.  If the

8          situation has escalated to beyond control of

9          the people that are presently there, it will be

10         called.

11             So it's not--  It can serve as a verbal

12         escalation tactic.  We can arrive just in a

13         show of numbers to de-escalate a situation.  Or

14         it can be a situation that's gone too far and

15         needs dealt with immediately.

16   Q.    All right.  And we heard some testimony earlier

17         about something called a red alert team.  Do

18         you know what that is?

19   A.    The red alert team, yes.

20   Q.    What is it?

21   A.    It's individuals within the hospital from the

22         healthcare system that have been certified,

23         have gone through the training for red alert.

24         They're all placed on the red alert team as

25         responders to the red alert.

Exam./Williams - Graby                    2

1  Q.  And if a red alert is called, then all the

2      members of the red alert team who are on duty

3      respond to it.  Is that accurate?

4  A.  Yes.

5  Q.  Now, you indicated and I think we noticed from

6      some other documents-- Strike that for a

7      second.  I'm sorry.  You've referred a couple

8      times to the ECU nurse that you may have had

9      some contact with at this point.

10 A.  Yes.

11 Q.  Who was that?

12 A.  Pat Smith.

13 Q.  Besides Dr. Spurrier and Pat Smith, any other

14     Holy Spirit personnel that you may have had

15     communication with at the point of this story

16     where you were present in the emergency room

17     and dealing with Ryan Schorr?

18 A.  Yes.  The ECU tech, Rodney Buckles--

19 Q.  Yes.

20 A.  --and Pat.  I don't recall any other

21     conversations with anyone.

22 Q.  Okay.  Now, you indicated, as I started to say

23     before, that at some point you had to leave the

24     emergency department.  Correct?

25 A.  Yes.

Exam./Williams - Graby                    21

1   Q.   Help me place that, first of all, in time.  How

2        long after Dr. Spurrier left the room did you

3        have to leave the emergency area approximately?

4   A.   Approximately 10, 15 minutes.

5   Q.   And why did you have to leave the emergency

6        room?

7   A.   I was called out.

8   Q.   Who called you and where?

9   A.   As hard as I tried to remember, I don't

10       remember exactly what I was called for.

11  Q.   You were called someplace else in the hospital?

12  A.   Yes.

13  Q.   And on this particular shift, am I correct in

14       understanding that you were the only security

15       officer on duty?

16  A.   Yes.

17  Q.   Now, before you left the emergency area--

18       First of all, had you been asked by anybody to

19       put any restraints on Ryan Schorr?  And by

20       "restraints", I mean on his person not just to

21       close the door to keep him in the room.

22  A.   No.

23  Q.   All right.  And did you consider, yourself,

24       using restraints on Ryan Schorr?

25  A.   No.

Exam./Williams - Graby                    22

1    Q.    And it may be a funny question, but let me ask

2          you, why not?

3    A.    His behavior didn't require such means.

4    Q.    Explain that to me.  What about his behavior

5          was not indicative of a need for restraints?

6    A.    He wasn't showing any indications of violence,

7          of the complete loss of control.  He wasn't

8          showing any indications of what we typically --

9          the criteria.  None of the criteria were being

10         fit that we would typically use to restrain

11         someone.

12   Q.    All right.  What criteria do you have in mind?

13   A.    Well, typically it falls upon the doctor to

14         make the call for restraints.  I say typically,

15         all the time.  Combative behavior is probably

16         the Number 1 reason.

17   Q.    All right.  And I guess you're indicating to me

18         that he did not appear combative to you?

19   A.    No.

20   Q.    Did he appear to be under the influence of

21         drugs?  To you, did he appear that way?

22   A.    I certainly couldn't make that determination.

23   Q.    All right.  You brought with you this -- or

24         we've received this incident report and I just

25         want to--

Exam./Williams - Graby                 23

1          MR. WILLIAMS:  Why don't we mark it, I

2     guess, as Graby 1?

3          (Graby Exhibit #1 was marked for

4     identification.)

5   BY MR. WILLIAMS:

6   Q.    Mr. Graby, what we marked as Graby 1 there,

7         that incident report, is that something you

8         prepared?

9   A.    Yes, sir.

10  Q.    And there's an indication that this was

11        prepared the same day as the Ryan Schorr

12        incident.  Is that accurate?

13  A.    Yes.

14  Q.    Let me see that for a minute and ask you a

15        couple of questions about it.  Who did you

16        submit this report to?

17  A.    It would have been submitted to my manager.

18  Q.    And who would that be?

19  A.    Charles Sterling.

20  Q.    And I--  Really on this document, I just want

21        to ask you a couple of -- about a couple of

22        words that you use.  One is the entry for

23        8:35--  By the way, these numbers on the side

24        here, these refer to approximate times that the

25        different things happened?

Exam./Williams - Graby                    2

1   A.    Yes, sir.

2   Q.    So at 8:35, you talk about what you told me

3         when you and Tech Buckles entered the room.

4         But at the end of that entry, it says, "Graby

5         secludes patient Schorr."  What does that mean?

6   A.    That would be the process of the door being

7         closed.

8   Q.    Okay.  And, of course, when you close that

9         door, it was locked as far as the inside person

10        was concerned?

11  A.    Yes, sir.

12  Q.    And there's an entry here at 8:55 where you're

13        talking about the time that you had to leave

14        the ECU.  And it says you're cleared from

15        standby ECU by staff?  That means you checked

16        with someone to see if it was okay to leave?

17  A.    Yes.

18  Q.    And who did you check with?

19  A.    Pat Smith.

20  Q.    And it says you were cleared by staff due to

21        patient's compliant behavior.

22  A.    Yes.

23  Q.    What does that mean "the patient's compliant

24        behavior"?

25  A.    That the patient was generally compliant with

Exam./Williams - Graby                    25

1        the requests of staff.

2    Q.    And by the way, before this day, had you,

3          yourself, had any previous contact with Ryan

4          Schorr?

5    A.    Not that I recall, no.

6              (Graby Exhibit #2 was marked for

7          identification.)

8    BY MR. WILLIAMS:

9    Q.    What we've marked as Graby 2, this is an

10         incident report, as counsel explained to me, on

11         the red alert.  Is that accurate?

12   A.    Yes.

13   Q.    And did you also prepare this?

14   A.    Yes.

15   Q.    And this report begins at 9:09 and ends at

16         9:30; is that correct?

17   A.    Yes.

18   Q.    I mean, as far as the events that you're

19         describing.

20   A.    Yes.

21   Q.    All right.  Do you recall where you were when

22         you heard the red alert?

23   A.    I believe I was in the vicinity of the

24         information desk.

25   Q.    And where is that in relation to the emergency

1        department?

2    A.    Relation by feet or by yards or--

3    Q.    Yes, by feet or yards, if you can do that.

4    A.    I would say as the crow flies approximately 75

5          yards to 100 yards.

6    Q.    Fine.  Now, I just want to ask you about some

7          details of the report here.  The red alert was

8          called at 9:09, and your report indicates you

9          got back there at 9:10; that is, got back to

10         the emergency department.  Now, at that point,

11         Schorr had already left the scene.  Is that

12         accurate?

13   A.    Yes.

14   Q.    Did you learn when you arrived there how long

15         he had been gone?

16   A.    When I arrived at the ECU?

17   Q.    Yes.

18   A.    No, I didn't.  I don't think I--

19   Q.    Okay.

20   A.    It wasn't stated, not in, like, seconds or

21         minutes or anything like that.

22   Q.    I understand.  And again, I also recognize that

23         we're dealing with approximate times, but if we

24         look at Graby 1, the incident report, this

25         indicates that you left the ECU around 9:00.

Exam./Williams - Graby                    27

1          Correct?

2    A.    Yes.

3    Q.    And obviously, at that point, Schorr was still

4          there.

5    A.    Yes.

6    Q.    And you got back around 9:10.  So he left

7          sometime between 9:00 and 9:10.  Does that

8          sound about right to you?

9    A.    Yes.

10   Q.    And you then described what you did when you

11         got back.  Is it fair to summarize it by saying

12         that you searched the garage and the general

13         area looking for Schorr?

14   A.    Yes.

15   Q.    But obviously you weren't able to find him at

16         that point.  Correct?

17   A.    Correct.

18   Q.    Your entry for this 9:20 time says that when

19         you got back from looking around for Schorr,

20         you were informed by staff that there were

21         three responders to the RA-- that's red alert--

22   A.    Yes.

23   Q.    --which ECU staff cleared.  Do you know who the

24         three responders were?

25   A.    No.

Exam./Williams - Graby                    28

1    Q.    Would they have been members of the red alert

2          team that we were talking about?

3    A.    Yes.

4    Q.    And does this entry indicate that when they got

5          there, ECU staff cleared them, meaning, you

6          might as well go because there's nothing for

7          you to do or something like that?  Or what does

8          that mean?

9    A.    That could be the case.  Or it could be that

10         there were enough other people present to

11         handle the situation.

12   Q.    All right.

13   A.    It could be for various reasons.

14   Q.    I understand.  But when you arrived, Mr. Myers

15         from engineering was still present?

16   A.    Yes.

17   Q.    Was he one of the responders?

18   A.    Yes.

19   Q.    And is he on the red alert team, if you know?

20   A.    I don't know.

21   Q.    All right.  But you cleared Mr. Myers.

22         Correct?

23   A.    Correct.

24   Q.    Now, there's a reference to Candice here.

25         That's Candice Highfield?

Exam./Williams - Graby                    29

1    A.    Yes.

2    Q.    And she's the crisis worker?  She was the

3          crisis worker?

4    A.    Yes.

5    Q.    You gave some indication of what Miss Highfield

6          told you.  And just to sort of put it in

7          context, I'll read it.  You say, "Candice said

8          that she opened the door to seclusion to read

9          patient Schorr his rights with the door only

10         open halfway.  Patient Schorr physically pushed

11         Candice and then ran from the ECU."  My

12         question is, did Candice tell you anything else

13         besides that?

14   A.    No.  I think that was pretty much it.

15   Q.    Did she tell you anything about Schorr's mood

16         or mental state or--

17   A.    No.

18   Q.    --way of being at that time?

19   A.    No.

20   Q.    All right.  Now, did you or someone that you

21         observed contact the police at any of these

22         points?

23   A.    The police were contacted.

24   Q.    Do you know by whom?

25   A.    I do not know.

Exam./Williams - Graby                          3

1    Q.    All right.  Were you present when the police

2          were contacted?  And when I say "present", I

3          mean present so that you could hear the contact

4          being made.

5    A.    I don't recall.

6    Q.    All right.  After these events, did you have

7          any conversation with the police or policemen

8          about this incident?

9    A.    After being--

10   Q.    Well, after Ryan Schorr had left Holy Spirit

11         Hospital, did you have any contact with the

12         police?

13   A.    That day?

14   Q.    Yes.

15   A.    Within that time frame there?

16   Q.    Yes, first of all.  Then I'll--

17   A.    I don't recall that I specifically talked to

18         any officers.

19   Q.    Now, later, as the police and other agencies

20         investigated this incident, did you have some

21         contact with law enforcement officers about it?

22   A.    As it was being investigated?

23   Q.    Yes.

24   A.    Yes.

25   Q.    And do you know with whom?  Do you know what

Exam./Williams - Graby                    31

1           police department or--

2   A.    An officer from, I believe it's called CID.

3   Q.    And did you give a recorded statement to that

4         officer, do you know?

5   A.    A written statement?

6   Q.    First of all--

7   A.    Sorry.

8   Q.    No, that's fine.  No, it's my confusion.  Did

9         you give a written statement?

10  A.    Yes.

11  Q.    All right.  And do you know if the written

12        statement was also recorded mechanically?

13  A.    No.

14  Q.    The written statement, was it one that you

15        signed?

16  A.    Yes.

17  Q.    And were you given a copy of it?

18  A.    Yes, I believe so.

19  Q.    All right.  When you were called away from ECU,

20        I know you told us you were cleared by staff

21        there, I guess Miss Smith, did you, you know,

22        report to anyone that you were leaving ECU?

23        Was that part of the protocol?

24  A.    Pat would have been the only person that needed

25        to know that.

Exam./Williams - Graby                                    32

1   Q.    I understand.  You didn't have to call in your

2         departure to somebody else?

3   A.    No.

4   Q.    Did Ryan Schorr curse or use any profane

5         language at any point that you heard?

6   A.    He may have.  Again, I don't recall the

7         specifics.

8   Q.    Fine.  Did you have any contact with Carol

9         Joeger, Nurse Joeger, on the day of the Ryan

10        Schorr incident?

11  A.    I know that I had contact with Carol at some

12        point, but I can't recall her specific role in

13        what I talked to her--

14  Q.    That's fine.  And I guess I should have asked

15        you this at the beginning of the deposition,

16        but were you a full-time security officer at

17        Holy Spirit?

18  A.    Yes, sir.

19  Q.    And how many hours a week did you work

20        typically?

21  A.    40 hours a week.

22  Q.    And that's still the case today?

23  A.    Yes, sir.

24  Q.    All right.  I have no further questions for

25        you.

Exam./MacMain - Graby                    33

1                        EXAMINATION

2    BY MR. MacMAIN:

3    Q.    I just have a couple.  The reports that are

4          generated, there's times and then you designate

5          what you did during those times--

6    A.    Yes, sir.

7    Q.    --do you write it as you go along or do you go

8          back after everything's over and approximate

9          the times that each of these events happened?

10   A.    I typically take notes as I'm going.

11         Obviously, certain events you can't take notes.

12         But I try to generate the times as close to the

13         actual times as possible.

14   Q.    And then you go back and type into a computer.

15         And I assume this is some type of a form

16         generated in the same format?

17   A.    Yes.

18   Q.    Do you recall -- and you may have already

19         answered this -- but do you recall any specific

20         conversations you may have had with either

21         Officer Berresford or Officer Hart from West

22         Shore Regional?

23   A.    No.

24   Q.    Do you remember speaking to them at all?

25   A.    I don't really recall having much interaction

Exam./MacMain - Graby                    3

1        with them at all.  I think I did ask them if

2        they searched the patient.  I don't recall much

3        more than that.

4   Q.   That's all the questions I have.  Thanks.

5             MR. YANINEK:  I don't have any questions.

6             (The proceedings concluded at 2:27 p.m.)

COMMONWEALTH OF PENNSYLVANIA       :
                                   : SS
COUNTY OF DAUPHIN                   :


        I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:

                    CORY GRABY

        I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.

        I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania this 10th day
of September, 2002.



                    _Debra L. Heary_
                    Debra L. Heary
                    Registered Professional Reporter
                    Notary Public

                    Notarial Seal
                    Debra L. Heary, Notary Public
                    Lower Paxton Twp., Dauphin County
                    My Commission Expires Feb. 10, 2003


(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

# Incident Report

**Page: 1**

---

Incident #: 0000006843  0000

---

Category:          32 - Security Standby
Subcategory:       03 - Patient - Male
Type:              02 - Adult

Occurrence Date: 11/18/2000 To: 11/18/2000
Occurrence Time: 08:20 To: 09:00
Reported Date:   11/18/2000

Building/Site:     Hospital
                   503 North 21st Street
                   Camp Hill, Pennsylvania
                   United States 17011

COPY

Location:          ECU
Status:            Closed

Report Taken By:   Graby, Cory M

### Incident Narrative

0820 S/O Graby is contacted by the ECU and requested to assist in placing pt Ryan Schorr into the seclusion room. Pt Schorr has been brought to the hospital by two West Shore Regional Police Officers, for a 302 commitment to Mental Health.

0822 Graby at the ECU, and meets with staff and the Officers outside of room 17. Pt Schorr is currently seated on the bed inside the room. Candice Highfield, Crisis, informs Graby that Schorr's mother is petitioning for a 302. WSRPD state that they did search the pt, and that he has been compliant with their requests.

0825 Pt Schorr is secluded in room 17, WSRPD clear from the ECU. Graby remains on standby, per the request of ECU staff.

0835 Graby enters room 17 along with Rodney Buckles, ECU Tech, to place Schorr's name tag on his wrist. Pt Schorr states that he will not be touched by anyone without his bodyguard present. He states that he would like his girlfriend and father contacted so they can bring him his Limo. Schorr also states that he needs to obtain a gun so he can get some money from one of his many bank accounts. Graby places the name tag on the bed and exits the room with Rodney. Upon exiting Schorr states that he is going to buy the hospital and blow it up at 1200 hrs. Graby secludes pt Schorr.

0845 Graby along with Dr. Spurrier enter room 17. Pt Schorr allows Spurrier to conduct a brief examination. Spurrier explains to Schorr that as long as he continues to cooperate no meds will be required, however if pt Schorr becomes non compliant and disruptive he will be medicated, Schorr acknowledges that he understands this.

0850 Graby and Spurrier clear from the room, Graby secludes pt Schorr.

0855 Graby is cleared from the standby by ECU staff, due to the pts compliant behavior.

0900 Graby clears from the ECU.



DEPOSITION
EXHIBIT #1
Graby
8|30|02  DH

---

# Incident Report

Page: 2

Incident Person

### Incident Person Details 1 of 5
Schorr, Ryan

Person Type: Patient

### Incident Person Details 2 of 5
Highfield, Candice

Person Type: CMHC Staff

### Incident Person Details 3 of 5
Buckles, Rodney

Person Type: ECU Staff

### Incident Person Details 4 of 5
Spurrier, Doctor

Person Type: Doctor

### Incident Person Details 5 of 5
Joeger, Carol

Person Type: ECU Staff

---

# Incident Report

Page:

Incident #: 0000006844  0000

```
Category:          29 - Red Alert
Subcategory:       02 - Patient
Type:              04 - Male - Adult

Occurrence Date:   11/18/2000 To: 11/18/2000
Occurrence Time:   09:09 To: 09:30
Reported Date:     11/18/2000

Building/Site:     Hospital
                   503 North 21st Street
                   Camp Hill, Pennsylvania
                   United States 17011

Location:          ECU
Status:            Closed

Report Taken By:   Graby, Cory M
```

**Incident Narrative**

0909  Red Alert to the ECU is called overhead and via radio, S/O Graby on route.

0910  Graby arrives at the ECU and is informed that pt Ryan Schorr forced his way past Candice Highfield, Crisis, and exited the hospital heading into the middle level of the parking garage. Graby proceeds to the parking garage and meets with Rodney Buckles, ECU Tech.  Graby enters the parking garage and conducts a full sweep of the area, Graby is unable to locate pt Schorr.  Graby then conducts a brief search of the Senate House, again not locating pt Schorr.

0920  Graby arrives back at the ECU.  Graby is informed by staff that there were three responders to the RA which ECU staff cleared.  Jesse Myers, Engineering is still present.  Graby clears Jesse.

0922  Graby is informed by Candice that she opened the door to seclusion to read pt Schorr his rights, with the door only opened halfway, pt Schorr physically pushed Candice and then ran from the ECU.  Rodney pursued but was unable to stop pt Schorr form fleeing.

0930  Graby clears from the ECU and the RA.

**Incident Person**

**Incident Person Details 1 of 3**
Schorr, Ryan

Person Type: Patient

**Incident Person Details 2 of 3**
Highfield, Candice

Person Type: CMHC Staff



# Incident Report

## Incident Person Details 3 of 3

**Buckles, Rodney**

Person Type: ECU Staff

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.



Cory G
August 30,

**1**

10 21:4
100 26:5
1990 7:2

**2**

2000 9:5; 11:2
235 7:23
2:27 34:6

**8**

8:35 23:23; 24:2
8:55 24:12

**9**

9:00 26:25; 27:7
9:09 25:15; 26:8
9:10 26:9; 27:6, 7
9:20 27:18
9:30 25:16

**A**

able 27:15
accompanied 12:10
accurate 11:9, 10, 24;
20:3; 23:12; 25:11; 26:12
acknowledged 12:19
Act 7:23
actual 33:13
actually 10:4
advanced 8:4
again 5:6; 26:22; 32:6
against 4:15
agencies 30:19
agitated 14:6; 17:1, 4, 7
ahead 9:25
alert 7:25; 18:3, 6, 8, 24;
19:3, 6, 17, 19, 23, 24, 25;
20:1, 2; 25:11, 22; 26:7;
27:21; 28:1, 19
alone 11:14
along 33:7
always 18:6, 10, 11, 25
anger 13:11, 12
answered 33:19
appear 14:6; 17:1; 22:18,
20, 21
approached 12:2
approaching 13:6
approximate 23:24;
26:23; 33:8
Approximately 6:21;
7:13, 14; 21:3, 4; 26:4
area 21:3, 17; 27:13

arises 18:7
around 9:1, 4; 26:25;
27:6, 19
arrive 19:12; 26:14, 16;
28:14
arriving 10:1
assist 11:13; 12:16; 19:7;
11:15
Association 8:3
assume 33:15
atmosphere 13:23
attained 7:5
attempt 13:8
attorneys 4:18
away 31:19

**B**

back 26:9, 9; 27:6, 11, 19;
33:8, 14
background 6:22
basic 8:4
becomes 18:24
bed 15:17
beginning 32:15
begins 25:15
behavior 22:3, 4, 15;
24:21, 24
Berresford 33:21
Besides 20:13; 29:13
best 5:13; 11:20
beyond 19:8
bit 9:1; 10:9; 15:14
blowing 14:15
bodyguard 14:21
bracelet 10:10; 11:12;
12:8, 18, 20; 13:9; 15:15,
17
break 10:9
brief 8:23
briefly 17:16
brought 9:16; 15:4; 22:23
Buckles 12:14; 20:18;
24:3
Business 7:11
buying 14:15

**C**

call 18:24; 22:14; 32:1;
4:8, 22; 7:23, 25; 10:16;
18:9; 19:3, 6, 10, 17; 20:1;
21:7, 8, 10, 11; 26:8; 31:2,
19; 18:3
came 10:4
can 10:21, 22; 14:13;
19:11, 12, 14; 26:3
Candice 28:24, 25; 29:7,
11, 12
care 10:23
Carol 32:8, 11
carry 8:8, 10, 13

case 4:13; 18:12, 21;
28:9; 32:22
Central 7:11
certain 13:18; 33:11
certainly 10:21; 22:22
certification 4:4; 7:23;
8:2, 4
certified 19:22
Charles 23:19
check 24:18, 15
CID 31:2
clear 5:21; 24:14, 20;
27:23; 28:5, 21; 31:20
close 13:6; 21:21; 24:8;
33:12; 15:20, 20, 22; 24:7
college 6:24
combative 19:7; 22:15,
18
communication 20:15
complete 22:7
compliant 24:21, 23, 25
computer 33:14
concerned 24:10
concluded 34:6
condition 11:7
conducted 16:19
conform 9:5
confusion 31:8
consider 21:23; 11:14;
18:5
contact 8:20, 22; 9:14;
10:3; 20:9; 25:3; 29:21;
30:3, 11, 21; 32:8, 11;
29:23; 30:2
context 29:7
control 19:8; 22:7
conversation 17:21;
30:7; 17:18; 20:21; 33:20
conversed 17:16
copy 31:17
CORY 4:8
counsel 4:3; 25:10
couple 20:7; 23:15, 21,
21; 33:3
course 11:23; 24:8
court 4:21; 6:5
courtroom 6:12
crisis 29:2, 3
criteria 22:9, 9, 12
crow 26:4
currently 7:4
curse 32:4

**D**

day 9:12; 23:11; 25:2;
30:13; 32:9
de-escalate 19:13
dealing 20:17; 26:23; 9:3
dealt 19:15
degree 9:9; 14:8
demeanor 13:3

department 9:21; 11:24;
20:24; 26:1, 10; 31:1
departure 32:2
depending 4:19
deposition 4:22, 23;
32:15
described 27:10
describing 25:19
designate 33:4
desk 25:24
details 26:7
determination 22:22
different 5:7; 23:25
difficulty 10:7
discuss 13:21; 16:20;
18:4, 20; 17:22; 18:13
discussion 18:2
doctor 16:7; 17:16; 22:13
document 23:20; 20:6
done 10:13
door 15:20, 20, 22; 21:21;
24:6, 9; 29:8, 9
doorway 16:12
down 4:21; 10:9; 15:5
Dr 16:8, 10, 17, 19; 17:9,
11, 14; 18:14; 20:13; 21:2
drugs 22:21
due 14:20
duly 4:9
during 33:5
duties 8:7
duty 20:2; 21:15

**E**

earlier 19:16
ECU 10:3; 11:20; 12:10;
17:17; 18:14, 22; 20:8, 18;
24:14, 15; 26:16, 25;
27:23; 28:5; 29:11; 31:19,
22
educational 6:22
effect 15:3; 18:23
either 14:24; 18:14; 33:20
elevated 14:5
else 21:11; 29:12; 32:2
emergency 11:24; 20:16,
24; 21:3, 5, 17; 25:25;
26:10
emotion 13:14
employed 6:14
encounter 9:7; 10:24;
16:17; 9:13
end 24:4
ends 25:15
enforcement 30:21
engineering 28:15
enough 14:9; 18:16;
28:10
enter 16:5, 7, 10; 10:4,
10; 11:11; 12:17; 24:3
entry 23:22; 24:4, 12;

27:18; 28:4
equipment 8:13, 1
escalate 18:23; 19
escalation 19:12
evaluating 5:11
even 6:6
events 9:17; 25:18
33:9, 11
everything's 33:8
exactly 12:22; 13:2
17:13, 20; 21:10
EXAMINATION 4:1
16:19; 33:1
example 16:24
except 4:5
exchange 16:23
Exhibit 23:3; 25:6
exited 15:17; 17:9
experience 7:9; 4:
Explain 22:4; 25:10
express 5:24; 12:2
13:11, 14

**F**

Fair 14:9; 18:16; 27
fallback 18:6
falls 22:13
family 4:14
far 16:20; 19:14; 24
25:18
feel 13:4
feet 16:1; 26:2, 3
filed 4:4
filing 4:4
find 4:25; 27:15
Fine 9:25; 11:22; 26
31:8; 32:8, 14
finish 6:3
First 5:3; 9:11; 21:1
30:16; 31:6
fit 22:10
five 6:21
flashlight 8:15, 16
flesh 14:13
flies 26:4
follow-up 18:18
following 6:2
follows 4:9
form 4:6; 33:15
format 33:16
frame 30:15
full-time 32:16
funny 22:1
further 32:24

**G**

garage 27:12
gave 29:5
general 18:19; 19:



**Keith I. Schorr & Susan Schorr v.**
**Borough of Lemoyne, et al.**

**Cory Graby**
**August 30, 2002**



represent 4:13
requests 25:1
require 22:3
reserved 4:6
respective 4:3
respond 20:3
responders 19:25;
27:21, 24; 28:17
restrain 22:10
restraints 8:11; 21:19,
20, 24; 22:5, 14
right 6:25; 8:7, 18; 9:18;
11:1, 11; 12:17; 13:13, 21;
14:6, 9; 15:21; 16:13; 17:1,
8; 18:2; 19:16; 21:23;
22:12, 17, 23; 25:21; 27:8;
28:12, 21; 29:20; 30:1, 6;
31:11, 19; 32:24; 29:9
Rodney 12:14; 20:18
role 12:15; 32:12
Room 10:3, 4, 10, 16, 17,
18, 22; 11:1, 2, 3, 8, 12, 13,
17, 22, 23; 12:6, 7, 18;
15:18, 19, 25; 16:2, 4, 6, 7,
10; 17:9, 12, 15; 20:16;
21:2, 6, 21; 24:3
routine 16:19
rule 6:2; 5:1
Ryan 4:14; 8:24; 9:3, 8;
10:11; 11:6; 16:17, 22;
20:17; 21:19, 24; 23:11;
25:3; 30:10; 32:4, 9

**S**

Safety 8:3
same 6:10, 11; 23:11;
33:16
saw 9:11, 12
saying 5:20; 27:11
scene 26:11
school 6:23; 7:1, 11
Schorr 4:15; 8:24; 9:3, 8,
14; 10:11; 12:19; 16:18,
22; 20:17; 21:19, 24;
23:11; 24:5; 25:4; 26:11;
27:3, 13, 19; 29:9, 10;
30:10; 32:4, 10; 11:6;
29:15
sealing 4:4
searched 10:2; 27:12;
34:2
secludes 24:5
seclusion 10:17; 29:8
second 20:7; 26:20
secondly 5:10
secretary 12:3
security 6:17, 19; 7:5, 6,
10, 12, 16; 8:4, 7, 14;
10:14; 21:14; 32:16
seemed 13:25; 14:1
sense 5:12
serve 19:11
shaking 14:7

shift 21:13
Shore 9:24; 33:22
shortcuts 5:20
show 19:13; 22:6, 8
side 23:23
signed 31:15
simple 4:25
situation 5:7; 11:6, 7;
19:8, 13, 14; 28:11
slightly 17:7
small 8:15
Smith 20:12, 13; 24:19;
31:21
somebody 32:2; 5:11
someone 15:20; 22:11;
24:16; 29:20
someplace 21:11
sometime 9:4; 27:7
sorry 20:7; 31:7
sort 29:6
sound 27:8
speak 13:24, 16; 33:24
specific 32:12; 33:19;
32:7
specifically 13:1; 15:6;
17:25; 18:13, 15, 17; 30:17
Spirit 4:15; 6:15, 20; 7:6,
15, 20; 8:8; 20:14; 30:10;
32:17
spoke 9:15; 12:25
Spurrier 16:8, 11, 17, 19;
17:9, 11, 14; 18:14; 20:13;
21:2
staff 11:20; 17:17; 18:14;
24:15, 20; 25:1; 27:20, 23;
28:5; 31:20
standby 24:15
start 6:4; 9:2; 13:16;
20:22
State 7:24; 29:16; 12:22;
15:3; 26:20
statement 14:18; 31:3, 5,
9, 12, 14; 13:18; 14:10, 17,
23
stating 18:15
Sterling 23:19
still 16:4; 17:8; 27:3;
28:15; 32:22
stipulated 4:2
STIPULATION 4:1
stood 16:12
story 20:15
Strike 20:6
subduing 19:7
subject 8:23
submit 23:16, 17
summarize 27:11
sworn 4:9
system 19:22

**T**

tactic 19:12
talk 24:2; 17:20; 30:17;
32:13; 6:5; 10:16; 14:18;
24:13; 28:2
team 19:17, 19, 24; 20:2;
28:2, 19
tech 12:10, 11, 12, 13, 15;
15:21; 20:18; 24:3
telling 9:2
test 5:10
testified 4:9
testimony 6:9, 11; 19:16
Thanks 34:4
three 6:23; 7:14; 27:21,
24
times 20:8; 23:24; 26:23;
33:4, 5, 9, 12, 13
timing 9:4
today 6:10; 32:22
told 14:9; 24:2; 29:6;
31:20
tone 12:24; 14:5
took 6:9
touch 13:8, 5; 14:21
training 7:16, 19, 22, 25;
8:1, 6; 19:23
trial 4:7
tried 21:9
try 6:3; 10:8; 33:12
trying 9:16; 13:12; 17:5
type 13:7; 14:18; 33:14,
15; 14:23
typically 22:8, 10, 13, 14;
32:20; 33:10

**U**

um-hum 5:20
under 22:20
unless 5:24
up 14:15
upon 12:20; 22:13
use 22:10; 23:22; 32:4
used 10:22
using 18:13; 21:24

**V**

variety 10:23
various 28:13
verbal 9:14; 19:11
verbally 12:22; 16:20
vicinity 25:23
violence 22:6
violent 17:1, 3
voice 12:25; 13:24; 16:23

**W**

wait 6:3
waived 4:5
Washington 15:5
way 5:7; 10:8; 11:13;
13:11; 14:7; 17:2; 22:21;
23:23; 25:2; 29:18
weapon 8:8; 7:23
week 32:19, 21; 5:22
weren't 27:15
West 9:24; 33:21
what's 6:22; 7:22; 10:16
whole 4:22
WILLIAMS 4:11, 12;
23:1, 5; 25:8
wish 12:20
within 11:23; 16:1; 19:21;
30:15
without 14:21
witness 4:8
words 5:19, 24; 23:22
work 7:6; 32:19; 7:11, 13
worker 29:2, 3
wristband 10:5; 12:4
write 33:7
written 31:5, 9, 11, 14

**Y**

YANINEK 34:5
yards 26:2, 3, 5, 5
years 6:21, 23; 7:4, 14

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and
SUSAN SCHORR,
          Plaintiffs

    vs.

BOROUGH OF LEMOYNE,
BOROUGH OF WORMLEYSBURG,
WEST SHORE REGIONAL POLICE
DEPARTMENT, HOWARD DOUGHERTY,
CHIEF WEST SHORE REGIONAL
POLICE DEPARTMENT, CUMBERLAND
COUNTY, HOLY SPIRIT HOSPITAL,
          Defendants

No. 1:01-CV-0930

Judge Kane

Deposition of  :  CANDICE HIGHFIELD

Taken by      :  Defendants

Date          :  August 30, 2002, 4:03 p.m.

Place        :  210 Senate Avenue
               Camp Hill, Pennsylvania

Before      :  Debra L. Heary, Notary Public
               Registered Professional Reporter

FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623  York 717-845-6418  PA 1-800-233-9327

2

APPEARANCES

      WILLIAMS, CUKER & BEREZOFSKY
      By:  GERALD J. WILLIAMS, ESQ.

          For - Plaintiffs

      MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
      By:  DAVID J. MacMAIN, ESQ.

          For - Defendants West Shore Regional
                Police Department, Howard Dougherty,
                Chief West Shore Regional Police
                Department

      METTE, EVANS & WOODSIDE
      By:  JOHN F. YANINEK, ESQ.

          For - Defendants Cumberland County and
                Holy Spirit Hospital

ALSO PRESENT

      Fran Charney, RN, Director Risk Management

3

I N D E X
WITNESS

CANDICE HIGHFIELD                          Examination

    By Mr. Williams                            4, 31

    By Mr. MacMain                              27

FILIUS & McLUCAS REPORTING SERVICE, INC.
Harrisburg 717-236-0623  York 717-845-6418  PA 1-800-233-9327

4

STIPULATION

1          It is hereby stipulated by and between

2    counsel for the respective parties that

3    sealing, certification and filing are hereby

4    waived; and all objections except as to the

5    form of the question are reserved to the time

6    of trial.

7          CANDICE HIGHFIELD, called as a witness,

8    being duly sworn, testified as follows:

9                 EXAMINATION

10  BY MR. WILLIAMS:

11  Q.    Miss Highfield, I'm Gerry Williams.  And I'm

12       here to take your deposition.  I'm going to try

13       to be even shorter with you than with other

14       witnesses, so I won't harangue you too much

15       about depositions.  But have you ever given one

16       before?

17  A.    I would say -- I'm going to age myself here --

18       back, like, in 1983.  I used to work at

19       Children and Youth, and I think there was an

20       insurance deposition.

21  Q.    All right.  Well, even way back then the same

22       rules applied.  And basically, they're that

23       your testimony is under oath, so it's important

24       for that reason alone.

25

Exam./Williams - Highfield                      5

1          We want you to give answers to questions

2      that you hear and you understand.  So if you

3      don't hear a question or don't understand it,

4      let me know and I'll correct it.  Okay?

5  A.   Um-hum.

6  Q.   Here's another rule which you just violated.

7      You have to give your answers in words for the

8      sake of our record, which is being taken down

9      by the court reporter.  Okay?

10 A.   Yes.

11 Q.   And I'm the worst violator of this.  I ask long

12      questions sometimes.  So let me finish before

13      you start your answer so we're not talking over

14      each other.  Okay?

15 A.   Okay.

16 Q.   And if for any reason you want to take a break

17      or talk to counsel or for any other purpose,

18      just let me know and you will be accommodated.

19      All right?

20 A.   Thank you.

21 Q.   Now, Ms. Highfield, you are not employed by

22      Holy Spirit at this moment, is that correct or

23      not?

24 A.   Yes, I am, in a part-time basis.

25 Q.   You are?  Okay.  Tell me your current

Exam./Williams - Highfield                    6

1    employment situation.

2    A.    I work full-time for Lancaster-Lebanon

3          Intermediate Unit as a clinical social worker.

4          I work part-time, every other weekend, for Holy

5          Spirit as a crisis worker.

6    Q.    And in your capacity--  First of all, back in

7          November of 2000, which is the time frame for

8          this case and incidents involving Ryan Schorr,

9          were you a full-time crisis worker at Holy

10         Spirit?

11   A.    No.

12   Q.    You were also then a part-time--

13   A.    Correct.

14   Q.    And describe for me then your duties as a

15         crisis worker at Holy Spirit.  And we'll use

16         November 2000 as the time frame.

17   A.    To answer crisis calls on the hotline or the

18         crisis line, to assess patients -- mental

19         health patients who come in for crisis

20         assessment or who are in the emergency room and

21         the doctor makes a referral or asks for a

22         crisis consult, and basically to be aware of

23         the mental health procedures and law.

24   Q.    Now, going back to November of 2000, were you

25         also then primarily a weekend worker?

Exam./Williams - Highfield                    7

1    A.    Yes.

2    Q.    And I guess I should have asked you a better

3          way.  Was it weekends that you worked back then

4          or--

5    A.    At Holy Spirit?

6    Q.    At Holy Spirit.

7    A.    Going back then, I was a clinical therapist at

8          KidsPeace, which is also a mental health

9          facility.  And I was working in intensive

10         mental health adolescent residential program.

11   Q.    Right.  And that was your full-time job, so to

12         speak?

13   A.    Yes.

14   Q.    And your part-time job at Holy Spirit back then

15         was on weekends?

16   A.    That's correct.

17   Q.    Same as it is now?

18   A.    That's correct.

19   Q.    And your part-time job at Holy Spirit is

20         essentially the same now as it was then?

21   A.    Yes.

22   Q.    And we understand from a lot of records and

23         from the rest of this litigation that back

24         then, back sometime in 2000, November

25         specifically, you had some contact with Ryan

Exam./Williams - Highfield                    8

1      Schorr who's the subject of this litigation; is

2      that correct?

3  A.   On that date, yes.

4  Q.   And I guess it's fair to say we're aware of one

5      particular moment of your encounter with Ryan

6      Schorr that I'm going to ask you about, but I

7      want to see what the whole parameters of your

8      contact were.

9           So is it true that you are the person who

10     opened the door to the seclusion room and the

11     person whom Ryan Schorr brushed past on his way

12     out of the hospital?

13 A.   It is true that I opened the door at a corner,

14     and Ryan did not push or brush by -- he shoved

15     me--

16 Q.   I understand.

17 A.   --back, yes.

18 Q.   But you are that person that he shoved?

19 A.   Yes.

20 Q.   And he then ran out of the emergency area?

21 A.   That's correct.

22 Q.   Other than that contact, had you previously had

23     any contact with Ryan Schorr?

24 A.   No.

25 Q.   All right.  Now, why were you attempting to

Exam./Williams - Highfield                    9

1      enter the seclusion room where Ryan Schorr was?

2  A.  Ryan was brought in under a 302, which is an

3      involuntary mental health commitment, which was

4      previously done with another crisis worker.

5  Q.  Right.

6  A.  He--

7  Q.  Who was that other crisis worker?

8  A.  Mercy, Mercedes.

9  Q.  All right.  Okay.

10 A.  And under a 302, every patient has a legal

11     right to have their rights read to them.  And I

12     was attempting to enter the room to talk to him

13     about his involuntary patient rights.

14 Q.  Understood.  Now, first of all, those rights

15     that are read to an involuntary patient, are

16     they on a placard or something that a worker

17     has?

18 A.  A piece of paper.

19 Q.  And did you have that piece of paper with you

20     when you were--

21 A.  In my hand.

22 Q.  Before you went in there, had you spoken to any

23     other Holy Spirit staff about Ryan Schorr?

24 A.  Before I went in there, to my recollection, I

25     was behind -- at the desk where the doctors sit

Exam./Williams - Highfield                 10

1    behind the front desk of the ER or that area,

2    and I was on the phone with Ryan's mother.

3  Q.    I'm going to ask you about that.  In fact, let

4        me ask you about that now.  It's not exactly

5        what I was trying to ask you, but tell me about

6        your conversation with Ryan Schorr's mother,

7        Susan Schorr.

8  A.    Okay.  Basically, we do an intake assessment.

9        Because Ryan was -- his thoughts were not

10       clear, I was gathering a history from his mom

11       about what happened the days before, what was

12       his mental health status, what was his history,

13       what are your concerns?

14 Q.    All right.  Let me break it down a little bit.

15       First of all, how did you know that Ryan's

16       thoughts were not clear?

17 A.    Because Mercy would have stated that you have a

18       patient coming in.  This is pending.  He is

19       going to be coming in with the police.  He's an

20       involuntary.  Mrs. Schorr is the petitioner,

21       the mother, and this is what she's stating.

22 Q.    But that's kind of a general statement.  I

23       guess--  Mercedes, that's Briscese?

24 A.    I think it's, like, Briscane or something.

25 Q.    Okay.  Mercedes -- we'll call her Mercedes --

Exam./Williams - Highfield                    1:

1     do you recall her specifically telling you that

2     Ryan Schorr's thoughts were not clear?

3  A.   Okay.  And maybe you need to rephrase this,

4     because I'm not sure what you're asking, okay,

5     because she passes on information.

6  Q.   I understand.  Well, let me backtrack and try

7     to make it clear.  You told me that one of the

8     reasons why you contacted Ryan Schorr's mother

9     is because Ryan's thoughts were not clear.

10        And I asked you why -- how did you know

11     his thoughts were not clear.  And I think you

12     told me because Mercedes would have told you

13     that this person was here on an involuntary--

14  A.   And the thoughts were unclear, and we're

15     looking at a 302.

16  Q.   Right.  But my question is, is that something

17     that applies to every 302, or was that

18     specifically applicable to Ryan Schorr?

19  A.   That would apply to every 302 that you want to

20     gather a detailed history, detailed information

21     on them.  And I would normally do that with

22     someone that's not going to be able to give me

23     a good history.  I would want to gather their

24     support system.

25  Q.   And just to probe it a little bit further, do

Exam./Williams - Highfield                    12

1    you specifically remember Mercedes specifically

2    telling you Ryan Schorr's thoughts weren't

3    clear?

4  A.   I remember her basically saying--  I'm not sure

5    the exact terms.

6  Q.   Right.

7  A.   She would have left me with the--  I had the

8    impression that his thinking was delusional.

9  Q.   And did you have any understanding about his

10    behavior?

11  A.   That she's basically saying that she -- the

12    mother was concerned for him.  She wanted him

13    to have treatment.  His thoughts were

14    delusional.

15        Mom says usually when he gets into the

16    hospital, he's cooperative.  And she had given

17    me part of the 302 that she had completed at

18    that point.

19  Q.   All right.  Now, do you recall if that part of

20    the 302 indicated that Ryan Schorr was a danger

21    to himself or others?

22  A.   I'm not quite--  It would have had to be that

23    he was a danger to himself or someone else for

24    the delegate to even allow him to be brought in

25    under the 302.

Exam./Williams - Highfield                    13

1   Q.   Understood.  That's sort of what a 302 means, I

2        guess.  But, I guess, further my question is,

3        did you have any specific information about any

4        specific danger that Ryan Schorr presented to

5        himself or others?

6   A.   That he believed he was working for the

7        president, that he had a security guard, that

8        his limo was picking him up to go get money,

9        that his -- he had maybe made some threats to

10       his roommate.

11  Q.   All right.  Now, I took you off the track

12       there.  You had started to tell me about your

13       conversation with Susan Schorr.  And I think

14       you said a couple of things you asked her about

15       was Ryan Schorr's mental status and his

16       history.  Is that accurate?

17  A.   Yes.

18  Q.   What do you recall, if anything, Susan Schorr

19       telling you about his mental status or his

20       history?

21  A.   That at this point she felt that he was

22       delusional.  She was concerned, this is her

23       son.  She loves him very much.  She wants him

24       to get treatment.

25           He had prior hospitalizations, and that

Exam./Williams - Highfield                    1

1    usually as long as it's not Edgewater that he

2    cooperates -- and Edgewater is a psychiatric

3    center in Harrisburg -- that he is involved

4    with Dr. Rameriz, who was a psychologist in our

5    drug and alcohol dual diagnose part here at

6    Holy Spirit in the community mental health part

7    and Dr. de la Cruz, and that Dr. Rameriz has a

8    calming effect on Ryan.

9    Q.    Did you attempt to contact Dr. Rameriz?

10   A.    Yes.

11   Q.    And what happened with that?

12   A.    I left a message.  He was not there.

13   Q.    How about Dr. de la Cruz?

14   A.    No.

15   Q.    No.  There wasn't an attempt to contact that

16         doctor.  Correct?

17   A.    Not at that time, no.

18   Q.    Now, did you have any conversation with Dr.

19         David Spurrier about Ryan Schorr before you

20         attempted to enter the room?

21   A.    In my recollection, in between him seeing Ryan

22         and another patient, he said a comment like,

23         let me know if you're wanting anything else

24         with him, like, if you want me to order

25         medication.

Exam./Williams - Highfield                15

1   Q.    Did Dr. Spurrier tell you anything about Ryan's

2         condition or mental status?

3   A.    Not that I recall.

4   Q.    All right.

5   A.    I mean, you've got to understand, I'm

6         collecting information with mom on the phone,

7         he's doing what he needs to do in the ER, and

8         we're passing.

9   Q.    All right.  When Dr. Spurrier made this I'll

10        call it an offer to you if you needed something

11        more, did you make any response to him?  What

12        did you say to him, if anything?

13  A.    That I would.

14  Q.    Okay.

15  A.    I don't know if I said that per word, but maybe

16        a nodding.

17  Q.    I understand.  Something to that effect that

18        you understood what he was saying and you would

19        avail yourself of it if you needed it.  Is that

20        accurate?

21  A.    Yes.

22  Q.    Now, from the time you hung up with Ryan

23        Schorr's mother Susan, did you talk to anyone

24        else before you attempted to enter the room?

25  A.    No.

Exam./Williams - Highfield                    16

1  Q.  And did you attempt to enter the room

2      immediately after you hung up from Ryan

3      Schorr's mother or was there some passage of

4      time there?

5  A.  There would have been a couple minutes passage

6      of time because, of course, I have to walk from

7      back at the desk to room -- it was Room 17 at

8      the time.

9  Q.  But you fairly immediately set out for Room 17

10     after you hung up.  Is that accurate?

11 A.  Yes.

12 Q.  All right.  Now, was anyone with you as you

13     approached Room 17?

14 A.  No.

15 Q.  We heard from Security Officer Graby earlier.

16     Had you seen him at all that day?

17 A.  Perhaps when the police brought Ryan in in

18     passing.  When Ryan came in with the police, he

19     was cooperating with them.  He walked into the

20     ER.  He was not handcuffed.  Security was there

21     in passing prior to going back to the doctors'

22     desk to make phone calls.

23 Q.  All right.  And did you play any role in

24     clearing Officer Graby from the emergency room?

25 A.  No.

Exam./Williams - Highfield                    1

```
 1   Q.   Who, if anyone, made that decision, if you
 2        know?
 3   A..  I would assume it would be either the ER charge
 4        nurse or the doctor.
 5   Q.   All right.  And who was the ER charge nurse?
 6   A.   Carol.
 7   Q.   Joeger.  Is that how -- J-o-e-r-g--
 8   A.   Yeah.  You get a--  I mean, there's a lot of
 9        nurses.  I'm very good with first names, not so
10        good with last names.
11   Q.   All right.  I think that's who it was.  Now,
12        when you arrived at Room 17, did you look in
13        before you opened the door?
14   A.   Yes.  There's a little window.
15   Q.   And what did you observe when you looked in?
16   A.   Ryan sitting on the cot.
17   Q.   Was he silent?
18   A.   Yes.
19   Q.   Was there anything notable about his
20        appearance?
21   A.   No.  He was just sitting there.
22   Q.   And still -- his body was still?
23   A.   Yes.
24   Q.   So what happened next after you looked in?
25   A.   After I looked in and he was sitting there?
```

1   Q.    Yes.

2   A.    17's door faces this way.  (Indicating)  So

3         when you're walking up, it's not like the

4         handle's here.  (Indicating)

5   Q.    Now, we're going to have to explain that for

6         the record.  17's door faces which way?  It's

7         on an angle, or is it something else?

8   A.    Okay.  The door would be to my right.  But the

9         knob, the handle, to get into 17 would not be

10        immediately to my right, it would be to the

11        left.

12  Q.    Oh, okay.  And then the door pulls out?

13  A.    Correct.

14  Q.    And swings to the right, so to speak?

15  A.    Yes.

16  Q.    All right.

17  A.    Okay.  So upon entering 17, of course there's a

18        window.  I can see that Ryan's sitting on the

19        cot.  So I'm going to the left, going to open

20        the door, a corner of the door to talk to Ryan.

21        As I'm trying to talk to say, Ryan, my name --

22        he shoves and pushes out.

23  Q.    All right.  Now, as he shoved or at any point

24        around that time, did he say or shout anything?

25  A.    No.

Exam./Williams - Highfield                    1

1   Q.   He remained silent?

2   A.   Yes.

3   Q.   And he shoved the door open?  What happened to

4        you?  Did you fall--

5   A.   He shoved me back.  I went back -- I'm not

6        quite sure, because I think I was taken back

7        when he shoved me.  I was like, whoa, because

8        Carol asked me, are you all right?

9             And I said, I'm okay.  She said, are you

10       sure you don't need to be seen?  I said, no,

11       I'm fine.  So it must have been, you know, a

12       number of yards -- several yards that he shoved

13       me back, because Room 17 is here.  (Indicating)

14       And the nurses' desk is a good piece away.

15  Q.   And you ended up near the nurses' desk?

16  A.   Near Carol.

17  Q.   And that's where Carol was?

18  A.   Correct.

19  Q.   And is Room 17 visible from the nurses' desk?

20  A.   Yes.

21  Q.   And the doorway is visible from the nurses'

22       desk?

23  A.   Yes.

24  Q.   When you say Ryan shoved you, did he shove you

25       directly -- I mean, did he put his hand on your

Exam./Williams - Highfield                    20

1       person, or was it by pushing the door?

2   A.  He shoved me on my person.  One of the things

3       when you deal with mentally ill patients is you

4       are trained in what they call some crisis kind

5       of mode of body protection.

6           So I've been through several trainings --

7       physical trainings, you know.  And I remember

8       this because I very rarely ever used it.  I

9       mean, I worked at KidsPeace, and they train

10      you.  And I've never had to use it.

11          But instinctively when Ryan shoved me, my

12      arms immediately went up around my face

13      (indicating), which is a block move.

14  Q.  Right.  All right.  Now, this question may

15      sound funny to you, but let me ask it anyway.

16      Why did you approach Room 17 alone?  Why didn't

17      you ask someone to accompany you?

18  A.  Because normally procedure as a crisis worker,

19      I read involuntary rights, whether they're 302

20      rights, whether they're voluntary rights,

21      whether they're 304 rights to patients.  I

22      mean, that's part of the job as a crisis worker

23      and as a social worker.

24          I was under--  I mean, I had no reason to

25      suspect that Ryan was going to shove me.  He

Exam./Williams - Highfield                    2

1    came in with the police without any handcuffs.

2    He was cooperating.  He walked to the room.  He

3    was not physically lashing out at anybody prior

4    to that.

5         I mean, I deal with delusional and

6    mentally ill patients all the time and read

7    them their rights.

8  Q.  And do you normally do it alone, is that fair

9    to say?

10 A.  Yeah.

11 Q.  If a security guard is present in the area, do

12   you ask the security guard to watch while you

13   go

14   in?

15 A.  If the patient is combative and usually is in

16   restraints or their thinking -- or at that

17   point there's an assessment by staff previously

18   that this person is going to need restraints

19   and has been physical, yes.

20 Q.  All right.  Otherwise, no?

21 A.  Otherwise, you would treat the patient with

22   respect and use the least restrictive measures.

23 Q.  Before you attempted to enter the room, were

24   you aware of any incident where Ryan refused to

25   have an ID bracelet put on his arm?

Exam./Williams - Highfield                    22

1   A.    No.

2   Q.    Now, after he shoved you out of the way and

3         left the hospital, what did you do next?

4   A.    Carol-- Oh, what did I do next? Okay, because

5         Carol called the red--

6   Q.    Well, tell me what happened next.

7   A.    --alert, and she called the police. Okay?

8   Q.    All right. So Carol called the red alert.

9         That's within the hospital; is that correct?

10  A.    Right.

11  Q.    And she called-- I mean, that's both by radio

12        and by intercom?

13  A.    Yes.

14  Q.    All right. And it was also Carol who called

15        the police?

16  A.    Correct.

17  Q.    And do you recall-- Did you hear what she said

18        to the police when she called?

19  A.    Basically that-- It would have been Ryan just

20        left the hospital and that he's potentially

21        dangerous.

22  Q.    Do you know what the phrase "full psychosis"

23        means?

24  A.    In mental health?

25  Q.    Yes.

Exam./Williams - Highfield                        23

1   A.   Full psychosis would be somebody who--  Full
2        psychosis would mean they have no sense of
3        reality.  You would need a psychiatrist to
4        diagnose that.
5   Q.   I understand.  Do you recall whether Carol used
6        that phrase in describing Ryan Schorr to the
7        police?
8   A.   No, I don't recall.  Sorry.
9   Q.   That's fine.  And just so I'm clear, you don't
10       recall one way or the other?
11  A.   No.
12  Q.   All right.  Did she use the term homicidal with
13       reference to Ryan, if you recall?
14  A.   We're talking back in November 2000.  No, I
15       don't recall.
16  Q.   I understand.  As you sit here today, you don't
17       recall one way or the other?
18  A.   Correct.
19  Q.   Would you describe Ryan Schorr as homicidal at
20       the moment he left the hospital?
21  A.   No, in that I would describe a homicidal
22       patient as someone who's actually committed a
23       homicidal act.  I don't know that Ryan with his
24       history had ever hurt anyone.  Would I have
25       called him delusional?  Yes.

Exam./Williams - Highfield                    24

1    Q.    And--

2    A.    And needing mental health treatment?  Yes.

3    Q.    And when you, as a crisis worker, use the term

4          "delusional", what do you mean?

5    A.    That his thoughts are in a fantasy world.  He

6          believes he's someone he's not.  He has the

7          thoughts that he works for the president, that

8          he's going to the bank in his limo, and he's

9          waiting for his security people.  Those kinds

10         of thoughts I would call delusional.

11   Q.    You're mentioning history.  Ryan's history

12         reminds me of something from your conversation

13         with Susan Schorr.  Did she tell you why Ryan

14         was more reactive or less cooperative if

15         Edgewater was involved?

16   A.    He had a bad experience when he was

17         hospitalized at Edgewater.

18   Q.    Did she tell you what it was?

19   A.    Not specifically, just that she did not want

20         him to go back to Edgewater and he would not

21         cooperate there.  He didn't like it there.

22   Q.    All right.  Now, you saw Ryan Schorr when he

23         arrived at the hospital or not?

24   A.    When he arrived at the hospital, he came in

25         with two police officers.  I was-- Okay.  The

Exam./Williams - Highfield                    2

1    crisis office is off of the ER -- off of ER

2    wing.  So I would be walking to the emergency

3    room expecting a patient to come.

4         So I was walking to the emergency room

5    with my forms for an involuntary admission.

6    And for an inpatient, there are a lot of forms

7    you complete when you are hospitalizing a

8    patient.

9         So I would be walking with my forms there

10   back to the ER.  So I was walking from the

11   crisis office over to the emergency room.  Ryan

12   was coming in the doors with the police

13   officers.

14   Q.   I understand.  So at that part of the

15        encounter, you basically just passed by.  Is

16        that accurate?

17   A.   That's correct.

18   Q.   And I know that you've told me you had the

19        forms for the involuntary procedures and so

20        forth, did you complete paperwork on Ryan?

21   A.   Yes, I completed an intake assessment form,

22        which we call the PI, and I signed off on the

23        302.

24   Q.   And the information you require to fill out

25        those forms, where did you get it from?