1   A.   The information for the intake assessment from

2        the PI?

3   Q.   Yes.

4   A.   I got that from Ryan's mother.

5   Q.   Now, after Ryan Schorr's elopement, did you

6        have any further involvement in the situation?

7   A.   Out of courtesy, I called Mom to let her know

8        that Ryan eloped, and if she hears from him

9        please try to encourage him to come back, and

10       call the police to bring him back because he

11       needs treatment.

12  Q.   When you called Susan Schorr, did you speak

13       with her directly or--

14  A.   Yes.

15  Q.   Did you make any telephone calls to Ryan

16       Schorr's residence?

17  A.   I don't recall.

18  Q.   You don't recall one way or the other?

19  A.   No.

20  Q.   Do you know if anyone else did from the

21       hospital?

22  A.   No, I don't know.

23  Q.   All right.  Did you ever speak to Ryan Schorr's

24       roommate?

25  A.   No.

1   Q.   Other than Ryan Schorr's mother, did you speak

2        with any other members of his family?

3   A.   No.

4   Q.   Did you speak to the police officers who

5        brought Ryan Schorr into the hospital?

6   A.   No.  Maybe, like, a nod in passing.  I mean,

7        they might have brought him in and said, this

8        is Ryan.  I mean, most police officers know to

9        take a patient to Room 17.

10  Q.   I understand.  And I know you told me that it

11       was Carol who called the police, but did you

12       speak with the police when she called?

13  A.   No.

14  Q.   All right.  I have no further questions for

15       you.

16                      EXAMINATION

17  BY MR. MacMAIN:

18  Q.   My name's David MacMain.  We met before the

19       deposition.  I represent the police department.

20       I just had a couple of questions.  You used the

21       term "called the police".  Do you know if they

22       actually spoke to the police or spoke to the

23       911 center?

24  A.   I'm not sure.

25  Q.   So when you used the term "police"--

Exam./MacMain - Highfield                    28

1   A.    It could have been 911 and/or the police,

2         that's correct.

3   Q.    You said that Ryan had had some prior dealings

4         here to your knowledge with Dr. Rameriz and Dr.

5         de la Cruz?

6   A.    Yes.  According to Mom, those were his

7         outpatient providers.  In gathering a history

8         with Mom, part of the social work process in

9         gathering an intake assessment is when you're

10        thinking about committing a person to a

11        hospital, you're also thinking about, because

12        stays are short unfortunately with insurances,

13        and once you've got the patient stabilized,

14        you're thinking aftercare.

15              They train social workers to think of

16        that.  So one of the things I like to be real

17        detailed about is where a patient being seen

18        currently, who was his provider when he was

19        last seen, what else has happened, because it

20        gives the inpatient staff a lot of information

21        to help with his treatment.

22  Q.    Now, these doctors, I thought you had said that

23        they were drug and alcohol specialists?

24  A.    Dr. Rameriz is what you would call a

25        psychologist.  He's a licensed psychologist.

1    He specializes in dual diagnosis, mental health

2    patients who deal with substance or alcohol

3    abuse.

4    Q.  So when you say substance, you don't mean the

5        medication that is properly diagnosed as

6        opposed to illegal drugs?

7    A.  Correct.  That means, like, drugs, street drugs

8        or alcohol.

9    Q.  Was it your understanding when you gathered the

10       information from Mrs. Schorr that Ryan also had

11       some substance abuse problems?

12   A.  When I asked Mrs. Schorr about Ryan's drug and

13       alcohol use, she was unsure.  It was apparent

14       that he had a history in the past of drug and

15       alcohol use.  But she was not sure of his

16       current use or if he had used that day.

17   Q.  You said "it was apparent".  Was "it was

18       apparent" because he had received treatment

19       from Dr. Rameriz?

20   A.  Dr. Rameriz, yes.

21   Q.  When you spoke to Mrs. Schorr, did she indicate

22       any concern that Ryan may be violent?

23   A.  She indicated that he had made some threats

24       toward his roommate, but she did not indicate

25       that he had hurt -- physically hurt his

Exam./MacMain - Highfield                    30

1    roommate or hurt anybody else.

2         She also made the comment to me that

3    usually once in the hospital he calms down and

4    he's cooperative.

5    Q.   Did she indicate that during any other periods

6    of hospitalization or other than this

7    particular occasion that he had any violent

8    history?

9    A.   No.  I mean, she was not very pleased with

10   Edgewater's care, but--

11   Q.   Is Edgewater a private mental health facility?

12   A.   It was a private--  It's a private psychiatric

13   center on Front Street in Harrisburg.  It was.

14   They no longer--  As far as an inpatient unit,

15   they no longer exist.  I think Northwestern

16   bought them out.

17        I do -- and I didn't write this down.  And

18   I didn't do it -- I do recall her saying, tell

19   him if he doesn't listen to you, you'll put him

20   in Edgewater.  Therefore, he'll think that Holy

21   Spirit is wonderful.  And I didn't do that, of

22   course.

23   Q.   Did Edgewater specialize in a particular type

24   of mental health?

25   A.   No, no, it's just another inpatient mental

Reexam./Williams - Highfield                    31

1       health unit.

2   Q.  Now, you said you called Mrs. Schorr after Ryan

3       had eloped from the hospital?

4   A.  Yes, because she's his support system.  She's

5       his mother.  If she would hear that he went

6       back to his apartment or went to her house,

7       that she would call the police.

8   Q.  Do you remember any details about that

9       conversation you may have said, she may have

10      said?

11  A.  I informed her that he eloped from the

12      hospital.  I informed her that I went to give

13      him his rights.  She would be familiar with me

14      legally having to give the 302 rights.  And he

15      shoved me, and she was apologetic in him

16      shoving me.

17  Q.  At that point, did she express any concern that

18      Ryan might be violent?

19  A.  No.  Just concern that we bring him back to the

20      hospital for treatment.

21  Q.  That's all the questions I have.

22                      REEXAMINATION

23  BY MR. WILLIAMS:

24  Q.  I actually have a couple short follow-up

25      questions.  Because Dr. Rameriz had provided

Reexam./Williams - Highfield                    32

1      treatment and his work is in dual diagnosis,

2      you had some understanding that Ryan Schorr at

3      least had some history of substance abuse.  Is

4      that accurate?

5    A.    Yes.

6    Q.    First of all, did you have any knowledge or

7      understanding as to what substance he had

8      abused?

9    A.    No.

10   Q.    And from his visit to the hospital in November

11     of 2000 and any contacts you may have had with

12     other staff or from another source, did you

13     have an understanding that he had been using

14     that day?  When I say "using"--

15   A.    No.

16   Q.    And when I say "using", I mean abusing some

17     substance.

18   A.    No.

19   Q.    Did anyone express to you the idea that he

20     appeared to be abusing a substance?

21   A.    No.  And I specifically asked Mom if she knew

22     if he had used any drugs or alcohol in this

23     time period, and she didn't know.  She was

24     unsure.

25   Q.    And what about other personnel from Holy Spirit

1   Hospital?  Did anyone indicate to you an

2   impression that Ryan Schorr had been abusing a

3   substance?

4 A.   That day, no.

5 Q.   And did you have the opportunity to make any

6   observations which would lead you one way or

7   another to conclude that Ryan Schorr had been

8   abusing a substance?

9 A.   No.

10 Q.   That's all I have.  Thank you.

11       MR. YANINEK:  I don't have any questions.

12   Thank you.

13       (The proceedings concluded at 4:39 p.m.)

34

COMMONWEALTH OF PENNSYLVANIA  :
                             :  SS
COUNTY OF DAUPHIN            :


        I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:

                  CANDICE HIGHFIELD

        I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.

        I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania this 10th day
of September, 2002.


                    
                    Debra L. Heary
                    Registered Professional Reporter
                    Notary Public


(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Candice Hig[...]
August 30,

**1**

17 16:13; 17:12; 18:17;
27:9
17's 18:2, 6
1983 4:19

**2**

2000 6:7, 16, 24; 7:24;
23:14; 32:11

**3**

302 9:2, 10; 11:15, 17, 19;
12:17, 20, 25; 13:1; 20:19;
25:23; 31:14
304 20:21

**4**

4:39 33:13

**9**

911 27:23; 28:1

**A**

able 11:22
abuse 29:3, 11; 32:3, 8
abusing 32:16, 20; 33:2,
8
accommodated 5:18
accompany 20:17
According 28:6
accurate 13:16; 15:20;
16:10; 25:16; 32:4
act 23:23
actually 23:22; 27:22;
31:24
admission 25:5
adolescent 7:10
aftercare 28:14
age 4:18
alcohol 14:5; 28:23; 29:2,
8, 13, 15; 32:22
alert 22:7, 8
allow 12:24
alone 4:25; 20:16; 21:8
and/or 28:1
angle 18:7
apartment 31:6
apologetic 31:15
apparent 29:13, 17, 18
appearance 17:20
appeared 32:20
applicable 11:18
applied 4:23

applies 11:17
apply 11:19
approach 20:16; 16:13
area 8:20; 10:1; 21:11
arm 21:25
arms 20:12
around 18:24; 20:12
arrived 17:12; 24:23, 24
assess 6:18
assessment 6:20; 10:8;
21:17; 25:21; 26:1; 28:9
assume 17:3
attempt 14:9, 15; 16:1;
14:20; 15:24; 21:23; 8:25;
9:12
avail 15:19
aware 6:22; 8:4; 21:24
away 19:14

**B**

back 4:19, 22; 6:6, 24;
7:3, 7, 14, 23, 24; 8:17;
16:7, 21; 19:5, 5, 6, 13;
23:14; 24:20; 25:10; 26:9,
10; 31:6, 19
backtrack 11:6
bad 24:16
bank 24:8
basically 4:23; 6:22;
10:8; 12:4, 11; 22:19;
25:15
basis 5:24
behavior 12:10
behind 9:25; 10:1
believes 24:6
better 7:2
bit 10:14; 11:25
block 20:13
body 17:22; 20:5
both 22:11
bought 30:16
bracelet 21:25
break 5:16; 10:14
bring 26:10; 31:19
Briscane 10:24
Briscese 10:23
brought 9:2; 12:24;
16:17; 27:5, 7
brush 8:14, 11

**C**

call 10:25; 15:10; 20:4;
24:10; 25:22; 26:10;
28:24; 31:7; 4:8; 22:5, 7, 8,
11, 14, 18; 23:25; 26:7, 12;
27:11, 12, 21; 31:2; 6:17;
16:22; 26:15
calming 14:8
calms 30:3
came 16:18; 21:1; 24:24

can 18:18
CANDICE 4:8
capacity 6:6
care 30:10
Carol 17:6; 19:8, 16, 17;
22:4, 5, 8, 14; 23:5; 27:11
case 6:8
center 14:3; 27:23; 30:13
certification 4:4
charge 17:3, 5
Children 4:20
clear 10:10, 16; 11:2, 7, 9,
11; 12:3; 23:9; 16:24
clinical 6:3; 7:7
collecting 15:6
combative 21:15
coming 10:18, 19; 25:12
comment 14:22; 30:2
commitment 9:3
committed 23:22
committing 28:10
community 14:6
complete 25:7, 20;
12:17; 25:21
concern 29:22; 31:17,
19; 12:12; 13:22; 10:13
conclude 33:7, 13
condition 15:2
consult 6:22
contact 7:25; 8:8, 22, 23;
14:9, 15; 11:8; 32:11
conversation 10:6;
13:13; 14:18; 24:12; 31:9
cooperate 24:21; 14:2
cooperating 16:19; 21:2
cooperative 12:16;
24:14; 30:4
corner 8:13; 18:20
cot 17:16; 18:19
counsel 4:3; 5:17
couple 13:14; 16:5;
27:20; 31:24
course 16:6; 18:17;
30:22
court 5:9
courtesy 26:7
crisis 6:5, 9, 15, 17, 18,
19, 22; 9:4, 7; 20:4, 18, 22;
24:3; 25:1, 11
Cruz 14:7, 13; 28:5
current 5:25; 29:16
currently 28:18

**D**

danger 12:20, 23; 13:4
dangerous 22:21
date 8:3
David 14:19; 27:18
day 16:16; 29:16; 32:14;
33:4
days 10:11

deal 20:3; 21:5; 29:2
dealings 28:3
decision 17:1
delegate 12:24
delusional 12:8, 14;
13:22; 21:5; 23:25; 24:4,
10
department 27:19
deposition 4:13, 21;
27:19; 4:16
describe 6:14; 23:19, 21
describing 23:6
desk 9:25; 10:1; 16:7, 22;
19:14, 15, 19, 22
detailed 11:20, 20; 28:17
details 31:8
diagnose 14:5; 23:4;
29:5
diagnosis 29:1; 32:1
directly 19:25; 26:13
doctor 6:21; 14:16; 17:4;
9:25; 16:21; 28:22
done 9:4
door 8:10, 13; 17:13;
18:2, 6, 8, 12, 20, 20; 19:3;
20:1; 25:12
doorway 19:21
down 5:8; 10:14; 30:3, 17
Dr 14:4, 7, 7, 9, 13, 18;
15:1, 9; 28:4, 4, 24; 29:19,
20; 31:25
drug 14:5; 28:23; 29:12,
14, 6, 7, 7; 32:22
dual 14:5; 29:1; 32:1
duly 4:9
during 30:5
duties 6:14

**E**

earlier 16:15
Edgewater 14:1, 2;
24:15, 17, 20; 30:11, 20,
23, 10
effect 14:8; 15:17
either 17:3
eloped 26:8; 31:3, 11
elopement 26:5
else 12:23; 14:23; 15:24;
18:7; 26:20; 28:19; 30:1
emergency 6:20; 8:20;
16:24; 25:2, 4, 11
employed 5:21
employment 6:1
encounter 8:5; 25:15
encourage 26:9
ended 19:15
enter 9:1, 12; 14:20;
15:24; 16:1; 21:23; 18:17
ER 15:7; 16:20; 25:10
essentially 7:20
even 4:14, 22; 12:24
exact 12:5

exactly 10:4
EXAMINATION 4:
27:16
except 4:5
exist 30:15
expecting 25:3
experience 24:16
explain 18:5
express 31:17; 32

**F**

face 20:12; 18:2, 6
facility 7:9; 30:11
fact 10:3
fair 8:4; 21:8
fairly 16:9
fall 19:4
familiar 31:13
family 27:2
fantasy 24:5
far 30:14
felt 13:21
filing 4:4
fill 25:24
fine 19:11; 23:9
finish 5:12
First 6:9; 9:14; 10:1
17:9; 32:6
follow-up 31:24
follows 4:9
form 4:6; 25:21, 5,
19, 25
forth 25:20
frame 6:7, 16
front 10:1; 30:13
full 22:22; 23:1, 1
full-time 6:2, 9; 7:1
funny 20:15
further 11:25; 13:2
27:14

**G**

gather 11:20, 23; 2
10:10; 28:7, 9
general 10:22
Gerry 4:12
gets 12:15
given 4:16; 12:16
gives 28:20
good 11:23; 17:9,
19:14
Graby 16:15, 24
guard 13:7; 21:11
guess 7:2; 8:4; 10
13:2, 2

Case 1:01-cv-00930-YK   Document 92-6   Filed 02/28/2003   Page 11 of 50

Keith L. Schorr & Susan Schorr   v.   Candice Highmeier
Borough of Lemoyne, et al.                                    August 30, 2002

**ran** 8:20
**rarely** 20:8
**reactive** 24:14
**read** 9:11, 15; 20:19; 21:6
**real** 28:16
**reality** 23:3
**reason** 4:25; 5:16; 20:24; 11:8
**recall** 11:1; 12:19; 13:18; 15:3; 22:17; 23:5, 8, 10, 13, 15, 17; 26:17, 18; 30:18
**received** 29:18
**recollection** 9:24; 14:21
**record** 5:8; 18:6; 7:22
**red** 22:5, 8
**REEXAMINATION** 31:22
**reference** 23:13
**referral** 6:21
**refused** 21:24
**remained** 19:1
**remember** 12:1, 4; 20:7; 31:8
**reminds** 24:12
**rephrase** 11:3
**reporter** 5:9
**represent** 27:19
**require** 25:24
**reserved** 4:6
**residence** 26:16
**residential** 7:10
**respect** 21:22
**respective** 4:3
**response** 15:11
**rest** 7:23
**restraints** 21:16, 18
**restrictive** 21:22
**right** 4:22; 5:19; 7:11; 8:25; 9:5, 9, 11; 10:14; 11:16; 12:6, 19; 13:11; 15:4, 9; 16:12, 23; 17:5, 11; 18:8, 10, 14, 16, 23; 19:8; 20:14, 14; 21:20; 22:8, 10, 14; 23:12; 24:22; 26:23; 27:14; 9:11, 13, 14; 20:19, 20, 20, 21; 21:7; 31:13, 14
**role** 16:23
**room** 6:20; 8:10; 9:1, 12; 14:20; 15:24; 16:1, 7, 7, 9, 13, 24; 17:12; 19:13, 19; 20:16; 21:2, 23; 25:3, 4, 11; 27:9
**roommate** 13:10; 26:24; 29:24; 30:1
**rule** 5:6; 4:23
**Ryan** 6:8; 7:25; 8:5, 11, 14, 23; 9:1, 2, 23; 10:6, 9; 11:2, 8, 18; 12:2, 20; 13:4, 15; 14:8, 19, 21; 15:22; 16:2, 17, 18; 17:16; 18:20, 21; 19:24; 20:11, 25; 21:24; 22:19; 23:6, 13, 19, 23; 24:13, 22; 25:11, 20; 26:5, 8, 15, 23; 27:1, 5, 8;

28:3; 29:10, 22; 31:2, 18; 32:2; 33:2, 7; 10:2, 15; 11:9; 15:1; 18:18; 24:11; 26:4; 29:12

## S

**sake** 5:8
**same** 4:22; 7:17, 20
**saw** 24:22
**saying** 12:4, 11; 15:18; 30:18
**Schorr** 6:8; 8:1, 6, 11, 23; 9:1, 23; 10:7, 20; 11:18; 12:20; 13:4, 13, 18; 14:19; 23:6, 19; 24:13, 22; 26:12; 27:5; 29:10, 12, 21; 31:2; 32:2; 33:2, 7; 10:6; 11:2, 8; 12:2; 13:15; 15:23; 16:3; 26:5, 16, 23; 27:1
**sealing** 4:4
**seclusion** 8:10; 9:1
**security** 13:7; 16:15, 20; 21:11, 12; 24:9
**seeing** 14:21
**sense** 23:2
**set** 16:9
**several** 19:12; 20:6
**short** 28:12; 31:24
**shorter** 4:14
**shout** 18:24
**shove** 19:24; 20:25; 8:14, 18; 18:23; 19:3, 5, 7, 12, 24; 20:2, 11; 22:2; 31:15; 18:22
**shoving** 31:16
**signed** 25:22
**silent** 17:17; 19:1
**sit** 9:25; 23:16
**sitting** 17:16, 21, 25; 18:18
**situation** 6:1; 26:6
**social** 6:3; 20:23; 28:8, 15
**somebody** 23:1
**someone** 11:22; 12:23; 20:17; 23:22; 24:6
**sometime** 7:24; 5:12
**son** 13:23
**Sorry** 23:8
**sort** 13:1
**sound** 20:15
**source** 32:12
**speak** 7:12; 18:14; 26:12, 23; 27:1, 4, 12
**specialists** 28:23
**specialize** 30:23; 29:1
**specific** 13:3, 4
**specifically** 7:25; 11:1, 18; 12:1, 1; 24:19; 32:21
**Spirit** 5:22; 6:5, 10, 15; 7:5, 6, 14, 19; 9:23; 14:6; 30:21; 32:25
**spoke** 27:22, 22; 29:21

**spoken** 9:22
**Spurrier** 14:19; 15:1, 9
**stabilized** 28:13
**staff** 9:23; 21:17; 28:20; 32:12
**start** 5:13; 13:12
**stated** 10:17
**statement** 10:22
**stating** 10:21
**status** 10:12; 13:15, 19; 15:2
**stays** 28:12
**still** 17:22, 22
**stipulated** 4:2
**STIPULATION** 4:1
**street** 29:7; 30:13
**subject** 8:1
**substance** 29:2, 4, 11; 32:3, 7, 17, 20; 33:3, 8
**support** 11:24; 31:4
**sure** 11:4; 12:4; 19:6, 10; 27:24; 29:15
**Susan** 10:7; 13:13, 18; 15:23; 24:13; 26:12
**suspect** 20:25
**swings** 18:14
**sworn** 4:9
**system** 11:24; 31:4

## T

**talk** 5:17; 9:12; 15:23; 18:20, 21; 5:13; 23:14
**telephone** 26:15
**telling** 11:1; 12:2; 13:19
**term** 23:12; 24:3; 27:21, 25; 12:5
**testified** 4:9
**testimony** 4:24
**therapist** 7:7
**Therefore** 30:20
**thinking** 12:8; 21:16; 28:10, 11, 14
**thought** 28:22; 10:9, 16; 11:2, 9, 11, 14; 12:2, 13; 24:5, 7, 10
**threats** 13:9; 29:23
**today** 23:16
**told** 11:7, 12, 12; 25:18; 27:10
**took** 13:11
**toward** 29:24
**track** 13:11
**train** 20:9; 28:15; 20:4, 6, 7
**treat** 21:21
**treatment** 12:13; 13:24; 24:2; 26:11; 28:21; 29:18; 31:20; 32:1
**trial** 4:7
**true** 8:9, 13
**try** 4:13; 11:6; 26:9

**trying** 10:5; 18:21
**two** 24:25
**type** 30:23

## U

**Um-hum** 5:5
**unclear** 11:14
**under** 4:24; 9:2, 10; 12:25; 20:24
**Understood** 9:14; 13:1; 15:18
**unfortunately** 28:12
**Unit** 6:3; 30:14; 31:1
**unsure** 29:13; 32:24
**up** 16:10; 18:3
**upon** 18:17
**use** 6:15; 20:10; 21:22; 23:12; 24:3; 29:13, 15, 16
**used** 4:19; 20:8; 23:5; 27:20, 25; 29:16; 32:22
**using** 32:13, 14, 16
**usually** 12:15; 14:1; 21:15; 30:3

## V

**violated** 5:6
**violator** 5:11
**violent** 29:22; 30:7; 31:18
**visible** 19:19, 21
**visit** 32:10
**voluntary** 20:20

## W

**waiting** 24:9
**waived** 4:5
**walk** 16:6, 19; 21:2; 18:3; 25:2, 4, 9, 10
**wants** 13:23
**watch** 21:12
**way** 4:22; 7:3; 8:11; 18:2, 6; 22:2; 23:10, 17; 26:18; 33:6
**weekend** 6:4, 25; 7:3, 15
**weren't** 12:2
**who's** 8:1; 23:22
**whoa** 19:7
**whole** 8:7
**WILLIAMS** 4:11, 12; 31:23
**window** 17:14; 18:18
**wing** 25:2
**within** 22:9
**without** 21:1
**witness** 4:8, 15
**wonderful** 30:21
**word** 15:15; 5:7
**work** 4:19; 6:2, 4; 28:8; 32:1; 7:3; 20:9; 7:9; 13:6;

24:7
**worker** 6:3, 5, 9, 15, 25; 9:4, 7, 16; 20:18, 22, 23; 24:3; 28:15
**world** 24:5
**worst** 5:11
**write** 30:17

## Y

**YANINEK** 33:11
**yards** 19:12, 12
**Youth** 4:20



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .
KEITH I. SCHORR and                .  No. 1:01-CV-0930
SUSAN SCHORR,
    Plaintiffs       .  Judge Kane
           .
   vs.                       .
           .
BOROUGH OF LEMOYNE,                .
BOROUGH OF WORMLEYSBURG,           .
WEST SHORE REGIONAL POLICE         .
DEPARTMENT, HOWARD DOUGHERTY,      .
CHIEF WEST SHORE REGIONAL          .
POLICE DEPARTMENT, CUMBERLAND      .
COUNTY, HOLY SPIRIT HOSPITAL,      .
    Defendants       .
. . . . . . . . . . . . . . . . .

Deposition of   :   STEVE BUCCIFERO

Taken by        :   Defendants

Date            :   August 30, 2002, 11:44 a.m.

Place           :   210 Senate Avenue
        Camp Hill, Pennsylvania

Before          :   Debra L. Heary, Notary Public
        Registered Professional Reporter

 **READING AND SIGNING**
**OF DEPOSITON TRANSCRIPT** 

To be attached to the deposition of _____ Steve Buccifero _____

Taken on __August 30, 2002_____ in the matter of __Schorr v. Borough of Lemoyne et al__

_____ Reporter _____ Debbie Heary _____

**INSTRUCTIONS TO DEPONENT:** In accordance with the Rules of Civil Procedure (reproduced on the reverse side for your information), we are submitting and making available to you this transcript of your testimony for your review. Please list the page number, line number, change or correction, and the reason for the change. **PLEASE SIGN** this form and date it. **RETURN THIS FORM** to Filius & McLucas Reporting Service, Inc., 1427 East Market Street, York, PA 17403, within thirty days in the enclosed envelope.

| PAGE | LINE | CHANGE/CORRECTION and REASON |
|------|------|------------------------------|
| Throughout deposition | | LAST name is spelled wrong throughout Correct: Buccifer |
| 10 | 18-19 | But now we just do it in the Emergency department. |
| 14 | 1-6 | The Holy Spirit Hospital will bring the necessary reso together to provide the 24 hour, 7 day a week coverag that the county wants us to provide or the service they want us to provide. |
| 16 | 6-8 | But it's in concert with the county because the cou does site visits. |
| 23 | 4-5 | You might have a counselor, you might have a D~~e~~ ~~expert~~ counselor. |
| | | |
| | | |
| | | |
| | | |

I hereby certify that I have read my deposition transcript and that it is, to the best of my knowledge, true and accurate, with the exception of the changes noted above.

___10/3/02___
Date

_Steven P Bucciferro_
Signature of Deponent

2

APPEARANCES

       WILLIAMS, CUKER & BEREZOFSKY
       By:  GERALD J. WILLIAMS, ESQ.

           For - Plaintiffs

       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
       By:  DAVID J. MacMAIN, ESQ.

           For - Defendants West Shore Regional
               Police Department, Howard Dougherty,
               Chief West Shore Regional Police
               Department

       METTE, EVANS & WOODSIDE
       By:  JOHN F. YANINEK, ESQ.

           For - Defendants Cumberland County and
               Holy Spirit Hospital


ALSO PRESENT

       Fran Charney, RN, Director Risk Management

3

<u>I N D E X</u>
<u>WITNESS</u>

STEVE BUCCIFERO                                    <u>Examination</u>

   By Mr. Williams                                    4

4

```
 1                      STIPULATION
 2           It is hereby stipulated by and between
 3      counsel for the respective parties that
 4      sealing, certification and filing are hereby
 5      waived; and all objections except as to the
 6      form of the question are reserved to the time
 7      of trial.
 8           STEVE BUCCIFERO, called as a witness,
 9      being duly sworn, testified as follows:
10                      EXAMINATION
11  BY MR. WILLIAMS:
12  Q.    Mr. Buccifero, we've met.  I'm going to ask you
13        some questions involving some claims that my
14        clients, the family of Ryan Schorr, brought
15        against Holy Spirit and some others.  The whole
16        process taken together is called a deposition.
17        Have you ever given one before?
18  A.    Yes.
19  Q.    So I won't bother you with all the rules of a
20        deposition other than to tell you or to ask you
21        to please let me know if you don't understand
22        one of my questions or don't hear it for some
23        reason so that I can correct the situation.
24        Okay?
25  A.    Yes.
```

Exam./Williams - Buccifero                    5

1    Q.    And please try to wait until I finish the

2          question before you start your answer.  Okay?

3    A.    Yes.

4    Q.    And give all of your answers in words not nods

5          or shakes of your head or even um-hums or

6          huh-uhs.  All right?

7    A.    Yes.

8    Q.    And as I told the last witness, I don't think

9          we'll take too long with you, but you're

10         entitled to any breaks you want or for any

11         purpose.  Just let us know, and we'll

12         accommodate it.  Okay?

13   A.    Okay.

14   Q.    Now, sir, I believe you are the director of

15         mental health services at Holy Spirit; is that

16         correct?

17   A.    Yes.

18   Q.    Is that the accurate title?  Did I say that--

19   A.    Well, administrative director of mental health

20         services.

21   Q.    And how long have you had that position?

22   A.    About nine years.

23   Q.    And what are its duties?

24   A.    Well, I direct the services of the mental

25         health center, which would include the

Exam./Williams - Buccifero                6

1    operations and direction of the staff and

2    clinical providers who render mental health

3    services here at Holy Spirit Hospital.

4         I'm responsible for the budgetary

5    responsibilities, the day-to-day operations of

6    the center with regards to manpower and

7    assigning duties, staffing levels, appropriate

8    resources to be allocated to providing mental

9    health services.

10        I'm not a clinician, so I'm not in charge

11   of the direct care.  But I'm the director who

12   makes sure that those direct care services are

13   provided by the trained clinical staff.

14        And I'm also responsible for strategic

15   planning for policy and procedure development,

16   for implementing of procedures and programs,

17   and things like that, financial management of

18   the center for cost and revenue and purchasing

19   and things like that.

20   Q.   Understood.  Before I ask you more questions

21        about your job, let's step back and have you

22        give me a little description of your background

23        educationally and vocationally.

24   A.   Okay.  First of all, I have a master's in

25        business administration from Ohio University in

1          Ohio.  I have 22 years experience in

2          healthcare.

3               And I have 15 years in mental health as

4          administrative director and/or director, like,

5          chief operating officer of a psychiatric

6          hospital in Indiana.  So I've had the

7          administrative director type position for 15

8          years.

9     Q.   All right.  And before your arrival at Holy

10         Spirit, was it just at that one hospital in

11         Indiana?

12    A.   No.  My entire career has been in several

13         hospitals.  In mental health, I've been in a

14         hospital in Cleveland, a hospital in Indiana.

15         I was a consultant for psychiatric services and

16         then came here.  So about four other locations

17         -- three other locations besides Holy Spirit.

18    Q.   All right.  And you've been here nine years?

19    A.   Yes.

20    Q.   And when did you earn your master's degree?

21    A.   1986.

22    Q.   While I'm at it, I'll ask you, what is your

23         undergraduate degree in?

24    A.   Business administration with an emphasis in

25         healthcare administration.

Exam./Williams - Buccifero                    8

1   Q.   And when and where did you obtain that?

2   A.   I received it in 1980 from Bowling Green State

3        University in Bowling Green, Ohio.

4   Q.   Now, with respect to your job here at Holy

5        Spirit, is it a part of your duty to deal with

6        the arrangements between Holy Spirit Hospital

7        and Cumberland County with respect to the

8        delivery of any psychiatric services?

9   A.   Yes.

10  Q.   And first of all, can you describe for us the

11       nature of that arrangement between the county

12       and Holy Spirit?

13  A.   Holy Spirit Hospital is a contract agency for

14       the Cumberland-Perry County MHMR program.  We

15       have a contractual relationship with them on a

16       yearly basis.  We have contracts to provide

17       services for the county or, I guess, the

18       consumers, the citizens of Cumberland-Perry

19       County for the Cumberland-Perry County MHMR

20       program.

21            That's done through a contract process

22       that is signed by Sister Romaine.  But I get

23       the contracts together.  I put together the

24       budget and the specifics about the contract.

25       And then Sister signs it.

Exam./Williams - Buccifero                    9

1    Q.    All right.  Let me ask you to tell us what

2          variety of services are provided by the

3          hospital through this arrangement with the

4          county.

5    A.    We have several contracts with the

6          Cumberland-Perry County MHMR program.  One is

7          called administrative case management, which is

8          a contract to provide case management --

9          general case management services for all of

10         Cumberland-Perry County citizens.

11             In other words, anyone who is receiving

12         mental health services and is paid for through

13         county money, we keep track of the information.

14         We sort of act as the case manager for that

15         information.  So it's administrative case

16         management.

17             Another contract we have is for Crisis

18         Intervention services, which is a 24 hour, 7

19         day a week service that Cumberland-Perry County

20         contracts for us to provide that for them.

21   Q.    Let me interrupt you before you go on.  I know

22         Crisis Intervention is sort of a term of art in

23         the mental health services field.  So can you

24         tell me what specifically that means; that is,

25         that the hospital provides Crisis Intervention

Exam./Williams - Buccifero                    10

1        services?

2   A.    The Cumberland-Perry MHMR program is required

3         by law to provide Crisis Intervention or the

4         ability or service for people to be able to

5         either walk into a facility, telephone a

6         telephone number, or to have trained

7         professionals go to their home to assess, to

8         interact, to handle a crisis situation of a

9         psychiatric or social service type situation

10        for anyone who lives in these two counties.

11             Holy Spirit Hospital, through the

12        contract, provides the trained people to do

13        that for the county.  It's a 24 hour, 7 day a

14        week service.  At Holy Spirit, we provide it in

15        our emergency department.

16             We've also in the past provided it in the

17        mental health center building and in the

18        emergency room.  But now we just do it in the

19        mental health center.  But we have the trained

20        staff to provide that service as an agent of

21        the county.

22  Q.    Understood.  And is it through that contract;

23        that is, the contract to provide Crisis

24        Intervention services, that the hospital

25        processes, if I can use that term, what are

Exam./Williams - Buccifero                           11

1           called 302 commitments of psychiatric patients?

2    A.     A 302 is a, like, a section of the Mental

3           Health Procedure Act that has guidelines to

4           follow, and it has its own definition.  We will

5           do 302s or we will engage in the steps and

6           processes to do a 302 as the crisis program for

7           the county.

8    Q.     All right.  That's my question.  And will the

9           hospital do 302s outside of the Crisis

10          Intervention program?

11   A.     A 302 can be initiated in a variety of

12          different ways.  And it might involve different

13          people other than the crisis staff, yes.

14   Q.     I think I understand.  Now, I interrupted you.

15          You were telling me the different types of

16          services the hospital provides through the

17          county arrangement:  administrative case

18          management, Crisis Intervention services, what

19          else?

20   A.     We have another type of case management which

21          is called intensive case management and

22          resource coordination.  Those are a higher

23          level of case management with more severely ill

24          patients that have more hands-on work, liaison

25          and connection with patients than the general

1   case management.  So it's another level of case

2   management.

3        And then another contract is called teen

4   line student assistance program.  It is a

5   program that specifically deals with child and

6   adolescent crisis situations.

7        But we work with the school systems in

8   Cumberland-Perry County to help the school

9   systems identify children at risk and go into

10  the schools to either help the teachers and the

11  counselors to assess or identify kids or

12  sometimes assess and identify kids at risk.

13       That's also a 24-hour hotline that's

14  answered either by the teen line staff or by

15  the crisis staff.  But it's more geared toward

16  child and adolescence.

17       We have contracts to provide inpatient

18  care for citizens of Cumberland and Perry

19  County who the county will pay for.  So in

20  other words, they will have a contract with us

21  to pay for their patients or patients who have

22  that as a payment source.  And they pay up to a

23  certain amount of money.  We have that same

24  with outpatient and with partial.

25       Those are three programs we provide to the

Exam./Williams - Buccifero                13

1    general population.  But if a patient comes in

2    and is covered by the county MHMR program as

3    the payer, we will have a contract for them to

4    pay us.

5  Q.   All right.  Understood.

6  A.   Those are the--  Well, we have one more that's

7    called community service.  That is sort of a

8    small contract to provide education material or

9    speakers or go out and do trainings for the

10   Cumberland-Perry County citizens.  And they

11   will fund -- pay us for that time to go out and

12   do that.

13  Q.   All right.  Let me ask you a couple of

14   questions focusing on the Crisis Intervention

15   contract, if I can call it that.  And we've

16   been provided with some documents, so I'm not

17   going to ask you the fine details of it.

18       But the contract for the provision of

19   Crisis Intervention services, can you tell me

20   in general terms now, how the funding is

21   handled; that is, is the hospital paid on a

22   per-patient basis, a per-service basis, an

23   annual basis, or what?

24  A.   The contract with the county for the crisis

25   service is what is called a grant-funded

1    program, grant-funded contract.  The Holy

2    Spirit Hospital will create the necessary and

3    bring the necessary resources together to

4    provide the 24 hour, 7 day a week coverage that

5    the county wants us to provide or the service

6    that they want us to provide.

7         We hire the staff.  We pay them their

8    salary and the fringe benefit and the overhead

9    expenses associated with providing that

10   service.

11        That is then put together in a budget.  We

12   give them a budget, and they will pay us cost

13   or the budget we give them.  So they allocate a

14   certain amount of money to crisis services that

15   they give to Holy Spirit in the contract

16   amount.

17        If it's a shortfall from the money or in

18   other words, if the hospital expenses are

19   higher than what the county gives us, then the

20   hospital subsidizes that program up to that

21   amount.

22        At the end of the year if there's extra

23   money left in the county funds to be able to

24   offset some of the money -- the shortfall, they

25   will try to pay us that.

Exam./Williams - Buccifero                    15

1         But the Holy Spirit Hospital will submit a

2    bill or an invoice each month of how much it

3    costs to provide that service.  And the county

4    will pay either 1/12 of what they have

5    allocated or they'll meet that cost.

6         And then by the time -- by the end of the

7    year, it's either run out before the 12 months

8    or all of the county grant is paid to us.

9  Q.  Right.  I think I understand.  Again, focusing

10    on the Crisis Intervention programs, who

11    specifies or determines what staff is

12    necessary, the hospital or the county?

13 A.  First of all, the county gives us their service

14    expectations, their service requirements, how

15    many hours or what level of service needs to be

16    provided, what type of expectations in terms of

17    how long the phone can ring or how long people

18    can wait to receive services and so forth.

19         We, at Holy Spirit Hospital, then need to

20    meet that expectation or request through the

21    contract terms.  Then it's Holy Spirit Hospital

22    that has to submit or to propose how to meet

23    those expectations.

24         So based on that and also volume

25    expectations or historical volumes of patient

Exam./Williams - Buccifero                           16

1    calls and walk-ins, we determine what the best

2    way to meet that demand, whether it's two

3    people a day on first shift, three people on

4    second shift and one on third shift, 24-7.

5          That's the hospital's responsibility for

6    meeting that staffing requirement.  But it's in

7    concert with the county because the county does

8    psych visits.  The county does audits.  The

9    county will come over and discuss any

10   shortcomings to the program through their

11   expectations and contract.

12         So if we choose to only open seven days a

13   week, 7 to 5, we have not met their

14   expectations, and the contract will be in

15   violation.

16         So we sit down with them and propose that

17   yearly.  And then it's tweaked or adjusted

18   accordingly.

19   Q.   I see.  Now, in that last bit of testimony when

20        you referred to the county making site visits

21        and so forth, is that the county MHMR office

22        that does that specifically?

23   A.   Yes.

24   Q.   And any individuals in particular?

25   A.   It's been numerous people over the years.  It's

Exam./Williams - Buccifero                    17

1      generally the mental health administrator or

2      deputy administrator, whatever their title is.

3      But that person's responsible for the mental

4      health portion of the MHMR program.

5   Q.   All right.  So at some point in time, Robert

6      Goril makes site visits to the hospital?

7   A.   Yes.

8   Q.   Now, can you give me a description of the type

9      of trained clinical personnel that are on staff

10      at Holy Spirit for the provision of mental

11      health or psychiatric services?

12   A.   There's a lot of positions and a lot of

13      clinical people that provide mental health and

14      psychiatric services.  I can begin in a general

15      sense or if you have more specific--

16   Q.   Well, let's, at least for a few questions, try

17      to--  Well, I'll ask you.  Would it be helpful

18      to restrict it to the provision of Crisis

19      Intervention services?

20   A.   If that's what you want.

21   Q.   Yes.  That's what I want for now.

22   A.   Okay.  The professional staff members who

23      provide Crisis Intervention services have to

24      have a minimum of a bachelor's degree training,

25      whether it be in a psychosocial service

1   background, a psychology background, a social

2   worker background, counseling background.  They

3   have to have at least a bachelor's degree

4   first.

5        Based on their number of-- Well, I should

6   stop there.  I missed-- RNs, registered

7   nurses, have provided Crisis Intervention

8   services in the past as well, because they've

9   been trained in psychiatric nursing.  So we

10   have had RNs.

11        Now, with their minimum educational

12   background, then it's a matter of how much

13   training they may have had elsewhere,

14   experience elsewhere working in either a

15   psychiatric or mental health setting or a

16   behavioral health setting, whether it be in

17   drug and alcohol or in other types of

18   counseling centers or experience in that way.

19        That helps in terms of being able to hire

20   that person.  If they come with the degree and

21   training but may not have a lot of training

22   with the crisis, then they'll be trained more

23   here at Holy Spirit with the supervisor and the

24   other crisis workers.

25        So there's a minimum educational and then

Exam./Williams - Buccifero                    19

1        it depends on the type of experience -- working

2        experience they have.  That's all taken into

3        account before they're hired.

4   Q.   All right.  Now, I'm trying to ask this next

5        question in a way that makes sense.  So I'll

6        make a statement first.

7              I recognize that obviously there are

8        psychiatrists with staff privileges at Holy

9        Spirit Hospital; that is, psychiatrists who

10       have admitting privileges and so forth.

11             But my question is, are there currently

12       any psychiatrists who are employees of the

13       hospital?

14  A.   Yes.

15  Q.   And where are they employed, in what kinds of

16       roles?

17  A.   Psychiatrists are employed at Holy Spirit

18       Hospital to work within the mental health

19       center, specifically holding positions or

20       duties that we need to provide service.

21             We have adult psychiatrists who work in

22       our inpatient unit, also work in our outpatient

23       clinic and program providing outpatient

24       services.

25             We have child and adolescent psychiatrists

Exam./Williams - Buccifero                    20

1    who are hired to provide inpatient service and

2    outpatient services to children and

3    adolescents.

4         We have psychiatrists who function as

5    medical director of the mental health center.

6    And we have a psychiatrist who works as our

7    clinical director for child/adolescent

8    services.

9         And they're paid a salary or a stipend to

10   provide that administrative service.  They are

11   employed as a means to pay them for the direct

12   services that we provide.

13   Q.   I understand.  Where is the mental health

14        center physically?

15   A.   Physically it's located at the end of the

16        auditorium or education building, to the left

17        of the main hospital.  As you're looking at the

18        front of the building, it's the building all

19        the way to the end.

20   Q.   Are there psychiatrists employed, in the sense

21        that we're using it, to provide services in the

22        emergency department?

23   A.   No.

24   Q.   Now--

25   A.   Well, I would like to qualify that.

Exam./Williams - Buccifero                21

1  Q.  Certainly.  Go ahead.

2  A.  We do not employ them to work in the emergency

3      room.  Our employed psychiatrists provide

4      services in the emergency room, but they are

5      not employed to be working in the emergency

6      room.

7  Q.  I understand.  But if a need in the emergency

8      room happens, one of those psychiatrists could

9      respond?

10 A.  Correct.

11 Q.  Now, are there employed psychiatrists who have

12     as part of their specified duties assisting in

13     the evaluation of psychiatric patients brought

14     to the hospital under Section 302 of the Mental

15     Health Procedures Act?

16 A.  Yes.

17 Q.  And who are they, and what is their role?

18 A.  Well, all psychiatrists on staff that have

19     responsibility to be on call and to respond to

20     the emergency room may be involved with doing a

21     302 assessment.

22 Q.  I understand that.  There's no one who's a 302

23     specialist or only does 302s.  Correct?

24 A.  Yes.

25 Q.  Now, are there nurses or other clinical

Exam./Williams - Buccifero                22

1   personnel whose work is first of all restricted
2   exclusively to working with 302s?
3   A.   No.
4   Q.   And are there-- How many nurses are there
5        trained to provide Crisis Intervention
6        services?
7   A.   I don't know at this time if we have any nurses
8        working in the crisis program.
9   Q.   All right.  And back in November of 2000, was
10       that also true at the time of the Ryan Schorr
11       incident?
12  A.   Well, my answer would be I don't know if there
13       were nurses as crisis workers at that time.
14  Q.   I understand.  That's fair enough.  What other
15       -- and I recognize that you've given me some of
16       this information -- but what other kinds of
17       professionals do Crisis Intervention services
18       at the current time?
19  A.   Well, there's no specific title or type of
20       patient -- or excuse me type of provider that
21       would do crisis.  It's more of a general
22       behavioral health specialist professional of a
23       bachelor's level or higher.
24            They may have a master's degree or they
25       may have more of a post graduate degree, but

Exam./Williams - Buccifero                    23

1    they are behavioral health specialists or

2    behavioral health generalists more so.

3            An RN is a specific category of someone

4    who is a registered nurse.  You might have a

5    counselor, you might have a DNA expert, someone

6    who's gone to school and got a master's in

7    social work is a crisis worker.

8            So there's no specific category other than

9    just a generalist in behavioral health or

10   mental health.

11  Q.  Understood.  Can you give me an overview of how

12      302s are handled at Holy Spirit when they come

13      into the emergency room, beginning at that

14      point?

15  A.  Well, I need some clarification.  Has a 302

16      already been initiated, assigned, and been

17      designated as a 302, thereby needing to have an

18      assessment done?  Or how are you using the term

19      302?

20  Q.  Well, yes, you're right.  That is a confusing

21      question.  But I'll try to restrict it to the

22      situation like the one I believe Ryan Schorr

23      was like.  And that is one where a 302 petition

24      has been filed and the police have brought in

25      the subject for evaluation and possibly

Exam./Williams - Buccifero                    24

```
 1              treatment.
 2   A.    What's your question again now?
 3   Q.    Can you give me an overview of how that process
 4         works at the hospital?
 5   A.    If a person is--  If a 302 has been approved
 6         and issued and a patient, a subject, is brought
 7         in by the police for assessment, a physician is
 8         required to assess that patient within two
 9         hours, and--
10   Q.    Does it have to be a psychiatrist?
11   A.    No, it has to be a physician.
12   Q.    Understood.
13   A.    That physician makes a determination as to
14         whether or not that patient -- or assesses the
15         situation of that patient.  And then a
16         determination is made as to what the next step
17         in that treatment is for them, for that
18         particular person.
19   Q.    All right.  Are you or have you been in your
20         capacity responsible for promulgating or
21         issuing any policies or protocols for the
22         handling of 302s?
23   A.    As the administrative director, I'm required to
24         make sure that it does happen, that there are
25         procedures, and that there are, you know, staff
```

Exam./Williams - Buccifero                    25

1    and professionals that are able to do that and

2    that those are then done.

3          I, as director, will not personally write

4    the procedures or follow through with the

5    training, but I am to ensure that that is done.

6  Q.   Understood.  Have you been involved in any way

7       in investigating the Ryan Schorr incident, what

8       happened at Holy Spirit?

9  A.   As administrative director, I would be involved

10      in investigating what happened, yes.

11 Q.   Tell me what your involvement was, first of

12      all.

13 A.   Well, I was called as the administrative

14      director about the -- when Mr. Schorr left the

15      facility and that he was -- the police were

16      called to bring him back and then what occurred

17      as that unfolded and--

18 Q.   Give me a better sense of the timing of that.

19      When were you first called about Ryan Schorr,

20      at what point?

21 A.   I think it was Saturday afternoon, early

22      afternoon.

23 Q.   All right.  Was it at a point before he was

24      shot?

25 A.   I don't recall.  I don't think so.

Exam./Williams - Buccifero                    26

1  Q.    It was after the fact in your recollection as

2        you sit here today?

3  A.    In my recollection, yes, it was after.

4  Q.    All right.  And who made the call to you?

5  A.    My manager or supervisor of the crisis program.

6  Q.    And who was that?

7  A.    Rhett Bennie, he's the nurse manager of the

8        inpatient, but he's also responsible for the

9        crisis program.

10 Q.    All right.  Was his first name Rhett or Red?

11 A.    Rhett.

12 Q.    Rhett, okay.  And what did Mr. Bennie tell you?

13 A.    He described the situation, the events that

14       occurred.  And then he proceeded to tell me

15       that he had been shot and killed.

16 Q.    Did he tell you anything about Ryan Schorr's

17       state at the time he left the hospital?

18 A.    I don't recall.

19 Q.    Did he tell you anything about Ryan Schorr's

20       conduct or mental state during his stay at the

21       hospital?

22 A.    I don't recall.

23 Q.    All right.  Now, I interrupted you.  What other

24       involvement did you have in this what we'll

25       call the aftermath of this Ryan Schorr

Exam./Williams - Buccifero                27

1          encounter?

2   A.     Well, when I was made aware of it, I instructed

3          him to, you know, pull together the

4          information, to make sure we had a copy of all

5          of the crisis information that was gathered or

6          the information pertaining to that crisis

7          visit.

8               And I think I asked to have the record

9          pulled and held, you know, put aside so that we

10         would have it available to us, and then began

11         to ask questions as to what happened, you know,

12         and so forth.

13              Then as formal review, I was involved with

14         the formal review processes as the

15         administrative director.

16  Q.     Tell me who you talked to during this review.

17              MR. YANINEK:  Objection.  Is this part of

18         the peer review?

19  A.     Peer review would be involved, yes.

20              MR. YANINEK:  But your review--

21  A.     No, I would not be part of the physician peer

22         review, but the operational review of it, just

23         my own questions of asking Rhett Bennie and --

24         what happened.

25              MR. YANINEK:  Okay.  I object to any, you

Exam./Williams - Buccifero                    2?

 1        know, you giving any information that would

 2        relate to the hospital's internal peer review.

 3        But to the extent that the question or your

 4        answers don't provide any information related

 5        to that, you can feel free to answer.

 6    A.    I don't recall who I spoke with directly.  I

 7        would be just speculating who was involved at

 8        that time.

 9    BY MR. WILLIAMS:

10    Q.    That's fine.  Did you speak with Candice

11        Highfield?

12    A.    I don't know when I was involved talking with

13        her.

14    Q.    That's fine.  What was her position at the

15        time?

16    A.    Crisis worker.

17    Q.    Did you speak with any persons who were in the

18        hospital, employees about the Ryan Schorr

19        situation?

20    A.    I don't recall.

21    Q.    And along the same lines, did you talk to any

22        police officers or departments about the Ryan

23        Schorr situation?

24    A.    I don't recall, but I don't think so.

25    Q.    All right.  While I'm on that subject, I'll ask

Exam./Williams - Buccifero                    29

1     you, in your capacity, have you ever received

2     any complaints from local police departments

3     regarding Holy Spirit's handling of 302

4     commitments?

5  A.  No.

6  Q.  And have you ever received any complaints from

7     local police departments regarding elopements

8     from Holy Spirit or the number of elopements?

9  A.  I can't say that I directly received a call

10    from a police chief or a police department to

11    say, I complained about your elopements.

12 Q.  Well, I understand--

13 A.  I'm aware that they're, you know, unhappy with,

14    you know, being involved or being called to

15    help us.  But I'm not directly aware of anyone

16    calling me and formally complaining to me.

17 Q.  I understand.  How are you aware of whatever

18    unhappiness you're referring to?

19 A.  Just--  I don't know how I'm aware of it.  I

20    just am aware of it.

21 Q.  Is it particular police departments that are

22    unhappy in your awareness?

23 A.  We work with East Pennsboro police department

24    more than any other.  Camp Hill would be

25    probably the next department we would work with

Exam./Williams - Buccifero                30

1    because they're in our -- we're in their

2    jurisdiction, if you will.

3  Q.    Right.  All right.  Did you ever have any

4    conversations with Chief Howard Dougherty of

5    the West Shore police about elopements?

6  A.    No.

7  Q.    All right.  Now, still on the subject of

8    dealing with local police departments, is Holy

9    Spirit charged with or asked to provide any

10   training to police officers with respect to

11   handling emotionally disturbed persons or

12   mental health patients?

13 A.    I'm aware that prior to my coming to Holy

14   Spirit and just in my beginning of my tenure

15   with Holy Spirit there was some work, some

16   training, some presentations made by former

17   supervisors of crisis programs and those in

18   charge of the crisis program.

19        And since the grand jury hearing, there

20   has been an increase in training and

21   involvement with the police departments on

22   that.

23 Q.    All right.  Has that increase been an increase

24   with respect to Holy Spirit personnel or county

25   personnel or what?

1   A.   As an extension of the crisis program that the

2        county contracts with, we've been working with

3        the police departments.

4   Q.   All right.  And who in particular at Holy

5        Spirit has been working with the police

6        departments?

7   A.   Rhett Bennie and Bruno Dario.

8   Q.   And who is Bruno Dario?

9   A.   He's the direct supervisor of the crisis

10       program.

11  Q.   And how long has he been the director?

12  A.   Since February 2002.

13  Q.   Who was the direct supervisor back in November

14       of 2000?

15  A.   I believe Don Wiley was the working supervisor

16       like in the same position as--

17  Q.   Right.  Now does Dario and would Wiley have

18       reported to Mr. Bennie?

19  A.   Yes.

20  Q.   I assume, but correct me if I am wrong, that

21       you had no direct contact with Ryan Schorr; is

22       that correct?

23  A.   Yes.

24  Q.   And had you had any direct contact with Ryan

25       Schorr before his being brought to the

Exam./Williams - Buccifero                      32

1        emergency room on the day of his death?

2   A.   I don't think so, no.

3   Q.   Have you reviewed any records regarding Ryan

4        Schorr and any other encounters he may have had

5        with Holy Spirit?  When I say "other", I mean

6        prior to his trip to the emergency room in

7        November of 2000.

8   A.   Well--

9             MR. YANINEK:  You can answer that

10        question.

11  A.   Yes, as part of looking into the case, you

12        know, the situation, what happened, and so

13        forth, yes.

14  BY MR. WILLIAMS:

15  Q.   And what have you learned about Ryan Schorr's

16        prior encounters with the hospital?

17  A.   What have I learned?

18  Q.   Well, let me ask you this.  Can you-- Let me

19        ask you some general questions.  What documents

20        did you review with respect to Ryan Schorr and

21        any prior encounters he had with the hospital?

22  A.   The medical records.

23  Q.   Fine.  Can you tell me whether his previous

24        trips or encounters with the hospital were all

25        for psychiatric services?

Exam./Williams - Buccifero                33

1    A.    I wouldn't be able to tell if they were all

2          that way, no.

3    Q.    I understand.  Do you have any recollection as

4          to how many prior encounters he had with the

5          hospital?

6    A.    No.

7    Q.    Do you recall whether he was previously at Holy

8          Spirit for a 302 evaluation or treatment?

9    A.    I do know he had another admission -- inpatient

10         treatment at Holy Spirit.  That's really all I

11         know in specific about Ryan Schorr.

12   Q.    That's fine.  And that was an inpatient

13         admission?

14   A.    Yes.

15   Q.    I take it from your answer you're not sure

16         whether that was voluntary or involuntary as

17         you sit here?

18   A.    Right.  I just know peripheral and, you know,

19         general that he had an inpatient.  I don't even

20         know the dates off the top of my head, what

21         those were.  But I know he was an inpatient at

22         one time.

23   Q.    I understand.  We've had some testimony about

24         communications with county dispatch with

25         respect to Ryan Schorr in particular, I guess

Exam./Williams - Buccifero                              34

1          the subjects of 302 procedures in general.

2              Is there a set protocol for what and when

3          hospital personnel should communicate to county

4          dispatch?

5    A.    I would say there's more guidelines.  And each

6          situation is different based on the

7          circumstances and the presenting situation.

8          But there are guidelines.

9    Q.    Are the guidelines written?

10   A.    Many of the guidelines are described in the 302

11         or the Emergency Detention Act, and we follow

12         those.  And then there are hospital guidelines

13         or procedures that, you know, correspond to or

14         complement or add to that.

15             But I would not say I'm an expert on

16         those.  But they-- You know, we try to

17         operationalize the process and guidelines that

18         the 302 Act has established.

19   Q.    I understand.  Have you reviewed in this case

20         any of the communications that were made with

21         county dispatch about Ryan Schorr?

22   A.    I don't know.  How are you using the term

23         "county dispatch"?  I don't know what that term

24         means.

25   Q.    Do you know that after Ryan Schorr eloped a

Exam./Williams - Buccifero                        35

1        call was made to the county about that fact?

2    A.   How are you using the term "county"?

3    Q.   I mean to the 911 center.

4    A.   I don't know.  I do not know that.

5    Q.   All right.  That's fine.  Do you know who Dr.

6         David Spurrier is?

7    A.   Yes.

8    Q.   And do you know what role he played with

9         respect to Ryan Schorr?

10   A.   I believe he's an emergency room physician that

11        was on duty that day.

12   Q.   All right.  Is he a psychiatrist?

13   A.   No.

14   Q.   What is his specialization, if you know?

15   A.   I believe he's an ER physician.

16   Q.   Fine.  That's all I have.  Thank you.

17             MR. MacMAIN:  I have no questions.

18             MR. YANINEK:  No questions.  Thanks.

19             (The proceedings concluded at 12:28 p.m.)

20

21

22

23

24

25

3 (

COMMONWEALTH OF PENNSYLVANIA    :
                                :  SS
COUNTY OF DAUPHIN               :


        I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:

                    STEVE BUCCIFERO

        I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.

        I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania this 10th day
of September, 2002.


                    _Debra L. Heary_

                    Debra L. Heary
                    Registered Professional Reporter
                    Notary Public

                    Notarial Seal
                    Debra L. Heary, Notary Public
                    Lower Paxton Twp., Dauphin County
                    My Commission Expires Feb. 10, 2003


(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

Keith L. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Steve Buccifero
August 30, 200

## 1

**1/12** 15:4
**12:28** 35:19
**1980** 8:2
**1986** 7:21

## 2

**2000** 22:9; 31:14; 32:7
**2002** 31:12
**24-7** 16:4
**24-hour** 12:13

## 3

**302** 11:1, 2, 6, 11; 21:14,
21, 22; 23:15, 17, 19, 23;
24:5; 29:3; 33:8; 34:1, 10,
18
**302s** 11:5, 9; 21:23; 22:2;
23:12; 24:22

## 9

**911** 35:3

## A

**ability** 10:4
**able** 10:4; 14:23; 18:19;
25:1; 33:1
**accommodate** 5:12
**accordingly** 16:18
**account** 19:3
**accurate** 5:18
**act** 9:14; 11:3; 21:15;
34:11, 18
**add** 34:14
**adjusted** 16:17
**administration** 6:25;
7:24, 25
**administrative** 5:19; 7:4,
7; 9:7, 15; 11:17; 20:10;
24:23; 25:9, 13; 27:15
**administrator** 17:1, 2
**admission** 33:9, 13
**admitting** 19:10
**adolescence** 12:16
**adolescent** 12:6; 19:25;
20:3
**adult** 19:21
**aftermath** 26:25
**afternoon** 25:21, 22
**Again** 15:9; 24:2
**against** 4:15
**agency** 8:13
**agent** 10:20
**ahead** 21:1
**alcohol** 18:17

**allocate** 14:13; 6:8; 15:5
**along** 28:21
**amount** 12:23; 14:14, 16,
21
**and/or** 7:4
**annual** 13:23
**answered** 12:14
**appropriate** 6:7
**approved** 24:5
**arrangement** 8:11; 9:3;
11:17; 8:6
**arrival** 7:9
**art** 9:22
**aside** 27:9
**assess** 10:7; 12:11, 12;
24:8, 14
**assessment** 21:21;
23:18; 24:7
**assigned** 23:16
**assigning** 6:7
**assistance** 12:4
**assisting** 21:12
**associated** 14:9
**assume** 31:20
**auditorium** 20:16
**audits** 16:8
**available** 27:10
**aware** 27:2; 29:13, 15, 17,
19, 20; 30:13
**awareness** 29:22

## B

**bachelor's** 17:24; 18:3;
22:23
**back** 6:21; 22:9; 25:16;
31:13
**background** 6:22; 18:1,
1, 2, 2, 12
**based** 15:24; 18:5; 34:6
**basis** 8:16; 13:22, 22, 23
**began** 27:10
**begin** 17:14
**beginning** 23:13; 30:14
**behavioral** 18:16; 22:22;
23:1, 2, 9
**benefit** 14:8
**Bennie** 26:7, 12; 27:23;
31:7, 18
**besides** 7:17
**best** 16:1
**better** 25:18
**bill** 15:2
**bit** 16:19
**bother** 4:19
**Bowling** 8:2, 3
**breaks** 5:10
**bring** 14:3; 25:16
**brought** 4:14; 21:13;
23:24; 24:6; 31:25
**Bruno** 31:7, 8
**BUCCIFERO** 4:8, 12

**budget** 8:24; 14:11, 12,
13
**budgetary** 6:4
**building** 10:17; 20:16,
18, 18
**business** 6:25; 7:24

## C

**call** 13:15; 21:19; 26:4,
25; 29:9; 35:1; 4:8, 16; 9:7;
11:1, 21; 12:3; 13:7, 25;
25:13, 16, 19; 29:14, 16;
16:1
**came** 7:16
**Camp** 29:24
**can** 4:23; 8:10; 9:23;
10:25; 11:11; 13:15, 19;
15:17, 18; 17:8, 14; 23:11;
24:3; 28:5; 32:9, 18, 23
**Candice** 28:10
**capacity** 24:20; 29:1
**care** 6:11, 12; 12:18
**career** 7:12
**case** 9:7, 8, 9, 14, 15;
11:17, 20, 21, 23; 12:1, 1;
32:11; 34:19
**category** 23:3, 8
**center** 5:25; 6:6, 18;
10:17, 19; 19:19; 20:5, 14;
35:3; 18:18
**certain** 12:23; 14:14
**Certainly** 21:1
**certification** 4:4
**charge** 6:10; 30:18, 9
**chief** 5:9; 29:10; 30:4
**child** 12:5, 16; 19:25
**child/adolescent** 20:7
**children** 12:9; 20:2
**choose** 16:12
**circumstances** 34:7
**citizens** 8:18; 9:10;
12:18; 13:10
**claims** 4:13
**clarification** 23:15
**Cleveland** 7:14
**clients** 4:14
**clinic** 19:23
**clinical** 6:2, 13; 17:9, 13;
20:7; 21:25
**clinician** 6:10
**coming** 30:13
**commitments** 11:1; 29:4
**communicate** 34:3
**communications** 33:24;
34:20
**community** 13:7
**complained** 29:11
**complaining** 29:16
**complaints** 29:2, 6
**complement** 34:14
**concert** 16:7
**concluded** 35:19

**conduct** 26:20
**confusing** 23:20
**connection** 11:25
**consultant** 7:15
**consumers** 8:18
**contact** 31:21, 24
**contract** 8:13, 21, 24;
9:8, 17; 10:12, 22, 23;
12:3, 20; 13:3, 8, 15, 18,
24; 14:1, 15; 15:21; 16:11,
14; 8:16, 23; 9:5, 20;
12:17; 31:2
**contractual** 8:15
**conversations** 30:4
**coordination** 11:22
**copy** 27:4
**correspond** 34:13
**cost** 6:18; 14:12; 15:5, 3
**counsel** 4:3; 18:2, 18
**counselor** 23:5; 12:11
**counties** 10:10
**County** 8:7, 11, 14, 17,
19, 19; 9:4, 6, 10, 13, 19;
10:13, 21; 11:7, 17; 12:8,
19, 19; 13:2, 10, 24; 14:5,
19, 23; 15:3, 8, 12, 13;
16:7, 7, 8, 9, 20, 21; 30:24;
31:2; 33:24; 34:3, 21, 23;
35:1, 2
**couple** 13:13
**coverage** 14:4
**covered** 13:2
**create** 14:2
**Crisis** 9:17, 22, 25; 10:3,
8, 23; 11:6, 9, 13, 18; 12:6,
15; 13:14, 19, 24; 14:14;
15:10; 17:18, 23; 18:7, 22,
24; 22:5, 8, 13, 17, 21;
23:7; 26:5, 9; 27:5, 6;
28:16; 30:17, 18; 31:1, 9
**Cumberland** 8:7; 12:18
**Cumberland-Perry**
8:14, 18, 19; 9:6, 10, 19;
10:2; 12:8; 13:10
**current** 22:18
**currently** 19:11

## D

**Dario** 31:7, 8, 17
**dates** 33:20
**David** 35:6
**day** 9:19; 10:13; 14:4;
16:3; 32:1; 35:11
**day-to-day** 6:5
**days** 16:12
**deal** 8:5; 30:8; 12:5
**death** 32:1
**definition** 11:4
**degree** 7:20, 23; 17:24;
18:3, 20; 22:24, 25
**delivery** 8:8
**demand** 16:2

**department** 10:15;
20:22; 29:10, 23, 25;
28:22; 29:2, 7, 21; 30:8;
21; 31:3, 6
**depends** 19:1
**deposition** 4:16, 20
**deputy** 17:2
**describe** 8:10; 26:13;
34:10
**description** 6:22; 17:8
**designated** 23:17
**details** 13:17
**Detention** 34:11
**determination** 23:14, 16
**determine** 16:1; 15:11
**development** 6:15
**different** 11:12, 12, 15;
34:6
**direct** 5:24; 6:11, 12;
20:11; 31:9, 13, 21, 24
**direction** 6:1
**directly** 28:6; 29:9, 15
**director** 5:14, 19; 6:11;
7:4, 4, 7; 20:5, 7; 24:23;
25:3, 9, 14; 27:15; 31:11
**discuss** 16:9
**dispatch** 33:24; 34:4, 21,
23
**disturbed** 30:11
**DNA** 23:5
**documents** 13:16; 32:19
**Don** 31:15
**done** 8:21; 23:18; 25:2, 5
**Dougherty** 30:4
**down** 16:16
**Dr** 35:5
**drug** 18:17
**duly** 4:9
**during** 26:20; 27:16
**duties** 5:23; 6:7; 19:20;
21:12
**duty** 8:5; 35:11

## E

**early** 25:21
**earn** 7:20
**East** 29:23
**education** 13:8; 20:16
**educational** 18:11, 25
**educationally** 6:23
**either** 10:5; 12:10, 14;
15:4, 7; 18:14
**eloped** 34:25
**elopements** 29:7, 8, 11;
30:5
**else** 11:19
**elsewhere** 18:13, 14
**emergency** 10:15, 18;
20:22; 21:2, 4, 5, 7, 20;
23:13; 32:1, 6; 34:11;
35:10

Keith I. Schorr & Susan Schorr   v.
Borough of Lemoyne, et al.

Steve Bucci
August 30, 2

own 11:4; 27:23

## P

p.m 35:19
paid 9:12; 13:21; 15:8;
20:9
part 8:5; 21:12; 27:17, 21;
32:11
partial 12:24
particular 16:24; 24:18;
29:21; 31:4; 33:25
parties 4:3
past 10:16; 18:8
patient 13:1; 15:25;
22:20; 24:6, 8, 14, 15;
11:1, 24, 25; 12:21, 21;
21:13; 30:12
pay 12:19, 21, 22; 13:4,
11; 14:7, 12, 25; 15:4;
20:11
payer 13:3
payment 12:22
peer 27:18, 19, 21; 28:2
Pennsboro 29:23
people 10:4, 12; 11:13;
15:17; 16:3, 3, 25; 17:13
per-patient 13:22
per-service 13:22
peripheral 33:18
Perry 12:18
person 18:20; 24:5, 18;
17:3; 28:17; 30:11
personally 25:3
personnel 17:9; 22:1;
30:24, 25; 34:3
pertaining 27:6
petition 23:23
phone 15:17
physically 20:14, 15
physician 24:7, 11, 13;
27:21; 35:10, 15
planning 6:15
played 35:8
please 4:21; 5:1
point 17:5; 23:14; 25:20,
23
police 23:24; 24:7; 25:15;
28:22; 29:2, 7, 10, 10, 21,
23; 30:5, 8, 10, 21; 31:3, 5
policies 24:21
policy 6:15
population 13:1
portion 17:4
position 5:21; 7:7; 28:14;
31:16; 17:12; 19:19
possibly 23:25
post 22:25
presentations 30:16
presenting 34:7
previous 32:23
previously 33:7
prior 30:13; 32:6, 16, 21;

33:4
privileges 19:8, 10
probably 29:25
procedure 6:15; 11:3;
6:16; 21:15; 24:25; 25:4;
34:1, 13
proceeded 26:14
proceedings 35:19
process 4:16; 8:21; 24:3;
34:17; 10:25; 11:6; 27:14
professional 17:22;
22:22; 10:7; 22:17; 25:1
program 8:14, 20; 9:6;
10:2; 11:6, 10; 12:4, 5;
13:2; 14:1, 20; 16:10; 17:4;
19:23; 22:8; 26:5, 9; 30:18;
31:1, 10; 6:16; 12:25;
15:10; 30:17
promulgating 24:20
propose 15:22; 16:16
protocol 34:2; 24:21
provide 8:16; 9:8, 20;
10:3, 14, 20, 23; 12:17, 25;
13:8; 14:4, 5, 6; 15:3;
17:13, 23; 19:20; 20:1, 10,
12, 21; 21:3; 22:5; 28:4;
30:9; 6:13; 9:2; 10:16;
13:16; 15:16; 18:7; 9:25;
10:12; 11:16
provider 22:20; 6:2
providing 6:8; 14:9;
19:23
provision 13:18; 17:10,
18
psych 16:8
psychiatric 7:5, 15; 8:8;
10:9; 11:1; 17:11, 14; 18:9,
15; 21:13; 32:25
psychiatrist 20:6; 24:10;
35:12; 19:8, 9, 12, 17, 21,
25; 20:4, 20; 21:3, 8, 11,
18
psychology 18:1
psychosocial 17:25
pull 27:3, 9
purchasing 6:18
purpose 5:11
put 8:23; 14:11; 27:9

## Q

qualify 20:25

## R

really 33:10
reason 4:23
recall 25:25; 26:18, 22;
28:6, 20, 24; 33:7
receive 15:18; 8:2; 29:1,
6, 9
receiving 9:11
recognize 19:7; 22:15
recollection 26:1, 3; 33:3

record 27:8; 32:3, 22
Red 26:10
referred 16:20
referring 29:18
regarding 29:3, 7; 32:3
regards 6:6
registered 18:6; 23:4
relate 28:2, 4
relationship 8:15
render 6:2
reported 31:18
request 15:20
required 10:2; 24:8, 23
requirement 16:6; 15:14
reserved 4:6
resource 11:22; 6:8; 14:3
respect 8:4, 7; 30:10, 24;
32:20; 33:25; 35:9
respective 4:3
respond 21:9, 19
responsibilities 6:5
responsibility 16:5;
21:19
responsible 6:4, 14;
17:3; 24:20; 26:8
restrict 17:18; 23:21;
22:1
revenue 6:18
review 27:13, 14, 16, 18,
19, 20, 22, 22; 28:2; 32:20,
3; 34:19
Rhett 26:7, 10, 11, 12;
27:23; 31:7
right 5:6; 7:9, 18; 9:1;
11:8; 13:5, 13; 15:9; 17:5;
19:4; 22:9; 23:20; 24:19;
25:23; 26:4, 10, 23; 28:25;
30:3, 3, 7, 23; 31:4, 17;
33:18; 35:5, 12
ring 15:17
risk 12:9, 12
RNs 18:6, 10
Robert 17:5
role 21:17; 35:8; 19:16
Romaine 8:22
room 10:18; 21:3, 4, 6, 8,
20; 23:13; 32:1, 6; 35:10
rules 4:19
run 15:7
Ryan 4:14; 22:10; 23:22;
25:7, 19; 26:16, 19, 25;
28:18, 22; 31:21, 24; 32:3,
15, 20; 33:11, 25; 34:21,
25; 35:9

## S

salary 14:8; 20:9
same 12:23; 28:21; 31:16
Saturday 25:21
school 12:7, 8; 23:6;
12:10
Schorr 4:14; 22:10;

23:22; 25:7, 14, 19; 26:25;
28:18, 23; 31:21, 25; 32:4,
20; 33:11, 25; 34:21, 25;
35:9; 26:16, 19; 32:15
sealing 4:4
second 16:4
section 12:1; 21:14
sense 17:15; 19:5; 20:20;
25:18
service 9:19; 10:4, 9, 14,
20; 13:7, 25; 14:5, 10;
15:3, 13, 14, 15; 17:25;
19:20; 20:1, 10; 5:15, 20,
24; 6:3, 9, 12; 7:15; 8:8,
17; 9:2, 9, 12, 18, 23; 10:1,
24; 11:16, 18; 13:9; 14:4,
14:14; 15:18; 17:11, 14,
19, 23; 18:8; 19:24; 20:2,
8, 12, 21; 21:4; 22:6, 17;
32:25
set 34:2
setting 18:15, 16
seven 16:12
several 7:12; 9:5
severely 11:23
shakes 5:5
shift 16:3, 4, 4
Shore 30:5
shortcomings 16:10
shortfall 14:17, 24
shot 25:24; 26:15
signed 8:22
signs 8:25
Sister 8:22, 25
sit 16:16; 26:2; 33:17
site 16:20; 17:6
situation 4:23; 10:8, 9;
23:22; 24:15; 26:13;
28:19, 23; 32:12; 34:6, 7;
12:6
small 13:8
social 10:9; 18:1; 23:7
someone 23:3, 5
sometimes 12:12
sort 9:14, 22; 13:7
source 12:22
speak 28:10, 17
speakers 13:9
specialist 21:23; 22:22;
23:1
specialization 35:14
specific 17:15; 22:19;
23:5, 8; 33:11; 8:24
specifically 9:24; 12:5;
16:22; 19:19
specified 21:12
specifies 15:11
speculating 28:7
Spirit 4:15; 5:15; 6:3;
7:10, 17; 8:5, 6, 12, 13;
10:11, 14; 14:2, 15; 15:1,
19, 21; 17:10; 18:23; 19:9,
17; 23:12; 25:8; 29:8; 30:9,
14, 15, 24; 31:5; 32:5;

33:8, 10; 29:3
spoke 28:6
Spurrier 35:6
staff 6:1, 13; 10:20;
11:13; 12:14, 15; 14:7,
15:11; 17:9, 22; 19:8;
21:18; 24:25; 6:7; 16:
start 5:2
State 8:2; 26:17, 20
statement 19:6
stay 26:20
step 6:21; 24:16; 11:
STEVE 4:8
still 30:7
stipend 20:9
stipulated 4:2
STIPULATION 4:1
stop 18:6
strategic 6:14
student 12:4
subject 23:25; 24:6;
28:25; 30:7; 34:1
submit 15:1, 22
subsidizes 14:20
supervisor 18:23; 2
31:9, 13, 15; 30:4
sure 6:12; 24:24; 27
33:15
sworn 4:9
systems 12:7, 9

## T

talk 28:21; 27:16; 28
teachers 12:10
teen 12:3, 14
telephone 10:5, 6
telling 11:15
tenure 30:14
term 9:22; 10:25; 23
34:22, 23; 35:2; 13:2
15:16, 21; 18:19
testified 4:9
testimony 16:19; 3:
Thanks 35:18
thereby 23:17
third 16:4
three 7:17; 12:25; 1
timing 25:18
title 5:18; 17:2; 22:1
today 26:2
together 4:16; 8:23
14:3, 11; 27:3
told 5:8
top 33:20
toward 12:15
track 9:13
trained 6:13; 10:6,
17:9; 18:9, 22; 22:5
training 17:24; 18:
21; 25:5; 30:10, 16,
13:9