

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .

KEITH I. SCHORR and          .  No. 1:01-CV-0930
SUSAN SCHORR,                .
            Plaintiffs       .  Judge Kane
                             .
      vs.                    .
                             .
BOROUGH OF LEMOYNE,          .
BOROUGH OF WORMLEYSBURG,     .
WEST SHORE REGIONAL POLICE   .
DEPARTMENT, HOWARD DOUGHERTY, .
CHIEF WEST SHORE REGIONAL    .
POLICE DEPARTMENT, CUMBERLAND .
COUNTY, HOLY SPIRIT HOSPITAL, .
            Defendants       .

. . . . . . . . . . . . . . . . .


Deposition of  :  MERCEDES BRISCESE

Taken by       :  Defendants

Date           :  October 9, 2002, 10:20 a.m.

Place          :  210 Senate Avenue
                  Camp Hill, Pennsylvania

Before         :  Debra L. Heary, Notary Public
                  Registered Professional Reporter

2

APPEARANCES

     WILLIAMS, CUKER & BEREZOFSKY
     By:  GERALD J. WILLIAMS, ESQ.

         For - Plaintiffs

     MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
     By:  GREGORY HAUCK, ESQ.

         For - Defendants West Shore Regional
              Police Department, Howard Dougherty,
              Chief West Shore Regional Police
              Department

     METTE, EVANS & WOODSIDE
     By:  JOHN F. YANINEK, ESQ.

         For - Defendants Cumberland County and
              Holy Spirit Hospital

ALSO PRESENT

     Fran Charney, RN, Director Risk Management

3

## I N D E X
### WITNESS

MERCEDES BRISCESE                      Examination

   By Mr. Williams                           4

   By Mr. Hauck                              21

4

STIPULATION

1

2          It is hereby stipulated by and between

3     counsel for the respective parties that

4     sealing, certification and filing are hereby

5     waived; and all objections except as to the

6     form of the question are reserved to the time

7     of trial.

8          MERCEDES BRISCESE, called as a witness,

9     being duly sworn, testified as follows:

10          MR. YANINEK:  Usual stipulations?

11          MR. WILLIAMS:  Fine.

EXAMINATION

12

13    BY MR. WILLIAMS:

14    Q.   Mrs. Briscese, my name is Gerry Williams.  I

15         represent Ryan Schorr in this case, which as

16         you may know has been filed against Holy Spirit

17         and some other entities in connection with Ryan

18         Schorr's death.

19              I'm going to ask you some questions about

20         some events that we think are relevant that you

21         may have some knowledge about or may have

22         participated in to some degree.

23              And my questions and anybody else's

24         questions and your answers are altogether a

25         deposition being taken down by the court

Exam./Williams - Briscese                    5

1    reporter.  Have you ever given a deposition

2    before?

3  A.    Yes.

4  Q.    Okay.  So I won't bother you too much with the

5        rules.  I'll just tell you, we're sitting

6        across a small table so you can probably hear

7        me.  But if you can't, let me know and I'll

8        speak louder.

9            If you don't understand one of my

10       questions, let me know and I will try to ask a

11       better question because we want you to give

12       answers that you mean to give to questions that

13       you understand.  Do you understand that?

14 A.    Yes.

15 Q.    And as you've done so far, you should give all

16       your answers in words not nods or gestures even

17       though we're talking to each other across the

18       table.  And that's because the court reporter

19       has to take it down.  Okay?

20 A.    Okay.

21 Q.    And as I told you before the deposition, I

22       expect that yours will be very short.  But even

23       so, if you want to take a break or talk to

24       counsel or stop for any reason, if you let me

25       know, we'll accommodate you.  Okay?

Exam./Williams - Briscese                    6

1   A.   Yes.

2   Q.   And last thing, which is more important in my

3        case sometimes than in others, some lawyer's

4        questions can be very long and you might

5        anticipate what they are and you might have an

6        urge to start your answer before the question

7        is finished.

8             Try not to do that so that we're not

9        talking over each other and the record becomes

10       confused.  Okay?

11  A.   Yes.

12  Q.   Now, ma'am, are you still employed by Holy

13       Spirit Hospital?

14  A.   Yes.

15  Q.   In what capacity?

16  A.   Part time as a Crisis worker.

17  Q.   And did you have that same job back in November

18       of 2000?

19  A.   Yes.

20  Q.   And was it also part time at that point?

21  A.   Yes.

22  Q.   And, I guess, flesh out for me a little bit

23       what part time means, how frequently do you

24       work typically?

25  A.   Every other weekend and PRN.

Exam./Williams - Briscese                    7

1   Q.   And "PRN" means as needed?

2   A.   Correct.

3   Q.   And when you are needed on that basis, you're

4        called in by someone?

5   A.   Correct.

6   Q.   And who typically calls you in?

7   A.   Usually the worker on that shift.

8   Q.   As I told you-- Well, first of all, when you

9        say "the worker", you mean the Crisis

10       Intervention worker?

11  A.   Correct.

12  Q.   As I told you, this deposition involves Ryan

13       Schorr.  As you sit here today, do you have an

14       independent recollection of Ryan Schorr?

15  A.   Yes.

16  Q.   And when you had, assuming that you did, any

17       dealings with Ryan Schorr, was it on a weekend

18       shift?

19  A.   Yes.

20  Q.   And so it was your regularly scheduled shift?

21  A.   Yes.

22  Q.   Before I ask you about the events of that day,

23       can you tell me a little bit more about your

24       educational background?  How do you qualify to

25       be a Crisis Intervention worker?

Exam./Williams - Briscese                    8

1  A.   I have my master's in counseling, and I also

2       have experience in counseling.

3  Q.   And just very briefly, describe for me the

4       experience.

5  A.   I've worked with children, Capable Adolescent

6       Mothers Program in New Jersey, also worked with

7       Superior Court working with both adults and

8       juveniles and having to counsel there.

9  Q.   And when did you obtain your master's degree?

10  A.   '82.

11  Q.   And from where?

12  A.   Trenton State.

13  Q.   And how long have you worked for Holy Spirit

14       altogether?

15  A.   Two years and a few months.

16  Q.   All right.  So I guess is it accurate to say

17       that at the time you encountered Ryan Schorr,

18       you had been at Holy Spirit for a few months?

19  A.   About a year.

20  Q.   All right.  Fair enough.  When you came to Holy

21       Spirit itself, did you receive any training at

22       the hospital -- additional training?

23  A.   Yes.

24  Q.   What did you receive?

25  A.   I was trained by the other Crisis workers as

Exam./Williams - Briscese                    9

1      well as the supervisor in the procedures of a

2      Crisis worker, given manuals to read.

3   Q.   Were you trained by a particular person or

4      group of people?

5   A.   Several Crisis workers as well as a supervisor.

6   Q.   Fine.  And I'm not asking you to cite chapter

7      and verse, but can you tell me what manuals or

8      kinds of manuals you reviewed?

9   A.   Just the procedure manual for Crisis mental

10     health, the hospital manual is mandatory for

11     all workers for procedures of the hospital.

12  Q.   Now, can you give me an overview of what

13     dealings you had with Ryan Schorr in November

14     of 2000?

15  A.   With Ryan himself, just in passing.

16  Q.   Well, maybe give me the overview for what I'll

17     call the Ryan Schorr case.  What participation

18     did you have in the evaluation or treatment of

19     Ryan Schorr?

20  A.   Okay.  How I got involved?

21  Q.   Yes.  That's a good place to start.

22  A.   I was contacted by the emergency room that

23     there was a woman who wanted to talk to someone

24     from Crisis about her son.  I went into the

25     waiting area of the emergency room and met with

1          Mrs. Schorr plus Ryan's roommate.

2               Mrs. Schorr was very upset and very

3          concerned about her son stating that he is

4          Bipolar and that he's had prior encounters with

5          mental health facilities, institutions, and

6          that she believes that he was not taking his

7          medication and that he was going off in that

8          and she wanted to file an involuntary placement

9          -- a 302.

10   Q.    Let me just interrupt you briefly.  First of

11         all, when you had this conversation with Mrs.

12         Schorr, Ryan Schorr was not at the facility.

13         Correct?

14   A.    Correct.

15   Q.    And when she told you that she was -- she

16         thought or was worried that Ryan was "going

17         off", are you referring to his medication or

18         something else?

19   A.    Both that he was going off his medication and

20         that he was acting peculiar.

21   Q.    And did she give you any particular examples of

22         this peculiar behavior?

23   A.    I can't recall what she said exactly about his

24         behavior.  The only thing I can remember is

25         what she was telling me was not 302-able

Exam./Williams - Briscese                    11

1    because it was kind of hearsay from what other

2    people were telling her.

3         And I said for a 302 to go through, it has

4    to be the person actually observing the

5    behavior within that 30-day period.

6  Q.  All right.  And again, for the record, when you

7      say "302-able" and "302", you're referring to a

8      section of the law dealing with involuntary

9      commitment?

10 A.  Correct.

11 Q.  So you advised Mrs. Schorr that what she was

12     describing, since she hadn't seen it, couldn't

13     be the basis for a 302 petition.  Is that

14     accurate?

15 A.  Exactly.

16 Q.  Then what happened?

17 A.  Then the roommate, Ryan's roommate stated that

18     -- she had introduced -- Mrs. Schorr introduced

19     Ryan's roommate -- which I can't recall his

20     name again -- stating that he was the person

21     who was telling her some of the things that

22     were going on.

23         So I addressed him.  And he said that his

24     roommate had become scary to him, that he had

25     pushed him, and he was fearful to stay in the

Exam./Williams - Briscese                    12

1          same place with Ryan and he left.  And that's

2          what his biggest concern was was that Ryan had

3          come after him.

4     Q.   And we know that roommate's first name to be

5          Matthew, so I'll refer to him as Matthew.

6     A.   Thank you.

7     Q.   Did you respond to Matthew, or what did you say

8          to Matthew, if anything?

9     A.   Well, I questioned him.  I said, well, would

10         you like to then file the 302, write down what

11         you're telling me in exact detail?  And I told

12         him what the procedure of a 302 is.

13             He was also concerned that Ryan wouldn't

14         know that he would be the one filing the 302.

15         I said, I can't guarantee that, because

16         sometimes if something goes forward, if the

17         patient decides he wants to--  You know, I

18         said, but we're not going to tell him who did

19         it.  That's confidential.

20    Q.   And so did he then agree to complete the 302

21         paperwork?

22    A.   Yes, he did.  And he did.

23    Q.   With you?  I mean, you helped him do the 302

24         paperwork?  Or tell me how that process worked.

25    A.   I opened up the sheets.  I explained each sheet

Exam./Williams - Briscese                    13

1    to him, walked him through a little bit.  Then

2    for the paragraph part, I said, just be as

3    detail oriented as you can, and it has to fall

4    within the 30-day guideline.

5         So whatever you saw within those 30 days,

6    just write it.  Because we really can't prompt

7    them with what to write.  And he did so and

8    then handed me the 302 at which time I went and

9    called up the delegate and informed the

10   delegate what was going on.

11  Q.   All right.  Let me backtrack you just a little

12       bit.  When you refer to "the paragraph part",

13       you're talking about the part where the

14       petitioner describes the behavior--

15  A.   Correct.

16  Q.   --that is the basis of the 302 petition.

17       Correct?

18  A.   Correct.

19  Q.   And when you say you gave the completed

20       paperwork to "the delegate"--

21  A.   No, I didn't give the completed paperwork to

22       the delegate, I called up the delegate and--

23  Q.   Okay.  First of all, who is "the delegate" or

24       what is "the delegate"?

25  A.   Okay.  I don't remember who the delegate was at

1      the time.  They switch off.  Was it--  I can't

2      remember who the delegate was at the time.  The

3      delegate is the person who we call up to

4      determine whether the petition is valid or not.

5 Q.   Now, does the delegate work for the county or

6      the hospital or some other entity?

7 A.   The county.

8 Q.   So tell me what you recall about your telephone

9      call to the delegate, whoever it was.

10 A.   What I did was I informed, just like what I'm

11      telling you, what the mother had said, what the

12      roommate had said, and read what the roommate

13      had written to the delegate.

14 Q.   And what did that person say to you, if

15      anything?

16 A.   That he would agree to a 302 and would come in

17      and sign for the warrant for Ryan to be picked

18      up.

19 Q.   And is that the procedure?  Is that what

20      happens, the delegates comes and signs a--

21 A.   Sometimes if it's a real emergency where it has

22      to be right then and there, the delegate can't

23      come.  It has been where the delegate says over

24      the phone to do this and get the procedure

25      going and then they come and sign it.

Exam./Williams - Briscese                    15

1          And I can't remember if that's what

2    happened at that point where the delegate

3    actually came and signed within that 30-minute

4    time frame or I don't remember.

5  Q.    The alternative is the delegate can authorize

6    somebody at the hospital to sign?

7  A.    Just yes, that it's okay, call up the police,

8    and I'll come in and sign the warrant.  And the

9    police can--

10 Q.    I understand.  All right.  So after however it

11   was accomplished, you received this approval

12   from the delegate, what did you do next?

13 A.    At that point, I went back to the parent and

14   the roommate and informed them that the

15   delegate did approve for the 302 and that if

16   they wanted to they could go home because it

17   would take time for the police to have to go

18   and pick up -- and if they possibly knew where

19   Ryan was so that they would have a basis.

20 Q.    Did they give you any information?

21 A.    I don't remember.

22 Q.    That's fine.  And then Mrs. Schorr and Matthew

23   left?

24 A.    Correct.

25 Q.    Did that end your involvement in the Ryan

Exam./Williams - Briscese                                16

1    Schorr case, or did you have some further

2    involvement?

3  A.  What I did was to write up some notes for the

4    other person coming in, because it was soon to

5    be my shift ending and the other Crisis worker

6    was going to come in.

7         So the only other involvement was to

8    inform the other Crisis worker that was coming

9    what had transpired and to prepare her for if

10    he comes in on her shift.

11  Q.  And do you recall, was the other Crisis worker

12    Candice Highfield?

13  A.  Correct.

14  Q.  And what, if anything, do you recall telling

15    Ms. Highfield about the Ryan Schorr case?

16  A.  What I had just told you and also that the

17    mother said that Ryan had been placed in

18    another facility, in Edgewater, and that he had

19    a very negative experience.

20         So they were really hoping that he could

21    get into our facility, because we can't

22    guarantee if they're going to come to Holy

23    Spirit or not depending upon beds and whether

24    he needs to have a secure bed or not.  And we

25    couldn't determine that yet not having met with

Exam./Williams - Briscese                    17

1    Ryan.

2         And I told her that she believed that as

3    soon as Ryan would come into the hospital, he

4    would be not upset -- he would want to come in

5    the hospital.  And he would act accordingly,

6    and he wouldn't be any trouble.

7  Q.  Just so I'm clear, Mrs. Schorr suggested that

8    once Ryan got there he would be okay?

9  A.  Yes.

10 Q.  But she expressed the hope that Edgewater could

11   be avoided?

12 A.  Yes.

13 Q.  Had she told you anything else about any prior

14   psychiatric or mental health treatment that

15   Ryan had received?

16 A.  Well, the fact that he was at Edgewater and

17   that she said that he was Bipolar and off his

18   medication.

19 Q.  Right.  Besides the Edgewater experience and

20   his condition, did she tell you anything else?

21 A.  Not that I can recall.

22 Q.  All right.  So at the time you talked to

23   Candice Highfield, your shift had ended or was

24   coming to an end?

25 A.  Yes.

Exam./Williams - Briscese                           18

1   Q.   And then you left the hospital, I assume, at

2        the end of your shift?

3   A.   We received a call that Ryan was coming in.

4        The police had picked him up.  And so just as I

5        was leaving -- and Candice was walking with me

6        -- the police were there with Ryan.  So I just

7        kind of in passing saw--

8   Q.   Did you speak with Ryan at all?

9   A.   No.

10  Q.   What, if anything, do you recall observing

11       about Ryan?

12  A.   It's difficult to say because the police

13       officer was in front and Ryan was in the back.

14       And so all I saw was really, like, the tip of

15       Ryan's head.  And that's all I can recall.

16  Q.   He wasn't saying anything or making any noises?

17  A.   No, he was pretty calm.

18  Q.   And I think we know the answer to this, but

19       I'll ask you if you observed it.  Was he in

20       handcuffs or anything?

21  A.   I couldn't tell because all I could see was,

22       like, the tip of his head.

23  Q.   All right.  That's fine.  Now, did you see Ryan

24       Schorr again?

25  A.   No.

Exam./Williams - Briscese                          19

1    Q.    Did you have any later conversations with

2          anybody from the hospital about Ryan Schorr

3          after that?

4    A.    Yes.

5    Q.    And what conversations did you have?

6    A.    Just about what had transpired.

7    Q.    Who did you have these conversations with?

8    A.    Rita.

9    Q.    Who is Rita?

10   A.    Another Crisis worker.

11   Q.    Do you know her last name?

12   A.    It just slipped my mind.

13   Q.    That's fine.  Who else?

14   A.    Candice again.

15   Q.    Okay.

16   A.    And that's it.

17   Q.    These conversations with Rita and Candice, when

18         did they occur in relation to Ryan Schorr's

19         death?

20   A.    It was after the newspapers and, you know, the

21         news had put it out.  And we were just saying

22         what a tragedy.

23   Q.    So within hours or a day or so of the death, is

24         that when you would have had these

25         conversations?

Exam./Williams - Briscese                    20

1  A.  Let me see, I don't remember the time frame.

2  Q.  Okay.  That's fair enough.  Did either woman

3      tell you anything specific about any experience

4      she had had with Ryan Schorr?

5  A.  Just Candice.

6  Q.  And what did Candice tell you?

7  A.  That it just surprised her what had happened.

8  Q.  And what was she, if you know, referring to

9      when she said when "it" happened?  What did you

10     understand that to mean?

11 A.  Well, she had just said that Ryan didn't show

12     any indication that he was going to be

13     aggressive.  And when she opened the door, he

14     pushed her.  And that was it.

15 Q.  All right.  And how about Rita, had she--

16 A.  No.  It was just to show me -- because it was

17     on the news, and she was showing me the news.

18 Q.  I understand.  Okay.  Conversations with anyone

19     else from the hospital about Ryan Schorr?

20 A.  Within, like, that time frame of a few weeks

21     afterwards?

22 Q.  Yes.

23 A.  No.

24 Q.  Were you asked to prepare a report or an

25     incident report about this situation?

Exam./Hauck - Briscese                              21

1    A.    Not that I can recall.

2    Q.    All right.  How about conversations with people

3          other than people from the hospital -- I don't

4          mean anyone in the universe -- I mean, for

5          example, with the police or anyone from

6          Cumberland County?

7    A.    No.

8    Q.    That's all the questions I have.  Thank you.

9                        EXAMINATION

10   BY MR. HAUCK:

11   Q.    Hi, Mrs. Briscese.  My name is Greg Hauck, and

12         I represent the West Shore Regional Police

13         Department in this case.

14              I'd like to take you back for a second to

15         when you were talking with Mrs. Schorr and Matt

16         when they first came into the emergency room.

17              Can you remember what Matt told you about

18         Ryan's behavior in that, I guess--  Can you

19         remember what Matt told you about how Ryan had

20         been acting in the last 30 days?

21   A.    In the last 30 days -- only in the shorter time

22         frame.  He was giving just in that particular

23         evening that Ryan was agitated and had pushed

24         him and he was fearful about going back in the

25         apartment.

Exam./Hauck - Briscese                    22

1          I recall something about a broken window.

2     I think he said Ryan had broken the window.  He

3     also said that he had made some threatening

4     phone calls to his mother -- not Matt's mother,

5     Ryan's mother.

6          But I can't recall if he was telling me

7     prior to that whether his behavior had been

8     agitated, you know, for the last couple weeks

9     or anything.

10  Q.   Did he tell you about Ryan's behavior just in

11     the last 30 days or did he go beyond the 30-day

12     period?

13  A.   No, it was up to that point.

14  Q.   So it was just in the last 30 days?

15  A.   Correct.

16  Q.   Do you remember what he told you about him

17     being pushed?

18  A.   Yeah.  I just remember him saying that's why he

19     left because Ryan wanted to get into an

20     argument with him and got a little bit loud and

21     that Ryan pushed him.  And he just left because

22     he didn't want to get into it with Ryan.

23  Q.   Was he afraid that there could be violence?

24  A.   That was his terminology was that, I'm afraid

25     to go back because I don't know what Ryan's

Exam./Hauck - Briscese                    23

1   going to do.

2   Q.   All right.   What did he tell you about the

3        phone calls with his mother?

4   A.   This was--  The mother had made mention of

5        that.  So I don't know if Matt was just saying

6        yes, he has been making these phone calls

7        because Ryan's mom was telling me about this or

8        that he had heard.

9             So that I can't remember whether it was

10       Matt saying, I heard him making these phone

11       calls to his mother, or Matt saying to me, his

12       mother is telling me he is also making

13       threatening phone calls, too.

14  Q.   What was your understanding about what was said

15       during the phone calls?

16  A.   I don't remember.

17  Q.   Did he explain to you--  You also mentioned

18       that he said there had been a broken window?

19  A.   Yes.

20  Q.   Did he tell you how the window had been broken?

21  A.   He might have, and I can't remember that.

22  Q.   Is there anything else you can remember that

23       Matt told you about Ryan's behavior?

24  A.   Just that he believes he was off his medication

25       also and that he was just very concerned for

Exam./Hauck - Briscese                    24

1          him because he didn't know if he was going to

2          hurt himself or hurt him -- hurt Matt.

3     Q.   Did Matt indicate that he was hurt when Ryan

4          pushed him?

5     A.   No.

6     Q.   But it was just that he was afraid that it

7          could have escalated?

8     A.   Correct.

9     Q.   Do you remember what Mrs. Schorr told you about

10         Ryan's behavior?

11    A.   She was basically telling me about the past --

12         a little bit of Ryan's past behavior when he's

13         off medication and that he had to be

14         institutionalized because of behavior.

15              And that's why I was informing her that

16         past behavior like that that's already been

17         treated is not 302-able stuff.  And him just

18         being off his medication is not a 302-able

19         cause for him to be involuntarily placed

20         somewhere.  It would have to be more of his

21         behavior.

22              And she couldn't really pinpoint--  From

23         what I remember, she couldn't really pinpoint

24         behaviors.  It was more she said, it's just a

25         mother's intuition knowing that if he doesn't

Exam./Hauck - Briscese                    25

1    get some help that something's going to happen.

2        And that's what I really recall, you know,

3    her saying that it's a mom's thing knowing

4    that, you know, something's going to happen if

5    he doesn't get some help.

6  Q.   Did she tell you about any violent behavior

7       that he'd exhibited in the past?

8  A.   I don't remember that.

9  Q.   When you said that you had called "the

10      delegate", would you mind spelling that?

11 A.   Delegate?

12 Q.   Yes.

13 A.   D-e-l-e-g-a-t-e.

14 Q.   Delegate.  Is that an official title of

15      someone?

16 A.   I think this individual actually has another

17      title.  But the delegate decides in instances

18      such as this whether something should be

19      validated or not, especially after hours.

20      They're on call.

21 Q.   Do you know, are they an elected official?

22 A.   No, I don't.

23 Q.   Now, you had mentioned that at the time Ryan

24      Schorr came into the hospital, it was toward

25      the end of your shift; is that right?

Exam./Hauck - Briscese                                    26

1   A.    Yes.

2   Q.    And did you say that you had written some notes

3         so that the people that were coming in the next

4         shift would know what had happened?

5   A.    Just quick notes, chronological order, you

6         know, so that they would have a point of

7         reference to go back.  If the police called,

8         the person would have a point of reference of

9         what happened since she wasn't there.

10  Q.    Do you know where those notes are now?

11  A.    No.  A lot of times what we'll do with those

12        notes is they will just be discarded.  They're

13        not even full sentences half the time, just

14        quick jots down.

15            And then we would go over with the person

16        we're changing shifts what's happening.  And

17        these, like, one words or two words would just

18        jar their memory of what's going on.

19  Q.    What are these types of notes written on

20        typically, just like a piece of loose-leaf?

21  A.    Legal pad like what you have in front of you.

22  Q.    I don't have any more questions.

23            MR. YANINEK:  I don't have any questions.

24            MR. WILLIAMS:  Okay.  Thank you.

25            (The proceedings concluded at 10:47 a.m.)

27

COMMONWEALTH OF PENNSYLVANIA    :
                                :  SS
COUNTY OF DAUPHIN               :


        I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:

                    MERCEDES BRISCESE

        I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.

        I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania this 18th day
of October, 2002.



                    Debra L. Heary
                    Registered Professional Reporter
                    Notary Public

Notarial Seal
Debra L. Heary, Notary Public
Lower Paxton Twp., Dauphin County
My Commission Expires Feb. 10, 2003


(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

Case 1:01-cv-00930-YK    Document 92-7    Filed 02/28/2003    Page 28 of 50

Borough of Lemoyne, et al.                                                October 9, 20

# 1

10:47 26:25

# 2

2000 6:18; 9:14

# 3

30 13:5; 21:20, 21; 22:11, 14
30-day 11:5; 13:4; 22:11
30-minute 15:3
302 10:9; 11:3, 7, 13; 12:10, 12, 14, 20, 23; 13:8, 16; 14:16; 15:15
302-able 10:25; 11:7; 24:17, 18

# 8

82 8:10

# A

a.m 26:25
accommodate 5:25
accomplished 5:11
accordingly 17:5
accurate 8:16; 11:14
across 5:6, 17
act 17:5
acting 10:20; 21:20
actually 11:4; 15:3; 25:16
additional 8:22
addressed 11:23
Adolescent 8:5
adults 8:7
advised 11:11
afraid 22:23, 24; 24:6
afterwards 20:21
again 11:6, 20; 18:24; 19:14
against 4:16
aggressive 20:13
agitated 21:23; 22:8
agree 12:20; 14:16
alternative 15:5
altogether 4:24; 8:14
anticipate 6:5
apartment 21:25
approval 15:11
approve 15:15
area 9:25
argument 22:20
assume 18:1
assuming 7:16
authorize 15:5

avoided 17:11

# B

back 6:17; 15:13; 18:13; 21:14, 24; 22:25; 26:7
background 7:24
backtrack 13:11
basically 24:11
basis 7:3; 11:13; 13:16; 15:19
become 11:24
becomes 6:9
bed 16:24
beds 16:23
behavior 10:22, 24; 11:5; 13:14; 21:18; 22:7, 10; 23:23; 24:10, 12, 14, 16, 21; 25:6
behaviors 24:24
believes 10:6; 23:24
Besides 17:19
better 5:11
beyond 22:11
biggest 12:2
Bipolar 10:4; 17:17
bit 6:22; 7:23; 13:1, 12; 22:20; 24:12
both 8:7; 10:19
bother 5:4
break 5:23
briefly 8:3; 10:10
BRISCESE 4:8, 14; 21:11
broken 22:1, 2; 23:18, 20

# C

call 9:17; 14:3, 9; 15:7; 18:3; 25:20
called 4:8; 7:4; 13:9, 22; 25:9; 26:7
calls 7:6; 22:4; 23:3, 6, 11, 13, 15
calm 18:17
came 8:20; 15:3; 21:16; 25:24
can 5:6; 6:4; 7:23; 9:7, 12; 10:24; 13:3; 15:5, 9; 17:21; 18:15; 21:1, 17, 18; 23:22
Candice 16:12; 17:23; 18:5; 19:14, 17; 20:5, 6
Capable 8:5
capacity 6:15
case 4:15; 6:3; 9:17; 16:1, 15; 21:13
cause 24:19
certification 4:4
changing 26:16
chapter 9:6
children 8:5
chronological 26:5
cite 9:6

clear 17:7
coming 16:4, 8; 17:24; 18:3; 26:3
commitment 11:9
complete 12:20
completed 13:19, 21
concern 12:2
concerned 10:3; 12:13; 23:25
concluded 26:25
condition 17:20
confidential 12:19
confused 6:10
connection 4:17
contacted 9:22
conversation 10:11
conversations 19:1, 5, 7, 17, 25; 20:18; 21:2
counsel 4:3; 5:24; 8:8
counseling 8:1, 2
county 14:5, 7; 21:6
couple 22:8
court 4:25; 5:18; 8:7
Crisis 6:16; 7:9, 25; 8:25; 9:2, 5, 9, 24; 16:5, 8, 11; 19:10
Cumberland 21:6

# D

D-e-l-e-g-a-t-e 25:13
day 7:22; 19:23
days 13:5; 21:20, 21; 22:11, 14
dealing 11:8
dealings 7:17; 9:13
death 4:18; 19:19, 23
decides 12:17; 25:17
degree 4:22; 8:9
delegate 13:9, 10, 20, 22, 22, 23, 24, 25; 14:2, 3, 5, 9, 13, 22, 23; 15:2, 5, 12, 15; 25:10, 11, 14, 17
delegates 14:20
Department 21:13
depending 16:23
deposition 4:25; 5:1, 21; 7:12
describe 8:3
describes 13:14
describing 11:12
detail 12:11; 13:3
determine 14:4; 16:25
difficult 18:12
discarded 26:12
done 5:15
door 20:13
down 4:25; 5:19; 12:10; 26:14
duly 4:9
during 23:15

# E

Edgewater 16:18; 17:10, 16, 19
educational 7:24
either 20:2
elected 25:21
else 10:18; 17:13, 20; 19:13; 20:19; 23:22
else's 4:23
emergency 9:22, 25; 14:21; 21:16
employed 6:12
encountered 8:17
encounters 10:4
end 15:25; 17:24; 18:2; 25:25
ended 17:23
ending 16:5
enough 8:20; 20:2
entities 4:17
entity 14:6
escalated 24:7
especially 25:19
evaluation 9:18
even 5:16, 22; 26:13
evening 21:23
events 4:20; 7:22
exact 12:11
exactly 10:23; 11:15
EXAMINATION 4:12; 21:9
example 21:5
examples 10:21
except 4:5
exhibited 25:7
expect 5:22
experience 8:2, 4; 16:19; 17:19; 20:3
explain 23:17
explained 12:25
expressed 17:10

# F

facilities 10:5
facility 10:12; 16:18, 21
fact 17:16
Fair 8:20; 20:2
fall 13:3
far 5:15
fearful 11:25; 21:24
few 8:15, 18; 20:20
file 10:8; 12:10
filed 4:16
filing 4:4; 12:14
Fine 4:11; 9:6; 15:22; 18:23; 19:13
finished 6:7
first 7:8; 10:10; 12:4;

13:23; 21:16
flesh 6:22
follows 4:9
form 4:6
forward 12:16
frame 15:4; 20:1, 20; 21:22
frequently 6:23
front 18:13; 26:21
full 26:13
further 16:1

# G

gave 13:19
Gerry 4:14
gestures 5:16
given 5:1; 9:2
giving 21:22
goes 12:16
good 9:21
Greg 21:11
group 9:4
guarantee 12:15; 16:2
guess 6:22; 8:16; 21:1
guideline 13:4

# H

half 26:13
handcuffs 18:20
handed 13:8
happen 25:1, 4
happened 11:16; 15:2; 20:7, 9; 26:4, 9
happening 26:16
happens 14:20
HAUCK 21:10, 11
head 18:15, 22
health 9:10; 10:5; 17:1∙
hear 5:6
heard 23:8, 10
hearsay 11:1
help 25:1, 5
helped 12:23
hereby 4:2, 4
Hi 21:11
Highfield 16:12, 15; 17:23
himself 9:15; 24:2
Holy 4:16; 6:12; 8:13, 1∙ 20; 16:22
home 15:16
hope 17:10
hoping 16:20
Hospital 6:13; 8:22; 9:1 11; 14:6; 15:6; 17:3, 5; 18:1; 19:2; 20:19; 21:3; 25:24
hours 19:23; 25:19
hurt 24:2, 2, 2, 3

Keith I. Schorr & Susan Schorr  v.
Borough of Lemoyne, et al.

Mercedes Bris
October 9, 2

somebody 15:6
someone 7:4; 9:23;
25:15
something's 25:1, 4
sometimes 6:3; 12:16;
14:21
somewhere 24:20
son 9:24; 10:3
soon 16:4; 17:3
speak 5:8; 18:8
specific 20:3
spelling 25:10
Spirit 4:16; 6:13; 8:13, 18,
21; 16:23
start 6:6; 9:21
State 8:12
stated 11:17
stating 10:3; 11:20
stay 11:25
still 6:12
stipulated 4:2
STIPULATION 4:1
stipulations 4:10
stop 5:24
stuff 24:17
suggested 17:7
Superior 8:7
supervisor 9:1, 5
surprised 20:7
switch 14:1
sworn 4:9

## T

table 5:6, 18
talk 5:23; 9:23
talked 17:22
talking 5:17; 6:9; 13:13;
21:15
telephone 14:8
telling 10:25; 11:2, 21;
12:11; 14:11; 16:14; 22:6;
23:7, 12; 24:11
terminology 22:24
testified 4:9
though 5:17
thought 10:16
threatening 22:3; 23:13
times 26:11
tip 18:14, 22
title 25:14, 17
today 7:13
told 5:21; 7:8, 12; 10:15;
12:11; 16:16; 17:2, 13;
21:17, 19; 22:16; 23:23;
24:9
toward 25:24
tragedy 19:22
trained 8:25; 9:3
training 8:21, 22
transpired 16:9; 19:6

treated 24:17
treatment 9:18; 17:14
Trenton 8:12
trial 4:7
trouble 17:6
try 5:10; 6:8
Two 8:15; 26:17
types 26:19
typically 6:24; 7:6; 26:20

## U

universe 21:4
up 12:25; 13:9, 22; 14:3,
18; 15:7, 18; 16:3; 18:4;
22:13
upon 16:23
upset 10:2; 17:4
urge 6:6
Usual 4:10
Usually 7:7

## V

valid 14:4
validated 25:19
verse 9:7
violence 22:23
violent 25:6

## W

waiting 9:25
waived 4:5
walked 13:1
walking 18:5
wants 12:17
warrant 14:17; 15:8
weekend 6:25; 7:17
weeks 20:20; 22:8
West 21:12
what's 26:16, 18
WILLIAMS 4:11, 13, 14;
26:24
window 22:1, 2; 23:18, 20
within 11:5; 13:4, 5; 15:3;
19:23; 20:20
witness 4:8
woman 9:23; 20:2
words 5:16; 26:17, 17
work 6:24; 14:5
worked 8:5, 6, 13; 12:24
worker 6:16; 7:7, 9, 10,
25; 9:2; 16:5, 8, 11; 19:10
workers 8:25; 9:5, 11
working 8:7
worried 10:16
write 12:10; 13:6, 7; 16:3
written 14:13; 26:2, 19

## Y

YANINEK 4:10; 26:23
year 8:19
years 8:15



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .
KEITH I. SCHORR and          .   No. 1:01-CV-0930
SUSAN SCHORR,                .
          Plaintiffs         .   Judge Kane

     vs.                     .
                             .
BOROUGH OF LEMOYNE,          .
BOROUGH OF WORMLEYSBURG,     .
WEST SHORE REGIONAL POLICE   .
DEPARTMENT, HOWARD DOUGHERTY,.
CHIEF WEST SHORE REGIONAL    .
POLICE DEPARTMENT, CUMBERLAND.
COUNTY, HOLY SPIRIT HOSPITAL,.
          Defendants         .
. . . . . . . . . . . . . . .


Deposition of  :  CHARLES STERLING

Taken by       :  Defendants

Date           :  August 30, 2002, 10:38 a.m.

Place          :  210 Senate Avenue
                  Camp Hill, Pennsylvania

Before         :  Debra L. Heary, Notary Public
                  Registered Professional Reporter

2

APPEARANCES

 WILLIAMS, CUKER & BEREZOFSKY
 By: GERALD J. WILLIAMS, ESQ.

  For - Plaintiffs

 MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
 By: DAVID J. MacMAIN, ESQ.

  For - Defendants West Shore Regional
   Police Department, Howard Dougherty,
   Chief West Shore Regional Police
   Department

 METTE, EVANS & WOODSIDE
 By: JOHN F. YANINEK, ESQ.

  For - Defendants Cumberland County and
   Holy Spirit Hospital

ALSO PRESENT

 Fran Charney, RN, Director Risk Management

3

I N D E X
WITNESS

CHARLES STERLING                    Examination

   By Mr. Williams                        4

   By Mr. MacMain                         44

EXHIBITS

Sterling Deposition
Exhibit Numbers                          Page

1        ECU Seclusion Room                21

2        Restraints/Protective Devices     28

4

```
 1                    STIPULATION
 2          It is hereby stipulated by and between
 3      counsel for the respective parties that
 4      sealing, certification and filing are hereby
 5      waived; and all objections except as to the
 6      form of the question are reserved to the time
 7      of trial.
 8          CHARLES STERLING, called as a witness,
 9      being duly sworn, testified as follows:
10                    EXAMINATION
11 BY MR. WILLIAMS:
12 Q.    Mr. Sterling, we've just met.  And as you now
13      know, I represent the family of Ryan Schorr and
14      the claim that's been made against Holy Spirit
15      and some other people and organizations arising
16      from his death.  Have you given a deposition
17      before?
18 A.    No, I haven't.
19 Q.    All right.  Well then, I'll just give you--
20      I'll torture you with a few ground rules, but I
21      don't think you'll have any problem.
22      Obviously, your testimony today is under oath.
23      Do you understand that?
24 A.    Yes, I do.
25 Q.    I'm going to and the other lawyers will also
```

Exam./Williams - Sterling                    5

1    have an opportunity to ask you some questions

2    that we think are relevant about these claims

3    and this situation.

4         The court reporter is taking down the

5    record of it.  And so obviously, we want that

6    record to be as accurate as possible, which

7    means we'd like to be able to rely on an idea

8    that you had given answers to questions that

9    you understand and have heard and answers that

10   you mean to give.  Do you understand that?

11 A.  Yes, I do.

12 Q.  So all that really means is if for some reason

13   you don't understand one of my questions, if

14   you'd let me know that I'll correct the

15   situation.  Is that okay?

16 A.  Okay.

17 Q.  Another important rule you've followed very

18   well so far, which is to give all of your

19   answers in words, not gestures or nods like you

20   might give if we were just talking to each

21   other.  And that's because the court reporter

22   needs to take down the record.  Okay?

23 A.  Right.

24 Q.  And as hard as it may be sometimes because

25   lawyers are so long-winded, try to let me

1      finish my question before you start your

2      answer.  Is that okay?

3  A.    Yes.

4  Q.    The deposition is going to be short, I believe,

5      but if you want to take a break or talk to

6      counsel or just stretch your legs, let me know

7      and we'll accommodate that.  Okay?

8  A.    Okay.

9  Q.    Now, sir, why don't you start by telling me

10     what your position at Holy Spirit Hospital is?

11  A.   I'm the security manager here.

12  Q.   And how long have you had that position?

13  A.   For 17 years.

14  Q.   Give me a synopsis of your duties as security

15     manager.

16  A.   I'm in charge of the day-to-day operation of

17     the security department here at Holy Spirit

18     Hospital and on the campus, responsible for

19     staffing of the department, scheduling of the

20     security officers, policies and procedures.

21  Q.   All right.  Who besides security officers are

22     the types of employees in the security

23     department?

24  A.   (No response)

25  Q.   I mean, are there clerical people who work for

Exam./Williams - Sterling                7

1    you, for example?

2  A.  No, I don't have any clerical people.

3  Q.  Is it only what I would think of as security

4    guards who work for you?

5  A.  Right.  Security officers, correct.

6  Q.  And how many security officers are there

7    currently?

8  A.  We have about 15 with our floats.

9  Q.  And was that roughly the same back in November

10    of 2000?

11  A.  No, it was not.

12  Q.  What was the number then?

13  A.  We had 11 at that time.

14  Q.  Is there any particular reason for the increase

15    since then?

16  A.  Last year, September 11th, that whole -- the

17    whole last year, we have increased our security

18    staff because of the situation in the world --

19    in the country.

20  Q.  I understand.  The next couple of questions, if

21    we can, I'd like to focus back on the time of

22    the Ryan Schorr incident, which is the November

23    2000 time frame.  At that time, was there a

24    specific number of security officers who would

25    be on duty at each shift at the hospital?

Exam./Williams - Sterling                    8

1   A.    Yes.

2   Q.    And what was that number?

3   A.    That given day or schedules for the department?

4   Q.    Well, let's do both.  Let's start with that

5         given day.  How many officers were, if you

6         know, on duty when Ryan Schorr arrived at Holy

7         Spirit?

8   A.    There would be one scheduled officer on the day

9         shift, two on evenings, and two on nights.

10  Q.    All right.  And that was the general rule at

11        that time?

12  A.    Yes, sir.

13  Q.    And so far as the day of the Ryan Schorr

14        incident, to your knowledge was there any

15        change in that?

16  A.    No.

17  Q.    So I'm not even sure which-- Well, let me ask

18        you this.  On which shift did Ryan Schorr

19        arrive at the Holy Spirit Hospital, do you

20        know?

21  A.    The day shift.

22  Q.    So there would have been one security officer

23        there?

24  A.    Yes.

25  Q.    And we have his identity, but can you tell me

Exam./Williams - Sterling                    9

1         who it was?

2    A.   Cory Graby.

3    Q.   Now, again, focusing on that particular day,

4         would Officer Graby have been assigned to a

5         particular locale in the hospital or what?

6    A.   No, sir.  He would have had the run of the

7         whole campus here.

8    Q.   All right.  Is there a place where he would

9         figuratively hang his hat?  Is there a station?

10   A.   He works out of the security office that was in

11        the basement, but he would be doing the whole

12        house.

13   Q.   I understand.  And the security office is

14        located in the basement where, in the main

15        building or where?

16   A.   Yeah.  Yes.

17   Q.   All right.  And you say he would have had the

18        run of the whole shop, so to speak.  Would he

19        have specified patrol duties?

20   A.   Yes.  He would do patrols through the hospital.

21   Q.   And what does that involve?

22   A.   Checking doors, answering pagers.  He wears a

23        beeper.  He would answer calls as they came in

24        through the pager.  And he would actually do

25        security patrols.

Exam./Williams - Sterling                    10

1   Q.   All right.  Would he do his patrols in

2        accordance with a specified schedule, like

3        rounds?

4   A.   No.

5   Q.   Are there checkpoints or places in the hospital

6        where he would have noted his presence?

7   A.   Yes.

8   Q.   How was that done?

9   A.   That's done with a bar coding system.  We have

10       a scanner, and we scan bar codes.

11  Q.   Some sort of magnetic card?

12  A.   No.  It's a device -- just a bar code reader

13       like a grocery store.

14  Q.   I understand.  And, of course, he would also be

15       available if he were called to some special --

16       for some special need during his shift; is that

17       correct?

18  A.   Yes, he would.

19  Q.   Now, in your capacity as a manager, have you

20       undertaken any I'll call it an investigation of

21       what Officer Graby did with respect to Ryan

22       Schorr?

23  A.   Yes.

24  Q.   What have you done in that regard?

25  A.   We've looked at what he did that day, you know,

Exam./Williams - Sterling                    11

1        and how he performed his duties.

2   Q.   All right.  Summarize for me, if you will, what

3        you found with respect to that.

4   A.   To the best of my knowledge, he did everything

5        according to what he should have been doing

6        that day for security.

7   Q.   And I think I understand what you're telling me

8        from an evaluation point of view.  Let me ask

9        you the question a slightly different way.

10       What is your understanding of what he actually

11       did, not how he performed his duties, but what

12       he did with respect to Ryan Schorr?

13  A.   What he did for that incident that day?

14  Q.   Yes, sir.

15  A.   Okay.  How that all transpired, is that what--

16  Q.   Yes.  Your understanding of it.

17  A.   Okay.  My understanding is that Mr. Schorr was

18       brought in by the police department through the

19       emergency room and put into one of our

20       seclusion rooms in ECU.

21  Q.   Let me stop you there.  First of all, is it

22       your understanding that Officer Graby assisted

23       in any fashion with the placement of Ryan

24       Schorr in a seclusion room?

25  A.   No, no.

Exam./Williams - Sterling                    12

1    Q.    That was done by whom?

2    A.    One of the nursing staff and the two policemen.

3    Q.    All right.  And you might as well tell me now

4          at this point what a seclusion room is.

5    A.    Seclusion room is a holding room we use for

6          patients -- psychiatric patients, detox

7          patients.

8    Q.    Is it used for all psychiatric patients or only

9          ones that are characterized in a certain way?

10   A.    We use that room mostly for psychiatric

11         patients when they come in for evaluation.

12   Q.    All right.  And it's a room that's equipped

13         with a lock as I understand it; is that

14         correct?

15   A.    Yes, sir.

16   Q.    Now, I interrupted you.  Get back to telling me

17         what your understanding of Officer Graby's

18         activities is.

19   A.    Mr. Graby was called up because they had a

20         patient in the room.  The nursing staff went in

21         and evaluated him along with a doctor,

22         evaluated the patient.

23              And he was not acting out in Cory's

24         experience, you know, he wasn't acting out or

25         anything.  Cory stood by.  He got another call.

Exam./Williams - Sterling                    13

1    He asked the staff if he could leave because

2    the patient was not acting out.  And they said

3    he could leave, so--

4  Q.   Fine.  Now, let me ask you this sort of

5    conceptually.  When Officer Graby or any

6    security officer is called to a seclusion room

7    because a patient has been placed in there and

8    as in this case a doctor goes in to treat or

9    evaluate the patient, is there a specified

10    position where the security officer should be,

11    or what the security officer should do at that

12    stage?

13  A.   The security officer just usually stands

14    outside the room and observes because of

15    confidentiality.

16  Q.   All right.  And do you have an understanding as

17    to what Officer Graby did in this particular

18    situation?

19  A.   He stood by.

20  Q.   All right.  And what is the purpose of having a

21    security officer there?

22  A.   They're there to assist if there is a problem

23    with a patient.  If the patient has valuables,

24    you know, we take valuables and put them in the

25    safe.  You know, anything that they need,

Exam./Williams - Sterling                    14

1        they'll call security to help.

2   Q.    All right.  Is any part of the purpose of the

3        security officer to prevent elopement?

4   A.    Yes, sir.

5   Q.    And how is that?  Explain that to me.

6   A.    They're outside of the room when the patient or

7        when the staff goes inside the room to speak

8        with this patient.

9            If for some reason the patient wants to

10       leave and the staff does not want them to

11       leave, they will tell security.  And security

12       will stop the patient or attempt to stop the

13       patient as best as possible.

14  Q.    Understood.  And I'll ask you some more general

15       questions about that a little later on, but let

16       me get back to your understanding of what

17       happened with respect to this particular

18       situation.  I think you told me that Officer

19       Graby got a call to go somewhere else.  Was

20       that accurate?

21  A.    Yes, sir.

22  Q.    And what was the nature of that call, do you

23       know?

24  A.    I can't recall.

25  Q.    Do you know what part of the hospital he was

Exam./Williams - Sterling                    15

1      called to?

2   A.    I can't recall that either.  I'm sorry.

3   Q.    That's fine.  You indicated that he, Officer

4         Graby, asked staff if he could respond to the

5         call, to leave the seclusion room?

6   A.    Yes, he did.

7   Q.    And do you know which staff he asked that

8         question of?

9   A.    I'm sorry, I can't recall that either.  It was

10        probably the charge nurse because that's who we

11        ask.

12  Q.    All right.  Who would have been the charge

13        nurse at this time, if you know?

14  A.    I'm sorry.

15  Q.    That's fine.  When you say the charge nurse,

16        what do you mean?  What is that position?

17  A.    The charge nurse in the emergency room for that

18        day, she's in charge of all the nursing and

19        the staff in the emergency room.

20  Q.    Understood.  Now, you indicated that -- again,

21        I realize you weren't there, this is your

22        understanding -- it was your understanding that

23        Ryan Schorr was not acting out at the time that

24        Officer Graby left to go to his other call.  Is

25        that accurate?

Exam./Williams - Sterling                    16

1   A.   Correct.

2   Q.   Let me ask you a couple questions about that.

3        First of all, where do you get that

4        understanding from, is it Officer Graby?  Did

5        he tell you that Schorr wasn't acting out?

6   A.   I got that from his report.

7   Q.   From Graby's written report?

8   A.   Right.

9   Q.   Okay.  And when you say "acting out", what do

10       you mean by that phrase?

11  A.   I mean pacing around in the room, acting

12       abnormal, trying to get out of the room,

13       yelling, you know, acting out in the room --

14       agitated, I guess I'm trying to say.

15  Q.   I think I understand that.  Now, do you know

16       whether or not Officer Graby had had any

17       previous contact with Ryan Schorr before this

18       encounter on the day we've been talking about?

19  A.   Before that day?

20  Q.   Yes.

21  A.   No, not to my knowledge I don't think.

22  Q.   All right.  Do you have any understanding as to

23       whether Holy Spirit Hospital in general had had

24       any prior contact with Ryan Schorr?

25  A.   Yes.

Exam./Williams - Sterling                    17

1   Q.    And what's your understanding?

2   A.    That he had come into the hospital before for

3         psych care.

4   Q.    Do you have any notion as to how many times?

5         And again, I'm not holding you to it.

6   A.    No, no, no, I don't.

7   Q.    I'm only asking you these questions about your

8         own understanding at this point.

9   A.    Sure.

10  Q.    Now, do you have an understanding as to whether

11        or not Ryan Schorr had eloped from Holy Spirit

12        before?

13            MR. YANINEK:   I guess I want to have you

14        just clarify what you mean by elopement,

15        because in a sense that if a mental patient is

16        here voluntarily and he leaves, that may not be

17        considered an elopement.

18            MR. WILLIAMS:   I understand.

19  BY MR. WILLIAMS:

20  Q.    I guess I would ask it this way.  Do you have

21        any understanding as to whether Ryan Schorr had

22        ever been to Holy Spirit before for psychiatric

23        reasons and left either against medical advice

24        or before the completion of a 302 evaluation?

25  A.    No.

Exam./Williams - Sterling                              18

1    Q.    You don't have understanding either way or it's

2          your understanding that he--

3    A.    I don't have an understanding that he left for

4          a 302 commitment.

5    Q.    All right.  Understood.  Have you talked to

6          anyone about that subject other than counsel?

7          I'm not interested in conversations with

8          counsel.

9    A     Well, my boss, Fran.

10   Q.    Outside the presence of counsel?

11   A.    Well, during our investigation of Ryan Schorr.

12   Q.    All right.  And what did you find out about

13         Ryan Schorr's previous contacts with Holy

14         Spirit?

15   A.    Well, that he was a previous mental health

16         patient here.

17   Q.    And that's all?

18   A.    Yes.

19   Q.    Did you develop any understanding that Ryan

20         Schorr had presented any security problems at

21         Holy Spirit before?

22   A.    Before the incident with Cory Graby?

23   Q.    Yes.

24   A.    No.

25   Q.    All right.  Understood.  Now, I guess this is

Exam./Williams - Sterling                    19

1    obvious, but I'll ask you anyway.  The security

2    department provides security in the emergency

3    room of the hospital.  Correct?

4  A.    Right, that's part of our duty.

5  Q.    Right.  Including the seclusion room and rooms

6    used for the evaluation of psychiatric

7    patients?

8  A.    Yes.  That's all in the same area.

9  Q.    Let me ask you about that first.  The seclusion

10    room, I think it's been designated as Room 17,

11    in which Ryan Schorr was placed--

12  A.    Correct.

13  Q.    --can you tell me where that is in relation to

14    the emergency department in general?

15  A.    Yes.

16  Q.    Where is it?

17  A.    That is right inside the emergency room coming

18    in through the ambulance entrance.  It's right

19    inside the door.

20  Q.    All right.  And--  I think that answers my

21    question.  And that's the door that there's

22    ingress and egress from?

23  A.    Correct.

24  Q.    Now, with respect to the security department

25    duties regarding the emergency department and

Exam./Williams - Sterling                      20

1      specifically the treatment of psychiatric

2      patients in the emergency department, was

3      there, back in November of 2000, any written

4      protocols or policies in effect?

5   A.    No.

6   Q.    All right.  And I have some understanding from

7      discovery that the hospital has provided us

8      that there was a draft seclusion room policy;

9      is that--

10  A.    There was a draft, but it was not approved by

11     the hospital.

12  Q.    Not approved.  So it wasn't in effect?  It was

13     not something that--  Well, that's a silly

14     question I was about to ask you.  Let me ask

15     you, when did the written policy go into

16     effect, if it did?

17  A.    The written seclusion room policy?

18  Q.    Yes.

19  A.    That went into effect August of this year -- or

20     July of this year, this year.

21  Q.    2002?

22  A.    Yes.

23  Q.    And I think I have a copy of it, let me just--

24          MR. WILLIAMS:  Maybe we can mark it as

25     Sterling 1?

Exam./Williams - Sterling                          21

1          (Sterling Exhibit #1 was marked for

2     identification.)

3          MR. YANINEK:  Just so you understand, that

4     was the draft.  That may not be the policy

5     that's in place now.  So to the extent that you

6     want to say policy--

7          MR. WILLIAMS:  I understand that, and I'll

8     try to clear that up.

9   BY MR. WILLIAMS:

10  Q.   I'm going to show you what we've marked as

11       Sterling 1, Mr. Sterling.  And I think counsel

12       has clarified something for me, but--  First of

13       all, take whatever time you need to take a look

14       at that document.

15            I'll tell you in advance the question I'm

16       going to ask.  I'm going to ask you whether

17       this is the written policy that is now in

18       effect.

19  A.   It's not the written policy that's in effect,

20       no.

21  Q.   Okay.  This is the draft policy that was around

22       back in 2000?

23  A.   Yes, it is.

24  Q.   All right.  Can you tell me what differences

25       there are between this and the written policy