Exam./Williams - Sterling                    22

1       which is now in effect?

2   A.   There's word changes, I mean, grammatic changes

3        in here.  It does not read like the one that's

4        in today.  Without that being in front of me, I

5        mean--

6   Q.   Let me ask you this.  Substantively, is it

7        essentially the same as the policy that's now

8        in effect?

9   A.   Yes.

10  Q.   And having looked at this -- and again, I'm not

11       holding you to it for purposes of these

12       questions -- do you detect any significant

13       substantive differences between this and the

14       policy now in effect?

15  A.   Significant?

16  Q.   Well, let's say any.

17  A.   Any?  Yeah, yeah.

18  Q.   Which ones do you notice?

19  A.   We have changed it.  We have put magnetic locks

20       on the doors.  So that's not in this policy.

21       And we use our cards to get through that.  So

22       that's not on this policy.

23  Q.   Okay.

24  A.   Pretty much, that's, you know, there's

25       grammatic changes in it.

Exam./Williams - Sterling                        23

1   Q.   All right.  That's fair enough.  Now, let me

2        ask you a couple of questions using this as a

3        reference.

4            First of all, the procedures that are

5        outlined in this draft, I recognize that the

6        written policy was not in effect back in

7        November of 2000, but were these the procedures

8        that were used with respect to the seclusion

9        room?

10  A.   Back then?

11  Q.   Yes.

12  A.   No, they were not.

13  Q.   Tell me what procedures were used in the

14       seclusion room back then, meaning November of

15       2000.

16  A.   Put somebody in the seclusion room, a mental

17       health patient, security was there.  We

18       evaluated the situation, as I said before.

19           If the patient was not acting out, we

20       asked staff if, you know, if we had to leave to

21       go do other duties, we left the area.  And, you

22       know, we were released from that area.  If they

23       needed assistance, they would call security

24       back.

25  Q.   Understood.  So -- I mean, I don't want to use

Exam./Williams - Sterling                24

1   my characterization or put words in your mouth

2   -- is it accurate to say that there was sort of

3   a standard security procedure used with respect

4   to seclusion rooms that was not different than

5   what security would do with respect to any

6   other of its duties?

7   A.    Correct.

8   Q.    Now, again, still using this as a reference,

9   and recognizing that it wasn't in effect in

10  November 2000, let me just ask you some

11  questions.

12        The first sentence of Paragraph 1 says,

13  "The seclusion room will be given priority to

14  those patients that pose a threat to

15  themselves, other patients, staff, and/or

16  visitors or are an elopement risk." Do you see

17  that?

18  A.    Yes.

19  Q.    Okay.  Now, is that in the written policy today

20  that is in effect?

21  A.    Yes.

22  Q.    And even though it wasn't the subject of a

23  written policy back in November 2000, was it

24  still a fact; that is, does that accurately

25  describe the use to be given to the seclusion

Exam./Williams - Sterling                    25

1    rooms back in November 2000?

2  A.    I guess not having this policy back in 2000, we

3        did put patients in that room--

4  Q.    I understood.

5  A.    --you know, so it was-- We used that room for,

6        like I said, people -- mental health patients

7        and detox patients.  So I can't say that we

8        followed this, because we didn't.

9  Q.    I understand.  It was sort of generally used

10        for a broad class of patients.  Is that

11        accurate?

12  A.    Right.  Correct, correct.

13  Q.    Now, again, this particular document or

14        procedure refers to an elopement risk.

15        Changing the focus now to today, can you tell

16        me how it is determined whether or not a

17        patient is an elopement risk?

18  A.    If a patient comes in and is a 302 patient?

19  Q.    Yes.

20  A.    A 302 patient is considered elopement risk

21        because they are being 302'd by the state.

22  Q.    Because it's involuntary?

23  A.    Because it's involuntary.  So they are put in

24        the seclusion room.

25  Q.    So again today, generally speaking, all 302

Exam./Williams - Sterling                    26

1        patients are treated as an elopement risk?

2   A.   Correct.

3   Q.   Besides being the subject of a 302 procedure,

4        is there anything else that gives rise to an

5        elopement risk?

6   A.   Is that in reference to a mental health patient

7        or any patient?

8   Q.   Yes, restricting it to mental health patients.

9   A.   Give me that question again.

10  Q.   Yes.  You've told me that because of the nature

11       of the commitments, any 302 patient is treated

12       as an elopement risk.

13            Now, my question is, are there any other

14       criteria applied to psychiatric patients to

15       determine whether or not they're an elopement

16       risk?

17  A.   Is that-- Are you saying, like, agitated?  Is

18       that what you're trying to say or--

19  Q.   Well, I'm just asking you.  How does security

20       decide-- Well, let me backtrack a little bit.

21       Who decides whether or not a patient is an

22       elopement risk?

23  A.   That's the staff, not the security staff,

24       medical staff and the crisis.

25  Q.   The medical staff and Crisis Intervention makes

1       that determination?

2   A.  Yes.

3   Q.  And do you know what criteria they use other

4       than the fact that a person has come in under a

5       302?

6   A.  No.

7   Q.  Fine.  I understand.  Do you know whether

8       they're written anywhere; that is, the criteria

9       for determining an elopement risk?

10  A.  I would have to say no.

11  Q.  All right.  When you say you would have to say

12      no, does that mean no, you don't know or no,

13      the criteria aren't written?

14  A.  I'd say, no, I don't know.

15  Q.  That's fair enough.  That's all I'm asking.

16      Going back again to November of 2000, and

17      again, with respect to mental health patients,

18      was there a -- we'll start with a written

19      policy -- was there a written policy in place

20      with respect to the use of physical restraints?

21  A.  Yes.

22  Q.  And I'll probably show you a document, but

23      first of all, can you describe to me what the

24      policy was?

25  A.  It's a restraint policy done by department of

Exam./Williams - Sterling                          28

1   nursing.  And again, there's criterias on that

2   policy that we have to follow to restrain an

3   individual.

4  Q.   All right.  Is it my understanding from--

5       Well, is my understanding correct from what you

6       just said that it--  Strike that whole

7       question.

8            Going back to November of 2000, who would

9       determine whether or not restraints were

10      necessary with respect to a psychiatric

11      patient?

12 A.   The medical staff.

13 Q.   All right.  And not security staff?

14 A.   No.

15           (Sterling Exhibit #2 was marked for

16      identification.)

17 BY MR. WILLIAMS:

18 Q.   All right.  I guess I'm going to show you a

19      stapled together document.  It may contain

20      several documents actually, but this has been

21      marked Sterling 2.

22           And I'll just ask you whether or not that

23      is the policy that was in effect in November

24      2000 with respect to restraints and their use?

25 A.   To the best of my knowledge, yes.

Exam./Williams - Sterling                     29

1   Q.    Okay.  And Mr. Sterling, will you do me a

2         favor?  Just go through the different pages of

3         that document and tell me if they all belong

4         together or if there's anything out of place.

5   A.    To the best of my knowledge, from Policy 31.90

6         to 31.95 is the restraint policy.  And then

7         there's another policy stapled to this, which

8         is a security policy, 15.03, two different

9         policies.

10  Q.    I understand.  Tell me about what is stapled to

11        Sterling 2 as the last page, 15.03, the

12        security policy that you described.  What is

13        the purpose of this document?

14  A.    That's the security department's restraint

15        policy.

16  Q.    All right.  And it's a relatively short

17        document.  I just want to go through some of

18        the points on it.

19        The first, I guess, point next to the word

20        policy says that "security officers will assist

21        in the restraint of patients when directed to

22        do so by the appropriate medical or nursing

23        staff."  That was the policy back in November

24        2000?

25  A.    Correct.

Exam./Williams - Sterling                      30

1   Q.   And it's still the policy today?

2   A.   Correct.

3   Q.   And as I understand it -- correct me if your

4        understanding is different -- security officers

5        received no direction to use restraints on Ryan

6        Schorr back in November of 2000?

7   A.   Correct.

8   Q.   All right.  And then the next part of this

9        policy, I guess, advises security personnel as

10       to what regulations to follow when they assist

11       in the restraint of patients.  Is that

12       accurate?

13  A.   Correct.

14  Q.   And I really only want to ask you about one

15       point, the first one, where it says "assess the

16       situation with the floor staff."  Can you just

17       tell me what that expression means?

18  A.   Whenever there's a call for a restraint of a

19       patient, we always go up and assess the

20       situation with the floor staff and ask them

21       what they want done, if they want the person in

22       restraints, escorted back to their room, in a

23       gerichair, whatever.  We assist that situation.

24  Q.   All right.  Now, other than Officer Graby's

25       involvement with the Ryan Schorr incident, were

Exam./Williams - Sterling                    31

1   there any other security personnel involved

2   with the incident to your knowledge?

3   A.   No, there was not.

4   Q.   All right.  And was the security department

5   involved in any way in what I'll call the

6   aftermath of the Ryan Schorr incident, and

7   here's what I mean by that:  in alerting the

8   police about his leaving the hospital or his

9   condition or anything of that nature?

10  A.   That would have been the nursing personnel.

11  Q.   Okay.  But not security personnel?

12  A.   Right.

13  Q.   Okay.  So, for example, Officer Graby would not

14  have called dispatch or--

15  A.   No.

16  Q.   --the county with respect to--

17  A.   No, not according to our policy.  That's

18  supposed to be handled by nursing personnel.

19  Q.   All right.  I guess I--  Let me ask you about

20  this.  With respect to the treatment or

21  handling of psychiatric patients, does the

22  security department at Holy Spirit have any

23  direct dealing with the Cumberland County

24  Office of Mental Health?

25  A.   No, we don't.

Exam./Williams - Sterling                    32

1   Q.   Okay.  And are you aware, you, yourself, as you

2        sit here today aware of any funding allocated

3        to the security department of Holy Spirit by

4        Cumberland County?

5   A.   No, we don't.

6   Q.   You're all direct employees of the hospital?

7   A.   Yes, we are.

8   Q.   And are paid by the hospital?

9   A.   Yes, we are.

10  Q.   Who is your supervisor?

11  A.   Fran Charney, director of risk management.

12  Q.   Okay.  I understand.  Has it always been Miss

13       Charney or someone in the position she occupies

14       who has always been your supervisor during the

15       17 years?

16  A.   No.

17  Q.   What differences have there been, what changes?

18  A.   I was in engineering.  And security was under

19       that.  And then probably eight years ago,

20       something like that, we went to risk

21       management, so--

22  Q.   Understood.  Can you tell me in general terms

23       what the qualifications are to be a security

24       officer at Holy Spirit?

25  A.   Well, generally, we look for security people

Exam./Williams - Sterling                    33

```
 1          that have experience -- security experience.

 2          Ideally it's hospital-related experience,

 3          however, we do look at security experience in

 4          different fields.

 5    Q.    All right.  And once a person, based on

 6          experience and qualifications at an interview I

 7          assume--

 8    A.    Correct.

 9    Q.    --is hired, does he or she receive any training

10          at Holy Spirit?

11    A.    Yes, they do.

12    Q.    Can you describe that training to me?

13    A.    Initially, an employee, when they're hired

14          here, they go through the hospital orientation

15          program.  And then security has their own other

16          programs that we run people through.

17    Q.    Can you describe those programs?

18    A.    Correct.  We have the red alert training, and

19          that's to deal with aggressive individuals.

20    Q.    Tell me about that.

21    A.    Red alert training is a course that we teach

22          our staff, our security staff and our mental

23          health staff and ECU staff.  It's how to handle

24          the aggressive individual, talk down/take down.

25    Q.    And talk down/take down, that's sort of a
```

1    continuum.  You start by talking--

2  A.    Correct.  Right, right.

3  Q.    --and you use minimal force as much as

4    necessary?

5  A.    Correct, correct.

6  Q.    And was that--  Did Officer Graby receive that

7    red alert training?

8  A.    Yes, sir, he did.

9  Q.    All right.  What other elements of training are

10    there?

11  A.    Mr. Graby has--  We belong to an association.

12    It's the Society of Healthcare Safety and

13    Security.  Mr. Graby has completed the basic

14    security officer course with that.  And that's

15    on healthcare and safety.  He completed that.

16        He's completed the advanced program of

17    that.  Each one--  Well, the first one has 40

18    units that they have to do, and the second one

19    is 20.  We have violence in the workplace

20    training.  Mr. Graby is involved in that.

21  Q.    All right.  Now, I don't want to jump around

22    too much, but we talked previously about

23    restraints and the policy regarding the use of

24    restraints.  Can you tell me where physically

25    the restraints are located?

Exam./Williams - Sterling                     35

1    A.    In the emergency room?

2    Q.    Yes.

3    A.    They are located behind the nurses' desk.

4    Q.    All right.  And what variety of restraints are

5          there?

6    A.    We have one type of restraints in the emergency

7          room.

8    Q.    And what is that?

9    A.    They are a locked restraint.

10   Q.    Is that handcuffs?

11   A.    No, they are not.

12   Q.    All right.  Give me a better description.

13   A.    They are a soft lock neoprene restraint that

14         locks to the bed.

15   Q.    All right.  And it's attached to the patient's

16         ankle or wrist?

17   A.    Right.  Correct.

18   Q.    All right.  And was the same thing true back in

19         November of 2000; that is, that this type of

20         soft restraint was located in the emergency

21         department and located behind the nurses' desk?

22   A.    Correct.

23   Q.    And it was the only kind of restraint--

24   A.    Correct.

25   Q.    --available at that time?

Exam./Williams - Sterling                                36

1   A.   Yes.

2   Q.   You've told me about the red alert training.

3        Is red alert a term of art?  By that I mean, is

4        there something called a red alert that a

5        security officer can call?

6   A.   Yes, there is.

7   Q.   And what does that involve?

8   A.   A red alert involves a call that we use over

9        our public address system to help with an

10       aggressive individual.

11  Q.   And where does the help come from?

12  A.   Help comes from a trained team that we have.

13  Q.   And when you say "a trained team", a trained

14       team of what kind of personnel?

15  A.   Medical staff people.

16  Q.   All right.  Does that team have a title or--

17  A.   It's the red alert team.

18  Q.   And was there a red alert team back in November

19       of 2000?

20  A.   Yes, there was.

21  Q.   And do they or can they--  Is it part of their

22       duty to deal with psychiatric patients when

23       necessary?

24  A.   Yes, it is.

25  Q.   And what does the team consist of, what kind of

Exam./Williams - Sterling                              37

1        staff?

2   A.   It consists of nursing staff, engineering

3        staff, mental health staff, and emergency room

4        staff.

5   Q.   All right.  And they will assist a security

6        officer if the security officer has called the

7        red alert?

8   A.   Right.  They do assist the security officer.

9   Q.   Is there just one red alert team or are there

10       several depending on the shift?

11  A.   Just one red alert team.  Red alert team

12       consists of 8 to 10 people.

13  Q.   And is any number of them on duty at any

14       particular time or--

15  A.   Yes.

16  Q.   I mean, do they all have the same shift is what

17       I'm saying or--

18  A.   Like I said before, we train the emergency room

19       staff.  All their staff gets trained on a red

20       alert procedure and policy.  So there's always

21       somebody here.

22  Q.   Understood.  But the red alert team itself, is

23       that--

24  A.   They're part of the team.

25  Q.   Part of the team.  All right.  And was the red

Exam./Williams - Sterling                    38

1   alert team in existence back in November of

2   2000?

3   A.   Yes, it was.

4   Q.   And in this particular incident, with respect

5   to Ryan Schorr, was a red alert ever called?

6   A.   Yes, there was.

7   Q.   And tell me about that.  Who called it, when

8   was it called, and what happened?

9   A.   Nursing staff called the red alert after the

10   crisis worker went in the room and Ryan Schorr

11   ran out.

12   Q.   All right.  And did the red alert team respond?

13   A.   Yes.

14   Q.   But I guess I understand that Ryan Schorr was

15   gone at that point?

16   A.   Yes.

17   Q.   All right.  Do you know who was the-- Well, do

18   you know who, if anyone, at Holy Spirit saw

19   Ryan Schorr leave the emergency department?

20   A.   The crisis worker that was working that day.

21   Q.   Do you have any understanding as to where Ryan

22   Schorr -- what route he took when he left the

23   emergency department?

24   A.   Yes, I do.

25   Q.   What's your understanding?

Exam./Williams - Sterling                 39

1   A.   He ran out of the room, through the ambulance

2        doors, went to the left and towards the parking

3        garage.

4   Q.   Do you know if he got into the parking garage

5        one way or the other?

6   A.   No, I don't.

7   Q.   All right.  I guess I should ask you this.  How

8        far is the ambulance entrance from the street?

9   A.   Where they park the ambulance?  Is that--

10  Q.   Yes, well, the doors that Ryan Schorr fled

11       through, how far are they from the street?

12            MR. YANINEK:  What do you mean by

13       "street"?

14            MR. WILLIAMS:  Yes.  That is a bad

15       question.

16  BY MR. WILLIAMS:

17  Q.   How far is it from those doors to the nearest

18       point off the hospital's property?

19  A.   I probably can't answer that.  I mean, I don't

20       know, maybe 200 yards or 100 yards -- 200

21       yards.

22  Q.   Fine.  I understand.  And I understand that

23       that's an estimate.

24  A.   Yeah, yeah.

25  Q.   How many seclusion rooms are there in the

Exam./Williams - Sterling                    40

1      emergency department?

2  A.   At this time or back then?

3  Q.   Well, let's start with at this time.

4  A.   Two.

5  Q.   And how many back then?

6  A.   One.

7  Q.   Currently, are the two seclusion rooms adjacent

8      to each other or not?

9  A.   Yes.

10  Q.   And one of them is still what I called Room 17

11      where Ryan Schorr was?

12  A.   Correct.

13  Q.   Is there any difference in the two rooms that

14      exist today?

15  A.   No.

16  Q.   Focusing back on Room 17 as it was in November

17      of 2000, what's the size of that room

18      approximately?

19  A.   10x14 maybe -- I don't know -- 10x14.

20  Q.   Sure.  I understand.  And is there any

21      furniture besides a bed in that room?

22  A.   No.

23  Q.   And I think you told me that today it has a

24      magnetic lock?

25  A.   Yes.

Exam./Williams - Sterling                    41

1  Q.   What kind of lock did it have back in November

2       2000?

3  A.   It had a door lock on it.

4  Q.   Meaning a lock that required a key or not?

5  A.   Yes-- I'm sorry.  No.

6  Q.   All right.  It had a button or a toggle or

7       something?

8  A.   It locked from the inside, but then the outside

9       you could open it up.

10 Q.   Understood.

11 A.   It was always locked, but you could open it

12      from the outside.

13 Q.   I understand.  It was designed in a way that if

14      there's a patient in there, the patient

15      couldn't get out until somebody opened the door

16      from the outside?

17 A.   Correct.

18 Q.   And are there windows in that room?

19 A.   Yes.

20 Q.   And where are the windows located?

21 A.   In the door.

22 Q.   All right.  Any other windows besides in the

23      door?

24 A.   No, sir.

25 Q.   And other than the door, no means of egress

Exam./Williams - Sterling                    42

1        from the room?

2   A.   No.

3   Q.   Let me just ask you a few more questions, and

4        these are not specific to Ryan Schorr but with

5        a more general focus.

6             In your capacity as manager of the

7        security department, have you ever received any

8        complaints from local police departments

9        regarding Holy Spirit's handling of 302

10       procedures?

11  A.   No, I have not.

12  Q.   Have you ever received any complaints from

13       local police officers or departments regarding

14       the number of elopements from Holy Spirit?

15  A.   No, I have not.

16  Q.   Have you ever been given any statistics by

17       police departments regarding elopements from

18       Holy Spirit?

19  A.   No, I have not.

20  Q.   Have you ever heard of any statistics compiled

21       by the East Pennsboro police regarding

22       elopements?

23  A.   Yes, I have.

24  Q.   Outside of any conversations you may have had

25       with counsel, how did you find out about those

Exam./Williams - Sterling                          43

1    statistics?

2  A.    The chief brought it up one time in a

3        conversation talking about the Ryan Schorr

4        case.

5  Q.    And when you say "the chief", you mean the

6        chief--

7  A.    The chief of East Pennsboro.

8  Q.    What did the chief tell you?

9  A.    Just that he compiled statistics of Holy Spirit

10       Hospital and calls over here.

11 Q.    And what did he tell you about what he--

12 A.    He didn't tell me anything.  He just--

13 Q.    All right.  Okay.  I understand.  And he didn't

14       give you the statistics themselves?

15 A.    No, he did not.  Nope.

16 Q.    When did you have this conversation with the

17       chief?

18 A.    Oh, months and months ago.

19 Q.    What did the East Pennsboro chief--  What's his

20       name?

21 A.    Chief McMasters.

22 Q.    What did Chief McMasters tell you about the

23       Ryan Schorr incident, if anything?

24 A.    Not a whole lot, just that he was complying-- I

25       guess there was a court order or something that

Exam./MacMain - Sterling                    44

1        he was just getting these statistics up.

2   Q.   All right.  Did you ever talk to either Chief

3        Dougherty or anyone from the West Shore

4        Regional Police about elopements from Holy

5        Spirit?

6   A.   No, I did not.

7   Q.   All right.  That's all I have.  My friends may

8        have some questions.

9                        EXAMINATION

10  BY MR. MacMAIN:

11  Q.   My name's David MacMain.  We met just before

12       the deposition.  I represent West Shore.  I

13       just have a few questions.  In terms of your

14       background, had you served in charge of

15       security at any other facilities prior to your

16       time here at Holy Spirit?

17  A.   No, I have not.

18  Q.   Did you work in security prior to being

19       employed by Holy Spirit?

20  A.   I worked at Harrisburg Hospital, and I worked

21       for the National Park Service.

22  Q.   You talked about the complex and that it needed

23       to be patrolled.  How big is the complex?

24  A.   We're 26 acres here.

25  Q.   And how many buildings?

Exam./MacMain - Sterling                    45

1    A.    Six outbuildings.

2    Q.    Your security officers, do they wear uniforms

3          or are they dressed professionally like you

4          are?

5    A.    Professionally dressed.

6    Q.    Are they required to fill out any type of

7          reports when there's an elopement?

8    A.    Yes.

9    Q.    Do you know if there was a report filled out in

10         this incident by Mr. Graby?

11   A.    Yes.

12   Q.    Those reports when they're filled out, are they

13         kept for any specified period of time?

14   A.    They're kept to the amount of time designated

15         by risk.

16   Q.    And are they kept in a designated place?

17   A.    Yes.

18   Q.    You were asked whether or not after this

19         incident you had looked into it to see if

20         anything was done incorrectly.  And your

21         conclusion was that Mr. Graby had followed

22         security procedures?

23   A.    Yes.

24   Q.    Do you know, did you prepare a report to that

25         effect or--

Exam./MacMain - Sterling                46

1  A.    No.   I just looked through it.

2  Q.    That's all the questions I have.

3              MR. YANINEK:   I don't have any questions.

4              MR. WILLIAMS:   Thank you, Mr. Sterling.

5              (The proceedings concluded at 11:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

COMMONWEALTH OF PENNSYLVANIA      :
                                  :    SS
COUNTY OF DAUPHIN                  :


        I, Debra L. Heary, Reporter and Notary Public
in and for the Commonwealth of Pennsylvania and
County of Dauphin, do hereby certify that the
foregoing deposition was taken before me at the time
and place hereinbefore set forth, and that it is the
testimony of:

                    CHARLES STERLING

        I further certify that said witness was by me
duly sworn to testify the whole and complete truth in
said cause; that the testimony then given was
reported by me stenographically, and subsequently
transcribed under my direction and supervision; and
that the foregoing is a full, true and correct
transcript of my original shorthand notes.

        I further certify that I am not counsel for or
related to any of the parties to the foregoing cause,
or employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania this 10th day
of September, 2002.



                    _Debra L. Heary_
                    Debra L. Heary
                    Registered Professional Reporter
                    Notary Public

                    Notarial Seal
                    Debra L. Heary, Notary Public
                    Lower Paxton Twp., Dauphin County
                    My Commission Expires Feb. 10, 2003


(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means unless under the direct control and/or
supervision of the certifying reporter.)

Holy Spirit Hospital

**SUBJECT:**       ECU Seclusion Room

**POLICY:**       The following procedures for secluding patients should be adhered to by ECU and Security staff to ensure the safety of all emergency room patients, staff and visitors.

## PROCEDURE:

1. The seclusion room will be given priority to those patients that pose a threat to themselves, other patients, staff and/or visitors or are an elopement risk. These types of patients will be placed in seclusion unless there is a medical condition that warrants a monitored bed. In this instance, ECU staff will use alternative methods of seclusion such as physical restraints, chemical restraints or security standbys.

2. The room will also be used for non-threatening detox and mental health patients, as long as there is not a patient in the ECU that fits the criteria of #1. If needed, the Charge Nurse will move patients so that a patient needing the seclusion room can be placed in.

3. Violent/Elopement patients placed in seclusion will be searched by Security. Once in seclusion, staff will assist Security in placing the patient in a hospital gown and searching the patient and his/her belongings. A clothing sheet will then be completed and all belongings secured in the ECU Security office. Any valuables found will be placed in a valuables envelope and secured in the hospital safe by Security. Security staff will refer to Security Department Weapons Policy #23.01, if any weapons are found on the patient.

4. After the search is complete, staff will then make sure that the viewing monitor for the seclusion room cameras is on and operational.

5. Once the door is closed/secured, only the patient's nurse or Security will open the door. If another staff member sees that the patient is ringing the nurse call, he/she should proceed to the room and inquire what the patient needs. If the patient needs to use the restroom and it has been approved, staff should page Security to come and escort the patient to the restroom and back to the room. If it is found that the patient is harming himself, i.e. banging head against walls, punching walls, etc., staff will then use discretion in deciding if the threat is immediate and warrants a Red Alert or if Security can be called STAT.

Initial Date:
Authorized By:
Staff Affected: Emergency Care Unit and Security
Dates of Revision:
Ecuseclusion.doc


DEPOSITION
EXHIBIT
Sterling #
8/30/02 D

31.90

# RESTRAINTS / PROTECTIVE DEVICES

**Policy:** The RN has the major responsibility to maintain patient safety and high quality care. Restraints are only applied after assessment of the patient and are limited to those situations with clinical justification. RN/GN, LPN/GPN or NA can monitor patient in restraints and document. Restraints are used as a last resort to limit a patient's movement as a means of protecting the patient or others from harm. The least restrictive means of physical restraints necessary for assuring safety of self/others is implemented. Restraints are not utilized for the convenience of staff.

Based on the assessed needs of the patient and after exhausting other options, restraints may be applied according to the behavioral indicators outlined in this protocol. In circumstances when restraints are applied and the patient does not meet the criteria, a physician's order for physical restraint must be obtained within 1 hour. If the attending physician is not available, an order is obtained from the House Physician. Verbal or phone orders must be signed, dated and timed within 24 hours of implementation of order.

Patients are re-evaluated for the continued need for restraint every 2 hours to determine whether the restraint may be safely removed. Written orders for restraints are limited to 24 hours.

* Physician's order must include.
  1. Type of restraint (i.e.: soft, locked)
  2. Duration
  3. Reason for application.

A visual safety check on any patient in restraints is performed hourly. Patient's fluid, nutritional and toileting needs are monitored and attended to at least every 2 hours. The limb and skin are assessed for function and integrity at that time.

** **EXCEPTION:** Detox patients on the D&A unit are monitored continuously or no less frequently than every 15 minutes.

The following devices that limit patient mobility are **NOT** considered restraints for the purpose of this policy:

  1. Adaptive Devices – provide postural support; intended to permit normal body function. (example: orthopedic appliance)
  2. Medical Immobilization - usual and customary requirement of a medical procedure (example: IV armboard, A-line wrist support, body "restraint" during surgery/procedure.)

   ***Patients are positioned and secured for safety and postural support pre-operatively, intra-operatively and post-operatively according to AORN Recommended Practices for Positioning the Surgical Patient.

CC/ps
Revsd: 11/82
Revsd: 5/97/PS/SE





DEPOSITION
EXHIBIT
Sterling #2
8/30/02 DH

31.91

## RESTRAINTS / PROTECTIVE DEVICES
(continued)

I. **EQUIPMENT**

A. Soft restraints - located on nursing units in clean utility room.

1. Chest or waist restraint.
2. Ankle and wrist restraints.
3. Pediatric chest restraints.
4. Bath blanket for pediatric patients.
5. Pediatric wrist restraint used to secure extremity for maintenance of IV Therapy.

B. Locked Restraints

1. Locked restraints are primarily used on 5E and ECU.

II. **ALTERNATIVE MEASURES**

A. The following are interventions that may be utilized <u>when appropriate</u> to the patient situation in an attempt to maintain patient safety and freedom of movement and prior to the use of restraint/protective devices.

1. Glasses/hearing aide
2. Frequently used items close to patient
3. Orient / reorient to surroundings
4. Brighter / softer lights
5. Toileting
6. Fluids / nourishment
7. Change in activity / positioning
   a. Up to chair
   b. Ambulation
8. Diversional activity
9. Family pictures / tapes
10. Family / sitter present
11. Increased level of observation
12. Move room closer to nurse's station
13. Siderails
14. Medication
15. Use of bed alarm

CC/ps
Revsd: 11/82
Revsd: 5/97/PS/SE

31.92

## RESTRAINTS / PROTECTIVE DEVICES
(continued)

B. If, in spite of the foregoing interventions, the patient's status / behavior persists, the RN may apply a restraint / protective device according to the protocol in III. below.

    1. The device chosen will permit the greatest freedom of movement consistent with patient safety

    2. Devices are applied strictly according to manufacturers instructions.

## III. BEHAVIORAL INDICATORS/PROTOCOL

A. The following observations / behaviors may be conditions placing the patient at risk for injury:

    1. Improper body alignment
    2. Pulling at IV's, tubes, drains, etc.
    3. Intrusive behavior toward other patients
    4. Wandering
    5. Impaired judgment which compromises or exacerbates condition
    6. Not able to understand use of call bell when needing assistance for safety
    7. Harming self or others  (includes suicidal tendencies)
    8. Restless agitation
    9. Confusion with sensory impairment or unsteady gait
    10. Recent fall / at risk for fall
    11. Prevent elopement of involuntarily committed patient
    12. Destructive of property

## IV. PROCEDURE

A. Assess the needs of the patient.  (Refer to III above for Behavioral Indicators which may place the patient at risk for injury.)

B. Utilize least restrictive intervention(s) to maintain patient safety  (Refer to II above for Alternatives to Restraint.)

C. Explain procedure to patient and/or family.  The patient and family education includes:

    1. Explanation of behaviors that have caused restraint to be used.
    2. Explanation of available alternatives to the use of physical restraint.
    3. Identification of possible family participation in the care process that could limit or halt the use of restraint.

CC/ps
Revsd: 11/82
Revsd: 5/97/PS/SE

31.93

## RESTRAINTS / PROTECTIVE DEVICES
(continued)

D.  Obtain adequate staff to correctly and safely apply restraints.

1.  Assist patient to comfortable position.
2.  Apply appropriate restraint following manufactures recommendations maintaining body alignment and patient comfort.  (Safety instruction for the Use of Posey Restrictive Products follows this policy.)

E.  Restraints are tied to allow quick release (i.e.:  restraint is able to be untied with one hand). EXCEPTION:  Locked restraints (key is located in room)

F.  Tie to movable part of bed-frame.  DO NOT tie to side rails.  (This ensures that the device will not tighten or loosen when the bed is raised or lowered.)

G.  Maintain call bell within patient's reach.

H.  Pediatric Restraints

1.  Blanket - fold blanket into triangle and place on bed.  Place child's head at middle base of angle.  Hold one arm straight next to child's body and bring blanket over his/her arm, trunk and opposite arm and tuck under back.  Pin as necessary.
2.  Chest - secure bilateral straps of restraint to bed frame.  Secure top ties to top bars of crib. Pin chest flaps securely with diaper pins.
3.  Wrist/Ankle - pad wrist or ankle and use for restraint of extremity for IV Therapy.  Wrist restraint may also be taped on armboard and ties then secured to the mattress or bed frame. Leeway length of restraint must not exceed 6 inches.
4.  Elbow - insert tongue blades into vertical pockets of muslin/cloth elbow restraint; sufficient number to encircle patient's arm.  Fold flap over pockets and place around patient's arm wrist to axilla.  Secure with attached ties.  When properly applied, patient should not be able to bend elbow.

V.  REMOVAL OF RESTRAINTS

A.  Patients are not to be maintained in restraints for longer than absolutely necessary.  If a patient's condition improves, the physician and/or nurse will decide to remove the restraints.

:C/ps
:evsd: 11/82
:evsd: 5/97/PS/SE

31.94

## RESTRAINTS / PROTECTIVE DEVICES
(continued)

B. Criteria for removal of restraints are based on the assessed needs of the patient and shall include:

1. Termination of the causative situation. Example: The patient is no longer restless/agitated and can be managed by less restrictive forms of care.
2. The patient is "in control". He/she is able to interact with the professional staff, to understand and follow directions, and to accept medications or other less restrictive interventions.
3. A medical indication that raises questions about adverse effects of the restraint has supervened (i.e., restraint is doing more harm than good).

VI. DOCUMENTATION

A. Patient Education Record

1. Discussion with patient/family as per IV. C.

B. Restraint Flow Record

1. Date, times
2. Assessment by RN upon initial application and every 24 hours
3. Re-evaluation by RN or LPN for the continued need for restraints every 2 hours
4. Alternative interventions
5. Type and location of device(s) used.
6. Visualization of patient hourly (every 15 minutes for Detox patient on D&A Unit)
7. Observation of circulation, skin under restraints and extremity movement every 2 hours.
8. Fluid, nutritional and toileting needs assessed every 2 hours.
9. Signature

C. Nursing Care Record

1. Fluid and nutritional intake and elimination as appropriate.

VII. ADMINISTRATIVE RESTRAINTS for INMATES (LAW ENFORCEMENT RESTRAINT)

A. Administrative restraints for inmates are governed by the Post Orders from the State Correctional Institute, Camp Hill, PA.

1. The corrections Officer is responsible for maintaining the restraints.

CC/ps
Revsd: 11/82
Revsd: 5/97/PS/SE

31.95

## RESTRAINTS / PROTECTIVE DEVICES
(continued)

B. Exceptions to Administrative Restraint can be made by physician order for justifiable medical reasons.

C. The inmate's personal care, elimination, nutrition and ambulation needs are met as needed and at the patient's request.

D. In the event of a CASE ONE, metal restraints are removed prior to defibrillation/cardioversion.

## VIII. GUIDELINES/PRECAUTIONS

A. When restraining any patient, use official hospital restraints ONLY. "Homemade" restraints cut off circulation, are DANGEROUS and are prohibited.

B. The patient is removed from a geriatric chair and exercised at least every two hours. Use of geriatric chair is documented on the Restraint Flow Record.

C. Use the least restrictive device that will keep the patient safe.

References:

1. Accreditation Manual for Hospitals, 1997, JCAHO. Standards TX.7 through TX.7.1.3.3.
2. Braun, Judith V & Steven Lipson. Toward a Restraint - Free Environment. 1993
3. Hospital Risk Management, May 1994, pp. 69-72 & supplement.
4. Posey application and product guidelines. Posey Co. Policy on the Use of Restraints, January 1993.
5. "Restraint and Seclusion: a Patient-Centered Approach." JCAHO video and Viewer's Guide, Tape V96/74.
6. Snyder, Joan A., RN, MS, CEN. "How We Do It: Documentation of Nursing Care for Patients who have been Restrained.". Journal of Emergency Nursing, October 1993. pp. 461-464.

**** -Refer to Community Mental Health Center for unit specific policy.
-Approved by Restraints Team: 5/27/97
-Approved by Medical Executive Committee: 7/1/97

/ps
.evsd: 11/82
.evsd: 5/97/PS/SE

Number: 15.03

Holy Spirit Hospital

**SUBJECT:**    RESTRAINT (PATIENT)

**POLICY:**    Security officers will assist in the restraint of patients when directed to do so by the appropriate medical or nursing staff.

**PROCEDURE:**    Security personnel are to adhere to the following regulations when assisting in the restraining of patients:

1. Assess the situation with the floor staff.
2. Develop a team plan for dealing with the patient (both verbally and physically).
3. Attempt to persuade the patient to cooperate.
4. If necessary, the officer will be permitted to exert physical force to restrain the patient . The force used will be only that which is required to overcome the patient's struggle.
5. Complete an INCIDENT REPORT.

NOTE:   In an emergency situation security personnel may be required to control a patient without a staff request.  In these situations the officer is to apply only  the necessary force to prevent the patient from injuring him/her self or surrounding persons.

Initial Date: June 1995
Authorized By: Chuck Sterling, Security Manager
Staff Affected: Security
Dates of Revision: July 1997
Dates of Review:

Keith I. Schorr & Susan Schorr v.
Borough of Lemoyne, et al.

Charles Sterl[...]
August 30, 2[...]

## 1

100 39:20
10x14 40:19, 19
11:30 46:5
11th 7:16
15.03 29:8, 11
17 19:10

## 2

20 34:19
200 39:20, 20
2000 7:10, 23; 20:3;
21:22; 23:7, 15; 24:10, 23;
25:1, 2; 27:16; 28:8, 24;
29:24; 30:6; 35:19; 36:19;
38:2; 40:17; 41:2
2002 20:21

## 3

302 17:24; 18:4; 25:18,
20, 25; 26:3, 11; 27:5; 42:9
302'd 25:21
31.90 29:5
31.95 29:6

## A

a.m 46:5
able 5:7
abnormal 16:12
accommodate 6:7
accordance 10:2
according 11:5; 31:17
accurate 5:6; 14:20;
15:25; 24:2; 25:11; 30:12
accurately 24:24
acres 44:24
acting 12:23, 24; 13:2;
15:23; 16:5, 9, 11, 13;
23:19
activities 12:18
actually 9:24; 11:10;
28:20
address 36:9
adjacent 40:7
advance 21:15; 34:16
advice 17:23
advises 30:9
aftermath 31:6
again 9:3; 15:20; 17:5;
22:10; 24:8; 25:13, 25;
26:9; 27:16, 17; 28:1
against 4:14; 17:23
aggressive 33:19, 24;
36:10
agitated 16:14; 26:17
ago 32:19; 43:18

alert 33:18, 21; 34:7;
36:2, 3, 4, 8, 17, 18; 37:7,
9, 11, 11, 20, 22; 38:1, 5, 9,
12; 31:7
allocated 32:2
along 12:21
always 30:19; 32:12, 14;
37:20; 41:11
ambulance 19:18; 39:1,
8, 9
amount 45:14
and/or 24:15
ankle 35:16
applied 26:14
appropriate 29:22
approved 20:10, 12
approximately 40:18
area 19:8; 23:21, 22
arising 4:15
around 16:11; 21:21;
34:21
arrive 8:19, 6
art 36:3
assess 30:15, 19
assigned 9:4
assist 13:22; 29:20;
30:10, 23; 37:5, 8; 11:22
assistance 23:23
association 34:11
assume 33:7
attached 35:15
attempt 14:12
August 20:19
available 10:15; 35:25
aware 32:1, 2

## B

back 7:9, 21; 12:16;
14:16; 20:3; 21:22; 23:6,
10, 14, 24; 24:23; 25:1, 2;
27:16; 28:8; 29:23; 30:6,
22; 35:18; 36:18; 38:1;
40:2, 5, 16; 41:1
background 44:14
backtrack 26:20
bad 39:14
bar 10:9, 10, 12
based 33:5
basement 9:11, 14
basic 34:13
bed 35:14; 40:21
beeper 9:23
behind 35:3, 21
belong 29:3; 34:11
besides 6:21; 26:3;
40:21; 41:22
best 11:4; 14:13; 28:25;
29:5
better 35:12
big 44:23
bit 26:20

boss 18:9
both 8:4
break 6:5
broad 25:10
brought 11:18; 43:2
building 9:15; 44:25
button 41:6

## C

call 10:20; 12:25; 14:1,
19, 22; 15:5, 24; 23:23;
30:18; 31:5; 36:5, 8; 4:8;
10:15; 12:19; 13:6; 15:1;
31:14; 36:4; 37:6; 38:5, 7,
8, 9; 40:10; 9:23; 43:10
came 9:23
campus 6:18; 9:7
can 7:21; 8:25; 19:13;
20:24; 21:24; 25:15;
27:23; 30:16; 32:22;
33:12, 17; 34:24; 36:5, 21
capacity 10:19; 42:6
card 10:11; 22:21
care 17:3
case 13:8; 43:4
certain 12:9
certification 4:4
change 8:15; 22:19, 2, 2,
25; 32:17
Changing 25:15
characterization 24:1
characterized 12:9
charge 6:16; 15:10, 12,
15, 17, 18; 44:14
CHARLES 4:8
Charney 32:11, 13
Checking 9:22
checkpoints 10:5
chief 43:2, 5, 6, 7, 8, 17,
19, 21, 22; 44:2
claim 4:14; 5:2
clarified 21:12
clarify 17:14
class 25:10
clear 21:8
clerical 6:25; 7:2
code 10:12, 10
coding 10:9
coming 19:17
commitment 18:4; 26:11
compiled 42:20; 43:9
complaints 42:8, 12
completed 34:13, 15, 16
completion 17:24
complex 44:22, 23
complying 43:24
conceptually 13:5
concluded 46:5
conclusion 45:21
condition 31:9
confidentiality 13:15

considered 17:17; 25:20
consist 36:25; 37:2, 12
contact 16:17, 24; 18:13
contain 28:19
continuum 34:1
conversation 43:3, 16;
18:7; 42:24
copy 20:23
Cory 9:2; 12:25; 18:22;
12:23
counsel 4:3; 6:6; 18:6, 8,
10; 21:11; 42:25
country 7:19
county 31:16, 23; 32:4
couple 7:20; 16:2; 23:2
course 10:14; 33:21;
34:14
court 5:4, 21; 43:25
crisis 26:24, 25; 38:10,
20
criteria 26:14; 27:3, 8, 13;
28:1
Cumberland 31:23; 32:4
currently 7:7; 40:7

## D

David 44:11
day 8:3, 5, 8, 13, 21; 9:3;
10:25; 11:6, 13; 15:18;
16:18, 19; 38:20
day-to-day 6:16
deal 33:19; 36:22; 31:23
death 4:16
decide 26:20, 21
department 6:17, 19, 23;
8:3; 11:18; 19:2, 14, 24,
25; 20:2; 27:25; 31:4, 22;
32:3; 35:21; 38:19, 23;
40:1; 42:7; 29:14; 42:8, 13,
17
depending 37:10
deposition 4:16; 6:4;
44:12
describe 24:25; 27:23;
33:12, 17; 29:12
description 35:12
designated 19:10; 45:14,
16
designed 41:13
desk 35:3, 21
detect 22:12
determination 27:1
determine 26:15; 28:9;
25:16
determining 27:9
detox 12:6; 25:7
develop 18:19
device 10:12
difference 40:13; 21:24;
22:13; 32:17
different 11:9; 24:4; 29:2,
8; 30:4; 33:4

direct 31:23; 32:6; 29:[...]
direction 30:5
director 32:11
discovery 20:7
dispatch 31:14
doctor 12:21; 13:8
document 21:14; 25:[...]
27:22; 28:19; 29:3, 13,
28:20
done 10:8, 9, 24; 12:1:[...]
27:25; 30:21; 45:20
door 19:19, 21; 41:3, 1
21, 23, 25; 9:22; 22:20;
39:2, 10, 17
Dougherty 44:3
down 5:4, 22; 33:24, 2
down/take 33:24, 25
draft 20:8, 10; 21:4, 21
23:5
dressed 45:3, 5
duly 4:9
during 10:16; 18:11;
32:14
duties 6:14; 9:19; 11:[...]
11; 19:25; 23:21; 24:6
duty 7:25; 8:6; 19:4;
36:22; 37:13

## E

East 42:21; 43:7, 19
ECU 11:20; 33:23
effect 20:4, 12, 16, 19;
21:18, 19; 22:1, 8, 14;
23:6; 24:9, 20; 28:23;
45:25
egress 19:22; 41:25
eight 32:19
either 15:2, 9; 17:23;
18:1; 44:2
elements 34:9
eloped 17:11
elopement 14:3; 17:1
17; 24:16; 25:14, 17, 20
26:1, 5, 12, 15, 22; 27:5
45:7; 42:14, 17, 22; 44:[...]
else 14:19; 26:4
emergency 11:19; 15
19; 19:2, 14, 17, 25; 20
35:1, 6, 20; 37:3, 18;
38:19, 23; 40:1
employed 44:19
employee 33:13; 6:22;
32:6
encounter 16:18
engineering 32:18; 3[...]
enough 23:1; 27:15
entrance 19:18; 39:8
equipped 12:12
escorted 30:22
essentially 22:7
estimate 39:23
evaluate 13:9; 12:21,



**Keith I. Schorr & Susan Schorr  v.**
**Borough of Lemoyne, et al.**

Charles Sterli
August 30, 20

**Paragraph** 24:12
**park** 39:9; 44:21; 39:2, 4
**part** 14:2, 25; 19:4; 30:8;
36:21; 37:24, 25
**particular** 7:14; 9:3, 5;
13:17; 14:17; 25:13;
37:14; 38:4
**parties** 4:3
**patient** 12:20, 22; 13:2, 7,
9, 23, 23; 14:6, 8, 9, 12, 13;
17:15; 18:16; 23:17, 19;
25:17, 18, 18, 20; 26:6, 7,
11, 21; 28:11; 30:19;
41:14, 14; 35:15; 12:6, 6,
7, 8, 11; 19:7; 20:2; 24:14,
15; 25:3, 6, 7, 10; 26:1, 8,
14; 27:17; 29:21; 30:11;
31:21; 36:22
**patrol** 9:19; 44:23; 9:20,
25; 10:1
**Pennsboro** 42:21; 43:7,
19
**people** 4:15; 6:25; 7:2;
25:6; 32:25; 33:16; 36:15;
37:12
**performed** 11:1, 11
**period** 45:13
**person** 27:4; 30:21; 33:5
**personnel** 30:9; 31:1, 10,
11, 18; 36:14
**phrase** 16:10
**physical** 27:20
**physically** 34:24
**place** 9:8; 21:5; 27:19;
29:4; 45:16; 13:7; 19:11;
10:5
**placement** 11:23
**point** 11:8; 12:4; 17:8;
29:19; 30:15; 38:15;
39:18; 29:18
**police** 11:18; 31:8; 42:8,
13, 17, 21; 44:4
**policemen** 12:2
**policies** 6:20; 20:4; 29:9
**policy** 20:8, 15, 17; 21:4,
6, 17, 19, 21, 25; 22:7, 14,
20, 22; 23:6; 24:19, 23;
25:2; 27:19, 19, 24, 25;
28:2, 23; 29:5, 6, 7, 8, 12,
15, 20, 23; 30:1, 9; 31:17;
34:23; 37:20
**pose** 24:14
**position** 6:10, 12; 13:10;
15:16; 32:13
**possible** 5:6; 14:13
**prepare** 45:24
**presence** 10:6; 18:10
**presented** 18:20
**Pretty** 22:24
**prevent** 14:3
**previous** 16:17; 18:13,
15
**previously** 34:22
**prior** 16:24; 44:15, 18
**priority** 24:13

**probably** 15:10; 27:22;
32:19; 39:19
**problem** 4:21; 13:22;
18:20
**procedure** 24:3; 25:14;
26:3; 37:20; 6:20; 23:4, 7,
13; 42:10; 45:22
**proceedings** 46:5
**professionally** 45:3, 5
**program** 33:15; 34:16;
33:16, 17
**property** 39:18
**protocols** 20:4
**provided** 20:7
**provides** 19:2
**psych** 17:3
**psychiatric** 12:6, 8, 10;
17:22; 19:6; 20:1; 26:14;
28:10; 31:21; 36:22
**public** 36:9
**purpose** 13:20; 14:2;
29:13; 22:11
**put** 11:19; 13:24; 22:19;
23:16; 24:1; 25:3, 23

## Q

**qualifications** 32:23;
33:6

## R

**ran** 38:11; 39:1
**read** 22:3
**reader** 10:12
**realize** 15:21
**really** 5:12; 30:14
**reason** 5:12; 7:14; 14:9;
17:23
**recall** 14:24; 15:2, 9
**receive** 33:9; 34:6; 30:5;
42:7, 12
**recognize** 23:5
**recognizing** 24:9
**record** 5:5, 6, 22
**red** 33:18, 21; 34:7; 36:2,
3, 4, 8, 17, 18; 37:7, 9, 11,
11, 19, 22, 25; 38:5, 9, 12
**reference** 23:3; 24:8;
26:6
**refers** 25:14
**regard** 10:24; 19:25;
34:23; 42:9, 13, 17, 21
**Regional** 44:4
**regulations** 30:10
**relation** 19:13
**relatively** 29:16
**released** 23:22
**relevant** 5:2
**rely** 5:7
**report** 16:6, 7; 45:9, 24, 7,
12

**reporter** 5:4, 21
**represent** 4:13; 44:12
**required** 41:4; 45:6
**reserved** 4:6
**respect** 10:21; 11:3, 12;
14:17; 19:24; 23:8; 24:3, 5,
27:17, 20; 28:10, 24;
31:16, 20; 38:4
**respective** 4:3
**respond** 15:4; 38:12
**response** 6:24
**responsible** 6:18
**restrain** 28:2
**restraint** 27:25; 29:6, 14,
21; 30:11, 18; 35:9, 13, 20,
23; 27:20; 28:9, 24; 30:5,
22; 34:23, 24, 25; 35:4, 6
**restricting** 26:8
**right** 4:19; 5:23; 6:21; 7:5;
8:10; 9:8, 17; 10:1; 11:2;
12:3, 12; 13:16, 20; 14:2;
15:12; 16:8, 22; 18:5, 12,
25; 19:4, 5, 17, 18, 20;
20:6; 21:24; 23:1; 25:12;
27:11; 28:4, 13, 18; 29:16;
30:8, 24; 31:4, 12, 19;
33:5; 34:2, 2, 9, 21; 35:4,
12, 15, 17, 18; 36:16; 37:5,
8, 25; 38:12, 17; 39:7;
41:6, 22; 43:13; 44:2, 7
**rise** 26:4
**risk** 24:16; 25:14, 17, 20;
26:1, 5, 12, 16, 22; 27:9;
32:11, 20; 45:15
**room** 11:19, 24; 12:4, 5,
5, 10, 12, 20; 13:6, 14;
14:6, 7; 15:5, 17, 19;
16:11, 12, 13; 19:3, 5, 10,
10, 17; 20:8, 17; 23:9, 14,
16; 24:13; 25:3, 5, 24;
30:22; 35:1, 7; 37:3, 18;
38:10; 39:1; 40:10, 16, 17,
21; 41:18; 42:1; 11:20;
19:5; 24:4; 25:1; 39:25;
40:7, 13
**roughly** 7:9
**rounds** 10:3
**route** 38:22
**rule** 5:17; 8:10; 4:20
**run** 9:6, 18; 33:16
**Ryan** 4:13; 7:22; 8:6, 13,
18; 10:21; 11:12, 23;
15:23; 16:17, 24; 17:11,
21; 18:11, 13, 19; 19:11;
30:5, 25; 31:6; 38:5, 10,
14, 19, 21; 39:10; 40:11;
42:4; 43:3, 23

## S

**safe** 13:25
**Safety** 34:12, 15
**same** 7:9; 19:8; 22:7;
35:18; 37:16
**saw** 38:18
**saying** 26:17; 37:17

**scan** 10:10
**scanner** 10:10
**schedule** 10:2; 8:8, 3
**scheduling** 6:19
**Schorr** 4:13; 7:22; 8:6,
13, 18; 10:22; 11:12, 17,
24; 15:23; 16:5, 17, 24;
17:11, 21; 18:11, 20;
19:11; 30:6, 25; 31:6; 38:5,
10, 14, 19, 22; 39:10;
40:11; 42:4; 43:3, 23;
18:13
**sealing** 4:4
**seclusion** 11:20, 24;
12:4, 5; 13:6; 15:5; 19:5, 9;
20:8, 17; 23:8, 14, 16;
24:4, 13, 25; 25:24; 39:25;
40:7
**second** 34:18
**security** 6:11, 14, 17, 20,
21, 22; 7:3, 5, 6, 17, 24;
8:22; 9:10, 13, 25; 11:6;
13:6, 10, 11, 13, 21; 14:1,
3, 11, 11; 18:20; 19:1, 2,
24; 23:17, 23; 24:3, 5;
26:19, 23; 28:13; 29:8, 12,
14, 20; 30:4; 9:31:1, 4, 11,
22; 32:3, 18, 23, 25; 33:1,
3, 15, 22; 34:13, 14; 36:5;
37:5, 6, 8; 42:7; 44:15, 18;
45:2, 22
**sense** 17:15
**sentence** 24:12
**September** 7:16
**served** 44:14
**Service** 44:21
**several** 28:20; 37:10
**shift** 7:25; 8:9, 18, 21;
10:16; 37:10, 16
**shop** 9:18
**Shore** 44:3, 12
**short** 6:4; 29:16
**show** 21:10; 27:22; 28:18
**significant** 22:12, 15
**silly** 20:13
**sit** 32:2
**situation** 5:3, 15; 7:18;
13:18; 14:18; 23:18;
30:16, 20, 23
**Six** 45:1
**size** 40:17
**slightly** 11:9
**Society** 34:12
**soft** 35:13, 20
**somebody** 23:16; 37:21;
41:15
**someone** 32:13
**sometimes** 5:24
**somewhere** 14:19
**sorry** 15:2, 9, 14; 41:5
**sort** 10:11; 13:4; 24:2;
25:9; 33:25
**speak** 9:18; 14:7; 25:25
**special** 10:15, 16
**specific** 7:24; 42:4

**specifically** 20:1
**specified** 9:19; 10:2;
13:9; 45:13
**Spirit** 4:14; 6:10, 17; 8:
19; 16:23; 17:11, 22;
18:14, 21; 31:22; 32:3,
33:10; 38:18; 42:14, 18
43:9; 44:5, 16, 19; 45:2
**staff** 7:18; 12:2, 20; 13
14:7, 10; 15:4, 7, 19;
23:20; 24:15; 26:23, 23
24, 25; 28:12, 13; 29:2;
30:16, 20; 33:22, 22, 2;
23; 36:15; 37:1, 2, 3, 3,
19, 19; 38:9; 6:19
**stage** 13:12
**standard** 24:3
**stands** 13:13
**stapled** 28:19; 29:7, 1
**start** 6:1, 9; 8:4; 27:18
34:1; 40:3
**state** 25:21
**station** 9:9
**statistics** 42:16, 20; 4
9, 14; 44:1
**STERLING** 4:8, 12;
20:25; 21:1, 11, 11; 28:
21; 29:1, 11; 46:4
**still** 24:8, 24; 30:1; 40:
**stipulated** 4:2
**STIPULATION** 4:1
**stood** 12:25; 13:19
**stop** 11:21; 14:12, 12
**store** 10:13
**street** 39:8, 11, 13
**stretch** 6:6
**Strike** 28:6
**subject** 18:6; 24:22; 2
**substantive** 22:13
**Substantively** 22:6
**Summarize** 11:2
**supervisor** 32:10, 14
**supposed** 31:18
**sure** 8:17; 17:9; 40:20
**sworn** 4:9
**synopsis** 6:14
**system** 10:9; 36:9

## T

**talk** 6:5; 33:24, 25; 44
18:5; 34:22; 44:22; 5:2
16:18; 34:1; 43:3
**teach** 33:21
**team** 36:12, 13, 14, 1
17, 18, 25; 37:9, 11, 1
22, 24, 25; 38:1, 12
**telling** 6:9; 11:7; 12:1
**term** 36:3; 32:22; 44:
**testified** 4:9
**testimony** 4:22
**though** 24:22
**threat** 24:14

## CERTIFICATE OF SERVICE

I, JOHN F. YANINEK, ESQUIRE, hereby certify that I am serving a copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Federal Rules of Civil Procedure, by depositing a copy of same in the United States Mail at Harrisburg, Pennsylvania, with first-class postage, prepaid, as follows:

Gerald J. Williams, Esquire
Williams, Cuker and Berezofsky
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1895

David J. MacMain, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

Stephen S Pennington Esquire
One Penn Center at Suburban
Station Suite 800
1617 JFK Boulevard
Philadelphia PA 19103

**METTE, EVANS & WOODSIDE**

By: _____
John F. Yaninek, Esquire
Sup. Ct. I.D. No. 55741
3401 North Front Street
P. O. Box 5950
Harrisburg, PA 17110-0950
(717) 232-5000
Attorneys for Defendants Holy Spirit
Hospital and Cumberland County

DATE:   February 28, 2003

:318178_1