ORIGINAL 2-to cf

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH I. SCHORR, SUSAN SCHORR, in their own right and as personal representatives of the ESTATE OF RYAN K. SCHORR<br><br>v.<br><br>Plaintiffs,<br><br>BOROUGH OF LEMOYNE, et al.<br><br>Defendants. | JURY TRIAL DEMANDED<br><br><br>HONORABLE YVETTE KANE<br><br><br><br><br><br>NO. 1:CV-01-0930 |

PLAINTIFFS' BRIEF IN OPPOSITION TO HOLY
SPIRIT'S MOTION FOR SUMMARY JUDGMENT

FILED
HARRISBURG
MAR 2 5 2003
MARY E. D'ANDREA, C

### I. Holy Spirit is not entitled to summary judgment on any aspect of plaintiffs' negligence claim.

In its attack on plaintiffs' negligence claim, Holy Spirit essentially rehashes the failed argument it presented in its original motion to dismiss, filed in July, 2001. The argument has not grown more compelling with time, and the evidence adduced in discovery has rendered it baseless.

It remains true that, under the Pennsylvania Mental Health Procedure Act ["MHPA"], at 50 P.S. §7114(a), the "treatment decisions" of certain treatment providers — including Holy Spirit here — are subject to liability only upon a finding of "gross negligence." It also remains true, however, that even an "expansive" judicial reading of the Act concludes that the acts immunized against claims of "ordinary negligence" are decisions related to *treatment*, *Farago v. Scared Heart Hospital*, 522 Pa. 410, 562 A.2d 300 at 304. And it remains true that many of the actions and failures of Holy Spirit which are pertinent in this case are not treatment decisions at all.

Indeed, for much of the time Ryan Schorr spent locked in the seclusion room in HS's Emergency Department, he was not being "treated" at all. He had been evaluated by E.R. physician

Dr. Spurrier — a treatment decision about which plaintiffs make no complaint. However, HS's failure to follow its own procedures and violating the most basic standards of care in: a) failing to recognize and abate a known risk of "elopement;" b) having only a single security guard on duty and permitting him to leave the unit prematurely, without proper "clearance;" c) permitting an unaccompanied staff member to open the seclusion room door occupied by Schorr to "read him his rights," despite knowledge of his "agitated," "psychotic" and "delusional" condition; and d) otherwise failing to provide adequate security are all acts subject to claims of ordinary negligence. This case does not present a situation like those in *Hollard* and *Farago*, the cases on which HS relies, where the issues concerned clinical decisions regarding how close supervision should be for patients under active, psychiatric treatment. By contrast, much of HS's negligence in this case occurred during Ryan Schorr's "processing" (while he was *waiting* to be treated), and involved non-clinical staff and policies unrelated to treatment, including the practices of HS's security personnel. Courts interpreting the MHPA have routinely agreed with the proposition that such acts are not subject to the heightened "gross negligence" standard established in the MHPA. *See, Fogg v. Paoli Memorial Hospital*, 686 A.2d 1355 (Pa. Super. 1996); *McNamara v. Schleifer Ambulance Services*, 566 A.2d 448 (Pa. Super. 1989); and the related discussion in plaintiffs' 7/19/01 brief in response to HS's Motion to Dismiss, at 3-4.

As in 2001, plaintiffs continue to concede that some of HS's conduct can only result in recovery upon a finding of gross negligence. *Id.* at 2. Thus, for example, HS's failure to recognize from Ryan Schorr's medical history that his stay in the seclusion room would aggravate his condition and heighten the need for security, as well as its failure to provide him overall care consistent with his diagnosis, require proof of gross negligence. Plaintiffs have provided expert

2

testimony that HS's failures in this regard constituted gross negligence. *See, e.g.*, N.T. Vogel-Scibillia, Pl. Ex. D, pp. 46-106 and Pl. Ex. A with attached exhibits.

Moreover, and perhaps more significantly, plaintiffs have produced evidence sufficient to prove that *all* of HS's culpable mistakes, including those subject to ordinary negligence analysis, were grossly negligent. For example, plaintiffs' security expert has opined that the hospital's security practices, including its failure to have any security present in the ED during the latter stages of Ryan Schorr's processing was, in light of common standards, "reprehensible." N.T. Somerson, HS Ex. B, with attached exhibits. In describing Candace Highfield's ill-fated attempt to read Ryan Schorr his rights, Dr. Vogel-Scibillia, a highly qualified psychiatrist and medical director of a mental health facility testified:

> Now this, of course, is a crisis intervention worker at Holy Spirit who is supposed to have an understanding of emergency people in crisis. So, I mean, either she is extraordinarily uninsightful and it had not occurred to her this happened or she simply did something recklessly without thinking. [Assuming she possessed "common sense"], she acted extraordinarily recklessly based on the fact that she made one look and saw him sitting on a mattress and cancelled out everything else that happened in that year, and cancelled out everything that she knew about patients with mania and everything she knew about people in seclusion and everything she knows about 302s.

Pl. Ex. D at 46-7.

Therefore, assuming *arguendo* that every act and omission of HS regarding Ryan Schorr is entitled to the protection of a "gross negligence" standard, plaintiffs have produced sufficient competent evidence for a reasonable jury to determine the issue in their favor.

Furthermore, again assuming *arguendo* that plaintiffs' entire negligence claim requires a finding of gross negligence, this Court may not preclude the jury from determining whether any negligence was, in fact, "gross," as the term is interpreted under Pennsylvania law. This was made clear in *Bloom v. Dubois Regional Medical Center*, 597 A.2d 671 (Pa. Super. 1991), the very case HS cites for a "thorough analysis of the concept of gross negligence under the MHPA." HS brief, p. 26. After pointing out that the line between ordinary and gross negligence is fine, and efforts to distinguish the degrees "have resulted in distinctions that are vague and impractical," *Id.* at 678, the Court held that it was for the jury to determine the degree of the defendant's negligence. It noted:

> ...the determination of whether an act or failure to act constitutes negligence of any degree, in view of all the evidence has always been particularly committed to determination by the jury [citations omitted].

*Id.* at 679-80.

It is no less the case here. Plaintiffs have produced ample evidence that Holy Spirit blithely ignored Ryan Schorr's history and condition, failed to take easy steps to prevent highly foreseeable harm, and violated the most basic "rules" for handling — in an emergency room — a person in grave crisis. As a result, it exacerbated the problem, and set in motion a chain of events leading to the unnecessary death of a young man. A reasonable jury could find such conduct grossly negligent, and the Court should permit it to hear the evidence.

4

II. **Plaintiffs' Action under 42 U.S.C. §1983 may not be dismissed.**

    A.    In the context of this case, Holy Spirit Is a "state actor" under 42 U.S.C. §1983.

In arguing that it may not be liable under 42 U.S.C. §1983 because its actions with Ryan Schorr were not "under color of state law," Holy Spirit relies exclusively on this Court's decision in *Janicsko v. Pellman*, 774 F.Supp. 331 (M.D. Pa. 1991), *aff'd, without* opinion, 970 F.2d 899 (3d Cir. 1992). That reliance is misplaced for several reasons.

First, in *Janicsko*, the court did not hold that a private hospital engaged in "302" activities could never be found to have engaged in "state action." *Id.* at 335. Rather, it dealt only with the issue of whether, simply because physicians and a hospital "committed" an involuntary patient pursuant to §302 of the MHPA, they had acted under color of state law. *Id.* The court correctly held that the mere fact that §302, a state law, provides the parameters of legal commitment, and contains some "coercive" provisions, did not "convert private health care providers to state actors." *Id.* at 336. That is not plaintiffs' claim here.

Here, plaintiffs are not complaining about the fact that Holy Spirit attempted to "commit" their decedent. Indeed, if their claim were that the examining physician, using medical judgment, inappropriately determined that Ryan Schorr should be involuntarily treated, state action would not be established under *Janicsko*. Here, by contrast, plaintiffs allege that Holy Spirit, providing services *for and under the auspices of Cumberland County,* worked in concert with the County's "delegate" to determine that Ryan Schorr met the legal criteria established by 50 P.S. §301 for involuntary treatment, arranged for the issuance of a warrant by the county authorizing a police department to deliver Ryan Schorr into custody, and ultimately held him in a locked "seclusion

room" awaiting treatment. While delivering *County* services to Ryan Schorr while he was in its custody, Holy Spirit, through a variety of conscience-shocking failures, exacerbated his condition and subjected him to a severe risk of serious harm, ultimately realized. That its action was under color of state law can be seen through several differences between the proofs in the case at bar and those presented in *Janicsko*.

The emergency psychiatric services rendered to Ryan Schorr were services provided to residents of Cumberland County by the Cumberland County Department of Mental Health and Retardation Department. Such services, including "crisis intervention," are mandated to the counties, under criteria promulgated by the Commonwealth's Department of Public Welfare. N.T. Herman, Pl. Ex. C, pp. 16-17. In 2000, Cumberland County performed these services through two emergency service providers, one of which was Holy Spirit (currently HS is the County's only crisis intervention program). *Id*. *See also*, N.T. S. Buccifero, HS Ex. F, pp. 12-17. Under its contract with Holy Spirit, the County maintains tight control over the provider, establishing hours and staffing requirements, making a "flat" annual payment for all mandated services, retaining an unfettered right to review the HS program and facility, "including review of service records, service policy and procedure issuances, staffing ratios and job descriptions, as well as meeting with any staff or consumersm" participating in grievances of patients, and requiring clinical records to be kept in accordance with County criteria. *Id*. *See also*, 2000 contract between Cumberland-Perry Counties and Holy Spirit. Pl. Ex. G, pp. 2-3; 6-7; 9-12; 15; App. A. The HS Crisis Intervention Program is funded solely by a grant from the County MH/MR program. *Id*. at App. A, App. C ("Special Terms and Conditions").

The close nexus between the County and the HS emergency and/or Crisis Intervention Program in 2000 was not confined to a funding relationship and theoretical oversight. To the contrary, county administrative personnel talked "nearly daily" with HS staff, conducted regular site visits and audits, worked jointly with HS to obtain MH/MR-related licensure, and considered HS to be "our" emergency service program. See N.T. Herman and Buccifero, supra, *passim*. Thus, when Ryan Schorr was brought to HS's emergency department for involuntary psychiatric evaluation and confined there, he was receiving County service, provided under the auspices of the County, paid for by the County, and delivered by what was in effect the County's alter ego.

The governmental connection was even closer and went even further in the Ryan Schorr case. Schorr was brought to HS pursuant to a warrant issued by the County delegate acting on the advice of a (non-physician) worker at Holy Spirit that his case met the legal criteria of 50 P.S. §301. See N.T. Bricese, HS Ex. B, pp. 14-15 and discussion in Plaintiffs' Statement of Case, pp.7-8. Holy Spirit then coordinated the execution of the warrant with West Shore policemen, and, subsequently, accepted custody of Schorr.

In short, the facts of this case, in contrast to those in *Janicsko*, meet several of the "tests" for determining that a private entity has been a "state actor" for §1983 purposes. There was a "close nexus" between a county program and the private service — in fact, there was no distinction between them; the County and HS had a deeply woven "symbiotic relationship," marked by interdependence and joint effort, and Holy Spirit was providing "community" services traditionally provided by the government. *See, Jensen v. Sacred Heart General Hospital*, 222 F.3d 570 (9th Cir. 2000). In the case of Ryan Schorr, Holy Spirit delivered is services by utilizing the

coercive aid of the police, and by taking him into involuntary physical custody. It caused him harm during the time he was in that forced custody, a condition traditionally reserved to a "public function."[1] Accordingly, it acted under color of state law.

        B.      Holy Spirit's "deliberate indifference" if proved, would subject it to liability under 42 U.S.C. §1983.

Plaintiffs' Constitutional claim against Holy Spirit is made pursuant to the Fourteenth Amendment, and is essentially a claim that HS violated the substantive due process rights of plaintiffs and their decedent. First Amended Complaint, ¶51. The relevant standard of culpability of a state actor in a substantive due process claim is not whether it was "deliberately indifferent." Rather, it is whether the conduct "shocks the conscience." *Smith v. Morasco, et al.*, 318 F.3d 497 (3d Cir. 2003), 2003 U.S. App. Lexis 1432. Where, as here, it is alleged that the state actor, either through an affirmative act or an omission, has "placed the plaintiff in a dangerous position that was foreseeable," the "meaning of [the shocks the conscience] standard varies depending on the factual context. The consistent hallmark of such conduct, however, is "gross negligence or arbitrariness" in the face of "foreseeable and fairly direct harm" to the plaintiff. *Id.* at *19; *22-23. It may be satisfied where a state actor's conduct "falls below accepted professional standards for dealing with emotionally disturbed persons." *Id.* at *25. As plaintiffs have repeatedly pointed out, they have produced ample evidence that Holy Spirit was grossly negligent in the face of highly foreseeable

---

[1] As a very recent decision by Judge Bartle of the Eastern District of Pennsylvania points out, such a restriction of liberty betokens a different situation than that presented in *Rendell-Baker v. Kohn*, 457 U.S. 830, cited by the *Janicsko* court. Where, as here, an entity holds a person "involuntarily deprived of their liberty as a result of a judicial process," "the entity has engaged in a "quintessentially governmental process." *C.K. v. Northwestern Human Services*, (E.D. Pa., 3/20/03); C.A. No. 02-8562 [Pltf.'s Ex. H], 2003 App. Lexis 1432 at 18, *22.

harm to Ryan Schorr. That evidence must be considered by the jury for a proper disposition of this case.

### III. If plaintiffs' claim under 42 U.S.C. §1983 survives, as it must, then the Court should not dismiss the plaintiff parents' claim for compensation for their <u>constitutionally protected interest in their decedent's life.</u>

Holy Spirit accurately notes that Pennsylvania law does not permit recovery of "filial consortium" damages in the case of a child's death. However, Holy Spirit ignores the fact that ¶¶s 35 and 36 of the complaint in which plaintiffs allege that they have suffered a loss of Ryan Schorr's "consortium" are in the "general allegations" of the complaint, and include claims cognizable under their federal claim, as well as ones cognizable under state law. Indeed, paragraph 36 specifically describes the parents' loss of Ryan's companionship and support as a deprivation of their constitutional interest.

This Court has explicitly held that a parent may recover the loss of his interest in an adult, emancipated son's life under 42 U.S.C. §1983. *Estate of Cooper v. Leamer*, 705 F.Supp. 1081, 1087 (M.D. Pa. 1989), following *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984). The Third Circuit has likewise followed *Bell*, in holding that parents have a "liberty interest" in the life of their child. *Estate of Bailey v. County of York*, 768 F.2d 503, 509 n. 7 (3d Cir. 1985). The most recent district court holdings on the subject have continued to do so, with respect both to minor and adult children. *See, Agresta v. Sambor*, 687 F. Supp. 162 (E.D. Pa. 1988); *McCurdy v. Dodd*, 2000 U.S. Dist. Lexis 2333 (E.D. Pa. 2000); *Schieber v. Philadelphia*, 156 F.Supp. 2d 451 (E.D. Pa. 2001) *rev'd on other grds*, 2003 U.S. App. Lexis 3013 (3d Cir. 2003). This Court should follow this precedent, and deny defendant's motion.

## IV.  Conclusion

Holy Spirit's motion for summary judgment should be denied in its entirety.

_____
GERALD J. WILLIAMS, ESQUIRE
Attorney I.D. No. 36418
Williams Cuker & Berezofsky
One Penn Center at Suburban Station Building
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1819
(215) 557-0099

STEPHEN S. PENNINGTON, ESQUIRE
Attorney I.D. No. 31612
Center For Disability Law & Policy
One Penn Center at Suburban Station Building
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1819
(215) 557-7112

Counsel for Plaintiffs

Dated: March 24, 2003

## CERTIFICATE OF SERVICE

I, GERALD J. WILLIAMS, hereby certify that on this date I served a true and correct copy of the foregoing Plaintiffs' Brief in Opposition to Defendant Holy Spirit Hospital's Motion for Summary Judgment by first class mail, postage prepaid upon the following counsel:

John F. Yaninek, Esquire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA 17110-0950
Counsel for Defendants Borough of Cumberland,
Cumberland County Mental Health/Mental
Retardation Center and Holy Spirit Hospital

Gregory J. Hauck, Esquire
David J. MacMain, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
Counsel for Defendants West Shore Regional Police Commission

_____
GERALD J. WILLIAMS, ESQUIRE

Dated: March 24, 2003