ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH I. SCHORR, SUSAN SCHORR, in their own right and as personal representatives of the ESTATE OF RYAN K. SCHORR | : : : : : | JURY TRIAL DEMANDED |
| | : | HONORABLE YVETTE KANE |
| v. | : : | |
| Plaintiffs, | : : | FILED HARRISBURG |
| BOROUGH OF LEMOYNE, et al. | : : | MAR 2 5 2003 |
| Defendants. | : | NO. 1:CV-01-0930 |

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

**PLAINTIFFS' STATEMENT OF THE CASE IN OPPOSITION
TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT[1]**

This case arises from the death of Ryan Schorr, a young man suffering from a severe mental illness, diagnosed as bipolar disorder. On November 18, 2000, Ryan was shot and killed by two part-time policemen employed by defendant West Shore Regional Police Commission. His death was the last, and most tragic event in a sequence of failure on the part of those charged with providing him care and protection.

---

[1] Defendants have collectively filed three motions for summary judgment, filing separate statements of material fact, and two sets of exhibits. Plaintiffs have filed separate responses to the motions and statements of fact, as well as separate briefs. However, in order to streamline the response as much as possible, the statement of the case set forth in this brief will apply to all three defense motions and plaintiffs' briefs will incorporate it by reference. In addition, the following abbreviations will be used throughout this statement and plaintiffs' briefs to refer to defendants and their exhibits:

- West Shore Regional Police Commission and Howard Doughterty = "WSRP"

- Holy Spirit Hospital = "Holy Spirit" or "HS"

- Cumberland County = "the County" or "CC"

The essential chronology of the relevant facts has now been stated to the Court by all the parties in the context of several motions, and has been well established in discovery. Ryan Schorr had a long history of bipolar disorder — a mental illness which all parties and their experts agree is a "severe" and disabling disorder. See, e.g., N.T. (V. I) of plaintiffs' expert, Suzanne Vogel-Scibillia, M.D., Pl. Ex. A, p. 89. He was treated for this condition and a related substance abuse problem for several years at Holy Spirit. *Id.*, pp. 53-72. When Ryan Schorr was brought to Holy Spirit on November 18, 2000, clinical personnel were aware of his history and had his medical records available to them. *Id.* See also, N.T. Candace Highfield, HS Ex. E, pp. 13-14; 28; N.T. Carol Joerger, HS Ex. C, pp. 18-19.

Shortly before his death, Ryan's condition had deteriorated, and, as is commonly the case with victims of bipolar disorder, he discontinued his medication. See, e.g., WSRP Statement of Material Facts, ¶1-6; N.T. (V. I), Vogel-Scibillia, Pl. Ex. A., P. 112.

Concerned about his resistance to treatment, knowing the severity of his disease, and worried about apparent delusions Ryan was having, his roommate Matthew Gaumier accompanied Ryan's mother Susan Schorr to the Emergency Department ["ED"] at Holy Spirit. N.T. Gaumier, WSRP Ex. "F" pp. 24-30. After consulting there with a "crisis worker," Mercedes Bricese, Gaumier signed "paperwork" requesting that Ryan Schorr be brought to Holy Spirit for an involuntary emergency examination and possible involuntary treatment under §302 of the Pennsylvania Mental Health Procedures Act, 50 P.S. §7302. *Id.* See also, N.T. Bricese, HS. Ex. G, pp. 10-15. Following procedures mandated by Cumberland County, Bricese arranged for a "§302 warrant" to be issued, authorizing law enforcement personnel to take Schorr into custody. *Id.*

2

Around 7:30 in the morning of November 18, 2000, WSRP Officers Harry Hart and Gary Berresford received notification from Holy Spirit that a warrant had been issued. N.T. Hart, WSRP Ex. H, p. 18. Officers Hart and Berresford picked up the warrant, went to Ryan Schorr's home, and took him into custody. *Id.* at 18-19. Although Ryan expressed a desire not to go to the hospital, he was "basically compliant," and went with the policemen. *Id.*

Shortly after he arrived in the ED, Ryan was escorted into "Room 17," a small, locked "seclusion" room used to hold subjects of §302 involuntary examinations. See, e.g., N.T. Joerger, HS Ex. C, pp. 12-13. A "female nurse" in the ED arranged for a Holy Spirit security guard, Cory Graby to be present for Ryan's "processing." N.T. G. Berresford, WSRP Ex. H, p. 20. Once Ryan was locked into Room 17, Officers Hart and Berresford left the hospital. *Id.* at 22.

In the room, Ryan quickly became highly agitated, delusional, verbally threatening, and possessed of a need to leave the hospital immediately. He:

- "was pacing back and forth. He was very loud, yelling. He was...cursing and swearing." N.T. Joerger, HS Ex. C, p. 14;

- "was delusional" and "had delusions of grandeur." *Id.* at 15;

- "felt he was a personal friend of the president." *Id.*;

- "believed he "had to get to his limousine...because he had many interviews with the president." *Id.*;

- "said that he had a license to kill. And he said that he would come back and put a bomb in the hospital and blow everybody up." *Id.* at 17;

3

- "was clearly psychotic and hallucinating." Statement of David Spurrier, M.D., HS Ex. A.

Ryan did not appear to be under the influence of drugs while at the hospital (*Id.* at 19), and was not physically assaultive. *Id.* at 18. However, he spoke in an "elevated" voice and he refused to permit Security Officer Graby to place an ID bracelet on him, "without his bodyguard being present." N.T. Graby, HS Ex. D., pp. 14, 15. Graby found him "slightly agitated" (*Id.* at 17), left the ID bracelet on the bed, and left Room 17, *Id.* at 15.

Doctor Spurrier decided that Ryan should be involuntarily committed, and left the room, leaving Ryan there for further "processing." HS Ex. A. Ten or fifteen minutes later, Graby inexplicably left the Emergency Department. *Id.* at 21. Graby cannot recall why he left, or where he went. *Id.*

Carol Joerger was the "charge nurse" in the ED on November 18, 2000, supervising clinical personnel, and the nurse "responsible for the patient." Schorr N.T. Joerger, HS Ex. C, p. 41. She was the Holy Spirit employee with authority to give Graby clearance to leave the ED. *Id.* at 41-42. Furthermore, she has testified that both Pat Smith, the nurse in charge during any "breaks" by Joerger and Dr. Spurrier have affirmed that neither of them permitted Graby to leave. *Id.* at 29-33; 42. Nurse Joerger recognized that it was a serious deviation from normal practice to have no security presence or other "backup" in the area of a seclusion room holding an agitated subject. *Id.* at 24-5. She later learned what has now been established as an undisputed fact. On November 18, 2000, Cory Graby was the only security guard on duty on the entire twenty-six acre, six-building campus of Holy Spirit. *Id.* at 32. See also, N.T. Charles Sterling, HS Ex. H, pp. 44-5; 8-9. Holy Spirit security personnel were to act in the context of the hospital's knowledge that any "302

4

patient" must be "considered an elopement risk because they are being 302'd by the state; because it's involuntary." *Id.* at 25.

Given the absence of the security officer, Nurse Joerger was surprised later, when she looked up and saw Candace Highfield, a crisis intervention worker, walking in a "fast motion" toward Room 17. N.T. Joerger, HS Ex. C., p. 24.[2] Before Joerger could stop her,[3] Ms. Highfield opened the door of the room, only to be brushed aside by Ryan Schorr, who quickly ran to and through the nearby ED exit. *Id.* at 26. Joerger then notified Cumberland County dispatch "911" that Schorr, "psychotic" and "homicidal," had eloped from the hospital. *Id.* at 34-5. A Holy Spirit employee apparently also called Ryan Schorr's home, and left a message on his answering machine that the "police would be picking Ryan up." N.T. Susan Schorr, Pl. Ex. B, pp. 53-55; N.T. Hart, WSRP Ex. H, p. 48.

WSRP officers Berresford and Hart responded to this second dispatch regarding Ryan Schorr. *See, e.g.*, HS Statement of Material Facts, ¶22.

Both officers were part-time policemen. N.T. Deft. Howard Doughterty, WSRP Ex. I, p. 8. Neither officer had received any training during his career in dealing with the emotionally disturbed, or the execution of §302 warrants. N.T. Hart, WSRP Ex. H, pp. 12-13; N.T. Berresford;

---

[2]Highfield intended to "read his rights" to Schorr in keeping with the Mental Health Procedures Act. N.T. Highfield, HS Ex. E, p. 9.

[3]Nurse Joerger would have stopped Ms. Highfield not only because of her recognition that "backup" was always necessary in dealing with "302" patients, "for the safety of the department and the safety of the patient" [HS Ex. C, p. 25]; Highfield's attempted entry of the "seclusion room" was contrary to Holy Spirit policy — in effect in November, 2000, but reduced to writing later — that once a seclusion room door is locked "only the patient's nurse or security will open the door." See Sterling dep. Ex. #1 [HS Ex. H]. Other staff "should page security..." *Id.*

WSRP Ex. G, pp. 19-21. Both received training which "touched on what bipolar is along with the other staff" *after* their encounter with Ryan Schorr. *Id.* at 23. Although they had received training on the use of other implements of force, neither was equipped by WSRP with any weapons less lethal than their "ASP batons," and firearms. *Id.*

The officers drove to Ryan Schorr's home. After calling his mother, plaintiff Susan Schorr, and ascertaining that she did not have a key to the house, they went to its rear, and entered through an apparently open sliding door. See, e.g., WSRP Statement of Material Facts, ¶¶28-30.

Before their entry of the home, Berresford and Hart had received no information about Schorr's current mental state, or advice on how to approach Ryan, either from Holy Spirit or Cumberland County dispatch, which had received Joerger's call. N.T. Berresford, WSRP Ex. G, p. 38; N.T. Hart, WSRP Ex. H, pp. 45-6. Before their entry, they made no call for any sort of assistance — either from other police units, or from Cumberland County's MH/MR program, or from any county-funded crisis intervention workers at Holy Spirit. *Id.*, N.T. Hart, WSRP Ex. H, pp. 49, 62; *See also*, N.T. Silvia Herman, Cumberland County MH/MR Director, Pl. Ex. B, pp. 14-19.

Once in the Schorr home, officers Berresford and Hart walked to a stairway to the second floor, from which they could hear loud music. N.T. Berresford, WSRP Ex. G, p. 42. They climbed the stairs, with Berresford in the lead. *Id.* at 43. Berresford loosed the "thumb-strap" on his holstered handgun, in anticipation of a possible need to use it.[4] *Id.* at 45-46. At the top of the stairs, still with his hand on his gun, Berresford confronted Schorr, who, at the time was standing in front of his mirror, clad only in a robe. *Id.*, pp. 43-46. Upon the sight of an armed policeman

---

[4]Officer Hart saw no such need on entry to the house, and left his gun "snapped." N.T. Hart, WSRP Ex. H, p. 25.

6

entering his bedroom, the delusional Schorr "grabbed" Berresford's hand, and a struggle ensued. *Id.* at 45. During the struggle, Officer Berresford was shot in the ring finger of his left hand. *Id.* at 48. Although Officer Berresford testified that Ryan Schorr ultimately gained control of the gun, Ryan subsequently fired no shots at either policemen. The gun "ended up on the bed," and Schorr fled the room. *Id.* at 50.[5]

During the encounter between Berresford and Schorr, Officer Hart hit Schorr "repeatedly" with his baton. *See, e.g.*, WSRP Statement of Material Facts.

After Schorr left the room, he left his house, and sat for a brief time in the officers' cruiser. WSRP Ex. E, p. 22 [Grand Jury Report]. He then returned to the house, and to the bedroom where the policemen had remained. He was holding a pot or pan in each hand, and according to Officer Hart, struck Hart with one of the pots. *Id.*, at 24. Officer Hart shot five rounds at Ryan Schorr. N.T. Hart, WSRP Ex. H, p. 44. Schorr sustained six gunshot wounds, and died. WSRP Ex., p. 26.

The fatal events of November 18, 2000 occurred in a context relevant to the disposition of several issues raised in defendants' various motions.

The Cumberland County Mental Health/Mental Retardation Department is responsible for providing "crisis intervention services" to residents of the County. WSRP Ex. E, p. 31. With respect to psychiatric crises, such services include those related to emergency involuntary commitments. *See, e.g.*, N.T. Herman, Pl. Ex. "C," pp. 7-12. Currently, Holy Spirit is the only licensed crisis intervention provider in the County. *Id.* at 18-19. In the year, 2000, Holy Spirit was

---

[5] Similarly, although Schorr also had access to ornamental swords in his room, and picked up an air rifle which he "swung" at the officers, he used neither to assert lethal force. *Id. See also*, WSRP Ex. E.

one of two centers providing the County's emergency psychiatric services. *Id.* at 17-19.

Holy Spirit receives funds from Cumberland County to provide services under a contract which, among other things, sets the budget available for providing the services, and establishes "expectations" and service requirements. *Id.*, pp. 21-23. *See also*, N.T. S. Buccifero, HS Ex. F, pp. 7-14; 15-17. Holy Spirit works "in concert" with the County in providing the services, and the County regularly conducts audits and site visits to insure the Hospital's conformity with its requirements. N.T. Buccifero, at 16-17. *See also*, N.T. Herman, Pl. Ex. C, pp. 23-25. Holy Spirit "crisis intervention" staff and the County MH/MR Director talk "almost daily." *Id.* at 24.

Where, as here, a person like Ryan Schorr is brought to Holy Spirit for an involuntary evaluation and/or treatment pursuant to a warrant, the warrant is issued, not by a physician, but by a Cumberland County "delegate" who acts on the certification of a crisis intervention worker that the subject meets the *legal*[6] criteria mandated by §302 of the Act. *Id.*, pp. 10-12. The delegate "signs off" on whether a warrant may be issued; once issued, the warrant permits the police to take the subject into custody. N.T. Bricese, HS Ex. G, pp. 10-13; N.T. Herman,, Pl. Ex. C, pp. 10-13. The County approves or denies requests for them. *Id.* at 12.

Requests for involuntary psychiatric evaluations are far from rare in Cumberland County, and involvement of police agencies is common. In a survey of Cumberland County police departments taken before the Ryan Schorr incident, it was reported that 82 police "incidents" involving County policemen and "302 involuntary commitments" occurred in the thirty-four months

---

[6]The Act requires a mentally ill person to have committed some "outward act evidencing a clear and convincing threat to themselves or others," and medical needs alone are insufficient grounds for involuntary treatment. WSRP Ex. E [Grand Jury Report's summary of T. Andrews testimony], pp. 30-31; 50 P.S. §7301.

8

between January, 1998 and November, 2000. WSRP Ex. E, p. 30. The West Shore Regional Police Commission officers were frequently involved in the execution of §302 warrants, and both Officer Berresford and Officer Hart testified that more than half of their on-duty "calls" involved the "emotionally disturbed." *See e.g.*, WSRP Statement of Material Facts, ¶¶s 63, 74, 87, 88.

The experience of police officers in Cumberland County with the mentally ill has been increased through their contact with persons "eloping" from Holy Spirit Hospital. *See, e.g.*, N.T. Chief Dougherty, WSRP Ex. I, pp. 53; 56. *See also*, report of plaintiff's expert Ira Somerson, p. 2(Ex. 3 of Somerson deposition, HS Ex. B).

The Chief of West Shore Regional Police Department testified to a deep frustration with obtaining assistance from the crisis intervention providers in the County before the Ryan Schorr incident:

> One would think we could call mental health to assist us in these, but they were never available and they didn't help us. So was there anybody there to help? Really, no.
>
> ******************
>
> It might be a 302 commitment. You would ask them to send someone. No one was available.
>
> ******************
>
> Crisis would tell you that they only have one worker on, they can't help you. And they were tied up at the hospital, they weren't available.

WSRP. Ex. I, pp. 23-25. The inability of the County or "Crisis"[7] to assist the police in any way was manifested "every time until the Schorr incident." *Id.* at 24. Given this level of frustration, it is not surprising that, before November 18, 2000, WSRPC had no policy regarding "backup" or assistance from crisis intervention workers in serving 302 warrants, and the officers involved in the Schorr incident were unaware even of the availability of such assistance. N.T. Berresford, WSRP Ex. G, pp. 61-2.[8]

When Cumberland County surveyed the local police departments it found that "81% of the departments reported little or no training is provided to their officers in...handling situations involving persons suffering from mental illness." WSRP Ex. E, p. 30. WSRP Commission was no exception, and defendant has admitted that it provided no such training. WSRP answers to plaintiffs' Interrogatories, Pl. Ex. F, No. 17. Likewise, it failed to promulgate any policy, conduct any "self-evaluation" or adopt any practice to insure that it provided adequate service to the mentally ill in conformity with the Americans With Disabilities Act. *Id.*, Nos. 13-16.

In light of these facts adduced in discovery, plaintiffs have produced expert opinions regarding defendants' liability in this case, including that of Ira Somerson, a security expert, (see HS Ex. B), Dr. Suzanne Vogel-Scibillia, a psychiatrist, (see plaintiffs' Exs. A and D), and D.P. Van Blaricom, a police practices expert (see plaintiffs' Ex. E). These experts have respectively opined in relevant part that:

---

[7]"Crisis" is, in effect, Holy Spirit Hospital. *Id.* at 25, 29.

[8]After the Schorr incident, the County and police departments began development of an assistance program, including a "Police Crisis Intervention Team," and Chief Dougherty began insisting that a "crisis" worker accompany policemen on every 302 "call." N.T. Herman, Pl. Ex. C, pp. 35-37; NT Dougherty, WSRP Ex. I, pp. 24-29.

- Holy Sprit was guilty of a "reprehensible" degree of negligence in failing to prevent Ryan Schorr's elopement by, *inter alia*, under-staffing the ED, failing to provide adequate security (in part by allowing the security guard to be absent), permitting Ms. Highfield to enter Room 17 alone, and failing to recognize risks of elopement readily foreseeable not only from Holy Spirit's previous experience, but from the observation of Ryan Schorr's condition. Somerson, HS Ex. B.

- Holy Spirit failed to follow "cardinal rules" in dealing with Ryan Schorr and his bipolar condition, failing to recognize the effect on or changes in his condition during confinement in the seclusion room, failing to consider his relevant medical history and diagnosis, and failing to maintain adequate safeguards against "elopement." Vogel-Scibillia, Pltfs. Exs. A and D, with attachments.

- Officers Berresford and Hart seriously mishandled their encounter with Schorr and caused its escalation to violence through an utter lack of training and the failure of WSRP to implement and provide adequate policies and resources relevant to encounters with the mentally ill, despite its explicit knowledge of the attendant risks, and the ready availability of appropriate remedies. *Id. See also*, Van Blaricom, Pl. Ex. F.

- As a result, the policemen violated "five of the seven basic guidelines for approaching a person experiencing the manic phrase of a bipolar disorder." Pl. Ex. E, p. 3. They

11

violated these guidelines, not only because their employer "provided no in-service training whatsoever," despite a "well-known" need for it; WSRP also violated several specific requirements of the ADA applicable to police departments, including the requirement to conduct a "self-evaluation" and related policy review to determine how it could meet the needs of mentally ill citizens. *Id.* at 3-4.

Against this framework, the relevant legal analysis makes it plain that the Court must deny the motions, and permit the jury to determine the disposition of the numerous issues of material fact remaining in the case. That analysis is set forth in plaintiffs' briefs in opposition to the motions.

Respectfully submitted,

_____
GERALD J. WILLIAMS, ESQUIRE
Attorney I.D. No. 36418
Williams Cuker & Berezofsky
One Penn Center at Suburban Station Building
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1819
(215) 557-0099

STEPHEN S. PENNINGTON, ESQUIRE
Attorney I.D. No. 31612
Center For Disability Law & Policy
One Penn Center at Suburban Station Building
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103-1819
(215) 557-7112

Counsel for Plaintiffs

Dated: March 24, 2003

## CERTIFICATE OF SERVICE

I, GERALD J. WILLIAMS, hereby certify that on this date I served a true and correct copy of the foregoing Plaintiffs' Statement of the Case in Opposition to All Defendants'' Motions for Summary Judgment by first class mail, postage prepaid upon the following counsel:

John F. Yaninek, Esquire
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA 17110-0950
Counsel for Defendants Borough of Cumberland,
Cumberland County Mental Health/Mental
Retardation Center and Holy Spirit Hospital

Gregory J. Hauck, Esquire
David J. MacMain, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
Counsel for Defendants West Shore Regional Police Commission

_____
GERALD J. WILLIAMS, ESQUIRE

Dated: March 24, 2003

F:\DATA\SCHORR\PLEADING\3-21-03statement.wpd