# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR,  :
In their own right and as personal  :
representatives of the Estate of RYAN K.  :
SCHORR,  :
   :
            Plaintiffs,  :  No. 1:CV-01-0930
   :
   vs.  :
   :
WEST SHORE REGIONAL POLICE  :  The Honorable Yvette Kane
COMMISSION, HOWARD DOUGHERTY,  :
CUMBERLAND COUNTY, ROBERT  :
GORIL and HOLY SPIRIT HOSPITAL,  :
   :
            Defendants.  :
   :

**FILED**
HARRISBURG, PA

MAY 0 7 2003

_____ D'ANDREA, CLERK
Per _____ 919

---

### DEFENDANTS WEST SHORE REGIONAL POLICE COMMISSION AND CHIEF HOWARD DOUGHERTY'S BRIEF IN SUPPORT OF THEIR MOTION IN LIMINE TO PRECLUDE THE PROPOSED EXPERT OPINIONS AND TESTIMONY OF DR. SUZANNE VOGEL-SCIBILIA

## I.    INTRODUCTION

Defendants West Shore Regional Police Commission ("WSPD") and Chief Howard

Dougherty submit this brief in support of their Motion in <u>Limine</u> to Preclude the Proposed

Expert Opinions and Testimony of Dr. Suzanne Vogel-Scibilia.

## II.     PROCEDURAL HISTORY

On May 25, 2000, Plaintiffs commenced this instant lawsuit.  In their First Amended Complaint ("Complaint"), Plaintiffs asserted claims against the WSPD and Chief Dougherty under Section 1983 (Count I), Section 504 of the Rehabilitation Act (Count IV), Title II of the ADA (Count V), and Pennsylvania law for wrongful death and survival (Counts VI and VII).

On September 5, 2002, the parties filed a Stipulation of Partial Dismissal, stipulating to the dismissal of the claims raised under Section 504 of the Rehabilitation Act in Count IV of the Complaint.

On February 10, 2003, the Court granted Plaintiffs' unopposed motion to dismiss the ADA claim against Chief Dougherty raised in Count V and the wrongful death and survival claims against both the WSPD and Chief Dougherty raised in Counts VI and VII.

On February 28, 2003, the WSPD and Chief Dougherty filed a motion for summary judgment.  This motion is currently pending before this Court.

## III.    STATEMENT OF FACTS

### A.     The Incident

For a large part of his life, Ryan Schorr ("decedent") suffered from a significant psychiatric illness, which severely disrupted his ability to carry out his daily life activities.  See Compl. ¶¶12-13.  In November 2000, decedent's psychiatric condition worsened such that his family and friends believed that a psychiatric evaluation was necessary.  See Compl. ¶¶15-16. On November 18, 2000, after consultation with decedent's mother, decedent's housemate completed an application at the Crisis Intervention Unit of Holy Spirit Hospital to have decedent involuntarily committed pursuant to section 302 of the Pennsylvania Mental Health Procedures Act.  See Compl. ¶¶17-18.

-2-

A crisis intervention worker evaluated the application, determined that decedent presented a clear and present danger to himself or others and caused an order to be issued for decedent's involuntary commitment. See Compl. ¶19. After obtaining the order and corresponding warrant, Officers Gary Berresford and Harry Hart of the WSPD went to decedent's house and transported him to Holy Spirit Hospital, where he was placed in a high security room. See Compl. ¶21. When a crisis intervention worker entered decedent's hospital room, he rushed past her and left the hospital. See Compl. ¶23.

Approximately two hours later, decedent returned to his home. See Compl. ¶24. Officers Berresford and Hart were contacted and instructed to return decedent to the hospital. See Compl. ¶25. After arriving at decedent's house, the police officers entered through a sliding glass door and found decedent in the doorway of his bedroom dressed only in a long robe. See Compl. ¶¶29-30. A physical struggle ensued during which Officer Hart fired his service revolver and killed decedent. See Compl. ¶¶31-33.

### B.    Dr. Vogel-Scibilia's Opinion And Testimony

Dr. Vogel-Scibilia is a psychiatrist licensed to practice in the Commonwealth of Pennsylvania. See Curriculum Vitae of Dr. Vogel-Scibilia, Ex. "B." She currently works as the medical director of a local mental health clinic. See Expert Report of Dr. Vogel-Scibilia ("Report") at 2, Ex. "A." She maintains certificates from various psychiatric associations and has written articles concerning psychiatric disorders. See Curriculum Vitae of Dr. Vogel-Scibilia, Ex. "B."

Dr. Vogel-Scibilia has no training, education, or experience in criminal justice or law enforcement. Vogel-Scibilia Dep. at 169-171, Ex. "C." She admits that she is not in any way familiar with police regulations governing the use of force, self defense, or defense of others. See id. at 271-273, Ex. "C."

On November 8, 2002, Plaintiffs produced the Report that had been prepared by Dr.

Vogel-Scibilia in connection with this case.  The Report contains the following opinions:

> There are cardinal rules about how to engage someone with acute manic symptoms.  These rules were not followed . . . by the West Shore Police Department.  The lack of thorough understanding of the patient's condition, severe communication problems, extremely lax safety procedures and lack of understanding how to manage persons with psychiatric illness by . . . West Shore Police were causal in the tragic outcome the patient experienced.
>
> \*      \*      \*      \*
>
> The police officers behavior further escalated the situation and led to his inability to be safely contained in the community.  Standards for care of persons with mental illness exist and were not followed throughout this case.  The patient's death was avoidable and the escalation to aggression by the patient who was in the throes of confusion and disorganization is entirely predictable.
>
> \*      \*      \*      \*
>
> Mr. Schorr's bipolar illness is a medical disability covered under the American for Disabilities Act.  The care he received was grossly negligent and avoidable.

See Report at 1-2, Ex. "A."

## IV.     ARGUMENT

### A.     Dr. Vogel-Scibilia's Opinions and Testimony are Inadmissible Under Rule 702 of the Federal Rules of Evidence

The determination of whether expert testimony is admissible is a question of law.  See

Fed. R. Evid. 104(a); Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579, 592 (1993).  The trial

court, acting as a gatekeeper, "must ensure that any and all [expert] testimony or evidence

admitted not only be relevant, but reliable."  Daubert, 509 U.S. at 589.  Accordingly, the trial

court is charged with determining that the proposed expert testimony "be supported by

appropriate validation – i.e. 'good grounds,' based on what is known."  Id. at 590.

In order to be admissible, the trial court must determine whether the proposed expert testimony meets two criteria under Federal Rule of Evidence 702:[1]  (1) whether the proposed expert is qualified to testify on the subject; and (2) whether the testimony will assist the trier of fact in understanding or determining a fact in issue.  See Daubert, 509 U.S. at 592.  The answer to both questions in this instance is no.

1.    Dr. Vogel-Scibilia Is Not Qualified to Testify as to Whether the Police Officers' Actions Were Appropriate

In determining whether a witness is qualified to provide expert testimony under Federal Rule of Evidence 702, the court must first determine whether he or she possesses "'specialized knowledge regarding the area of testimony.'"  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  Although this requirement is interpreted liberally, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman."  Id.  (citations omitted).

Moreover, a witness who qualifies as an expert in one field will not necessarily qualify as an expert in all fields.  See Goodwin v. MTD Products, Inc., 232 F.3d 600, 609 (7th Cir. 2000) (affirming district court's determination that expert in engineering was qualified to testify as to the design of defendant's product but was not qualified to render an opinion as to the injury sustained by plaintiff from use of the product).  "In other words, the specialized knowledge must

---

[1] Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

be relevant to the area of inquiry." Fedor v. Freightliner, Inc., 193 F. Supp.2d 820, 829 (E.D. Pa. 2002).

In Fedor, the court analyzed the qualifications of plaintiff's proposed expert, Dr. Stephen Wilcox, to testify as to the allegedly defective design of a truck step system. Id. at 822. One of the bases for his opinion that the step system was defectively designed concerned the surface friction and radius of the step. He testified that his conclusion was based, in part, on "basic physics." Id. at 823-824. Although Dr. Wilcox had a Ph.D. in experimental psychology, with coursework in biomechanics, and had investigated hundreds of accidents, he had no expertise in engineering. Id. at 826-27. Because his conclusions were based upon principles of engineering, defendants argued that his testimony was irrelevant and should be excluded. Id. at 827. The court agreed with the defendants and concluded that Dr. Wilcox was not qualified to offer expert testimony on the design or radius of the step. Id. at 828. The court found that Dr. Wilcox, while possessing "specialized knowledge" in the field of ergonomic and human factors, had virtually no experience in engineering or physics. Id. Consequently, Dr. Wilcox was prohibited from testifying on these subjects. See also Berry v. City of Detroit, 25 F.3d 1342, 1349 (6th Cir. 1994) (holding that a sociologist, who had some experience working as a sheriff, was not qualified to testify as an expert on police polices and procedures).

Like Dr. Wilcox, Dr. Vogel-Scibilia is not qualified to offer opinions or testimony on the subjects for which she has been offered – specifically, the appropriateness of the police officers' actions. See Report at 1-2, Ex. "A." Dr. Vogel-Scibilia opined that the police officers in this case acted inappropriately because their actions violated the "cardinal rules" about how to engage someone with acute manic symptoms. See id., Ex. "B." During her deposition, Dr. Vogel-Scibilia explained that there are about six cardinal rules and summarized them as follows:

-6-

- <u>Space</u> - "[W]hen you're first approaching and engaging someone you keep your distance . . . ." <u>See</u> Vogel-Scibilia Dep. at 199, Ex. "C."

- <u>Control</u> - "You firmly but politely state your issue . . . ." <u>See</u> <u>id.</u> at 201, Ex. "C."

- <u>Tenor of Conversation</u> - "You don't yell at someone." <u>See</u> <u>id.</u> at 203, Ex. "C."

- <u>Empathy</u> - "[C]ommunicate to them the idea that you care about them . . . ." <u>See</u> <u>id.</u> at 206, Ex. "C."

- <u>Safety</u> - "[F]irst do no harm . . . ." <u>See</u> <u>id.</u> at 207, Ex. "C."

- <u>Practicality</u> - "You have to be able to be flexible and kind of roll with the situation." <u>See</u> <u>id.</u> at 209, Ex. "C."

Dr. Vogel-Scibilia does not maintain any "specialized knowledge" of the law or law enforcement to qualify her as an expert on the appropriateness of the officers' actions. <u>See</u> <u>Fedor</u>, 193 F. Supp.2d at 829. She is not, nor has she ever been, a police officer. <u>See</u> Vogel-Scibilia Dep. at 170, 179, Ex. "C." She has no education or experience in law enforcement. <u>See</u> <u>id.</u> at 170, Ex. "C." When asked if she was familiar with police regulations governing the use of force, self defense, or defense of others, she responded in the negative <u>See</u> <u>id.</u> at 272-273, Ex. "C."

Dr. Vogel-Scibilia's opinions and testimony are based on her experiences as a psychiatrist. The mere fact that she believes that the officers violated several of her so-called "cardinal rules" should have no bearing on whether the officers' actions were improper. Perhaps fearing that she would be found unqualified to render an opinion concerning the officers' actions, Dr. Vogel-Scibilia explained that her opinions were also based on the American with Disabilities Act ("ADA") and insisted that she was "offering an expert opinion with respect to what the ADA required in this case." <u>See</u> <u>id.</u> at 178, Ex. "C." Yet, Dr. Vogel-Scibilia flatly admits that she is not a lawyer. <u>See</u> <u>id.</u> at 179-180, Ex. "C."

Dr. Vogel-Scibilia's "cardinal rules" are wholly inappropriate to the law enforcement setting. It is ridiculous to expect that a police officer tasked with the duty to protect others and facing a deadly assailant would have to adhere to rules which would require him to give an armed assailant space and to speak politely to him. Dr. Vogel-Scibilia cannot provide expert opinions or testimony of the appropriateness of the police officers' actions, such as the use of deadly force or when self-defense is appropriate, when she does not have any knowledge whatsoever about such issues.

> 2. Dr. Vogel-Scibilia's Opinions and Testimony Will Not Assist the Trier of Fact in Determining Whether Defendants Should Be Held Liable

Dr. Vogel-Scibilia's testimony will not assist the trier of fact. She admitted during her deposition that her opinions are based, in part, on common sense. See id. at 225, Ex. "C." Expert testimony cannot be based on common sense. See U.S. v. Gibbs, 190 F.3d 188, 212-13 (3d. Cir. 1999) (finding that the trial court abused its discretion in failing to exclude the prosecution's expert testimony explaining phrases that the jury could understand for itself). Likewise, expert testimony cannot be based on the inevitable conjecture that will occur if Dr. Vogel-Scibilia is allowed to testify as to subjects over which she maintains no expertise. Such conjecture will only serve to confuse the trier of fact with baseless conclusions and theories. Consequently, Dr. Vogel-Scibilia's opinions and testimony should be excluded as against the WSPD and Chief Dougherty.

> **B.** **Dr. Vogel-Scibilia's Opinions and Testimony Should Also Be Excluded Under Rule 403 Because any Probative Value Is Substantially Outweighed by the Danger of Confusion**

Pursuant to Rule 403 of the Federal Rules of Evidence, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or ... by considerations of undue delay, waste of time or needless presentation of

cumulative evidence." Dr. Vogel-Scibilia's proposed opinions and testimony on the

appropriateness of the officers' actions – based on the beliefs of someone trained in psychiatry –

are unreliable and thus has no probative value whatsoever. Even if Dr. Vogel-Scibilia's opinions

and testimony were probative, however, the danger of unfair prejudice and confusion of the

issues would substantially outweigh it. Specifically, her theories may mislead the jury. While

Dr. Vogel-Scibilia's area of expertise has nothing to do with law enforcement, a jury may

overlook this fact because they are so impressed by her credentials.

Moreover, Plaintiffs already have identified a witness, D.P. Van Blaricom, to offer expert

testimony on law enforcement. To allow a second witness to similarly opine, particularly one

with inadequate knowledge on the subject would invite confusion and cause "undue delay, waste

of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

## V.    CONCLUSION

For the foregoing reasons, Defendants WSPD and Chief Dougherty respectfully request

that this Court grant their motion and preclude Dr. Vogel-Scibilia from offering any opinions or

testimony against them.

Respectfully submitted,

Dated: May 6, 2003

David J. MacMain (Pa. Atty. I.D. No. 59320)
Gregory J. Hauck (Pa. Atty. I.D. No. 82958)
MONTGOMERY, McCRACKEN,
  WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109-1099
(215) 772-1500

Attorneys for Defendants West Shore
Regional Police Commission and Chief
Howard Dougherty

## CERTIFICATE OF NONCONCURRENCE

Defendants West Shore Regional Police Commission and Chief Howard Dougherty certify that they have sought concurrence in the foregoing motion from Plaintiffs and that it has been denied.


Dated:  May 6, 2003

Gregory J. Hauck

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing proposed order, motion in limine, and supporting brief to be served, via first-class mail, postage prepaid, upon each of the following persons:

> Gerald J. Williams, Esquire
> Williams, Cuker & Berezofsky
> One Penn Center
> 1617 JFK Boulevard, Suite 800
> Philadelphia, PA  19103-1895
> Attorney for Plaintiffs
>
> John F. Yaninek
> Mette, Evans & Woodside
> 3401 North Front Street
> P.O. Box 5950
> Harrisburg, PA  17110-0950
> Attorney for Holy Spirit Hospital and
> Cumberland County

Dated:  May 6, 2003

Gregory J. Hauck

*Beaver County Psychiatric Services*

219 THIRD STREET
BEAVER, PA 15009
OFFICE: (724) 775-9150 EMERGENCY (724) 775-9152
FAX (724) 775-9153

Williams, Cuker, Berezofsky
One Penn Center at Suburban Station
1617 J.F.K. Boulevard
Suite 800
Philadelphia, Pennsylvania 19103-1819

November 8, 2002

Re: Schorr, et al v. Borough of Lemoyne et al.

Preliminary Report

My name is Suzanne Vogel-Scibilia M.D. I am the medical director of a local mental health clinic in an area of Pennsylvania similar to Cumberland County. I have been asked to comment on the following issues in relation to the above mentioned case:

Bipolar disorder is an extremely common (1-2% of the population) disorder which causes erratic, unpredictable behavior, depression, suicide, elevated mood periods and as in the case of Mr. Schorr, psychotic episodes. Mr. Schorr had classical features of this illness which has a chronic course requiring lifetime treatment. He also had another equally important diagnosis, mixed substance dependence, for which he had been receiving outpatient treatment until several months before his death. He was discharged from outpatient drug and alcohol services at Holy Spirit in the summer, 2002 before his death. He was discharged without adequate follow-up and assigned only to medication checks at the Holy Spirit outpatient facility which did not adequately monitor his signs of relapse, nor provide substance abuse treatment. When patients with a dual diagnosis relapse from their psychiatric illness in this circumstance they most often also relapse-using chemicals such as was found in Mr. Schorr's blood. This is a very predictable finding -- consistent with his diagnosis. Patients with Bipolar disorder tend to react impulsively, seek hedonistic sensations from chemicals or try to medicate their symptoms. This was previously documented in Mr. Schorr's particular case as well as found in the terminal incident that is the basis of this litigation.

Patients with bipolar illness respond to certain interventions well known to the treatment community. There are cardinal rules about how to engage someone with acute manic

symptoms . These rules were not followed – both by Holy Spirit and by the West Shore Police Department. The lack of thorough understanding of the patient's condition, severe communication problems, extremely lax safety procedures and lack of understanding how to manage persons with psychiatric illness by both Holy Spirit and West Shore Police were causal in the tragic outcome the patient experienced. This patient's intent for the aggressive behavior appeared to be self protection. He had opportunity to shoot firearms and instead struck the officers with them suggesting he had no clear lethal intent.

Holy Spirit's treatment of this patient beginning with his confinement in a small locked room that ultimately was not secure escalated his paranoia which resulted in him eloping from the facility. The telephone call from Holy Spirit informing the patient that the police where coming to arrest him further instigated the dangerous situation. The police officers behavior further escalated the situation and led to his inability to be safely contained in the community. Standards for care of persons with mental illness exist and were not followed throughout this case. The patient's death was avoidable and the escalation to aggression by the patient who was in the throes of confusion and disorganization is entirely predictable.

Mr. Schorr's bipolar illness is a medical disability covered under the American for Disabilities Act. The care he received was grossly negligent and avoidable. I am available to testify to this if needed.

Suzanne Vogel-Scibilia MD

# CURRICULUM VITAE

## BIOGRAPHICAL

NAME:  Suzanne Vogel-Scibilia. MD

HOME ADDRESS:  758 River Road
Beaver, PA  15009

BUSINESS ADDRESS:  Beaver County
Psychiatric Services
219 Third Street
Beaver, PA  15009

BIRTH DATE:  October 23, 1959

BIRTH PLACE:  Pittsburgh, PA

CITIZENSHIP:  USA

BUSINESS PHONE:  724-775-9150
EMERGENCY:  724-775-9152
FAX:  724-775-9153

## EDUCATION AND TRAINING

UNDERGRADUATE
1977 – 1981

Johns Hopkins University
Baltimore, Maryland

B.A. Natural
Sciences Area Major

GRADUATE
1981 – 1985

University of Pittsburgh
School of Medicine
Pittsburgh, PA.

Dr. Rubin
Dean of Medicine

POSTGRADUATE
1985 – 1986

Internship in Medicine and Pediatrics
Montefiore Hospital of Pittsburgh
Pittsburgh, PA

Dr. Philip Troen
Physician-in-Chief

1987 – 1989

Residency in Adult Psychiatry
University of Pittsburgh School Of Medicine
Western Psychiatric Institute and Clinic
Pittsburgh, PA

Michael Rancurello,
Director of Residency
Education in General
and Adult Psychiatry

01/90 – 06/90

Chief Resident
Mood Disorders Module
Western Psychiatric Institute and Clinic
Pittsburgh, PA

Jack Cornelius, MD
Medical Director

## CERTIFICATION AND LICENSURE

MEDICAL AND OTHER PROFESSIONAL LICENSURE

Commonwealth of Pennsylvania
State Board of Medicine, 1989

CERTIFICATION

American Board of Psychiatry
And Neurology, 1991

CERTIFICATION

American Board of Adolescent
Psychiatry, 1993

CERTIFICATION

American Board of Psychiatry and
Neurology with qualification in
Geriatric Psychiatry, 1994

CERTIFICATION

American Board of Psychiatry and
Neurology with qualification in
Addiction Psychiatry, 1994

CERTIFICATION

American Society of Addiction
Medicine, 1994

# MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

| | |
|---|---|
| 1985 – 1990 | Association for the Study of Dreams |
| 1989 | American Association for Geriatric Psychiatry |
| 1990 – Present | American Psychiatry Association |
| 1991 | American Academy of Psychiatrists in Alcoholism and Addiction |
| 1993 – Present | American Society of Addictive Medicine |
| 1994 | American Board of Forensic Examiners |

# HONORS

| | |
|---|---|
| 1980 | Phi Beta Kappa Honor Society<br>Dean's List – eight semesters |
| 1984 | Alpha Omega Alpha Honor Medical Society |
| 1989 | Laughlin Award for Merit – National Psychiatric Fund Fellow |
| 1990 | Chief Resident – Western Psychiatric Institute |
| 1992 | Exemplary Psychiatrist Award – National Alliance for The Mentally Ill |
| 1996 | Exemplary Psychiatrist Award – National Alliance for The Mentally Ill |
| 1996 | Super-Supporter Award – Beaver County Mental Health Association |
| 1997 | National Consumer Advocacy Award – Institute of Behavioral Health |
| 1997 | Psychiatrist of the Year – Pennsylvania Alliance for The Mentally Ill |
| 1998 | Eli Lilly Program Award for Clinical Medicine at Psychiatric Services Convention, Los Angeles, CA |
| 2001 | Fellow, American Psychiatric Association |
| 2001 | Consumer Council Award, National Alliance for The Mentally Ill |
| 2001 | Exemplary Psychiatrist Award – National Alliance for the Mentally Ill |

# PUBLICATIONS

## REFERRED ARTICLES

1. Vogel-Scibilia SE: Mulsant BM, Keshavan MK:  HIV Psychosis, a critique Acta Psych Scan, 78:652-656, November 1988

2. Vogel-Scibilia SE:  Gershon, S:  An update on cognitive enhancers for the elderly.  New Trends in Clinical Neuropharmacology. 3 (4):207-217, 1989.

3. Vogel-Scibilia SE:  Pharmacotherapy of Dementia.  Clinical Advances in the Treatment of Psychiatric Disorders, June 1990, Page 12

4. Vogel-Scibilia SE: Decade of the Brain – "Psychiatric Ethics" April, 1999

5. Vogel-Scibilia SE: The Journal, 1999 (CAMI) – "A Permanent Solution, A Temporary Problem" P 39-40

6.      Vogel-Scibilia SE:  Journal of Biological Psychiatry – "The Controversy Over Challenge and Discontinuation Studies" – October, 1999 15;46 (8) 1021-4

7.      Vogel-Scibilia SE: The Journal, 2000 (CAMI) "I am a Prosumer"

8.      Frese FJ 3rd, Stanley J, Kress K, Vogel-Scibilia S,: "Integrating Evidence Based Practices and the Recovery Model  Psych Services 2001 November; 52 (11) 1462 – 8

9.      Muesser KT, Corrigan PW, Hilton DW, Tanzman B, Schaub A, Gingerich S, Essock SM, Tarrier N, Morey B, Vogel-Scibilia S, Herz MI:  "Illness Management and Recovery: A review of the research" Psych Services 2002 October, 53 (10) 1272 – 84

10.     Vogel-Scibilia SE:  "Current Issues in Psychiatric Research" Psychiatric Times December 2002

# POSTERS

1.      Poster Session:     May, 1998, Society of Biological Psychiatry, "Does HIV Psychosis Exist?", Mulsant, BM Vogel-Scibilia, SE, Keshavan, MK.

2.      Poster Session:     October, 1990, Institute of Hospital & Community Psychiatry, "Issues Concerning the Residence Training of Bipolar Psychiatrists", Vogel-Scibilia, SE and Trazkovich, SK.

3.      Poster Session:     December 1, 1995, American Association of Physicians for Alcohol and Addictions – "Anticholinergic Abuse", Vogel-Scibilia, SE.

4.      Poster Session:     July 17, 1998 – National Alliance for the Mentally "Managed Care Issues".

5.      Poster Session:     July 17, 1998 – National Alliance for the Mentally Ill "Consumer Provider Issues".

6.      Poster Session:     June 18, 1999 – International Bipolar conference "Hyperammonemia with Depakote Therapy".

7.      Poster Session:     June 15, 2001, International Bipolar Conference "GBL Intoxication Masquerading as Bipolar Disorder"

# PROFESSIONAL ACTIVITIES

TEACHING

| | |
|---|---|
| 06/90 -07/91 | Organizer, Affective Disorders Journal Club |
| 10/89 -07/91 | Lecturer, WPIC Office of Education and Regional Programming. "Counseling the Chronic and Terminally Ill." |
| 05/91 – 07/91 | Lecturer, WPIC Office of Education and Regional Programming. "Crisis Management". |
| 05/89 – 07/91 | Instructor, 2nd year medical students; small group discussions. |
| 05/89 – 07/91 | Instructor, 3rd year medical students; serving on committee to revise Medical Student Syllabus. |
| 01/90 – 07/91 | Daily supervision of psychiatric residents and medical students during their rotations on the 10th floor inpatient service; Western Psychiatric Institute |
| 07/91 – Present | Inservices to resident psychiatric staff, The Medical Center, Beaver, as well as Family Practice Residents. |
| 1993 – Present | Psychotherapy Supervisor, Psychiatric Residents at Western Psychiatric Institute. Lecturer in Community Psychiatric Course |
| 07/95 – 01/96 | Supervisor, Duquesne University Masters Program – Internship Division. |

### SERVICE

| | |
|---|---|
| 1984 – 1991 | Telephone Crisis Counselor, Contact Pittsburgh, General Division. |
| 1988 – 1991 | Telephone Crisis Counselor, Elderly Reassurance Division. |
| 1987 – 1988 | Resident Representative, Center for Psychotherapy Steering Committee. |
| 1988 – 1989 | WPIC House Staff President |
| 1991 – Present | Monthly presentations in the community on psychiatric topics |
| 1995 – Present | "Ask the Doctor" series at the Phoenix Drop-in Center, Rochester, PA |
| 1995 – Present | AMI, Beaver County: Lecturer for Coping Skills Classes |
| 1997 – Present | Co-leader Bipolar Disorder Support Group, Rochester Methodist Church, Rochester, PA. |
| 1998 – Present | President – Brighton First – a non-profit organization to address mental health needs in Beaver County. |
| 1998 – Present | AMI-CARE and AMI-CAN, Beaver County, Group Leader |
| 1998 – Present | Columnist for Alliance of PA NAMI Columnist for Alliance Voice of SW AMI PA |
| 1998 – 1999 | Columnist for Oregon Voice, Portland, Oregon |
| 1998 – Present | Guest Lecturer in Library Science – St. Peter and Paul's Church. |
| 1998 – Present | Speaker, Family to Family, NAMI |
| June 1998 | Reviewer for the National Substance Abuse and Mental Health Services Administration (SAMSHA) for consumer-operated grant proposals for the 1999 fiscal year |
| July 1998 | Reviewer for National Institute of Mental Health – Research Issues in Schizophrenia |
| Aug 1998 – Sept 2001 | Board of Directors – Alliance for the Mentally Ill – SW Pennsylvania Chairman – Education Committee Member of the SW AMI/OERP Committee |
| Sept 1998 – Present | Board of Directors – National Alliance for The Mentally Ill, Pennsylvania. Psychiatric Advanced Directives' Chairman. Education and Training Committee, Chair. Executive Director – Search Committee. |
| December 1, 1998 | Testimony for The National Institute of Mental Health – Ethics of Research Discontinuation Studies in Maintenance Treatment of Depression. |
| February 1998 – Present | Forensic Committee – Mental Health Association of Beaver County. |
| Jan 1999 – Dec 1999 | Participation in Four NAMI Educational Videos |
| March 1999 – Present | NIMH – Reviewer for psychiatric research grants, Bethesda, Maryland |
| April 1999 – Present | Panel member – Data and Safety Monitoring Board – NIMH, Bethesda, Maryland |
| April 1999 – July 2002 | Councilor at large, Pittsburgh Psychiatric Society |
| May 1999 – Present | APA/NAMI Collaborative Workshop Series at National APA Conference |
| July 1999 – July 2001 | Chair, National Consumer Council for NAMI (CCNAMI) |
| Oct 1999 – July 2001 | Chair of CCNAMI Operating Procedures Committee Chair of CCNAMI Advance Directives Committee |

| | |
|---|---|
| Jan 2000 – July 2000 | Chairman, NAMI Pennsylvania Annual Conference 2000 |
| Sept 2000 – Nov 2000 | Reviewer for National Institute of Mental Health – Early Onset Psychosis in Young Adults, Bethesda, Maryland |
| Jan 2001 – July 2001 | Chairman, NAMI Pennsylvania Annual Conference of 2001 |
| Jan 2001 – Present | Chairman, Pennsylvania Psychiatric Society; Essay Contest – "When Not To Tell A Secret" |
| January 2001 – Present | Forensic Committee, Pittsburgh Psychiatric Society |
| January 2001 – Present | Peer to Peer Recovery Pilot Program – for NAMI; Consultant – Advance Directive Program |
| April 2001 | Participation in Pennsylvania's Department of Public Welfare's Antistigma Video |
| July 2001 – Present | Board of Directors, National Alliance of the Mentally Ill – National, Arlington, Virginia Chair - Child and Adolescent Policy Committee |
| October, 2001 | Chairman – Mental Illness Awareness Week Program, NAMI, Beaver County |
| Dec 2001 – Present | Consultant, University of Illinois – Self Determination Workgroup |
| January 2002 | Consultant, University of Maryland, Grant to develop psychiatric capacity evaluation scale |
| July 2002 – Present | Treasurer, Pittsburgh Psychiatric Society |

162

1

2

3

4

5            IN THE UNITED STATES DISTRICT COURT FOR THE
                    MIDDLE DISTRICT OF PENNSYLVANIA

6                            - - - - -

7
        KEITH I. SCHORR and        ) CIVIL DIVISION
8       SUSAN SCHORR,              )
                                   ) No. 1:CV-01-0930
9            Plaintiffs,           )
                                   ) Telephonic Deposition
10                                 ) SUZANNE VOGEL-SCIBILIA,
             vs.                   )   M.D., (VOLUME II)
11                                 )
                                   ) Called on Behalf of
12      WEST SHORE REGIONAL        )   the Defendant
        POLICE COMMISSION,         )
13      HOWARD DOUGHERTY,          ) Counsel of Record for
        CUMBERLAND COUNTY,         )   this Party:
14      and HOLY SPIRIT            )
        HOSPITAL,                  ) Greg Hauck, Esq.
15                                 ) Montgomery, McCracken,
             Defendants.           )   Walker & Rhoades
16                                 ) 123 South Broad Street
                                   ) Philadelphia, PA  19109
17
                             - - - - -
18

19
20
                           CERTIFIED COPY
21
                           NOT AN ORIGINAL
22

23

24

25

167

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2          MR. PENNINGTON:  Yes.
 3          MR. HAUCK:  John?
 4          MR. YANINEK:  Yes.
 5          MR. HAUCK:  Let me just ask a
 6  question.  This is a question for the court
 7  reporter.  I assume you cannot identify who is
 8  talking; is that correct?
 9          COURT REPORTER:  I sort of can
10  from knowing you guys from Friday night.
11          MR. HAUCK:  I'm sorry, you said
12  you could?
13          COURT REPORTER:  Right.  I'm
14  familiar with the voices.
15          MR. HAUCK:  Okay, great.
16               -----
17             EXAMINATION
18               -----
19  BY MR. HAUCK:
20      Q.  Could you put a copy of your report in
21  front of you.
22      A.  My report?  Hello?
23      Q.  Yes, I'm still here.
24      A.  Do you mean my letter?
25      Q.  Yes.
```

168

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2      A.  Yes.
 3      Q.  This is the document that has
 4  preliminary report on it?
 5      A.  Yes.  Let me just try to get it.  Okay,
 6  I have it here.
 7      Q.  Now toward the middle of the page on
 8  the first page it says preliminary report, do
 9  you see that?
10      A.  Yes.
11      Q.  Why does it say preliminary report?
12      A.  Because I was asked to give the report
13  on very short notice.  I was initially told I
14  had one deadline, and so I usually write a
15  longer letter, and so I wrote one with less of
16  the specifics in it because I had to do it
17  fairly quickly.  And we had a typist, you know,
18  she is not a medical person, and there is a
19  better chance of having errors or need a
20  revision or spelling or other things so I tried
21  to do a preliminary report just to try to get
22  something to Mr. Pennington and -- Attorney
23  Pennington and Attorney Williams -- as soon as
24  possible.
25      Q.  Do you have any intention of providing
```

169

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  a supplemental report?
 3      A.  The only thing I assume I'm doing is my
 4  deposition and the notes that were things for
 5  here, but, no, everything that I've shown I
 6  assume is what I'm supposed to show.  I didn't
 7  know that I could do more than what I've
 8  already done and Friday night.
 9      Q.  Okay.  Doctor, have you ever had any
10  training in law enforcement?
11      A.  In law enforcement?
12      Q.  Yes.
13      A.  No.  I've done work in jail settings as
14  a psychiatrist, and I have gone out and done
15  crisis with police officers in the community on
16  a couple occasions, so I have an understanding
17  of the police, and I interact with them quite a
18  bit under the context of 302s and other kinds
19  of things.  Many times I want to go to the
20  house of someone that I'm treating, which most
21  psychiatrists won't do, and it's a difficult
22  situation, and there may be some problems, and
23  I don't want them to interface only with the
24  police, so I go out there, and I've interacted
25  with them in those circumstances, but have I
```

170

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  been trained as a police officer, no.
 3      Q.  The work that you have done in
 4  connection with police officers, would you
 5  consider that to be work in the law enforcement
 6  area?
 7      A.  I consider it to be in the forensic
 8  psychiatric area.
 9      Q.  Okay.
10      A.  But I wouldn't say that I have done law
11  enforcement, no.
12      Q.  Have you had any training in law
13  enforcement?
14      A.  No.
15      Q.  Have you ever taken any law enforcement
16  classes?
17      A.  No.
18      Q.  Have you ever worked for a police
19  department?
20      A.  No.
21      Q.  Have you ever taught any classes
22  involving law enforcement?
23      A.  I have taught classes in psychiatric
24  aspects of law enforcement and crisis
25  intervention for people in the community that
```

171

1  S. Vogel-Scibilia - by Mr. Hauck
2  interface with law enforcement.  I have given
3  talks and lectures about this around the
4  country, but I wouldn't say that I've ever
5  given, like a course to an academic academy of
6  police officers.  I've certainly taught police
7  officers, and I've done that a fair amount.
8  Q.  Okay.  The courses that you've given to
9  police officers, are they courses in which some
10 police officers happen to be there or are all
11 the students in the class police officers?
12 A.  The students -- and it's not like a
13 class, like a formal class like I teach like
14 something at Community College.  What I do is I
15 teach NAMI, the National Alliance for the
16 Mentally Ill.  Many times there will be people
17 who are involved in forensic issues globally.
18 You'll have the case workers who do outreach
19 with people, you know, that have legal charges,
20 and we have like lawyers and we have police
21 officers and then we'll have other advocates.
22 That's more the kind of milieu that I have.
23 Q.  How often have you taught these types
24 of classes?
25 A.  For forensic stuff, probably, maybe a

172

1  S. Vogel-Scibilia - by Mr. Hauck
2  couple times a year that there would be a lot
3  of content in my talks.  My talks are more
4  general because I start out talking about what
5  is mental illness and how do you handle someone
6  who has mental illness and then I get into
7  maybe more specific issues around different
8  things.  I've given those kinds of talks -- I
9  started out giving those talks probably in the
10 early '90s but only a couple a year.
11 Q.  Let me cut you off a second.  The only
12 thing I'm interested in right now are classes
13 that you've taught that involve law
14 enforcement.
15 A.  Only?  You mean only law enforcement?
16 Q.  No.  Classes that you taught that
17 involve any aspect of law enforcement.
18 A.  No, not in that way, no.
19 Q.  So you haven't taught any classes that
20 involve law enforcement?
21 A.  Not that are specifically devoted only
22 to law enforcement issues, no.  I've taught
23 courses, again, about persons who have
24 psychiatric illness and what happens to them in
25 the community, how to interact with them so

173

1  S. Vogel-Scibilia - by Mr. Hauck
2  that you don't escalate them -- the same things
3  that I've been giving my testimony about today
4  -- how to interact with them so you don't
5  escalate them, how do you end up taking care of
6  them safely, maintain their constitutional
7  rights, not having adverse consequences to the
8  people involved with them as well as themselves
9  because of reckless behavior on the part of
10 other people that are like law enforcement
11 officers or lawyers or crisis care workers or
12 ICMs.  Anything like that.  Those kinds of
13 things I give a lot of talks about.  But do I
14 specifically talk about aspects of like when
15 someone can be arrested or how you throw
16 handcuffs on people or things like that, no, I
17 do not do that.
18 Q.  Have you taught classes about how law
19 enforcement officers should treat a person with
20 an X disability?
21 A.  Yes, that has come up in my talks, yes.
22 Q.  Okay.  Now that's really what I want to
23 focus in on.  How often have you spoken on that
24 topic?
25 A.  Again, it would not be that commonly.

174

1  S. Vogel-Scibilia - by Mr. Hauck
2  I would say maybe once or twice a year.
3  Q.  Once or twice a year you've taught a
4  class and that has been addressed in the class?
5  A.  Yes.  It might be more than that, but
6  I'm being conservative in my estimate because I
7  don't want to overestimate things for you.
8  Q.  How many years have you provided
9  teaching on that?
10 A.  I provided teaching, just starting out
11 though, it probably wasn't that topic.  If
12 you're thinking when that topic may have come
13 up, I would say maybe starting in maybe '91 or
14 '92 maybe.
15 Q.  Okay.  Now the nature of your
16 instruction, is it specifically geared toward
17 law enforcement individuals or is it more
18 geared towards anyone who is dealing with a
19 person with a disability?
20 A.  When I make those comments, it's geared
21 to discuss for people who may be on the scene
22 when law enforcement is called and that would
23 include law enforcement of course, but it could
24 be paramedics -- I'm trying to think what else,
25 you know -- nurses, ICMs, intensive case

175

1        S. Vogel-Scibilia - by Mr. Hauck
2  managers, various things like that.
3     Q.  Okay.
4     A.  You have to realize, I mean, I do
5  psychiatric work pretty much constantly.  I
6  mean, it's not only my job, it's kind of, you
7  know, the thing that takes up most of my spare
8  time, too.  So pretty much anything that you
9  ask me have I given a talk on something, I
10  probably have to some degree or another.  I
11  mean, because there's nobody out here to give
12  these kinds of talks.  It's a very small club,
13  so I get asked to do all different kinds of
14  stuff.
15     Q.  Okay.  Do you have any training with
16  respect to the Americans with Disabilities Act?
17     A.  I know generally what it entails, yes.
18  I end up advising employees --
19     Q.  Doctor, one thing that I think is in
20  all our best interest, and I want to hear what
21  you have to tell me, but try to just respond to
22  the question that I'm asking you.  Okay?
23     A.  I have no other training other than
24  what other physicians get.
25     Q.  And explain to me what that training

176

1        S. Vogel-Scibilia - by Mr. Hauck
2  is?
3     A.  The training is covered in like
4  continuing medical education classes.  It comes
5  up in psychiatric lectures, and I use the ADA
6  in my work.
7     Q.  How so?
8     A.  Well, a lot of times my patients are
9  not having their ADA rights addressed so I end
10  up having to talk to employers and tell them,
11  you know, you can't give them warning letters
12  because they used their Family Medical Leave
13  Act and, you know, take a day off because
14  they're sick and you can't say that they have
15  to do some type of remediation or things like
16  that.  Or I explain to them that the kind of
17  disability my patient has is akin to the same
18  kind of medical disabilities that they are more
19  familiar with like, you know, blindness or
20  being in a wheelchair or having a heart attack
21  and having cardiac issues.  Those kinds of
22  things.  It is a lot of, like, awareness kinds
23  of issues and education.
24     Q.  Okay.  Do you consider yourself an
25  expert as to what the ADA requires?

177

1        S. Vogel-Scibilia - by Mr. Hauck
2     A.  I think I have practical understanding
3  for people in the community.  Do I think that I
4  have, you know, some type of special knowledge
5  and could I speak extensively on the ADA, no, I
6  don't think so.  I have the amount of knowledge
7  I need to practice psychiatry in the community
8  and to advise other people who are ignorant of
9  the ADA about generally what it entails.
10     Q.  And with respect to this case, are you
11  offering expert opinions as to what the ADA
12  requires?
13     A.  I think that I can offer an expert
14  opinion about what the ADA requires for people
15  in the community, yes, because that's what I
16  end up doing every day, is telling employers
17  what you did you shouldn't have done or I also
18  tell employers sometimes I think their plan for
19  addressing the ADA needs of my clients are
20  extremely good.  So I certainly render opinions
21  about that, about peoples' ADA rights in the
22  community fairly commonly.
23     Q.  I'm just asking with respect to this
24  case?
25     A.  Yes, yes.  I think this case -- I mean,

178

1        S. Vogel-Scibilia - by Mr. Hauck
2  this case occurred in the community, but, I
3  mean, do I have an academic appointment or do I
4  do research on the subject, no.
5     Q.  So in this case you are offering expert
6  opinion what the ADA requires?
7     A.  I assume so, yes.
8     Q.  Well, I don't want you to guess.
9     A.  No -- I mean, I assume that was part of
10  what I was expected to do because I mentioned
11  in my letter that I thought that his ADA rights
12  were not upheld so I assume that's part of my
13  testimony and is going to be part of your
14  questioning of me is what I meant.  I already
15  told you what I do about the ADA.
16     Q.  So you are offering an expert opinion
17  with respect to what the ADA required in this
18  case?
19     A.  Yes.  The violation of the ADA is a
20  very simple and basic violation, sir.  It's not
21  a gray zone.  Okay?
22     Q.  Okay.
23     A.  So I don't think that this takes a lot
24  of expertise other than knowing what the ADA is
25  to say that there was a violation.

Case 1:01-cv-00930-YK   Document 115   Filed 05/07/2003   Page 24 of 33

**179**

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2     Q.  Do you have a license to practice law?
 3     A.  No, absolutely not.
 4     Q.  Have you ever taken any legal classes?
 5     A.  No.  I have served as a lawyer for -- I
 6  have a patient in my practice who is very
 7  severely psychiatrically ill, and he is
 8  completely unable to work and was getting
 9  notices because his wife was claiming that he
10  couldn't pay child support, but the guy
11  couldn't work.  I mean, he was bringing in, I
12  think, $20 a month, and his sister was
13  supporting him.
14          What happened was that he came in one
15  day into my office and said this is the last
16  time you're going to see me because they're
17  going to lock me up for being a deadbeat dad.
18  I said what are you talking about, and he
19  showed me legal paperwork.  I guess this had
20  been going on for years and years and I wasn't
21  aware of this.  So he was completely unable to
22  represent himself and also completely unable to
23  find a lawyer in the community to represent him
24  because he was so psychiatrically ill so I
25  showed up in court and represented him and got
```

**180**

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  the whole thing dismissed.  I didn't have a
 3  legal degree.  I just came in and said that I
 4  was just a concerned interested party, and I
 5  actually got the case taken care of with no
 6  legal degree.  Besides that case, I think I may
 7  have had to come back once more for him and
 8  interact with the other lawyer, but besides
 9  that, I have done no legal work.
10     Q.  Prior to representing that individual,
11  did you obtain a license to practice law?
12     A.  No.  I told Judge Waco when I came in
13  here to Beaver County that I was just a
14  concerned person, and I was concerned that he
15  would be unable to represent himself and he
16  would be incarcerated because he was in arrears
17  for these payments, and essentially I put
18  myself on the stand and then they dismissed the
19  whole thing.
20     Q.  Have you ever given any lectures on the
21  requirements of the ADA?
22     A.  Not on the specific requirements other
23  than the philosophy and the spirit of the ADA,
24  no.
25     Q.  Have you ever written anything about
```

**181**

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  the requirements of the ADA?
 3     A.  No, I don't think I have.
 4     Q.  Are you offering an opinion in this
 5  case as to whether Officers Berresford and Hart
 6  properly acted in their capacities as police
 7  officers in their dealings with Ryan Schorr?
 8     A.  I'm not sure what that question means.
 9  What I'm stating is that Officers Hart and
10  Berresford had inadequate knowledge about
11  psychiatric consumers, psychiatric patients and
12  acted in such a manner that they further
13  escalated his physical aggression towards them
14  and they were completely unnerved because of
15  this and acted in a way that caused his death
16  that could have been prevented.
17     Q.  Okay.
18     A.  I think that they were -- frankly, my
19  opinion is that they were as much a victim of
20  this whole circumstance as Ryan Schorr was, and
21  I understand that the plaintiffs, since they
22  did not list them in the suit, acknowledge that
23  they were also, you know, severely injured by
24  this lack of training and understanding that
25  the larger police community, you know, their
```

**182**

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  superiors and other people who would decide
 3  training and curriculum such that they were not
 4  named in the suit.
 5     Q.  Okay.  Do you have your report in front
 6  of you?
 7     A.  Yes, I do, sir.
 8     Q.  Okay.  Could you focus on the second
 9  sentence of your report.  I'll read it.  It
10  says, I am the medical director of a local
11  mental health clinic in an area of Pennsylvania
12  similar to Cumberland County.  Do you see that?
13     A.  Yes.
14     Q.  In what sense is the area of
15  Pennsylvania that you're in similar to
16  Cumberland County?
17     A.  Well, it's not incredibly urban.  It's
18  not like Philadelphia or Pittsburgh proper, and
19  it's certainly not rural like Potter County and
20  Elk County.  We are close to more concentrated
21  population centers like they're concentrated
22  close to Harrisburg, in the Harrisburg area,
23  and we also share the same lack of, like,
24  access to psychiatric care.
25          You know, throughout Pennsylvania it's
```

Case 1:01-cv-00930-YK Document 115 Filed 05/07/2003 Page 25 of 33

195

1       S. Vogel-Scibilia - by Mr. Hauck
2    Q. Did you see anything in the records
3 that led you to believe that Officers
4 Berresford and Hart were aware that Ryan Schorr
5 had ingested illegal drugs at the time that the
6 officers were executing the 302 warrant?
7    A. Let me think about that for a minute.
8 I don't think that they would have had any
9 direct evidence of that, but police officers
10 who work with people with mental illness and
11 have adequate training know that people with
12 bipolar disorder and mental illness oftentimes
13 are under the influence of chemicals and so you
14 have to take that into account. I think
15 because of their lack of training and
16 understanding, my opinion would be, reading the
17 records and their deposition, that they didn't
18 know what they were getting into whenever they
19 entered the house the second time at all. And
20 that is part of the issue about my comment
21 about the issues of the West Shore Police
22 Department and their training.
23     So my assumption would be based on all
24 the information that I've gathered in this case
25 was that Officers Berresford and Hart had the

196

1       S. Vogel-Scibilia - by Mr. Hauck
2 incident that day take them totally by
3 surprise.
4    Q. Did you see any evidence in the records
5 that they did know that Ryan Schorr had
6 ingested illegal substances at the time they
7 were executing the 302 warrant?
8    A. My statement is that if they had been
9 adequately trained, they should have prepared
10 for that possibility, but I believe from
11 reading the records, that they were clueless
12 about it because of the issues about their lack
13 of training and understanding.
14    Q. Okay. I'm not asking your opinion as
15 to whether they should have known that it was
16 possible that Ryan Schorr could have used
17 illegal substances. I'm asking if you saw
18 anything in the record which indicated that the
19 officers did know that Ryan Schorr used illegal
20 substances at the time they executed the 302
21 warrant.
22    A. I have no evidence that anyone told
23 them that because there were so many bad
24 communication issues in this case. If you're
25 asking me that specific question, I would say

197

1       S. Vogel-Scibilia - by Mr. Hauck
2 that I don't think they did. The one police
3 officer talked to the mother, but he didn't
4 really gather a lot of information from what I
5 saw in his rendition of that so that probably
6 he did not know that, no. But I can't say for
7 sure. I don't know what that conversation
8 entailed.
9    Q. Let me focus your attention to the
10 third paragraph of your report, the second
11 sentence, and I'll read that. It says, there
12 are cardinal rules about how to engage someone
13 with acute manic symptoms. Do you see that?
14    A. Yes.
15    Q. How many cardinal rules are there?
16    A. That is something that if you would
17 depose different experts, you would get answers
18 along the same lines, but I think that I
19 haven't seen specific directives that are
20 followed by all mental health care
21 professionals about engaging people with acute
22 psychosis. There are many common rules.
23    Q. Let me ask you, in your opinion, how
24 many rules are there?
25    A. I can go over them. I didn't count

198

1       S. Vogel-Scibilia - by Mr. Hauck
2 them up, but I could go over them.
3    Q. Okay. Then what I would like you to do
4 is just quickly identify each rule and then
5 we'll come back and you can explain each one,
6 but right now I would like to just get a list
7 of the rules. Okay?
8    A. Okay.
9    Q. Can you do that?
10    A. Sure.
11    Q. Okay. Go ahead.
12    A. The first issue is the issue of space.
13 The first is the issue of control.
14    Q. I am sorry. Is space and control the
15 same?
16    A. No.
17    Q. So the first is space and the second is
18 control?
19    A. Right.
20    Q. Go ahead.
21    A. The third is tenor of the conversation.
22    Q. Okay. Go ahead.
23    A. The third case is empathy. The fourth
24 is safety. And the fifth, okay, is
25 practicality. These are my summation of what

Case 1:01-cv-00830-YK   Document 115   Filed 05/07/2003   Page 26 of 33

**199**

1        S. Vogel-Scibilia - by Mr. Hauck
2    is commonly out there.
3        Q.  You gave me six.  Are there any others?
4        A.  Those probably carry a fair amount of
5    weight.
6        Q.  Are there any others?
7        A.  Not that I can think of at this moment.
8        Q.  The first one you mentioned was space;
9    is that right?
10       A.  Yes.
11       Q.  Could you explain to me what the
12   cardinal rule of space is?
13       A.  The issue of space is that someone who
14   is psychotic and agitated perceives someone as
15   being closer than they really are.  So if your
16   manic, sir, and I'm standing three feet away
17   from you, you perceive me as being far closer.
18   I might appear to be right up in your face,
19   okay.  So whenever you're engaging someone,
20   when you don't realize what they're going to do
21   at this point, you don't have a sense of being
22   able to get close enough to touch them or to
23   get them to do something, when you're first
24   approaching and engaging someone, you keep your
25   distance, okay.  You don't move fast, okay.

**200**

1        S. Vogel-Scibilia - by Mr. Hauck
2    You keep your hands in plain view, okay.  You
3    let them have some space and distance.  You
4    also do not appear to crowd them in, okay.
5        For instance, if you're in a situation
6    where someone maybe is dangerous, you can make
7    a circle around them that has some openings
8    between them and give them the sense that
9    you're not coming in with them and you can give
10   them some distance between you and them and
11   they can't escape, but they also are not going
12   to feel like you're going to jump them, okay.
13   So it's like everything when you're manic is
14   magnified.  So if you're coming at them, you
15   actually appear to be coming at them faster
16   than you really are.  If you're standing four
17   feet away from them, you appear to be right up
18   on top of them, okay.  That's the first thing.
19   You don't come rushing in.  You don't come
20   right up next to them.
21       Q.  Okay.  Are you done explaining that
22   one?
23       A.  That is the basic stuff.  I could
24   elaborate more.  I could talk for hours, but
25   I'll keep it to this.  It's Sunday morning.

**201**

1        S. Vogel-Scibilia - by Mr. Hauck
2        Q.  The second rule you mentioned was
3    control.
4        A.  Right.
5        Q.  Could you explain that to me?
6        A.  You firmly but politely state your
7    issue, and you never go into a situation unless
8    you have the ability to keep yourself safe and
9    the patient safe, okay.  Control really comes
10   into getting more information, having a lot of
11   back-up, having -- if you can't do it, if you
12   don't have a police officer who is trained in
13   this, having maybe a mental health care
14   professional with you to be able to talk to
15   this person, okay.  So you don't go into a
16   situation where you do not have adequate means
17   to do what you have to do and keep yourself and
18   the patient, the consumer, safe.
19       Q.  Okay.
20       A.  I'm still going.
21       Q.  I'm sorry.
22       A.  Also, you want to have ways to be able
23   to take care of the situation in the least
24   noxious and least damaging and least abusive
25   and least threatening way.  In this issue, they

**202**

1        S. Vogel-Scibilia - by Mr. Hauck
2    came in with lethal force.  They had --
3        Q.  I'm just asking you to explain the
4    rules right now.  I'm not asking you to apply
5    them to what happened.
6        A.  Okay, okay.  So, for instance, with any
7    police officer, you want to have levels of ways
8    of subduing someone.  The obvious first way
9    would be manually.  Someone is out of control
10   that you could manually restrain them such that
11   nothing happens to them that is bad and nothing
12   happens to you.  Then if you have ways, like
13   weapons in a sense, that you would start with
14   stuff that is not permanently damaging or
15   painful or threatening, and you would have to
16   obviously have some type of ascending limits of
17   weapons, but that's another issue, too.
18       In psychiatric care units where you
19   have, people that are probably much more
20   agitated on the average than the general
21   community because they keep, in a sense, all
22   the people that are severely agitated, there
23   isn't a single psychiatric care worker on an
24   inpatient unit that has a gun or a knife or
25   anything like that.  So if you have appropriate

203

1       S. Vogel-Scibilia - by Mr. Hauck
2  numbers of people, okay, and you can ascertain
3  that the person does not have, you know, some
4  way to inflict significant harm, you know -- I
5  mean people sometimes get things like knives on
6  a unit but, you know, they don't have an AK47
7  -- usually sufficient numbers of people can
8  take care of any situation just with physical
9  manual restraint.
10      Q.  Are you finished?
11      A.  Yes.
12      Q.  The third cardinal rule you mentioned
13  was tenor of the --
14      A.  Conversation.
15      Q.  -- conversation.  Could you explain
16  that cardinal rule to me?
17      A.  You don't yell at someone.  You don't
18  come in and say look, buddy, this is what you
19  do.  You don't say, okay, buddy, you are coming
20  with us.  Do you know what I mean?  You don't
21  do that.  You have very soft speech.  Again,
22  with somebody manic that they're going to -- on
23  some level they're going to crave louder
24  conversations, louder noise, but louder noise
25  also is escalating.  So like him playing that

204

1       S. Vogel-Scibilia - by Mr. Hauck
2  music up there -- well, I'll get to that in a
3  minute -- but anyway, they'll crave louder
4  noise on some level, but louder noise escalates
5  them.  You want to have soft speech.  You want
6  to have slow speech.  You want to be gentle
7  about your speech.  You want to logically say
8  to them something along the lines of we have
9  these concerns.  It's very important that you
10  do things.  And that usually works very well.
11  And that very well can de-escalate a difficult
12  situation.
13      The other thing is that you don't want
14  necessarily to make it appear as if they have
15  no choices, okay, in the conversation.  You
16  want to appear as if you're trying to engage
17  them in something cooperative.  So oftentimes
18  what will be done is you'll give them a choice
19  between two different things.  And those two
20  different things may be something that really
21  isn't that important to you but gives them the
22  appearance that you're trying to negotiate with
23  them.
24      For instance, let's say you're in an
25  emergency room and you're telling someone that

205

1       S. Vogel-Scibilia - by Mr. Hauck
2  they have been involuntarily committed, okay.
3  And, of course, they don't want to be
4  involuntarily committed.  You could say
5  something like, look I know you're really upset
6  and everything about this, and I just have to
7  tell you that this is a legal commitment and
8  you have to be committed, but could I get you
9  something to eat?  Would you like a glass of
10  orange juice or would you like a can of
11  decaffeinated pop?  And sometimes if you offer
12  them a choice between a glass of orange juice
13  and a glass of decaffeinated pop, then they'll
14  choose that and they'll de-escalate and then
15  you have somebody go get them the orange juice
16  or the pop, okay.
17      Actually, those kinds of things, giving
18  them some control and some choice in the
19  matter, even if it's a negligible choice.  If
20  you have somebody that is agitated and you
21  enter a room, you say could we sit down and
22  talk about this?  Would you like to sit on the
23  bed or would you like to sit in a chair?
24  Something like that starts off the conversation
25  with giving them some type of choice.  It's a

206

1       S. Vogel-Scibilia - by Mr. Hauck
2  whole different tenor than I'm the police
3  officer and I'm in control and this is what I'm
4  doing, which is against generally what law
5  enforcement officers are trained to do.  That's
6  why they need special training.
7      Q.  The fourth cardinal rule that you
8  mentioned was empathy?
9      A.  Yes.
10      Q.  Could you briefly explain to me what
11  that cardinal rule is?
12      A.  I think it means that you have to
13  communicate to them the idea that you care
14  about them, that you don't want anything to
15  happen to them, you are concerned about them,
16  and you have to communicate that genuinely.  I
17  mean, you want to make eye contact with them,
18  you want to look in their eyes.  You don't want
19  to stare at them though.  If looking at them
20  directly to be empathic seems to agitate them,
21  the two of you can then look at some other kind
22  of thing.  Sometimes I'll sit with my back to
23  the same wall the patient is sitting at and
24  there is some distance between us and we'll
25  appear to both look straight ahead.  This tends

207

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2   to work better with someone like, let's say,
 3   with schizophrenia or something like that who
 4   is extraordinarily paranoid.
 5          People with bipolar disorder generally
 6   like to look at you, okay.  But, I mean, you
 7   know, you can do that as well.  There's all
 8   different kinds of techniques that you can do.
 9   You know, any training that someone would get
10   would probably get other practical suggestions
11   maybe than the ones that I'm giving you, but
12   I'm giving you some general kinds of stuff.
13   You want to have the issue of empathy.
14       Q.  Okay.  The next cardinal rule that you
15   mentioned was safety?
16       A.  Yes, safety.
17       Q.  Could you briefly explain what that
18   cardinal rule is?
19       A.  It's really first do no harm, okay.
20   Safety is of the primary importance.  You want
21   the people involved to be safe and you want the
22   patient, the consumer, to be safe.  As I said,
23   sometimes you have to leave an exit to the door
24   or some space to the door so that if for some
25   reason it is safe to let them get out of the
```

208

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2   room, okay -- there may be situations where
 3   maybe you're just talking to someone and you're
 4   not trying necessarily to pick them up or maybe
 5   even if there's other people outside, if you
 6   give an opening to the door, they'll feel more
 7   secure.  They won't feel like they're being
 8   boxed in.
 9          You also want to make sure that you
10   don't violate other kinds of rules or you don't
11   escalate the person maybe with comments.  For
12   instance, you wouldn't say your mother says you
13   are not going to work and you're doing X, Y and
14   Z and she is really angry with you.  That's not
15   what you would say, you know.  You want to be
16   able to protect their safety.  If they have any
17   kind of weapon or any kind of thing that could
18   be used, you want them to put it down.  You
19   don't come near them or negotiate or try to
20   subdue them until you've worked to get them to
21   relinquish whatever they have.
22          I have that happen a lot of times on
23   the phone.  I'll have a patient call me and
24   say --
25       Q.  Doctor, let me cut you off.  What I
```

209

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2   want right now is just a brief explanation.  I
 3   understand what you've said.  I don't need
 4   examples unless you feel as if you haven't
 5   fully explained your answer.  I'm comfortable
 6   with your answer, okay?
 7       A.  Okay.
 8       Q.  So I'm going to move on.
 9       A.  Okay.
10       Q.  The next cardinal rule was
11   practicality.
12       A.  Yes, practicality.
13       Q.  Could you just briefly explain what
14   that cardinal rule is?
15       A.  I mean, you have to be logical.  You
16   have to know what is possible and what is not
17   possible.  You have to be able to be flexible
18   and kind of roll with the situation.  I mean,
19   you may come in with an understanding that
20   you're going to do X, Y and Z or you may decide
21   I've got other things to do and I'm going to do
22   this in 10 minutes, and you may end up having
23   to spend 40 minutes there, okay.
24          With mental health issues, there isn't
25   a speed to it, okay.  You have to gather a lot
```

210

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2   of information.  You've got to know what you're
 3   going into.  You have to be able to take some
 4   time to negotiate things.  It's just like when
 5   you've got somebody up on a bridge or up on a
 6   roof or, you know, got a gun to their head or
 7   something like that, you have to be able to
 8   take some time, and you have to realize the
 9   plan you go in with may not be the plan you end
10   up with.
11       Q.  Doctor --
12       A.  And sometimes you have to do something
13   that may not even seem like it's going to work.
14   Do you know what I mean?  But it's not going to
15   be harmful and it's worth a try and it will
16   work.
17       Q.  Okay.  To whom do these cardinal rules
18   apply?
19       A.  I think for anyone who is working with
20   mentally ill people.  This is the context of
21   what I talk about.  These kinds of things.  You
22   can see I just kind of spewed them off without
23   any effort.  I wasn't really prepared to
24   specifically list those things, so if I can
25   spew them off with absolutely no thought at
```

223

```
1            S. Vogel-Scibilia - by Mr. Hauck
2    she doesn't understand.  She is saying they are
3    bad questions.
4            THE WITNESS:  That's correct.
5    Attorney Pennington is correctly describing
6    what I said.
7            MR. HAUCK:  Okay, great.  If you
8    don't understand, ask me to restate the
9    question, and I'll do that.
10           THE WITNESS:  I understand every
11   question you've asked me.
12           MR. HAUCK:  If you think the
13   question is bad, don't answer it.
14           MR. PENNINGTON:  If you can
15   answer it without response, Doctor.
16           THE WITNESS:  I think it would be
17   misleading for me to answer a bad question,
18   sir.
19      Q.  Is it your opinion that the cardinal
20   rules may not apply in a situation involving
21   police and a person with a mental illness where
22   safety is of a concern?
23           MR. PENNINGTON:  I'm going to
24   object to that.  Police officers themselves may
25   create the safety problems.
```

224

```
1            S. Vogel-Scibilia - by Mr. Hauck
2       A.  I'm not sure what kind of safety.
3    Could you give me an example of safety?
4       Q.  Right now I'm just trying to find out
5    if it's possible that the cardinal rules won't
6    apply, and then once you answer that, if your
7    answer is yes, they might not apply, then we
8    can go into some examples.  But right now I'm
9    just trying to find out if there could be a
10   situation where the cardinal rules might not
11   apply.
12      A.  Where one or more of the cardinal rules
13   may not apply, yes.
14      Q.  Could you explain to me an instance
15   where one or more of the cardinal rules may not
16   apply?  Just give me one example.
17      A.  I go back to the AK47.  You have
18   anybody that has an AK47 and is shooting into a
19   crowd, then you have to stop the shooting with
20   the AK47.  You may not have the ability to have
21   a conversation of the tenor that I explained.
22   You may not have the empathy that I previously
23   mentioned.  You may have to disable the person
24   who is shooting into the crowd, but you should
25   use the least forceful means to accomplish what
```

225

```
1            S. Vogel-Scibilia - by Mr. Hauck
2    you need to accomplish for safety.
3       Q.  Now, the opinions that you just gave,
4    what is the source of those opinions?  Is it
5    derived from a law?  What is it derived from?
6       A.  I think it comes from common sense
7    practicality of working with people.  I mean, I
8    understand police officers are trained to use
9    deadly force.  I know that.  But I think that
10   you have to use your deadly force judiciously.
11   That's why you have all the procedures and
12   protocols and inquiries that are done in law
13   enforcement in this day and age.  I think that
14   those things have to be -- the rules that you
15   have have to be applied with sensitivity to the
16   fact that you have people who are disabled
17   under the American for Disabilities Act and
18   have special needs and, at times, need special
19   accommodations.  But I acknowledge also that if
20   you have a significant safety issue, you may
21   not have the luxury of doing what I went
22   through when I went through the six cardinal
23   rules.  I don't think any of that applies in
24   this case, but I would put that on the record.
25      Q.  You said that your opinions as to what
```

226

```
1            S. Vogel-Scibilia - by Mr. Hauck
2    context the cardinal rules would apply is
3    derived from common sense.  Are your opinions
4    derived from anything else?
5       A.  Yes, I'm a professional who is an
6    expert witness in how to deal with people who
7    are agitated and have a mental illness,
8    either/or.  I mean, I interact with people who
9    end up not having a mental illness and are just
10   agitated.  I mean, I think if you needed to
11   have someone who is an expert witness in this
12   category, a psychiatrist that does this of the
13   nature of my qualifications would make this an
14   expert opinion about it.
15           MR. PENNINGTON:  I just want to
16   interpose an objection.  She was speaking
17   specifically of the example of the person with
18   the AK47.
19           THE WITNESS:  Yes, that's true.
20      Q.  Is it based on anything other than
21   common sense in your experience as a
22   psychiatrist?
23           MR. PENNINGTON:  Objection.  Are
24   you talking about the AK47 situation or
25   generally?
```

227

1          S. Vogel-Scibilia - by Mr. Hauck
2          MR. HAUCK:  Generally.
3      A.  I'm talking about common known rules of
4  engaging psychiatric patients that is well
5  founded in the literature that is leading to my
6  expert opinion.
7      Q.  That's what I'm getting at.
8      A.  Yes.
9      Q.  What type of literature?  Is it
10  psychiatric literature?
11      A.  Well, psychiatric literature and
12  medical literature, yes.
13      Q.  Anything else?
14      A.  Well, you have issues around the ADA
15  and you also have general issues around common
16  law and common rules in our country and legal
17  rules within our country.  I mean, there are
18  legal statutes about inappropriate treatment
19  and assault and other kinds of things.  I mean,
20  you know the law better than I do, Attorney
21  Hauck, but there are certainly legal statutes
22  around not using deadly force in an
23  inappropriate way.
24      Q.  Okay.  Right now I'm just trying to get
25  at what sources of information certain of your

228

1          S. Vogel-Scibilia - by Mr. Hauck
2  opinions are derived from, and the opinions
3  that I'm curious about are the ones in which
4  you said that the cardinal rules would apply in
5  certain situations.  Now you said that common
6  sense, your experience as a psychiatrist, and
7  then I think you said law; is that right?
8      A.  No.  I also said psychiatric and
9  medical literature.
10      Q.  Okay.  Anything else?
11      A.  I mean, I think that probably covers
12  just about everything.
13      Q.  Okay, great.  Which laws are relevant?
14      A.  I think that psychiatrists have a
15  general understanding of what is appropriate
16  laws in our country that all people subscribe
17  to, okay.  The issues of, you know, your right
18  to your person, the basic Bill of Rights and
19  other kinds of things.  I'm not going to debate
20  law with you I don't know, but we all
21  understand the Bill of Rights, and I
22  understand, and I'm sure you understand the
23  ADA, but I'm not going to argue legal
24  literature with you.  I have a very basic
25  understanding of that compared to you, sir.

229

1          S. Vogel-Scibilia - by Mr. Hauck
2      Q.  What aspect of the Bill of Rights
3  dictates when and when the cardinal rules do
4  not apply?
5      A.  I don't understand that question.  That
6  is way, way too broad.
7      Q.  Okay.  I was asking you about in what
8  circumstances the cardinal rules would apply,
9  and you gave me your opinion as to when and
10  when they don't apply.  And then I asked you
11  what your opinions were based on, and one of
12  the things you told me was that your opinions
13  were based on the Bill of Rights; is that
14  right?
15      A.  Yes.
16      Q.  Okay.  What aspects of the Bill of
17  Rights is your opinion based on?
18      A.  That people have a right to life,
19  liberty and the pursuit of happiness and the
20  Constitution.  I mean, you have a right to be
21  able to be safe in your person and your
22  surroundings without undue influence and
23  damage.
24      Q.  Any other aspects of the Bill of
25  Rights?

230

1          S. Vogel-Scibilia - by Mr. Hauck
2      A.  Well, the ADA gives you the same
3  protection --
4      Q.  Bill of Rights, any other aspects of
5  the Bill of Rights?
6      A.  Well, the whole thing of the Bill of
7  Rights.  You have a right to be able to redress
8  for your complaints.  You are not to be
9  incarcerated unnecessarily or arbitrarily.  You
10  have a right to be able to have legal
11  representation and to have your feelings
12  transmitted.  I mean, all those kinds of
13  things.
14      Q.  Okay.  Anything else other than the
15  ones that you mentioned?
16      A.  No.
17      Q.  Okay.
18      A.  Not that I'm aware of.  I mean, to be
19  able to recite the Bill of Rights at 9:00 on a
20  Sunday morning, I mean, we could probably go
21  into that with further depth if you want to
22  later, but I think that is pretty much what you
23  need.
24      Q.  From those rights that you just
25  mentioned is how you've come to the expert

231

1        S. Vogel-Scibilia - by Mr. Hauck
2 opinion as to when and when the cardinals rules
3 do not apply?
4     A. No, there are other things that I told
5 you about.
6     Q. I'm sorry. That's a good point,
7 Doctor. The Bill of Rights that you just
8 mentioned, that is one of the things that has
9 helped you come to the conclusion as to when
10 and when the cardinal rules do not apply?
11        MR. PENNINGTON: I'm going to
12 object. I don't think she testified to that at
13 all.
14        MR. HAUCK: Okay. That's why I'm
15 asking her the question.
16     A. No.
17        MR. PENNINGTON: You are talking
18 about when and when they don't apply.
19     A. You started talking about the Bill of
20 Rights extensively after I mentioned it as a
21 factor. I mean, the main thing about when you
22 use techniques to be able to treat someone with
23 a mental illness, to be able to keep their ADA
24 rights intact and be able to keep the situation
25 safe for you and for other people, the basic

232

1        S. Vogel-Scibilia - by Mr. Hauck
2 information along that line is in the
3 psychiatric and medical literature, but you
4 don't ignore the Constitution and the Bill of
5 Rights and the ADA as well. I mean, you
6 know --
7     Q. I want to make sure that I understand
8 what you're saying. Is the Bill of Rights one
9 of the sources of information that has helped
10 you come to the conclusion as to when the
11 cardinal rules apply?
12        MR. PENNINGTON: I'm going to
13 object.
14     A. I don't think -- I think that the Bill
15 of Rights and the Constitution and the ADA are
16 something that are a factor in anything in this
17 regard, but I didn't review the Bill of Rights
18 before I looked at these issues because the
19 Bill of Rights and the Constitution are
20 something that we are all commonly living under
21 and aware of. I think that that's a given for
22 all situations. But, I mean, I don't think
23 that you could try to pull something
24 specifically out of the Bill of Rights and then
25 apply it looking and saying this is the

233

1        S. Vogel-Scibilia - by Mr. Hauck
2 deciding factor in using cardinal rules for
3 things.
4     Q. So the Bill of Rights isn't one of the
5 items that helped you come to the conclusion as
6 to when the cardinal rules apply?
7     A. No, it is, but it is not the main
8 issue. The main issue --
9     Q. You said it is just one of the sources.
10     A. It's one of the sources, yes.
11     Q. Got it.
12     A. But it's important. It's a very
13 important source. No one is going to say that
14 the Constitution and the Bill of Rights is not
15 one of the most defining things that we all
16 live under as Americans. I mean, come on now.
17 But on the other hand, the day-to-day
18 application of these kinds of things are things
19 that we all acknowledge and accept and live
20 with every day.
21        MR. PENNINGTON: We've been
22 through this.
23        THE WITNESS: Yeah, you know.
24        MR. PENNINGTON: Excuse me,
25 Doctor. Greg, we've been through this for the

234

1        S. Vogel-Scibilia - by Mr. Hauck
2 last 20 minutes. Do you have any other
3 questions?
4        MR. HAUCK: Yes.
5        MR. PENNINGTON: I think she
6 testified that the Bill of Rights is a factor
7 that she takes into consideration when the
8 cardinal rules may not apply. She said that at
9 least six or seven times.
10        MR. HAUCK: Are you done stating
11 your objection?
12        MR. PENNINGTON: Yes.
13        MR. HAUCK: Great.
14     Q. Doctor, have you ever had any classes
15 on the Bill of Rights?
16     A. Have I had any classes on the Bill of
17 Rights?
18     Q. Yes.
19     A. Yes.
20     Q. Could you identify those classes for
21 me?
22     A. I took a course in business law, and I
23 also took a course in civics, and one of my
24 interests is that I read history extensively
25 and the Bill of Rights and the American

Case 1:01-cv-00930-YK   Document 115   Filed 05/07/2003   Page 32 of 33

235

1     S. Vogel-Scibilia - by Mr. Hauck
2  Constitution and the forming of our country
3  and, you know, issues of federalism versus
4  states' rights and other things, you know,
5  around the early period of our country I've
6  read about.
7     Q.  Do you consider yourself an expert with
8  respect to the Bill of Rights?
9     A.  No, definitely not.
10          MR. PENNINGTON:  I interpose my
11  objection, please.
12     Q.  Okay, one of the other things that you
13  mentioned that your opinions were derived from
14  with respect to when the cardinal rules applied
15  is the ADA; is that right?
16     A.  Yes.
17     Q.  Do you consider yourself an expert with
18  the respect to the ADA?
19     A.  I think we already covered this.
20          MR. PENNINGTON:  I interpose my
21  objection, please.
22     Q.  What was your answer, Doctor?
23     A.  I said that I have information that I
24  use in my everyday clinical practice where I
25  apply the ADA on a daily basis and that I know

236

1     S. Vogel-Scibilia - by Mr. Hauck
2  the ADA, what it entails, especially for
3  consumers with mental illness and other medical
4  disabilities and that I have especially a
5  practical clinical application in the community
6  for it.
7        Am I a law instructor who lectures on
8  the nuances of the ADA, no.  Would I be
9  involved in doing research in the ADA in an
10  academic setting, no.  I certainly wouldn't
11  want to get into an argument about the ADA with
12  someone who's made their life's work of it.
13        But I certainly spend a lot of time
14  educating people and discussing the ADA and
15  fighting for ADA rights for my patients in my
16  practice who end up needing it because there is
17  a lot of lack of understanding in the community
18  about the ADA.
19     Q.  Do you know whether the ADA applies to
20  police officers?
21     A.  I have an understanding that the ADA by
22  law applies to all people who have a mental
23  illness as well as a medical illness and that
24  applies to all people who interface with them.
25     Q.  Okay.  I don't want you to guess.

237

1     S. Vogel-Scibilia - by Mr. Hauck
2     A.  No, I mean, that's how I've always --
3     Q.  Okay.
4     A.  That's been my opinion, and that's what
5  I've talked -- I mean, it applies to teachers,
6  it applies to employers, it applies to lawyers,
7  it applies to access to public facilities, it
8  applies to getting medical care.
9          MR. PENNINGTON:  Doctor, if the
10  answer is yes, just give him yes, and he'll
11  follow-up.
12          THE WITNESS:  Sorry.
13     A.  Yes.
14     Q.  Do you know whether the ADA applies to
15  police officers in the context of when police
16  officers are trying to arrest someone?
17          MR. PENNINGTON:  Objection.  Go
18  ahead and answer, Doctor.
19     A.  I feel that it does, yes.  Based on my
20  reading of ADA, yes.
21     Q.  When you said based on your reading of
22  the ADA, do you mean the reading of the statute
23  itself?
24     A.  Yes.
25     Q.  Have you read anything else with

238

1     S. Vogel-Scibilia - by Mr. Hauck
2  respect to the ADA that has helped you come to
3  that conclusion?
4     A.  I read a lot in the psychiatric
5  literature about the ADA.  I haven't read
6  anything in legal literature about the ADA.
7  But I would use what I've used in the
8  psychiatric literature to base that opinion,
9  yes.
10     Q.  Okay.  Doctor, could you turn to page 2
11  of your report?
12     A.  Sure.
13     Q.  Now the first full sentence at the top
14  there says these rules were not followed both
15  by Holy Spirit and by the West Shore Police
16  Department.  Do you see that?
17     A.  The second page of my report?
18          MR. PENNINGTON:  At the top,
19  first sentence.
20     A.  Yes, I see it.  These rules were not
21  followed both by Holy Spirit and the West Shore
22  Police Department, yes.
23     Q.  Now, when you say these rules were not
24  followed, I'm just going to focus on the West
25  Shore Police Department.  Okay?

271

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  in a protective stance.  Hart was protecting
 3  his officer who was down, and he shot the man
 4  five times.
 5      Q.  Okay.
 6      A.  All six things were violated by Hart
 7  too in this whole issue as well.
 8      Q.  One of the things that you talk about,
 9  Doctor, was Officer Hart's failure to have less
10  lethal force.
11      A.  Yes.
12      Q.  Do you know if Officer Hart is required
13  as a police officer to have less lethal force
14  than what he had?
15          MR. PENNINGTON:  In the context
16  of the 302 or what context?
17          MR. HAUCK:  In this context.
18      A.  Certainly there are other things
19  available and certainly people look at using
20  less lethal means in circumstances.  The idea
21  of whether or not immobilizing devices should
22  be used on airplanes with terrorist situations
23  is certainly available and around.  What the
24  laws are around police officers and what they
25  need to carry, I really don't know.
```

272

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2      Q.  Okay.
 3      A.  But I can tell you that clearly less
 4  lethal means is a common sense kind of thing
 5  with dealing with people in general and
 6  especially with people with mental illness, and
 7  if there had been less lethal means available
 8  to these police officers and had they had
 9  training and had they not acted so recklessly,
10  though I acknowledge it's through their own
11  ignorance, then this whole situation, this
12  whole regrettable avoidable situation for all
13  three people, Officer Berresford, Officer Hart,
14  and Ryan Schorr could have been avoided.
15      Q.  Another thing that you talked about was
16  Officer Hart striking Ryan Schorr with the
17  baton.
18      A.  Yes.
19      Q.  Are you familiar with police
20  regulations that dictate what a police officer
21  should do when one of his fellow officers is
22  under attack?
23      A.  I'm not aware of the specific things.
24  All I'm commenting on -- I understand why
25  Officer Hart did what he did.  I'm just telling
```

273

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  you that that escalated the situation.  That's
 3  my statement.
 4      Q.  Right.  I understand that.
 5          MR. PENNINGTON:  Let her answer
 6  the question.
 7      Q.  I'm asking you if you know the police
 8  regulations, what police regulations?
 9      A.  No.
10      Q.  Okay.  Are you familiar with what the
11  police regulations say with respect to what a
12  police officer should do if one of their fellow
13  officers had been shot?
14      A.  No.
15          MR. PENNINGTON:  Yes or no?
16          THE WITNESS:  I already said no,
17  but you didn't hear me because of the banging
18  and the background static.
19      Q.  Are you familiar with what police
20  regulations say that a police officer should do
21  when he's in fear of his life?
22      A.  No.
23      Q.  All right.  Let me focus your attention
24  to Page 2 of your report, the last sentence of
25  the first paragraph on that page.  It starts
```

274

```
 1          S. Vogel-Scibilia - by Mr. Hauck
 2  with he had opportunity, do you see that?
 3      A.  One second.  Yes.
 4      Q.  I'm going to read that sentence.  It
 5  says he -- I think referring to Ryan Schorr --
 6      A.  Yes.
 7      Q.  -- had an opportunity to shoot firearms
 8  and instead struck the officers with them
 9  suggesting he had no clear lethal intent.
10      A.  Yes.
11      Q.  Do you see that?
12      A.  Yes.
13      Q.  Do you know if Ryan Schorr shot either
14  one of the officers?
15      A.  I see no evidence in the record that he
16  intentionally shot anyone other than they were
17  fighting over the gun and Officer Berresford
18  perceived that him getting his finger on the
19  trigger is what caused the gun to go off.  In a
20  situation like that, you can't really say that
21  the patient was willfully trying to shoot the
22  police officer.  Okay?  And there is no doubt
23  that they struggled over the gun.  But if the
24  patient was trying to shoot the police officer
25  in the beginning when they first were
```