ORIGINAL

2 to 4

FILED
HARRISBURG, PA

MAY 1 4 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KEITH I. SCHORR and SUSAN SCHORR,    :
In their own right and as personal    :
representatives of the Estate of RYAN K.    :
SCHORR,    :
   :
          Plaintiffs,    :    No. 1:CV-01-0930
   :
     vs.    :
   :
WEST SHORE REGIONAL POLICE    :    The Honorable Yvette Kane
COMMISSION, HOWARD DOUGHERTY,    :
CUMBERLAND COUNTY, ROBERT    :
GORIL and HOLY SPIRIT HOSPITAL,    :
   :
          Defendants.    :
   :

## PRETRIAL MEMORANDUM OF
## WEST SHORE REGIONAL POLICE COMMISSION
## AND CHIEF HOWARD DOUGHERTY

Pursuant to Rule 16.6 of the Local Rules of Civil Procedure, Defendants West Shore

Regional Police Commission (the "WSPD") and Chief Howard Dougherty, while reserving their

rights to supplement, hereby submit their Pretrial Memorandum.

**A.**     **Statement of Jurisdiction**

Plaintiffs have brought: (1) a claim against both the WSPD and Chief Dougherty under 42 U.S.C. § 1983; and (2) a claim against only the WSPD under the Americans with Disabilities Act. Jurisdiction is vested in this Court by virtue of the presence of a federal question. See 28 U.S.C. § 1331.

**B.**     **Statement of Facts and Contentions of Liability**

This case arises from an unfortunate set of circumstances involving the death of Plaintiffs' son, Ryan Schorr ("Decedent"). For a large part of his life, Decedent suffered from a significant psychiatric illness which severely disrupted his ability to carry out his daily life activities. In November 2000, Decedent's psychiatric condition worsened such that his family and friends believed that a psychiatric evaluation was necessary. On November 18, 2000, after consultation with Decedent's mother, Decedent's housemate completed an application at the Crisis Intervention Unit of Holy Spirit Hospital to have Decedent involuntarily committed pursuant to section 302 of the Pennsylvania Mental Health Procedures Act.

A crisis intervention worker evaluated the application, determined that Decedent presented a clear and present danger to himself or others and caused a warrant to be issued for Decedent's involuntary commitment. After obtaining the warrant, Officers Gary Berresford and Harry Hart of the WSPD went to Decedent's house and transported him to Holy Spirit Hospital, where he was placed in a high security room. When a crisis intervention worker entered Decedent's hospital room, he rushed past her and left the hospital.

Approximately two hours later, Decedent returned to his home. Officers Berresford and Hart were contacted and instructed to return Decedent to the hospital. After arriving at Decedent's house, the police officers entered through a sliding glass door and found Decedent in the doorway of his bedroom dressed only in a long robe. Upon seeing the officers, Decedent

-2-

ambushed them and initiated a violent assault.  During the course of the struggle, Decedent grabbed Officer Berresford's gun and managed to shoot the officer's finger off and then proceeded to attack the officers with a knife, an air rifle and metal pots.  Ultimately, Officer Hart was forced to shoot Decedent.

The shooting of Decedent led to a Grand Jury investigation.  After hearing testimony from 44 witnesses and receiving into the record 180 exhibits, the Grand Jury concluded that Officer Hart exercised sound judgment and that he was justified in using deadly force because it was necessary to use such force to prevent death or serious bodily injury to himself and/or Officer Berresford.

Plaintiffs maintain that the WSPD and Chief Dougherty are liable under Section 1983 and that the WSPD is liable under the ADA.  These claims are based on Plaintiffs' assertion that the WSPD and Chief Dougherty failed to train Officers Berresford and Hart on how to handle the type of incident at issue.  The WSPD and Chief Dougherty vigorously contest this assertion. They maintain that they are not liable because, <u>inter alia</u>, the shooting was entirely justified and because the officers received all of the training that was required under Pennsylvania law, including training relating to the service of involuntary commitment warrants.

**C.**     **Statement of Undisputed Facts**

See Exhibit "A" attached hereto.

**D.**     **Damages**

According to their First Amended Complaint, Plaintiffs seek to recover: (a) general and compensatory damages and (b) reasonable attorneys' fees and costs.

E.    **Witnesses and Experts**

Chief Howard Dougherty
West Shore Regional Police Department
301 Market Street
Lemoyne, PA 17043

Officer Gary Berresford
West Shore Regional Police Department
301 Market Street
Lemoyne, PA 17043

Officer Harry Hart
West Shore Regional Police Department
301 Market Street
Lemoyne, PA 17043

Dr. Theodore J. Siek
Analytic Bio-Chemistries
1680 D. Loretta Avenue
Feasterville, PA  19053

Candace Krzywicki
Cumberland/Perry Drug and Alcohol Commission
Cumberland County Human Services Building
16 West High Street, Suite 302
Carlisle, PA 17013

Dr. Sarah Funke, M.D.
Forensic Pathology Associates, Inc.
1200 S. Cedar Crest Blvd.
2nd Floor GSB
Allentown, PA  18103

Jeffrey Franks, Cumberland County detective
Cumberland County Criminal Investigation Division
One Courthouse Square
Carlisle, PA  17013

Simon Jackson, Cumberland County detective
Cumberland County Criminal Investigation Division
One Courthouse Square
Carlisle, PA  17013

Les Freehling, Cumberland County detective commander
Cumberland County Criminal Investigation Division
One Courthouse Square
Carlisle, PA  17013

Sergeant Guido
Carlisle Police Department
53 W South St
Carlisle, Pennsylvania 17013

Joseph J. Stine (Liability Expert)
J.J.S. Associates, Inc.
2368 Greensward South
Warrington, PA 18976

Dr. Robert Wolf (Damages Expert)
1939 Rt. 70 East
Suite 120
Cherry Hill, PA  NJ  08003

The WSPD and Chief Dougherty reserve the right to call any witness identified by

Plaintiffs, Defendant Holy Spirit Hospital or Defendant Cumberland County.

**F.**   **Summary of Testimony from Expert Witnesses**

Joseph Stine – Mr. Stine is a former police chief who has over 25 years of experience
working as a police officer.  Mr. Stine opines that Officers Berresford and Hart acted in
conformity with generally accepted practices and procedures when they served the
involuntary commitment warrant on Decedent and that the use of deadly force was
justified.

Dr. Robert Wolf, Ed.D. M.B.A. – Dr. Wolf is a Certified Rehabilitation Economist.  Dr.
Wolf reviewed various documents, including Decedent's school records and tax returns.
Based upon Decedent's background, Dr. Wolf opines that Decedent's economic losses
range from $0 to approximately $45,000.

**G.**   **Special Comments**

None at the present time.

**H.**   **Summary of Legal Issues**

The WSPD and Chief Dougherty have filed a motion for summary judgment and a

motion in limine to preclude Plaintiffs from offering the opinions and testimony of Dr. Suzanne

Vogel-Scibilia against them.  Both of these motions are currently pending before this Court and the relevant legal issues are summarized therein.

**I.       Stipulations Desired**

None at the present time.

**J.       Estimated Number of Trial Days**

The WSPD and Chief Dougherty estimate that a trial in this case would last approximately 10 days.

**K.      Other Matters To Be Tried**

None at the present time.

**L.      Schedule of Exhibits**

See Exhibit "B" attached hereto.  The WSPD and Chief Dougherty reserve the right to use any exhibit identified by Plaintiffs, Defendant Holy Spirit Hospital or Defendant Cumberland County.

**M.      Special Verdict Questions**

None at the present time.

**N.      Notification of Person with Settlement Authority**

Counsel for the WSPD and Chief Dougherty has notified a person with settlement authority that she must attend both the pretrial conference (scheduled for May 27, 2003) and the trial (scheduled to begin on June 9, 2003), or, upon approval of the Court, be available by telephone during the pretrial conference and trial.

**O.      Certification Regarding Depositions**

The WSPD and Chief Dougherty intend to introduce a videotape deposition from its damages expert, Dr. Robert Wolf.  The deposition is being scheduled for the end of May 2003. After the deposition is taken, counsel for the WSPD and Chief Dougherty intends to confer with

-6-

all counsel in this case in an effort to eliminate irrelevancies, side comments, resolved objections and other matters not necessary for consideration by the trier of fact.

**P.**     **Requests for Findings of Fact and Law**

      Not Applicable.

                                        Respectfully submitted,

Dated: May 13, 2003

                                        David J. MacMain (Pa. Atty. I.D. No. 59320)
Gregory J. Hauck (Pa. Atty. I.D. No. 82958)
MONTGOMERY, McCRACKEN,
   WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA  19109-1099
(215) 772-1500

Attorneys for Defendants West Shore
Regional Police Commission and Chief
Howard Dougherty

# EXHIBIT "A"

## STATEMENT OF UNDISPUTED FACTS BETWEEN PLAINTIFFS AND THE WEST SHORE REGIONAL POLICE COMMISSION AND CHIEF HOWARD DOUGHERTY

On or about February 28, 2003, the West Shore Regional Police Commission (the "WSPD") and Chief Howard Dougherty filed a Statement of Material Facts in Support of their Motion for Summary Judgment. The undisputed facts listed below are those facts which Plaintiffs admitted to in their response to the WSPD's and Chief Dougherty's Statement of Material Facts.

## A.   The Incident

1.   At the time of his death, Ryan Schorr ("Decedent") was a 25 year old man who lived with a roommate, Matthew Gaumer, in the Borough of Wormleysburg.

2.   For a large part of his life, Decedent suffered from bipolar manic disorder, a psychiatric illness which severely disrupted his ability to carry out his daily life activities.

3.   While the disorder was treatable with medication, Decedent failed to take his medication on several occasions, causing him to experience delusions and hallucinations.

4.   On several of these occasions, Decedent had been involuntarily committed pursuant to Section 302 of Pennsylvania's Mental Health Act, 50 Pa. C.S.A. § 7302.

5.   In early November 2000, Decedent's roommate, Mr. Gaumer, became concerned for Decedent's well-being.

6.   He had been friends with Decedent since high school and recognized that Decedent was acting odd.

7.   At some point, Mr. Gaumer learned that Decedent had stopped taking his medication and ceased seeing his psychiatrist.

8.     Omitted.

9.     Mr. Gaumer decided to place a phone call to Decedent's mother, Plaintiff Susan Schorr.

10.    He told her about the odd behavior that Decedent had recently been exhibiting.

11.    For example, earlier that day, Decedent had entered the Hershey Hotel and attempted to get a room, telling hotel staff that he did not carry cash without his bodyguard and stating that the only way he was going to get a room was if he had either a credit card or a gun.

12.    Because of Decedent's unusual behavior, Mr. Gaumer and Mrs. Schorr went to Holy Spirit Hospital, where Mr. Gaumer completed an Application for Involuntary Emergency Examination and Treatment.

13.    In the application, Mr. Gaumer indicated that Decedent should be involuntarily committed because he believed that Decedent was mentally disabled and that he presented a "clear and present danger" to himself or others.

14.    A crisis intervention worker evaluated the application and caused an order to be issued for Decedent's involuntary commitment.

15.    At approximately 7:30 a.m. on the morning of November 18, 2000, Officers Gary Berresford and Harry Hart were dispatched to execute the Section 302 warrant and corresponding order that had been issued for Decedent.

16.    When the officers arrived at Decedent's house, they explained that they were there to take him to the hospital.

17.    Decedent told the officers that he was losing a million dollars a day by putting up with "this bullshit" and that he had "a license to kill from the President."

-2-

18.     When the officers told Decedent that they could all go to the hospital together where they could talk about this situation, Decedent became complacent.

19.     The officers then transported Decedent to the hospital and escorted him into a room in the Emergency Department that is specifically adapted for patients that present a security risk.

20.     The officers remained at the hospital until hospital personnel indicated that they were not needed anymore.

21.     Despite Decedent's emotional problems, the officers handled the first encounter without any problems or difficulties.

22.     Shortly after 9:00 a.m. that morning, a crisis intervention worker attempted to enter Decedent's room so that she could read him his rights.

23.     When she opened the door, Decedent rushed toward her, pushed her backwards and fled from the hospital.

24.     A nurse quickly called 911 and informed the operator that Decedent had escaped.

25.     Police began searching the vicinity for Decedent.

26.     At approximately 11:20 a.m., Mrs. Schorr notified police that Decedent had returned to his home.

27.     Cumberland County Control radioed Officers Berresford and Hart and informed them that Decedent was back home.

28.     The officers approached the front of Decedent's house, repeatedly banging on Decedent's door and trying to contact Decedent by calling him on the phone, but received no response.

29.     The officers then walked around the back of the house and discovered that a sliding glass door was unlocked.

30.     The officers entered the house and could hear loud music coming from upstairs. Officer Hart called out: "Police officers.  We're here.  We need to talk to you.  Come on out and talk to us."

31.     Omitted.

32.     Officer Berresford proceeded up the stairs first with Officer Hart following a few steps behind.

33.     When he reached the top of the stairs, Officer Berresford peeked around the corner in the direction of the music.

34.     He saw Decedent standing in his bedroom wearing a hat and a long shaggy white coat.

35.     The coat was hanging open and Officer Berresford could see that Decedent had no clothes on underneath the coat.

36.     A physical struggle between Officer Berresford and Decedent ensued, during which Officer Berresford's finger was shot off when his pistol discharged.

37.     Omitted.

38.     Omitted.

39.     When Officer Hart entered the bedroom, he saw Officer Berresford on his knees with Decedent on top of him.

40.     Omitted.

41.     Omitted.

42.     Omitted.

43.     Omitted.

44.     Omitted.

45. Decedent – whose coat had come off during the altercation and was now completely nude – ran out of the bedroom.

46. Omitted.

47. After Decedent fled from the bedroom, Officer Berresford was bleeding.

48. Officer Hart radioed for back-up and requested medical assistance.

49. Shortly thereafter, however, Decedent suddenly reappeared in the doorway of the bedroom with a pot and a pan.

50. Omitted.

51. Omitted.

52. Officer Hart fired several shots at Decedent, which resulted in Decedent's death.

53. The autopsy of Decedent revealed that there were traces of the illegal drugs Ecstasy and marijuana in his blood stream.

54. Omitted.

55. Omitted.

56. Because officers from the WSPD were involved in the shooting of Decedent, the investigation was turned over to the District Attorney's Office for Cumberland County.

57. The District Attorney's Office convened a grand jury, which heard testimony from 44 witnesses and reviewed 180 exhibits.

58. Omitted.

**B.** **The WSPD**

59. The WSPD was formed in 1995 by an agreement between the Boroughs of Lemoyne and Wormleysburg for the purpose of providing police services to both boroughs.

60. All persons employed as police officers in the Commonwealth of Pennsylvania – including officers of the WSPD – must be certified by the Municipal Police Officers Education and Training Commission ("MPOETC").

61. MPOETC requires officers to receive both basic training, which is often referred to as "Act 120" training, and annual training, which is often referred to as "Act 180" training.

62. At the time of the incident involving Decedent, both Officer Berresford and Hart were certified and in good standing with MPOETC.

63. Omitted.

64. Omitted.

65. Aside from the incident involving Decedent, not once between January 1, 1998 and December 31, 2000 had the execution of an involuntary commitment order resulted in the use of force by police officers or physical injury to anyone.

66. Additionally, Chief Dougherty testified that in the ten (10) years preceding the incident with Decedent, there had never been a shooting involving an officer of the WSPD.

## C. Officer Berresford

67. Officer Berresford graduated from the police academy in 1978.

68. He has worked as a police officer continuously from that time until the present, except for a brief period between September 1990 and April 1991.

69. He began working as a patrolman with the WSPD at the time of its inception in 1995.

70. Since his graduation from the police academy, Officer Berresford has attended training courses on various topics, including training on the use of firearms, ASP batons and pepper spray.

71. Omitted.

72.     As a rookie, he accompanied other officers and observed how to properly serve the warrant.

73.     Officer Berresford testified that at the time he executed the involuntary commitment order for Decedent, he felt as if he was qualified and properly trained to do so.

74.     Officer Berresford estimated that over the course of his career, approximately 50 percent of the calls that he has handled involved someone with some nature of emotional disturbance.

75.     He explained that he has very rarely had any difficulty in dealing with these types of people as he has usually been successful in talking them down to where they can talk reasonably with one another.

76.     During his career with the WSPD, there have never been any complaints by a citizen or any lawsuits of any type filed against Officer Berresford.

77.     In both 2001 and 2002, MPOETC introduced courses for police officers in Pennsylvania that were aimed at assisting officers in the recognition of various disabilities.

78.     Officer Berresford took both of these courses and testified that there was nothing that he learned which would have made him handle the incident involving Decedent any differently.

**D.     Officer Hart**

79.     Officer Hart was first hired as a police officer by the New Cumberland Police Department in 1965.

80.     He retired from that department as a sergeant in 1990, after having worked there for 25 years.

81.     Between 1990 and 1994, Officer Hart worked as a police officer in the Borough of Lemoyne and from 1995 to the present, he has worked for the WSPD.

82.     At the beginning of his career, Officer Hart received police training when he attended programs at the Harrisburg City Police School and the Municipal Police Officer's Training Academy in Hershey.

83.     Each of these training programs lasted about three months.

84.     Since the early 1980's, he has attended the annual training courses that are required to be taken by all police officers in Pennsylvania.

85.     Also, in the early 1990's, he was certified as an instructor for the ASP baton.

86.     Omitted.

87.     He estimated that over the course of his career, he has served several dozen involuntary commitment warrants.

88.     He also estimated that about 50% to 60% of the calls that he handles involves someone who is emotionally upset.

89.     Officer Hart explained that he has received both formal and on-the-field training with respect to dealing with these types of people.

90.     Officer Hart also testified that at the time of the incident involving Decedent, there was no question in his mind about how to properly execute an involuntary commitment order.

91.     Like Officer Berresford, there have never been any citizen complaints or any lawsuits of any type filed against Officer Hart.

92.     In the years following the incident involving Decedent, Officer Hart attended the courses offered by MPOETC that were aimed at assisting officers in the recognition of various disabilities.

93.     Officer Hart testified that there was nothing that he learned which would have made him handle the incident differently.

# EXHIBIT "B"

## CLERK'S EXHIBIT LISTING

**JUDGE:**     Judge Yvette Kane

**Abbreviated Name of Case:** Schorr v. West Shore Regional Police Commission, et al.

**Case No.::**     1:CV-01-930

**Name of party submitting this list:**     West Schorr Regional Police Commission and Chief Howard Doughterty

**(Judge's trial notes:   Vertical lines equal ditto marks throughout; W equals witness)**

| Exhibit Initial and No. | Description of Object or Item | Identified in Court | Date Admitted |
|---|---|---|---|
| D100 | Complaints on November 18, 2000 relating to incident | | |
| D101 | Cumberland County Police Communications relating to shooting incident | | |
| D102 | Cumberland County Pennsylvania Public Safety Communications on November 18, 2000 | | |
| D103 | Timeline | | |
| D104 | E-mail from Howard Dougherty, dated November 19, 2000 | | |
| D105 | Memorandum from Howard Dougherty, dated November 19, 2000 | | |
| D106 | Memorandum from Howard Dougherty, dated May 29, 2001 | | |
| D107 | List of Officer Injuries | | |
| D108 | Letter from John Sancenito to Howard Dougherty, dated December 6, 2000 | | |
| D109 | Subpoena from Commonwealth of Pennsylvania to Howard Dougherty, dated December 4, 2000 | | |
| D110 | Letter from Howard Dougherty to John Sancenito, dated December 11, 2000 | | |
| D111 | Press Release regarding Grand Jury Report | | |
| D112 | Order Accepting and Filing Investigating Grand Jury Report No. 1 | | |

| | |
|---|---|
| D113 | Report No. 1 of Grand Jury |
| D114 | Letter from Howard Dougherty to Michael Schwoyer, dated December 11, 2000, and attachment |
| D115 | Letter from Michael Schwoyer to Chiefs of Police, dated December 7, 2000 |
| D116 | News Releases from Cumberland County Coroner's Officer |
| D117 | Resolution 1995-1 of the West Shore Regional Police Department |
| D118 | General Order 95-2, Impact and Secondary Weapons |
| D119 | General Order 95-3, Vehicle Inventory Search Policy |
| D120 | General Order 95-5, Evidence and Property Control Policy |
| D121 | General Order 95-6, Motor Vehicle Pursuit Policy |
| D122 | General Order 95-6, Use of Deadly Force |
| D123 | General Order 95-8, Domestic Violence Information Form |
| D124 | General Order 95-9, Use of Force |
| D125 | General Order 95-10, Confidentiality of Records |
| D126 | General Order 95-11, Dissemination of Information |
| D127 | General Order 96-1, Criminal Arrest Processing Policy |
| D128 | General Order 97-1, Domestic Violence Policy |
| D129 | General Order 98-1, Silent Alarm Response Policy |
| D130 | General Order 99-1, Information System Security and Authorizations |
| D131 | General Order 99-2, Acutrak |
| D132 | General Order 2000-1, Automated External Defibrillators |
| D133 | Organizational Chart |
| D134 | General Order 2000-2, Investigative & Technical Services |
| D135 | General Order 2000-4, Safe Operation of Vehicles |
| D136 | Mandatory In-Service Training, 1991 Through 2002 |
| D137 | Mandatory In-Service Training, 1998 Schedule |
| D138 | Mental Health & Mental Health Retardation Act of 1996 |
| D139 | West Shore Regional Police Department Police Manual |
| D140 | Howard Dougherty's Curriculum Vitae |
| D141 | Personnel Records of Gary Berresford |
| D142 | Personnel Records of Harry Hart |
| D143 | Curriculum Vitae and Report of Robert P. Wolf |

| D144 | Curriculum Vitae and Expert Report of Joseph J. Stine | | | | |
| D145 | Ryan Schorr's Tax Returns for years 1995-2000 | | | | |
| D146 | Certificate for Letters of Administration | | | | |
| D147 | Receipts from expenses relating to Ryan Schorr that were paid after his death | | | | |
| D148 | Application for involuntary emergency examination and treatment of Ryan Schorr, dated 11/00 | | | | |
| D149 | Event Report Forms, dated November 18, 2000 | | | | |
| D150 | Written statement of Carol Joerger | | | | |
| D151 | Written statement of David Spurrier | | | | |
| D152 | Crisis Intervention Log, dated November 18, 2000 | | | | |
| D153 | Cumberland – Perry Counties Mental Health – Mental Retardation Program Contract | | | | |
| D154 | John R. Dietz Emergency Center – Management of the Acutely Disturbed Patient Policy #660.50 | | | | |
| D155 | Holy Spirit Hospital Community Mental Health Center – Crisis intervention service – Management of Acutely Disturbed Patient in ECU | | | | |
| D156 | John R. Dietz Emergency Center – Management of the Psychiatric Patient in the Emergency Center Policy #660.00-03 | | | | |
| D157 | Safety Manual | | | | |
| D158 | Restraints/Protective Devices Policy #31.90 | | | | |
| D159 | Holy Spirit Hospital – Security Manual – Restraint (Patient) Policy #15.03 | | | | |
| D160 | Holy Spirit Hospital – ECU Seclusion Room draft policy #40.01 | | | | |
| D161 | Medical records of Ryan Schorr, dated November 18, 2000 | | | | |
| D162 | Diagram of first floor of Ryan Schorr's house | | | | |
| D163 | Diagram of second floor of Ryan Schorr's house | | | | |
| D164 | Tape Summaries | | | | |
| D165 | Letter from Heidi Bowen to Matt Gaumer | | | | |
| D166 | Incident Report No. 6843 | | | | |
| D167 | Incident Report No. 6844 | | | | |
| D168 | Ira Somerson's diary | | | | |
| D169 | Letter from Ira Somerson to Gerald Williams, dated September 9, 2002 | | | | |
| D170 | Letter from Gerald Williams to Ira Somerson, dated October 10, 2002 | | | | |

-3-

| | |
|---|---|
| D171 | Letter from Gerald Williams to Ira Somerson, dated August 28, 2002 |
| D172 | Toxicology report of Theodore Siek |
| D173 | Application for involuntary emergency examination and treatment of Ryan Schorr, dated 6/99 |
| D174 | Application for involuntary emergency examination and treatment of Ryan Schorr, dated 5/99 |
| D175 | Application for involuntary emergency examination and treatment of Ryan Schorr, dated 5/95 |
| D176 | Holy Spirit Hospital Social History of Ryan Schorr, dated May 1995 |
| D177 | Investigator's notes of interview with Susan Schorr |
| D178 | Investigator's narrative of interview with Susan Schorr |
| D179 | Transcript and Communications Log Times |
| D180 | Transcript of Taped Statement of Matthew Gaumer on November 28, 2000 |
| D181 | Photographs of Officer Berresford's injuries |
| D182 | Photographs of Officer Hart's injuries |
| D183 | Photographs of West Shore Regional Police Cruiser |
| D184 | Photographs of pot used in assault of officers |
| D185 | Photographs of air rifle used in assault of officers |
| D186 | Photographs of back of 445 Meadow Drive |
| D187 | Photographs of first floor of 445 Meadow Drive |
| D188 | Photographs of second floor of 445 Meadow Drive |
| D189 | Photographs of stairs leading from first floor to second floor of 445 Meadow Drive |
| D190 | Photograph of scissors behind sofa |
| D191 | Court records from Susan Schorr v. Keith Schorr, No. 2228 DR 1989 (Dauphin Co.) |
| D192 | Court records from Schorr v. Schorr, No. 4400 S 1989 (Dauphin Co.) |
| D193 | Court records from Schorr v. Schorr, No. 445 S 96 (Cumberland Co.) |
| D194 | Ryan Schorr's records from Shippensburg University |
| D195 | Ryan Schorr's records from Susquehanna Township High School |
| D196 | Records relating to Estate of Ryan Schorr produced by Ronald Archer |
| D197 | Ordinances of the Borough of Lemoyne and the Borough of Wormleysburg creating the West Shore Regional Police Department |

-4-

| D198 | Merger Agreement between Borough of Wormleysburg and Borough of Lemoyne, dated January 1, 1995 | | |
| D199 | Interrogatory and Documents Responses of Plaintiffs | | |
| D200 | Letter from Jamie C. Ray to Gregory J. Hauck supplementing interrogatory responses, dated June 25, 2002, K. Schorr Dep. Ex. 7 | | |

-5-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing pretrial memorandum to be served, via first-class mail, postage prepaid, upon each of the following persons:

Gerald J. Williams, Esquire
Williams, Cuker & Berezofsky
One Penn Center
1617 JFK Boulevard, Suite 800
Philadelphia, PA  19103-1895
Attorney for Plaintiffs

John F. Yaninek
Mette, Evans & Woodside
3401 North Front Street
P.O. Box 5950
Harrisburg, PA  17110-0950
Attorney for Holy Spirit Hospital and
Cumberland County

Dated:  May 13, 2003

Gregory J. Hauck