IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH I. SCHORR and SUSAN SCHORR, In their own right and as personal representatives of the Estate of Ryan K. Schorr,<br>　　　Plaintiffs<br><br>　　v.<br><br>BOROUGH OF LEMOYNE; BOROUGH OF WORMLEYSBURG; WEST SHORE REGIONAL POLICE DEPT.; HOWARD DOUGHERTY, Chief, West Shore Regional Police Dept.; CUMBERLAND COUNTY; ROBERT GORIL, Executive Director, Cumberland County Mental Health/ Mental Retardation Dept.; HOLY SPIRIT HOSPITAL, and WEST SHORE REGIONAL POLICE COMMISSION,<br>　　　Defendants | CIVIL ACTION NO. 1:CV-01-930<br><br>(Judge Kane) |

### MEMORANDUM AND ORDER

Before the Court is Defendant Holy Spirit Hospital's motion for summary judgment. The motion has been fully briefed and is ripe for disposition. For the reasons that follow, the motion will be granted in part and denied in part.

**I.　Background**

This case arises out of the death of Plaintiffs' son, Ryan Schorr. Schorr was afflicted with bipolar disorder and had been under treatment for his condition for several years. Because Schorr's condition was escalating, his roommate, Matthew Gaumer, after consulting with a crisis

worker at Holy Spirit Hospital along with Schorr's mother, signed paperwork requesting an involuntary commitment of Schorr. A warrant was issued by the West Shore Regional Police pursuant to § 302 of the Pennsylvania Mental Health Procedures Act ("MHPA"), 50 P.S. § 7302. On November 18, 2002, two officers from the West Shore Regional Police, Officers Hart and Berresford, took Schorr into custody and transported him to the emergency department of Holy Spirit Hospital.

Schorr was locked into a seclusion room, where he became agitated and threatening. The on-duty physician, who was not a psychiatrist, examined Schorr briefly and signed the § 302 commitment. During the initial examination, a security guard was posted outside the door, but the guard left the area before a crisis intervention worker entered the room in order to read Schorr his rights. Schorr pushed past the worker and ran out of the hospital. Hospital personnel then notified the police department of Schorr's elopement.

After a phone call from Schorr's mother in which she directed the police to Schorr's home, Officers Hart and Berresford returned to Schorr's home. After knocking on the door and receiving no response, the officers entered through a back door that was partially open. Upstairs, they found and confronted Schorr in his bedroom. A violent struggle ensued, during which Schorr shot at Officer Berresford's left ring finger, and Officer Hart struck Schorr repeatedly with a baton. At some point in the struggle, Schorr fled the house and went to the police officers' car. The officers remained in Schorr's bedroom and called for back up. Schorr then returned to the bedroom wielding pots and pans. Officer Hart shot and killed Schorr.

On May 25, 2001, Schorr's parents, Susan and Keith Schorr, brought this action in their own right and as personal representatives of Schorr's estate against Holy Spirit Hospital,

Cumberland County, West Shore Regional Police Commission ("Commission"), Chief of Police Howard Dougherty, and several other defendants that have since been dismissed. All remaining defendants filed motions for summary judgment.

## II.    Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56. A factual dispute is material if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. Id. at 249. The nonmoving party receives the benefit of all reasonable inferences. Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint. Instead, [it] must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." Id. at 322.

## III.    Discussion

The remaining claims against Holy Spirit are as follows: Count II, brought pursuant to 42 U.S.C. § 1983; Count III, a state law negligence and/or gross negligence claim; Count VI, brought pursuant to Pennsylvania's Survival Act, and Count VII, a wrongful death claim. Holy Spirit has moved for partial summary judgment, seeking to dismiss Counts II and III in their entirety and Count VII insofar as it seeks damages for loss of fillial consortium.

### A. Section 1983 Claim

Holy Spirit argues that it is not a state actor and therefore cannot be liable to Plaintiffs for any alleged violations of constitutional rights pursuant to 42 U.S.C. § 1983.

To state a claim under 42 U.S.C. § 1983,[1] a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). Here, the liberty interest involved is clear. Addington v. Texas, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."). The only question then is whether Holy Spirit acted under color of state law in its involvement in the challenged conduct and policy failures. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (stating that there are circumstances in which "seemingly private behavior may be fairly treated as that of the State itself").

Acting "under color of state law" requires that the defendant in a § 1983 action have

---

[1] The statute provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected" any person to the deprivation of any right protected by federal law or the United States Constitution. 42 U.S.C. § 1983.

exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).

"In cases under §1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794 n.7 (1966); see also Robison v. Canterbury Vill., Inc., 848 F.2d 424 (3d Cir. 1988). Thus, "[t]he ultimate issue in determining whether a person is subject to suit under §1983 is the same question posed in cases arising under the Fourteenth Amendment:  is the alleged infringement of federal rights fairly attributable to the State?" Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). To constitute state action, first, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. . . . no one fact can function as a necessary condition across the board for finding state action[.]" Brentwood Acad., 531 U.S. at 295.

The Supreme Court has articulated and refined a number of tests that can be used by courts in determining whether the challenged conduct can be attributed to the state:  (1) the "public function" test, which examines "whether the function performed has been traditionally the exclusive prerogative of the State," Rendell-Baker, 457 U.S. at 842; (2) the "close nexus" test, Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974); (3) the "state compulsion" test, wherein a court determines whether a state "has exercised coercive power or has provided such significant

encouragement, either overt or covert, that the choice must in law be deemed to be that of the State," Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); and (4) the "joint action" test, Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970).  The Supreme Court has often applied other factors or resolved a state action question without reference to any of the other tests.  See, e.g., Brentwood, 531 U.S. 288 (using examination of interdependence of public schools and athletic association to hold that the athletic association's regulatory activity is state action due to "the pervasive entwinement of state school officials in the structure of the association"); Burton v. Wilmington Parking Auth., 365 U.S. 715 (1961) (utilizing a "symbiotic relationship" test to hold that the state was a joint participant with the operator of a restaurant in racially discriminatory practices).[2]

In order to determine which test should be applied to a given set of facts, courts must carefully investigate the circumstances of each case.  Burton, 365 U.S. at 722; Brown v. Philip Morris Inc., 250 F.3d 789, 801 (3d Cir. 2001). The state action inquiry is "necessarily fact-bound," Lugar, 457 U.S. at 939, "[b]ut any approach a court uses must remain focused on the heart of the state action inquiry," which is "to discern if the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  Groman v. Township of Manalapan, 47 F.3d 628, 639 n.17 (3d Cir. 1995) (citing West, 487 U.S. at 49) (internal quotation marks omitted).

In this case, Plaintiffs argue that Holy Spirit meets the public function, symbiotic relationship, and close nexus tests, but their brief details facts that relate only to the last of these

---

[2]But see, e.g., Crissman v. Dover Downs Entertainment Inc., 289 F.3d 231, 245-246 (3d Cir. 2002) (summarizing Third Circuit state action jurisprudence and recognizing the limitations of Burton due to the fact-specific nature of the "involvement and interdependence" present there).

tests. This Court will first look at Third Circuit precedent and non-precedential cases which have dealt specifically with involuntary commitment, then examining the particular circumstances of this case, will employ the approach that appears to be best suited to its facts.

Holy Spirit argues that pursuant to Janicsko v. Pellman, 774 F. Supp. 331 (M.D. Pa. 1991), the challenged conduct surrounding the involuntary commitment of Schorr cannot be attributed to the state. In Janicsko, the plaintiff argued "in a rather conclusory fashion," that § 302(b) of the MHPA, 50 P.S. § 7302(b), established the necessary nexus between the actions of the defendants and the state. Id. at 336. The court entered summary judgment in favor of the defendants on this claim, apparently not having been provided any additional facts or bases by plaintiff to find state action other than this attempt to use the MHPA to convert the acts into state action. Examining the relevant provisions of the MHPA, the court concluded that although the statute suggested "a degree of coercion," it could not "hold that the standards set by the MHPA rise to the level of coercion." Id. at 338.

The court further rejected a public function argument, noting that plaintiff did not argue commitment of mentally ill was a public function and expressing concurrence with the Seventh Circuit's historical analysis of private commitment in Spencer v. Lee, 864 F.2d 1376 (7th Cir. 1989). The Janicsko court further relied on Spencer v. Lee in rejecting the plaintiff's nexus argument, despite the differences between the Pennsylvania statute and that at issue in Spencer. Janicsko, 774 F. Supp. at 337-38.

In Spencer, the Seventh Circuit became the first court[3] to hold that private physicians and

---

[3]Prior to the Seventh Circuit decision in Spencer, most of the district courts to have considered the issue found state action or suggested so. See, e.g., Davenport v. Saint Mary Hospital, 633 F. Supp. 1228, 1237 (E.D. Pa. 1986); Plain v. Flicker, 645 F. Supp. 898, 908

a private hospital did not act under color of state law when they committed mentally disturbed person. 864 F.2d 1376.[4] Comparing a private commitment to a citizen's arrest, the court found that the treatment of the mentally disabled is not a function that has "traditionally been the exclusive prerogative of government." Id. at 1379 (emphasis in original). The court noted that "[i]f the State of Illinois ordered or encouraged private persons to commit the mentally ill, they would indeed be state actors, for they would be doing the state's business." Id. at 1378.

The public function test employed by the Spencer court has been called "the most rigorous" of the state action inquiries. Brown v. Philip Morris Inc., 250 F.3d 789, 802 (3d Cir. 2001). Because courts generally emphasize the "exclusivity" requirement, the high standard is rarely found to have been met. Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995). From the guidance provided by these cases, then, this Court can assume that the involuntary commitment here would probably fail the public function test, as it is unlikely to overcome the exclusivity requirement. However, the actions complained of by Plaintiffs may meet another state action test. Furthermore, the close nexus analysis of the Janicsko court is not controlling because the issue is "necessarily fact-bound," Lugar, 457 U.S. at 939, and the plaintiff there apparently did

---

(D.N.J. 1986); Willacy v. Lewis, 598 F. Supp. 346, 349 (D.D.C. 1984); Brown v. Jenson, 572 F. Supp. 193, 197 n.1 (D. Colo. 1983); Kay v. Benson, 472 F. Supp. 850, 851 (D.N.H. 1979); Ruffler v. Phelps Mem. Hospital, 453 F. Supp. 1062, 1068-70 (S.D.N.Y. 1978).

[4]Other Circuit courts have followed the Seventh Circuit's lead and similarly held. E.g., S.P. v. City of Takoma Park, 134 F.3d 260 (4th Cir. 1998); Pino v. Higgs, 75 F.3d 1461, 1466 (10th Cir. 1996); Ellison v. Garbarino 48 F.3d 192 (6th Cir. 1995); Rockwell v. Cape Cod Hosp., 26 F.3d 254 (1st Cir.1994). However, all of these cases rely solely upon the existence of a permissive statutory scheme regulating involuntary commitments in ruling that the state action requirement was not met. As will be seen in the discussion above, the factual situation presented here is distinguishable from this line of cases. For instance, the Ellison court distinguishes West v. Atkins on the basis that the hospital and physicians were "in no way contractually bound to the state," 48 F.3d at 197; no such distinctions are applicable to the present case.

not put forth any evidence of a nexus between the hospital and the state beyond the statutory scheme.  See Janicsko,  774 F. Supp. at 336.  Therefore, this Court will not end the inquiry here.

The United States Court of Appeals for the Third Circuit has not addressed the precise issue confronted by this Court.  However, in Holton v. Crozer-Chester Medical Ctr., the Third Circuit vacated the district court's finding of no state action based on the new allegation that the Social Security Act mandated that the state provide family planning services for certain Medicaid recipients and that the state may contract with private hospitals, such as the defendant, to provide those services on behalf of the state.  The Court found that under this new circumstance, the district court could find state action.  560 F.2d 575 (3rd Cir. 1977).

In a case involving a private school specializing in educating and treating juvenile sex offenders, the Third Circuit found no state action and contrasted that plaintiff's case to one "of a prisoner or a person who has been involuntarily civilly committed."  Robert S. v. Stetson Sch., Inc., 256 F.3d 159, 166 (3d Cir. 2001).  The Court noted that the plaintiff's placement in the school was not "involuntary" and did not deprive him of his liberty contrary to the wishes of his legal guardian, since his mother placed him there.  Id. at 166-67.  Significantly, the Court stated: "The power that DHS exercised over Robert is not comparable to the power that a state exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment.  The latter power is quintessentially governmental, but a legal guardian's authority over a minor is not."  Id. at 167 n.9 (emphasis added).

The Ninth Circuit, in Jensen v. Lane County found that the involuntary detention situation presented there did not "fall within the rule of the cases concerning private actors who perform a 'public function.'"  222 F.3d 570 (9th Cir. 2000).  Rather, that court held that under the "close

9

nexus/joint action test," the "state has so deeply insinuated itself into this process that there is 'a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself.'" Id. at 575 (quoting Jackson, 419 U.S. at 350).

The court details the connection of the hospital and doctor with the county to find a sufficiently close nexus between the state and the challenged action which "overrides the 'purely medical judgment' rationale of Blum," Id., as follows:

> The record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others. County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both PA [Psychiatric Associates] psychiatrists and county crisis workers), and PA helps to develop and maintain the mental health policies of LCPH [Lane County Psychiatric Hospital].

Id. LCPH was a county hospital that had a contract with the defendant hospital "under which the hospital provides administration and hospital staff to the county." Id. at 573. This intertwined combination of private actors and government officials formed the basis for the court's holding that the contract services provided by the private physician constituted state action. See id. at 575-76.

Other district courts have found state action in the context of involuntary commitment where there was more significant interdependence or entwinement between the state and hospital or doctors than in the cases holding to the contrary. See, e.g., Ruhlmann v. Ulster County Dep't of Soc. Servs., 234 F. Supp. 2d 140, 165, (N.D.N.Y. 2002) (finding material issue of fact as to whether state action issue was satisfied under the compulsion test); Tewksbury v. Dowling, 169

F. Supp. 2d 103, 109 (E.D.N.Y. 2001) (finding that medical defendants acted jointly with state actors and the decision to commit was not made pursuant to "independent medical judgment"); Moore v. Wyo. Med. Ctr., 825 F. Supp. 1531 (D. Wyo. 1993); Rubenstein v. Benedictine Hosp., 790 F. Supp. 396 (N.D.N.Y. 1992) (finding state action where the defendant hospital had a contract with the county to provide the involuntary commitment services at issue).

In Moore, for example, the court found state action for three reasons: (1) the county benefitted from the hospital because the two entities were "financially interdependent;" (2) the county benefitted from the complained of activities because the hospital had a duty under lease agreement with the county to serve indigent patients; and (3) the county retained responsibility for the hospital in that it determined whether the hospital "properly discharges its public mission," even though it did not control the day-to-day activities of the hospital. 825 F. Supp. at 1540. Holy Spirit's arrangement with Cumberland County is analogous to the interdependent relationship in Moore. The two entities have financial interdependence through the various county contracts; Holy Spirit had an obligation under the contract to provide the commitment services and design the policies complained of; and county officials had regular involvement and oversight of Holy Spirit's programs. Although the financial relationship is not as extensive as that in Moore, the other two factors exhibit more entwinement than in that case.

In short, the present case is factually closer to the Ninth Circuit case of Jensen and the district court cases that follow it than it is to Spencer or Janicsko because Plaintiffs are not alleging state action solely on the basis of a statutory scheme, but rather allege a complex relationship between the entities. Like Jensen, this case "falls between lines drawn in other jurisdictions." Jensen, 222 F.3d at 575.

Here, Plaintiff argues that "when Ryan Schorr was brought to [Holy Spirit's] emergency department for involuntary psychiatric evaluation and confined there, he was receiving County service, provided under the auspices of the County, paid for by the County, and delivered by what was in effect the County's alter ego." (Pl. Br. at 7). The record reveals that Holy Spirit has a contract with the County which obligates them to provide crisis intervention services that are mandated to the county by statute (See Doc. No. 98, Ex. G ("contract")). The contract requires a County delegate to handle all section 302 commitments, id. at app. A, and such was the case with Schorr's commitment (Briscese Dep. at 13-14). The contract requires Holy Spirit to maintain a patient grievance procedure and the County reviews the grievances. (Herman Dep. at 45-46; contract app. A).

Furthermore, there is daily involvement and oversight of the county such that it has influence over the policies of the Crisis Intervention program at Holy Spirit. For example, the county does a variety of informal and formal periodic reviews and audits, (Bucciferro Dep. at 15-16; Herman Dep. at 24-28), receives monthly reports, (Bucciferro Dep. at 15; Herman Dep. at 22-23 & 43-44), provides the hospital with set service expectations, (Bucciferro Dep. at 15), and the County entirely funds the program (Bucciferro Dep. at 14; Herman Dep. at 22-23; contract at 3 & app. B). The contract requires a certain level of staff expertise and sets forth other expectations of the county, (contract apps. A & C; Bucciferro Dep. at 15; Herman Dep. at 30; 47), and lists the program staffing as "county weekly hours" and "county salary." (Contract app. A). Furthermore, the County assisted the program in obtaining state licencing for its emergency mental health services (Herman Dep. at 16-20), and the County mental health services director is in contact with the Crisis Intervention staff at Holy Spirit "almost daily." Id. at 24.

According to Plaintiffs' allegations, the concerted action was consistent with this close nexus in Schorr's case. The hospital coordinated the execution of the § 302 warrant, carried out by policemen, and a county representative was involved throughout the commitment process, as required by the contract. Steve Bucciferro, administrative director of mental health services at Holy Spirit, testified in his deposition that the arrangement between the hospital and the county is very intertwined and was at the time of Schorr's admission to the hospital. For instance, he characterized the hospital's contractual obligation to meet the program's staffing requirements as done "in concert with the county" (Dep. at 16), and described the crisis services as provided by Holy Spirit "as an agent of the county." Id. at 10. He testified that the crisis program funded by the county processes § 302 commitments "for the county," id. at 11, but that commitments can be done outside of the program. Id.

Schorr's commitment was processed through the county-funded program pursuant to the contractual duty to provide the service. By virtue of this contractual relationship with the state, Holy Spirit is authorized and obligated to treat confined mentally disabled persons, such as Schorr. This Court concludes that they do so "clothed with the authority of state law." See West v. Atkins, 487 U.S. 42, 54-56 (1988).

Therefore, for these reasons, this Court cannot find that there are no facts to support a finding that Holy Spirit was acting under color of state law under the close nexus test. Indeed, the evidence of record supports a finding that Holy Spirit was acting under color of state law. Holy Spirit's motion for summary judgment will be denied on this ground.

  **B. Wrongful Death Statute and Loss of Fillial Consortium**

Holy Spirit argues that Plaintiffs' claim for damages for loss of fillial consortium brought

under the Pennsylvania Wrongful Death statute should be dismissed because such damages are not available under Pennsylvania law. Plaintiffs respond that their loss of fillial consortium claim is brought only under their civil rights claim and appear to concede that the damages would not be available under the Pennsylvania statute.

There is no parental right of action for loss of companionship and support provided for explicitly under Pennsylvania's wrongful death statute. 42 P.S. § 8301. Pennsylvania courts have made it clear that such damages are not available under the statute. See, e.g., Schroeder v. Ear, Nose & Throat Assocs. of Lehigh Valley, Inc., 557 A.2d 21 (Pa. Super Ct. 1989) (parents cannot recover damages for loss of consortium of their negligently injured child). The measure of damages for the death of a minor child is limited to "funeral and medical expenses, plus the total earnings which would have been earned by the child up to the age of 21, minus the cost of maintaining the child during this period, with the resulting amount reduced to its present worth." Sinn v. Burd, 404 A.2d 672, 675 n.3 (Pa. 1979) (citation omitted). Therefore, any claim of loss of consortium arising under Count VII of Plaintiff's complaint will be dismissed. However, Plaintiff may recover under their wrongful death claim for the economic value of their son's life as well as the special expenses provided for in the statute. See 42 P.S. § 8301(c).

Furthermore, as this Court has already held, Plaintiff is correct in stating that damages for loss of fillial consortium are available pursuant to their civil rights claims. Any attempt by Cumberland County to argue otherwise is disingenuous and is rejected by this Court.[5]

---

[5]In a footnote in its reply brief, the County adopts West Shore Regional Police Commission's argument that Plaintiffs' § 1983 claim cannot be based on a theory that they were constitutionally deprived of an interest in their son's life, citing to two District of Colorado cases. (Comm'n Br. at 8 n.3 and Holy Spirit Reply Br. at 5-6). This argument has already been explicitly rejected by the Magistrate Court in a section of the Report and Recommendation

14

---

adopted by this Court (Report and Recommendation, Doc. No. 63 at 5-6 n.4) and Defendants have been pointed to contrary legal authority, including Supreme Court cases, by both the Plaintiffs and the Magistrate Court.  See id. at 6 n.4.  Moreover, the cases Defendants cite have been rejected even within the applicable jurisdiction.  See, e.g., Trujillo v. Board of County Commissioners of Sante Fe, 768 F.2d 1186 (10th Cir. 1985); Myres v. Rask, 602 F. Supp. 210 (D. Colo. 1985).  Counsel's approach does not satisfy their duty of candor to the tribunal.

## IV.  ORDER

**AND NOW**, therefore, **IT IS ORDERED THAT** Defendant Holy Spirit Hospital's motion for summary judgment (Doc. No. 78) is **DENIED** in part and **GRANTED** in part as follows:  Plaintiff's claim for damages pursuant to Count VII of their complaint is limited to the damages described above; any claim for loss of fillial consortium under this claim is **DISMISSED**. The remainder of the motion for summary judgment is **DENIED**.

                                                s/Yvette Kane
                                                Yvette Kane
                                                United States District Judge

Date:  May  30 , 2003